**GIBSON, DUNN & CRUTCHER LLP**
J. Eric Wise
Shira D. Weiner
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Proposed Attorneys for the Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|   |   |
|---|---|
| **IN RE:** | : **Chapter 11** |
| | : |
| **NEWLAND INTERNATIONAL** | : **Case No. _____** |
| **PROPERTIES, CORP.,** | : |
| | : |
| **Debtor.** | : |
| | : |

---------------------------------------------------------------x

**DECLARATION OF CARLOS A. SARAVIA,**
**CHIEF OPERATING OFFICER OF NEWLAND**
**INTERNATIONAL PROPERTIES, CORP., IN SUPPORT**
**OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY**
**MOTIONS AND IN ACCORDANCE WITH LOCAL RULE 1007-2**

Carlos A. Saravia, being duly sworn, declares and states:

1.       I am the Chief Operating Officer of Newland International Properties,

Corp. ("***Newland***" or the "***Debtor***"), a Panamanian corporation and the debtor and debtor in

possession in the above-captioned case (the "***Chapter 11 Case***").  I have been employed in this

position through Arias, Serna y Saravia, S.A. ("***AS&S***") as an independent contractor since

April, 2006.  Prior to that, I was Project and Asset Manager, primarily focused on the

conceptualization, structuring and administration of real estate and hotel projects at AS&S, and

prior to that I was Developer and Chief Executive Officer of Brinks de Colombia S.A.
Accordingly, and in such capacity, I am familiar with the day-to-day operations, business, and
financial affairs of the Debtor.

2.      I submit this declaration ("***Declaration***") pursuant to Rule 1007-2 of the
Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***") in support of
the voluntary petition for relief filed by the Debtor under chapter 11 of title 11 of the United
States Code (the "***Bankruptcy Code***") and the motions and applications for related relief filed as
of the date hereof (the "***Petition Date***") or concurrently herewith (collectively, the "***First Day
Motions***") and to assist the Court and other interest parties in understanding the circumstances
giving rise to the commencement of this Chapter 11 Case.  The Debtor intends to continue in the
possession of its property and the management of its business as debtor in possession pursuant to
sections 1107 and 1108 of the Bankruptcy Code.

3.      I have reviewed the First Day Motions or have otherwise had their
contents explained to me, and, to the best of my knowledge, insofar as I have been able to
ascertain after reasonable inquiry, I believe that approval of the relief requested therein is
necessary to minimize disruption to the Debtor's business operations so as to permit an effective
transition into chapter 11, to preserve and maximize the value of the Debtor's estate and,
ultimately, to achieve a successful reorganization.  I also believe that, absent immediate access to
cash collateral and authority to make certain essential payments and otherwise to continue
conducting ordinary course business operations as sought under and described in greater detail in
the First Day Motions, the Debtor would suffer immediate and irreparable harm to the detriment
of its estate and creditors.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's business operations, my review of relevant documents, information provided to me by employees working under my supervision or verified by other executives, employees or the Debtor's professional advisors, and/or my opinion based upon my experience, knowledge and information concerning the Debtor's operations, financials, and the hotel development industry as a whole.  Unless otherwise indicated, the financial information contained herein is unaudited and subject to change.  I am authorized to submit this Declaration on behalf of the Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

5.      This Declaration is divided into four parts.  Part I provides background information with respect to the Debtor's business and its operations.  Part II describes the circumstances giving rise to the commencement of this Chapter 11 Case.  Part III describes the relief sought by the Debtor in each of its First Day Motions.  Part IV sets forth additional information concerning the Debtor as required by Local Rules 1007-2(a) and (b).

## I.

## DESCRIPTION OF THE DEBTOR'S BUSINESS

**A.      Company History and Corporate Structure**

6.      The Debtor is a Panamanian *sociedad anónima* (corporation) controlled by Ocean Point Development Corp., a Panamanian holding company ("***Ocean***"), which in turn is controlled, directly and indirectly, by Roger Khafif, AS&S and Espacios Urbanos S.A.  As discussed more fully below, the Debtor is a real estate development company, established exclusively to develop a luxury hotel and condominium known as the "Trump Ocean Club

International Hotel & Tower," located in Panama City, Panama (the "***Trump Ocean Club***") and the related amenities.

7.     The Debtor was incorporated on March 28, 2006 by public deed number 3,482 from the Ninth Public Notary of Panama and recorded with the Public Registry of Panama on March 30, 2006 under record number 521,258, document number 929,232 of the microfiche section.  The Debtor is not an affiliate of Trump Entertainment Resorts, Inc., Trump Organization, LLC or Trump Marks Panama LLC.

**B.     Current Business and Operations**

8.     The Debtor is a Panamanian real estate development company instituted for the purpose of developing the Trump Ocean Club, a multi-use luxury tower overlooking the Pacific Ocean, with luxury condominium residences, a world-class hotel condominium, a limited number of offices and premier leisure amenities.  The Debtor's principal assets are condominium, commercial and hotel units in the Trump Ocean Club itself and certain adjoining facilities, which serve as its primary sources of revenue to satisfy and meet any outstanding financial obligations.

9.     The Trump Ocean Club is located on the Punta Pacifica Peninsula – one of the most exclusive neighborhoods in Panama City, on approximately 2.8 acres of land, including approximately 295 lineal feet of oceanfront.  The Trump Ocean Club tower has  69 floors of construction, three of which are technical floors dedicated to critical machinery, with the remaining floors  including, among other things, 630 luxury residential condominium units and 369 world-class hotel condominium units, a pier facility, pool deck, 30 boutique shops, 64 office lofts, restaurants and 1592 parking spaces.  The construction of the building is finished and the hotel is currently in operation as are the residences, offices, boutiques and restaurants.  The developers, out of their own funds, are now finishing a private beach club located on Viveros

Island, which is scheduled to be completed in September 2013.  Newland also announced an

agreement with a globally-recognized gaming group, which plans to operate a 5,828 square

meter (approximately 62,700 square feet) casino in the building and to acquire important real

estate units to complement its gaming business.  The transaction remains subject to the

fulfillment of certain conditions for filing and obtaining the necessary authorizations from the

Panamanian Government.  Operating under the internationally recognized "Trump" brand name,

Trump Ocean Club is a unique development not only in Panama, but also in the Central

American and Caribbean regions.

> 10.     As per the Independent Engineer's ("*IE*") Report of September 2012,
construction of the Trump Ocean Club was fully completed in September 2012 at a total cost of
$294.6 million.  The IE also indicated that, despite certain cost overruns, the completion cost of
$1,176 per square meter is competitive when compared with other projects of a similar nature in
the region.

> 11.     As of April 23, 2013, sellout totals approximately $530.2 million,
consisting of 604 sold units aggregating $239.2 million and 495 available units aggregating
$290.9 million.  Of the 604 units sold, 554 units have "closed."[1]  From January 2012 through
April 23, 2013, Newland sold 50 units in gross sales (before broker commissions) in an
aggregate amount of $19.3 million.  Average price per square meter for residential units, condo-
hotel units and commercial space amounted to $3,075, $4,871 and $6,126, respectively.  The 495
units of available inventory include 291 residential condominium units, 201 hotel condominium
units, 2 restaurant spaces, and the casino.

---

[1] A unit is considered "closed" when the buyer has paid the remaining balance and has signed the deed.

12.     As of the Petition Date, the Debtor has approximately 40 direct employees, all of whom work in the Debtor's corporate headquarters in Panama City, Panama. The Debtor's management (which is not part of the above-mentioned 40 employees) is employed by the Debtor through AS&S and work in Colombia.  Pursuant to and in accordance with Panamanian law, the Debtor provides certain healthcare and other benefits to each of its 40 Employees (as defined below).  Pursuant to and in accordance with Colombian law, AS&S also provides certain healthcare and other benefits to each of its employees, which are reimbursed by the Debtor.

## C.     Prepetition Capital Structure[2]

13.     The Debtor's prepetition capital structure is comprised of senior secured notes relating to the financing and development of the Trump Ocean Club and certain other related obligations.  On November 7, 2007, the Debtor entered into that certain indenture, dated as of November 7, 2007, as amended (collectively with such amendments, the "*Indenture*") by and among the Debtor and HSBC Bank USA, N.A., as trustee and HSBC Investment Corporation (Panama) as co-trustee, providing for the issuance of $220,000,000 in Senior Secured Notes due 2014 (the "*Prepetition Senior Secured Notes*") at an offering price of 96.934%.  The Prepetition Senior Secured Notes bear interest at a fixed annual rate of 9.50%, payable semi-annually in arrears, and are due to mature on November 15, 2014.  Proceeds from the issuance of the Prepetition Senior Secured Notes were used to finance construction of the Trump Ocean Club.

---

[2] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

## II.

## EVENTS LEADING TO THE COMMENCMENT OF THE CHAPTER 11 CASE

### A.    Adverse Economic Conditions

14.    The Debtor operates in a highly competitive industry that since 2008 has been significantly impacted by the global economic downturn and has resulted in the deterioration of its business fundamentals.  Despite the completion of the Trump Ocean Club, the Debtor is still facing obstacles in the current aftermath of this global economic downturn, which is compounded by market and industry-wide pressures.  Ongoing developments in international capital markets and the overall impact of the world economic crisis on the real estate business, which have persisted to date, have brought about and exacerbated several trends that subject the Debtor to extraordinary pressure and duress.

15.    First, recent real estate market trends have led to a significant reduction in unit sales over the last few years.  The success of the Trump Ocean Club, which is unquestionably and directly tied to the Debtor's revenues, is highly correlated to the strength of the real estate market that has generally lost the interest of investors as compared to other asset classes.  The sale of units in the Trump Ocean Club has been particularly impacted as the financial losses suffered by affluent customers during the economic crises have adversely affected second home and resort purchases.  While a significant percentage of the Trump Ocean Club units were originally subject to sales contracts, the crisis led to delays or cancellations in closings and in collections of outstanding unit buyer balances.  Furthermore, processing times for the funding of previously approved local bank mortgages, including second mortgages and home equity loans on principal residences, were longer than expected and, in numerous cases, the banks reduced the amount of financing available under such buyer mortgages.  Consequently, the Debtor's ability to collect on receivables generated by sales has been greatly limited.

7

16.     Concomitantly, the Debtor's liquidity has also been reduced to critical levels.  The availability of financing for real estate development companies, including the Debtor, has been dramatically constrained over recent years.  Consequently, the Debtor's development and construction plans have been vastly disrupted.  Finally, global increases in commodity prices and, in particular, the prices of energy, steel, concrete and wood, have resulted in increased overall costs for the construction of real estate.  This, coupled with decreasing revenues and limited access to financing, has dramatically impacted the Debtor's profit margins.  All of these factors have significantly impacted the Debtor's cash flows and the ability of the Debtor to service its debt in accordance with the original debt service schedule, which was established under more favorable, pre-crisis market conditions.

### B.     Prepetition Restructuring Initiatives

17.     As a result of the aforementioned factors, the Debtor's cash flow has been considerably reduced and, in conjunction with substantial cost increases, has resulted in significant liquidity problems and disruptions of construction programs.  Since 2010, however, the Debtor has undertaken a variety of measures to restructure the Prepetition Senior Secured Notes and, as more fully discussed herein, intends to further restructure the Prepetition Senior Secured Notes pursuant to the Plan (as defined below).

18.     Beginning on May 14, 2010, the Debtor completed a consent solicitation and executed a First Supplemental Indenture to the Indenture, thereby amending the Indenture to (i) permit funds held in the accounts pledged as collateral (the "*Collateral Accounts*") for the benefit of the holders of the Prepetition Senior Secured Notes (collectively, the "*Prepetition Noteholders*") to flow through the Collateral Accounts more promptly; (ii) reduce the requirement to retain on deposit an amount equal to twice the amount of the next due interest and principal payments to require an amount equal to one time the amount of such payments; and

8

(iii) modify the definition of the "Collateralization Ratio" and the "Withdrawal Ratio" in the Indenture to add to the numerator a percentage of the list price of each unit that has not been sold at the time the applicable ratios are to be calculated.

19.     Due to liquidity pressures, however, the Debtor did not make the required interest payment and the first scheduled payment of amortization of principal due to the Prepetition Noteholders on November 15, 2011, which constituted an "Event of Default" under Section 6.01(d) of the Indenture.  As such, the Debtor has been and remains in default under the Prepetition Senior Secured Notes ever since.

20.     To address this, the Debtor made attempts immediately thereafter to explore various restructuring avenues for its Prepetition Senior Secured Notes and intensified discussions regarding its options.  In addition, a steering group of Prepetition Noteholders collectively holding or controlling in excess of 41.76% of the outstanding principal amount of the Prepetition Senior Secured Notes (the "***Steering Group***") was formed at that time in response to the Debtor's November 15th payment default.  The Steering Group worked with the Debtor to establish monthly working capital allocations to allow for the continuation of operations and the completion of construction while restructuring negotiations took place.  On March 29, 2012, the Debtor executed the Second Supplemental Indenture to the Indenture, thereby further amending the Indenture to permit monies to be accessed in order to pay ongoing construction costs notwithstanding the November 15th payment default, subject to certain terms and conditions. Such monies were used to fund the remaining construction completion costs of Trump Ocean Club.

21.     Despite these efforts, however, on May 15, 2012, the Debtor again defaulted on its second interest payment and second scheduled payment of amortization of

principal and, in July 2012, informed the Trustee of its default in accordance with the terms of

the "Collateralization Ratio Requirement" of the Indenture from the months of October 2011

through the date of such notice to the Trustee.  Concurrently, the Debtor again made a concerted

effort to address its financial issues and executed the Third Supplemental Indenture to the

Indenture, thereby further amending the priority of payments provisions of the Indenture to

permit monies to be accessed to exercise the repurchase right under the Purchase Option

Agreement, dated as of July 13, 2011, between the Debtor and Global Realty Investments, S.A.,

to repurchase in bulk units to return to inventory the amount of $6.1 million.

22.     Other subsequent modifications to the Indenture were made as well:

- On December 19, 2012, the Debtor executed the Fourth Supplemental Indenture to the Indenture. The Fourth Supplemental Indenture created a separate account to be held in Panama by the Co-Trustee, from which separate account brokers' commissions due in respect of a unit purchase agreement would be segregated for payment to the relevant obliges of such obligations; all other amounts in respect of unit purchase agreements would continue to be transferred to the HSBC Panama Account and onward to the Release Account and Collection Account (each as defined below), as set forth in the Indenture, as amended by the first, second, and third supplements thereto.

- On February 6, 2013, the Debtor executed a Fifth Supplemental Indenture to the Indenture. The purpose of the Fifth Supplemental Indenture was to permit the Trustee or the Co-Trustee, as applicable, to consent to the registration of a unit purchase agreement entered into in connection with a sale of the casino at the Trump Ocean Club, and any other unit purchase agreement signed with the buyer of the casino or an affiliate of the buyer of the casino, with the Registro Público de Panamá and to permit the Debtor to cancel any such registration with the Registro Público de Panamá should such a unit purchase agreement for the casino be terminated.

23.     Notwithstanding these efforts, the Debtor remains in default under the

Prepetition Senior Secured Notes, its single largest liability.  The Debtor has determined that

commencing this Chapter 11 Case, through which it will seek a restructuring of its Prepetition

Senior Secured Notes pursuant to its proposed plan of reorganization (the "***Plan***"), represents the

best available alternative for the Debtor to meet its immediate and ongoing liquidity needs.  In

light of adverse global economic conditions and the likely unavailability of short-term financing, the Debtor must restructure its financial debt in order to remain a viable business enterprise. Although the Debtor continues to develop and plans to sell additional units in the Trump Ocean Club, it is not anticipated that such sales are likely to generate sufficient cash flow to cover current operating costs and debt service obligations absent a restructuring of the Debtor's financial debt. Finally, a restructuring of the Prepetition Senior Secured Notes is necessary in order to satisfy current "Events of Default" under the Prepetition Senior Secured Notes. Through the hard work and dedication of its management team, and with the assistance of its restructuring professionals, the Debtor has made tremendous strides in achieving key stakeholder support for a comprehensive restructuring solution that will address its financial and operational needs.

**III.**

**THE PROPOSED PREPACKAGED PLAN OF REORGANIZATION**

A.    **The Plan Support Agreement**

24.    As discussed above, the Debtor's management team has undertaken extensive efforts in response to the challenges Newland has faced. In the months prior to the Petition Date, the Debtor engaged in substantial discussions and negotiations with its key constituents in furtherance of the necessary restructuring of its debt obligations. Specifically, the Debtor has been diligently working with its financial advisors and Prepetition Noteholders to renegotiate the terms of the Prepetition Senior Secured Notes pursuant to the Plan Support Agreement, as defined below and as attached hereto as **Exhibit A**.

25.    On January 23, 2013, Prepetition Noteholders representing 41.76% in aggregate principal amount of the Prepetition Senior Secured Notes executed a Plan Support Agreement between such Prepetition Noteholders and the Debtor (the "***Plan Support***

*Agreement*"). The Plan Support Agreement outlines a restructuring transaction that would

proceed via a pre-packaged chapter 11 bankruptcy process that would seek consents from

holders of Prepetition Senior Secured Notes (the "***Consenting Noteholders***") to certain

amendments to the Indenture, all supplements thereto, and the Prepetition Senior Secured Notes,

including, among other things, the conversion, whether by amendment or exchange of

Prepetition Senior Secured Notes for new notes (the "***New Notes***"), certain collateral package

enhancements, the deletion of, addition of and amendments to covenants and certain other rights

and remedies, as well the as settlement of certain other issues, as summarized herein, to be

documented in, among other things, the Indenture as modified pursuant to the Plan (the "***New***

***Indenture***"). Pursuant to the terms of the Plan Support Agreement, the Plan will also terminate

the Construction Completion Support Agreement (the "***CCSA***"), and any and all obligations

thereunder in respect of the New Notes of the parties to the CCSA (the "***CCSA Parties***") shall be

released, provided that the CCSA Parties deliver a $5 million limited financial guarantee in

respect of the New Notes pursuant to a settlement agreement. Such an arrangement would

provide a final resolution and settlement of the CCSA.

26.    The Plan Support Agreement, which was executed by approximately 62%

of the Prepetition Noteholders, represents a culmination of months-long efforts on the part of the

Debtor and key constituents to work towards a comprehensive restructuring that is necessary to

deleverage the Debtor's balance sheet to ensure the Debtor's ability to operate as a going

concern. The Plan incorporates the terms of all of the related prepetition agreements, including

the Plan Support Agreement.

**B.      The Proposed Plan of Reorganization**

27.      The salient terms of the Plan, including the proposed treatment of the

Debtor's stakeholders under the Plan, are as follows:[3]

| CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | |
|---|---|
| **Unclassified Claims** | |
| **Administrative Expense Claims** | **Treatment.**  On the later of (a) the effective date of the Plan (the "***Effective Date***") or (b) if an Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Expense Claim becomes Allowed, each holder of an Administrative Expense claim shall either receive (i) full cash payment in the amount of such Allowed Administrative Expense Claim, or (ii) such other treatment that the Debtor and such holder shall have agreed upon; *provided, however,* that such agreed-upon treatment shall not be more favorable than (i).<br><br>**Voting.**  Not classified; non-voting. |
| **Professional Compensation Claims** | **Treatment.**  Any person asserting a Professional Compensation Claim shall, no later than 45 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.  To the extent that such an application is granted by the Bankruptcy Court, the requesting person shall receive: (a) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Case, such payment to be made within the later of (i) the Effective Date or (ii) three Business Days after the order granting such person's final fee application becomes a Final Order; or (b) payment on such other terms as may be |

---

[3]  Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the Plan.  To the extent this Declaration is inconsistent with any provision of the Plan, the Plan shall govern.

| | |
|---|---|
| | mutually agreed upon by the holder of the Professional Compensation Claim and the Reorganized Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Case).<br><br>**Voting.** Not classified; non-voting. |
| **Indenture Trustee Fee Claims** | **Treatment.** Each holder of an Indenture Trustee Fee Claim shall be paid in Cash on the Effective Date by the Debtor as Administrative Expense Claims, without the need for application to, or approval of, the Bankruptcy Court, unless otherwise agreed to.<br><br>**Voting.** Not classified; non-voting. |
| **Priority Tax Claims** | **Treatment.** Each holder of an Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code or, at the Debtor's election upon notice to the holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code, unless otherwise agreed to.<br><br>**Voting.** Not classified; non-voting. |
| **Classified Claims** | |
| **Other Priority Claims (Class 1)** | **Treatment.** On the Distribution Date, each holder of an Allowed Other Priority Claim shall either receive (a) cash payment in an amount equal to the unpaid portion of such Allowed Other Priority Claim, or (b) such other treatment that the Debtor and such holder shall have agreed upon in writing; *provided, however,* that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (a).<br><br>**Voting.** Unimpaired. Each holder of an Allowed Other Priority Claim in Class 1 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. |
| **Other Secured Claims (Class 2)** | **Treatment.** Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, |

| | |
|---|---|
| | each Allowed Other Secured Claim shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed Other Secured Claims.<br><br>**Voting.**  Unimpaired.  Each holder of an Allowed Other Secured Claim as of the Record Date is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. |
| **Prepetition Senior Secured Notes Claims (Class 3)** | **Treatment.**  Each holder of an Allowed Prepetition Senior Secured Notes Claim shall receive New Notes in an aggregate principal amount equal to the principal amount of such holder's Allowed Prepetition Senior Secured Notes Claim plus interest accrued and unpaid thereon through the Effective Date.<br><br>**Voting.**  Impaired.  Each holder of an Allowed Prepetition Senior Secured Notes Claim as of the Record Date is entitled to vote such Claim to accept or reject the Plan. |
| **General Unsecured Claims (Class 4)** | **Treatment.**  To the extent that a holder of an Allowed General Unsecured Claim has not been paid in full as of the Confirmation Date, unless such holder agrees to a less favorable treatment, each Allowed General Unsecured Claim shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed General Unsecured Claim. Without limiting the generality of the foregoing, if an Allowed General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the holder of such General Unsecured Claim shall be paid in Cash by the Debtor (or, after the Effective Date, by the Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Allowed General Unsecured Claim.<br><br>**Voting.**  Unimpaired.  Each holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. |

| | |
|---|---|
| **Interests (Class 5)** | **Treatment.**  Interests shall be reinstated. |
| | **Voting.**  Unimpaired.  Each holder of an Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan. |

## MEANS FOR IMPLEMENTATION OF THE PLAN AND CORPORATE GOVERNANCE

| | |
|---|---|
| **The New Notes** | On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor shall issue the New Notes.  Confirmation of the Plan shall be deemed approval of the New Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith) and authorization and direction for the Debtor to issue the New Notes, subject to such modifications as the Reorganized Debtor, with the consent of the Steering Group (which consent shall not be unreasonably withheld), deems to be reasonably necessary to consummate such New Notes. |
| **Noteholder Representative** | Prior to the Effective Date, the Steering Group will appoint a representative (including any duly authorized representative or designee of such representative, the "***Noteholder Representative***") to discharge certain corporate governance functions, as more fully described in the Plan and Plan Supplement.  The appointment of the Noteholder Representative shall be duly recorded in the Panamanian Public Registry and the Reorganized Debtor's by-laws and, to the extent necessary (to the satisfaction of the Steering Group), other organizing documents will be amended or supplemented to recognize the Noteholder Representative and his/her rights and provide that his/her appointment and service would be governed by the Noteholders holding a majority in principal amount of the Notes ("***Majority Holders***"). The selection (including replacements thereof) of the Noteholder Representative shall be in each case subject to reasonable prior notice to the Reorganized Debtor; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group). |

16

| | The Noteholder Representative function shall cease to exist following the date which is the later of eighteen (18) months following the Effective Date or three (3) months after the occurrence of an Event of Default under the Indenture, unless such Default has been earlier cured or waived. |
| --- | --- |
| **Directors and Officers of the Reorganized Debtor** | On and after the Effective Date, the business and affairs of the Reorganized Debtor will be managed by the New Board and the officers, directors, managers or other responsible persons identified in the Plan Supplement. The New Board will be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the New Board (the "***Noteholder Board Delegate***"), which Noteholder Board Delegate shall not have any voting rights except to the limited extent described below.  The selection (including replacements thereof) of the Noteholder Board Delegate shall be in each case subject to reasonable prior notice to the Reorganized Debtor; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group). The Corporate Governance Documents shall provide that all New Board decisions shall be taken unanimously and that, in the case of a non-unanimous vote, the Nominee shall have in such instance (and only in such instance) the ability to produce the deciding vote.  Upon payment in full of the New Notes, the voting rights held by the Noteholder Board Delegate shall be relinquished, the Noteholder Board Delegate shall resign from the New Board, and the Noteholder Representative provisions in the Corporate Governance Documents shall be null and void.<br><br>Pursuant to the Plan, shareholder voting agreements will be entered into by the Shareholders and a nominee of the Noteholder (the "***Noteholder Nominee***"), which agreements shall provide that 30% of the Shareholder voting rights (but not economic entitlements) attributable to the Debtor's capital stock shall be controlled by the Noteholder Nominee for the benefit of the Noteholders, such that shareholder voting at the Debtor (and otherwise affecting the Trump Ocean Club) shall be effectively allocated as follows:  Upper Deck (21%), Mr. Roger Khafif (49%), and Noteholder Nominee (30%) (together, the "***Voting Persons***").  For the avoidance of doubt, the |

|  | 30% shareholder voting rights of the Noteholder Nominee shall only be applicable to break a vote tie between the other Voting Persons.<br><br>Carlos Saravia shall be appointed as CEO, President and Legal Representative of the Reorganized Debtor. Mr. Saravia may be replaced in such roles any time after September 30, 2013, but shall be given at least thirty (30) days' notice of any such intended replacement. A more fulsome description of the duties and power of the CEO and the terms and provisions of Mr. Saravia's appointment will be included in the Plan Supplement.<br><br>For the avoidance of doubt, the appointment of corporate officers of the Reorganized Debtor (excluding the position of CEO) shall not be subject to preapproval of the Noteholder Nominee. |
|---|---|
| **EFFECT OF CONFIRMATION** ||
| **Releases by the CCSA Parties** | Through payment in full of the New Notes, after which such waivers and representations will be of no further force or effect: (i) Kassir Development shall waive its claim in the amount of $2,022,274.00 against the Debtor (and shall represent that it has no other claims against the Debtor); (ii) Opcorp shall waive its claim in the amount of $4,787,742.45 against the Debtor (and shall represent that it has no other claims against the Debtor); and (iii) the CCSA Parties, on their own behalf and that of their respective Affiliates shall waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Debtor until such time as the New Notes have been paid in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the New Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except as disclosed on Exhibit 6 to the Term Sheet annexed to the Plan Support Agreement. |
| **Releases of the CCSA Parties** | As of the Effective Date, for good and valuable consideration, which shall include the releases set forth in section 8.2.4.1 of the Plan and the CCSA Parties' pledging of their Interests and providing the $5 million Financial Guarantee of the Debtor's obligations under the |

|  | New Notes issued under the Plan, (i) each of the Debtor in its individual capacity and as Debtor in Possession, the Trustee, in its individual capacity and on behalf of the Holders, and the Holders will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the CCSA, the Trump Ocean Club, the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any CCSA Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtor or its Estate at any time on or prior to the Effective Date against the CCSA Parties, other than Claims or liabilities arising out of or relating to any act or omission of a CCSA Party that constitutes willful misconduct or gross negligence, and (ii) the CCSA is terminated and is of no further force and effect, and the CCSA Parties are released from any and all obligations thereunder.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release the obligations of the CCSA Parties under the Share Pledge or the Financial Guarantee pursuant to the terms thereof. |

**C.**     **Prepetition Solicitation and the Proposed Chapter 11 Timeline**

28.     To effectuate the terms of the consensual restructuring, on April 1, 2013,

prior to filing the Chapter 11 Case, the Debtor delivered a copy of the Plan, the related disclosure

19

statement (the "***Disclosure Statement***") and all exhibits thereto, including the Plan Support

Agreement, and the appropriate ballots to the Prepetition Noteholders, the only impaired class of

creditors entitled to vote on the Plan.  The Debtor established April 29, 2013 at 5:00 p.m.

(Eastern Time), as the deadline for the receipt of votes to accept or reject the Plan.  The Debtor's

balloting and tabulation agent, Epiq Bankruptcy Solutions, LLC (the "***Balloting and Tabulation***

***Agent***"), has confirmed that it has received votes accepting the Plan from at least 66-2/3 of

amount and over 50% in number of creditors in the sole voting class of the Plan.  In fact, 100%

of the votes received were in favor of the Plan.[4]  Accordingly, contemporaneously with the filing

of this Declaration, the Debtor has filed the Plan and Disclosure Statement, and a motion seeking

approval of the adequacy of the Disclosure Statement, approval of the solicitation package and

confirmation of the Plan (the "***Scheduling Motion***" and the proposed order in respect thereto, the

"***Scheduling Order***").

        29.      The following table sets forth the anticipated timetable for this chapter 11

case, subject to the Court's approval:

| PROPOSED TIMELINE | |
|---|---|
| **Record Date** | March 20, 2013 |
| **Commencement of Prepetition Solicitation** | April 1, 2013 |
| **Voting Deadline** | April 29, 2013 |
| **Petition Date** | April 30, 2013 |

---

[4] The voting results are set forth in the *Affidavit of Service of Solicitation Packages and Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding the Voting and Tabulation of Ballots Cast on the Prepackaged Plan of Reorganization for the Debtor Under Chapter 11 of the Bankruptcy Code*, dated April 29, 2013, filed contemporaneously herewith.

| Mailing of Combined Hearing Notice | May 2, 2013 |
|---|---|
| Plan Supplement | May 17, 2013 |
| Objection Deadline | May 21, 2013 |
| Reply Deadline | May 24, 2013 |
| Combined Hearing | May 28, 2013 |

30.     As noted above, a substantial majority of the Prepetition Noteholders have executed the Plan Support Agreement indicating their support for a chapter 11 plan containing the terms set forth in the term sheet.  Moreover, the Debtor and virtually all of the Debtor's Prepetition Noteholders, firmly believe that prolonged a chapter 11 case could potentially damage its ongoing business operations and threaten its viability as a going concern. Accordingly, the Debtor has filed this pre-packaged Chapter 11 Case to effectuate its proposed restructuring on an expedited basis and to allow it to emerge with a sustainable capital structure and competitive going-forward operation.

**IV.**

**FIRST-DAY MOTIONS**

31.     Contemporaneously herewith, the Debtor has filed a number of First Day Motions.  I believe that, among other things, the relief requested in the First Day Motions is necessary to enable the Debtor to operate with minimal disruption during the pendency of this Chapter 11 Case, thereby preserving and maximizing the value of the Debtor's estate and

assisting the Debtor in achieving a successful reorganization.  A description of the relief

requested and the facts supporting each of the First Day Motions is set forth below.[5]

### A.    Administrative Motions

**1.    Debtor's Motion for Prepackaged Chapter 11 Case and (I) for an Order (A) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Confirmation of the Plan, (B) Establishing Deadlines and Procedures to File Objections, and (C) Approving the Form and Manner of the Notice of Combined Hearing; and (II) for an Order (A) Approving Solicitation Procedures, (B) Approving the Adequacy of the Disclosure Statement, and (C) Confirming the Plan  (the "_Scheduling Motion_")**

32.    The Debtor requests (i) entry of an order (a) scheduling a combined

hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan (the

"**_Combined Hearing_**"), (b) establishing deadlines and procedures to file objections, and (c)

approving the form and manner of the notice of combined hearing; and (ii) for an order (a)

approving solicitation procedures (the "**_Solicitation Procedures_**"), (b) approving the adequacy of

the Disclosure Statement and (c) confirming the Plan.  I understand that the Debtor undertook the

Solicitation Procedures described in the Scheduling Motion.

33.    I have been advised that section 105(d)(2)(B)(vi) of the Bankruptcy Code

authorizes a bankruptcy court to combine a hearing on the adequacy of a disclosure statement

with a hearing on confirmation of a plan of reorganization.  I believe that such a combined

hearing in this proceeding would promote judicial economy and provide an expeditious exit out

of chapter 11.  I further believe doing so would minimize any adverse effects of the chapter 11

filing on the Debtor's business and going concern value and maximize creditor recoveries

through lowered administrative expenses and prompt distributions.  It was for these reasons that

---

[5]  Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Motion.  To the extent this Declaration is inconsistent with any provision of the First Day Motions, the respective First Day Motion shall govern.

the Debtor elected to pursue a prepackaged plan of reorganization, which offered the possibility
of a more expedited reorganization process.

34.    Moreover, the Debtor has already completed some of the most complex
and time-consuming milestones in a reorganization process.  Prior to the Petition Date, the
Debtor reached agreement with critical creditor constituencies and solicited votes on the Plan
from holders of Prepetition Senior Secured Notes Claims (the "*Holders of Class 3 Claims*"), the
only impaired class in the Chapter 11 Case.  I understand that, according to the Balloting and
Tabulation Agent, the Debtor has received the requisite number and amount of accepting votes
from Holders of Class 3 Claims.  Accordingly, no reason exists to delay the consideration of the
adequacy of the Disclosure Statement and confirmation of the Plan.

35.    I further believe that the Debtor's proposed timing for the filing and
service of objections and proposed modifications, if any, to the Plan and Disclosure Statement
will afford the Court, the Debtor and other parties-in-interest sufficient time to consider any
objections and proposed modifications prior to the Combined Hearing.  The Debtor and its key
constituents have already engaged in extensive prepetition negotiations concerning the terms of
the Plan and Disclosure Statement, which represent the culmination of months-long, intensive
discussions.

36.    In addition, the Debtor's proposed streamlined procedures for handling
objections to the proposed cure amounts facilitate the prompt resolution of cure disputes and
objections.  Moreover, such procedures further address any objections concerning assumed
contracts and/or leases and whether they satisfy the requirements for assumption while
adequately protecting the rights of the counterparties to the assumed contracts and leases.

23

37.     Furthermore, allowing the Debtor to serve a combined notice (the "***Combined Hearing Notice***"), rather than three individual notices, to advise parties in interest of (a) the commencement of the Chapter 11 Case, (b) the hearing to consider the adequacy of the Disclosure Statement and (c) the hearing to consider confirmation of the Plan will save the Debtor considerable time and expense to the benefit of its creditors.  The Debtor's proposed service procedures with respect the Combined Hearing Notice will provide sufficient notice to all parties in interest of the relevant and pertinent information relating to the Debtor's Disclosure Statement and Plan proceedings.  In addition, the Debtor proposes to publish a notice in certain major domestic and local newspapers.  I believe that doing so will sufficiently inform persons who may not otherwise receive notice pursuant to the Combined Hearing Notice.

38.     Accordingly, on behalf of the Debtor, I respectfully submit that the Scheduling Motion should be approved.

**2.      Debtor's Motion for Entry of an Order (A) Providing Extension of Time to File Schedules and Statements of Financial Affairs; and (B) Waiving Requirement to File Same if Plan Becomes Effective Prior to Expiration of Such Extension (the "*Schedules and Statements Motion*")**

39.     The Debtor requests entry of an order (a) granting an additional 46 days from the Petition Date (the "***Extension Period***") to file its schedule of assets and liabilities, schedule of current income and expenditures, schedule of executory contracts and unexpired leases, and statement of financial affairs (collectively, the "***Schedules and Statements***"), without prejudice to the Debtor's ability to request an additional extension of time if necessary; and (b) waiving the requirement to file Schedules and Statements should the Plan become effective prior to the expiration of the Extension Period.

40.     An extension of time to file the Schedules and Statements is both beneficial to the Debtor's estate and necessary for the smooth progression of this Chapter 11

Case.  The Debtor operates internationally and has numerous potential creditors, many of whom are foreign creditors.  The breadth of the Debtor's business operations requires the Debtor to maintain voluminous books and records and complex accounting systems.  Given the complexity and international nature of its business operations and the number of creditors, I submit that the amount of information that must be assembled to prepare the Schedules and Statements and the hundreds of employee and advisor hours required to complete the same would be unnecessarily burdensome to the Debtor during the critical first weeks following the Petition Date.  This is compounded by the proposed timeline in the Scheduling Motion, which seeks entry of an order setting a combined hearing to approve the Disclosure Statement and Plan within 28 days of the Petition Date.  I believe that the Debtor's limited resources would be better used towards stabilizing its business operations, the majority of which occur overseas, and focusing on implementing the transactions provided for under the Plan and the Plan Support Agreement.

41.    Furthermore, it is my understanding that a waiver of the requirement to file the Schedules and Statements is also appropriate in a pre-packaged reorganization.  The primary purpose of the schedules and statements requirement is to provide parties in interest with an opportunity to review and assess the debtor's assets and liabilities to enable fair and open discussion and understanding during the plan negotiation and confirmation process. In contrast, here, the Plan has already been negotiated prepetition and votes have already been solicited. Accordingly, the driving rationale and justification underlying the schedules and statements requirement is non-existent in this pre-packaged chapter 11 proceeding.

42.    I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

Accordingly, on behalf of the Debtor, I respectfully submit that the Schedules and Statements

Motion should be approved.

**3.**     **Debtor's Motion for an Order (A) Waiving the Requirement that the Debtor
File a List of Creditors and Equity Security Holders and Authorizing
Maintenance of List of Creditors in Lieu of Matrix and (B) Approving
Notice, Case Management and Administrative Procedures (the "_Notice and
Case Management Procedures Motion_")**

43.     The Debtor seeks entry of an order: (a) waiving the requirement to file a

list of creditors and equity security holders on the Petition Date and authorizing the Debtor to

maintain a list of creditors in lieu of a matrix; and (b) authorizing the implementation of certain

notice and case management procedures.

44.     I believe that a waiver of the requirement that the Debtor file a list of

creditors and equity security holders is appropriate in this Chapter 11 Case.  Subject to the

court's approval, the Debtor, by separate application, seeks to retain Epiq Bankruptcy Solutions,

LLC as its claims and noticing agent (the "_Claims and Noticing Agent_").  The Claims and

Noticing Agent will assist with the compilation of a creditor database based upon the Debtor's

records as well as the mailing and service of all required notices.  Accordingly, requiring the

Debtor to file a list of creditors and equity security holders would lead to duplicative efforts and

a waiver of this requirement would ease administrative burdens and costs as well as conserve the

Debtor's limited resources.

45.     Moreover, the Debtor's request to maintain a list of creditors in an

electronic format, in lieu of a required matrix, is also warranted and would maximize efficiency

while reducing costs.  With the assistance of its Claims and Noticing Agent, the Debtor will be

prepared to file a computer-readable list of creditors and equity security holders upon request.

Providing the Debtor's data in the required matrix format would be unduly burdensome and,

moreover, would greatly increase the risk and reoccurrence of error with respect to information already intact on computer systems maintained by the Debtor or its agents.

46.     Finally, the Debtor proposes certain notice and case management procedures that would maximize the efficiency and orderliness of case administration and would reduce the costs associated with traditional case management procedures, thereby preserving assets of the estate.  The costs and burdens that might arise absent adoption of case management procedures could impose significant economic and administrative burdens on the Debtor's estate, the Court and all other parties in interest.  I believe that the proposed procedures offer a streamlined approach to the management of this Chapter 11 Case and constitute a critical element of achieving a successful and smooth transition into and out of chapter 11.

47.     Accordingly, on behalf of the Debtor, I respectfully request that the Notice and Case Management Procedures Motion be granted.

**B.     Operational Motions Requesting Immediate Relief**

**1.     Debtor's Motion for Entry of an Order Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Salaries, and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Similar Benefits, and (C) Continue Employee Compensation and Employee Benefit Programs (the "_Wages and Benefits Motion_")**

48.     The Debtor seeks entry of an order authorizing the Debtor to, in the ordinary course of business, (a) pay certain prepetition wages and Reimbursable Expenses to its Employees; (b) pay and honor Employee medical and similar benefits; and (c) continue certain Employee compensation and Employee benefit programs.

49.    The Debtor employs approximately 40 employees on a full-time basis (the "**Full-Time Employees**").[6]  Approximately half of the Full-Time Employees are salaried; the remainder are paid on an hourly basis.  Moreover, 22 of the Full-Time Employees, who provide post-sale services,[7] are members of the SUNTRACS union.[8]  In addition to its Full-Time Employees, the Debtor supplements its business needs and workforce with third-party contract employees (as discussed in greater detail below) (collectively, with the Full-Time Employees, the "**Employees**") as well as two Independent Contractors (as defined below and, together with the Employees, the "**Workforce**").  In the ordinary course of business, the Debtor pays its Employees, among other things, wages, salaries, and expense reimbursement and provides certain other forms of compensation described herein, depending on the services provided by the Employee to the Debtor.  Moreover, the Debtor pays the Independent Contractors certain compensation in connection with the services the Independent Contractors provide, as more fully discussed below.  As will be discussed in greater detail, the Debtor offers various types of compensation to its Employees and the Independent Contractors (collectively, the "**Workforce Compensation**").

---

[6]  An employee who works the standard working hours each week, defined as eight hours per day, six days per week, is considered a Full-Time Employee.  An employee who works four hours per day, six days per week is considered a part-time employee.  The Debtor presently does not have any part-time employees.

[7]  The Debtor's post-sales division is responsible for (1) ensuring that the purchased or leased units in the Trump Ocean Club are suitable and ready for incoming owners and tenants, respectively and (2) attending and responding to any issues that may arise in connection with the units during the "warranty" period, including but not limited to, plumbing and electrical work (the "**Post-Sales Department**").  The Post-Sales Department is comprised of four managing individuals (the "**Post-Sales Managers**") who are non-union employees and are responsible for inspecting and evaluating any repair requests and overseeing the 22 union personnel to carry out any necessary repairs (such personnel together with the Post-Sales Managers, collectively the "**Post-Sales Personnel**").

[8]  "SUNTRACS" stands for *El Sindicato Único Nacional de Trabajadores de la Industria de la Construcción y Similares* (which translates to National Union of Workers of Construction and Similar Industries).

50.     The Employees perform a variety of critical operational functions and I believe that their skills, knowledge and understanding with respect to the Debtor's business and infrastructure are essential to the effective reorganization of the Debtor's business.  Although the Debtor has paid its wage, salary and other Employee obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition Employee Obligations may nevertheless be due and owing.  Just as the Debtor depends on its Employees to operate its business on a daily basis, these individuals also depend on the Debtor.  Indeed, I believe the majority of the Debtor's Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily basic living necessities.  Consequently, they will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for unpaid compensation, benefits, as provided for and required under Panamanian law, and reimbursable expenses.

51.     In the absence of such payments, I believe that the Debtor's Employees may seek alternative employment opportunities, thereby hindering the Debtor's ability to meet its client obligations and likely diminishing client confidence in the Debtor.  Additionally, the Debtor's relationships with its Employees could be adversely impacted and there could be irreparable harm to the Employees' morale, dedication, confidence and cooperation.  The Employees' support for the Debtor's reorganization efforts is critical to the success of those efforts.  Moreover, it is my opinion that loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be distracting at a time when the Debtor should be focusing on maintaining its operations, and the Debtor's business would be substantially damaged.  I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtor's estate and will enable the Debtor to continue to operate its

business in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtor's estate. Accordingly, on behalf of the Debtor, I respectfully submit that the Wages and Benefits Motion should be approved.

### a.    Wage Obligations

52.    In the ordinary course of business, the Debtor incurs payroll obligations for wages owed to its Employees (collectively, the "***Wage Obligations***"). All Employees are paid bi-weekly in arrears, either by direct deposit or by manually issued check, and on either an hourly or salaried basis. The Debtor's next scheduled payroll date is on or about May 11, 2013 with respect to Employees paid on an hourly basis, and May 15, 2013 with respect to salaried Employees.[9] My colleagues in Human Resources have informed me that, on average, the Debtor's aggregate gross bi-weekly payroll expense for Employees is approximately US$ 22,907.56, comprising of an estimated US$ 7,384.50 for Employees paid on an hourly basis and an estimated US$ 15,523.06 for salaried Employees. I have also been informed that, as of the Petition Date, the Debtor is fully current with respect to accrued wages, salaries, and other compensation earned prior to the Petition Date ("***Unpaid Wage Obligations***"). Moreover, I have also been informed that the Debtor does not believe that, to the extent it may not be current on its Wage Obligations, any Unpaid Wage Obligations as to any individual Employee exceeds the priority cap of $11,725 under section 507(a)(4) of the Bankruptcy Code. Out of an abundance of caution, however, the Debtor seeks authority to pay any Unpaid Wage Obligations and to continue to honor the Wage Obligations on a postpetition basis in the ordinary course of business.

---

[9] Employees paid on an hourly basis receive their payroll every other Saturday. Employees paid on a salaried basis receive their payroll on the 15th and 30th of each month.

b.        **Reimbursable Expenses**

53.    In the ordinary course of business, the Debtor reimburses or provides an allowance to certain Employees for reasonable, customary and approved, legitimate expenses incurred on behalf of the Debtor in the scope of the Employees' employment and service, in accordance with the Debtor's policies (collectively, the "***Reimbursable Expenses***"). Reimbursable Expenses include costs of office supplies purchased for business purposes as well as transportation costs during work hours, including taxi fares and gasoline.[10]  I have been informed that, as of the Petition Date, the Debtor is current and there are no unpaid amounts with respect to all Reimbursable Expenses incurred prior to the Petition Date ("***Unpaid Reimbursable Expenses***").  Out of an abundance of caution, however, the Debtor seeks authority to pay any Unpaid Reimbursable Expenses and to continue to honor Reimbursable Expenses in the ordinary course of business on a postpetition basis.

c.        **Vacation Time and Sick Leave**

54.    The Debtor provides all Employees with vacation time as a paid, time-off benefit ("***Vacation Time***").  During each calendar year, Employees earn one day of Vacation Time for every 11 days worked at a maximum of 30 days of Vacation Time for every 11 months worked.  Unused Vacation Time is carried over throughout the duration of employment.  When an Employee elects to take Vacation Time, that Employee is paid his or her regular salaried rate. An Employee is only entitled to a cash payment for unused Vacation Time in the event that such Employee is terminated from the Debtor's employment.

---

[10]   Generally, business-related travel expenses for administrative personnel and key executives are paid in advance as an allowance.

55.    In addition, all Employees are eligible for sick leave due to illness or injury ("**Sick Leave**").  Employees paid on an hourly basis earn 12 hours of Sick Leave for every 26 days worked up to a maximum of two years; Employees paid on a salaried basis earn 12 hours of Sick Leave for every 30 days worked during a 1 year period.  I have been advised that, pursuant to Panamanian law, Employees are not entitled to cash payments for any accrued Sick Leave.

56.    The Debtor seeks authority to continue its policies for Vacation Time and Sick Leave in the ordinary course of business on a postpetition basis.

### d.    Obligations in Respect of Third-Party Contract Employees

a.    The Debtor makes reimbursement payments to Arias, Serna y Saravia, S.A. ("**AS&S**") for the compensation (including health and other benefits) of certain Employees of AS&S that the Debtor utilizes to administer its business (the "**AS&S Employees**").[11]  I have been informed that, generally, the Debtor receives monthly invoices from Zaturim on behalf of AS&S in the amount of approximately $45,954, which amount covers the AS&S Employees' salaries plus commissions, health and other benefits, couriers, meals, office supplies, utilities and rental expenses related to the Debtor's use of the services of AS&S Employees (collectively, the "**AS&S Obligations**").[12]  It is my understanding that, upon receipt of the payment from the Debtor through Zaturim, AS&S is responsible for payment of the AS&S Employees' wages and benefits and for making any necessary Withholdings (as defined below).  I believe that it is necessary to pay the AS&S Obligations so that AS&S will continue to make the AS&S

---

[11]  The Debtor's reimbursement payments are made to Zaturim Investment ("**Zaturium**"), the sole shareholder of AS&S, and are then ultimately passed through to AS&S.

[12]  The monthly invoices from AS&S include the COO Obligations (as defined and discussed below).

Employees available to the Debtor.  I have been informed that the Debtor does not believe that there are any accrued and unpaid obligations to AS&S relating to the period prior to the Petition Date (the "***Unpaid AS&S Obligations***").  Out of an abundance of caution, however, the Debtor seeks authority to pay any Unpaid AS&S Obligations and to continue to honor the AS&S Obligations on a postpetition basis in the ordinary course of business.

57.    Because the AS&S Employees are not employees of the Debtor, Debtor's counsel has advised me that the claims of such employees likely are not priority claims within the meaning of section 507(a)(3) of the Bankruptcy Code.  However, the continued utilization of the AS&S Employees is necessary for the continued efficient operation of the Debtor.  I believe that if the Debtor does not honor its prepetition obligations to AS&S, it may cease doing business with the Debtor, thereby causing a significant disruption in the Debtor's operations.  Any disruption in the services rendered by these employees would have an adverse impact on the Debtor's business operations.  Accordingly, I believe that the continued payment of the AS&S Obligations is warranted, particularly in view of the relatively modest amount outstanding relating to the prepetition period.

### e.    Obligations in Respect of the Independent Contractors

58.    The Debtor presently has two employees that it employs on an independent basis:  (i) the closing coordinator (the "***Closing Coordinator***"), who is responsible for managing and handling all tasks necessary to be completed for closing upon a unit in the Trump Ocean Club, and (ii) myself, the Debtor's chief operating officer (the "***COO***" and, together with the Closing Coordinator, the "***Independent Contractors***").

### 1)    The Closing Coordinator

59.    The Closing Coordinator's involvement commences when the buyer seeks to move towards closing.  Its responsibilities include, among other things, (1) coordinating with

33

the buyer as to finalizing the deed; (2) conducting the walk-throughs with the buyer and working

with the Post-Sales Department to resolve any issues that may have arisen during the walk-

throughs: and (3) coordinating with all necessary parties to finalize any mortgage financing.  On

a monthly aggregate basis, the Debtor pays the Closing Coordinator US$ 3,500 in addition to a

mandatory 7% transfer tax[13] as well as a monthly commission of US$ 200 per every closed

transaction (collectively, the "***Closing Coordinator Obligations***").  The Debtor does not make

any Withholdings (as defined below) with respect to the Closing Coordinator, nor does it provide

any Employee Benefits (as defined below) to the Closing Coordinator.

     **2)**       **The COO**

60.    On a monthly aggregate basis, the Debtor makes reimbursement payments

to AS&S[14] for my compensation in the amount of US$ 9,730 plus an additional mandatory 16%

transfer tax[15] (together, the "***COO Obligations***" and, together with the Closing Coordinator

Obligations, the "***Independent Contractor Obligations***"), which amount includes health and

other benefits provided by AS&S to its employees.  I am subject to Withholdings (as defined

below) with respect to my compensation, however such amounts are collected and remitted by

the COO's direct employer, AS&S.

61.    I have been informed that, as of the Petition Date, the Debtor believes that

it is fully current and does not have any unpaid payment obligations with respect to the

---

[13]  Panamanian law requires the Closing Coordinator to collect from the Debtor a 7% transfer tax on the total
amount of monthly fees invoiced to the Debtor.

[14]  In the same fashion as the AS&S Employees, the Debtor's reimbursement payments are made to Zaturim, the
sole shareholder of AS&S, and are then ultimately passed through to AS&S.

[15]  Colombian law requires the COO to collect from the Debtor a 16% transfer tax on the total amount of monthly
fees invoiced to the Debtor.

Independent Contractors for the period prior to the Petition Date (the "***Unpaid Independent Contractor Obligations***").  Out of an abundance of caution, however, the Debtor seeks authority to pay any Unpaid Independent Contractor Obligations and to continue to honor the Independent Contractor Obligations on a postpetition basis in the ordinary course of business.

### f.    Withholdings and Payroll Taxes

62.    It is my understanding that during each applicable pay period, the Debtor routinely withholds certain amounts from all Employees' gross pay comprising of government-mandated withholdings (the "***Government-Mandated Withholdings***") as well as additional withholdings applicable to certain subgroups of Employees as specified below (the "***Additional Withholdings***" and, together with Government-Mandated Withholdings, the "***Withholdings***"). The Debtor is also obligated to make certain payroll tax payments and maintain certain employee-related insurance policies.

### 1)    Government-Mandated Withholdings

63.    Pursuant to Panamanian law, the Debtor routinely withholds the following amounts from all Employees' paychecks during each applicable pay period and remits and forwards them to Social Security, the appropriate taxing authority, who then distributes the amounts to the respective agencies:

a)  Panamanian Social Security – 9.75% of Employees' gross salaries are designated for Panamanian "social security," which provides individual employees with medical, dental and vision coverage as required by Panamanian law, as well as retirement benefits (as discussed in greater detail below, "***Social Security***");

b)  Educational Security – 1.25% of Employees' gross salaries are designated for an educational insurance tax ("***Educational Security***"), which is an administrative fee established by the Panamanian government for the purpose of collecting funds to provide financial resources for public education, vocational and technical training and grant scholarships for secondary education as well as grant loans for university studies; and

35

c) Income Tax – Panama maintains a three-tier income tax structure with the applicable percentage (the "**Income Tax Rate**") dependent upon and determined by individuals' annual salaries (collectively, the "**Income Taxes**"):

     i. With respect to annual salaries falling below US$ 11,000.00, individuals are tax-exempt;

     ii. With respect to annual salaries totaling between US$ 11,000.00 and, including, US$50,000.00, individuals are taxed at an Income Tax Rate of 15%; and

     iii. With respect to annual salaries in excess of US$50,000.00, individuals are taxed at an Income Tax Rate of 25%.

**2)    Additional Withholdings**

64.    In addition to the Government-Mandated Withholdings, the Debtor

withholds the following amounts from certain Employees' paychecks as specified below:

a) Union Fees – Approximately 2% of the Debtor's Post-Sales Personnel's gross salaries which is designated for payment to the SUNTRACS union;[16] and

b) Private Life Insurance Premiums – The Debtor is required to pay a monthly premium in the amount of US$ 36.00 for all Employees (which is one-half of the total premium, with the other half to be paid by the respective Employee) with respect to private life insurance for all Employees in the Post-Sales Department, which provides insurance coverage up to US$ 22,000 for each individual to be paid in the event of such individual's death arising from labor-related incidents.

**3)    Employer Payroll Taxes**

65.    The Debtor is required by applicable Panamanian law to pay, from its own

funds at the end of each month and based upon total monthly gross payroll salaries, Social

Security taxes at a rate of 12.25%, Educational Security taxes at a rate of 1.5% and occupational

---

[16] SUNTRACS establishes certain requirements and standards with respect to its union members, including, but not limited to, safety conditions at work sites, occupational training, minimum wage thresholds, overtime pay, work permits and licenses and disciplinary sanctions.

hazards insurance ("**Occupational Hazards Insurance**") premiums at a rate of 5.67% as well as monthly union fees in the fixed amount of US$ 60.00 with respect to the 22 unionized Employees in the Post-Sales Department (collectively, the "**Employer Payroll Taxes**," and, together with the Withholdings, the "**Payroll Taxes**").  I have been informed that, on a bi-weekly basis, the Debtor estimates that Payroll Taxes (which include both Employee and Debtor contributions) total approximately US$ 8,317.94.  Moreover, I have been further informed that, as of the Petition Date, the Debtor has collected and remitted all accrued prepetition Payroll Taxes to the appropriate third-party recipients and does not have any unpaid Payroll Taxes (the "**Unremitted Payroll Taxes**").

66.     I believe that the Unremitted Payroll Taxes are held for payment to third parties.  Counsel has informed me that, accordingly, they are effectively "trust fund" taxes, properly deemed to be held in trust and therefore, do not constitute property of the Debtor's estate.  Out of an abundance of caution, however, the Debtor seeks authority to remit any Unremitted Payroll Taxes and to continue collecting and remitting Payroll Taxes in the ordinary course of business on a postpetition basis.

### g.     Employee Benefit Programs

67.     I have been advised that pursuant to Panamanian law, which requires all employers to provide medical benefits for each of its employees, the Debtor is required to provide for Social Security, which offers medical, dental and vision coverage as well as retiree benefits, and the Debtor must maintain Occupational Hazards Insurance for all the Employees (collectively, and as discussed in more detail below, the "**Employee Benefits**").  Maintaining these benefits and honoring obligations thereunder is necessary from both a legal perspective and to preserve employee morale and maintain the stability of the Debtor's workforce during this Chapter 11 Case.

37

### 1) Medical, Dental and Vision Coverage

68.     All Employees are eligible to receive the following medical, dental and vision insurance coverage (collectively, the "**Health Benefits**") as provided for through the Panamanian-government required Social Security:

   a) Medical Plan – The government-mandated Social Security for all Employees offers general and specialized medical care, including hospital and emergency services and covers any related imaging and testing costs, at Social Security clinics and hospitals nationwide. Such coverage extends to dependents which may include parents, spouses and children, if any (collectively, the "**Dependents**"). The Social Security medical plan also covers any costs arising from medical care addressing disabilities that have arisen unrelated to and irrespective of professional hazards;

   b) Dental Plan – Employees and their Dependents are offered dental coverage under Social Security, including all odontology services at Social Security clinics and hospitals nationwide; and

   c) Vision Plan – Employees and their Dependents are offered ophthalmology services for treatment and routine monitoring at Social Security clinics and hospitals nationwide.

### 2) Social Security Retirement Benefits

69.     In addition to Health Benefits, Social Security includes certain retirement benefits (the "**Retirement Benefits**") through its Death and Elderly Risks Program. Female employees over 57 years of age and male employees over 62 years of age who have made contributions to Social Security for at least 15 years (equivalent to 180 monthly payments) will qualify and must apply to the Panamanian government to receive Retirement Benefits payments. Employees who qualify are entitled to pension payments calculated based on the average salary of the employee's seven highest paid years during their employed lifetime. Dependents of qualified employees are offered a death and funeral subsidy in the event the employee becomes deceased for reasons unrelated to and irrespective of professional hazards.

### 3)    Occupational Hazards Insurance

70.    The Debtor maintains Occupational Hazards Insurance for its Employees pursuant to and in accordance with Panamanian law.  Occupational Hazards Insurance offers coverage for all individuals employed in the public and private sectors and compensates individuals for injuries sustained during the course of his or her employment.  Specifically, Employees are entitled to the following coverage and under Occupational Hazards Insurance where applicable:

- Temporary disability benefits[17] for the duration of the injury;

- Preventative, curative and rehabilitative care, including prostheses and any required physical support equipment; and

- Pension and funeral subsidies for surviving family members in the event the insured Employee becomes deceased , including, among others, spouses or partners, children under the age of 18 or those who are disabled, and dependent parents.

71.    The terms and conditions of coverage, including length, varies for different types of disabilities that arise from on-the-job hazards as provided for in the Panamanian labor code and are determined by the Evaluation Committee who examines and decides how much a disability has impacted an individual's working abilities.

### 4)    Additional Benefits to Post-Sale Managers

72.    The Debtor further offers Post-Sales Managers certain supplementary benefits.  First, on top of the government-mandated Health Benefits as required under Social Security, the Debtor also provides Post-Sales Managers additional medical coverage through a private medical insurer ("***Post-Sales Managers' Private Medical Coverage***").  The Post-Sales

---

17    An individual will be deemed to have a temporary disability if the evaluation committee (the "***Evaluation Committee***") determines that the injury has reduced the individual's working capacity by up to 35%.  For individuals who have sustained injuries that have reduced their working capacity by more than 35%, the Evaluation Committee will consider them to have sustained a permanent disability.

Managers' Private Medical Coverage offers individuals general and specialized medical care, discounted emergency and hospital services as well as any related imaging and testing costs.  I have been informed that the Debtor incurs the full cost of the Post-Sales Managers' Private Medical Coverage and estimates that, on an annual basis, it makes payments aggregating US$ 12,189.84 on account of such insurance.  Finally, the Post-Sales Managers, as expatriates of Colombia, receive from the Debtor a monthly housing stipend ("***Post-Sales Managers' Housing Stipend***").  The aggregate amount of the Post-Sales Managers' Housing Stipend for all Post-Sales Managers is US$ 3,300.[18]

### 5)    Employee Benefit Payments

73.    I have been informed that, as of the Petition Date, the Debtor is current with respect to all Social Security payments, Post-Sales Managers' Private Medical Coverage payments as well as Post-Sales Managers' Housing Stipend payments accrued prior to the Petition Date and therefore does not believe there are any accrued and unpaid amounts in respect thereof ("***Unpaid Employee Benefits***").  Out of an abundance of caution, however, the Debtor seeks authority to pay any Unpaid Employee Benefits and to continue to honor Social Security, as required under Panamanian law, as well as Post-Sales Managers' Private Medical Coverage in the ordinary course of business on a postpetition basis.

---

[18]    The Post-Sale Managers' Private Medical Coverage is also provided to the Debtor's general counsel, Cecilia Sucre ("***General Counsel***").  The aggregate cost of the Post Sale Managers' Private Medical Coverage includes payments made on the General Counsel's behalf.

**2.      Debtor's Motion for Entry of an Order (I) Authorizing Debtor to Continue Existing Cash Management System, Bank Accounts, and Business Forms and (II) Granting Extension of Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code (the "_Cash Management Motion_")**

74.      The Debtor seeks entry of an order (a) authorizing the Debtor to continue to operate its prepetition cash management system with respect to intracompany cash management and obligations and maintain its bank accounts and business forms and (b) granting an additional 45 days from the Petition Date to secure any deposit or other investment made by a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the United States Trustee or by a deposit of securities, except those insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States.

75.      In the ordinary course of business, the Debtor maintains an integrated cash management system that provides well-established mechanisms for the collection, management, and disbursement of funds used in its operations (the "**_Cash Management System_**").  The Cash Management System is structured to serve the Debtor's operational needs and reflects numerous aspects of its prepetition capital structure.  As such, the Debtor's current system provides numerous benefits, including the ability to:  (a) track and control corporate funds; (b) ensure cash availability and prompt payment of vendors, contractors, employees, administrative expenses, and other corporate expenses; and (c) reduce administrative costs by facilitating the efficient movement of funds.

76.      As of the Petition Date, the Cash Management System is comprised of the following bank accounts (collectively, the "**_Bank Accounts_**"), including Bank Accounts with HSBC (Panama) S.A., HSBC Investment Corporation (Panama) S.A., and HSBC Bank USA, N.A. (together, "**HSBC**"), Banco Universal (Panama) ("**_Banco Universal_**"), Tower Bank

41

(Panama) ("***Tower Bank***") and Banco General (together with HSBC, Banco Universal and Tower Bank, collectively the "***Banks***"), which are used in the ordinary course of the Debtor's business. The Debtor utilizes a number of methods for disbursing funds, including: (a) debit; (b) wire transfer; and (c) written check.

77.     The Debtor has designed the Cash Management System to meet its operating needs, enable management to control and monitor corporate funds, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balances. I believe the Debtor's continued use of the Cash Management System will greatly facilitate its transition into this Chapter 11 Case by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of postpetition debts and providing important internal controls. I believe that parties in interest not only will not be harmed but also benefitted by the Debtor's maintenance of the existing Cash Management System, including its Back Accounts, because the Debtor has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date. In light of such protective measures, the Debtor submits that maintaining the Cash Management System is in the best interests of its estate and creditors.

78.     I believe that absent the requested relief, the Debtor will be unable to maintain its operations, leading to significant harm to the Debtor, its creditors and estate. I therefore believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.

79.     I believe that any disruption to the Cash Management System could impede a successful reorganization of the Debtor's business.  Thus, I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate and, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

a.     **Overview of the Cash Management System**

80.     The Debtor has used its Cash Management System since the company was formed in 2007, and the Cash Management System has evolved over time into a mainstay of the Debtor's ordinary, usual, and essential business practices.  The Cash Management System is comprised of the following accounts:

(a)     HSBC Panama Closing Account.  This account, located in Panama, receives initial deposits and installment payments from purchasers of units in Trump Ocean Club.  Funds in this account are used to pay brokers' commissions (which, with respect to the casino transaction, include investment banking and advisory fees of the Debtor) as well as certain property transfer fees.

(b)     HSBC Panama Account.  This account, located in Panama, receives on a bi-weekly basis any funds remaining in the HSBC Panama Closing Account after payment of the brokers' commissions and property transfer fees.  This account also receives all proceeds of sales of certain "prime units" and any revenues not related to purchase agreements (including payments, receipts and fees due to the Debtor from lease, hotel, food and beverage, beach club membership fees, the casino and the spa).  Funds in this account are used to pay certain license fees.

(c)     Release Account.  This account, located in New York, receives funds from the HSBC Panama Account on a bi-weekly basis (after deducting any amount necessary to permit the Debtor to pay certain license fees).  Funds in this account are disbursed to the Corporate Account (described below) to satisfy monthly working capital requests.  Any excess is transferred to the Collection Account (described below).

(d)     Collection Account.  This account, located in New York, receives excess funds from the Release Account after transfers on account of monthly working capital requests.  Funds in this account are used to satisfy interest payments due under the Prepetition Senior

Secured Notes or New Notes.  Any excess funds are transferred to the Investment Account (described below).

(e)  Debt Service Reserve Account ("DSRA Account").  This account, located in New York, exists pursuant to the Indenture and operates as a "reserve" to guarantee interest payments.  Any funds used from this account to satisfy interest payments must be replenished.  The Debtor has not made any deposits into or payments from this account since its last interest payment in November 2011.

(f)  Construction Escrow Account ("CEA Account").  This account, located in New York, exists pursuant to the Indenture and was intended to maintain the remaining costs of completion of the Trump Ocean Club project.  Upon issuance of the Prepetition Senior Secured Notes, the Debtor was required to deposit the sum of the net proceeds of the issuance into the account plus an additional $15.1 million.  Construction of the Trump Ocean Club has been completed and currently there are zero funds in this account

(g)  Investment Account.  This account, located in New York, receives funds from the Collection Account and is cash collateral securing the Prepetition Senior Secured Notes.

(h)  Corporate Accounts.  The Debtor's Corporate Accounts, located in Panama at HSBC (Panama), Tower Bank, Banco Universal and Banco General, receive funds from the Release Account to be used for monthly working capital payments.  Any excess after payment of monthly working capital expenses is available to the Debtor as unrestricted cash.

(i)  Accounts "en Secuestro".  Various of the Debtor's bank accounts have been frozen ("*secuestrados*") by operation of Panamanian law in connection with pending litigation.

**b.  Investment Policies and Practices**

81.  In the ordinary course of its business, the Debtor maintains policies and practices for deposits and investments (the "***Investment Practices***") of excess funds within the Cash Management System, intended to preserve principal, maintaining liquidity, and minimizing investment risk.  Under the Indenture, the Debtor may invest excess cash in "Eligible Investments," which includes only (i) cash equivalents maturing not later than the next interest payment date or principal payment date, and (ii) securities issued by the United States

44

government or the Republic of Panama, in each case having maturities not less than 180 days before the stated maturity of the notes. I believe that maintaining and following these Investment Practices is prudent and would yield maximum reasonable net return on the funds invested. To the extent the Debtor's Investment Practices do not comply with the United States Trustee's guidelines, I believe that in light of the Debtor's ability to transfer funds rapidly to ensure its safety and availability for use, the safety of the institutions and investment vehicles that the Debtor proposes to use as a continuation of its Investment Practices, sufficient cause exists to allow for deviation from the United States Trustee's guidelines.

### c.    Existing Business Forms and Checks

82.    In the ordinary course of business, the Debtor uses a variety of checks and business forms. To minimize expenses to its estate and avoid unnecessarily confusing its employees, customers, and suppliers, I believe it is appropriate for the Debtor to continue to use all checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "***Business Forms***") as such forms were in existence immediately before the Petition Date – without reference to the Debtor's status as debtor in possession – rather than requiring the Debtor to incur the expense and delay of ordering entirely new business forms. The Debtor will replace its existing stock of Business Forms with new forms identifying its status as debtor in possession as existing forms are depleted.

### 3.    Debtor's Motion for an Order (A) Authorizing Debtor to Pay Certain Prepetition Claims of Foreign Vendors; and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "***Foreign Creditors Motion***")

83.    The Debtor seeks entry of an order (a) authorizing the Debtor, in its sole discretion, to pay all or a portion of prepetition claims of foreign vendors with little to no connection with the United States (the "***Foreign Vendors***"), as well as certain taxes and fees,

assessments and other charges (collectively, the "*Taxes and Fees*" and, together with the claims

of Foreign Vendors, the "*Foreign Creditor Claims*") from various governmental, taxing and

licensing authorities outside of the United States (the "*Foreign Authorities*" and, together with

the Foreign Vendors, the "*Foreign Creditors*") and (b) authorizing banks and other financial

institutions to receive, process, honor and pay checks and transfers issued in relation to the

foregoing as well as rely on the Debtor's representations as to which checks and transfers are

authorized to be paid.  It is my belief that the successful operation of the Debtor's business

depends on the continued cooperation and assistance of foreign vendors who provide goods and

services necessary to continue these efforts, and on its ability to operate with the authorization of

all relevant foreign governmental, taxing and licensing authorities, and without such Foreign

Creditors, the value of the Debtor's business operations would be significantly diminished, if not

arrested altogether.

84.     It is my understanding that many of the vendors of goods and services to

the Debtor – specifically vendors in foreign countries with little to no contacts in the United

States – may not be willing to do business with a "Chapter 11 Debtor" absent payment of

prepetition claims.  Additionally, I have been advised that, despite the extraterritorial effect of

the automatic stay, it is possible (if not likely) that certain Foreign Creditors could seek to

withhold goods and services or otherwise interfere with the Debtor's business outside the United

States.  I believe that such actions would have an immediate negative impact on the Debtor's

ability to operate and would likely negatively affect sales.

85.     In order to preserve the value of the Debtor's assets, the Debtor must be

allowed to continue paying its accounts with these creditors.  These Foreign Creditors are critical

to continuing the Debtor's business, and I believe that any interruption to these relationships will

severely disrupt the Debtor's operations and jeopardize the Debtor's ability to successfully reorganize.

86.     Moreover, the failure by the Debtor to pay relevant and undisputed Taxes and Fees could prove disruptive to the ongoing operation of the Debtor's business postpetition. While I am advised that not permitting the Debtor to continue to do business in Panama or another relevant jurisdiction would be a violation of the automatic stay, I believe that the disruption to the Debtor's business caused by any such action outside the jurisdiction of the United States could be significant and immediate and have lasting consequences for ongoing operations. I believe such possible disruptions would be avoided by permitting the Debtor to pay all Taxes and Fees as they occur in the ordinary course of business. Such payments would also help prevent the Debtor from being unnecessarily audited by Foreign Authorities, which would divert the Debtor's attention from the reorganization process. Further, by paying Taxes and Fees, the Debtor would reduce the amounts eventually paid due to penalties and interest that might accrue otherwise.

87.     In connection with and to effectuate the foregoing, it is my belief that all applicable banks and other financial institutions should be authorized to honor and process any related checks and transfers issued by the Debtor in connection with the payment of Foreign Creditor Claims. I believe that, as a result of this Chapter 11 Case, certain Foreign Creditors may be concerned that they will not be timely paid on a postpetition basis and may discontinue cooperation or the provision of goods and services, even on a temporary basis, which would lead to irreparable harm to the Debtor's business. Moreover, I understand that many of these Foreign Creditors may not be familiar with the Bankruptcy Code.

88.     Accordingly, I believe that payment of the Foreign Creditor Claims is necessary to a successful chapter 11 reorganization and is in the best interests of the Debtor's estate and creditors.  On behalf of the Debtor, I respectfully submit that the Foreign Vendors Motion should be granted.

**4.      Debtor's Motion for Entry of an Order Confirming the Protections of Sections 362 and 365 of the Bankruptcy Code and Restraining any Action in Contravention Thereof (the "_Automatic Stay Motion_")**

89.     The Debtor seeks entry of an order (a) confirming and restating (i) the automatic stay provisions of section 362 of the Bankruptcy Code and (ii) the prohibitions against automatic termination of agreements and leases pursuant to _ipso facto_ provisions under section 365 of the Bankruptcy Code; and (b) constraining any action in contravention thereof.

90.     It is my belief that such relief is necessary in light of the international nature of the Debtor's business operations.  The Debtor has many foreign creditors and counterparties to contracts who, despite various contacts with the United States, may be unaware of the global-reaching prohibitions and restrictions of the Bankruptcy Code.  Due to this unfamiliarity, certain foreign creditors may attempt to pursue or take actions that would violate the automatic stay and/or terminate leases and contracts due to the commencement of this Chapter 11 Case.

91.     Accordingly, I believe that the existence of such an order, which the Debtor would be able to transmit to affected parties, would help ensure that the Debtor's operations are not disrupted by enforcement actions or the exercise of self-help remedies.  It is critical for the Debtor to maintain its relationships with its foreign creditors and to afford itself of the protections of the automatic stay, a hallmark of the chapter 11 restructuring process.  Therefore, I believe that the relief requested in the Automatic Stay Motion is essential to maintaining the Debtor's business operations in chapter 11 and to preserving the value of the

48

Debtor's estate and, on behalf of the Debtor, I respectfully submit that the Automatic Stay

Motion should be granted.

**5.**     **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral and (II) Scheduling a Final Hearing (the "_Cash Collateral Motion_")**

92.     The Debtor seeks entry of interim and final orders authorizing the Debtor

to continue using certain cash contained in bank accounts maintained in New York (the "**_Cash_**

**_Collateral_**") for working capital and general corporate purposes and costs and expenses related

to this Chapter 11 Case.  The Debtor, with the assistance of Gapstone Group, LLC as its financial

advisor, analyzed its cash needs in an effort to determine what is necessary to maintain its

operations in chapter 11 and work towards a successful reorganization.  The Debtor also

conferred with individuals in operational and management capacities to understand key business

metrics in both the near and long term.  Through this, the Debtor and its advisors developed a

budget pursuant to which the Cash Collateral will be used (the "**_Budget_**") and subject to the

terms and conditions set forth therein.

93.     In connection with the Debtor's efforts to secure access to immediate and

necessary liquidity, the Debtor has engaged in extensive negotiations with key parties.

Specifically, I have been informed that the Debtor has sought and obtained the consent of the

Prepetition Noteholders holding greater than a majority of the outstanding principal amount of

the Prepetition Notes to use Cash Collateral securing such notes without providing adequate

protection with respect thereto, other than the following: (1) senior additional and replacement

security interests and liens in and upon all the property of the Debtor; (2) administrative expense

claims pursuant to Section 503(b) of the Bankruptcy Code; and (3) allowed super-priority

administrative expense claims pursuant to Section 507(b) of the Bankruptcy Code.  Moreover, as

further adequate protection, the Debtor seeks authorization to provide the indenture trustee and

49

its professionals cash payment for their budgeted, reasonable fees and expenses on a monthly

basis without further Court approval unless such invoices are disputed in which event the matter

may be submitted to the Court for approval.  Finally, the Prepetition Noteholders have further

directed the indenture trustee to (i) not object to (or support any objection to) the use of the Cash

Collateral, and (ii) not independently file a motion or otherwise seek adequate protection with

respect to the use of the Cash Collateral.

94.     I believe that the continued viability of the Debtor's business and the

success of the Debtor's reorganization efforts hinge upon obtaining immediate access to funds

and authorization for the Debtor to use the Cash Collateral is critical to its ability to operate its

business and preserve value.  Without immediate liquidity provided by the use of the Cash

Collateral, the Debtor likely will be unable to conduct normal business operations, satisfy

working capital and pay basic expenses, including payroll and trade obligations.  Failure to make

these payments would prove seriously disruptive to the Debtor's vendor and employee

relationships and could case severe and irreparable harm to the Debtor's operations to the

material detriment of the estate.  Therefore, to fully satisfy the Debtor's liquidity needs and their

ordinary course obligations, I believe that the Debtor requires immediate use of the Cash

Collateral to fund its obligations which is vital to the success of its going forward operations and

restructuring efforts and therefore, respectfully submit that the Cash Collateral Motion should be

approved.

**6.     Debtor's Motion for Entry of an Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code Authorizing the Debtor to Employ and Retain Certain Professionals Utilized in the Ordinary Course of Business (the "_Ordinary Course Professionals Motion_")**

95.     The Debtor requests authority to retain and compensate professionals used

in the ordinary course of their business (the "***Ordinary Course Professionals***") *nunc pro tunc* to

the Petition Date.  Prior to the Petition Date, the Ordinary Course Professionals rendered services

in the various jurisdictions where the Debtor is located relating to such broad topics as litigation,

regulatory matters, labor and employment matters, and environmental matters, as well as other

services for the Debtor in relation to issues that have a direct and significant impact on the

Debtor's day-to-day operations.  Thus, I believe that it is essential and efficient that the

employment of the Ordinary Course Professionals be continued on an ongoing basis so as to

avoid disruption of the Debtor's business.

96.     Due to the number of Ordinary Course Professionals that are regularly

retained by the Debtor, I believe it would be unwieldy and burdensome to both the Debtor and

this Court to request that each such Ordinary Course Professional to apply separately for

approval of its employment and compensation.  While I believe that some Ordinary Course

Professionals may wish to continue to represent the Debtor on an ongoing basis, others may be

unwilling to do so if the Debtor cannot pay them on a regular basis.  Without the background

knowledge, expertise and familiarity that the Ordinary Course Professionals have relative to the

Debtor and its operations, the Debtor undoubtedly will incur additional and unnecessary

expenses in educating replacement professionals about the Debtor's business and financial

operations.  Moreover, I believe that the Debtor's estate and its creditors are best served by

avoiding any disruption in the professional services that are required for the day-to-day operation

of the Debtor's business. I respectfully submit that the continued retention and compensation of

the Ordinary Course Professionals is in the best interests of the Debtor's estate, creditors, and

other parties-in-interest and that the Ordinary Course Professionals Motion should be approved.

**C.**     **Professional Retention and Compensation Applications**

**1.**     **Debtor's Application for an Order Approving the Employment and
Retention of Gibson, Dunn & Crutcher LLP, as Co-Counsel for the Debtor in
Possession *Nunc Pro Tunc* to the Petition Date (the "*Gibson Dunn Retention
Application*")**

97.     The Debtor seeks to retain Gibson, Dunn & Crutcher LLP ("***Gibson
Dunn***") as its general bankruptcy and restructuring co-counsel.  Gibson Dunn is an international
law firm with extensive experience and knowledge in, and an excellent reputation for, providing
high quality legal services in the field of debtor protections, creditor rights and business
reorganizations under chapter 11 of the Bankruptcy Code.  As serving as general outside counsel
to the Debtor for over 6 years and in preparing for this Chapter 11 Case, Gibson Dunn has
become familiar with the Debtor's business and the legal issues that may arise in this case.  I
believe that Gibson Dunn is well-qualified and uniquely able to represent the Debtor in this
Chapter 11 Case and respectfully submit that the Gibson Dunn Retention Application should be
approved.

**2.**     **Debtor's Application for an Order Approving the Employment and
Retention of Adames, Duran, Alfaro & Lopez as Co-Counsel for the Debtor
in Possession *Nunc Pro Tunc* to the Petition Date (the "*Adural Retention
Application*")**

98.     The Debtor seeks to retain Adural, Duran, Alfaro & Lopez ("***Adural***") as
its general bankruptcy and restructuring co-counsel.  Adural is a Panamanian law firm, with
extensive experience and expertise in a broad spectrum of areas of Panamanian law, including,
but not limited to, business and corporate law, banking and securities law, fund and investment
company structuring, mergers and acquisitions, intellectual property, real estate, and litigation
and arbitration.  In light of this, Adural will be available to assist and advise Gibson Dunn as to
the intricacies of Panamanian law when such issues arise.  In preparing for this Chapter 11 Case
and through its prior representations of the Debtor, Adural has become familiar with the Debtor's

business and the legal issues involved.  I believe that Adural is well-qualified and uniquely able

to represent the Debtor in this Chapter 11 Case and respectfully submit that the Adural Retention

Application should be approved.

**3.    Debtor's Application for an Order Appointing Gapstone Group, LLC, as Financial Advisor for the Debtor in Possession *Nunc Pro Tunc* to the Petition Date (the "*Gapstone Retention Application*")**

99.    The Debtor seeks to retain Gapstone Group, LLC ("***Gapstone***") as its

financial advisor *nunc pro tunc* to the Petition Date.  Gapstone is a full-service financial firm

offering a variety of financial services, including corporate finance, financial restructuring and

capital funding.  Moreover, Gapstone maintains experience in a variety of industries, including

telecommunications, real estate and transportation and its work spans internationally.  In light of

this, it is my understanding that Gapstone is adequately equipped and fully qualified to serve as

the Debtor's financial advisor in these bankruptcy proceedings.  In preparing for this Chapter 11

Case and through its prior work with the Debtor, it is my belief that Gapstone is well-acquainted

with the Debtor's corporate history, debt structure, and business operations.  As a result,

Gapstone has developed relevant experience and expertise regarding the Debtor that will assist it

in providing effective and efficient services in the Chapter 11 Case.  Accordingly, I believe that

Gapstone is well-qualified and uniquely able to serve as the Debtor's financial advisor in this

Chapter 11 Case and respectfully submit that the Gapstone Retention Application should be

approved.

**4.    Debtor's Application for an Order Appointing Epiq Bankruptcy Solutions, LLC, as Claims and Noticing Agent for the Debtor in Possession Pursuant to 28 U.S.C. § 156 (C), 11 U.S.C. § 105(A), S.D.N.Y. LBR 5075-1 and General Order M-409 (the "*Epiq 156(c) Retention Application*")**

100.    The Debtor seeks to retain Epiq Bankruptcy Solutions, LLC ("***Epiq***") as

its claims and noticing agent in this Chapter 11 Case.  I believe that by retaining Epiq, the

Debtor's estate, and particularly its creditors, will benefit from Epiq's services.  Epiq specializes

in noticing, claims processing and other administrative tasks necessary to operate chapter 11

cases effectively.  It is my understanding that Epiq is fully equipped to manage claims issues and

provide notice to creditors and other interested parties in this chapter 11 case.  The Debtor has

obtained and reviewed engagement proposals from two other court-approved claims and noticing

agents to ensure selection through a competitive process.  Based on all engagement proposals

obtained and reviewed, I believe that Epiq's rates are both competitive and reasonable in light of

Epiq's high quality service and expertise.  Accordingly, on behalf of the Debtor, I respectfully

submit that the relief requested in the Epiq Retention Application should be approved.

> **5.**     **Debtor's Application for an Order Authorizing and Approving the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Balloting and Tabulation Agent for the Debtor Pursuant to 11 U.S.C. § 327(A) and Fed. R. Bankr. P. 2014(A)** *Nunc Pro Tunc* **to the Petition Date (the "*Epiq Balloting and Tabulation Agent Application*")**

101.     The Debtor seeks to retain Epiq as its balloting and tabulation agent in this

Chapter 11 Case.  Due to the administrative complexity of the voting process where, as here,

votes on a plan of reorganization have been solicited from holders of public securities, I believe

that the Debtor requires the assistance of Epiq to perform balloting and tabulation duties which

fall outside the scope of the contemporaneously filed Epiq 156(c) Retention Application.  I

believe that by retaining Epiq, the Debtor's estate will benefit from Epiq's services.  Epiq has

acted as the balloting and tabulation agent in numerous cases of comparable size and with

international components.  It is my understanding that Epiq is fully equipped to address any

issues arising in connection with the balloting and tabulation of votes in this Chapter 11 Case.  I

believe that the appointment of Epiq in such a capacity will ensure that the balloting and

tabulation process is run in an effective and efficient manner and by professionals who have

extensive experience with the process.  Accordingly, on behalf of the Debtor, I respectfully

submit that the relief requested in the Epiq Balloting and Tabulation Agent Application should be approved.

## V.

## SELECTION OF VENUE AND THE NOTICING OF PARTIES

102.    The Debtor has determined that the Southern District of New York is the appropriate and optimal venue for the Debtor's Chapter 11 Case and is in the best interests of the Debtor and its estate, creditors and all other stakeholders.  Under 28 U.S.C. § 1408, "a case under title 11 may be commenced in the district court for the district—(1) in which the . . . principal assets in the United States . . . have been located for the one hundred and eighty days immediately preceding such commencement . . ."  The principal asset of the Debtor in the United States – the majority of the Debtor's cash, which is the Prepetition Noteholders' Cash Collateral – is and has been since 2007 held in bank accounts located in New York as is required under the Indenture for the Prepetition Senior Secured Notes and will be required under the New Notes.  In fact, not only is the "principal asset" of the Debtor "in the United States" located in New York, the sole material asset of the Debtor "in the United States" is in New York.  Accordingly, venue in New York is appropriate under 28 U.S.C. § 1408.  In addition, while not dispositive of the issue, the Indenture and the Prepetition Senior Secured Notes are issued under and governed by New York law; counsel to the Steering Group is located in New York; and the Debtor's lead legal and financial advisors, with whom it has worked for several years, are all located in New York.

103.    Moreover, I am advised that courts in this district have held that where, as here, "upsetting the [Debtor's] selected venue will have dire consequences for the [Debtor's] stakeholders," choice of venue should not be disturbed.  *In re Patriot Coal Corp., et al.*, 482 B.R. 718, 745 (Bankr. S.D.N.Y. 2012).  This could not be more true in the instant case.  Here, venue

in New York is not only proper, but it is also essential.  Panamanian bankruptcy law does not provide for reorganization as it exists under chapter 11 of the U.S. Bankruptcy Code.  Rather, Panamanian bankruptcies are liquidation, and not reorganization, proceedings aimed at the liquidation and distribution of a debtor's assets to its creditors.  Upon commencement of an insolvency in Panama, all of the Debtor's existing contractual obligations and liabilities would be immediately deemed enforceable and collectable.  Moreover, the process of liquidating a corporation's estate in a Panamanian court is lengthy and costly.

104.   Further, I have been advised that in the chapter 11 cases of *Patriot Coal Corporation* and *Houghton Mifflin Harcourt Publishing Company*, venue was found to not be proper because contact with the venue was manufactured for the principal purpose of the debtors in those cases availing themselves of the chosen venue.  In *Patriot Coal*, the debtors created two subsidiaries in New York one month prior to the commencement of their chapter 11 cases.  It is also my understanding that those subsidiaries did not have any business operations, nor did they have any offices in New York and, despite being a multi-billion-dollar corporation with reported revenues of $2.33 billion, the "principal asset" in New York of one of the Patriot Coal debtors at the time of filing, which was the asserted justification for venue in New York, was a business checking account in the amount of $97,985.  The other New York debtor's "principal asset" was an equity certificate that was located in New York.  Indeed, Patriot Coal stipulated to the fact that it had formed the two New York entities "to ensure that the provisions of 28 U.S.C. § 1408(1) were satisfied, and for no other purpose."  *Patriot Coal*, 482 B.R. at 728.  Here, the majority of the Debtor's cash is and always has been, since at least as early as 2007 when the Prepetition Senior Secured Notes were issued under the Indenture, in New York.  Moreover, the Debtor's cash management system and the structure of the Prepetition Senior Secured Notes

were designed around the New York accounts so that the creditors' most liquid collateral was

located in a jurisdiction where the law on collateral in deposit accounts was well developed and

the judicial system predicatable.

105.   I have been advised that the facts of *Houghton Mifflin* are similarly

distinguishable.  In that case, the debtors asserted venue was proper in New York because they

maintained a "residence" by way of one of the debtors doing business in New York.  *In re*

*Houghton Mifflin Harcourt Publishing Company, et al.*, 474 B.R. 122, 134 (Bankr. S.D.N.Y.

2012).  The Court, however, found that the term "residence" as used in 28 U.S.C. § 1408 is "the

place where a natural person (a human being) lives."  *Id.*  The court also found that the second

asserted basis for venue in New York – a holding company's lease and a sublease for office

space in the state – were not the holding company's principal assets; rather, the stock of the

subsidiary it held, which in turn had 14 direct and indirect subsidiaries, was of significantly more

value and, therefore, the leases in New York were not the holding company's "principal assets"

in the United States.  *Id*. at 135-136.  Here, what is clearly the Debtor's principal asset in the

United States is located in New York.

106.   I have also been advised that in both *Patriot Coal* and *Houghton Mifflin*,

the bankruptcy court noted that venue support by creditors is a key factor with respect to a

determination as to the propriety of a particular venue.  Holders of Prepetition Senior Secured

Notes – the only impaired creditors under the Plan – have overwhelmingly and unanimously

voted to accept the Plan, and no creditor at any time during the Plan formulation process

suggested an alternative venue.  Moreover, the Debtor does not have any contacts in the United

States outside of the State of New York.  As set forth in the Debtor's liquidation analysis

annexed to the Disclosure Statement, and as is clear to all parties in interest, the chapter 11

reorganization contemplated under the Plan is a far better outcome than liquidation, which is the only alternative available to the Debtor if it were to file in Panama.  Consequently, New York is not merely the most appropriate venue but also *the only venue* where this Chapter 11 Case or adjudicated reorganization could proceed.  It is therefore in the interest of justice and of all parties with an economic stake in this Debtor that venue of this Chapter 11 Case is in New York.  *See Patriot Coal*, 482 B.R. at 748, quoting *Houghton Mifflin*, 474 B.R. at 124 (noting the "importance of deferring to the collective wisdom of the parties with 'money on the line.'").

107.    In light of this advice I have received, I believe that the Southern District of New York is the appropriate venue for these proceedings.

## VI.

## LOCAL BANKRUPTCY RULE 1007-2 DISCLOSURES

108.    Local Rule 1007-2 requires that certain information related to the Debtor be provided in this Declaration.  To the extent applicable to the Debtor, the required information is attached hereto as **Exhibit B**.  Specifically, the schedules attached as **Exhibit B** contain the following information with respect to the Debtor:[19]

- Schedule 1.  Schedule 1 sets forth a list of the names and addresses of the creditors holding the 20 largest unsecured claims against the Debtor, excluding insiders, and (where available) the name of the person familiar with the Debtor's account.  This list also includes the amount of each claim, and if applicable, an indication whether the

---

[19] The information contained in the schedules attached as **Exhibit B** of this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  Unless otherwise indicated, the financial information contained in the schedules is unaudited. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. Capitalized terms used in the schedules that are not otherwise defined therein shall have the meanings ascribed to them in preceding paragraphs of this Declaration.

claim is contingent, unliquidated, disputed, or partially secured, subject to the Debtor's right to dispute the actual validity of any claims.

- <u>Schedule 2</u>.  Schedule 2 sets forth a list of the names and addresses of the Debtor's creditors holding the five largest secured claims.  This list also includes the amount of each claim, a brief description of the type of collateral securing the claim, an estimate of the value of the collateral, and whether the claim or lien is disputed, subject to the Debtor's right to dispute the actual validity of any claims.

- <u>Schedule 3</u>.  Schedule 3 sets forth a summary of the assets and liabilities of the Debtor as of the Petition Date, which has not been audited and is subject to change.

- <u>Schedule 4</u>.  Schedule 4 sets forth a list of the number and classes of shares of stock, debentures, and other securities of the Debtor that are publicly held and, to the extent available, the number of holders thereof.  Schedule 4 separately lists the shares of stock, debentures and other securities of the Debtor held by each of the Debtor's officers and directors and the amounts so held.

- <u>Schedule 5</u>.  Schedule 5 sets forth a list of all of the Debtor's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.  Schedule 5 further provides the name, address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

- <u>Schedule 6</u>.  Schedule 6 sets forth a list of the premises owned, leased or held under other arrangement from which the Debtor operates its business.

- <u>Schedule 7</u>.  Schedule 7 sets forth a list of the approximate locations of the Debtor's substantial assets and books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

- <u>Schedule 8</u>.  Schedule sets forth a list identifying the nature and present status of each action or proceeding, pending or threatened, against the Debtor where a judgment against the Debtor or a seizure of its property is imminent.

- <u>Schedule 9</u>.  Schedule 9 sets forth the names of the individuals who comprise the Debtor's existing senior management, a description of their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

- <u>Schedule 10</u>.  Schedule 10 sets forth a list identifying the estimated amount of gross weekly payroll and fees to be paid to employees (exclusive of officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial business consultants retained by the Debtor, for the thirty-day period following the filing of the Debtor's chapter 11 petition.

- <u>Schedule 11</u>.  Schedule 11 sets forth a list of the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected

to accrue but remain unpaid (other than professional fees), for the thirty-day period following the filing of the Debtor's chapter 11 petition.

109.    Notwithstanding anything in this Declaration or on any of the exhibits attached hereto to the contrary, nothing contained in this Declaration or on any of the exhibits or schedules attached hereto is intended to be, or should be deemed or construed as, an admission with respect to: (a) the liability for, the amount of, the enforceability of or the validity of any claim; (b) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim; or (c) the proper characterization of any transaction or financing as a sale or financing.  The Debtor respectfully reserves the right to challenge any claim or any transaction or any alleged security for any claim on any basis.

## VII.

## CONCLUSION

110.    To minimize any loss of value to its business, the Debtor's immediate objective is to engage in business as usual following the commencement of this Chapter 11 Case with as little interruption to the Debtor's operations as possible.  If the court grants the relief requested in the First Day Motions, the prospect of achieving these objectives—to the maximum benefit of the Debtor's estate, creditors and parties in interest—will be substantially enhanced.  I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:    April 30, 2013

Name:  Carlos A. Saravia
Title:  Chief Operating Officer

101408690.8