**PLAN SUPPORT AGREEMENT**

This PLAN SUPPORT AGREEMENT (this "Agreement") is made and entered into as of January 23, 2013 by and among (i) Newland International Properties, Corp. ("Newland" or the "Company" or "Debtor"); and (ii) the holders or investment advisers or managers of discretionary accounts that hold the Prepetition Notes (as defined below) that collectively hold not less than a majority in aggregate principal amount of Prepetition Notes (the "Initial Supporting Noteholders"; each, an "Initial Supporting Noteholder") and have executed this Agreement on or before the Agreement Effective Date (as defined below). The Debtor, each Initial Supporting Noteholder and each person or entity that becomes a party hereto in accordance with the terms hereof are collectively referred to as the "Parties" and individually as a "Party."[1]

**R E C I T A L S**

WHEREAS, the Debtor and the Initial Supporting Noteholders are seeking to implement restructuring transactions with respect to the capital structure of the Debtor, including the Debtor's obligations under its 9.50% Senior Secured Notes due 2014 (the "Prepetition Notes") issued by the Debtor pursuant to that certain indenture, dated as of November 21, 2007, as supplemented by the first supplement thereto, dated as of May 14, 2010, as further supplemented by the second supplement thereto, dated as of March 29, 2012, and as further supplemented by the third supplemental indenture thereto, dated as of July 12, 2012, and as further supplemented by the fourth supplemental indenture thereto, dated as of December 10, 2012, by and among the Debtor and HSBC Bank USA, N.A., as trustee (the "Trustee") (with any further supplements, collectively, the "Indenture"), pursuant to the terms and conditions set forth in the Settlement Term Sheet attached hereto as Exhibit A (the "Term Sheet") and in this Agreement which are intended to form the basis, effectively, of an exchange made by the Debtor to the holders of Prepetition Notes in which the Debtor shall issue "New Notes" in exchange for the Prepetition Notes through a pre-packaged bankruptcy (the "Pre-Pack Case") by the Debtor (as same is set forth in the Term Sheet and this Agreement, (the "Transaction") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**AGREEMENT**

**Section 1.      Agreement Effective Date and Joinder**

1.1      Agreement Effective Date.  This Agreement shall become effective and binding upon each of the Parties (the "Agreement Effective Date") on the later of: (i) the date on which counterpart signature pages of this Agreement shall have been executed by the Debtor and

---

[1]  Capitalized terms not defined herein are as defined in the Term Sheet (defined in the text infra).

delivered to Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), as counsel to the Debtor, and (ii) the date on which counterpart signature pages to this Agreement shall have been executed by the Initial Supporting Noteholders and delivered to the Debtor.  Thereafter, the Agreement Effective Date as to each Subsequent Supporting Noteholder (as defined below) shall be the date they execute a Joinder Agreement (as defined below).

1.2    Joinder.  Each holder of Prepetition Notes, or investment adviser or manager of discretionary accounts that hold the Prepetition Notes, that is not an Initial Supporting Noteholder and which executes a Joinder Agreement substantially in the form attached hereto as Exhibit B ("Joinder Agreement") shall be deemed, as of the date of such execution, for all purposes of this Agreement to be a Party to this Agreement (each, a "Subsequent Supporting Noteholder") as a Consenting Noteholder (as defined below), and this Agreement shall be deemed to have been amended as of such date to include such holder of Prepetition Notes or investment adviser or manager of discretionary accounts that hold the Prepetition Notes as a Consenting Noteholder; provided, that, except as expressly amended as contemplated by this section, each provision of this Agreement shall remain in full force and effect, unamended.

### Section 2.    Term Sheet

The Term Sheet is expressly incorporated herein and is made part of this Agreement by reference.  The general terms and conditions of the Transaction are set forth in the Term Sheet; provided, however, that the Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Term Sheet, this Agreement shall govern.  Capitalized terms used but not defined herein have the meanings set forth in the Term Sheet.

### Section 3.    Commitments Regarding the Transaction

3.1    Noteholder Support of the Transaction.  So long as this Agreement has not been terminated in accordance with the terms hereof, each Initial Supporting Noteholder and each Subsequent Supporting Noteholder (such holders together, the "Consenting Noteholders" and each a "Consenting Noteholder") agrees, in compliance with the timeframes set forth in this Agreement, that it shall, subject to the terms and conditions contained herein:

(i)    on a timely basis, negotiate in good faith all documentation relating to the Transaction, including those documents that implement the Term Sheet, applicable court materials and all other documentation relating to the Transaction (collectively, the "Transaction Documents"), which Transaction Documents shall contain provisions consistent in all respects with the Term Sheet and this Agreement and shall contain such other provisions as are reasonably satisfactory to Consenting Noteholders constituting the lesser of (i) a majority in aggregate principal amount of the Prepetition Notes and (ii) all Consenting Noteholders;

(ii)    permit all necessary disclosures in the Transaction Documents of the contents of this Agreement (provided, that, except as required in a ballot, the amount of Prepetition Notes held by each Consenting Noteholder shall not be publicly disclosed);

(iii)    support the Pre-Pack Case and the Transaction contemplated therein and thereby, including, without limitation, by (A) provided that it has been provided with a Pre-Pack Plan, related Disclosure Statement and Ballot in advance thereof, voting all claims held by them in favor of the Chapter 11 plan proposed in the Pre-Pack Case incorporating the Transaction (the "Pre-Pack Plan"), and (B), should the amount of Prepetition Notes held by the Consenting Holders continue to constitute a majority of the aggregate principal amount of the Prepetition Notes, deliver a direction to the Trustee (at no liability to themselves in respect of such direction) in respect of the Prepetition Notes to take such actions as are necessary or appropriate to conduct the Pre-Pack Case, including by directing the Trustee to agree to and not oppose the Debtor's use of the cash collateral ("Cash Collateral Use") securing the Prepetition Notes solely pursuant to the Term Sheet and the cash collateral budget that is attached to the Term Sheet (the "CC Budget");

(iv)    not, directly or indirectly, in any material respect, (A) object to, delay, impede, or take any other action to interfere with confirmation or consummation of the Pre-Pack Plan, and acceptance or implementation of the Transaction or (B) propose, file, support, solicit or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtor, other than the Pre-Pack Plan, and notwithstanding the foregoing, each Consenting Noteholder may raise and be heard on any issue arising in the Pre-Pack Case so long as such Consenting Noteholder is not in breach of, or attempting to breach any of, the provisions of this Agreement; and

(v)    enter into, support, and not object to any and all transactions consistent with the Term Sheet including, without limitation, any and all transactions contemplated by the Term Sheet and the New Notes described in the Term Sheet whether or not such transactions are permitted or prohibited under the Prepetition Notes.

3.2    Commitment of the Debtor.  As long as this Agreement has not been terminated in accordance with the terms hereof, the Debtor hereby agrees, in compliance with the timeframes set forth in this Agreement, that it shall, subject to the terms and conditions set forth herein:

(i)    support and complete the Transaction embodied in this Agreement and the Term Sheet; and

(ii)    do all things necessary and appropriate in furtherance of the Transaction embodied in the Term Sheet and this Agreement, including, without limitation: (a) cooperate and work in good faith with the Company's management, counsel and advisors to prepare and cause the preparation of the Transaction Documents, (b) pursue, support, and use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transaction embodied in the Term Sheet and this Agreement, (c) pursue, support, and use commercially reasonable efforts to complete the Transaction in good faith, and use commercially reasonable efforts to do all things that are reasonably necessary and appropriate in furtherance of, and to consummate and make effective, the Transaction, including, without limitation, using

3

commercially reasonable efforts to satisfy the conditions precedent set forth in this Agreement, and (d) not take any action that is materially inconsistent with, or is intended or is likely to interfere with consummation of, the restructuring and the Transaction embodied in the Term Sheet and this Agreement.

3.3     Transfer of Prepetition Notes.  Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Noteholder (a "Transferor") to sell, assign, transfer or otherwise dispose of ("Transfer") any of its Prepetition Notes; provided, however, that for the period commencing as of the Agreement Effective Date until termination of this Agreement pursuant to the terms hereof, no Consenting Noteholder shall transfer any Prepetition Notes unless the transferee (the "Transferee"): (a) is a Consenting Noteholder or (b) prior to the Transfer, such Transferee delivers to the Debtor, at or prior to the time of the proposed Transfer, an executed copy of the Joinder pursuant to which such Transferee shall become a Party to, and bound by the terms and conditions of, this Agreement as a Consenting Noteholder in accordance with Section 1.2 of this Agreement in respect of the Prepetition Notes being transferred.  If a Transferee does not execute a Joinder Agreement or is not already a Consenting Noteholder, the sale, transfer, assignment or other disposition of the Prepetition Notes shall be deemed void ab initio.  Any Consenting Noteholder that acquires Prepetition Notes after executing this Agreement shall notify the Debtor of such acquisition within (3) three business days after the closing of such trade and shall disclose to the Debtor in writing the principal amount of any such Prepetition Notes so acquired, and (b) any such additional Prepetition Notes shall automatically and immediately upon acquisition by a Consenting Noteholder be deemed subject to all of the terms of this Agreement whether or not notice is given to the Debtor of such acquisition.

3.4     Representations of Consenting Noteholders.  Each of the Consenting Noteholders severally and not jointly represents and warrants that as of the Agreement Effective Date:

(i)      (x) it is the sole beneficial owner of the outstanding principal amount of the Prepetition Notes, or is the nominee, investment manager, or advisor for beneficial holders of the Prepetition Notes, and has the power and authority to bind the beneficial holders of such Prepetition Notes to the terms of this Agreement, as reflected in such Consenting Noteholder's signature block to this Agreement or the Joinder Agreement, as the case may be, and (y) the principal amount of Prepetition Notes reflected in such Consenting Noteholder's signature block to this Agreement or the Joinder Agreement, as the case may be, constitutes all of the Prepetition Notes that are legally or beneficially owned by such Consenting Noteholder or over which such Consenting Noteholder has the power to vote or dispose;

(ii)     other than pursuant to this Agreement and applicable law, such Prepetition Notes are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

4

(iii)    it is either (x) not a "U.S. person," as such term is used in Regulation S under the Securities Act of 1933, as amended (the "Securities Act") or (y) (i) it is an "accredited investor" within the meaning of Rule 501 of the Securities and Exchange Commission under the Securities Act, with sufficient knowledge and experience to evaluate properly the terms and conditions of the Term Sheet and this Agreement, and has been afforded the opportunity to discuss the Term Sheet and other information concerning the Debtor with the Debtor's representatives, and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and (ii) it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction and will not seek rescission or revocation of this Agreement;

(iv)    any securities acquired in the Transaction will have been acquired for investment and not with a view to distribution or resale;

(v)    it is not aware of any fact, obligation or event, including any fiduciary or similar duty to any other person, that would prevent it from taking any action required of it under this Agreement; and

(vi) it will not object to (and will not support any person in objecting to) or otherwise take any action to prohibit or limit any transactions entered into by the Debtor that would not violate the terms of the Term Sheet including without limitation the New Notes described in the Term Sheet whether or not such transactions are permitted or prohibited under the Prepetition Notes.

3.5    Representations of the Debtor.  The Debtor hereby represents and warrants as of the date the Debtor executes and delivers this Agreement (and Debtor acknowledges that each of the Consenting Noteholders is relying upon such representations and warranties) that:

(i)    the Board of Directors of the Debtor has approved, adopted and declared advisable this Agreement and the Transaction and agreements contemplated hereby and determined that this Agreement is in the best interest of the Debtor and the Company has resolved to recommend approval of this Agreement and the Transaction and agreements contemplated hereby to holders of the Prepetition Notes;

(ii)    the Transaction Documents comply with all applicable laws in all material respects and do not, as of the date of this Agreement, and will not, as of the date of any Transaction Document, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and

(iii)    (x) it has been advised by professionals of nationally recognized standing and experience in transactions of this nature, and has been afforded the opportunity to discuss and evaluate the terms and conditions of the Term Sheet and this Agreement, and to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and (y) it has made its own analysis and decision to enter into this Agreement

and otherwise investigated this matter to its full satisfaction and will not seek rescission or revocation of this Agreement.

### Section 4.        Mutual Representations, Warranties, and Covenants

Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

4.1     <u>Enforceability</u>.  It is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Agreement has been duly executed and delivered by such Party and is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

4.2     <u>No Consent or Approval</u>.  Except as expressly provided for in this Agreement, the Bankruptcy Code, and such approvals as may be required by the federal securities laws, state blue sky laws or Panamanian law in connection with the Transaction, no consent or approval is required by any other person or entity in order for it to carry out the Transaction contemplated by, and perform their respective obligations under, this Agreement.

4.3     <u>Power and Authority</u>.  It has all requisite power and authority to enter into this Agreement and to carry out the Transaction contemplated by, and perform its respective obligations under, this Agreement.

4.4     <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part.

4.5     <u>No Conflicts</u>.  The execution, delivery, and performance by it of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to a Party or any of its affiliates, or its certificate of incorporation or bylaws or other organizational documents or those of any of its affiliates, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which a Party or any of its affiliates is a party, that would in any way impede the ability to consummate the Transaction.

4.6     <u>Scope of Representations and Warranties</u>.  Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

### Section 5.        Termination Events

5.1     This Agreement shall automatically terminate and, except as otherwise provided herein, all obligations of the Parties shall immediately terminate and be of no further force and effect upon the occurrence and continuation of any of the following events:

(i)      The filing by the Debtor of any motion or other request for relief seeking to (1) dismiss the Pre-Pack Case, (2) convert the Pre-Pack Case to a case under Chapter 7 of the Bankruptcy Code, or (3) appoint a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in the Pre-Pack Case, unless such motion or other request is withdrawn prior to the earlier of (x) three (3) business days after filing such motion or other request for relief with the Bankruptcy Court, and (y) entry of any order by the Bankruptcy Court approving the requested relief (whether such relief is sought by the Debtor or a third party);

(ii)      An examiner is appointed pursuant to Section 1104(c)(1) of the Bankruptcy Code with expanded powers to run the business of the Debtor, or a trustee under Chapter 11 of the Bankruptcy Code is appointed for the Debtor in the Pre-Pack Case;

(iii)      A court of competent jurisdiction shall enter a final nonappealable judgment or order declaring this Agreement to be unenforceable;

(iv)      The entry of a final non-appealable judgment or order in the Pre-Pack Case rejecting this Agreement;

(v)      The commencement of an involuntary bankruptcy proceeding against the Debtor that is not dismissed or converted to a voluntary proceeding within thirty (30) business days (provided that no Consenting Noteholder sought or supported such order);

(vi)      The conversion of the Pre-Pack Case to a case under chapter 7 of the U.S. Bankruptcy Code or dismissal of the Pre-Pack Case; or

(vii)      The determination of the Debtor in good faith and based on the advice of outside legal counsel to the Debtor's Board of Directors that continued performance under this Agreement would be inconsistent with the exercise of applicable fiduciary or similar duties imposed on the Debtor's Board of Directors, shareholders or officers by law; provided, however, that as of the date of this Agreement, the Debtor represents and warrants to the Consenting Noteholders that nothing in this Agreement conflicts with applicable fiduciary duties imposed on the Debtor's Board of Directors by law.

5.2      This Agreement may be terminated on the occurrence of any of the following events, so long as such Termination Event (as defined below) is not waived pursuant to Section 6.1 of this Agreement (subject to written notice of any such event and the passage of any cure period as provided below):

(i)      By a Consenting Noteholder if the Debtor has not commenced the Pre-Pack Case in the Bankruptcy Court, together with the filing of the Pre-Pack Plan and Disclosure Statement, and motions to approve the Cash Collateral Use and this Agreement on or before March 8, 2013 (the "Commencement Date"), subject to the ability of the Debtor, with written approval of the Steering Group as evidenced by the signature of its legal counsel, to extend the Commencement Date by up to seven (7) business days;

(ii)     By a Consenting Noteholder if the Pre-Pack Plan, the Disclosure Statement, any Cash Collateral Use, or the CC Budget has been amended, modified or supplemented, such that the Plan, Disclosure Statement, Cash Collateral Use or the CC Budget is not consistent in all material respects with the Term Sheet;

(iii)    By a Consenting Noteholder if the Debtor shall in any material respect (A) fail to comply with the CC Budget, or (B) undertake any related party expenditures, transfers or transactions (other than the payment of ordinary course salaries and professional fees in accordance with the CC Budget attached to the Term Sheet);

(iv)    By a Consenting Noteholder if the business, properties, assets or financial condition of the Debtor and any of its direct or indirect subsidiaries taken as a whole shall have been materially and adversely affected since the date of this Agreement;

(v)     By a Consenting Noteholder if the Pre-Pack Plan shall not have been confirmed and the Disclosure Statement approved on or before the date which is ninety (90) calendar days after the Commencement Date;

(vi)    By a Consenting Noteholder if the Pre-Pack Plan shall not have become effective (the "Effective Date") within twenty (20) calendar days after or shall not have been substantially consummated within thirty (30) days after confirmation of the Pre-Pack Plan;

(vii)   By a Consenting Noteholder in the case of a breach in any material respect by the Debtor of any of the obligations, representations, warranties, or covenants of the Debtor set forth in this Agreement; provided, however, that the Debtor shall have five (5) Business Days after receiving such notice to cure such breach; provided, further, that this clause (vii) shall not be actionable as a Termination Event if Consenting Noteholders collectively holding a majority in aggregate principal amount of Prepetition Notes have transmitted a notice to the Debtor waiving any such breach within five (5) Business Days of such event;

(viii)  By the Company in the case of a breach in any material respect by any of the Consenting Noteholders of any of the representations, warranties, or covenants of such Consenting Noteholders set forth in this Agreement; provided, however, that the Debtor shall transmit a notice to the Consenting Noteholders detailing any such breach, and the breaching Consenting Noteholders shall have five (5) Business Days after receiving such notice to cure any breach;

(ix)    By a Consenting Noteholder in the case of an issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Transaction; provided, however, that the Debtor shall have ten (10) Business Days after receiving such notice of any ruling or order to cure any such Termination Event;

(x)     By a Consenting Noteholder in the event of a termination of, material modification of, or breach in any material respect by the Shareholders of that certain Letter Agreement, dated January 23, 2013, by and among Ocean Point Development

Corp., Roger Khafif, Upper Deck Properties, S.A., Arias, Serna & Saravia, Espacios
Urbanos, S.A., Eduardo Saravia Calderón, and Carlos and Alberto Serna Londoño
(together, the "Shareholders") and the Company regarding their support for the Pre-Pack
Plan; provided, however, that the Debtor shall have five (5) Business Days after receiving
such notice to cure such breach; provided, further, that this clause (vii) shall not be
actionable as a Termination Event if Consenting Noteholders collectively holding a
majority in aggregate principal amount of Prepetition Notes have transmitted a notice to
the Debtor waiving any such breach within five (5) Business Days of such event;

(xi)    By a Consenting Noteholder in the case of a reversal on appeal or vacation
of any order authorizing Cash Collateral Use, approving the disclosure statement, or
confirming the Pre-Pack Plan; or

(xii)    By a Consenting Noteholder or the Company if the Trustee fails to take
any action with respect to any matter necessary or proper to support the Pre-Pack Case
and the Transaction;

provided, however, that no Party shall have the right to so terminate its obligations under this
Agreement upon the occurrence of any of the events and conditions described above in this
Section 5.2 (the "Termination Events") unless such Party has given written notice ("Notice of
Termination") thereof to each of the other Parties hereto specifically identifying the alleged
Termination Event, and, except where a cure period is provided within this Section 5.2, the event
or condition giving rise to such right is not cured within three (3) Business Days of receipt of
such written notice.

5.3    This Agreement and the obligations of all Parties hereunder may be terminated by
mutual agreement among (a) the Debtor and (b) Consenting Noteholders representing a majority
in aggregate principal amount of Prepetition Notes.

5.4    Upon termination of this Agreement under Section 5.1, 5.2, or 5.3 except as
otherwise provided herein, this Agreement shall be of no further force and effect, except for the
provisions in Section 7 other than Section 7.1 and 7.12, each of which shall survive termination
of this Agreement, and each Party (and, for the avoidance of doubt, in the case of an individual
Consenting Noteholder, that Consenting Noteholder, and in the case of the Company, all Parties)
shall be released from its commitments, undertakings, and agreements under or related to this
Agreement, including any votes or consents delivered in furtherance hereof (provided, that, a
vote or consent delivered in furtherance hereof shall be revoked in the event of a termination
under Section 5.2 hereof only as to such terminating Party and only if the terminating Party in its
Notice of Termination or in connection therewith indicates its intention to nullify its vote or
consent), and shall have the rights and remedies that it would have had it not entered into this
Agreement, and shall be entitled to take all actions, whether with respect to the Transaction or
otherwise, that it would have been entitled to take had it not entered into this Agreement.

5.5    The Consenting Noteholders shall have no liability to the Debtor or each other for
any termination of this Agreement in accordance with the terms hereof. The Debtor shall have no

liability to the Consenting Noteholders for any termination of this Agreement in accordance with the terms hereof.

### Section 6.    Amendments and Waiver

6.1    This Agreement, including the Term Sheet, may not be modified, amended, or supplemented and no provisions of this Agreement may be waived (except as expressly provided herein or therein) except in writing signed by the Debtor and Consenting Noteholders representing a majority in aggregate principal amount of Prepetition Notes.

### Section 7.    Miscellaneous

7.1    Payment to Initial Supporting Noteholders Advisors.  In consideration of the efforts of the Initial Supporting Noteholders in connection with the Pre-Pack Plan, this Agreement, the Term Sheet, and the overall restructuring of the Company, the Company shall continue to make payments to the advisors to the Initial Supporting Noteholders (Seward & Kissel LLP, Morgan & Morgan, BroadSpan Capital LLC), and such advisors shall be paid in full for all services rendered and disbursements incurred through the Commencement Date before the Commencement Date and any fees and expenses incurred or payable thereafter shall be paid on or before and as a condition to the Effective Date (including in connection with Cash Collateral Use).

7.2    Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Transaction, as applicable.

7.3    Complete Agreement.  Except as expressly provided herein, this Agreement and all Exhibits hereto is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

7.4    Parties.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided herein.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

7.5    Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

7.6    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY: THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH

STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES
THEREOF.  Each Party agrees that it shall bring any action or proceeding in respect of any claim
arising out of or related to this Agreement, to the extent possible, in either the United States
Bankruptcy Court for the Southern District of New York or any New York State court sitting in
New York City (the "Chosen Courts"), and solely in connection with claims arising under this
Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives
any objection to laying venue in any such action or proceeding in the Chosen Courts, and
(c) waives any objection that the Chosen Courts are an inconvenient forum or do not have
jurisdiction over any Party.  Each Party irrevocably waives any and all right to trial by jury in
any legal proceeding arising out of or relating to this Agreement or the Transaction contemplated
hereby.

7.7    Execution of Agreement. This Agreement may be executed and delivered (by
facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when
executed and delivered, shall be deemed an original, and all of which together shall constitute the
same agreement.

7.8    Successors and Assigns.  This Agreement is intended to bind and inure to the
benefit of the Parties and their respective successors, assigns, heirs, executors, administrators,
and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

7.9    Relationship among Parties.

(i)    it is understood and agreed that no Consenting Noteholder has any
fiduciary duty or other duty of trust or confidence in any form with any other Consenting
Noteholder, and, except as provided in this Agreement, there are no commitments among
or between them.  In this regard, it is understood and agreed that any Consenting
Noteholder may trade in the Prepetition Notes without the consent of the Debtor or any
other Consenting Noteholder, subject to applicable securities laws and the terms of this
Agreement; provided, however, that no Consenting Noteholder shall have any
responsibility for any such trading by any other entity by virtue of this Agreement.  No
prior history, pattern, or practice of sharing confidences among or between the
Consenting Noteholders shall in any way affect or negate this understanding and
agreement;

(ii)    Except as otherwise provided herein, this Agreement applies only to each
Consenting Noteholder's Prepetition Notes and to each Consenting Noteholder solely
with respect to its legal and/or beneficial ownership of, or its investment and voting
discretion over its Prepetition Notes (and not, for greater certainty, to any other types or
classes of securities, loans or obligations that may be held, acquired or sold by such
Consenting Noteholder or any client of such Consenting Noteholder whose funds or
accounts are managed by such Consenting Noteholder or managed by a different
investment advisor) and, without limiting the generality of the foregoing, shall not apply
to: (x) (any securities, loans or other obligations (including Prepetition Notes) that may
be held, acquired or sold by, or any activities, services or businesses conducted or
provided by, any group or business unit within or affiliate of a Consenting Noteholder
(A) that has not been involved in and is not acting at the direction of or with knowledge

11

of the Debtor's affairs provided by any person involved in the Transaction discussions or (B) is on the other side of an information firewall with respect to the officers, partners and employees of such Consenting Noteholder who have been working on the Transaction and is not acting at the direction of or with knowledge of the Debtor's affairs provided by any officers, partners and employees of such Consenting Noteholder who have been working on the Transaction; and (y) (any securities, loans or other obligations that may be beneficially owned by clients of a Consenting Noteholder, including accounts or funds managed by the Consenting Noteholder, that are not Prepetition Notes.

7.10    Notices.  All notices hereunder shall be deemed given if in writing and delivered, if sent by telecopy, electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as shall be specified by like notice):

      (i)      if to the Debtor to:

> Newland International Properties, Corp.
> Calle 53 Obarrio
> Plaza 53
> Panama City, Republic of Panama
> Attention:  Mr. Carlos Saravia
> Fax:  (507) 223-0225
> Electronic Mail:  charlies@trumpoceanclub.com

with copy to:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York, 10166
> Attn:  Kevin Kelley and Eric Wise
> Fax:  (212) 351-5322

      (i)      if to an Initial Supporting Noteholders or a transferee thereof, to the addresses or telecopier numbers following the Consenting Noteholder's signature (or as directed by any transferee thereof), or set forth in a Joinder Agreement,

with a copy to:

> Seward & Kissel LLP
> One Battery Park Plaza
> New York, NY 10004
> Attn:  John R. Ashmead
> Fax:  (212) 480-8421

7.11    Waiver.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Noteholder or the ability of each of the Consenting Noteholders to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against the Debtor.  If the Transaction is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, defenses and counterclaims.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

7.12    Specific Performance.  Except as otherwise provided herein, it is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of a Chosen Court, or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

7.13    Several, and not Joint, Obligations.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

7.14    Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

7.15    No Third Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

7.16    Good Faith Cooperation.  Each Party hereby covenants and agrees to cooperate with each other and negotiate in good faith in all matters concerning the drafting of the Transaction Documents, implementation and consummation of the Transaction and the Pre-Pack Case and in supporting the Transaction Documents, the Transaction and the Pre-Pack Plan.

7.17    Acknowledgement.  This Agreement is not and shall not be deemed a solicitation of votes for the acceptance of the Pre-Pack Plan or a solicitation to tender or exchange any Prepetition Notes.

7.18    Interpretation.  This agreement is the product of negotiations among the Initial Supporting Noteholders and the Debtor, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted this Agreement, or caused this Agreement, or any portion hereof to be drafted, shall not be effective in regard to the interpretation hereof.

7.19    Severability.  If any portion of this Agreement shall be held to be invalid, void, or otherwise unenforceable, then that portion shall be deemed modified (only to the extent necessary and in a manner consistent with the remainder of this Agreement) so as to be valid and

13

enforceable, or, if such modification is not reasonably feasible, shall be deemed to have been severed out of this Agreement, and the Parties acknowledge that the balance of this Agreement shall in any event be valid and enforceable unless the effect shall be to materially alter the terms and conditions of this Agreement.

7.20    <u>Confidentiality.</u>  Each Party hereto hereby agrees that until the Pre-Pack Plan is launched, this Agreement is to be kept confidential and that no Party can make a public disclosure regarding this Agreement without the consent of the other Parties.

7.21    <u>Exculpation and Release</u>.  The Pre-Pack Plan shall provide for a customary release and exculpation of the Consenting Noteholders, the Steering Group and their advisors, and the Debtor shall use its reasonable best efforts to support such provisions.

7.22    <u>Fiduciary Duties</u>.  Notwithstanding anything to the contrary herein, none of the Consenting Noteholders shall have any fiduciary duty or other duties or responsibilities to each other, any other Noteholder, the Debtor or any of the Debtor's creditors or other stakeholders.

7.23    <u>Appointment to Statutory Committee; Discretion to Exercise Fiduciary Responsibilities</u>.  Anything else in this Agreement to the contrary notwithstanding, if a Consenting Noteholder is appointed to and serves on a statutory committee established in the Pre-Pack Case, the terms of this Agreement shall not be construed to limit such Party's exercise, in its sole discretion, of its fiduciary duties to any person arising from its service on such committee, and any exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement.  To the extent that the United States Trustee declines to appoint a Consenting Noteholder to any such statutory committee based upon such Consenting Noteholder's execution of this Agreement, this Agreement shall be deemed to be terminated as to one or more such Consenting Noteholders so as to allow such Consenting Noteholders to be appointed to such statutory committee, but only to the extent that after giving effect to such terminations(s), the remaining Consenting Noteholders hold a majority of outstanding Prepetition Notes.

7.24    <u>Time</u>.  Time is of the essence in the performance of the Parties' respective obligations.  Any date, time or period referred to in this Agreement shall be of the essence, except to the extent to which the Parties agree in writing to vary any date, time or period, in which event the varied date, time or period shall be of the essence.

[signature pages follow]

14

Newland International Properties, Corp.

By: _____
Name: ROGER KHAFIF
Title: President
and authorized
signatory of Newland International
Properties, Corp.

[Initial Supporting Noteholder signatures on following pages]

Initial Supporting Noteholder Signature Page

[Initial Supporting Noteholder]

By: _____
Name:
Title:

Principal amount of
Prepetition Notes held: $_____

## **Exhibit A**

## **Term Sheet**

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

## NEWLAND INTERNATIONAL PROPERTIES, CORP.

## SETTLEMENT TERM SHEET

### January 23, 2013

This Settlement Term Sheet ("Term Sheet") sets forth the principal indicative terms of a proposed settlement (the "Settlement") negotiated among the Company (as defined below), the Steering Group (as defined below), the Shareholders (as defined below) and the CCSA Parties (as defined below) (the forgoing parties together, the "Settlement Parties") of certain disputes concerning the Company's existing defaults (together, the "Default") on, and a restructuring of the terms of, the Company's secured notes due 2014 (the "Existing Notes") issued to or held by investors ("Noteholders") under that certain indenture, dated as of November 7, 2007, as supplemented by the first supplemental indenture, dated as of May 14, 2010, the second supplemental indenture dated as of March 29, 2012, the third supplemental indenture dated as of July 12, 2012, and the fourth supplemental indenture dated as of December 10, 2012 (including all documents executed and delivered with the foregoing, the "Existing Indenture")[1], among the Company and HSBC Bank USA, N.A., as trustee (the "Trustee"), relating to the financing and development of the Trump Ocean Club in Panama (the "Project") and certain other related obligations.

The transactions contemplated by this Term Sheet are subject to further terms and conditions to be set forth in definitive documents that are consistent in all material respects with the terms set forth herein. This Term Sheet shall not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a Chapter 11 plan. Any such offer or solicitation shall only be made in compliance with all applicable laws. This Term Sheet is strictly confidential to the Settlement Parties and their respective legal and financial advisers, not to be disclosed to third parties, and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import applicable to the parties and the subject matter hereof, until such time as it is included in solicitation materials in connection with the acceptances of a Chapter 11 plan. This Term Sheet is being presented for discussion and settlement purposes only. Any binding agreement or commitment between the Settlement Parties would result only from the execution and delivery by each party of a definitive agreement or agreements, when and if executed and delivered, containing such terms and conditions consistent in all material respects with the terms set forth herein. Capitalized terms not defined herein shall have the meanings ascribed thereto in the Existing Indenture.

THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE RESTRUCTURING TRANSACTION, EACH ELEMENT OF WHICH IS

---

[1]    Note – if sufficient consents are obtained, the Existing Indenture is to be adjusted to include a Fifth Amendment as of the date that amendment is effective concerning the registration of the Unit Purchase Agreements in connection with the sale of the Casino. The Fifth Amendment is to be in the form of the amendment recently circulated to Noteholders.

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE
PROPOSED RESTRUCTURING OF THE COMPANY.  NOTHING IN THIS TERM SHEET
SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR
LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED
HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL
RIGHTS, REMEDIES, CLAIMS, OR DEFENSES OF THE COMPANY, THE STEERING
GROUP (INCLUDING ITS MEMBERS IN THEIR INDIVIDUAL CAPACITIES), THE
SHAREHOLDERS AND THE CCSA PARTIES.


I.    **Settlement Parties and Other Important Parties**


| | |
|---|---|
| **Company:** | Newland International Properties, Corp., a Republic of Panama corporation ("Newland" or the "Company"). |
| **Shareholders:** | The direct and indirect shareholders of the Company:  Ocean Point Development Corp. ("Ocean Point"); Roger Khafif; Upper Deck Properties, S.A. ("Upper Deck"); Arias, Serna & Saravia; Espacios Urbanos, S.A (together, the "Shareholders"). |
| **CCSA Parties:** | Roger Khafif, Eduardo Saravia, and Carlos A. Serna (each, a "CCSA Party"; together, the "CCSA Parties"). |
| **Affiliates:** | An "Affiliate" and "Affiliates" of any person or entity shall be all direct and indirect subsidiaries, parents, or affiliates (which term "affiliate" shall mean any entity or person controlling, controlled by, under common control with such person or entity) of such person or entity.  When the term Affiliate or Affiliates is used herein, such term shall refer to the Affiliate or Affiliates of the Company, except where expressly stated that such term refers instead to one or more of the Company, Shareholders or CCSA Parties. |
| **Steering Group:** | Greylock Capital Management, LLC, Moneda Asset Management, Polo Capital Management, Trinidad and Tobago Unit Trust Corporation and Portfolio Credit Management Limited, all via managed or controlled accounts or funds, collectively holding or controlling in excess of 41.76% of the outstanding principal amount of the Existing Notes (the "Steering Group"). |
| **Trump:** | The Licensor as defined in Exhibit 2 attached hereto and its affiliates, as applicable ("Trump"). |
| **Trustee:** | The Trustee as defined above, and also as context dictates, HSBC Investment Corporation (Panama), acting in its capacity as Co-Trustee under the Indenture (individually referred to as the "Co-Trustee"). The references to the Trustee herein and in the Exhibits appended hereto are solely to the Trustee in its capacity as Trustee and its representative capacity for holders of the Existing Notes, and not in its individual capacity. |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

## II.    **Settlement Overview**

| | |
|---|---|
| **Restructuring:** | The Settlement contemplates a restructuring transaction ("Restructuring") pursuant to a plan support agreement (the "Plan Support Agreement") among the Company, the Shareholders, the CCSA Parties and the members of the Steering Group and other holders that execute and deliver the Plan Support Agreement, which Restructuring shall be implemented through a pre-packaged Chapter 11 bankruptcy plan (the "Pre-Packaged Plan") that would provide for (a) the cancellation of the Existing Indenture and Existing Notes in exchange for a new indenture and new notes similar to the Existing Indenture and Existing Notes in all material respects except as set forth herein,[2] (b) the new notes (the "Notes") having, among other things set forth below, revised amortization, certain collateral package enhancements, the deletion of, addition of and amendments to covenants and certain other rights and remedies, and (c) the as settlement of certain other issues, as summarized herein, all the foregoing to be documented in, among other things, the new indenture executed pursuant to the Pre-Packaged Plan (the "Indenture").<br><br>The Pre-Packaged Plan shall also provide for, the final settlement of the Construction Completion Support Agreement, dated as of November 6, 2007 (the "CCSA"), and any and all obligations of the CCSA Parties thereunder, all on the conditions and terms to the settlement of the CCSA as are set forth in Exhibit 1 hereto (the "CCSA Settlement").<br><br>In exchange for all the consideration set forth in Exhibit 1 hereto, the effectiveness of the Pre-Packaged Plan shall result in the final settlement of the CCSA and the satisfaction and release of any and all obligations of the CCSA Parties thereunder without any liability to any of them.  In furtherance thereof, the Pre-Packaged Plan and confirmation order (the "Confirmation Order") shall direct the Trustee to execute and deliver any and all documents required, if any, to effectuate the CCSA Settlement, with no liability to the Trustee and with the Trustee being released and exculpated under the Pre-Packaged Plan for taking any such action.  In addition, each vote in favor of the Pre-Packaged Plan by a holder of Existing Notes shall constitute an effective irrevocable direction to the Trustee not to oppose the Pre-Packaged Plan or the CCSA Settlement, to forbear from seeking to enforce the CCSA, and, if under any circumstance the Trustee obtains any monies under or |

---

[2]    Notwithstanding the execution of the Indenture and issuance of Notes in consideration of the Existing Indenture and Existing Notes, the Settlement Parties intend there to be no loss of perfection or priority in the Collateral as same exists as of the date hereof.

| | pursuant to the CCSA Agreement, to return such monies to the CCSA Parties. |
| | The "Effective Date" as used herein shall be the effective date of the Pre-Packaged Plan. |

## III. New Notes

| | |
|---|---|
| **Notes:** | New Senior Secured Notes due May 15, 2017.  Pursuant to the Pre-Packaged Plan, the Notes will represent the US$220,000,000[3] Existing Notes, plus the Accrued Interest Amount (as defined below)  in accordance with the Pre-Packaged Plan which shall be capitalized on a pro-rata basis (as described below), and shall be governed by the terms of the Indenture.<br><br>"Accrued Interest Amount" shall be an amount equal to the interest accrued and unpaid on the Existing Notes through the Effective Date. |
| **Interest:** | The Notes shall accrue interest from the Effective Date at 9.5% which shall be payable in cash twice yearly in arrears on each Payment Date; provided, that, the first payment of interest in respect of the Notes shall be the Payment Date falling on May 15, 2013. |
| **Minimum Scheduled Amortization:** | Principal payments on the Notes will consist of the Minimum Scheduled Amortization Amounts as set forth in the table below, which equals, in the aggregate, the original (and presently remaining) outstanding principal amount of $220 million of the Existing Notes; provided, that the outstanding principal amount of the Existing Notes shall be increased to reflect the Accrued Interest Amount (such that the Minimum Scheduled Amortization Amounts below shall be increased on a pro-rata basis to reflect such capitalization).<br><br>"Minimum Scheduled Amortization Amount" means, with respect to a Payment Date, the respective amount shown for such Payment Date in the table below (which outstanding principal amount of the Existing Notes shall be increased to reflect the Accrued Interest Amount, which shall be applied across each Minimum Scheduled Amortization Amount on a pro rata basis); provided, that, the Minimum Scheduled Amortization Amount shall be decreased over the life of the Notes to the extent of any prepayments made due to Net Proceeds (as defined below) prepaid as Mandatory Prepayments from Prime Unit Sales and other Asset Sales under |

---

[3]    Every reference to currency herein (including the Exhibits hereto) shall mean U.S. currency.

|  |  |
|---|---|
|  | the Indenture and to the extent of any Supplemental Amortizations, Optional Redemptions or cancellation of the Notes following "Open Market Repurchases" (as defined below) or otherwise cancelled in accordance with the Indenture, each as more fully described herein. |
|  | **Date**       **Minimum Scheduled Amortization Amount** |
|  | 15 May 2013        $5 million[4] |
|  | 15 Nov 2013        $10 million |
|  | 15 May 2014        $15 million |
|  | 15 Nov 2014        $20 million |
|  | 15 May 2015        $21 million |
|  | 15 Nov 2015        $23.5 million |
|  | 15 May 2016        $26.5 million |
|  | 15 Nov 2016        $29 million |
|  | 15 May 2017        $70 million |
| **Supplemental Amortization:** | In addition to the Minimum Scheduled Amortization Amount for each Payment Date, on each Payment Date commencing with the first Payment Date on May 15, 2013, the Notes shall become due and payable on such date in an amount equal to the Supplemental Amortization Amount (as defined below) (each such payment amount, a "Supplemental Amortization"). |
|  | The "Supplemental Amortization Amount" on each Payment Date shall be the positive balance, if any, in the Collection Account reserve referred to in item (7) under "Priority of Payments and Reserves in the Collection Account" below after application of items (1) – (6) in such section of this Term Sheet on the 5th Business Day prior to such Payment Date (the "Determination Date"). |
|  | Supplemental Amortizations shall be applied to the reduction of the Minimum Scheduled Amortization Amounts remaining to be paid by a reduction of each such remaining scheduled amount in equal amounts across all such remaining Payment Dates (i.e., per capita not pro rata). |
| **Mandatory Prepayment** | In the event of a sale by the Company of the Casino[5], Spa or Penthouse unit on the 66th floor (each a "Prime Unit", and each |

---

[4]        If the Effective Date occurs after May 15, 2013, then the May 15, 2013 Minimum Scheduled Amortization for the Notes may be set to a later date following the Effective Date but not later than 60 days following the Effective Date.

| | |
|---|---|
| **from Prime Unit Sales:** | such sale a "Prime Unit Sale"), the Company shall prepay (a "Mandatory Prepayment") the Notes at par in the amount of the Net Proceeds (as defined below), on the third Business Day following the date on which a Company Officer has certified to the Trustee as to the calculation of the Net Proceeds and the Mandatory Prepayment, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to the calculation.  Mandatory Prepayments pursuant to Prime Unit Sales shall be applied to the Minimum Scheduled Amortization Amounts in reverse order of maturity in an aggregate principal amount equal to the Net Proceeds (for the avoidance of doubt, the full amount of such prepayment shall be applied in full to the final Minimum Scheduled Amortization Amount (e.g., until it has been prepaid in full, the May 15, 2017 Minimum Scheduled Amortization Amount) existing at such time).

"Net Proceeds" shall mean the aggregate cash proceeds received by Newland in respect of any Prime Unit Sale, including in respect of any installment payment for such Prime Unit Sale, net of the commercially reasonable direct costs  related to such Prime Unit Sale required to be paid by the Company, including, without limitation, legal and accounting expenses of the Company, applicable Trump license fees, the TOC Casino BC Loan Amount (as defined in Exhibit 3), investment banking or advisory fees of the Company and other Brokers' Commissions (as defined herein), taxes paid or payable directly attributable to the Prime Unit Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, any reserve for adjustment in respect of performance obligations assumed by Newland in connection with the agreed sale price of such Prime Unit or Prime Units and any reserve for adjustment in respect of the sale price of such Prime Unit or Prime Units (in all cases until such reserve is released), and in all cases above established in accordance with IFRS and applicable Panamanian regulations.

A Company Officer shall certify to the Trustee within 3 Business Days of closing of a Prime Unit Sale, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it, as to the calculation of the Net Proceeds and the Mandatory Prepayment. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the |

---

<sup>5</sup>     In connection with any actions taken by the Trustee in connection with a sale of the Casino Unit, the Trustee shall be entitled to any and all information required in order to satisfy its internal policies and procedures with respect to anti-money laundering laws and regulations to which the Trustee is subject.

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

|  |  |
|---|---|
|  | certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance of such certification. |
| **Accounts:** | "Accounts" shall mean the HSBC Panama Closing Account, the HSBC Panama Account, the Release Account, and the Collection Account. The Accounts to be maintained with or by the Trustee or the Co-Trustee, as applicable, are: |
|  | (1)    HSBC Panama Closing Account.  The account, currently existing, at HSBC Panama into which payments on Receivables in connection with Unit Purchase Agreements shall be deposited and Brokers' Commissions as well as Property Transfer Fees (each as defined herein) shall be paid from as provided in the fourth supplemental indenture dated December 10, 2012; |
|  | (2)    HSBC Panama Account.  The account, currently existing, into which Newland Unit Proceeds (as defined herein) shall be transferred from the HSBC Panama Closing Account twice weekly and into which proceeds of Prime Unit Sales and Non-UPA Revenues (defined below) shall be deposited; |
|  | (3)    Release Account.  The account, currently existing, into which funds will be transferred from the HSBC Panama Account twice weekly (after deducting an amount necessary to permit the Company pay the Trump license fees per the Existing Indenture); and |
|  | (4)    Collection Account.  The account, currently existing, into which funds will be transferred from the Release Account (after deduction of Monthly Working Capital Amount (defined below)). |
| **Priority of Payments and Reserves in the Collection Account:** | On any Business Day on which a disbursement is requested by the Company or otherwise required under the Indenture (each, a "Disbursement Date"), or where indicated below, on each Payment Date or Expense Payment Date, the Trustee will reserve or reduce and/or disburse any prior reservation of amounts in the Collection Account, all as specified below and in the following order of priority (the "Priority of Payments"): |
|  | (1)    (x) on an Expense Payment Date, in amounts sufficient to pay the fees, expenses and indemnities of the Trustee and Co-Trustee due and unpaid on such Expense Payment Date; and (y) to reserve funds in an amount up to the Minimum Collection Account Balance (but only for so long as provided and as defined in the second supplemental indenture between the Company and the Trustee, dated as of March 29, 2012); |
|  | (2)    (x) if requested by the Company, to reserve, or reduce and/or disburse any prior reservation of, all or a portion of an amount up to the Monthly Working Capital Amount (defined below) to the |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

extent not previously withdrawn by the Company from the Release Account; and (y) if requested by the Company, to reserve, or reduce and/or disburse any prior reservation of, all or a portion of an amount up to the Monthly Working Capital Reserve Amount (as defined below); provided, that, in no instance shall the Company be permitted to draw under (x) or (y) an amount in excess of the Monthly Working Capital Amount for any month;

(3)      if requested by the Company, to reserve or reduce and/or disburse any prior reservation of all or a portion of the Contingency Reserve Amount (as defined below);

(4)      as directed by the Company, to reserve and/or disburse any prior reservation of all or a portion of an amount up to the Bulk 2 Repurchase Reserve Amount (as defined below);

(5)      as directed by the Company, (x) to reserve all remaining amounts until the Debt Service Reserve Amount (as defined below) is achieved; (y) on a Payment Date to apply all amounts previously reserved pursuant to this item (5) and any other amounts needed for such purpose to the payment of the Debt Service then due and payable; and (z) if requested by the Company to reserve or reduce any prior reservation of all or a portion of the Debt Service Reserve Amount for the second Payment Date following the date of such reservation or reduction;

(6)      if requested by the Company, to reserve, or reduce and/or disburse any prior reservation of, all or a portion of the (x) BC Senior Loan Reserve Amount and/or BC Ferry Payment Reserve Amount (as defined below); (y) Open Market Purchase or Optional Redemption (as defined below) amounts to be paid by the Company; and (z) Net Proceeds in respect of a Prime Unit Sale, in the event any such Net Proceeds have been received by the Company and not yet applied to a Mandatory Prepayment for any reason; and

(7)      on the Determination Date, any balance remaining in the Collection Account after application and reservation of all items in (1) – (6) above shall constitute the Supplemental Amortization Amount to be paid on the Payment Date following such Determination Date.

With respect to the items above, to be agreed with the Trustee in the final documentation reasonable time periods for payments, for notice to the Trustee and for frequency of disbursements.

With respect to item (4), any prior reservation of the Bulk 2 Repurchase Reserve Amount may only be reduced to fund a Debt Service payment.

In all cases, disbursements shall be permitted provided that they

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE
FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | are in accordance with the other terms of the Indenture. |
| **Certain Defined Terms:** | Unless otherwise defined herein, terms used in this Term Sheet are used as defined in the Existing Indenture and if not defined herein or in the Existing Indenture shall be construed as provided in Section 1.02 of the Existing Indenture and, in particular, terms used and not otherwise defined as provided herein shall be given the meanings assigned to such terms in accordance with IFRS. |
| | "<u>Debt Service</u>" shall mean, as to any Payment Date, the amount of interest, Additional Amounts (defined below) (if any), and of principal in respect of the Minimum Scheduled Amortization Amount (after adjustments to such amount resulting from any prior Optional Redemptions (defined below), Open Market Purchases (defined below), Supplemental Amortizations and Mandatory Prepayments up to and excluding such Determination Date) due on the Notes on such Payment Date. |
| | "<u>Debt Service Reserve Amount</u>" shall be an amount up to the Debt Service then scheduled for the next Payment Date. |
| | "<u>Monthly Working Capital Amount</u>" for each month shall be the amount set forth for such month and each category as set forth in Exhibit 4A annexed hereto (the "MWC Budget"); provided, that, the Monthly Working Capital Amount for any month and category of expense shall be reduced to the extent of any amounts previously disbursed to the Company in such month and for such category from the Collection Account with respect to the Monthly Working Capital Amount for such month; provided, further, that, Monthly Working Capital Amount for any month and such category shall include any undrawn Monthly Working Capital Amounts from the preceding two months ("Carry-Over Amounts"), and provided further that the Monthly Working Capital Amount in any given month shall be increased by such amounts as are necessary to pay any bonus amounts then due under that certain Consulting Agreement, dated September 10, 2012, by and between the Company and Cervera Real Estate, Inc. (the "Cervera Contract") in such amounts and on such payment dates as are provided in the Cervera Contract.[6] For the avoidance of doubt, the Company shall not be permitted in any month to have drawn from the Release Account or the Collection Account more than the Monthly Working Capital Amount for such month. |
| | "<u>Monthly Working Capital Reserve Amount</u>" as of the first Business Day of any calendar month shall be a reserve at the Company's discretion of Monthly Working Capital Amounts for the next two following calendar months from such Business Day. |

---

[6]     Any such bonus payments that increase the Monthly Working Capital Amount shall be certified to the Trustee.

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

For the avoidance of doubt, the Company shall not be able to reserve more than two months of Monthly Working Capital Amounts at any time. For the avoidance of doubt, such monies cannot be disbursed from the Collection Account to the Company but only reserved in the Collection Account by the Company.

"Contingency Events" shall mean litigation related contingencies, post-sales related contingencies, tax contingencies, and Officers' liquidations (according to Colombian and/or Panamanian law) not budgeted for in the MWC Budget.

"Contingency Amounts" shall mean an aggregate amount of $5,000,000 over the life of the Notes. Contingency Amounts shall be released to the Company from time to time from the Collection Account, upon certification by a Company Officer to the Trustee, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it, that a Contingency Event has occurred and must be paid. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations based on any related judgment, official order, settlement agreement or the like. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.  After the term of the Noteholder Representative has expired, certification shall be to the Noteholders' Board Nominee (defined below). The certification by a Company Officer shall identify the Contingency Event and Contingency Amount and provide that such amount shall be disbursed for such Contingency Event promptly upon a disbursement from the Collection Account.

"Contingency Reserve Amount" as of a Payment Date shall be a reserve at the Company's discretion of an amount up to the Contingency Amounts reasonably expected to be incurred before the next following Payment Date.

"Bulk 2 Repurchase Reserve Amount" as of a Payment Date shall be a reserve of an amount up to the Bulk 2 Repurchase Amount.

"BC Senior Loan Reserve Amount" or "BC Ferry Payment Reserve Amount" as of a Payment Date shall be a reserve at the Company's discretion of an amount up to the amount of the BC Senior Loan (as defined in Exhibit 3 herein) or BC Ferry Payment (as defined in Exhibit 3 herein) reasonably expected to be incurred before the next following Payment Date; provided, that, the Company shall not maintain any reserve for the BC Ferry Payment from and after 18 months from the Effective Date. The BC Senior Loan Reserve Amount and the BC Ferry Payment Reserve Amount shall be released to the Company, upon certification by a Company

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

Officer to the Trustee, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.

"Brokers' Commissions" means, in respect of each Unit Purchase Agreement, the amount of the full purchase price under such Unit Purchase Agreement required to cover the brokerage commissions (including any gross-up for value added or sales tax levied in Panama on such brokerage commissions) that will be due in respect of the transfer of the respective unit ("Unit"). Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions that will be due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and thereafter all remaining payments will be attributed to Newland Unit Proceeds. Notwithstanding the foregoing and for the avoidance of doubt, the Brokers' Commissions for the TOC Casino Transaction shall include any investment banking and advisory fees of the Company related to the TOC Casino Transaction. For the further avoidance of doubt, amounts shall be treated as Brokers' Commissions only for so long as the relevant broker or brokers remain entitled to such payments at a future date upon the satisfaction of the conditions to the payment of their commissions, and in any event where a broker or brokers lose such entitlement the related Brokers' Commissions shall be thereafter treated as Newland Unit Proceeds.

"Newland Unit Proceeds" means, in respect of a Unit Purchase Agreement, the total of all initial and subsequent deposits and installments (i.e., the purchase price) for a Unit under such Unit Purchase Agreement, less the Brokers' Commissions and Property Transfer Fees in respect of such Unit. Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions and Property Transfer Fees that will be due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and Property Transfer Fees and thereafter all remaining payments will be attributable to Newland Unit Proceeds. Notwithstanding the foregoing and for the avoidance of doubt, the Brokers' Commissions and Property Transfer Fees for the TOC Casino Transaction shall include any investment banking and advisory fees of the Company related to the TOC Casino

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

|  | |
|---|---|
|  | Transaction.<br><br>"<u>Property Transfer Fees</u>" means any notary fees, recording fees, property or transfer taxes or other costs and expenses payable to the Panamanian government or any of its agencies in connection with the transfer of a Unit. |
| **Optional Redemption:** | The Company may, at its option, upon not less than thirty (30) nor more than sixty (60) days' prior notice to holders of the Notes, redeem the Notes, pro rata, in whole or in part at a price equal to 100% of the outstanding amount of the Notes being redeemed (together with accrued and unpaid interest, if any, on the Notes to be so redeemed to (but excluding) the date fixed for redemption, plus any Additional Amounts (as defined below); provided, that, any such Optional Redemption shall be subject to a minimum threshold of $10 million. |
| **Open Market Repurchases:** | The Company may purchase Notes at market value prices provided those prices are below par, through tender offer or otherwise; provided, that, the Company shall be prohibited from using more than $15,000,000 in the aggregate toward the principal portion of Notes for such purchases (each such purchase, an "Open Market Repurchase").<br><br>The Company shall immediately cancel any Notes purchased pursuant to an Open Market Repurchase, such that such Notes are no longer outstanding.[7] No such Open Market Repurchase shall be made directly or indirectly from an Affiliate or a direct family member of a CCSA Party ("Insiders").<br><br>For the avoidance of doubt, no Open Market Repurchase shall be permitted until and unless the Bulk 2 Repurchase Amount shall have been reduced to zero. Open Market Repurchases will be made in compliance with applicable United States and Panamanian securities laws. |
| **Additional Amounts:** | All payments made by the Company under or with respect to the Notes will be made free and clear of and without withholding or deduction for or on account of any present or future taxes, levies, imposts, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the Republic of Panama or any political subdivision or taxing authority of or in the Republic of Panama ("Taxes"), unless the Company is required to withhold or deduct any amount for or on account of Taxes by law or by the interpretation or administration of law. If the Company is required to withhold or deduct any amount for or on account of Taxes from any payment made by the Company under or with |

---

[7]    For the avoidance of doubt, the "Global Note" representing the Notes and deposited with The Depository Trust Company shall not be cancelled; the Global Note shall be marked down to reflect the book-entry interests purchased pursuant to such Open Market Repurchase.

|  |  |
|---|---|
|  | respect to the Notes, the Company will, subject to certain customary exemptions ("Additional Amounts"), pay such additional Amounts ("Additional Amounts") as may be necessary so that the net amount (including Additional Amounts) received by each holder of Notes after withholding or deduction will not be less than the amount the holder would have received if Taxes had not been withheld or deducted. |
| **Collateral:** | "Collateral" for the Notes shall consist of the Collateral as defined under the Existing Indenture together with the following additions and clarifications: <br><br> (i) 100% of the shares in the Company, along with an assignment of voting rights/stock power/voting power (exercisable only upon payment default, voluntary or involuntary bankruptcy filing) and the assignment of the Noteholder Swing Vote (as defined below) in accordance with the CCSA Settlement; <br><br> (ii) all Company accounts not presently subject to the Trustee's lien (including any new accounts opened on or after the date hereof); and <br><br> (iii) any assets or revenue streams due to the Company and rights or licenses to which the Company is a party (to the extent permitted by the terms of such right or license) not part of Collateral before the date hereof. |
| **Covenants, Representations and Warranties:** | The Notes shall enjoy all covenants, representations and warranties set forth in the Existing Indenture (brought down as of the Effective Date), subject to such additions, deletions and adjustments as provided below, or otherwise set forth in this Term Sheet: <br><br> **Negative Covenants** <br><br> The Company shall not: <br><br> (i) open accounts other than Accounts except where such accounts would be subject to a Trustee lien; (ii) incur additional debt, except as specifically agreed by the Steering Group in the final documentation, and a debt basket shall be created for the redemption or replacement of the Bulk 2 Repurchase Transaction (as defined herein); and <br><br> (iii) enter into transactions with Affiliates of the Company, the Shareholders or CCSA Parties except upon full prior disclosure to the Board (including the Noteholder's Board Nominee (as defined below)) and upon demonstration to the Board that the terms of the transaction are arm's-length, market terms, and such transaction is approved by the Board; provided, further, that, in no instance shall |

the re-sale of any units purchased by Affiliates of the Company, the Shareholders or CCSA Parties be permitted while any of the Notes are outstanding unless all Units owned by the Company have been sold (or closed).  For the avoidance of doubt, the transactions with Affiliates covenant shall include all necessary exceptions for purposes of effectuating the Beach Club settlement and Casino/MTA Arrangements, in each case as set forth in Exhibit 1 hereto.

Notwithstanding the foregoing, Affiliates of the Company, the Shareholders or CCSA Parties shall not be eligible to receive any future commissions (co-broker commission, finder's fee or other monetary arrangement) with respect to the sale of any assets comprising Collateral.

The Collateralization Ratio covenant and the $20 million debt basket in the Existing Indenture shall be deleted.

**Affirmative Covenants**

The Company shall:

(i) comply with Noteholder Representative covenants;
(ii) comply with Corporate Governance requirements (as described below);and
(iii) ensure all revenue streams of the Project owed to the Company are deposited directly into the HSBC Panama Account, provided, however, if any such revenues are instead received by the Company, the Company shall promptly deposit those into the HSBC Panama Account.


The CCSA Parties shall:

(i) subject to all of the other conditions to the Settlement being satisfied, provide the financial guarantee and pledge their respective shares in the Company, in each case as more fully described in Exhibit 1 hereto, and in each case subject to the full release without liability to any of them under the CCSA Agreement as described elsewhere in this Term Sheet; and

(ii) individually, and not jointly and severally, shall agree that neither they nor their Affiliates or Insiders shall purchase Existing Notes or Notes (except for permitted Open Market Repurchases by the                                                                            Company).


**Representations by Company:**

(i) all assets, rights and claims of and owed to the Company are pledged as part of the Collateral (except for Brokers' Commissions and Property Transfer Fees as provided for herein);

(ii) the Company has made full disclosure of all related party

| | |
|---|---|
| | transactions and relationships with Affiliates of the Company, the Shareholders or CCSA Parties, and that no Affiliates of the Company, the Shareholders or CCSA Parties derive any economic benefit from the Project except as has been fully disclosed in writing to the Steering Group in advance of the filing of the Pre-Packaged Plan. |
| | **Representations of the CCSA Parties, which representations shall be made by each of them severally and not jointly, with respect to themselves and their respective Affiliates:** |
| | (i) to the best knowledge of each such CCSA Party, neither it, nor any of its Affiliates, are party to any agreements with the Company other than has been fully disclosed in writing to the Steering Group in advance of the filing of the Pre-Packaged Plan; |
| | (ii) to the best knowledge of each such CCSA Party, neither it, nor any of its Affiliates or Insiders owns or controls Existing Notes. |
| **Pre-Approved Policies and Budgets; Reporting:** | The Company shall comply with: |
| | (i) MWC Budget shall be as set forth in Exhibit 4A hereto, for such month and for such categories of uses as set for in Exhibit 4A. With each draw of Monthly Working Capital, the Company shall certify to the Trustee that such funds are to be spent in accordance with the approved categories contained herein. The MWC Budget shall consist of four categories, as set forth in Exhibit 4A hereto: (i) TOC Asset Completion & Preservation; (ii) Newland TOC Operations; (iii) Newland Corporate Operations; and (iv) Miscellaneous, which Miscellaneous category shall be available for expenses in each other category. To the extent that funds in a given category (including the Miscellaneous category) and month are unspent, such funds shall remain available to be used as Carry-Over Amounts, which Carry-Over Amounts can be applied within the same category.  To the extent such unused funds have been drawn by the Company such funds shall be transferred back to the Collection Account after expiration of the applicable period for Carry-Over Amounts; |
| | (ii) the Minimum Pricing Level, which shall be a price per square meter equal to 75% of the average sale price of the preceding five (5) most comparable units (comparability of which shall be assessed based on product, line and floor). For the avoidance of doubt, "Product" shall refer to a given units classification within Hotel, Condo, Bayloft, Commercial; "Line" shall refer to a unit's position within each floor, as represented by the last two digits of a given unit number. The calculation of the Minimum Pricing Level covenant shall not include comparable units used for purposes of any financing, extension, or replacement transaction in respect of |

|  | the Bulk 2 Repurchase Option (as defined herein) nor shall the calculation of the Minimum Pricing Level include unit sales deemed to be an Affiliate transaction; and

(iii) Approved quarterly reporting (with monthly detail) requirements for sales, unit purchase defaults, related-party transactions, and all other performance metrics as shown in Exhibit 5. |
|---|---|
| **Noteholder Representative:** | The Steering Group will appoint a representative (including any duly authorized representative or designee of such representative, the "Noteholder Representative") to discharge the functions described below.   The appointment of the Noteholder Representative shall be duly recorded in the Panamanian Public Registry and the Company's by-laws and, to the extent necessary (as determined by the Steering Group), other organizing documents would be amended or supplemented to recognize the Noteholder Representative and his/her rights and provide that his/her appointment and service would be governed by the Noteholders. After initial appointment by the Steering Group, replacement, including through removal, resignation or otherwise, of the Noteholder Representative would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders").   The selection (including replacements thereof) of the Noteholder Representative shall be in each case subject to reasonable prior notice to the Company; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group).

The function of the Noteholder Representative shall be to communicate in writing to the Trustee defaults under the Indenture and to review certifications identified herein.[8] In this regard, the Company agrees for all periods on or after the Effective Date that:

(i) Noteholder Representative shall have full access to, subject in all cases to confidentiality provisions to be agreed prior to the Chapter 11 filing,[9] the Company's offices and all property, books, accounting and other records, invoices, contracts, and to attend internal and business meetings (but for the avoidance of doubt, not meetings unrelated to the operation of the Company) and to observe sales and marketing meetings; for the avoidance of doubt, |

---

[8]     The Noteholder Representative's reporting function shall be independent of the Company's reporting obligations under the Indenture.

[9]     For the avoidance of doubt, the Noteholder Representative's fulfilling its obligation to report to the Trustee would not be a breach of any confidentiality obligation.

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

|  | this clause (i) shall not include internal electronic mail (email) communications; provided that from the Effective Date, a copy of any email communication used by the CEO as written approval of a unit sale must be delivered to the Noteholder Representative; |
|---|---|
|  | (ii) Noteholder Representative shall have full access to all information concerning the Project, performance data relating to the Pre-Approved Policies and Budgets, and to attend construction, sales, marketing and management meetings.  This would include access to weekly reports on sales and expenses, with supporting data; |
|  | (iii) Noteholder Representative shall have full access to any contracts or other relevant documentation or details that pertain to the legal relationship between the Company and its Affiliates and the Affiliates of the Shareholders or CCSA Parties; |
|  | (iv) Noteholder Representative compensation to be agreed with SG prior to the solicitation date of the Pre-Packaged Plan and paid by Company; and |
|  | (v) Each Noteholder Representative shall execute a Confidentiality Agreement with the Company prior to appointment. |
|  | The Noteholder Representative function shall cease to exist following the date which is the later of eighteen (18) months following the Effective Date or three (3) months after the existence of an Event of Default, unless such Default has been earlier cured or waived. |

## IV.    **Corporate Governance**

| Shareholder and Board Control; Noteholder Voting Rights: | As part of the Restructuring and the CCSA Settlement (described below), shareholder voting agreements shall be entered by the Shareholders and a nominee ("Noteholders' Shareholder Nominee") of the Noteholders (or effective documents shall be executed in favor of the Noteholders and enforceable by the Trustee and the Noteholders' Shareholder Nominee, to provide that 30% of the shareholder voting rights (but not economic entitlements) attributable to the Company's capital stock shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders (the "Noteholder Swing Vote"), such that shareholder voting by shareholders of the Company shall be effectively allocated:  Upper Deck – 21%, Roger Khafif – 49%, and Noteholders' Shareholder Nominee 30% (together, "Voting Persons").  Notwithstanding the foregoing, the 30% shareholder |
|---|---|

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

voting rights of the Noteholders' Shareholder Nominee shall only be exercisable in the event of a shareholder voting dispute between Khafif and Upper Deck; provided, that, notwithstanding the foregoing, the Noteholders' Shareholder Nominee shall receive the same information provided to, at the same time as received by, the other shareholders in respect of any voting to be undertaken by the shareholders, and shall be invited, sufficiently in advance, to attend all shareholder meetings at which voting will take place, whether in-person or telephonic, and shall timely receive (at the same time as the other shareholders) copies of all minutes, resolutions, and presentations prepared for or to reflect the outcome of such shareholder voting meeting.

Further, in connection with the shareholder voting arrangements described immediately above, the Company's Board of Directors (the "Board") shall be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the Board (the "Noteholders' Board Nominee"), which nominee (a natural person or an entity (in turn, represented by a natural person)) shall not have any voting rights, except as provided below. The Company's governing documents and any existing shareholder and/or voting agreements shall be modified to provide that all decisions by the Board shall be taken unanimously and that, in the case of a non-unanimous vote, the Noteholders' Board Nominee shall have in such instance (and only in such instance) the ability to cast the deciding vote. For the avoidance of doubt, the Noteholders' Board Nominee shall have unfettered access to all Board meetings and communications, shall receive same at the same time as members of the Board, and shall be invited, sufficiently in advance, to attend all meetings, whether in-person or telephonic, shall timely receive (at the same time as members of the Board) copies of all minutes, resolutions, and presentations, and shall be permitted to participate in such meetings as if s/he were a full-voting member of the Board.

After initial appointment by the Steering Group (which may be for the full term of the Notes), replacement, including through resignation or otherwise, of the Noteholders' Board Nominee and Noteholders' Shareholder Nominee would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders"); provided, that, the Steering Group can, at its discretion, select an alternate Noteholders' Board Nominee and Noteholders' Shareholder Nominee before the Effective Date with the alternate assuming the position for the balance of the term up to the prior Nominee's resignation, death or incapacity.

Upon payment in full of the Notes, the Noteholders' Board

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | Nominee shall resign from the Board |
| | The Company's governing documents shall provide indemnification for the Noteholders' Board Nominee as well as for all other members of the Board of Directors of the Company and for designated Officers of the Company. |
| | The Noteholders' Board Nominee and the Noteholders' Shareholder Nominee can be the same person/entity, but need not be. |
| **Senior Officer Appointments:** | As part of the Restructuring, Carlos Saravia shall be appointed as Chief Executive Officer ("CEO"), President and Legal Representative of the Company. Carlos Saravia may be replaced in such roles anytime after September 30, 2013, but shall be given at least 30 days' notice of any such intended replacement. An executive search to replace Carlos Saravia will be initiated before his anticipated departure; furthermore, the replacement Chief Executive Officer shall be selected prior to Carlos Saravia's departure. Roger Khafif, Eduardo Saravia Calderón, Carlos Alberto Serna Londoño shall, directly or indirectly, only hold non-executive roles with no corporate officer responsibilities or powers, or roles or powers related to the Owners meeting of the PH (as defined in the "Reglamento" (Co-ownership Rules) Board and Administration. |
| | For the avoidance of doubt, the appointment of corporate officers of the Company (excluding the position of CEO) shall not be subject to preapproval of the Noteholders' Board Nominee. |
| | Further, Carlos Saravia, as Chief Executive Officer shall have all requisite power to sign all legal documentation of the Company on behalf of the Company, including sales documentation. Such power and authority shall be expressly provided in the governing documentation of the Company and registered in the applicable Panamanian public registry and by means of power-of-authority from the remaining officers authorized by the governing documentation of the Company to sign legal documentation on behalf of the Company. |
| | The Company shall also execute a "professional services contract" under Panama law with Carlos Saravia, outlining his role as Chief Executive Officer. The Company shall also implement a succession plan for the Chief Executive Officer role; such succession plan shall provide for the Chief Financial Officer to become interim CEO in the event the CEO resigns or otherwise |

| | |
|---|---|
| | ceases to perform its duties prior to securing a replacement and for the means by which a full-time replacement CEO shall be selected. Any CEO of the Company after Carlos Saravia shall have education and experience commensurate with the position, with the hiring of the replacement CEO shall approved by the Board. Furthermore, the replacement can only be consummated if not objected to by the Noteholders' Board Nominee. The Noteholders' Board Nominee shall recite any reasons for any objection on the record at a Board meeting or, at his/her choice, in a separate writing to the Company. |

## V.    **Additional Terms**

| | |
|---|---|
| **ISG:** | Steering Group to be satisfied with any potential settlement of the Company's obligations, if any, to and disassociation with ISG. |
| **CEO Approval of Sales:** | There must be a written approval by the Company's CEO for each unit sale (residential, commercial or hotel). For the avoidance of doubt, facsimile and email approval by the CEO shall be acceptable. |
| **Bulk 2 Units:** | "Bulk 2 Repurchase Amount" shall mean as of any date the outstanding principal balance of the Bulk 2 Repurchase Option (as defined below) (if fully exercised) as adjusted from time to time in accordance with its terms. For the avoidance of doubt, the Bulk 2 Repurchase Amount shall be zero once it is paid in full or otherwise expires in accordance with the terms of its contract.<br><br>If prior to the Effective Date, there is a full or partial settlement, extension, or replacement (each a "Bulk 2 Repurchase Transaction") of the Bulk 2 Repurchase Amount, the Steering Group shall be satisfied with the proposal related to such Bulk 2 Repurchase Transaction.<br><br>The Company shall be permitted to refinance the Bulk 2 Repurchase Amount, provided that such transaction is acceptable to the Steering Group if to be consummated prior to the Effective Date, and if after the Effective Date, provided that any refinancing facility:<br><br>(i) Shall result in no net cash proceeds to the Company;<br>(ii) Shall carry an interest rate no greater than the interest rate on the Notes;<br>(iii) Shall have a term of no greater than 12 months in the absence of such facility allowing for prepayments without penalty or premium;<br>(iv) Require a collateralization ratio of no greater than 2.0x. |

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

|  |  |
|---|---|
|  | Provided that such characteristics are met, the mortgage on a given pool of units may be released and used as collateral against such facility, provided further that in all instances the Noteholder Representative must confirm that the terms of such a refinancing facility satisfy these requirements.<br><br>"Bulk 2 Repurchase Option" means the option to repurchase units under that certain contract between Global Realty Investments, S.A. and the Company, dated July 13, 2011. |
| **Seller Financing:** | (i) Company shall be permitted to offer seller financing for up to the lesser of 110 Units or $40 million (in aggregate) of Units at then applicable pricing;<br><br>(ii) Terms for a seller financing shall include no more than a 2.5 year average life in addition to a maximum maturity date of the scheduled final maturity date of the Notes (such date the "Seller Financing Horizon Date") and a step-up in interest rate at each six (6) month interval to encourage refinancing, a maximum loan to value determined by Newland in its reasonable judgment based on the creditworthiness of the obligor not to exceed 60% of the purchase price of the Unit;<br><br>(iii) Units purchased with a seller financing facility will be subject to a price no lower than the three month historical weighted average pricing of sales of comparable units (e.g., residential, commercial, hotel) in the Project; provided that if no applicable Unit sales occurred in the last three (3) months, such weighted average shall be based on the last three sales of such Units;<br><br>(iv) A single buyer may acquire no more than two (2) Units with a seller financing facility;<br><br>(v) Seller financing terms shall specify that all CAM (and other) charges will be payable by the buyer; terms will also require that the mortgages entered into in connection with the seller financing shall be pledged to the Co-Trustee for the benefit of the Noteholders.<br><br>For the avoidance of doubt, there shall be no Seller Financing for Prime Unit Sales or for Affiliate unit purchases.<br><br>Upon certification by a Company Officer to the Trustee that such characteristics are met, the mortgage on a given pool of units subject to seller financing may be released; the Company may then obtain a mortgage (with the Company as mortgagee) on such pool of Units and any such mortgage to be obtained by the Company will be pledged as Collateral; provided, further, that, in all instances the certification shall indicate that it has been reviewed |

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

|  |  |
|---|---|
|  | by the Noteholder Representative who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification. |
| **Non-UPA Revenue**: | All non-UPA revenue due to the Company (including payments, receipts, fees due the Company from lease, hotel, food and beverage, Beach Club Membership Fees, Casino, Spa), from any Collateral shall be deposited directly, or caused to be deposited by the Company, to the HSBC Panama Account.  Such amounts shall be net of any fees, commissions, property or transfer taxes or other costs and expenses payable under the contract giving rise to such non-UPA revenue. |
| **Casino/MTA/Beach Club Agreement:** | See Exhibit 3 hereto. |
| **TOC Casino Transaction Related Unit Sale Financing** | In connection with one or more transactions governed under a master transaction agreement (the "TOC Casino Transaction") in which a purchaser (including any affiliates designated by such purchaser for such purposes, the "Casino Buyer") acquires one or more Units at the Project, and one of such acquired Units is the Casino for purposes of developing a gaming enterprise at the Project, the Company shall be permitted to sell Units (each an "Ancillary Unit") that are not Prime Units for purchase prices in aggregate of up to $7 million to the Casino buyer in the TOC Casino Transaction on terms and conditions that comply with the Indenture; provided, however, that (i) any such Ancillary Unit sale will not be included in the calculations of prices under the Minimum Pricing Level covenant and (ii) the sale of Ancillary Units to the Casino Buyer may be for a combination of cash and one or more loans (each an "Ancillary Unit Loan") in favor of the Company for the balance of the purchase price set forth in each relevant UPA. The transfer of title to such Ancillary Units, and the release of the relevant Mortgage on such Ancillary Units, will occur at the time of sale of each Ancillary Unit under the respective UPA, provided the Casino Buyer shall register in the Panamanian Public Registry a mortgage in favor of the Company (with the Company as mortgagee) securing the obligations under the Ancillary Unit Loans in favor of the Company (the "Casino Buyer Mortgage"). The Company will then pledge its rights under the Casino Buyer Mortgage as Collateral to the Co-Trustee. The Casino Buyer shall also be responsible for making payment in respect of CAM and other owner expenses from the earlier of occupancy of any such Ancillary Unit or the closing date of any |

FRE 408 SETTLEMENT COMMUNICATION     FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE     PRIVILEGED AND CONFIDENTIAL

| | such sale. |
|---|---|
| **Ratings:** | The Notes shall be rated by at least one ratings agency satisfactory to Steering Group. |

## VI.    **Other Conditions**

| | |
|---|---|
| **Trump:** | The Trump arrangements shall be as provided in Exhibit 2 hereto. Further, subject to appropriate confidentiality provisions agreed by Trump, the Company and the Steering Group or as may be ordered by the Bankruptcy Court (as defined below), all documentation, contracts and agreements between the Company and Trump shall be made available for review by the Steering Group prior to the Effective Date. |
| **MTA Agreement:** | On or prior to the Effective Date, the Company shall agree to and execute a settlement of any amounts owed in respect of the MTA Agreement that is acceptable to the Steering Group. For the purposes of this Term Sheet, "MTA Agreement" shall mean the currently existing agreement among Marvin Traub Associates ("MTA") and Newland which, among other things, provides for an amount payable to MTA by Newland based on certain amounts paid and payable by Newland to Trump in respect of the Trump License Agreement. |
| **Contadora Sale:** | Within 6 months from the Effective Date, the Company shall commence a sale process related to its interest in the parcel at Contadora Island, with the terms of such sale process to be acceptable to the Noteholder Representative and the Noteholder Board Nominee. Upon such sale, the mortgage on the collateral consisting of Contadora Island shall be released and net proceeds shall be deposited to the HSBC Panama Account. |
| **CCSA Liability:** | The CCSA and any liabilities under the CCSA shall be settled as set forth in Exhibit 1 hereto.<br><br>Delivery by Independent Engineer of certificate of Construction Completion occurred on January 8, 2013. |
| **Definitive Documentation:** | Definitive documentation shall be in form and in substance reflecting the terms herein and consistent in all material respects with this Term Sheet. |
| **Fees and Expenses:** | All fees and expenses of professional advisors to the Steering Group (BroadSpan, Seward & Kissel, Morgan & Morgan), Trustee (Chadbourne & Parke, Morgan & Morgan) and Company (Gibson Dunn, Adural, Gapstone, DLA Piper and Noteholder Representative) shall have been paid in full in cash by the Company on or before the Effective Date, with legal advisors to |

| | the Steering Group and Company paid on a current basis and in full before any filing of the Chapter 11 Case (as defined below). |
|---|---|

## VII.   Chapter 11 Case

| Chapter 11 Case: | Subject to the consent of the Steering Group, which consent shall not unreasonably be withheld, the Company shall file a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The plan of reorganization describing the Pre-Packaged Plan (the "Plan of Reorganization") and the disclosure statement describing the Plan of Reorganization (the "Disclosure Statement") shall be filed on the same day as the filing of the Chapter 11 Case (the "Petition Date"). The Plan of Reorganization shall be in all material respects consistent with the elements of this Term Sheet. |
|---|---|
| Motions and Other Bankruptcy Court Filings: | All motions and other filings with the Bankruptcy Court, including any proposed orders (including, without limitation, the order confirming the Plan of Reorganization (the "Confirmation Order")) shall be in form and substance reflecting all material elements of this Term Sheet and reasonably acceptable to the Steering Group and the Company. Additionally, the Noteholders party to the Plan Support Agreement shall (i) (A) consent and not object to the use of cash collateral pursuant to a cash collateral stipulation/order to be agreed by the Steering Group in advance of the filing of the Chapter 11 Case (which shall provide adequate protection in the form of professional fees and expenses for advisors to the Steering Group and the Trustee), and (B) not file any motion seeking adequate protection with respect to the use of cash collateral or in connection with the automatic stay or otherwise (subject to (A) above) and (ii) direct the Trustee (subject to (A) above) (X) to consent and not object (or support any noteholder in objecting) to the use of cash collateral without providing adequate protection for any reason, including, without limitation, the imposition of the automatic stay, and (Y) not to file any motion seeking adequate protection with respect to the use of cash collateral or in connection with the automatic stay or otherwise; provided that items (x) and (y) are subject to provision of the adequate protection set forth above. |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 1

## CCSA SETTLEMENT TERM SHEET

As an integral part of the Restructuring, any and all obligations under the Construction Completion Support Agreement, dated as of November 6, 2007 (the "CCSA"), of Roger Khafif, Eduardo Saravia, and Carlos A. Serna (each, a "CCSA Party"; together, the "CCSA Parties") shall be compromised and settled as follows (the "CCSA Settlement"):[10]

| | |
|---|---|
| **Plan Support/Stock Pledge** | The CCSA Parties shall agree, severally and not jointly, to support the Pre-Packaged Plan and as provided in the Term Sheet execute a stock pledge and deliver stock powers as Collateral for the Notes. |
| **Release/Waiver** | Through payment in full of the Notes, after which such waivers and representations will be of no further force or effect:<br><br>(i) Kassir Development shall waive its claim in the amount of US$2,022,274.00 against the Company (and represent it has no other claims against the Company);<br><br>(ii) Opcorp Arsesa International, Inc. shall waive its claim in the amount of US$4,787,742.45 against the Company (and represent it has no other claims against the Company); and<br><br>(iii) the CCSA Parties, on their own behalf and that of their respective Affiliates shall waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Company until such time as the Notes have been paid in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except as disclosed on Exhibit 6 hereto[11]. |

---

[10]      Terms not defined herein shall be as defined in the Settlement Term Sheet.
[11]      NB: Arias Serna & Saravia through an affiliate currently pays salaries of some Newland officers with concurrent reimbursement by Newland out of the MWC; labor contracts are between the employees and Arias Serna; these contracts and arrangements will be specified in an exhibit and carved-out of this clause (iii).

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

| **Swing Voting Rights** | Shareholder voting agreements shall be entered by the Shareholders and a nominee ("Noteholders' Shareholder Nominee") of the Noteholders (or effective documents shall be executed in favor of the Noteholders and enforceable by the Trustee and the Noteholders' Shareholder Nominee, to provide that 30% of the shareholder voting rights (but not economic entitlements) attributable to the Company's capital stock (the "Noteholder Swing Vote") shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders, such that shareholder voting by shareholders of the Company shall be effectively allocated:  Upper Deck – 21%, Roger Khafif – 49%, and Noteholders' Shareholder Nominee 30% (together, "Voting Persons"). Notwthstanding the foregoing, the 30% shareholder voting rights of the Noteholders' Shareholder Nominee shall only be exercisable in the event of a shareholder voting dispute between Khafif and Upper Deck; provided, that, notwithstanding the foregoing, the Noteholders' Shareholder Nominee shall receive the same information provided to, at the same time as received by, the other shareholders in respect of any voting to be undertaken by the shareholders, and shall be invited, sufficiently in advance, to attend all shareholder meetings at which voting will take place, whether in-person or telephonic, and shall timely receive (at the same time as the other shareholders) copies of all minutes, resolutions, and presentations prepared for or to reflect the outcome of such shareholder voting meeting.<br><br>After initial appointment by the Steering Group (which may be for the full term of the Notes), replacement, including through resignation or otherwise, of the Noteholders' Shareholder Nominee would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders"); provided, that, the Steering Group can, at its |
|---|---|

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | discretion, select an alternate Noteholders' Shareholder Nominee before the Effective Date, with the alternate assuming the position for the balance of the term up to the prior Nominee's resignation, death or incapacity. |
| **Board Seat/Noteholder Nominee** | Further, in connection with the shareholder voting arrangements described immediately above, the Company's Board of Directors (the "Board") shall be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the Board (the "Noteholders' Board Nominee"), which nominee (a natural person or an entity (in turn, represented by a natural person)) shall not have any voting rights, except as provided below. The Company's governing documents and any existing shareholder and/or voting agreements shall be modified to provide that all decisions by the Board shall be taken unanimously and that, in the case of a non-unanimous vote, the Noteholders' Board Nominee shall have in such instance (and only in such instance) the ability to cast the deciding vote. For the avoidance of doubt, the Noteholders' Board Nominee shall have unfettered access to all Board meetings and communications, shall receive same at the same time as members of the Board, and shall be invited, sufficiently in advance, to attend all meetings, whether in-person or telephonic, shall timely receive (at the same time as members of the Board) copies of all minutes, resolutions, and presentations, and shall be permitted to participate in such meetings as if s/he were a full-voting member of the Board.

After initial appointment by the Steering Group (which may be for the full term of the Notes), replacement, including through resignation or otherwise, of the Noteholders' Board Nominee would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders"); provided, that, the Steering Group can, at its discretion, select an alternate Noteholders' Board Nominee before the Effective Date, with |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | the alternate assuming the position for the balance of the term up to the prior Nominee's resignation, death or incapacity.<br><br>Upon payment in full of the Notes, the Noteholders' Board Nominee shall resign from the Board<br><br>The Company's governing documents shall provide indemnification for the Noteholders' Board Nominee.<br><br>The Noteholders' Board Nominee and the Noteholders' Shareholder Nominee can be the same person/entity, but need not be. |
| **CEO Replacement** | If the CEO of the Company is to be replaced for any reason, the replacement can only be consummated if not objected to by the Noteholders' Board Nominee.  The Noteholders' Board Nominee shall recite any reasons for any objection on the record at a Board meeting or, at his/her choice, in a separate writing to the Company. |
| **Financial Guarantee** | Subject to the effectiveness of the Pre-Packaged Plan, the CCSA  Parties shall execute and deliver a joint and several financial guarantee of payments on the Notes payable ninety (90) days after (i) an acceleration by holders of the Notes in accordance with the Indenture (provided such acceleration is not rescinded in accordance with the Indenture) or (ii) at the scheduled final maturity date of the Notes, to the extent in each case the holders of the Notes have not been paid in full (the "Partners' Financial Guarantee") and, provided, that, the maximum amount due and payable under such Partners' Financial Guarantee shall under no circumstance exceed in the aggregate the amount of US\$5 million and the CCSA Parties' exposure under the Partners' Financial Guarantee shall be limited to such US\$5 million amount. |
| **Beach Club** | The CCSA Parties shall make or cause their Affiliates to make the commitments with |

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

|  |  |
|---|---|
|  | respect to the Beach Club as set forth in Exhibit 3 hereto. |
| **Satisfaction and Release** | In exchange for all the foregoing consideration, the effectiveness of the Pre-Packaged Plan shall result in the final settlement of the CCSA and the satisfaction and release of any and all obligations of the CCSA Parties thereunder without any liability to any of them.  In furtherance thereof, the Pre-Packaged Plan and confirmation order shall direct the Trustee to execute and deliver any and all documents required, if any, to effectuate the CCSA Settlement, with no liability to the Trustee and with the Trustee being exculpated under the Pre-Packaged Plan for taking any such action. In addition, each vote in favor of the Pre-Packaged Plan by a holder of Existing Notes shall constitute an effective irrevocable direction to the Trustee not to oppose the Pre-Packaged Plan or the CCSA Settlement, to forbear from seeking to enforce the CCSA, and, if under any circumstance the Trustee obtains any monies under or pursuant to the CCSA Agreement, to return such monies to the CCSA Parties. |

# EXHIBIT 2

# TRUMP RELATED TERMS

| License Fee to Licensor | The amount payable to Trump Marks Panama LLC ("Licensor") based on current formula (with fixed CAP) but reduced ▮▮▮▮ to be paid according to current priority and timing with respect to Closings (as defined in the License Agreement); but with respect to any Unit, no earlier than the Closing for such Unit; provided that initial payments shall be made in accordance with the License Fee Payment Plan (to be determined) which shall provide a payment schedule over months for amounts calculated as payable in respect of License Fees pursuant to this clause; provided further that subsequent to the end of such payment schedule, amounts calculated as payable in respect of License Fees shall be paid according to the priority and timing established in the current Indenture. |
|---|---|
| Hotel Management Agreement | 1. Reduce Hotel Management Fee and Hotel Amenities Management Fee ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ These management fees are for services rendered for operating the Hotel, the Hotel Amenities, and for the PH Administration.<br><br>2. Eliminate the minimum fee ▮▮▮▮▮ for Hotel Units that are in the Hotel Operator rental program. The minimum fee for non-participating units to be reduced ▮▮▮▮.<br><br>3. Incentive Fee to be eliminated until the start of year 4. Commencing at the start of year 4, Incentive Fee to be ▮▮▮ instead of ▮▮<br><br>4. Newland to use best efforts to open Spa, Casino and Beach Club; performance termination to be tolled until delivery of Spa, Casino and Beach Club. |
| PH Administration | Eliminate the ▮▮▮▮ annual condominium management fees paid to the PH administrator, Trump Panama Condominium Management LLC (the "PH Administrator"). |
| Seller Financing | Seller Financing would be explicitly provisioned in the Indenture and UPA forms and subject to the conditions set forth in the term sheet.<br><br>License Agreement to be amended as necessary to |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | preserve the rights of the Licensor in respect of any Unsold Unit delivered pursuant to such seller financing arrangement. |
| Non-disturbance terms | Trustee, Trump and Newland shall enter into an agreement in accordance with the following terms: |
| | 1. The pledge of the majority of the equity interests in Newland to the Trustee shall not alter Newland's obligations under the terms and conditions of the agreements with Trump in connection with the licensing, management and operation of the Project. |
| | 2. In the event the Trustee or its designee becomes the owner of the majority of the equity interests of Newland, such event shall not alter (i) Newland's obligations under all of the terms and conditions of the agreements with Trump in connection with the licensing, management and operation of the Project , and (ii) Newland's obligations to appoint the board members of the condominium and entities affiliated with the ownership and operation of the Project. |
| | 3. In the event that Trustee or its designee becomes the owner of hotel units or hotel amenities units then the Trustee or its designee (i) will be subject to all of the obligations of a hotel unit owner and hotel amenities unit owner under the condominium documents, (ii) shall enter into an agreement whereby the unsold hotel units shall enter into the rental program, (iii) shall not be limited to the restriction which prohibits any one owner from owning more than 10 hotel units, (iv) shall have the right to sell more than 10 hotel units to any single purchaser, provided, that such purchaser is pre-approved by Trump. |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 3

## BEACH CLUB
## TERMS RELATED TO THE RESTRUCTURING

As an integral part of the Restructuring, the following terms are agreed and shall be implemented related to the completion and operation of a beach club on Isla Viveros ("Beach Club") which shall grant memberships to residential and hotel condominium units at the TOC.

| Parties and Definitions: [12] | "Pearl" means Ocean Club Pearl Island Corp, the owner of the Beach Club. |
|---|---|
| | "RKCo" means one or more entities owned and/or controlled by Roger Khafif to act as a shareholder in Pearl or a lender under the BC Bridge Loan. |
| | "BC Bridge Loan" shall mean an unsecured loan agreement in respect of the Beach Club, subordinated to the BC Senior Loan (defined below), between Pearl and RKCo, Upper Deck and/or such other entity that will act as a lender thereunder, as lenders and which shall have an effective maturity date consisting of 20 years (with automatic and mandatory 20 year renewals) and will not accrue any interest. The amount and use of proceeds for the BC Bridge Loan must be certified by an officer of Pearl to the Newland Board and the Noteholder Representative. |
| | "BC Completion Date" shall mean the date on which construction completion of the Beach Club, as certified by the project contractor to the Newland Board and the Noteholder Representative, has occurred in accordance with the relevant plans and specifications provided to the Steering Group on or before the date hereof (the "BC Plans"), which date shall be deemed to be the later of (i) six months from the Effective Date and (ii) September 30, 2013. |
| | "BC Net Operating Cost" shall be for each month an amount equal to the operating cost of the Beach Club reduced by the revenue generated from sales of beach club passes to persons who are not BC Members, each as reported by Pearl in its quarterly operating statement (which statement shall contain monthly detail). |
| | "BC Ferry Net Operating Costs" shall be for each month an amount equal to the cost incurred by Pearl for the BC Ferry operation or to pay a third party operator under the BC Ferry Concession (defined below), as applicable, reduced by any revenue received by Pearl, directly or indirectly, from operation of the BC |

---

[12]    Terms not defined herein shall be as defined in the Settlement Term Sheet.

32

FRE 408 SETTLEMENT COMMUNICATION   FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE   PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | Ferry, each as reported by Pearl in its quarterly operating statement (which statement shall contain monthly detail). |
| | "BC Ferry Concession" means a concession to a third party operator to run the BC Ferry operation. |
| | "MTA Disclosure Date" shall be September 15, 2012. |
| | "MTA Reserved Amount" shall mean as of any date an amount equal to the sum of all payments made to MTA by or on behalf of Newland in respect of the Trump Reference Payments (as defined below). |
| | "TOC Casino Transaction" shall mean a transaction in which a purchaser acquires one or more units at the Project, and one of such acquired units is the casino unit, for purposes of developing a gaming enterprise at the Project. |
| | "TOC Casino BC Loan Amount" shall be a portion of the BC Senior Loan in one or more advances an amount equal to the positive difference, if any, of (i) 5% of the gross purchase price of the TOC Casino Transaction minus (ii) the MTA Reserved Amount. |
| | "Trump Reference Payments" shall mean as of any date an amount equal to the cumulative sum of that portion of each payment made to Trump on or prior to the MTA Disclosure Date by or on behalf of Newland in respect of the Trump License Agreement which is applicable for the calculation of amounts due to MTA by Newland pursuant to the MTA Agreement. |
| **Beach Club and Certain Commitments:** | The Beach Club comprises land and related improvements currently being constructed on Isla Viveros in the Pearl Islands archipelago of Panama and is owned by Pearl. |
| | The CCSA Parties shall cause the Beach Club to be completed in a commercially reasonable manner consistent in all respects with the BC Plans by the BC Completion Date. The Beach Club will be constructed by RKCo and Upper Deck without funds from the Company other than the BC Senior Loan. |
| | The Beach Club will operate as a private beach club for its members. Permanent memberships at the Beach Club (each a "BC Membership" and each underlying member a "BC Member") will be offered to qualifying candidates with a unique sequential identifying number ("BC Member ID") and governed by a membership agreement ("BC Members Agreement") establishing |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE
FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | among other things the Beach Club rules and regulations, monthly membership dues, and remedies available to Pearl to enforce compliance. BC Members' monthly dues (the "BC Monthly Dues") will be assessed on all BC Members without discrimination based on each BC Member's share of the sum of (i) BC Net Operating Costs and (ii) BC Ferry Net Operating Costs, if any; provided that such share will be allocated in a fair and equitable manner such that BC Memberships held by TOC Residents shall not be unfairly discriminated versus BC Memberships not held by TOC Residents. <br><br> The access/use of the Beach Club to TOC residents will be governed by an agreement (the "TOC Membership Agreement") between Pearl and Newland. The TOC Membership Agreement shall irrevocably provide at no cost to Newland BC Memberships (which shall, in the hands of TOC residents be treated in all respects no less favorably than BC Memberships not held by TOC residents), adjusted for any Declined Memberships (as defined below), representing each residential and hotel condominium unit at the TOC. Each BC Membership granted under the TOC Membership Agreement will not be transferable except with the transfer of the underlying TOC unit. For the avoidance of doubt, TOC Residents can decline BC Memberships, as set forth in "— BC Membership Sales at TOC". |
| **BC Senior Loan** | The Company may make disbursements under a senior secured loan (the "BC Senior Loan") to Pearl, with the following principal terms: <br><br> <u>Disbursements</u>: <br><br> (i) Subject to the Priority of Payments, $500,000 on or prior to BC Completion Date, the proceeds of which will be used by Pearl to supplement its furniture, fixtures and equipment budget; and <br><br> (iii) Upon the receipt of any proceeds from the TOC Casino Transaction which in aggregate exceed the MTA Reserved Amount, an amount equal to such excess up to the TOC Casino BC Loan Amount, which shall be used for general corporate purposes of Pearl including to repay the BC Bridge Loan; provided, that, any repayment of the BC Bridge Loan shall be prohibited until the later of (x) the BC Completion Date and (y) November 20, 2013. <br><br> <u>Collateral and Certain Covenants, Events of Default and Conditions</u>: |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE
FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

The collateral for the BC Senior Loan shall be secured by a first priority security interest and include all assets of the Beach Club, including but not limited to the following:

    i.)  100% of the common stock of Pearl;

    ii.) The Land Development Agreement or agreements involving the contribution of land or fees in exchange for Beach Club memberships;

    iii.) The BC Members Agreements;

    iv.) Insurance policies and proceeds there of;

    v.) BC Ferry lease agreement (if applicable);

    vi.) Any and all real and personal property. The BC Senior Loan will have an effective maturity date consisting of 20 years (with automatic and mandatory 20 year renewals) and will not accrue any interest; in addition:

The BC Senior Loan will be senior in priority to any other debt or equity capital instrument of Pearl, including the BC Bridge Loan; and the BC Senior Loan will be secured by a pledge of 100% of the common stock of Pearl (for the avoidance of doubt, not to be limited to the portion of common stock held currently by RKCo and Upper Deck).

The BC Senior Loan will cross-default to the Notes and to the TOC Membership Agreement, with such relevant events of default as specified in the final documentation, such that Events of Default under the Notes will cause a default under the BC Senior Loan; provided, further, that Events of Default under the BC Senior Loan shall have a cure period of 45 days.

Any Event of Default under the BC Bridge Loan shall cross-default to the BC Senior Loan, which shall have a first priority claim over the BC Bridge Loan over any collateral and shall be senior in right of repayment.

As a condition of the BC Senior Loan, Pearl and the CCSA Parties shall represent that no Affiliates of the Company, Pearl or the CCSA Parties derive any economic benefit from the Beach Club, except as has been fully disclosed in writing to the Steering Group in advance of the filing of the Pre-Packaged Plan.

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| **BC Membership Sales at TOC:** | Sales of residential and hotel units at the TOC include BC Membership in the Beach Club for a one-time payment (the "Membership Fee") in the UPA. Membership Fees to be paid by owners of Units in the Project pursuant to Unit Purchase Agreements are payable to the Company and deposited in the HSBC Panama Account. Sold BC Memberships shall be issued in sequence based on the BC Member ID.<br><br>Newland will notify the applicable purchaser(s) under each UPA for a residential or hotel condominium unit that payment of the Membership Fee is required within three months from the later of (i) the closing date of such UPA and (ii) the BC Completion Date, after which if the Membership Fee remains unpaid, the underlying BC Membership shall be considered declined (each a "Declined Membership") and will revert back to Pearl; provided that the proceeds of any subsequent sale of a Declined Membership must be used to repay the BC Senior Loan. |
| **Beach Club Ferry:** | Up to $1.25MM (the "BC Ferry Payment") will be incorporated into the Priority of Payments which amount may be used by Newland toward the purchase of a ferry (the "BC Ferry") or for any approved transportation solution to transport residents of the TOC to and from the Beach Club, as described below. Newland will contribute any needed portion of the BC Ferry Payment utilized toward the purchase of the BC Ferry into a special purpose entity (the "BC SPV") for such purpose, which shall be owned 100% by Newland.<br><br>If and when acquired, the BC Ferry will be leased to Pearl under an operating lease ("BC Ferry Lease") under which Pearl shall be responsible for operating and maintaining the BC Ferry (without charge-back to Newland for any such costs or services). The BC Ferry Lease will establish the pricing and methods for reserving seats on the BC Ferry for TOC residents and non-residents, which shall be subject to approval of Newland. Newland shall be able to defer the purchase of the BC Ferry and instead either arrange a BC Ferry Concession. Any use of funds in respect of the BC Ferry Payment toward such a transportation solution will require written notice to the Noteholder Representative and the Noteholder Representative indicating no objection (with any objection being reasonable and described in writing to the Newland Board) to the transportation solution and related arrangements.<br><br>Newland's obligation to make the BC Ferry Payment shall expire on the date that is eighteen months from the Effective Date. |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 4A
## MONTHLY WORKING CAPITAL BUDGET

| Monthy Working Capital Period | | Monthly Woring Capital Categories | | | |
|---|---|---|---|---|---|
| Post Closing Monthly Period | Expected Month/Year | TOC Asset Completion & Preservation | Newland TOC Operations | Newland Corporate Operations | Miscellaneous Monthly Working Capital |
| Closing Month | April-2013 | $ 210,000 | $ 430,000 | $ 240,000 | $ 245,000 |
| + 1 Month | May-2013 | $ 210,000 | $ 430,000 | $ 240,000 | $ 245,000 |
| + 2 Month | June-2013 | $ 220,000 | $ 345,000 | $ 230,000 | $ 255,000 |
| + 3 Month | July-2013 | $ 210,000 | $ 255,000 | $ 235,000 | $ 225,000 |
| + 4 Month | August-2013 | $ 210,000 | $ 200,000 | $ 225,000 | $ 240,000 |
| + 5 Month | September-2013 | $ 205,000 | $ 185,000 | $ 225,000 | $ 235,000 |
| + 6 Month | October-2013 | $ 205,000 | $ 200,000 | $ 230,000 | $ 215,000 |
| + 7 Month | November-2013 | $ 180,000 | $ 110,000 | $ 120,000 | $ 215,000 |
| + 8 Month | December-2013 | $ 185,000 | $ 110,000 | $ 120,000 | $ 210,000 |
| + 9 Month | January-2014 | $ 150,000 | $ 35,000 | $ 105,000 | $ 210,000 |
| + 10 Month | February-2014 | $ 155,000 | $ 35,000 | $ 105,000 | $ 200,000 |
| + 11 Month | March-2014 | $ 155,000 | $ 35,000 | $ 110,000 | $ 195,000 |
| + 12 Month | April-2014 | $ 155,000 | $ 40,000 | $ 110,000 | $ 190,000 |
| + 13 Month | May-2014 | $ 155,000 | $ 40,000 | $ 115,000 | $ 185,000 |
| + 14 Month | June-2014 | $ 155,000 | $ 40,000 | $ 115,000 | $ 185,000 |
| + 15 Month | July-2014 | $ 140,000 | $ 35,000 | $ 105,000 | $ 190,000 |
| + 16 Month | August-2014 | $ 140,000 | $ 35,000 | $ 110,000 | $ 185,000 |
| + 17 Month | September-2014 | $ 145,000 | $ 35,000 | $ 105,000 | $ 185,000 |
| + 18 Month | October-2014 | $ 145,000 | $ 40,000 | $ 105,000 | $ 180,000 |
| + 19 Month | November-2014 | $ 140,000 | $ 40,000 | $ 110,000 | $ 180,000 |
| + 20 Month | December-2014 | $ 130,000 | $ 35,000 | $ 100,000 | $ 180,000 |
| + 21 Month | January-2015 | $ 130,000 | $ 35,000 | $ 100,000 | $ 180,000 |
| + 22 Month | February-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 23 Month | March-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 24 Month | April-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 25 Month | May-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 175,000 |
| + 26 Month | June-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 27 Month | July-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 28 Month | August-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 29 Month | September-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 30 Month | October-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 31 Month | November-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 32 Month | December-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 33 Month | January-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 34 Month | February-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 35 Month | March-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 36 Month | April-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 37 Month | May-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 38 Month | June-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 39 Month | July-2016 | $ 90,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 40 Month | August-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 41 Month | September-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 42 Month | October-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 43 Month | November-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 44 Month | December-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 45 Month | January-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 46 Month | February-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 47 Month | March-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 48 Month | April-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 49 Month | May-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 50 Month | Thereafter May 2017 | $ - | $ - | $ - | $ - |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

These Monthly Working Capital numbers shall become available effective on the date of the issuance of the new restructured Notes, and if the date of such issuance is other than the first day of a calendar month then the amount available for that month shall be the total amount set forth for that month reduced on a pro rata basis to cover the number of days remaining during that month following the date of such issuance.

FRE 408 SETTLEMENT COMMUNICATION   FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE   PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 4B
## PROJECTED CASH COLLATERAL BUDGET

| | Filing Date Month | Chap 11 1st Month | Monthly Average [1] | Effective Date Month [2] |
|---|---|---|---|---|
| **Newland Payable Brokerage & Licensing Fees** | | | | |
| MTA Success Fees Payable | - | - | - | 1,125,000 |
| Master & Co-Broker Fees | 37,500 | 21,500 | 21,500 | 27,500 |
| Total Newland Payable Brokerage & Licensing Fees | **37,500** | **21,500** | **21,500** | **1,152,500** |
| **Asset Maintenance/Preservation** | | | | |
| Post Sales Materials Costs | 6,000 | 6,000 | 6,000 | 6,000 |
| Common & Concession Area Maintenance | 190,000 | 187,000 | 187,000 | 174,500 |
| Electricity Bills | 334,500 | 22,000 | 22,000 | 21,500 |
| Salaries: Asset Maintenance/Preservation | 81,000 | 81,000 | 81,000 | 81,500 |
| Total Asset Maintenance/Preservation | **611,500** | **296,000** | **296,000** | **283,500** |
| **Asset Re-Positioning / Marketing Launch** | | | | |
| Advertising Creative Development | 22,000 | 16,500 | 16,500 | 16,500 |
| Media & Public Relations | 21,000 | 15,000 | 15,000 | 15,000 |
| Marketing & Sales Workproduct | 78,000 | 54,500 | 54,500 | 57,500 |
| Events/Co-Branding | 15,500 | 10,000 | 10,000 | 10,000 |
| Sales Center Misc | 25,000 | 19,500 | 19,500 | 19,500 |
| Total Asset Re-Positioning / Marketing Launch | **161,500** | **115,500** | **115,500** | **118,500** |
| **Sales & Marketing Operations (Ex Brokerage)** | | | | |
| ACRE Sales Manager & Panama Brokerage License | 14,500 | 14,500 | 14,500 | 14,500 |
| Salaries: Newland Closing Coordinators | 11,500 | 11,500 | 11,500 | 11,500 |
| Closings: Transfer Taxes/Notary Fees | 24,000 | 24,500 | 24,000 | 25,000 |
| Salaries: Legal Support for Closing | 3,000 | 3,000 | 3,000 | 3,000 |
| Re-Sales & Floor Area Ratio Reimbursements | - | - | - | 88,500 |
| Total Sales & Marketing Operations (Ex Brokerage) | **53,000** | **53,500** | **53,000** | **142,500** |
| **Newland Financial, Legal & Tax Related** | | | | |
| Trustee/Program/Banking Fees & Expenses | 17,000 | 17,000 | 17,000 | 67,000 |
| Rating Agency Fees & Expenses | - | - | - | 161,000 |
| Court Filing/US Trustee/Translation Expenses | 27,500 | 15,000 | 15,000 | 15,000 |
| Claims Agent / Ballot Tabulation Agent | 25,000 | 20,000 | 20,000 | 15,000 |
| Legal Professionals Debtor | 331,000 | 321,000 | 321,000 | 336,000 |
| Legal Professionals Steering Group | 100,000 | 100,000 | 100,000 | 100,000 |
| Legal Professionals Trustee | 15,000 | 40,000 | 40,000 | 40,000 |
| Restructuring/Financial Advisor Debtor | 5,000 | 5,000 | 5,000 | 4,000,000 |
| Financial Advisor Steering Group | 30,000 | 30,000 | 30,000 | 690,000 |
| Bulk Sale Re-Purchase Option Fees | 112,000 | 112,000 | 112,000 | 112,000 |
| Revenue & Developer Taxes | - | - | - | 60,000 |
| Total Newland Financial, Legal & Tax Related | **662,500** | **660,000** | **660,000** | **5,596,000** |
| **Newland Corporate & Administrative** | | | | |
| Salaries: Newland Officers | 19,500 | 19,500 | 19,500 | 19,500 |
| Salaries: Newland Control & Administrative | 33,500 | 33,500 | 33,500 | 33,500 |
| Salaries: Newland Sales & Marketing | 10,000 | 10,000 | 10,000 | 10,000 |
| Newland Corp & Admin Miscellaneous | 57,000 | 17,000 | 17,000 | 17,000 |
| Total Newland Corporate & Administrative | **120,000** | **80,000** | **80,000** | **80,000** |
| | | | | |
| **Miscellaneous Cash Collateral Usage** | **50,000** | **50,000** | **50,000** | **50,000** |
| | | | | |
| **Total** | **1,696,000** | **1,276,500** | **1,276,500** | **7,423,000** |

1 The line-item amounts as presented above shall be subject to a carry forward of any unused amounts and a carry back of future amounts, subject to parameters and variances to be reasonably agreed with the Steering Group, it being understood among the parties that (i) line-items pertaining to service providers shall have a carry forward or carry back reasonably consistent with the nature of the service provided and (ii) that variances from line-items shall not

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

exceed a material portion of a given monthly allocation (with such materiality threshold to be agreed).

2 The budget duration shall be for such number of months as are contemplated to complete the Restructuring in accordance with the terms of the Plan Support Agreement as the same may be amended from time to time.

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 5

## FORM OF QUARTERLY REPORT OF MONTHLY DATA

### SELLOUT (UNITS CONTRACTED TO BE SOLD AND AVAILABLE UNITS)

| | Sold or contracted to be sold | | | | | | | | | | | | | Available | | | Total Sellout | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | January | | | February | | | March | | | Total thru 1Q13 | | | as of 1Q13 | | | as of 1Q13 | | | | |
| | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | |
| *Residential Condominium Units* | | | | | | | | | | | | | | | | | | | |
| One Bedroom Units | | | | | | | | | | | | | | | | | | | |
| Two Bedroom Units | | | | | | | | | | | | | | | | | | | |
| Three Bedroom Units | | | | | | | | | | | | | | | | | | | |
| Three Bedroom combo Units | | | | | | | | | | | | | | | | | | | |
| Penthouse | | | | | | | | | | | | | | | | | | | |
| Curve Units | | | | | | | | | | | | | | | | | | | |
| Baylofts | | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | | |
| *Hotel Condominium Units* | | | | | | | | | | | | | | | | | | | |
| One Bedroom Suite Units | | | | | | | | | | | | | | | | | | | |
| One Bedroom Curve Units | | | | | | | | | | | | | | | | | | | |
| Studio Units | | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | | |
| **Total Residential and Hotel Units** | | | | | | | | | | | | | | | | | | | |
| **Other Products** | | | | | | | | | | | | | | | | | | | |
| Commercial Units | | | | | | | | | | | | | | | | | | | |
| Restaurants | | | | | | | | | | | | | | | | | | | |
| Offices | | | | | | | | | | | | | | | | | | | |
| Spa | | | | | | | | | | | | | | | | | | | |
| Casino | | | | | | | | | | | | | | | | | | | |
| **Total Commercial Space** | | | | | | | | | | | | | | | | | | | |
| **Total Sell Out** | | | | | | | | | | | | | | | | | | | |
| Membership Fee | | | | | | | | | | | | | | | | | | | |
| **TOTAL SALES PLUS MEMBERSHIPS** | | | | | | | | | | | | | | | | | | | |

### TOTAL UNITS SOLD (CLOSED VS. UNCLOSED)

Mar. 31, 2013
US$ Thousands

| | Closed | | | | | | | | | | | | Unclosed | | | | | Total Sold | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | January | | | February | | | March | | | as of 1Q13 | | | as of 1Q13 | | | | Total Sold | | |
| | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Receivables (US$) | Units | Sq Mtrs | Sales Amount US$ |
| Bayloft | | | | | | | | | | | | | | | | | | | |
| Condo | | | | | | | | | | | | | | | | | | | |
| Hotel | | | | | | | | | | | | | | | | | | | |
| Commercial | | | | | | | | | | | | | | | | | | | |
| Restaurant | | | | | | | | | | | | | | | | | | | |
| Office | | | | | | | | | | | | | | | | | | | |
| **Total general** | | | | | | | | | | | | | | | | | | | |

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

## COLLECTIONS

**Mar. 31, 2013**

**US$ Thousands**

|  | January | February | March | Collections YTD (US$) |
|---|---|---|---|---|
| New Sales |  |  |  |  |
| Cash |  |  |  |  |
| Mortgages |  |  |  |  |
| **Total** |  |  |  |  |

## NEW SALES

**Mar. 31, 2013**

**US$ Thousands**

|  | January | | | February | | | March | | | Total YTD |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ |  |
| Condo |  |  |  |  |  |  |  |  |  |  |
| Hotel |  |  |  |  |  |  |  |  |  |  |
| Commercial |  |  |  |  |  |  |  |  |  |  |
| Total |  |  |  |  |  |  |  |  |  |  |

## DEFAULTS

**Mar. 31, 2013**

**US$ Thousands**

|  | January | | | February | | | March | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ |
| Bayloft |  |  |  |  |  |  |  |  |  |  |  |  |
| Condo |  |  |  |  |  |  |  |  |  |  |  |  |
| Hotel |  |  |  |  |  |  |  |  |  |  |  |  |
| Commercial |  |  |  |  |  |  |  |  |  |  |  |  |
| Restaurant |  |  |  |  |  |  |  |  |  |  |  |  |
| Office |  |  |  |  |  |  |  |  |  |  |  |  |
| Casino |  |  |  |  |  |  |  |  |  |  |  |  |
| Total |  |  |  |  |  |  |  |  |  |  |  |  |

## DEEDS PROCESSING

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

**Mar. 31, 2013**

| Recording Status | January | February | March |
|---|---|---|---|
| Deed to be signed by Newland | | | |
| Deed in process with bank | | | |
| Deed in Notary office | | | |
| Deed payments procesing in public registry | | | |
| Deed to be Recorded | | | |
| RECORDED | | | |
| **Total** | | | |

## RELATED PARTY TRANSACTIONS

**Mar. 31, 2013**

**US$ Thousands**

| Date | Related Party | Relation to Newland | Counterparty | Description | Amount (US$) |
|---|---|---|---|---|---|
| | | | | | |

FRE 408 Settlement Communication    For Discussion Purposes Only
Not For Disclosure    Privileged and Confidential

## EXHIBIT 6

## INDIVIDUALS WORKING FOR NEWLAND EMPLOYED BY ARIAS SERNA SARAVIA

| NAME | Position |
|---|---|
| Andres Romero | IT |
| Carlos Saravia | COO |
| Catalina Rodriguez | CFO |
| Evelin Cardenas | Accounting assistant |
| Flor Leon | Deed process coordinator |
| Francisco Franco | Technical office Director |
| Juan Cruz | Inhouse lawyer |
| Juan Sierra | Financial Planner |
| Luis Serna | ASyS Construction Manager |
| Rafael Rojas | Deliveries and post sales coordinator |
| Rosella Violi | Sales Director |
| Soraya Avendaño | Accounting Director |
| Yenny Robayo | Financial Assistant |

## Exhibit B

## Joinder Agreement

The undersigned transferee (the "Transferee") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of January __, 2013 (the "Agreement"), by and among Newland and the Initial Supporting Noteholders (each as defined therein), and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed an Initial Supporting Noteholder under the terms of the Agreement.

Date Executed: _____ __, 2013

**TRANSFEREE**

Name of Institution:

By:

Name:

Telephone:

Principal Amount of Notes Held:

With a Copy to: