THIS SOLICITATION IS BEING COMMENCED TO OBTAIN ACCEPTANCES OF THE DEBTOR'S PLAN PRIOR TO THE FILING BY THE DEBTOR OF ITS VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE NO CHAPTER 11 CASE HAS YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE OR COMPLYING WITH APPLICABLE NON-BANKRUPTCY LAW, ALTHOUGH THE DEBTOR BELIEVES IT DOES. FOLLOWING THE COMMENCEMENT OF ITS CHAPTER 11 CASE, THE DEBTOR EXPECTS PROMPTLY TO SEEK AN ORDER OF THE BANKRUPTCY COURT (i) APPROVING (a) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION WITH RESPECT TO THE PLAN AND BEING IN COMPLIANCE WITH APPLICABLE NON-BANKRUPTCY LAW AND (b) THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE AND (ii) CONFIRMING THE PLAN. **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. PREVAILING U.S. EASTERN TIME ON APRIL 29, 2013**, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.   THE DEBTOR MAY COMMENCE ITS CHAPTER 11 CASE PRIOR TO THE VOTING DEADLINE.

## DISCLOSURE STATEMENT

### Dated:  March 29, 2013

**Prepetition Solicitation of Votes in Respect of Prepackaged Chapter 11 Plan**

of

**NEWLAND**

**INTERNATIONAL PROPERTIES, CORP.**

| | |
|---|---|
| ACGM, Inc. | Plan Solicitation Agent |
| Epiq Bankruptcy Solutions, LLC | Balloting and Tabulation Agent |

AS OF THE DATE OF THIS DISCLOSURE STATEMENT, NEWLAND INTERNATIONAL PROPERTIES, CORP. HAS NOT COMMENCED A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THIS DISCLOSURE STATEMENT SOLICITS ACCEPTANCES OF THE PLAN AND CONTAINS INFORMATION RELEVANT TO A DECISION TO ACCEPT OR REJECT THE PLAN.

## DISCLAIMER

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW NOTES TO BE ISSUED UNDER THE PLAN WILL NOT HAVE BEEN, AND WILL NOT BE, THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR FOREIGN COUNTRY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS OR THE LAWS OF ANY FOREIGN COUNTRY. THE NEW NOTES OFFERED AND ISSUED PURSUANT TO THE PLAN WILL BE OFFERED AND ISSUED PURSUANT TO A PRIVATE PLACEMENT UNDER THE SECURITIES ACT. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE OR FOREIGN SECURITIES REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO EXCHANGE PREPETITION SENIORED SECURED NOTES FOR NEW NOTES IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED. ANY OFFER TO EXCHANGE PREPETITION SENIOR SECURED NOTES FOR NEW NOTES IS NOT BEING MADE, AND WILL NOT BE MADE, PURSUANT TO ANY "GENERAL SOLICITATION" OR "GENERAL ADVERTISING" AS SUCH TERMS ARE USED AND CONSTRUED UNDER THE SECURITIES ACT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. THE PLAN SOLICITATION AGENT, ACGM, INC. (A BROKER-DEALER REGISTERED WITH THE U.S SECURITIES AND EXCHANGE COMMISSION, AND A MEMBER OF FINRA AND SIPC), IS RELYING SOLELY UPON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND HAS NOT CONDUCTED ITS OWN DUE DILIGENCE TO VERIFY ITS ACCURACY OR COMPLETENESS AND THEREFORE DOES NOT GUARANTEE, EXPLICITLY OR IMPLICITLY, THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO

HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY OTHER PERSON.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  PLEASE BE ADVISED, HOWEVER, THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE HEREOF UNLESS SO SPECIFIED.  THE DEBTOR UNDERTAKES NO DUTY TO UPDATE THE INFORMATION CONTAINED HEREIN.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125(g) OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  ALL PERSONS HOLDING CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS IN ACCORDANCE WITH FEDERAL RULE OF EVIDENCE 408.

**THE DEBTOR'S BOARD OF DIRECTORS HAS APPROVED THE PLAN AND RECOMMENDS THAT THE HOLDERS OF CLAIMS ENTITLED TO VOTE IN CLASS 3 VOTE TO ACCEPT THE PLAN.**

THE DEBTOR PRESENTLY INTENDS TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

ACTUALLY WILL OCCUR. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. *SEE* SECTION V.I. – "CONDITIONS PRECEDENT TO CONSUMMATION." THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN ARE DESCRIBED UNDER SECTION V.G. – "PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS." DISTRIBUTIONS WILL BE MADE ONLY IN COMPLIANCE WITH THESE PROCEDURES.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS AND INTERESTS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

IF THE RESTRUCTURING OF INDEBTEDNESS CONTEMPLATED BY THE PLAN IS NOT APPROVED AND CONSUMMATED, THERE CAN BE NO ASSURANCE THAT THE DEBTOR WILL BE ABLE TO EFFECTUATE AN ALTERNATIVE FINANCIAL RESTRUCTURING OR SUCCESSFULLY EMERGE FROM ITS CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THE DEBTOR MAY BE FORCED INTO A LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE OR UNDER THE LAWS OF OTHER COUNTRIES. AS REFLECTED IN THE LIQUIDATION ANALYSIS, THE DEBTOR BELIEVES THAT IF IT WERE LIQUIDATED UNDER CHAPTER 7 OR OTHERWISE, THE VALUE OF THE ASSETS AVAILABLE FOR PAYMENT OF CREDITORS WOULD BE SIGNIFICANTLY LOWER THAN THE VALUE OF THE DISTRIBUTIONS CONTEMPLATED BY AND UNDER THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTOR AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. THE DEBTOR'S MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS. THE DEBTOR'S MANAGEMENT DID NOT PREPARE THE PROJECTIONS IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("*GAAP*") OR INTERNATIONAL FINANCIAL REPORTING STANDARDS ("*IFRS*") OR TO COMPLY WITH THE RULES AND REGULATIONS OF THE SEC OR ANY FOREIGN REGULATORY AUTHORITY.

THE PROJECTIONS AND FORWARD-LOOKING STATEMENTS HEREIN ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE SUMMARIZED HEREIN. *SEE* SECTION VIII. – "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN." CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM

d

THOSE INCLUDED IN OR CONTEMPLATED BY THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN WHICH, THEREFORE, ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE REORGANIZED DEBTOR AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTOR, THE REORGANIZED DEBTOR, ITS ADVISORS, THE PLAN SOLICITATION AGENT, OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED. NEITHER THE DEBTOR'S INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED, OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS AND THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY.

THE PROJECTIONS SET FORTH HEREIN ARE PUBLISHED SOLELY FOR PURPOSES OF THIS DISCLOSURE STATEMENT. THE PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED IN THIS DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS WILL PROVE CORRECT OR THAT THE DEBTOR'S OR REORGANIZED DEBTOR'S ACTUAL RESULTS WILL NOT DIFFER MATERIALLY FROM THE RESULTS PROJECTED IN THIS DISCLOSURE STATEMENT. THE DEBTOR AND ITS PROFESSIONALS DO NOT UNDERTAKE ANY OBLIGATION, EXPRESS OR IMPLIED, TO UPDATE OR OTHERWISE REVISE ANY PROJECTIONS OR INFORMATION DISCLOSED HEREIN TO REFLECT ANY CHANGES ARISING AFTER THE DATE HEREOF OR TO REFLECT FUTURE EVENTS, EVEN IF ANY ASSUMPTIONS CONTAINED HEREIN ARE SHOWN TO BE IN ERROR. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN, INCLUDING THOSE ASSOCIATED WITH THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, ACHIEVING OPERATING EFFICIENCIES, UNIT PRICE FLUCTUATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS AND OTHER MARKET AND COMPETITIVE CONDITIONS.

HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY,

REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.

SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT; MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTOR PREPARED THE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

IN THIS DISCLOSURE STATEMENT, THE DEBTOR RELIES ON AND REFERS TO INFORMATION AND STATISTICS REGARDING ITS INDUSTRY. THE DEBTOR OBTAINED THIS MARKET DATA FROM INDEPENDENT INDUSTRY PUBLICATIONS OR OTHER PUBLICLY AVAILABLE INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SOURCES ARE RELIABLE, THE DEBTOR, ITS ADVISORS AND THE PLAN SOLICTATION AGENT HAVE NOT INDEPENDENTLY VERIFIED AND DO NOT GUARANTEE THE ACCURACY AND COMPLETENESS OF THIS INFORMATION.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION AND SUMMARY OF THE PLAN .......................................................... 1

   A.  OVERVIEW OF CHAPTER 11 ........................................................................2

   B.  ECONOMICS AND EFFECT OF THE PLAN TRANSACTIONS ................................3

   C.  SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ......................................................................................5

   D.  SUMMARY OF TREATMENT AND PROJECTED RECOVERIES ...........................5

II.  GENERAL INFORMATION ...................................................................................... 7

   A.  THE COMPANY'S BUSINESS ........................................................................7

   B.  DEBTOR'S PREPETITION CORPORATE STRUCTURE .........................................27

   C.  DEBTOR'S PREPETITION CAPITAL STRUCTURE ..............................................27

      1.  Prepetition Senior Secured Notes ......................................................... 27

      2.  Unsecured Trade Debt .......................................................................... 27

      3.  The CCSA and the CCSA Settlement ................................................... 27

      4.  Trump Concessionary Amendments ...................................................... 28

III.  EVENTS LEADING TO THE CHAPTER 11 CASE ..................................................... 31

   A.  IMPACT OF GLOBAL RECESSION ..................................................................31

   B.  DESCRIPTION OF THE NEW NOTES ...............................................................33

IV.  THE ANTICIPATED CHAPTER 11 CASE ................................................................ 33

   A.  RELIEF TO BE SOUGHT AT OR NEAR THE OUTSET OF THE CHAPTER 11 CASE ........................................................................................34

   B.  ADMINISTRATIVE MOTIONS .......................................................................38

V.  SUMMARY OF THE PLAN ...................................................................................... 38

   A.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...............39

   B.  TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN: ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION CLAIMS AND PRIORITY TAX CLAIMS ...................................40

      1.  Administrative Expense Claims ............................................................ 40

      2.  Professional Compensation Claims ....................................................... 41

      3.  Indenture Trustee Fee Claims ............................................................... 41

      4.  Priority Tax Claims .............................................................................. 42

      5.  U.S. Trustee Fees ................................................................................ 42

   C.  CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ......................................................................................42

1.  Summary ................................................................................................................ 42

2.  Classification of Claims and Interests ................................................................. 42

3.  Treatment of Class 1: Other Priority Claims ...................................................... 43

4.  Treatment of Class 2: Other Secured Claims ...................................................... 43

5.  Treatment of Class 3: Prepetition Senior Secured Notes Claims ....................... 43

6.  Treatment of Class 4: General Unsecured Claims ............................................... 43

7.  Treatment of Class 5: Interests ........................................................................... 44

8.  Disclaimer Governing Unimpaired Claims ......................................................... 44

9.  Controversy Concerning Impairment .................................................................. 44

D.  PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY
    IMPAIRED CLASS, AND CONSEQUENCES OF NON-CONFIRMABILITY ......... 44

1.  Voting Rights ...................................................................................................... 44

2.  Acceptance Requirements .................................................................................... 45

3.  Tabulation of the Votes ....................................................................................... 45

4.  Non-Confirmability ............................................................................................. 45

E.  MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION
    GOVERNANCE OF REORGANIZED DEBTOR ........................................................ 45

1.  General Settlement of Claims ............................................................................. 45

2.  Sources of Consideration for Plan Distributions ................................................ 45

3.  Rule 2004 Examinations ...................................................................................... 46

4.  Continued Existence ............................................................................................ 46

5.  Re-vesting of Assets ........................................................................................... 46

6.  Implementation Transactions .............................................................................. 46

7.  Cancellation or Amendment of Securities and Agreements ............................... 46

8.  Reorganized Debtor ............................................................................................. 47

9.  Post Effective Date Management ........................................................................ 48

10. Noteholder Representative ................................................................................... 48

11. Directors and Officers of the Reorganized Debtor ............................................. 48

12. New Articles of Association and New Bylaws of the Reorganized Debtor ........ 50

13. Effectuating Documents; Further Transactions ................................................. 50

14. Entity Action ....................................................................................................... 50

15. Section 1146 Exemption ...................................................................................... 50

16. Preservation of Causes of Action ....................................................................... 51

17. Non-occurrence of Effective Date ...................................................................... 51

F.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 52

1. Assumption of Contracts and Unexpired Leases ................................................. 52

2. Cure of Defaults ................................................................................................. 52

3. Contracts and Leases Entered into after the Petition Date ................................. 53

4. Modifications, Amendments, Supplements, Restatements, or Other Agreements ............ 53

5. Reservation of Rights ......................................................................................... 53

6. Modification, Assumption and Non-Disturbance of Certain Plan Critical
   Agreements ......................................................................................................... 53

G. PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR
   TREATING AND RESOLVING DISPUTED CLAIMS ......................................... 56

1. Distribution Record Date .................................................................................... 56

2. Date of Distributions .......................................................................................... 56

3. Disbursing Agent ................................................................................................ 56

4. Rights and Powers of Disbursing Agent ............................................................. 57

5. Delivery of Distributions .................................................................................... 57

6. Withholding Taxes .............................................................................................. 57

7. Unclaimed Property ............................................................................................ 58

8. Disputed Claims .................................................................................................. 58

9. Objections to Claims ........................................................................................... 58

10. Setoffs and Recoupment ..................................................................................... 59

11. Allocation of Plan Distributions Between Principal and Interest ......................... 59

12. Allocation of Professional Fees .......................................................................... 59

13. Compromises and Settlements ............................................................................ 59

14. Reservation of Debtor's Rights ........................................................................... 59

15. No Distributions Pending Allowance .................................................................. 59

16. Claims Paid or Payable by Third Parties ............................................................. 59

17. Effect of Acceptance of Distribution .................................................................. 60

H. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........... 60

1. Discharge ............................................................................................................ 60

2. Releases .............................................................................................................. 61

3. No Successor Liability ........................................................................................ 65

4. Term of Injunctions ............................................................................................ 65

5. Binding Effect ..................................................................................................... 66

6. Dissolution of the Committee ............................................................................. 66

7. Post-Confirmation Date Retention of Professionals ........................................... 66

8. Survival of Certain Indemnification Obligations ................................................ 66

I.  CONDITIONS PRECEDENT TO CONSUMMATION ...............................................67

    1.  Conditions Precedent................................................................. 67

    2.  Conditions to Confirmation....................................................... 67

    3.  Conditions to Effective Date ..................................................... 67

    4.  Trump Concessionary Amendments ......................................... 68

    5.  Waiver ....................................................................................... 68

    6.  Effect of Failure of Conditions upon the Plan......................... 68

J.  RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT ....................69

K.  MISCELLANEOUS PROVISIONS OF THE PLAN ...................................71

    1.  Plan Supplement....................................................................... 71

**VI.  SOLICITATION AND VOTING PROCEDURES ........................................ 74**

A.  PERSONS ENTITLED TO VOTE ON THE PLAN .......................................74

    1.  Voting Class .............................................................................. 74

    2.  Presumed Acceptance of the Plan ............................................ 75

B.  THE SOLICITATION PACKAGE ...........................................................75

C.  VOTING INSTRUCTIONS ....................................................................75

D.  VOTING TABULATION........................................................................81

**VII. CONFIRMATION PROCEDURES ........................................................... 83**

A.  COMBINED DISCLOSURE STATEMENT AND CONFIRMATION
HEARING .........................................................................................83

B.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..............83

    1.  Best Interests of Creditors Test/Liquidation Analysis.............. 84

    2.  Feasibility ................................................................................. 86

    3.  Acceptance by Impaired Class ................................................. 87

    4.  No Unfair Discrimination......................................................... 88

    5.  Fair and Equitable Test............................................................. 88

**VIII.PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION
AND CONSUMMATION OF THE PLAN ........................................................... 88**

A.  RISK FACTORS RELATED TO CONFIRMATION, EFFECTIVENESS, AND
IMPLEMENTATION.............................................................................89

B.  RISK FACTORS RELATED TO THE BUSINESS OF THE REORGANIZED
DEBTOR AND THE DEBTOR'S INDUSTRY ............................................91

C.  RISK FACTORS RELATED TO PANAMA .................................................95

D.  RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING
STATEMENTS ...................................................................................97

    E.  RISK FACTORS RELATED TO THE NEW NOTES ...................................................98

    F.  DISCLOSURE STATEMENT DISCLAIMER ...........................................................101

    G.  LIQUIDATION UNDER CHAPTER 7 ........................................................................104

**IX.**  **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ................................. 105**

    A.  CONSEQUENCES OF EXCHANGING PREPETITION SENIOR SECURED
        NOTES FOR NEW NOTES ........................................................................................106

    B.  PAYMENTS OF INTEREST ON NEW NOTES .........................................................109

    C.  SALE, EXCHANGE OR OTHER TAXABLE DISPOSITION OF NEW NOTES ......109

    D.  MEDICARE TAX AND FOREIGN ASSET REPORTING .........................................109

    E.  BACKUP WITHHOLDING AND INFORMATION REPORTING ..........................110

**X.**   **CERTAIN PANAMANIAN TAX CONSEQUENCES................................................. 110**

    A.  TAXATION OF INTEREST .........................................................................................110

    B.  TAXATION OF DISPOSITIONS .................................................................................110

    C.  STAMP AND OTHER TAXES ....................................................................................111

    D.  FOREIGN INVESTORS .............................................................................................111

**XI.**  **CONCLUSION AND RECOMMENDATION ............................................................ 111**

**EXHIBIT A DESCRIPTION OF NOTES............................................................................ 113**

**EXHIBIT B PREPACKAGED PLAN OF REORGANIZATION....................................... 114**

**EXHIBIT C PROJECTIONS .............................................................................................. 115**

**EXHIBIT D LIQUIDATION ANALYSIS ......................................................................... 116**

**EXHIBIT E PLAN SUPPORT AGREEMENT .................................................................. 117**

## I.    INTRODUCTION AND SUMMARY OF THE PLAN

Newland International Properties, Corp., as debtor and debtor in possession (the "***Debtor***" or the "***Company***"), submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims and Interests in connection with the solicitation of votes to accept or reject the *Prepackaged Plan of Reorganization for the Debtor under Chapter 11 of the Bankruptcy Code*, dated March 29, 2013 (as the same may be amended, modified, or supplemented from time to time, the "***Plan***"). The Plan is being proposed by the Debtor and is anticipated to be filed with the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). A Uniform Glossary of Terms for the Plan Documents, including this Disclosure Statement, is attached as **Appendix A** to the Plan and is incorporated herein by reference.

Attached as exhibits to this Disclosure Statement are copies of the following documents: (a) the Description of Notes (**Exhibit A**); (b) the Plan (**Exhibit B**); (c) the Projections (**Exhibit C**), which set forth the analysis, and related financial projections, showing that, after the Effective Date, the Debtor will be able to fund its ongoing business and debt service obligations and will likely not require further financial reorganization; (d) the Liquidation Analysis (**Exhibit D**), which sets forth estimated recoveries in a chapter 7 liquidation of the Debtor, as compared to estimated recoveries under the Plan; and (e) the Plan Support Agreement (**Exhibit E**). In addition, for those Holders of Claims and/or Interests entitled to vote under the Plan, a Ballot (together with voting instructions) for the acceptance or rejection of the Plan is separately enclosed.

The Plan represents a compromise and settlement of various significant Claims against the Debtor and certain other stakeholders. The Plan seeks to preserve the value of the Debtor for its Creditors while recognizing and balancing the fact that the Holders of the Debtor's Prepetition Senior Secured Notes have claims against the Debtor that, absent such compromise and settlement, may result in a liquidation of the Debtor, leaving the Debtor's creditors and equity Holders with little or no recovery.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTOR'S CREDITORS AND THE BEST POSSIBLE PROSPECT FOR THE DEBTOR'S SUCCESSFUL REORGANIZATION. THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CLASS OF CREDITORS AND URGES ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

THE DEBTOR INTENDS TO COMMENCE A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THE CONCLUSION OF THE SOLICITATION PERIOD OR AS SHORTLY THEREAFTER AS REASONABLY PRACTICABLE AND TO USE ANY PREPETITION ACCEPTANCES OF THE PLAN THAT ARE RECEIVED PRIOR TO THE CONCLUSION OF THE SOLICITATION PERIOD TO OBTAIN CONFIRMATION OF THE PLAN. HOWEVER, THE DEBTOR RESERVES THE RIGHT TO EXTEND THE SOLICITATION PERIOD OR TO COMMENCE THE CHAPTER 11 CASE PRIOR TO THE

CONCLUSION OF THE SOLICITATION PERIOD AND SEEK TO USE ANY PREPETITION ACCEPTANCES OF THE PLAN THAT ARE RECEIVED PRIOR TO COMMENCEMENT OF SUCH CASE, TOGETHER WITH ANY POSTPETITION ACCEPTANCES OF THE PLAN RECEIVED IN ACCORDANCE WITH SECTION 1125(g) OF THE BANKRUPTCY CODE, TO OBTAIN CONFIRMATION OF THE PLAN.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the Plan. Only Claims in Class 3 are Impaired by the Plan, and only the Holders of Claims in such Class are entitled to vote to accept or reject the Plan. Class 3 consists of the Holders of Claims arising under the 9.50% Senior Secured Notes due 2014. Claims or Interests in Classes 1, 2, 4 and 5 are Unimpaired by the Plan, and the Holders of Claims or Interests in such Classes are conclusively presumed to have accepted the Plan. These Unimpaired Classes include any Holders of Other Priority Claims, Other Secured Claims, General Unsecured Claims (to the extent any such Claims exist) and Interests in the Debtor.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the rationale for the Debtor's decision to seek chapter 11 protection, significant events that are expected to occur during the Chapter 11 Case, and the anticipated organization, operations, and liquidity of the Reorganized Debtor upon successful emergence from chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders entitled to vote under the Plan must follow for their votes to be counted. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Plan.

This Disclosure Statement describes certain aspects of the Plan, the Debtor's operations, the Debtor's projections, and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES HERETO AND THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN IS CONTROLLING. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE TERMS OF THE CONFIRMATION ORDER, THE CONFIRMATION ORDER IS CONTROLLING.

## A.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests in property as of the commencement of the chapter 11 case.

The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, any holder of a claim against or equity interest in a debtor, and all other persons as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, to the terms and conditions of the confirmed plan. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of claims and equity interests in accordance with the terms of the confirmed plan and discharges a debtor from its prepetition obligations.

A debtor may propose a plan of reorganization prior to the filing of a chapter 11 case, and may solicit certain holders of claims against and interests in the debtor to vote to accept or reject the plan. Prior to soliciting acceptances of a chapter 11 plan proposed prior to the filing of a chapter 11 case, section 1125(g) of the Bankruptcy Code requires a debtor to prepare a disclosure statement that complies with applicable non-bankruptcy law. In the Debtor's circumstances, applicable non-bankruptcy law generally requires that a disclosure statement contain information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. The disclosure statement must accompany any solicitation of votes with respect to a plan. Votes to accept or reject a plan that are solicited and received before the filing of a chapter 11 case and in conjunction with a disclosure statement that complies with applicable non-bankruptcy law are deemed, pursuant to section 1126(b) of the Bankruptcy Code, to be votes to accept or reject such plan in such chapter 11 case. Similarly, votes to accept or reject such plan received after the commencement of a chapter 11 case, but in connection with a pre-filing solicitation, may be treated as votes to accept or reject such plan. The purpose of this Disclosure Statement, prepared in accordance with the requirements of section 1125(g) of the Bankruptcy Code, is to provide disclosure relative to the Plan in compliance with applicable non-bankruptcy law.

## B.    ECONOMICS AND EFFECT OF THE PLAN TRANSACTIONS

The Debtor is a Panamanian company established for the purpose of developing a luxury hotel and condominium known as the "Trump Ocean Club" (the "***Trump Ocean Club***") and its accompanying amenities. Its principal assets are the Trump Ocean Club itself and certain related facilities described below. As a result, the Debtor is dependent upon the Trump Ocean Club and the related facilities to generate revenue and the funds necessary to meet its outstanding debt service and other obligations.

Despite completion of the construction of the Trump Ocean Club, the Debtor faces obstacles as a result of the current global economic downturn, as well as market and industry-wide pressures. Ongoing developments in the international financial markets and the overall impact of the world economic crisis on the real estate business has significantly reduced unit sales over the last few years, and has adversely affected the Debtor's ability to collect on receivables generated by sales which had been in contract and, consequently, reduced the Debtor's liquidity to critical levels, as more fully described below.

The crisis in the international financial and real estate markets, which accelerated over 2008 and has persisted to date, has brought about and exacerbated several trends that subjected the Debtor to extraordinary pressure and duress. The success of Trump Ocean Club is highly correlated to the strength of the real estate market. A substantial portion of funds that would have been received by the Debtor were expected to come from second mortgages and home equity loans on principal residences, which have been reduced substantially. As such, the sale of units in Trump Ocean Club has been significantly affected as the financial losses suffered by affluent customers in the context of the crisis have adversely affected second home and resort purchases. Further, the availability of financing for real estate development companies, such as the Debtor, has been dramatically constrained over recent years, disrupting the Debtor's prior development and construction plans, and forcing the Debtor to re-evaluate the delivery of several of its products. In addition, the global increase in commodity prices, in particular the prices of energy, steel, concrete and wood, resulted in increased costs for the development and construction of real estate projects, which has impacted the Debtor's profit margins.

As a result of the aforementioned factors, the Debtor's cash flow has been reduced significantly and, in conjunction with substantial cost increases, has resulted in liquidity problems. Due to such liquidity pressures, the Debtor is and has been in default under the Prepetition Senior Secured Notes since November 15, 2011. As more fully described below, the Debtor has undertaken a variety of measures since 2010 to restructure the Prepetition Senior Secured Notes and intends to further restructure the Prepetition Senior Secured Notes pursuant to the Plan.

The Plan provides that Holders of General Unsecured Claims, including trade creditors, will be Unimpaired under the Plan. Unimpairment of these entities is essential to the uninterrupted continuation of the business of the Reorganized Debtor and, therefore, to the maximization of the going concern value of the Reorganized Debtor.

The Prepetition Senior Secured Notes will be cancelled and the holders of Prepetition Senior Secured Notes Claims will receive the New Notes.

The Plan provides that Interests in the Debtor will be reinstated.

The Plan provides that the existing Construction Completion Support Agreement, dated November 6, 2007 (the "*CCSA*"), will be terminated and any and all obligations thereunder released provided that the obligors under the CCSA provide a new $5 million Limited Financial Guarantee (as defined herein) of the Debtor's obligations under certain circumstances under the New Notes issued under the Plan.

As a result of the restructuring contemplated by the Plan, the Reorganized Debtor is expected to be well-positioned to take advantage of current demand and the expected recovery in the global economy.

The Debtor believes that the restructuring contemplated by the Plan will (i) restructure its financial indebtedness by rescheduling its principal payment obligations to more closely align such obligations with the cash flows expected to be generated by sales and closings on unit purchase agreements, (ii) improve its liquidity profile, and (iii) enable it to continue operating as

a going concern. The Debtor believes that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Case, would diminish the value of the Debtor's business and assets, result in significant delays, litigation and additional cost, and substantially lower, and in certain cases eliminate entirely, the recoveries for Holders of Allowed Claims.

   C.    **SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

   **THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND THE PROJECTED RECOVERIES UNDER THE PLAN.** *__THE PROJECTED RECOVERIES SET FORTH BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE__.* **REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. THE ALLOWANCE OF CLAIMS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM AMOUNTS MAY DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS.**

   D.    **SUMMARY OF TREATMENT AND PROJECTED RECOVERIES**

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| Unclassified | Administrative Expense Claims | These Claims are Unimpaired. The Plan provides for payment of each Allowed Administrative Expense Claim in full in Cash. | 100% |
| Unclassified | Professional Compensation Claims | These Claims are Unimpaired. The Plan provides for payment of each Allowed Professional Compensation Claim in full in Cash. | 100% |
| Unclassified | Priority Tax Claims | These Claims are Unimpaired. The Plan provides that each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code, or at the Debtor's election upon notice to the Holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code. | 100% |
| 1 | Other Priority Claims | These Claims are Unimpaired. The Plan provides for payment of each Allowed Other Priority Claim in full in Cash. | 100% |
| 2 | Other Secured | These Claims are Unimpaired. Except to the | 100% |

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | Claims | extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Other Secured Claim shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed Other Secured Claims. | |
| 3 | Prepetition Senior Secured Notes Claims | These Claims are Impaired. The Holders of Allowed Prepetition Senior Secured Notes Claims shall receive New Notes in principal amount equal to the principal amount of the Allowed Prepetition Senior Secured Notes Claims held by such Holders plus interest accrued and unpaid thereon through the Effective Date. | 95-100%[1] |
| 4 | General Unsecured Claims | These Claims are Unimpaired. To the extent that a Holder of an Allowed General Unsecured Claim has not been paid in full as of the Confirmation Date, unless such Holder agrees to a less favorable treatment, each Allowed General Unsecured Claim in Class 4 shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed General Unsecured Claim. Without limiting the generality of the foregoing, if an Allowed General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such General Unsecured Claim shall be paid in Cash by the Debtor (or, after the Effective Date, by the Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Allowed General Unsecured Claim. | 100% |

---

[1]  The range is based on the present value of the New Notes as compared to the present value of the Prepetition Senior Secured Notes.

| Class | Type of Claim or Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|---------------------------|-----------------------------|-----------------------------------|
| 5 | Interests in Newland International Properties, Corp. | Interests in Class 5 are Unimpaired.  Interests in Class 5 shall be reinstated. | N/A |

## II.     GENERAL INFORMATION

### A.     THE COMPANY'S BUSINESS

*Overview*

Trump Ocean Club is being developed by the Debtor as a multi-use luxury tower, overlooking the Pacific Ocean, with luxury condominium residences, a world-class hotel condominium, offices and premier leisure amenities.  Trump Ocean Club is located on the Punta Pacifica Peninsula, one of the most exclusive neighborhoods in Panama City, on approximately 2.8 acres (11,200 square meters) of land, including approximately 295 lineal feet (90 lineal meters) of oceanfront.  Trump Ocean Club has 69 floors of construction, three of which are technical floors dedicated to critical machinery, with the remaining floors including, among other things, the following amenities:

- 630 luxury residential condominium units, including one, two and three bedroom units;
- 369 world-class hotel condominium units, including fully furnished studio style rooms and suites;
- private beach club on Viveros Island, Panama;
- international casino;
- pier facility;
- pool deck;
- 30 boutique shops;
- 64 office lofts;
- restaurants;
- business center;
- wellness spa; and
- 1592 parking spaces.

Given the international prestige and name recognition associated with the Trump brand name and the breadth of the Trump Ocean Club's product offerings, the Debtor believes Trump Ocean Club is a unique development in Panama, and also in the Central American and Caribbean regions.

*Forward-looking Statements*

The discussion of Trump Ocean Club presented below contains forward-looking information that is based on management's beliefs, assumptions, estimates and projections and reflects current views with respect to future events. All statements, other than statements of historical facts, included in this presentation are forward-looking statements and involve significant risks and uncertainties. This information is not a guarantee of Trump Ocean Club's future performance and may change as a result of many possible events or factors, not all of which are known to the management of Trump Ocean Club. If a change occurs, Trump Ocean Club's business, financial condition, liquidity and results of operations may vary materially from those expressed in these forward-looking statements. You are cautioned not to place undue reliance on these forward-looking statements, which speak only as of their dates, and you should carefully consider the following factors that could cause actual results to vary from the financial projections, assumptions and other forward-looking statements presented below:

- Political, economic and other conditions in Panama and globally;
- Natural disaster-related losses which may not be fully insurable;
- Any loss of key personnel;
- Transactions with related parties;
- The Company's ability to attract and retain sales executives or real estate brokerage firms;
- Potential non-performance of contractual obligations by the Company's customers;
- The Company's ability to achieve its sales targets
- The Company's ability to collect on its receivables and to deliver real estate products to its customers;
- Competition in the luxury real estate development industry;
- The loss of tax exemptions granted to the Trump Ocean Club and other changes in applicable tax laws;
- Changes in interest rates or foreign exchange rates;
- Litigation risk;
- Availability of bank financing for units based on market perception and prospects of restructuring;
- Uncertainty in reaching a restructuring agreement acceptable to stakeholders
- The performance of third parties with whom we do business;
- Risk of foreclosure by Trustee resulting in court ordered liquidation of Trump Ocean Club;
- Various other factors that may emerge from time to time.

All financial projections, assumptions and other forward-looking statements contained in this Disclosure Statement are qualified in their entirety by these risks, uncertainties and other factors. The Debtor disclaims any obligation or undertaking to update publicly or revise any financial projections, assumptions and other forward-looking statement contained in this Disclosure Statement or in related discussions, whether as a result of new information, future events or otherwise. It is not possible for the Debtor to predict new factors which may arise or to assess with any precision the impact of each factor on its business or the extent to which any

factor, or combination of factors may cause actual results to differ materially from historical results or those contained in any forward-looking statements.

*Summary of Events*

On October 19, 2011, the Company announced that it would not be making its required debt service payment due November 15, 2011, including a principal payment of $31.4 million on the Prepetition Senior Secured Notes (for purposes of this section, "General Information – The Company's Business" only, herein referred to as the "Notes"). The Company proceeded to make the interest payment due but not the principal payment due on that date. The Company has not made any interest or principal payments on the Notes since that date. Events leading up to the default and following the default can be summarized as follows:

- The global economic crisis prevailing since late 2008 has had a negative impact on the real estate market and also on the financial profile of Trump Ocean Club unit buyers. While a significant percentage of the Trump Ocean Club units were originally subject to sales contracts, the crisis led to delays or cancellations in closings and in collections of outstanding unit buyer balances. Furthermore, longer than expected processing times for the funding of previously approved local bank mortgages were occurring, and in numerous cases, the banks reduced the amount of financing available under such buyer mortgages. The Company also experienced construction cost overruns and delays, due in part to an increased scope of the Trump Ocean Club above and beyond its original design. All of these factors significantly impacted the Company's cash flows and the ability of the Company to service its debt in accordance with the original debt service schedule, which had been established under favorable, pre-crisis market conditions.

- In April 2010, the Company engaged J.P. Morgan Securities LLC as restructuring advisor in connection with a consent solicitation for the execution of the First Supplemental Indenture, as further described herein, on May 14, 2010.

- In May 2010, the Company announced cost overruns of $26.9 million. The Notes were subsequently downgraded by Moody's from B1 to B2 and by Fitch from BB- to B+.

- In March 2011, the Notes were downgraded by Fitch to B. Shortly thereafter, in June 2011, the Company disclosed that it faced $19.6 million of additional cost overruns due to delays in millwork delivery, increasing the overall construction contract to $266.0 million.

- In July 2011, the hotel was opened in a high profile ribbon cutting ceremony attended by Donald Trump and Panamanian President Ricardo Martinelli.

- In August 2011, the Company hired Gapstone Group LLC to provide restructuring advice.

- In September 2011, the construction contract between Opcorp Arsesa International ("***Opcorp***") and the Company was increased to $289.6 million, and the Notes were again downgraded by Fitch and Moody's to CCsf and Caa3, respectively.

- In October 2011, the Company announced it would miss the November 15, 2011 amortization payment. On November 15, 2011, the Company missed the amortization payment, causing a payment default.

- In November 2011, a steering group of Noteholders (the "***Steering Group***") was formed in response to the payment default.  Ultimately, the Steering Group worked with the Company in establishing monthly working capital allocations to allow for continuation of operations and the completion of construction while restructuring negotiations took place.

- On March 29, 2012, Noteholders holding a majority in principal amount of the Notes approved a second amendment to the Indenture to allow for up to $12.7 million in funding from the Collection Account (as defined in the Indenture) to be utilized to fund remaining construction, which had been halted due to lack of funding, causing delays and associated cost increases.  The approved funding, pursuant to the Supplemental Construction Budget (as defined in the Indenture), allowed for completion of work on unfinished units, many of which had already been sold and whose buyers had been awaiting delivery before funding the remaining payment balance due.  Construction work has now been fully completed.

- On July 11, 2012, Noteholders holding a majority in principal amount of the Notes approved a third amendment to the Indenture to allow funds to be utilized to repurchase 27 residential units (26 two-bedroom units and 1 three-bedroom unit, collectively the "***Bulk No. 1 Units***") with a total area of 4,375 square meters, originally sold ("***Bulk Sale No. 1***") on May 28, 2010 at a price of $6.2 million (the "***Bulk Sale No. 1 Price***"), or $1,406 per square meter with a one year repurchase option granted to the Company (a "***Purchase Option Agreement***" or "***POA***").  The POA for the Bulk No. 1 Units was subsequently extended with an expiration date of July 13, 2012.  Under such POA, the Company paid a monthly option fee of 1.5% of the Bulk Sale No. 1 Price, or $92,270.45 per month.  The original purpose of Bulk Sale No. 1 and the use of its proceeds were to replenish the Debt Service Reserve Account (as defined in the Indenture).

- In August 2012, the Company hired a sales and marketing consultant, Cervera Real Estate ("***Cervera***"), to assist in the repositioning and re-launching of sales at Trump Ocean Club.  In conjunction with the hiring of Cervera, the Company also retained the services of LGD Communication Inc. ("***LGD***") to handle various advertising and marketing efforts and AMGW Agency to handle its public relations efforts.  As more fully discussed below, in October 2012, the Company officially re-launched sales with Cervera, inviting local and international brokers to tour the Trump Ocean Club.

- On November 26, 2012, the Company launched a consent solicitation for a fourth amendment to the Indenture, which was approved by a majority of Noteholders on December 10, 2012, allowing for the direct payment of broker fees from an account at

HSBC Panama. This direct payment method was negotiated as part of the contract with Cervera, the new master broker for Trump Ocean Club, in order to give brokers assurances of timely payment. As part of the restructuring plan, the Indenture would be further amended to include the direct expenses of any notary fees, recording fees, property or transfer taxes or other costs and expenses payable to the Panamanian government or its agencies to effect the transfer of a unit ("**_Property Transfer Fees_**").

- On November 28, 2012, the Company announced that it had entered into a Framework Agreement with Sun International, based in Johannesburg, South Africa ("**_Sun International_**"), to purchase and operate the Casino (as defined below), the Penthouse (as defined below), and the 65th floor units for a total price of $45.5 million plus certain incentive revenues up to $8 million subject to certain revenue targets being attained (the "**_Sun Agreement_**"). Sun International plans to invest approximately $105 million for its acquisition and complete build-out of the Casino. The Casino is slated to open by mid-2014. Sun International is currently in the process of completing the application to the Gaming Control Board of Panama for approval of its gaming license. The application includes, among other items, a business plan, the corporate structure of the Casino operator and its relation to Sun International, and the Form for the Process of Investigation as issued by the Gaming Control Board.

- As part of the Sun Agreement, Sun International has required that, upon signing the unit purchase agreement ("**_UPA_**") for each unit sold to Sun International, such UPA(s) be registered with the Public Registry of Panama. In order to accommodate this requirement, the Company and a majority of Noteholders approved a fifth supplement to the Indenture allowing the Trustee in Panama to consent to the registration of the applicable UPA(s) with the Public Registry of Panama.

*Sources and Uses of Cash Since the November 15, 2011 Default up Through February 28, 2013*

Table 1 (below) indicates sources and uses of cash since the payment default date of November 15, 2011. Of the approximately $41 million in cash expenses since that time, it is estimated that approximately $27 million are one-time expenses that are not expected to recur, including construction costs, Bulk Sale No. 1 repurchase expenses, restructuring related legal fees, and expenses related to the sales re-launch, including outfitting of the new Trump Ocean Club showroom floor, and other one-time fees.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

11

**_TABLE 1_:  SOURCES AND USES OF CASH SINCE NOV. 15, 2011 DEFAULT**

| Cash Balances Post-Default (Nov. 15, 2011) | |
|---|---:|
| Co-Trustee | 744,669 |
| Debt Service Reserve Account | - |
| Construction Escrow Acc. | 930,772 |
| Release Account | 879,493 |
| Collection Account | 217 |
| Investment Account | 442 |
| Corporate Account | 1,665,294 |
| **Total Cash Balances (Nov. 15, 20122)** | **4,220,889** |
| | |
| New Sales (Initial Payment) | 8,794,267 |
| Cash Purchase Payments | 19,117,485 |
| Mortgage Financing | 15,840,682 |
| Interest Income | 20,606 |
| Notary and Registration Fees (Paid by Clients) | 304,456 |
| Rentals | 1,257,894 |
| Opcorp (equipment sales, etc.)/Others | 2,286,239 |
| **Total Collections** | **47,621,630** |
| | |
| **Account balance after inflows for period** | **51,842,519** |
| | |
| Auditors | (66,816) |
| Banking Expenses | (208,969) |
| Bulk Sales Financing and Repurchase | (9,035,987) |
| CAM Expenses | (4,849,184) |
| Commissions [1] | (110,463) |
| Construction | (15,014,191) |
| Miscellaneous Expenses | (7,166,955) |
| Reimbursement Resale Account | (1,981,465) |
| Salaries and Benefits | (1,279,191) |
| Sales and Marketing Relaunch | (852,641) |
| Showroom Floor | (454,210) |
| Taxes | (310,077) |
| **Total Expenses** | **(41,330,148)** |
| | |
| **Final Balance as of  February 28, 2013** | **10,512,371** |
| **Sequestered Account [2]** | **1,469,353** |
| **Available Cash Balance as of February 28, 2013** | **9,043,018** |

[1]  Commissions since November 2012 not included as they are paid prior to deposit of funds at HSBC Panama account.
[2]  Funds under _secuestro_ (judicial seizure) pending decision of 8th District Civil Court of Panama.

*Construction Completion*

Upon the closing of the second supplement to the Indenture in March 2012, providing a $12.7 million supplemental construction budget, the construction team was able to resume the activities required to complete all construction and finishing work at Trump Ocean Club. As per the Independent Engineer's Report delivered to the Trustee, construction was completed in September 2012 at a total cost of $294.6 million. The report also indicated that, despite cost overruns, the completion cost of $1,176 per square meter is competitive when compared with other projects of a similar nature in the region. Some of the cost overruns resulted from the delay of critical construction work flows during the period when funds were held by the Trustee and were unavailable to the Company. The Casino and Penthouse were not finished by the contractor as these special units are sold as grey space and therefore are not within the scope of the construction contract. The buyers of these spaces will use their own interior design concepts and will build out the spaces in compliance with design and operating standards of Trump Ocean Club. The Spa is also sold as grey space and will be built out by the Spa operator in compliance with Trump Ocean Club standards.

As there is substantial remaining inventory to be sold, the Company will retain a labor force to prepare the delivery of units to buyers closing on their units and to handle any required post sales work. This team, which is currently comprised of 22 field workers and 4 professionals and will be reduced over the sellout of the Trump Ocean Club, was funded as part of the supplemental construction budget in 2012. From January 2013 onward, post sales expenses are being funded from monthly-working capital allocations. This team is expected to provide post sales services until 12 months after the final unit is sold.

*Summary of Bulk 2 Transaction*

The currently outstanding bulk sale transaction ("**Bulk Sale No. 2**"), which was funded on June 13, 2011, was a transaction involving a conditional sale by the Company with partial up-front proceeds of 25 units (14 residential units and 11 commercial units, collectively the "**Bulk No. 2 Units**") to a single buyer (the "**Bulk Purchaser**").

Bulk Sale No. 2 was structured as a conditional sale with a POA, which is currently set to expire on June 10, 2013. Under the POA, the Company pays an option fee of 1.5% of the Bulk Sale No. 2 price per month for the right to cancel the conditional sales on the Bulk No. 2 Units by repaying their portion of the Bulk Sale No. 2 Price. After the transaction took place, there were several subsequent substitutions and/or modifications of units subject to the Bulk Sale No. 2. Two of the condo units within the Bulk No. 2 Units were integrated into one unit; in addition, two of the commercial units were substituted for other similar commercial units, and the POA on one of those substituted units was later exercised by the Company for a cash payment of $297,870. More recently, five condo units with a total area of 1,016 square meters on the 65th floor were substituted for a package of units which included three condo units comprising an area of 459 square meters, two offices with a total area of 157 square meters, one commercial unit sized at 84 square meters, and the Spa.

Currently, the Bulk Sale No. 2 portfolio consists of 25 units, including 11 commercial units with a total area of 1,394 square meters, seven baylofts comprised of 702 square meters,

four condos with a total area of 612 square meters, two offices comprised of 150 square meters, and the Spa.

The terms of the restructured New Notes will provide for the application of cash collections to cancel the Bulk Sale No. 2 portfolio and return of Bulk No. 2 Units into inventory, and also will provide for a limited secured debt incurrence, if necessary, to preserve the Bulk No. 2 Units, to refinance any unexercised amount of the POA on commercially reasonable terms that include, among others, the requirement for an effective interest rate no greater than the coupon of the New Notes.

*Summary of Inventory, Closings and Sellout*

Inventory available for sale as of February 28, 2013 consisted of 497 units, including 296 condo units, 198 condo-hotel units, 2 restaurant spaces, and the Casino. The number of units in inventory available for sale ("***Available Units***") will increase by an additional 25 units should the Bulk Sale No. 2 POA be exercised by the Company.

In addition, the number of Available Units will increase by the number of units whose buyers default on their outstanding payment balances. Currently, of the 34 unit buyers with receivables outstanding, 27 are expected to close, resulting in receivables of $5.9 million, and 7 are expected to default and be returned to available inventory. In the ordinary course, these defaults do not result in the return of any of the $1.8 million of deposits in installments previously paid by the defaulting purchasers.

As of February 28, 2013, there 543 unit sales closed. "Closed" units are defined as units whose buyers have paid their balance in full and have signed the deed.

Defaults over the life of the Trump Ocean Club total 452 units with an original sale value of $227.9 million.

Table 2 below (the "***Sellout Matrix***") provides a breakdown of total units sold net of defaults ("***Sold Units***") along with Available Units as of February 28, 2013.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

14

| | Sold or contracted to be sold | | | Available | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Units | US$ | SQMT Th | Units | US$ | SQMT Th | Units | US$ | SQMT Th |
| **Residential Condominium Units** | | | | | | | | | |
| One Bedroom Units | 99 | 33.1 | 9.7 | 57 | 22.7 | 5.6 | 156 | 55.8 | 15.3 |
| Two Bedroom Units | 99 | 49.4 | 15.2 | 97 | 55.6 | 14.9 | 196 | 104.9 | 30.0 |
| Three Bedroom Units | 41 | 27.1 | 7.5 | 33 | 26.6 | 6.1 | 74 | 53.6 | 13.6 |
| Three Bedroom combo Units | 5 | 8.6 | 2.0 | 7 | 11.2 | 2.8 | 12 | 19.8 | 4.7 |
| 65th Floor Sun Units | - | - | - | 6 | 6.5 | 1.4 | 6 | 6.5 | 1.4 |
| Penthouse | - | - | - | 4 | 7.0 | 1.4 | 4 | 7.0 | 1.4 |
| Curve Units | 26 | 14.8 | 4.1 | 33 | 17.7 | 4.6 | 59 | 32.4 | 8.7 |
| Baylofts | 64 | 21.0 | 5.0 | 59 | 30.7 | 6.1 | 123 | 51.7 | 11.1 |
| Subtotal | 334 | 153.8 | 43.4 | 296 | 177.9 | 42.8 | 630 | 331.8 | 86.2 |
| **Hotel Condominium Units** | | | | | | | | | |
| One Bedroom Suite Units | 3 | 1.1 | 0.3 | 7 | 4.8 | 0.7 | 10 | 5.9 | 1.0 |
| One Bedroom Curve Units | 5 | 2.3 | 0.4 | 34 | 16.5 | 2.6 | 39 | 18.8 | 3.0 |
| Studio Units | 163 | 39.9 | 8.0 | 157 | 52.7 | 7.8 | 320 | 92.6 | 15.8 |
| Subtotal | 171 | 43.3 | 8.7 | 198 | 74.0 | 11.1 | 369 | 117.3 | 19.8 |
| **Total Residential and Hotel Units** | **505** | **197.1** | **52.1** | **494** | **252.0** | **53.9** | **999** | **449.1** | **106.0** |
| **Other Products** | | | | | | | | | |
| Commercial Units | 30 | 16.9 | 3.2 | - | - | - | 30 | 16.9 | 3.2 |
| Restaurants | 2 | 2.4 | 0.4 | 2 | 1.5 | 0.4 | 4 | 3.9 | 0.8 |
| Offices | 64 | 14.3 | 4.7 | - | - | - | 64 | 14.3 | 4.7 |
| Spa | 1 | 1.3 | 0.9 | - | - | - | 1 | 1.3 | 0.9 |
| Casino | - | - | - | 1 | 32.0 | 5.2 | 1 | 32.0 | 5.2 |
| **Total Commercial Space** | **97** | **34.8** | **9.2** | **3** | **33.5** | **5.6** | **100** | **68.3** | **14.7** |
| **Total Sell Out** | 602 | 231.9 | 61.3 | 497 | 285.5 | 59.5 | 1,099 | 517.4 | 120.8 |
| Membership Fee | - | 6.8 | - | - | 7.0 | - | - | 13.9 | - |
| **TOTAL SALES PLUS MEMBERSHIPS** | **602** | **238.8** | **61.3** | **497** | **292.5** | **59.5** | **1,099** | **531.3** | **120.8** |

The Sellout Matrix indicates a total sellout of 1,099 units at approximately $531.3 million, consisting of 602 Sold Units of $238.8 million, and 497 Available Units of $292.5 million, expressed in terms of the historical list price established and maintained by the Company since inception ("*List Price*") less a 25.0% discount, adhering to the Company's historical reporting convention (the "*Available Unit Values*"). Exceptions to this convention are the units subject to the Sun Agreement, including the Casino, which has been assigned an Available Unit Value of $32 million, as well as the Penthouse and 65th Floor Units, which have been assigned Available Unit Values of $7 million and $6.5 million respectively, based on prices stipulated in the Sun Agreement.

Within the Sellout Matrix, Bulk No. 2 Units are classified as Sold Units at the conditional sale price (as further described below) of approximately $7.5 million (the "*Bulk Sale No. 2 Price*"). Upon a release of the Bulk No. 2 Units, it is estimated that the total sellout value would increase by approximately $10.9 million to $542.2 million, based on the differential between the Bulk Sale No. 2 Price and the expected Available Unit Value of Bulk No. 2 Units when these units become Available Units, which is calculated at List Price less 25% for all units except the Spa, which itself is assumed to have an Available Unit Value of $2 million, the most recent offer received by the Company.

In addition there are assets and potential revenue sources for the Company which are not indicated in the Sellout Matrix. Examples of such additional assets and potential revenue sources could include the Sun Agreement (which includes certain payments to the Company totaling $8.0 million subject to attaining certain revenue targets), and net profits from hotel

rooms and hotel amenities, including food and beverage and meeting rooms. In addition, the Company may be able to sell or otherwise monetize certain hotel amenities, such as meeting rooms and food and beverage amenities, add-on products at Trump Ocean Club such as storage lockers, the sale of the Contadora Island parcel (as further described below), and the sale of certain construction tools and equipment. The Company also generates revenue from the leasing of commercial and residential units it owns.

*Receivables Balance*

The total receivables balance as of February 28, 2013 equals $7.7 million. It is anticipated that $5.9 million of the existing balance will be collected and $1.8 million will be defaulted. The majority of the expected collections are anticipated to be received within the next 60-90 days. The expected defaulting inventory consists of 7 units, including 1 condo unit with a size of 153 square meters, 3 condo-hotel units with an average size of 50 square meters, and 3 baylofts with an average size of 85 square meters.

*Sales*

| | Residential | | Hotel | | Commercial | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Units | US$ | Units | US$ | Units | US$ | Units | US$ |
| Jan-12 | | | | | | | | |
| Feb-12 | 3 | 1,454,500 | | | | | 3 | 1,454,500 |
| Mar-12 | | | | | | | - | - |
| Apr-12 | | | 1 | 210,000 | | | 1 | 210,000 |
| May-12 | | | | | 1 | 522,500 | 1 | 522,500 |
| Jun-12 | | | | | | | - | - |
| Jul-12 | 2 | 615,600 | | | | | 2 | 615,600 |
| Aug-12 | | | | | | | - | - |
| Sep-12 | 2 | 750,320 | | | | | 2 | 750,320 |
| Oct-12 | 5 | 1,657,700 | | | | | 5 | 1,657,700 |
| Nov-12 | 13 | 5,274,791 | | | | | 13 | 5,274,791 |
| Dec-12 | 2 | 800,900 | | | | | 2 | 800,900 |
| Jan-13 | 5 | 1,533,500 | | | | | 5 | 1,533,500 |
| Feb-13 | 7 | 2,899,561 | 2 | 496,800 | | | 9 | 3,396,361 |
| **TOTAL** | **39** | **14,986,872** | **3** | **706,800** | **1** | **522,500** | **43** | **16,216,172** |

From January 2012 through February 2013, the Company sold 43 units in gross sales (before broker commissions) in an aggregate amount of $16.2 million. Average price per square meter for residential units during that time period was $3,195. Average price per square meter for condo-hotel units and commercial space amounted to $4,871 and $5,262, respectively. Average prices since the re-launch of sales of units in the Trump Ocean Club in October 2012 through February 2013 month end were $3,325 per square meter, including an average of $3,276 for residential units and $5,250 for hotel units. The sales environment and mortgage financing availability have been impacted by the default on the bonds and the uncertainty of the path of the restructuring. Through 3Q2012, the Company generally refrained from a high volume sales campaign in order to avoid a negative impact on collections from prior sales. Since October, as a result of the Company's sales launch in conjunction with Cervera Real Estate, 34 units have been sold with a total sales value of $12.7 million.

*Collections*

|  | Cash (US$) | Mortgage (US$) | Total (US$) |
|---|---|---|---|
| Jan-12 | 1,233,931 | 424,069 | 1,658,000 |
| Feb-12 | 1,779,216 | 941,690 | 2,720,906 |
| Mar-12 | 1,510,386 | 752,893 | 2,263,279 |
| Apr-12 | 2,038,966 | 1,455,100 | 3,494,066 |
| May-12 | 2,254,445 | 2,779,282 | 5,033,726 |
| Jun-12 | 1,673,289 | 712,642 | 2,385,931 |
| Jul-12 | 373,885 | 1,219,289 | 1,593,174 |
| Aug-12 | 100,903 | 1,189,422 | 1,290,326 |
| Sep-12 | 1,387,698 | 2,179,778 | 3,567,477 |
| Oct-12 | 1,300,882 | 897,938 | 2,198,821 |
| Nov-12 | 1,435,863 | 980,805 | 2,416,668 |
| Dec-12 | 1,988,331 | 240,079 | 2,228,410 |
| Jan-13 | 771,149 | - | 771,149 |
| Feb-13 | 2,385,535 | 507,453 | 2,892,987 |
| **Total** | **20,234,479** | **14,280,441** | **34,514,920** |

From January 2012 through February 2013, the Company converted $34.5 million in receivables to cash collections. During that same period, banks disbursed loans to unit purchasers in an amount of $14.3 million, while $20.2 million in cash collections were realized. The Company has continued to experience longer than expected processing times for the funding of previously approved local bank mortgages due to problems exacerbated by the bond default and the restructuring, which impact unit appraisals and internal approval processes. In addition, the Company experienced delays in obtaining tax exemptions from local authorities. The situation is being remedied and the pace of disbursements has improved for approved units, and the Company expects a successful restructuring to result in an improvement in both the number and pace of mortgage disbursements.

*Closings*

As of February 28, 2013, 543 of the 602 units sold (net of defaults) were closed. Closing takes place when the deed is signed by the client and the value of the unit is paid in full. The breakdown per type of unit is as follows:

17

| | Closed | | Unclosed | | Total Sold | |
|---|---|---|---|---|---|---|
| | Units | US$ 000 | Units | US$ 000 | Units | US$ 000 |
| Bayloft | 54 | 18,634 | 10 | 2,338 | 64 | 20,972 |
| Condo | 244 | 122,257 | 26 | 10,586 | 270 | 132,843 |
| Hotel | 165 | 41,281 | 6 | 2,022 | 171 | 43,303 |
| Commercial | 19 | 12,730 | 11 | 4,136 | 30 | 16,866 |
| Restaurant | 2 | 2,411 | 0 | - | 2 | 2,411 |
| Office | 59 | 13,439 | 5 | 851 | 64 | 14,290 |
| Spa | 0 | - | 1 | 1,255 | 1 | 1,255 |
| **Total general** | **543** | **210,752** | **59** | **21,188** | **602** | **231,940** |

* Note: Unclosed Units include Qty 25 Bulk Sale # 2 Units

*Deed Recording Status*

In the past, the Company faced significant delays in the recording of deeds for unit buyers. Those delays were associated primarily with (i) obtaining certificates of good standing reflecting certain tax exemptions to which the Trump Ocean Club is entitled; (ii) delays in filing building and approval processes administered by the banks, often due to missing or amended information from foreign buyers, who are less accessible than local buyers; and (iii) timing of the receipt of necessary documents and/or instruments from the governmental authorities, among others. In April 2012, the deed recording process was put under additional control by centralizing certain functions under a local law firm and as a result, the deed registration timing has improved significantly.

The following chart shows the deed status of the 543 units that are classified as closed per the definition above.

| | |
|---|---|
| Deed to be signed by Newland | 5 |
| Deed in process with HSBC | 3 |
| Deed in Notary office | 9 |
| Deed payments procesing in public registry | 1 |
| Deed to be Recorded | 37 |
| RECORDED | 488 |
| **Total general** | **543** |

As of February 2013, deeds for 488 of the 543 units closed were recorded and delivered to the purchaser, 37 were pending to be recorded and the remaining 18 were in other stages as specified above.

*Defaults*

During the period from January 2012 through February month end 2013, a total of 185 units were classified as defaults and returned to available inventory, including 6 bayloft units, 134 condo units and 45 condo hotel units.

A total of 452 units have been defaulted with a corresponding total sales value of $227.9 million. The breakdown per type of unit is as follows:

| | 2009 | | 2010 | | 2011 | | 2012 | | 2013 | | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. | US$ | No. | US$ | No. | US$ | No. | US$ | No. | US$ | No. | US$ |
| Bayloft | - | - | 2 | 914,288 | 37 | 12,278,770 | 6 | 2,334,461 | - | - | 45 | 15,527,519 |
| Condo | 3 | 1,693,500 | 11 | 7,079,500 | 68 | 37,718,792 | 103 | 61,488,006 | 31 | 18,980,542 | 216 | 126,960,340 |
| Hotel | 3 | 1,015,000 | 12 | 3,819,500 | 121 | 36,692,420 | 39 | 14,414,410 | 6 | 1,770,200 | 181 | 57,711,530 |
| Commercial | - | - | - | - | 2 | 783,447 | - | - | - | - | 2 | 783,447 |
| Office | - | - | - | - | 4 | 1,937,775 | - | - | - | - | 4 | 1,937,775 |
| Restaurant | - | - | 1 | 2,937,000 | 2 | 2,070,800 | - | - | - | - | 3 | 5,007,800 |
| Casino | - | - | 1 | 20,000,000 | - | - | - | - | - | - | 1 | 20,000,000 |
| **TOTAL** | 6 | 2,708,500 | 27 | 34,750,288 | 234 | 91,482,004 | 148 | 78,236,877 | 37 | 20,750,742 | 452 | 227,928,411 |

*Hotel Performance*

During 2012, the hotel units at the Trump Ocean Club achieved 50.9% occupancy at an average daily rate of $182.68, producing a revenue per available room ("**RevPar**") of $92.91 through December 2102.   The occupancy percentage is ahead of budget by 9.3% and encouraging for any hotel in its first seventeen months of operation, especially given the recent addition to the local market of the 645 room RIU Hotel & Suites, the 611 room Westin Playa Bonita, and the first 700 rooms of the 1,500 room Hard Rock Hotel.  The average rate for the hotel at the Trump Ocean Club is the highest in Panama City, and ahead of its competition by over $45.00 per room per day.   Net profits generated from the hotel component are only payable to the Company to the extent that the Company retains ownership of unsold condo-hotel units, and are net of costs deducted by Trump Panama Hotel Management LLC, the hotel management company, to cover various fees and maintenance expenses. Strong performance of the hotel operation is critical to encouraging sales of Newland's inventory of unsold condo-hotel units.

Food and beverage operations generated $8.5 million in 2012, $2.8 million of which came from banquets and catering, a portion of which was generated by some of the most high-profile events, including the taping of ABC's show "The Bachelor".   Significant food and beverage revenue has also been obtained from events and conferences hosted by some of the most prominent corporate clients in Latin and North America, including Caterpillar, Procter & Gamble, Dell, DHL, Maersk, Johnson & Johnson and Abbott Laboratories.

Hotel room revenue during 2012 was $12.5 million, which, when combined with food and beverage and other revenue, led to total combined revenue of $21.5 million and gross operating profits of $2.2 million.

The Company is the largest hotel unit owner and it continues to work with Trump Panama Hotel Management LLC, as hotel operator, to maximize cash flow from its hotel units. Since July 2012, cash flow from the Company's owned hotel units has more than offset the associated common area maintenance obligations of the hotel, allowing the Company to apply this excess to reduce the common area maintenance charges ("**CAM**") due on its condo and commercial units.

*Sales and Marketing Strategy*

In August 2012, the Company hired Cervera, a full service, Miami-based brokerage firm, to assist in the repositioning of the Trump Ocean Club in the market and in the re-launch of the sales effort for the Trump Ocean Club.  The Company conducted negotiations with several

firms and selected Cervera based on its unique combination of successes with developer sales in the Miami market, its wide brokerage relationships, and its deep knowledge of the Latin American markets.

Enhancements were made to the common areas to improve the sales process, based on Cervera's previous experience marketing luxury buildings, including establishing a showroom floor with eight different units of various types and sizes designed to showcase the Trump Ocean Club as the premier luxury residence in Panama and to recapture its price premium versus other luxury buildings in Panama. The showrooms have been outfitted with premium furniture designed to showcase the unique quality offered at the Trump Ocean Club.

The Company has also retained the services of LGD to handle various advertising and marketing efforts and AMGW Agency to handle its public relations efforts. On October 23, 2012, the Company re-launched the sales effort with Cervera, inviting local and international brokers to tour the Trump Ocean Club. The results of the launch were fruitful, as substantial broker interest was generated, resulting in 34 new sales since the launch through February 2013 month end.

As part of the re-launch, units were marketed at prices below market levels in order to reactivate market interest. Furthermore, in order to generate maximum "buzz," the initial release of units for the re-launch was optimized to achieve lower price points in order to drive demand. The initial price points set the basis from which subsequent price comparisons will be made. The Company intends to raise prices incrementally for each category of unit as a certain number of units are sold within a particular line, and based on the remaining units available for sale in such line. Thus, the pricing strategy will be implemented by managing supply and demand, i.e., taking into account how inventory is released and presented to the market and the demand for the remaining units in each line. In addition, having a high-end operating casino in place as well as fully occupied commercial units should have a favorable impact on hotel, residential and commercial unit valuations.

*Beach Club Status Update*

In 2007, the Company offered to develop the Club de Playa, or "Beach Club" (the "**Beach Club**"), in order to sell memberships to potential unit purchasers. The Beach Club was initially conceived by the Company to be built on Contadora Island, in the Pearl Island archipelago, located about 72 km from Panama City. The Company acquired a 3,100 square meter parcel of land there for this purpose. However, an unexpected change of land-use and zoning regulations was issued by local authorities, preventing the development of the Beach Club on this parcel of land. The Contadora Island parcel remains as an asset of the Company, pledged to the Notes under the Indenture.

Following the re-zoning at Contadora Island, the Partners (as defined herein) resolved that an alternative Beach Club amenity would be provided to purchasers of real estate at the Trump Ocean Club who pay the membership fee. In 2010, the Partners located a suitable land parcel (the "**BC Lot**") of approximately 10,000 square meters with beachfront on Isla Viveros, also in the Pearl Island archipelago. The BC Lot was acquired by Mr. André Beladina ("**Beladina**") via a development arrangement for a five-star beach club (the "**Viveros Beach**

20

*Club*") for valuable consideration, which included the assumption of certain development costs of the Viveros Beach Club, the provision of 68 memberships of the Viveros Beach Club, the right to reacquire the BC Lot under certain events of default conditions related to the failure to develop the Viveros Beach Club, and certain terms related to the development of land adjacent to the BC Lot for future hotel and real estate projects (the "*Viveros Resort Hotel*").  Beladina and his affiliated general contracting firm MAQTEC S.A. ("*MAQTEC*") undertook the design, construction and equipping of the Viveros Beach Club in accordance with design standards and as agreed to among the Partners.  Construction of the Viveros Beach Club is slated to be completed by September 2013.

The Viveros Beach Club project is owned by Ocean Pearl Island Corp., an affiliate of Roger Khafif.  The Viveros Beach Club construction will be financed by Roger Khafif, Eduardo Saravia, and Carlos A. Serna (collectively, the "*Partners*"), without funds from the Company, other than certain amounts described in the settlement term sheet, which will be provided by the Company in the form of a senior secured loan. As of the Effective Date of the restructuring, the Partners expect to have spent approximately $2.5 million toward the development of the Viveros Beach Club, with total development costs expected to be in the range of approximately $5.0 million to $6.5 million.

The Viveros Beach Club will operate as a private club for its members.  Viveros Beach Club memberships will be available to purchasers of units at Trump Ocean Club who pay the Membership Fee. Permanent memberships also will be offered to qualifying candidates who are not owners of Trump Ocean Club units, and will be governed by a membership agreement establishing, among other things, the Viveros Beach Club rules and regulations, monthly membership dues, and remedies available to enforce compliance.

*Casino Status Update*

The casino unit component ("*Casino*") is located on the mezzanine level of the Trump Ocean Club with an approximate area of 5,828 square meters.  The Company currently has a provisional permit to install and operate a Casino at the Trump Ocean Club through a qualified operator due to the construction and operation of the hotel at the Trump Ocean Club and compliance with other important requisites established under Panamanian gaming law.  Any Casino operator will be required to qualify for a gaming license prior to commencing operations. The gaming license approval process is based on the attributes of the operator and its operating history in the gaming business, whether in Panama or in foreign jurisdictions.

The Company recognizes the critical role the Casino, hotel, Beach Club, and Spa amenities play in the overall functioning and marketability of the Trump Ocean Club.  The Company has sought in each case to find the most suitable purchasers for such units to ensure these amenities are developed and operated up to the standards required by the Company and Trump. With respect to the Casino, the Company, its advisors, and the brokerage community have spent significant time and effort identifying, evaluating, and approaching numerous potential purchasers for the Casino, and the Company has reached various stages with such potential purchasers.

Recently, Sun International, a globally recognized gaming enterprise with significant growth plans in the Latin American market, was selected for the purchase, development, and operation of the Casino. The Company and its advisors evaluated the proposal in a competitive process and determined that the proposal was in the best interest of all Trump Ocean Club stakeholders. Sun International thereafter signed an agreement with the Company which memorialized the initial terms and conditions and which granted to Sun International an exclusivity period to conduct due diligence and to use their best endeavors to negotiate and execute definitive documents for the purchase of the Casino and potentially a certain number of additional units. On November 28, 2012, Sun International and the Company signed the Sun Agreement to purchase the Casino, Penthouse, and the units on the 65th floor for a price of $45.5 million. The terms of the Sun Agreement and Sun's commitment to purchase the Casino units and assume operation of the Casino are conditioned on the successful restructuring of the bonds.

The Company believes that the negotiated purchase price of $45.5 million, including $32 million for the Casino, $7 million for the Penthouse, and $6.5 million for the 65th Floor units, achieves full value for these properties. In addition, further performance-related payments up to $8 million based on revenue targets achieved in the first, second, and third year of operation are stipulated in the Framework Agreement.

Sun International also reached an agreement with Trump on certain operational issues (the "***Shared Services Agreement***"), including, but not limited to, food and beverage outlets, the convention center, access to hotel rooms, certain services to be provided by the hotel, and an assessment of the availability and handling of parking spaces for Casino guests.

Sun International is currently in the process of working in conjunction with the Company in preparing the application for a casino license in Panama with the Gaming Control Board.

*Legal Matters*

The Company is proactively engaged in managing its litigation risk and in educating stakeholders and buyers about the unintended negative impact such actions can have on all stakeholders. Such adverse consequences also include those on banks and potential new buyers who would be discouraged from committing capital to finance or to purchase units in the building.

The Company is currently managing 30 litigation cases. Of these cases, 26 are being managed by the law firm Owens & Watson and 4 cases were assigned to Sucre Arias & Reyes. The total amount under litigation of the 30 cases is $6.7 million. This amount includes litigation that has resulted in the freezing of a cash account in an amount of approximately $1.5 million.

There is only one lawsuit in which the Company is acting as plaintiff: a case against Jumeirah International LLC, in an amount of $400,000.00 as compensation for damages associated with Jumeirah's attempts to disrupt the completion of the Trump Ocean Club through its claims that the Company copied the design of its Burj Al Arab hotel in Dubai.

There are currently two non-client claims against the Company, Marvin Traub Associates (MTA) and International Sales Group (ISG):

- *Marvin Traub Associates (MTA)*:  The Company has finalized an agreement with Marvin Traub Associates ("**MTA**") settling MTA's claim for fees due for its role in introducing Trump to the Company and establishing the relationship leading to the branding agreement between the two parties, and releasing all further claims by MTA.

- *International Sales Group (ISG)*:  International Sales Group ("**ISG**") recently initiated a claim against Komco, an affiliate of the Company, through its legal counsel in an amount of approximately $1.7 million claiming that it is owed past due unpaid broker commissions.  The Company has denied this claim and has retained the law firm White & Case LLP to assist in addressing this claim.  Discussions are in initial stages. As part of the Plan Support Agreement, it has been agreed that the Steering Group will be satisfied with any potential settlement of the Company's obligations, if any, to and disassociation with ISG.

*Spanish Investor Settlement*

The Company has agreed to return to a group of four Spanish investors a total amount of $324,299 in deposits upon resale of their four bayloft units by the Company.  Total square footage of the units in question is 246 square meters.

*Resales Reimbursements*

There is an amount of approximately $266,000 of claims due to unit buyers who resold their units to third party buyers through the Company in a resales program developed as part of a mandatory component of the engagement of ISG as a master broker.   The resales program was designed and implemented with ISG for unit buyers wishing to resell their units.  The Company acted as an intermediary in such resales, in which any profits net of commissions and fees on these transactions were to be distributed by the Company to the original buyer upon payment by a new buyer.  None of these resales program claimants have chosen to litigate, and it is the Company's intention to pay these remaining obligations in full.

*Principal Benefits of the Restructuring*

As a result of extensive arms-length negotiations with the Steering Group, the Company is offering numerous concessions pursuant to a successful restructuring which should serve as key contributors to an effective sellout of the Trump Ocean Club and repayment in full of Noteholders under the newly-agreed terms of the New Notes.

1. No Reduction of Principal or Interest

The restructuring proposal calls for the maintenance of the existing principal and coupon on the New Notes. Past due accrued interest from November 15, 2011 to the Effective Date of

the restructuring will be capitalized and added to the existing principal balance of the New Notes.

   2.   Share Pledge by Ocean Point Development Corp.

     Subject to the successful completion of the restructuring, Ocean Point Development Corp, as sole shareholder of the Debtor, will provide, for the benefit of the Noteholders, a pledge of and assignment of the voting rights of 100% of the shares (the "***Share Pledge***") of the Debtor, which is not currently provided under the Indenture for the Notes.  This Share Pledge will be made in connection with the settlement of the CCSA.

     The Share Pledge will provide Noteholders with the right to foreclose on 100% of the shares and related economic and/or voting rights of the Debtor upon the event of a payment default on the restructured New Notes.  In the absence of a Share Pledge, the Noteholders' chief remedy would be a lengthy and uncertain Panamanian foreclosure process.  The Company views the Share Pledge as a key concession on the part of its Shareholders for the benefit of the Noteholders, given the expected difficulties associated with a foreclosure process in Panama.

   3.   Limited Financial Guaranty as Settlement of the CCSA

     As discussed more fully below, in addition to the Share Pledge, the CCSA Parties have agreed to issue a limited financial guarantee in the amount of $5 million, which will be due and payable to the Trustee for the benefit of Noteholders, 90 days after either of the following two circumstances occurs:  (a) a declaration of acceleration by the Noteholders (provided such declaration of acceleration is not rescinded in accordance with the Indenture) or (b) at the scheduled final maturity date of the New Notes, to the extent in each case that all amounts due on the New Notes have not previously been paid in full (the "***Limited Financial Guarantee***").  The Limited Financial Guarantee will be made in settlement of the CCSA, involving the termination of the CCSA and the waiver of any and all obligations thereunder under the part of the CCSA Parties.

   4.   Collateral and Credit Enhancement

     As an enhancement to the Collateral (as defined in the Indenture) specified under the Indenture, holders of the restructured New Notes will have access to the following additional Collateral and credit enhancement:

   a.   The Share Pledge;

   b.   All accounts of the Company not presently subject to the Trustee's lien (including any new accounts opened on or after the Effective Date);

   c.   Any assets or revenue streams due to the Company, and any rights or licenses to which the Company is a party (to the extent not prohibited by the terms of such right or license).  The definition of "Receivables" pledged as Collateral in the Indenture governing the restructured New Notes will be amended such that "Newland Unit

24

Proceeds" (as defined in the Indenture) will not include brokers' commissions or property transfer fees; and

d.   The $5 million Limited Financial Guarantee.

5.   Supplemental Amortization Provision

The terms of the restructured New Notes provide for a cash sweep mechanism to prepay the principal of the New Notes, after payment of current debt service and reserves of certain amounts to fund operating expenses and other required cash obligations of the Company. This cash sweep was designed to trap any cash available for debt service in excess of the minimum scheduled amortization of the New Notes amount to further amortize the New Notes.

6.   Mandatory Prepayment from Prime Units Sales

Pursuant to the terms of the restructured New Notes, in the event of a sale by the Company of the Casino unit, Spa unit or Penthouse unit (each a "***Prime Unit***"), the Company will prepay the New Notes in an amount equal to the net proceeds from the such transactions. Such prepayments will be applied to the minimum scheduled amortization amounts for the New Notes in reverse order of maturity in an aggregate principal amount equal to the net proceeds. The Prime Unit prepayment scheme was designed to allow flexibility in the timing of sales of Prime Units while maintaining an acceptable schedule for minimum amortizations.

7.   Corporate Governance Measures

Under the terms of the restructured New Notes, the Company has agreed to implement the following corporate governance measures:

a.   30% of all shareholder voting rights at the Company will be controlled by the Noteholders' Shareholder Nominee (as defined below), such that shareholder voting over the life of the New Notes will be allocated 49% to Roger Khafif, 21% to Upper Deck Properties, S.A., and 30% to the Noteholders' Shareholder Nominee.

b.   The Board of Directors of the Company will be reconstituted to include a Noteholders' Board Nominee (as defined below), with this Noteholders' Board Nominee gaining the ability to cast the deciding vote in the instance of a non-unanimous board vote amongst the founder-appointed board members;

c.   A Noteholder Representative will be appointed by the Steering Group, and will independently monitor certain items at the Company and communicate events of default under the Indenture governing the New Notes to the Trustee. Additionally, the Noteholder Representative will have full access to the Company's offices, property, records and internal meetings, among other areas; and

d.   Through at least September 2013, Carlos Saravia will be appointed as Chief Executive Officer ("***CEO***"), President and Legal Representative of the Company, and will be required to provide a written approval of all condo, hotel, commercial or other

unit sales. Further, the Noteholders' Board Nominee will have the right to object to any identified replacement CEO.

8. Trump Concessions

Based on negotiations between the Company and Trump Marks Panama LLC ("*Licensor*"), Trump Panama Condominium Management LLC ("*Condominium Manager*") and Trump Panama Hotel Management LLC, ("*Hotel Operator*" and, together with Licensor and Condominium Manager, the "*Trump Parties*"), subject to the successful completion of the restructuring, the Trump Parties have agreed to various concessions, as described in Section II.C.4 below.

9. Opcorp Management Fee Concession

Opcorp has agreed to waive, until the New Notes are paid in full, its claim on approximately $4.8 million in uncollected construction management and services fees. This amount includes salaries of Company personnel previously paid by Opcorp.

10. Kassir Development to Waive Claims

Kassir Development, an entity associated with Roger Khafif, has agreed to waive, until the New Notes are paid in full, its claim on uncollected real estate commissions totaling approximately $2.2 million in recognition of past sales, and has agreed to additionally represent that it has no other outstanding claims against the Company.

11. Asset Management Fee Concession

The CCSA Parties, on their own behalf and that of their respective affiliates, shall waive the asset management fees relating to the operation of the hotel or its amenities until the earlier of such time as (i) when the New Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except to the extent of the actual fair market out-of-pocket costs incurred by the Company or its affiliate of engaging one or more third party asset managers on an arms-length basis to provide asset management services in respect of the hotel and the *propiedad horizontal* (condo association).

12. Commission Concessions

Affiliates of the Debtor, the CCSA Parties, Ocean Point Development Corp., Upper Deck Properties, S.A., Arias, Serna & Saravia and Espacios Urbanos, S.A. have agreed to waive the right to receive any future commissions, including co-broker commissions, finder's fees, or any other monetary arrangements, with respect to the sale of Trump Ocean Club units.

Absent a restructuring on essentially these terms, as show in the Liquidation Analysis the recovery of the Prepetition Senior Secured Notes on a recovery basis we believe would likely be much lower.

26

## B.    DEBTOR'S PREPETITION CORPORATE STRUCTURE

The Debtor is a Panamanian *sociedad anónima* (corporation) controlled by Ocean Point Development Corp., a Panamanian holding company ("*Ocean*"), which in turn is controlled, directly and indirectly, by Mr. Roger Khafif, Arias Serna y Saravia S.A. and Espacios Urbanos S.A.

The Debtor, a real estate development company, was established to develop the Trump Ocean Club in Panama City, Panama. The Debtor is not an affiliate of Trump Entertainment Resorts, Inc., Trump Organization, LLC or Trump Marks Panama LLC.

The Debtor was incorporated on March 28, 2006 by public deed number 3,482 from the Ninth Public Notary of Panama and recorded with the Public Registry of Panama on March 30, 2006 under record number 521,258, document number 929,232 of the microfiche section. The Debtor's executive offices are located at Calle 53 Obarrio, Plaza 53, Panama City, Republic of Panama.

## C.    DEBTOR'S PREPETITION CAPITAL STRUCTURE

### 1.    Prepetition Senior Secured Notes

On November 7, 2007, the Debtor entered into that certain Indenture, dated as of November 7, 2007, as amended (collectively, with such amendments, the "*Indenture*"), providing for the issuance of $220,000,000 in principal amount of Senior Secured Notes due 2014 (the "*Prepetition Senior Secured Notes*") at an offering price of 96.934%. The Prepetition Senior Secured Notes bear interest at a fixed annual rate of 9.50%, payable semi-annually in arrears, and are due to mature on November 15, 2014. Proceeds from the issuance of the Prepetition Senior Secured Notes were used to finance construction of Trump Ocean Club. HSBC Bank USA, N.A. ("*HSBC Bank*") is the trustee under the Indenture and HSBC Investment Corporation (Panama) S.A. is the co-trustee under the Indenture.

### 2.    Unsecured Trade Debt

The Debtor owes approximately $32.1 million in principal amount of unsecured trade debt as of March 13, 2013. This debt arises from the provisions of goods and services necessary to operate the Debtor's business. Pursuant to various motions (including a motion to pay Foreign Vendors, as defined below) and the terms of the Plan, the Debtor is seeking authority to pay all of this debt during the Chapter 11 Case.

### 3.    The CCSA and the CCSA Settlement

In November 2007, Roger Khafif, Eduardo Saravia and Carlos Serna (the "*CCSA Parties*") and HSBC Bank, in its capacity as trustee under the Prepetition Senior Secured Notes Indenture, entered into the CCSA. Pursuant to the CCSA, the CCSA Parties jointly and severally agreed to pay any Construction Shortfall (as defined in the CCSA), if so designated by the independent engineer under the Prepetition Senior Secured Notes Indenture, to the Construction Escrow Account (as defined in the Prepetition Senior Secured Notes Indenture) established under

the Prepetition Senior Secured Notes Indenture.  The CCSA was not a guarantee of payment of the Prepetition Senior Secured Notes.

Following extensive, arms'-length negotiations, the Debtor and the CCSA Parties have agreed, pursuant to the Plan, to terminate the CCSA and any and all obligations thereunder in respect of the New Notes, and that the CCSA Parties shall be granted mutual releases (the "*CCSA Settlement*").  The CCSA Settlement is being delivered in consideration of several concessions by the Newland Shareholders.  These concessions include the following:  the CCSA Parties deliver the $5 million Limited Financial Guarantee in respect of the New Notes and also the Share Pledge. The CCSA Parties have also agreed, individually and not jointly and severally, that neither they nor their affiliates or their direct family members shall purchase Prepetition Senior Secured Notes or the New Notes. The CCSA Parties shall also represent and warrant, severally and not jointly, with respect to themselves and their affiliates, that to the best knowledge of such CCSA Party, neither it, nor any of its affiliates, (i) are party to any agreements with the Debtor other than has been fully disclosed to the Steering Group in advance of the filing of the Plan with the Bankruptcy Court and (ii) owns or controls any Prepetition Senior Secured Notes.  The CCSA Parties have also agreed to, on their own behalf and that of their respective affiliates, (as provided in sections II.A.9 through A.12 above), waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Debtor until such time as the New Notes have been paid in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the New Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold, except as otherwise provided in Exhibit 1 to the Settlement Term Sheet, comprising of the labor contracts and arrangements by and between Arias Serna & Saravia, an affiliate company, and the respective employees.  The CCSA Parties have also agreed to make or cause their affiliates to make the commitments with respect to the Beach Club as set forth in Section II.A. above and Exhibit 3 to the Settlement Term Sheet.

### 4.    Trump Concessionary Amendments

Pursuant to the Concessionary Amendments, as a result of extensive, arms'-length negotiations between the Company, the Trump Parties and others, the Company and the Trump Parties have made certain concessions for the benefit of the Plan and Trump Ocean Club, including the following:

a.  With regard to the License Agreement, the parties have agreed to reduce amounts otherwise payable by Newland to Trump Marks Panama LLC, by approximately 50%, and such license fees will be paid pursuant to a reduced market-range license fee comprised of a base rate with escalation based on price increases and a cumulative aggregate maximum amount.

b.  With regard to the PH Administration Agreement, dated as of April 13, 2011, between PH TOC and Trump Panama Condominium Management LLC, Trump Panama Condominium Management LLC has agreed to waive the collection of annual condominium management fees.

    c. With regard to the Hotel Management Agreement between Trump Panama Hotel Management LLC and the Company, the following agreements have been reached:

        i. Trump Panama Management LLC has agreed to reduce or eliminate certain hotel management fees, hotel amenities management fees and rental program fees; and

        ii. The Company has agreed to open the Beach Club by a date certain and to use its best efforts to open a spa and casino, provided that the grace period for termination under the Hotel Management Agreement shall be tolled until delivery of the spa, casino and Beach Club.

The Company expects that the aggregate savings of the foregoing concession should help make the remaining unsold Units held by the Company easier to sell and will reduce the Company's carrying costs on such unsold Units. The foregoing concessions are subject to successful approval of the Plan.

In the Concessionary Amendments, the Licensor has granted certain discounts and limits to its license fees (the "***License Fees***"), both past due and future, subject to the following payment requirements, effective as of the effectiveness of the Concessionary Amendments (the "***Amendment Effective Date***"). License Fees arising from closings after the Amendment Effective Date as discounted and limited pursuant to the Concessionary Amendments (the "***Current License Fees***") will continue to be paid as and when due in accordance with terms, payment mechanisms and priorities set forth in the License Agreement and the Indenture, each as in effect immediately prior to the Petition Date. In addition, License Fees that are past due as of the Amendment Effective Date, together with interest accrued thereon, as discounted and limited by the Concessionary Amendments (the "***Accrued Fees***"), shall be paid in equal monthly installments (each a "***Monthly Installment***") commencing with the Amendment Effective Date and until paid in full. Notwithstanding anything to the contrary stated in the Description of Notes or other Plan Documents, the final Plan Documents (including the Indenture) shall provide that, subject to the Trustee's default remedies under the Indenture, any funds from time to time on deposit (or to be deposited) in the Panama Closing Account and/or Panama Account or any replacement accounts, including, Newland Unit Proceeds, Net Proceeds of Prime Unit Sales and Non-UPA Revenues (each as defined in the Description of Notes) shall be applied in the following order: first, to the payment of Brokers Commissions and Property Transfer Fees (each, as defined in the Description of Notes), then, to the payment of License Fees then due (or past due) and payable and, then, to the payment of Monthly Installments, then due (or past due) and payable, before being released to the Release Account (as described in the Description of Notes) or applied to any other purpose. Without limiting the foregoing, to the extent that funds on deposit in the Panama Account (or its replacement) may at any time be insufficient to pay the License Fees then due (or past due) and payable, then, the shortfall amount shall be included in, and shall be paid from, the Monthly Working Capital Amount and shall be payable from the Release Account, prior to the release of funds from the Release Account to the Collection Account or for any other purpose. The Debtor shall provide such certifications and standing instructions to the Co-Trustee as shall authorize and permit the payment of the License Fees in accordance with the foregoing procedures and priorities.

29

In addition, notwithstanding anything to the contrary stated in the Description of Notes, including the stated affirmative covenant of the Debtor to ensure that Non-UPA Revenue (as defined in the Description of Notes) are deposited "directly" into the Panama Account, the terms of the Final Plan Documents (including the Indenture) shall not require any interruption in the existing requirements and practices under the Hotel Agreements for the collection and netting of revenues generated from the Debtor's unsold units, initially, through accounts owned and/or managed by Owners Meeting, Hotel Owner, Hotel Operator and/or Condominium Manager (each as defined in the respective Hotel Agreements), and that the Debtor's obligation with respect to deposit of Non-UPA Revenue shall be limited to ensuring that the netted amounts payable to the Debtor are "directly" transferred from such accounts to the Panama Account.

Enforcement against the Collateral will be subject to a limited non-disturbance-type agreement with the Trump Parties, the principal terms of which can be found in Exhibit 2 to the Plan Support Agreement annexed hereto as **Exhibit E**; provided, that, the provision described therein regarding the Trump Parties' agreement that the Trustee or its designee can sell more than ten hotel units to a single purchaser subject to the Trump Parties' limited pre-approval rights shall remain subject to the restriction contained in the "*Reglamento*" (Co-Ownership Rules) Board and Administration, which presently prohibits sales in excess of ten hotel units to a single purchaser.

The Debtor has determined that the Concessionary Amendments and each of the Hotel Agreements as modified by the Concessionary Amendment are critical to the operations of Trump Ocean Club, the Debtor's business and the success of the Plan. Therefore, upon confirmation of the Plan, each of the Hotel Agreements to which the Debtor is a party shall be automatically assumed as an Executory Contract or Unexpired Lease, as modified solely by the Concessionary Amendments, and the Debtor shall not disturb any of the other Hotel Agreements to which it is not a direct party, as modified solely by the applicable Concessionary Amendments.  The assumption and non-disturbance of the Hotel Agreements as modified solely by the Concessionary Amendments are integral to the Plan and are the basis upon which the Trump Parties and other counterparties to the Hotel Agreements are deemed Unimpaired Claimants under the Plan. In the event that the Plan does not become effective, or any other condition to the effectiveness of the Concessionary Amendments is not satisfied, each of the Trump Parties and other counterparties to the Hotel Agreements shall have reserved all rights under each of the Hotel Agreements, without modification by the Concessionary Amendments.

Except as otherwise disclosed in the Disclosure Statement or the Plan, or as may be required to be disclosed by the Bankruptcy Court or by law, the Debtor has agreed with certain Plan Critical Counterparties to maintain the confidentiality of the specific terms and conditions of the Hotel Agreements and Concessionary Amendments, which may be disclosed only on a need to know basis.  For that reason, copies of the Hotel Agreements and Concessionary Amendments shall be made available only to Claimants entitled to vote on the Plan and their representatives, subject to execution of a confidentiality agreement with respect to such agreements.

## III.    EVENTS LEADING TO THE CHAPTER 11 CASE

## A.    IMPACT OF GLOBAL RECESSION

Despite completion of the Trump Ocean Club, the Debtor faces obstacles as a result of the current global economic downturn, as well as market and industry-wide pressures. Ongoing developments in the international capital markets and the overall impact of the world economic crisis on the real estate business has significantly reduced unit sales over the last few years, adversely affected the Debtor's ability to collect on receivables generated by such sales and, consequently, reduced the Debtor's liquidity to critical levels, as more fully described below.

The crisis in the international financial and real estate markets, which accelerated over 2008 and has persisted to date, has brought about and exacerbated several trends that subjected the Debtor to extraordinary financial pressure. The success of Trump Ocean Club is highly correlated to the strength of the real estate market. A substantial portion of funds that would have been received by the Debtor came from second mortgages and home equity loans on principal residences, which have been reduced substantially. As such, the sale of units in Trump Ocean Club has been significantly affected as the financial losses suffered by affluent customers in the context of the crisis have adversely affected second home and resort purchases. Further, the availability of financing for real estate development companies, such as the Debtor, has been dramatically constrained over recent years, disrupting the Debtor's prior development and construction plans, and forcing the Debtor to re-evaluate the delivery of several of its products. In addition, the global increase in commodity prices, in particular the prices of energy, steel, concrete and wood, have resulted in increased costs for the development and construction of real estate projects, which has impacted the Debtor's profit margins.

As a result of the aforementioned factors, the Debtor's cash flow has been reduced significantly and, in conjunction with substantial cost increases, has resulted in significant liquidity problems and disruptions of construction programs. Due to such liquidity pressures, the Debtor is and has been in default under the Prepetition Senior Secured Notes since November 15, 2011. Moreover, as more fully described herein, the Debtor has undertaken a variety of measures since 2010 to restructure the Prepetition Senior Secured Notes and intends to further restructure the Prepetition Senior Secured Notes pursuant to the Plan.

On May 14, 2010, the Debtor completed a consent solicitation and executed a First Supplemental Indenture to the Indenture, thereby amending the Indenture to (i) permit funds held in the accounts pledged as collateral for the benefit of the holders of the Prepetition Senior Secured Notes (the "*Collateral Accounts*") to flow through the Collateral Accounts more promptly, (ii) modify the requirement to retain on deposit an amount equal to twice the amount of the next interest and principal payment to require an amount equal to one time the amount of the next interest and principal payment to be retained on deposit, and (iii) modify the definition of the Collateralization Ratio and the Withdrawal Ratio in the Indenture to add to the numerator a percentage of the list price of each unit that has not been sold at the time the applicable ratios are being calculated.

Subsequently, the Debtor failed to make the first scheduled amortization of principal due under the Prepetition Senior Secured Notes on November 15, 2011, which constituted an Event

of Default under Section 6.01(d) of the Indenture.   Shortly thereafter, a Steering Group of Noteholders was formed as the Debtor intensified discussions regarding potential restructuring options for the Prepetition Senior Secured Notes.

On March 29, 2012, the Debtor executed the Second Supplemental Indenture to the Indenture, thereby amending the Indenture in order to permit monies from the Collection Amount to be accessed by the Debtor in order to pay ongoing construction costs, subject to certain terms and conditions.   Such monies were used to fund the remaining construction completion costs of Trump Ocean Club.

On May 15, 2012, the Debtor defaulted on an interest payment and second scheduled amortization of principal.  In July 2012, the Debtor informed the Trustee of its default under the Collateralization Ratio Requirement under (and as defined in) the Indenture from the months of October 2011 through the date of such notice to the Trustee.

On July 12, 2012, the Debtor executed the Third Supplemental Indenture to the Indenture, thereby further amending the priority of payments provisions of the Indenture in order to permit monies from the Collection Account to be accessed to exercise the repurchase right under the Purchase Option Agreement, dated as of July 13, 2011, between the Debtor and Global Realty Investments, S.A., to repurchase in bulk units to return to inventory the amount of $6.1 million.

On December 19, 2012, the Debtor executed the Fourth Supplemental Indenture to the Indenture. The Fourth Supplemental Indenture created a separate account to be held in Panama at the Co-Trustee pursuant to which separate account brokers' commissions due in respect of a unit purchase agreement would be segregated for payment to the relevant obligees of such obligations; all other amounts in respect of unit purchase agreements would continue to be transferred to the HSBC Panama Account and onward to the Release Account and Collection Account, as set forth in the Indenture, as amended by the first, second, and third supplements thereto.

On February 6, 2013, the Debtor executed a Fifth Supplemental Indenture to the Indenture. The Fifth Supplemental Indenture permits the Trustee or the Co-Trustee, as applicable, to consent to the registration of a unit purchase agreement entered into in connection with a sale of the Casino at the Trump Ocean Club, and any other unit purchase agreement signed with the buyer of the Casino or an affiliate of the buyer of the Casino, with the Registro Público de Panamá and to permit the Company to cancel any such registration with the Registro Público de Panamá should such a unit purchase agreement for the Casino be terminated.

On January 23, 2013, Noteholders collectively representing not less than a majority in aggregate principal amount of the Prepetition Senior Secured Notes executed a Plan Support Agreement between such Noteholders and the Debtor (the "***Plan Support Agreement***").   The Plan Support Agreement outlined a restructuring transaction which would proceed via a pre-packaged Chapter 11 bankruptcy process that would seek votes from holders of Prepetition Senior Secured Notes to certain amendments to the Indenture, all supplements thereto, and Prepetition Senior Secured Notes, including, among other things, the exchange of Prepetition Senior Secured Notes for new notes (the "***New Notes***"), certain collateral package enhancements,

32

the deletion of, addition of and amendments to covenants and certain other rights and remedies, as well the as settlement of certain other issues, as summarized herein, to be documented in, among other things, the Indenture as modified pursuant to the Plan (the "***New Indenture***").  The Plan will also terminate the CCSA, and any and all obligations thereunder of the CCSA Parties shall be released in consideration of the CCSA Parties delivery of the $5 million Limited Financial Guarantee in respect of the New Notes, the delivery of the Share Pledge, and certain other considerations, pursuant to the CCSA Settlement (*see* Section II.C.3. above).

The Prepetition Senior Secured Notes constitute the Debtor's single largest liability.  In light of adverse global economic conditions and the likely unavailability of financing to the Debtor in the short-term, in order to remain a viable business enterprise, the Debtor must restructure its financial debt.  Although the Debtor continues to develop and sell units in Trump Ocean Club, it is not anticipated that such sales are likely to generate sufficient cash flow to cover current operating costs and debt service obligations absent a restructuring of financial debt. Furthermore, a restructuring of the Prepetition Senior Secured Notes is necessary in order to satisfy current Events of Default under the Prepetition Senior Secured Notes.

In furtherance of such restructuring, the Debtor diligently worked with its financial advisors and the Steering Group to renegotiate the terms of the Prepetition Senior Secured Notes pursuant to the Plan Support Agreement, as more fully discussed above.

The Debtor will agree with the Noteholders and HSBC Bank (collectively, the "***Cash Collateral Secured Parties***") regarding the Debtor's use of prepetition Cash Collateral (the "***Cash Collateral Agreement***"), subject to Bankruptcy Court approval.  Specifically, pursuant to the terms of the Cash Collateral Agreement, the Debtor is authorized to use Cash Collateral for working capital and general corporate purposes as well as to fund costs and expenses related to the Chapter 11 Case, subject to proposed budget and other related terms and conditions. Moreover, the Debtor has agreed to provide the Cash Collateral Secured Parties adequate protection to protect against any diminution in value of the Cash Collateral Secured Parties' interests in the Cash Collateral, including senior and additional replacement security interests and liens in all of the Debtor's assets, subject to the effect of applicable non-bankruptcy law, and allowed super-priority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code.  As discussed more fully below in Section IV.A.2., the Debtor intends to file a motion seeking entry of an order authorizing the Debtor's use of Cash Collateral as set forth in the Cash Collateral Agreement.

## B.    DESCRIPTION OF THE NEW NOTES

Please reference **Exhibit A** attached hereto for a detailed description of the New Notes.

## IV.    THE ANTICIPATED CHAPTER 11 CASE

The Debtor anticipates filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code when it receives (or anticipates receiving after the Petition Date) the requisite votes for acceptance of the Plan.  The petition will commence the Chapter 11 Case.  At that time, all actions and proceedings against the Debtor and all acts to obtain property from the Debtor will be stayed under section 362 of the Bankruptcy Code.  The Debtor will continue to operate its

business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtor does not expect the Chapter 11 Case to be protracted.  To expedite its emergence from chapter 11, the Debtor on the Petition Date, in addition to filing this Disclosure Statement and the Plan, will file motions seeking the relief detailed below, among other relief, from the Bankruptcy Court.  Such relief, if granted, will facilitate the administration of the Chapter 11 Case; there can be no assurance, however, that the Bankruptcy Court will grant all of the relief sought.

Chapter 11 enables the Debtor to effectuate a necessary restructuring of their financial obligations.  The Debtor believes that the transactions contemplated by the Plan will enhance the long-term growth prospects and financial performance of the Debtor and provide the Debtor with an appropriately leveraged capital structure.

## A.    RELIEF TO BE SOUGHT AT OR NEAR THE OUTSET OF THE CHAPTER 11 CASE

The Debtor intends to seek certain orders from the Bankruptcy Court designed to minimize disruptions of business operations and facilitate their reorganization.  These include, but are not limited to, those described below.

### 1.    Scheduling Motion for Combined Disclosure Statement and Confirmation Hearing

The Debtor intends to file a motion (the "*Scheduling Motion*") seeking, among other things, an order scheduling a combined hearing on the adequacy of the disclosure in this Disclosure Statement and the confirmation of the Plan, on the earliest date that is convenient for the Bankruptcy Court to conduct such a hearing (the "*Combined Hearing*").  The Debtor will request that this combined hearing occur within 28 days after the Petition Date and that the Bankruptcy Court approve the procedures for the filing of objections to the adequacy of this Disclosure Statement and confirmation of the Plan.  Pursuant to the Bankruptcy Rules, the Debtor must provide notice of the Combined Hearing and the date set for the filing of objections to this Disclosure Statement and confirmation of the Plan.  The Debtor will seek approval of the form and manner of the notice of the Combined Hearing and, once approved, will mail the notice to all Holders of Claims and Interests and various other parties in interest as provided in the order with respect to the Scheduling Motion.  In addition, because the Debtor has commenced the solicitation prior to the filing of the Chapter 11 Case and expects to obtain approval of the Plan from the Voting Class (as defined below), the Debtor will request the Bankruptcy Court to order the United States Trustee not to convene a meeting of creditors.  The Debtor believes that cause exists under section 341(e) of the Bankruptcy Code for such relief.  Similarly, in accordance with the Amended Guidelines for Prepackaged Chapter 11 Case in the United States Bankruptcy Court for the Southern District of New York, General Order M-387, dated November 24, 2009 (the "*Prepack Standing Order*"), the Debtor will request that the Court direct the United States Trustee not to appoint any committee of creditors or equity security holders pursuant to section 1102 of the Bankruptcy Code.

In the Scheduling Motion, the Debtor will also request that the Bankruptcy Court (i) approve the Debtor's solicitation procedures, (ii) approve the adequacy of this Disclosure Statement, and (iii) confirm the Plan, all through entry of the Confirmation Order, the proposed form of which shall be contained in the Plan Supplement.

### 2. Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor's Use of Cash Collateral, (II) Modifying the Automatic Stay and (III) Scheduling a Final Hearing

If the Chapter 11 Case is filed, the Debtor expects to have an immediate and urgent need for the use of Cash to continue to operate its business, to pay vendors to supply necessary goods and services, to pay employees, to satisfy other working capital and operational needs, and to fund its reorganization. All of these requirements for the use of Cash must be satisfied for the Debtor to preserve and maintain its going-concern value and, ultimately, its ability to reorganize successfully pursuant to chapter 11. Without use of Cash during the Chapter 11 Case, the Debtor would be forced to shut down its business, lay off employees, including those responsible for ordinary-course maintenance of sold units for occupancy, and cease operations. This immediate and irreparable harm would be to the extreme detriment of the Debtor, its Estate and stakeholders, including the Holders of Prepetition Senior Secured Notes and the Partners.

Certain of the Debtor's Cash Collateral and certain of the Debtor's assets are subject to security interests in favor of the Holders of Prepetition Senior Secured Notes.[2] The Holders of Prepetition Senior Secured Notes, by virtue of voting to accept the Plan, are deemed to have consented and agreed (a) to the Debtor's use of Cash Collateral for working capital and general corporate purposes and to fund the costs and expenses related to the Chapter 11 Case, subject to the proposed Cash Collateral budget and other related terms and conditions as set forth in the Cash Collateral order that is subject to Bankruptcy Court approval (the "***Cash Collateral Order***"), (b) to not object to the Debtor's use of Cash Collateral substantially in accordance with the Cash Collateral Order, (c) provided that an order substantially in the form of the Cash Collateral Order is promptly entered, to not file any motion seeking adequate protection with respect to the use of Cash Collateral or in connection with the automatic stay or otherwise, and (d) that the Ballots used in solicitation shall constitute the instruction to the Indenture Trustee to accept and not object (or support any objection) to the use of Cash Collateral consistent with the Cash Collateral Order, including, without limitation, the imposition of the automatic stay, and to not file a motion seeking adequate protection with respect to the use of Cash Collateral or in connection with the automatic stay or otherwise. The Debtor will acknowledge the validity and amount of the Prepetition Senior Secured Notes Claim and the priority and perfection of prepetition liens, and will make adequate protection payments in an amount equal to interest on all obligations under the Prepetition Senior Secured Notes arising after the Petition Date and payments of reasonable and documented professional fees and expenses of the Indenture Trustee and the Steering Group.

---

[2] Note that under Panamanian law, a foreign court cannot affect property that is located in Panama or otherwise governed by Panamanian laws.

3.    **Motion For Order Authorizing the Debtor to (I) Continue Existing Cash Management System and (II) Maintain Existing Bank Accounts and Business Forms**

Because of the administrative hardship that any operating changes would impose on them, the Debtor intends to seek authority, on a postpetition basis, to continue to use its existing cash management system, bank accounts and business forms, and to follow its internal investment and deposit guidelines, in the ordinary course of business.  Absent the Bankruptcy Court's authorization of the continued use of the cash management system and the other relief sought, the Debtor's business operations would be impeded to the detriment of its Estate and its creditors.

Continued use of the existing cash management system, bank accounts, business forms, and investment guidelines will facilitate the Debtor's smooth and orderly transition into chapter 11, minimize the disruption of its business while in chapter 11 and expedite its emergence from chapter 11.  As a result of set-up time and expenses, requiring the Debtor to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Case.  For the same reasons, requiring the Debtor to cancel its existing bank accounts and establish new accounts or requiring the Debtor to create new business forms would only frustrate the Debtor's efforts to reorganize expeditiously.

4.    **Motion for Interim and Final Orders (A) Authorizing Debtor to Pay Certain Prepetition Claims of Foreign Creditors; and (B) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers**

The Debtor is a real estate development company established to develop the Trump Ocean Club in Panama City, Panama.  Construction of the Trump Ocean Club is complete, and the Debtor is in the ongoing process of selling commercial and residential units in the Trump Ocean Club.  The continued successful operation of the Debtor's business is dependent upon the continued cooperation and assistance of foreign creditors who provide goods and services necessary to continue these efforts.  Many of the vendors of these goods and services are located entirely outside the United States (the "***Foreign Vendors***").  The Foreign Vendors may not be willing to do business with a chapter 11 debtor absent payment of certain prepetition claims.

Although the Foreign Vendors are subject to the automatic stay as a matter of U.S. bankruptcy law, as a practical matter the Debtor's ability to enforce the stay provisions as to Foreign Vendors may be limited.  There is a significant risk that the Foreign Vendors may consider themselves to be beyond the jurisdiction of the Bankruptcy Court, disregard the automatic stay, and engage in conduct that disrupts the Debtor's operations, including, but not limited to, commencing competing insolvency proceedings in Panama, foreclosing on or impounding the Debtor's property, including the Trump Ocean Club, withholding goods and services from the Debtor, asserting liens against the Debtor's property located outside the United States, and terminating service agreements.  It is therefore essential to the reorganization efforts that the Debtor is allowed to pay the Foreign Vendors.

Accordingly, the Debtor will request the Bankruptcy Court to exercise its equitable powers and authorize the Debtor to pay its pre-petition obligations to the Debtor's Foreign Vendors as set forth in the orders entered by the Bankruptcy Court.

The Debtor will also seek authorization to pay any outstanding administrative claims, to the extent any such claims may exist, pursuant to section 503(b)(9) of the Bankruptcy Code, as well as any outstanding taxes, fees, assessments and other charges from governmental taxing and licensing authorities that are necessary to continue the Debtor's business. Notwithstanding the foregoing, no section 503(b)(9) claims payments shall be made to insiders.

**5.     Motion for Interim and Final Orders Confirming the Protections of Sections 362 and 365 of the Bankruptcy Code and Restraining Any Action in Contravention Thereof**

As a result of the Debtor's international operations, the Debtor has a significant number of foreign creditors, customers, and counterparties to contracts that may be unfamiliar with the global reach of the protections afforded by the Bankruptcy Code. Due to this lack of familiarity, certain Foreign Vendors may attempt to seize assets located outside of the United States to the detriment of the Debtor, its Estate, and Creditors, or may take other actions in contravention of the automatic stay imposed by section 362 of the Bankruptcy Code. In addition, Foreign Vendor counterparties to unexpired leases and executory contracts may attempt to terminate those leases or contracts due to the commencement of the Chapter 11 Case in contravention of section 365 of the Bankruptcy Code.

To assist the Debtor in explaining the bankruptcy protections to the Foreign Vendors, in addition to the Foreign Vendor motion, the Debtor will seek an order that confirms, restates, and restrains any action taken in violation of two key protections afforded to the Debtor by the Bankruptcy Code:  (a) the automatic stay provisions of section 362; and (b) the prohibition of section 365 against terminating agreements and leases due to *ipso facto* provisions. The Debtor believes that a specific order from the Court that the Debtor can present to the Foreign Vendors will assist the Debtor to explain these protections to the Foreign Vendors and dissuade many, if not all, of such Foreign Vendors from taking actions that would violate the Bankruptcy Code.

**6.     Motion for Entry of Interim and Final Orders Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Salaries, and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Similar Benefits, and (C) Continue Employee Compensation and Benefit Programs**

The Debtor believes that it has valuable assets in its workforce and that any delay in paying prepetition compensation or benefits to its employees would significantly jeopardize the Debtor's relationships with its employees and irreparably harms morale at a time when the need for continued dedication, confidence, and cooperation of the Debtor's employees is most critical. Accordingly, the Debtor will seek authority to pay compensation and benefits that were accrued but unpaid as of the Petition Date, and to continue its employee benefit programs in the ordinary course of business postpetition.

37

### B.    ADMINISTRATIVE MOTIONS

The Debtor will seek certain relief to ease the administrative burdens of the Chapter 11 Case on the Debtor and other parties in interest.  Specifically, the Debtor will request:

1.  an order (A) waiving the requirement that the Debtor file a list of creditors; and (B) authorizing the Debtor to maintain a list of creditors in lieu of a matrix;

2.  an order approving the retention of Epiq Bankruptcy Solutions, LLC as balloting and tabulation agent;

3.  an order approving the retention of Epiq Bankruptcy Solutions, LLC as claims and noticing agent; and

4.  an order approving the retention various ordinary course professionals, including Zaidee Sucre as translation service provider.

### 1.    Professional Retention Applications and Professional-Related Motions

The Debtor will seek to retain the following restructuring professionals to represent the Debtor and assist them in connection with the Chapter 11 Case:

1.  Gibson, Dunn & Crutcher LLP as United States bankruptcy counsel;

2.  Adames Duran Alfaro & Lopez (ADURAL) as Panamanian counsel;

3.  Gapstone LLC or one of its affiliates ("*Gapstone*") as financial advisor;

4.  Other professionals used by the Debtor in the ordinary course of business.

The Debtor will also seek orders (i) authorizing implementation of orderly procedures for interim monthly payment of fees and expenses of restructuring professionals, and (ii) authorizing the employment of ordinary course professionals and setting forth procedures for their compensation.

### V.    SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED HERETO AND THERETO, AND THE DOCUMENTS FILED IN THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF

ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICTS BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.   IN THE EVENT OF ANY CONFLICTS BETWEEN THE CONFIRMATION ORDER AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE CONFIRMATION ORDER WILL CONTROL.

The Plan described herein provides for the restructuring of the Debtor's liabilities in a manner designed to maximize recoveries to Holders of Claims against the Debtor.

The terms of the Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its business plan, make the Distributions contemplated under the Plan, and pay its continuing obligations in the ordinary course of its business.  Under the Plan, the Claims against and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or paid in full and (ii) the Claims in Class 3 will be modified and receive Distributions constituting of a partial recovery on such Claims.  On the Distribution Date and at certain times thereafter, the Disbursing Agent will make or cause to be made the Distributions as provided in the Plan.  The Classes of Claims and Interests established by the Plan, the treatment of those Classes under the Plan, and various other aspects of the Plan are described below.

## A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders into classes that contain claims and interests that are substantially similar to the other claims and interests in such Class.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides the Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1) are not required to be classified).

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for

the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan as are necessary to permit Confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated amount of such Claim and, accordingly, the total Allowed Claims with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of the Claims and Interests and the nature of the Distributions to members of each Class are summarized below. The Debtor believes that the consideration provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of its Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtor's assets.

**B.    TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN: ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION CLAIMS AND PRIORITY TAX CLAIMS**

**1.    Administrative Expense Claims**

Other than in respect of Professional Compensation Claims (which shall be treated pursuant to Section 2.2 of the Plan (*see* Section V.B.2., below)) and Indenture Trustee Fee Claims (which shall be treated pursuant to Section 2.3 of the Plan (*see* Section V.B.3., below)), on the later of (a) the Effective Date or (b) if an Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Expense Claim becomes Allowed, the Debtor will either (i) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtor and such Holder shall have agreed upon; *provided*, *however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (i). Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary, if an Administrative Expense Claim arises (x) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (y) pursuant to an Executory Contract or Unexpired Lease, the Holder of such Administrative Expense Claim shall be paid in Cash by the Debtor (or after the Effective Date, by the Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Administrative Expense Claim without the need or requirement for

the Holder of such Administrative Expense Claim to file a motion, application, claim or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court, including those asserted by the Steering Group in connection with the payment of all reasonable fees and expenses of its professionals as provided for and set forth in the agreement memorialized in the order approving Cash Collateral and the Plan Support Agreement.

Notwithstanding any provision contained in the Plan to the contrary, unless otherwise agreed to by the respective Plan Critical Party, the reasonable, actual out-of-pocket legal expenses for outside counsel incurred by each Plan Critical Party for any non-adversarial legal matters relating to the Concessionary Amendments and the Chapter 11 Case prior to the Effective Date shall be paid in Cash on the Effective Date by the Debtor as Administrative Expense Claims, as and to the extent set forth in a side letter entered into among the Debtor and the Plan Critical Parties.

## 2.      Professional Compensation Claims

Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, any Person asserting a Professional Compensation Claim shall, no later than 45 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.  To the extent that such an application is granted by the Bankruptcy Court, the requesting Person shall receive: (a) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Case, such payment to be made within the later of (i) the Effective Date or (ii) three Business Days after the order granting such Person's final fee application becomes a Final Order; or (b) payment on such other terms as may be mutually agreed upon by the Holder of the Professional Compensation Claim and the Reorganized Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Case).  After the Confirmation Date, any requirement that Professionals employed by the Debtor comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor shall be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.  All Professional Compensation Claims for services rendered after the Confirmation Date shall be paid by the Reorganized Debtor (or the Debtor prior to the Effective Date) upon receipt of an invoice therefor, or on such other terms as the Reorganized Debtor (or the Debtor prior to the Effective Date) and the Professional may agree, without the requirement of any order of the Bankruptcy Court.

## 3.      Indenture Trustee Fee Claims

Notwithstanding any provision contained in this Plan to the contrary, unless otherwise agreed to by the Indenture Trustee and the Debtor, all Indenture Trustee Fee Claims incurred by the Indenture Trustee prior to the Effective Date and fees for services related to distributions pursuant to the Plan incurred other than as Disbursing Agent shall be paid in Cash on the Effective Date by the Debtor as Administrative Expense Claims, without the need for application to, or approval of, the Bankruptcy Court.  An Indenture Trustee's Charging Lien will be discharged solely upon payment in full of the Indenture Trustee Fee Claims and fees incurred for

41

services rendered as Disbursing Agent.  Nothing herein shall be deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by the Debtor.

### 4.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code or, at the Debtor's election upon notice to the Holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code.

### 5.      U.S. Trustee Fees

U.S. Trustee Fees incurred prior to the Effective Date will be paid on the Distribution Date in accordance with the applicable schedule for payment of such fees.  Until the Chapter 11 Case is closed by entry of a final decree of the Bankruptcy Court, any additional U.S. Trustee Fees will be paid by the Reorganized Debtor.

### C.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 1.      Summary

Pursuant to section 1122 of the Bankruptcy Code, the Plan designates Classes of Claims against and Interests in the Debtor.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date.

### 2.      Classification of Claims and Interests

The classification of Claims against and Interests in the Debtor pursuant to the Plan is as follows:

**Class 1: Other Priority Claims.**  Other Priority Claims in Class 1 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**Class 2: Other Secured Claims.**  Other Secured Claims in Class 2 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**Class 3: Prepetition Senior Secured Notes Claims.**  Prepetition Senior Secured Notes Claims in Class 3 are Impaired and are entitled to vote on the Plan.

**Class 4: General Unsecured Claims.**  General Unsecured Claims in Class 4 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

     **Class 5: Interests.**  Interests in Class 5 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

### 3.    Treatment of Class 1: Other Priority Claims

     *i.    Impairment and Voting*.  Class 1 is Unimpaired by the Plan.  Each Holder of an Allowed Other Priority Claim in Class 1 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

     *ii.    Treatment*.  On the Distribution Date, each Holder of an Allowed Other Priority Claim shall receive in full satisfaction, release, and discharge of and in exchange for such Claim: (a) payment of Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim, or (b) such other treatment that the Debtor and such Holder shall have agreed upon in writing; provided, however, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (a) of this Section 3.ii.

### 4.    Treatment of Class 2: Other Secured Claims

     *i.    Impairment and Voting*.  Class 2 is Unimpaired by the Plan.  Each Holder of an Allowed Other Secured Claim in Class 2 as of the Record Date is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

     *ii.    Treatment*.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Other Secured Claim in Class 2 shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed Other Secured Claims.

### 5.    Treatment of Class 3: Prepetition Senior Secured Notes Claims

     *i.    Impairment and Voting*.  Class 3 is Impaired by the Plan.  Each Holder of an Allowed Prepetition Senior Secured Notes Claim in Class 3 as of the Record Date is entitled to vote such Claim to accept or reject the Plan.

     *ii.    Treatment*.  Each Holder of an Allowed Prepetition Senior Secured Notes Claim in Class 3 shall receive New Notes in an aggregate principal amount equal to the principal amount of such Holder's Allowed Prepetition Senior Secured Notes Claim plus interest accrued and unpaid thereon through the Effective Date.  The Prepetition Senior Secured Notes Claims shall be allowed in the amount of $220 million as of the date hereof plus any accrued interest up through the Effective Date.

### 6.    Treatment of Class 4: General Unsecured Claims

     *i.    Impairment and Voting*.  Class 4 is Unimpaired by the Plan.  Each Holder of an Allowed General Unsecured Claim in Class 4 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*ii.    Treatment*.  To the extent that a Holder of an Allowed General Unsecured Claim has not been paid in full as of the Confirmation Date, unless such Holder agrees to a less favorable treatment, each Allowed General Unsecured Claim in Class 4 shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed General Unsecured Claim.  Without limiting the generality of the foregoing, if an Allowed General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such General Unsecured Claim shall be paid in Cash by the Debtor (or, after the Effective Date, by the Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Allowed General Unsecured Claim.  The Debtor reserves its rights to dispute in the Bankruptcy Court or any other court with jurisdiction the validity of any General Unsecured Claim at any time prior to the Claims Objection Bar Date.

### 7.    Treatment of Class 5: Interests

*i.    Impairment and Voting*.  Class 5 is Unimpaired by the Plan.  Each Holder of an Interest in Class 5 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*ii.    Treatment of Interests*.  Interests in Class 5 shall be reinstated.

### 8.    Disclaimer Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Reorganized Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of the assertion of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 9.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### D.    PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY IMPAIRED CLASS, AND CONSEQUENCES OF NON-CONFIRMABILITY

### 1.    Voting Rights

Each Holder of an Allowed Claim as of the Voting Deadline that is not (a) deemed to have rejected the Plan or (b) conclusively presumed to have accepted the Plan, and that held such Claim as of the Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the Ballot Instructions.  Approval for the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Scheduling Motion.  The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described herein.

### 2. Acceptance Requirements

An Impaired Class of Claims shall have accepted the Plan if votes in favor of the Plan have been cast by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

### 3. Tabulation of the Votes

If the Impaired Class does not vote to accept the Plan, the Debtor reserves the right to modify the Plan.

### 4. Non-Confirmability

If the Plan has not been accepted by the Class of Claims entitled to vote with respect thereto in accordance with Section 4.2 of the Plan (*see* Section V.D.2. above), and the Debtor determines that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code, or if the Bankruptcy Court, upon consideration, declines to approve Confirmation of the Plan the Debtor may seek to (a) propose a new plan or plans of reorganization for the Debtor, (b) amend the current Plan incorporated therein to satisfy any and all objections, (c) withdraw the Plan, or (d) convert or dismiss the Chapter 11 Case.

### E. MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTOR

### 1. General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. Subject to Article VII of the Plan (*see* Section V.G. below), all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

### 2. Sources of Consideration for Plan Distributions

#### i. Debtor's Available Cash

Cash will be available from the Debtor's operations.

#### ii. The New Notes

On the Effective Date, the Reorganized Debtor shall issue the New Notes. Confirmation of the Plan shall be deemed approval of the New Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith) and authorization and direction for the Debtor to issue the New Notes, subject to such modifications as the Reorganized Debtor, with the consent of the Steering Group (which consent shall not be unreasonably withheld), deems to be reasonably necessary to consummate such New Notes.

45

*iii.*    Use of Proceeds

Cash available on the Effective Date shall be used by the Reorganized Debtor (a) to fund the Debtor's exit from the Chapter 11 Case, including, without limitation, the funding of (i) Allowed Administrative Expense Claims, (ii) Allowed Professional Compensation Claims, (iii) Indenture Trustee Fee Claims; (iv) Allowed Priority Tax Claims, (v) Allowed Other Priority Claims, and (vi) Distributions to be made on the Distribution Date; and (b) to fund ongoing operating expenses of the Reorganized Debtor.

**3.    Rule 2004 Examinations**

The power of the Debtor to conduct examinations pursuant to Bankruptcy Rule 2004 will be expressly preserved following the Effective Date.

**4.    Continued Existence**

Except as provided herein, the Debtor, as Reorganized Debtor, will continue to exist on or after the Effective Date as a corporate entity, with all the rights and powers applicable to such entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution, or otherwise) under applicable law.

**5.    Re-vesting of Assets**

Except as expressly provided in the Plan, the Assets of the Debtor's Estate shall re-vest with the Reorganized Debtor on the Effective Date.  The Bankruptcy Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan.  From and after the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, except as provided herein.  As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests, except as, and to the extent, provided in the Plan.

**6.    Implementation Transactions**

In connection with implementation of the Plan, the Debtor (or, after the Effective Date, the Reorganized Debtor) (a) shall effectuate the Plan through the transactions described in the Plan and Plan Supplement and (b) may engage in any other transaction in furtherance of the Plan.

**7.    Cancellation or Amendment of Securities and Agreements**

On the Effective Date, the Plan shall be consummated in accordance with the provisions set forth therein and, upon the effectiveness of such transactions on the Effective Date (including through execution and delivery of the New Notes and the other documents required to be executed and delivered on the Effective Date):  (a) the Prepetition Senior Secured Notes, and any other Certificate, Interest, share, note, bond, indenture, including the Indenture, except to the extent the Indenture is amended and/or restated to permit the issuance of the New Notes under the Indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the

46

Debtor (except the mortgage and such agreements, Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtor that are reinstated) shall be deemed cancelled and terminated as permitted by section 1123(a)(5)(F) of the Bankruptcy Code without further act or action under applicable agreements, law, orders, regulations or rules, and the Reorganized Debtor shall not have any continuing obligations therefor; (b) a first priority security interest in or first mortgage on the Collateral under the New Indenture and the New Notes to secure the payment of all obligations of the Debtor under the New Indenture and the New Notes shall be granted to the Indenture Trustee and Co-Trustee, as applicable, which grant to the Co-Trustee, as agent of the Indenture Trustee, shall be by way of assignment of, and any necessary conforming amendment to, the existing mortgage on the Collateral under the Indenture for the Prepetition Senior Secured Notes, such that the first priority security interest on the existing mortgage on the Collateral under the Indenture for the Prepetition Senior Secured Notes remains in place and unencumbered; and (c) the Claims against and Interests in the Debtor pursuant, relating, or pertaining to any agreements, indentures, including the Indenture, except to the extent the Indenture is amended and/or restated to permit the issuance of the New Notes under the Indenture, certificates of designation, bylaws, or certificate or articles of incorporation, formation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor (except the mortgage and such agreements, Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtor that are specifically reinstated)   shall be released and discharged; provided, however, that notwithstanding Confirmation or consummation, the Prepetition Senior Secured Notes, the Indenture, or, if the Indenture is amended and/or restated, the Indenture prior to such amendment and/or restatement, and any other similar agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of: (i) allowing such Holder to receive Distributions under and in accordance with the Plan; (ii) allowing the Disbursing Agent and the Indenture Trustee (to the extent provided in the Plan) to make distributions, if any, on account of Allowed Claims; (iii) allowing the Disbursing Agent and the Indenture Trustee to perform any necessary administrative functions with respect to the distributions (if any) to be made on account of Allowed Claims; and (iv) permitting the Indenture Trustee to (a) maintain and assert any Charging Liens and any rights for payment of Indenture Trustee fees, costs, expenses, and indemnification, (b) seek compensation and reimbursement for any reasonable and documented fees and expenses, if any, incurred in making distributions pursuant to the Plan, (c) maintain and enforce any right to indemnification under the Indenture, (d) exercise its rights and obligations relating to the interest of their holders pursuant to the Indenture, and (e) appear in these Chapter 11 cases.

If the record holder of a Prepetition Senior Secured Note is the Depository Trust Company or its nominee or another securities depository or custodian thereof, and such Prepetition Senior Secured Notes are represented by a global security held by or on behalf of the Depository Trust Company or such other securities depository or custodian, then the beneficial holder of such a Prepetition Senior Secured Note shall be deemed to have surrendered such holder's upon surrender of such global security by the Depository Trust Company or such other securities depository or custodian thereof.

## 8.  Reorganized Debtor

On the Effective Date, the New Board of the Reorganized Debtor shall be appointed, and shall adopt the New Articles of Association and/or New Bylaws. The Reorganized Debtor shall be authorized to adopt any other agreements, documents, and instruments and to take any other action necessary and desirable to consummate the Plan. The Corporate Governance Documents will be substantially in the form filed in the Plan Supplement.

### 9.    Post Effective Date Management

Pursuant to the provisions of the Corporate Governance Documents and the Reorganized Debtor's operative constituent documents, which may be amended from time to time in accordance with their terms and applicable law, the operation, management, and control of the Reorganized Debtor shall be the responsibility of its board of directors and senior officers (as provided under applicable law). Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtor from the Petition Date through and until the Effective Date.

### 10.    Noteholder Representative

Prior to the Effective Date, the Steering Group will appoint a representative (including any duly authorized representative or designee of such representative, the "***Noteholder Representative***") to discharge certain reporting functions described below. The appointment of the Noteholder Representative shall be duly recorded in the Panamanian Public Registry and the Reorganized Debtor's by-laws and, to the extent necessary (to the satisfaction of the Steering Group), other organizing documents will be amended or supplemented to recognize the Noteholder Representative and his/her rights and provide that his/her appointment and service would be governed by the Noteholders holding a majority in principal amount of the Notes ("***Majority Holders***"). The selection (including replacements thereof) of the Noteholder Representative shall be in each case subject to reasonable prior notice to the Reorganized Debtor; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group).

The function of the Noteholder Representative shall be to communicate in writing to the trustee under the New Indenture defaults thereunder and to review certifications identified herein. In this regard, the Reorganized Debtor shall covenant for all periods on or after the Effective Date that the Noteholder Representative shall have full access, subject in all cases to confidentiality provisions, to certain information and meetings, all as will be more fully described in the Plan Supplement. The Noteholder Representative shall not be required to communicate with, or take directions from, holders of the New Notes.

The Noteholder Representative shall execute a confidentiality agreement with the Reorganized Debtor prior to appointment, which agreement shall be negotiated with the Steering Group before the Effective Date.

The Noteholder Representative function shall cease to exist following the date which is the later of eighteen (18) months following the Effective Date or three (3) months after the occurrence of an Event of Default under the Indenture, unless such Default has been earlier cured or waived.

### 11.    Directors and Officers of the Reorganized Debtor

On and after the Effective Date, the business and affairs of the Reorganized Debtor will be managed by the New Board and the officers, directors, managers or other responsible persons identified in the Plan Supplement. The New Board will be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the New Board (the "***Noteholders' Board Nominee***"), which Delegate shall not have any voting rights except to the limited extent described below. The selection (including replacements thereof) of the Noteholders' Board Nominee shall be in each case subject to reasonable prior notice to the Reorganized Debtor; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group). The Corporate Governance Documents shall provide that all New Board decisions shall be taken unanimously and that, in the case of a non-unanimous vote, the Nominee shall have in such instance (and only in such instance) the ability to produce the deciding vote. Upon payment in full of the New Notes, the voting rights held by the Noteholders' Board Nominee shall be relinquished, the Noteholders' Board Nominee shall resign from the New Board, and the Noteholder Representative provisions in the Corporate Governance Documents shall be null and void. Biographical information regarding these proposed officers, directors, managers and other responsible persons will be set forth in the Plan Supplement. A schedule of the annual compensation to be paid to persons serving as executives, officers, directors, managers or responsible persons as of the Effective Date will be set forth in the Plan Supplement.

Pursuant to the Plan, shareholder voting agreements will be entered into by the Shareholders and a nominee of the Noteholders (the "***Noteholders' Shareholder Nominee***"), which agreements shall provide that 30% of the Shareholder voting rights (but not economic entitlements) attributable to the Debtor's capital stock shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders, such that shareholder voting at the Debtor (and otherwise affecting the Trump Ocean Club) shall be effectively allocated as follows: Upper Deck (21%), Mr. Roger Khafif (49%), and Noteholders' Shareholder Nominee (30%) (together, the "***Voting Persons***"). For the avoidance of doubt, the 30% shareholder voting rights of the Noteholders' Shareholder Nominee shall only be applicable to break a vote tie between the other Voting Persons. "Shareholders," as used herein, shall mean: the direct and indirect shareholders of the Company: Ocean Point Development Corp. ("Ocean Point"); Roger Khafif; Upper Deck Properties, S.A. ("Upper Deck"); Arias, Serna & Saravia; Espacios Urbanos, S.A.

Carlos Saravia shall be appointed as CEO, President and Legal Representative of the Reorganized Debtor. Mr. Saravia may be replaced in such roles any time after September 30, 2013, but shall be given at least thirty (30) days' notice of any such intended replacement. A more fulsome description of the duties and power of the CEO and the terms and provisions of Mr. Saravia's appointment will be included in the Plan Supplement.

For the avoidance of doubt, the appointment of corporate officers of the Reorganized Debtor (excluding the position of CEO) shall not be subject to preapproval of the Noteholders' Board Nominee.

12.    **New Articles of Association and New Bylaws of the Reorganized Debtor**

The New Bylaws and New Articles of Association (as applicable), among other things, shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtor may amend and restate its New Bylaws and/or New Articles of Association (as applicable), as permitted under applicable laws, subject to the terms and conditions of such documents.

13.    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtor and the officers and members of the New Board are authorized to and may, in the name of and on behalf of the Reorganized Debtor, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

14.    **Entity Action**

Upon the Effective Date, to the extent permitted by applicable law, all actions contemplated by the Plan shall be deemed ratified, authorized, and approved in all respects, including but not limited to:  (a) the selection of the directors and officers for the Reorganized Debtor; (b) the issuance of the New Notes and related transaction security agreements and any other ancillary agreements relating to the foregoing; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the entity structure of the Debtor or the Reorganized Debtor and any entity action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, or officers of the Debtor or the Reorganized Debtor.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, including the New Notes and any and all other agreements, documents, securities, and instruments relating to any of the foregoing.  The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under any non-bankruptcy law.

15.    **Section 1146 Exemption**

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any United States document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate United States state or local governmental officials or agents

50

shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

### 16.    Preservation of Causes of Action

Unless expressly released or waived pursuant to Article VIII (*see* Section V.H. below) of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against such Person.  The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against any Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

The Reorganized Debtor reserves and will retain the Causes of Action notwithstanding the repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Person shall vest in the Reorganized Debtor, as the case may be.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 17.    Non-occurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

F.    **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.    **Assumption of Contracts and Unexpired Leases**

Except as otherwise provided herein or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtor and any Person, including the Plan Support Agreement, shall be and shall be deemed to be assumed pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date.    Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases provided for herein.    Each Executory Contract and Unexpired Lease assumed pursuant to section 6.1 of the Plan (see this Section V.F.1.) or by any order of the Bankruptcy Court that has not been assigned to a third party prior to the Confirmation Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under section 365 of the Bankruptcy Code.

2.    **Cure of Defaults**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan, to the extent not already paid by the Debtor, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.    In the event of a dispute regarding (a) the Cure Claim, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.    At least ten (10) days prior to the Confirmation Hearing, the Debtor shall provide for notices of proposed assumption and proposed Cure Claims to be sent to applicable third parties.    Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed and served in accordance with, and otherwise comply with, the provisions of the Scheduling Order related to assumption of Executory Contracts and Unexpired Leases.    Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.    Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Contracts and Leases Entered into after the Petition Date

Contracts and leases entered into during the Postpetition Period by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### 4. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or in the order assuming an Executory Contract or Unexpired Lease, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.

Modifications, amendments, supplements, and restatements to any prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtor during the Postpetition Period shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 5. Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on a list of assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized Debtor, as applicable, shall have 30 days following entry of a Final Order to resolve and to alter its treatment of such contract or lease.

### 6. Modification, Assumption and Non-Disturbance of Certain Plan Critical Agreements

The Debtor and the Debtor's principal assets are subject to certain Executory Contracts and an Unexpired Lease that the Debtor considers critical to the operations of Trump Ocean Club, the business of the Debtor and the success of the Plan, including the Trump License Agreement and other Hotel Agreements (collectively, the "***Plan Critical Agreements***"). Currently, and as of the Petition Date, the Debtor is and will be in continuing material default of its obligations under certain of the Plan Critical Agreements, including defaults in performance and payment obligations, which defaults remain to be cured or waived. The Plan provides for the cure or waiver of such defaults (to the extent known and identified), for the assumption of each of the Plan Critical Agreements to which the Debtor is a party and for the non-disturbance of each other Plan Critical Agreement, subject to the certain Concessionary Amendments, as described herein. Such cures, waivers, modifications, assumptions and non-disturbance of the Plan Critical Agreements are integral to the Plan and are the basis for determining that each of

the counterparties to the Plan Critical Agreements (each, a "***Plan Critical Counterparty***") is an Unimpaired Claimant and not entitled to vote on the Plan.

In pursuit of the Plan, the Debtor has negotiated the Concessionary Amendments, pursuant to which, among other things, Licensor, Manager, Hotel Manager and Hotel Asset Manager have accepted and granted material concessions for the benefit of the Debtor, Trump Ocean Club and the Plan, including substantial reductions and rescheduling of licensing and management fees, modification of certain performance obligations and the cure of certain known and identified defaults. While each of the Concessionary Amendments has been fully negotiated and executed by all parties thereto, each remains subject to certain conditions to effectiveness (as set forth in the Concessionary Amendments (the "***Concessionary Amendment Conditions***"), including, that (i) the Plan shall have become effective, by no later than July 15, 2013, subject to final documentation that is in substantial compliance with the Plan, as set forth herein and in the Plan, and not materially adverse to the operations of the Trump Ocean Club as contemplated by the Plan Critical Agreements (as modified by the Concessionary Amendments) and to the interests of the Plan Critical Parties thereunder, (ii) the Debtor shall have assumed pursuant to the Plan each of the Plan Critical Agreements to which it is a party, and shall not otherwise disturb the other Plan Critical Agreements to which it may not be a direct party, in each case, as modified solely by the applicable Concessionary Amendments, and such assumptions shall have been approved as part of the Confirmation Order, such that, after giving effect to Plan, each of the Plan Critical Agreements shall remain in full force and effect, as in effect immediately prior to the Petition Date, subject only to the Concessionary Amendments, (iii) the Indenture Trustee shall have entered into a non-disturbance agreement (the form of which has also been substantially negotiated), with respect to the Plan Critical Agreements, as modified solely by the Concessionary Amendment, (iv) at all times after the execution of the Concessionary Amendments, including after the Petition Date, until the satisfaction of the Concessionary Amendment Conditions, there shall be no newly discovered defaults, and no further deterioration of the level of performance, by the Debtor or its Affiliates under any of the Plan Critical Agreements, and (v) the release and discharge by the Debtor and each of its Affiliates of any Cause of Action it or they may have against any of the Plan Critical Counterparties, as set forth herein.

To effectuate the Plan, each of the Concessionary Amendments, and each of the Plan Critical Agreements to which the Debtor is a party, as modified solely by the Concessionary Amendments, shall be automatically assumed by the Debtor, and the entry of the Confirmation Order shall constitute approval of each such assumption, pursuant to section 365(a) of the Bankruptcy Code, in each case, without the requirement of any further action by the Debtor or any Plan Critical Counterparty, and without prejudice to the rights of the Debtor or any Plan Critical Counterparty, as party to an Executory Contract or Unexpired Lease, as a Claimant or otherwise in the Chapter 11 Case, including, without limitation, the right to file a Proof of Claim, to dispute a Cure Claim, to seek adequate assurance of future performance and/or to compel the assumption or rejection of a Plan Critical Agreement, in each case, based on the terms and conditions of the Plan Critical Agreements, without giving effect to the Concessionary Amendments, in the event that the Plan is not confirmed, any of the other Concessionary Amendment Conditions are not satisfied or a Bankruptcy Court order is entered or other event occurs, in the reasonable determination of a Plan Critical Counterparty, makes it unlikely that the Plan will be Confirmed or that any of the other Concessionary Amendment Conditions shall not

be satisfied by July 15, 2013.  Each Plan Critical Counterparty shall be entitled to exercise such right at any time prior to the satisfaction of the Concessionary Amendment Conditions, notwithstanding any time bar for the exercise of such rights set forth in the Plan or any Scheduling Order.

Without limiting the foregoing, (x) until the Plan is confirmed and, with it, the Plan Critical Agreements are assumed, as modified solely by the Concessionary Amendments, and each of the other Concessionary Amendment Conditions are satisfied, no obligation of, or default by, the Debtor or its Affiliates under any of the Plan Critical Agreements (as in effect prior to the Concessionary Amendments), and no Claim by any of the Plan Critical Counterparties in respect thereof, shall be or be deemed cure, waived, released, discharged or time barred, in any respect, and (y) upon confirmation of the Plan, including assumption of each of the Plan Critical Agreements, modified solely by the Concessionary Amendments, and the satisfaction of all other Concessionary Amendment Conditions, except as expressly set forth in such Concessionary Amendments, or in any written agreement accompanying such Concessionary Amendment that shall have been executed by the applicable Plan Critical Counterparty, no obligation of, or default by, the Debtor or its Affiliates, and no Claim by any Plan Critical Counterparty, under or with respect to such Plan Critical Agreement, shall be or be deemed cure, waived, released or discharged in any respect, and (z) with respect to any such obligation or default that has not been cured, waived, released or discharged, the applicable Plan Critical Counterparty has, and shall be deemed to have, reserved all of its Claims, rights and remedies.

None of the Plan Critical Counterparties has participated in the preparation of the Plan, the Disclosure Statement or any other Plan Document.  No Plan Critical Counterparty has, or shall be deemed to have, made any representation or warranty with respect to the Plan, the Disclosure Statement or any other Plan Document, or any statements or information contained in any of the foregoing, or that any or all of the foregoing (in whole or in part) is accurate, complete, not misleading, sufficient or appropriate for any legal or other purpose.  In agreeing to execute the Concessionary Amendments and to allow the Plan Critical Agreements to be assumed, as modified by the Concessionary Amendments, each of the Plan Critical Counterparties is relying on information provided by the Debtor and its Affiliates, including as set forth in the Plan, Disclosure Statement and other Plan Documents, and has reserved its rights with respect to any material misrepresentations or other defects in such disclosures.  No other Claimant or other person shall be entitled to assert that such agreement by a Plan Critical Counterparty constitutes an endorsement of the Plan, the Disclosure Statement or any Plan Document, or to hold any of the Plan Critical Counterparties responsible or liable for any information or omissions contained herein or therein.  For purposes of the Plan, each of the Plan Critical Counterparties, and its respective members, directors, officers, employees, representative, advisors and agents, shall be and be deemed an Exculpated Party and a Released Party.

None of the Plan Critical Counterparties participated in the preparation of the Plan, including the Liquidation Analysis, Projections or any other information contained in the Plan Documents, and no representation, warranty or endorsement with respect to the Liquidation Analysis, Projections or any other statements or information contained in the Plan, or to the Plan itself, has been made or will be made by any of the Plan Critical Counterparties, nor may any such representation, warranty or endorsement be implied by the execution of the Concessionary

Amendments, the assumption of the Hotel Agreements as modified by the Concessionary Amendments, the failure of any Plan Critical Counterparty to object to the Plan or to any statement or information contained in or omitted from any of the Plan Documents, nor by any other action or inaction on the part of any the Plan Critical Counterparties. The Debtor remains solely responsible for all statements, information and omissions contained in the Plan.

Except as otherwise disclosed in the Disclosure Statement or the Plan, or as may be required to be disclosed by the Bankruptcy Court or by law, the Debtor has agreed with certain Plan Critical Counterparties to maintain the confidentiality of the specific terms and conditions of the Hotel Agreements and Concessionary Amendments, which may be disclosed only on a need to know basis. For that reason, copies of the Hotel Agreements and Concessionary Amendments shall be made available only to Claimants entitled to vote on the Plan and their representatives, subject to execution of a confidentiality agreement with respect to such agreements.

### G.    PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

#### 1.    Distribution Record Date

For purposes of the Plan, as of 5:00 p.m. prevailing U.S. Eastern Time on the Distribution Record Date, the records of ownership of Claims against the Debtor (including the claims register in the Chapter 11 Case) will be closed; *provided*, *however*, the Distribution Record Date shall not apply to any distributions of securities. For purposes of the Plan, the Debtor, the Estate, the Reorganized Debtor, and the Disbursing Agent shall have no obligation to recognize the transfer of any of the Claims against the Debtor occurring after the Distribution Record Date, and shall be entitled for all purposes relating to the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date.

#### 2.    Date of Distributions

Distributions pursuant to the Plan shall be made on the dates otherwise set forth in the Plan or as soon as practicable thereafter. In the event that any payment or any act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

#### 3.    Disbursing Agent

All distributions under the Plan shall be made by the Debtor as Disbursing Agent or such other entity designated as a Disbursing Agent by the Debtor on or after the Effective Date. The Indenture Trustee shall be the Disbursing Agent for the holders of Prepetition Senior Secured Notes Claims. The Debtor and the Indenture Trustee shall not be required to give any bond, surety, or any other security for the performance of their duties as Disbursing Agent unless otherwise ordered by the Bankruptcy Court. If a Disbursing Agent is not the Debtor or the

Indenture Trustee, such Person shall obtain a bond or surety for the performance of its duties, and all costs and expenses incurred to obtain the bond or surety shall be borne by the Debtor. Furthermore, the Disbursing Agent shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any bond or surety that is obtained in connection with this Section V.G.3. hereof or section 7.3 of the Plan.  The Debtor shall inform the U.S. Trustee in writing of any changes to the identity of the Disbursing Agent.

### 4.        Rights and Powers of Disbursing Agent

i.        *Powers of the Disbursing Agent*. The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

ii.        *Expenses Incurred on or After the Effective Date*. Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Debtor in the ordinary course of business or in the manner and upon such other terms as may be otherwise agreed by the Debtor and the Disbursing Agent.

### 5.        Delivery of Distributions

i.        Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Plan Debtors or their agents, as applicable, unless the Plan Debtors have been notified in writing of a change of address, including by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.

ii.        Notwithstanding the foregoing, distributions to holders of Prepetition Senior Secured Notes Claims will be made to or through the direction of the Indenture Trustee pursuant to the terms of the Indenture.  Any distribution to the Indenture Trustee shall be deemed a distribution to the respective holder of a Prepetition Senior Secured Notes Claim under the Indenture.

### 6.        Withholding Taxes

The Disbursing Agent shall comply with all withholding, reporting, certification, and information requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification, and information requirements.

Persons entitled to receive Distributions hereunder shall, as a condition to receiving such Distributions, provide such information and take such steps as the Disbursing Agent may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Disbursing Agent to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

Any Person that does not provide the Disbursing Agent with requisite information after the Disbursing Agent has made at least three attempts (by written notice or request for such information, including on the Ballot) to obtain such information, may be deemed to have forfeited such Person's right to such Distributions, which shall be treated as unclaimed property under section 7.7 of the Plan (*see* Section V.G.7. below).

### 7.    Unclaimed Property

Any Person that fails to claim any Distribution to be distributed hereunder (including, but not limited to, by failure to comply with the Distribution Procedures applicable to the relevant Distribution) by the Forfeiture Date will forfeit all rights to any Distributions hereunder, and shall have no claim whatsoever with respect thereto against the Debtor or its Estate, the Reorganized Debtor, or any Holder of an Allowed Claim to which Distributions are made.  Upon the forfeiture of Cash, such Cash shall be the property of the Debtor or the Reorganized Debtor, as applicable; upon the forfeiture of the right to Distributions of any debt issued under the New Notes, such Distributions shall be cancelled.  Nothing herein shall require further efforts by any Person to attempt to locate or notify any other Person with respect to any forfeited property.

### 8.    Disputed Claims

If the Debtor, the Reorganized Debtor, or any other party in interest disputes any Claim against the Debtor, such dispute shall be (a) adjudicated in the Bankruptcy Court or in any other court having jurisdiction over such dispute, or (b) settled or compromised without any further notice to or action, order, or approval by the Bankruptcy Court, as the case may be, under applicable law.  Among other things, the Debtor (on or before the Effective Date) or the Reorganized Debtor (after the Effective Date) may elect, at its sole option, to object to or seek estimation under section 502 of the Bankruptcy Code with respect to any Proof of Claim filed by or on behalf of a Holder of a Claim against the Debtor.

### 9.    Objections to Claims

Unless a later or different time is set by Final Order or otherwise established by other provisions of the Plan, all objections to Claims must be filed by the Claims Objection Bar Date; provided, however**,** that no such objection may be filed with respect to any Claim after the Bankruptcy Court has determined by entry of a Final Order that such Claim is an Allowed Claim.    The failure by any party in interest, including the Debtor and the Committee (if appointed) to object to any Claim, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's rights to object to, or re-examine, any such Claim in whole or in part.  After the Effective Date, no party in interest shall have the right to object to Claims against the Debtor or its Estate other than the Reorganized Debtor.

10.  **Setoffs and Recoupment**

The Debtor may, but shall not be required to, offset or recoup from any Claim or Interest, any Claims of any nature the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtor of any such Claim it may have against such Claimant or Interest holder.

11.  **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution, unless otherwise set forth explicitly in the Plan or its exhibits, shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amount.

12.  **Allocation of Professional Fees**

The Debtor reserves its rights to allocate as overhead any claims for professional fees and expenses approved as payable by the Debtor that are or were incurred in connection with the negotiation, consummation and effectuating the transactions set forth in the Plan.

13.  **Compromises and Settlements**

From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtor may compromise and settle all Claims and Causes of Action, without any further approval of the Bankruptcy Court.

14.  **Reservation of Debtor's Rights**

Prior to the Effective Date, the Debtor expressly reserves the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against it or other claims it may have against other Persons.

15.  **No Distributions Pending Allowance**

If a Claim or any portion of a Claim is Disputed, no payment or Distribution will be made on account of the Disputed portion of such Claim (or the entire Claim, if the entire Claim is Disputed), unless such Disputed claim or portion thereof becomes an Allowed Claim.

16.  **Claims Paid or Payable by Third Parties**

The Disbursing Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor, the Reorganized Debtor, or the Disbursing Agent.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not the Debtor, the Reorganized Debtor, or the Disbursing Agent on account of such Claim, such

59

Holder shall, within two weeks of receipt thereof, repay or return the Distribution to the Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.   The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

### 17.   Effect of Acceptance of Distribution

Acceptance of any Distribution or other property under the Plan will constitute the recipient's acknowledgement and agreement that all Claims, demands, liabilities, other debts against, or Interests in, the Debtor (other than those created by the Plan) have been discharged and enjoined in accordance with Article VIII of the Plan. (*see* Section V.H. below).

## H.   SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### 1.   Discharge

*i.*   Discharge of Claims Against the Debtor and the Reorganized Debtor

Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (a) discharge the Debtor, the Reorganized Debtor or any of their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including without limitation all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based on such debt has accepted the Plan; and (b) preclude all Persons from asserting against the Debtor, the Reorganized Debtor, or any of their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code.   The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

*ii.*   Injunction Related to the Discharge

**Except as otherwise provided in the Plan or the Confirmation Order, all entities, wherever located in the world, that have held, currently hold, or may hold Claims or other debts or liabilities against the Debtor, or any Interest in any or all of the Debtor, that are discharged pursuant to the terms of the Plan, are permanently enjoined, on and after the Effective Date, from taking, or causing any other entity to take, any of the following actions on account of any such Claims, debts, liabilities or Interests or rights:  (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a**

Distribution pursuant to the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor, or any of their Assets on account of any such Claim, debt, liability, Interest or right; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor, the Reorganized Debtor, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (e) transferring or purporting to transfer, in whole or in part or any interest in, or asserting in any case, proceeding, or court in any jurisdiction, any Claim under the Prepetition Senior Secured Notes; and (f) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  Such injunction shall extend to any successor of the Debtor, the Reorganized Debtor, and any of their Assets.  Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

2.    Releases

i.    Releases by the Debtor

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor in its individual capacity and as Debtor in Possession will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtor or its Estate at any time on or prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

61

*ii.*    Certain Waivers

**Although the Debtor does not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, the Debtor hereby understands and waives the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtor. Section 1542 of the California Civil Code provides:**

**§1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

**THE DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND THE DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE DEBTOR WAIVES AND RELEASES ANY BENEFIT, RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

*iii.*    Releases by Holders of Claims and Interests

**For good and valuable consideration, the adequacy of which is hereby confirmed, and except as may be otherwise ordered by the Bankruptcy Court, on and after the Effective Date, (i) Holders of Claims that vote to accept the Plan (or are deemed to accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each Holder of a Claim that does not vote to accept the Plan, shall be deemed to have released and forever waived and discharged all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated**

in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtor or its Estate at any time up to immediately prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations (except Cure Claims that have not been filed timely) of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

<em>iv.</em>      Releases by Opcorp and Kassir Development

**In addition to the releases set forth in subsection iii above, through payment in full of the New Notes, after which such waivers and representations will be of no further force or effect: (i) Kassir Development shall waive its claim in the amount of $2,022,274.00 against the Debtor (and shall represent that it has no other claims against the Debtor); and (ii) Opcorp shall waive its claim in the amount of $4,787,742.45 against the Debtor (and shall represent that it has no other claims against the Debtor).**

<em>v.</em>      Releases by CCSA Parties

**In addition to the releases set forth in subsection iii above, through payment in full of the New Notes, the CCSA Parties, on their own behalf and that of their respective Affiliates shall waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Debtor until such time as the New Notes have been paid in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the New Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except as disclosed on Exhibit 6 to the Term Sheet.**

<em>vi.</em>      Releases of CCSA Parties

**As of the Effective Date, for good and valuable consideration, which shall include the releases set forth in Section V.H.2.(iv) hereof and the CCSA Parties' pledging of their Interests and providing the $5 million Limited Financial Guarantee of the Debtor's obligations under the New Notes issued under the Plan, (i) each of the Debtor in its individual capacity and as Debtor in Possession, the Indenture Trustee, in its individual capacity and on behalf of the Holders, and the Holders will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on**

63

any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the CCSA, the Trump Ocean Club, the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any CCSA Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtor or its Estate at any time on or prior to the Effective Date against the CCSA Parties, other than Claims or liabilities arising out of or relating to any act or omission of a CCSA Party that constitutes willful misconduct or gross negligence, and (ii) the CCSA is terminated and is of no further force and effect, and the CCSA Parties are released from any and all obligations thereunder.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release the obligations of the CCSA Parties under the Share Pledge or the $5 million Limited Financial Guarantee pursuant to the terms thereof.

*vii.*    Exculpation

On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Case or in connection with the preparation and filing of the Chapter 11 Case, the formulation, negotiation, solicitation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  No provision of the Plan, the Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action, or liabilities that the Debtor, the Estate, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Case.

*viii.*    Injunction Related to Releases and Exculpation

To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and

**liabilities that are released, waived, or exculpated pursuant to sections 8.2.1, 8.2.2, 8.2.3, 8.2.4, and 8.2.5 of the Plan (*see* Sections V.H.2.i., V.H.2.ii., V.H.2.iii., V.H.2.iv., and V.H.2.v. above) will be permanently enjoined, on and after the Effective Date, from taking or causing any other Person to take, any of the following actions, at any time or at any place in the world, on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities:  (a) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without limitation any such actions arising from or related to the Prepetition Credit Agreements; (c) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without limitation any such Lien or encumbrance arising from or related to the Prepetition Credit Agreements; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (e) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  Such injunction shall extend to any successor of any Released Party or any Exculpated Party or any of its or their assets.  Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.**

### 3.    No Successor Liability

Except as otherwise expressly provided herein, none of the Released Parties or the Exculpated Parties shall be determined to be successors to the Debtor or to any Person for which the Debtor may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character.  The Released Parties and Exculpated Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtor or the Reorganized Debtor, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Plan.

### 4.    Term of Injunctions

All injunctions or stays provided in, or in connection with, the Chapter 11 Case, whether pursuant to section 105, section 362, or any other provision of the Bankruptcy Code, other applicable law or court order, in effect immediately prior to Confirmation will remain in full force and effect until the Effective Date and shall remain in full force and effect thereafter if so provided in the Plan, the Confirmation Order, or by their own terms.  In addition, as described in

this Section V.H., the Confirmation Order shall incorporate the release, injunction, discharge, and exculpation provisions set forth in the Plan, which shall be in effect after the Effective Date and, on and after Confirmation Date, the Debtor may seek further orders to preserve the status quo during the time between the Confirmation Date and the Effective Date or to enforce the provisions of the Plan.

### 5.    Binding Effect

The Plan will be binding upon, and inure to the benefit of, the Debtor and all Holders of Claims and Interests, and their respective successors and assigns, whether or not the Claims and Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan.

### 6.    Dissolution of the Committee

The Committee, if appointed, shall be dissolved on the Effective Date and shall not continue to exist thereafter except for the limited purposes of filing any remaining fee applications, and the Professionals retained by the Committee shall be entitled to compensation for services performed and reimbursement of expenses incurred in connection therewith.  Upon dissolution of the Committee, the members of the Committee shall be released and discharged of and from all duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Case.

### 7.    Post-Confirmation Date Retention of Professionals

After the Confirmation Date, any requirement that Professionals employed by the Debtor comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor shall be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

### 8.    Survival of Certain Indemnification Obligations

Subject to Section 5.6 of the Plan, the obligations of the Debtor, pursuant to the Debtor's operating agreements, certificates of incorporation or formation, articles of association, by-laws, memoranda of association, or equivalent corporate governance documents, applicable statutes, or employment agreements, to indemnify individuals who prior to the Effective Date served as its directors, officers, managers, agents, employees, representatives, and Professionals, in respect of all present and future actions, suits, and proceedings against any of such officers, directors, managers, agents, employees, representatives, and Professionals, based upon any act or omission related to service with, for, or on behalf of the Debtor on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, shall not be discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the reorganization contemplated by the Plan and shall be performed and honored by the Reorganized Debtor regardless of such confirmation, consummation, and reorganization.

## I.    CONDITIONS PRECEDENT TO CONSUMMATION

### 1.    Conditions Precedent

The Plan shall not become effective unless and until the following conditions have been satisfied or waived.  The Debtor anticipates that all of such conditions to Confirmation and to the Effective Date will be satisfied or waived, and intends to present evidence at the Confirmation Hearing demonstrating such satisfaction or waiver.  Notwithstanding the foregoing, there is a risk that some or all of the conditions to Confirmation or the Effective Date will not be satisfied or waived.  See "Risk Factors Related to Confirmation, Effectiveness, and Implementation", at Section VIII.A. below.

### 2.    Conditions to Confirmation

*Plan Supplement*.  All documents to be provided in the Plan Supplement are in a form that is reasonably acceptable in all material respects to the Debtor and the Steering Group.

*Confirmation Order*.  The Confirmation Order must be entered by the Bankruptcy Court in a form reasonably acceptable in all material respects to the Debtor and the Steering Group.

### 3.    Conditions to Effective Date

*Confirmation Order*.  The Bankruptcy Court shall have entered the Confirmation Order in a form reasonably acceptable in all material respects to the Debtor and the Steering Group.

*No Stay of Confirmation*.  There shall not be in force any order, decree, or ruling of any court or governmental body having jurisdiction, restraining, enjoining, or staying the consummation of, or rendering illegal the transactions contemplated by, the Plan.

*Receipt of Required Authorization*.  All authorizations, consents, and regulatory approvals (if any) necessary to effectuate the Plan shall have been obtained.

*New Notes*.  The documents evidencing the New Notes shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

*Delivery of Share Pledge and the Limited Financial Guarantees.* The documents evidencing the Share Pledge and $5 million Limited Financial Guarantee shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

*Organizational Documents.*  The New Articles of Association, New Bylaws and New Shareholder Agreement shall each be in form and substance reasonably acceptable to the Debtor and the Steering Group.

*Implementation Transactions*.  The transactions that are required to be completed on or before the Effective Date have been completed in a manner reasonably acceptable in all material respects to the Debtor and the Steering Group, including the CCSA Parties' (1) waiver, on their

own behalf and that of their respective affiliates, their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Company until such time as the New Notes have been paid in full or otherwise defeased pursuant to the terms of the New Notes, and (2) representations and warranties as set forth in the letter agreement by and among the CCSA Parties, dated as of the Effective Date.  Notwithstanding the foregoing conditions, no party that willfully causes the failure to satisfy a condition should be entitled to object to the consummation of the Plan on the grounds that such condition is not satisfied.

*Assumption*.    The Bankruptcy Court shall have entered an order approving the assumption of the Plan Support Agreement.

*Payment of Fees*.    The Debtor shall have paid all reasonable professional fees and expenses of the Steering Group as agreed under the Plan Support Agreement.

*Kassir Development's Waiver*.    Kassir Development's wavier of its claim in the amount of $2,022,274.00 against the Debtor (and shall represent that it has no other claims against the Debtor).

*Opcorp's Waiver*.    Opcorp shall waive its claim in the amount of $4,787,742.45 against the Debtor (and shall represent that it has no other claims against the Debtor).

*CCSA Parties' Waiver*.    The CCSA Parties, on their own behalf and that of their respective Affiliates shall waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Debtor until such time as the New Notes have been paid for in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the New Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except as disclosed on Exhibit 6 to the Term Sheet.

## 4.    Trump Concessionary Amendments

Upon satisfaction of the conditions in Section 9.1.2 of the Plan (*see* Section V.I.3 above), the condition to effectiveness of the Concessionary Amendments, requiring that the Plan be effective, will be deemed satisfied and the Concessionary Amendments, accordingly, will be concurrently deemed effective.

## 5.    Waiver

Any of the conditions set forth in sections 9.1.1 and 9.1.2 of the Plan (*see* Sections V.I.2. and V.I.3. above) may be waived by the Debtor, with the consent of the Steering Group, which consent shall not be unreasonably withheld.

## 6.    Effect of Failure of Conditions upon the Plan

In the event that the conditions specified in section 9.1 of the Plan (see Sections V.I.2. and V.I.3. above) have not been satisfied or waived in accordance with section 9.1.3 of the Plan (see Section V.I.4. above) on or before 120 days after the Confirmation Date, then, the Debtor may seek an order from the Bankruptcy Court vacating the Confirmation Order.  Such request

shall be served upon counsel for the Steering Group, the Committee (if appointed) and the U.S. Trustee.  If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects, (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court, and (c) the time within which the Debtor may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of 60 days after the date the Confirmation Order is vacated.

## J.   RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

- hear and rule upon all Causes of Action retained by the Debtor and commenced and/or pursued by the Debtor or the Reorganized Debtor;

- resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, and (c) any dispute regarding whether a contract or lease is or was executory or expired;

- ensure that Distributions on account of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

- adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Plan Supplement, this Disclosure Statement, or the Confirmation Order;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

69

- resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

- approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, this Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtor, or the Reorganized Debtor, as applicable, only upon allowance thereof pursuant to the order of the Bankruptcy Court; provided, however, that the fees and expenses of the Debtor incurred after the Confirmation Date, including attorneys' fees, may be paid by the Reorganized Debtor in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation of the Plan, implementation, or enforcement of the Plan or the Confirmation Order;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or if Distributions pursuant to the Plan are enjoined or stayed;

- determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Plan Supplement, this Disclosure Statement, or the Confirmation Order;

- enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

- hear and determine all matters related to (a) the property of the Debtor and the Estate from and after the Confirmation Date and (b) all disputes regarding the existence, nature or scope of the Debtor's discharge;

- enter an order or final decree concluding or closing the Chapter 11 Case; and

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

For the avoidance of doubt, the Bankruptcy Court will not be retaining jurisdiction to interpret and enforce the provisions of the New Notes.

## K.    MISCELLANEOUS PROVISIONS OF THE PLAN

### 1.    Plan Supplement

No later than ten (10) days prior to the Confirmation Hearing, the Debtor shall File with the Bankruptcy Court the Plan Supplement, which shall contain the documents identified herein and such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Balloting and Tabulation Agent.

#### i.        Exemption From Registration Requirements

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and Distribution of any securities contemplated by the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.  In addition, any securities contemplated by the Plan will be tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code; and (ii) the restrictions, if any, on the transferability of such securities and instruments.

#### ii.        Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtor on or before the Effective Date.

#### iii.        Third Party Agreements

The Distributions to the various Classes of Claims and Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan.  Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.

#### iv.        Amendment or Modification of the Plan

71

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtor, with the consent of the Steering Group (which consent shall not be unreasonably withheld), at any time before Confirmation, provided, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  The Debtor may modify the Plan at any time after Confirmation and before consummation of the Plan, provided, however, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, the Debtor shall have complied with section 1125 of the Bankruptcy Code, the Bankruptcy Court, after notice and a hearing, shall have confirmed the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  Except as specifically provided herein, a Holder of a Claim that has accepted the Plan prior to modification shall be deemed to have accepted such Plan as modified; provided, however, that the Plan, as modified, does not materially and adversely change the treatment of the Claim or Interest of such Holder.

*v.*      Severability

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, the Debtor may, at its option, and with the consent of the Steering Group, such consent not to be unreasonably withheld, (a) treat such provision as invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Interests that the provision is determined to be invalid, void, or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

*vi.*      Revocation or Withdrawal of the Plan

The Debtor reserves the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing at any time prior to the occurrence of the Effective Date.  If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any other Person, or (iii) constitute an admission of any sort by the Debtor or any other Person.

For the avoidance of doubt, if the Confirmation Hearing is adjourned, the Debtor reserves the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as it considers appropriate, subject to the provisions of the Bankruptcy Code.

*vii.*      Rules Governing Conflicts Between Documents

In the event of a conflict between the terms or provisions of the Plan and any Plan Documents other than the Plan, the terms of the Plan shall control over such Plan Documents.  In

the event of a conflict between the terms of the Plan or the Plan Documents, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control.  In the event of a conflict between the information contained in this Disclosure Statement and the Plan or any other Plan Document, the Plan or other Plan Document (as the case may be) will control.

<em>viii.</em>    Governing Law

Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its conflicts of law principles.

<em>ix.</em>    Notices

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, charges prepaid.  If to the Debtor, any such notice shall be directed to the following at the addresses set forth below:

> Newland International Properties, Corp.
> Trump Ocean Club
> Avenida Calle 82 # 10-33 Oficina 1001
> Bogota, Columbia
> Attention:    Carlos Saravia
>               Chief Operating Officer

> -- with copies to –

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166-0193
> Attention:    Kevin W. Kelley, Esq.
>               J. Eric Wise, Esq.
>               Shira D. Weiner, Esq.

> -and-

> Adames, Duran, Alfaro & Lopez
> Calle 50, Torre Global Bank
> Piso 24, Oficina 2406
> Panama, Republic of Panama
> Attention:    Nadiuska López de Abood
>               Beatriz L. Romero Alfaro

*x.*      Interest and Attorneys' Fees

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order, or as otherwise required by the Bankruptcy Court or by applicable law.  No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

*xi.*      Binding Effect

The Plan shall be binding upon the Debtor, the Reorganized Debtor, the Holders of all Claims and Interests, parties in interest, Persons, and Governmental Units and their respective successors and assigns.  To the extent any provision of this Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

*xii.*      No Admissions

As to contested matters, adversary proceedings, and other Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, this Disclosure Statement, or other Plan Documents shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.  The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtor, as Debtor and Debtor in possession in the Chapter 11 Case.

*xiii.*      Exhibits

All Exhibits and Schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

## VI.      SOLICITATION AND VOTING PROCEDURES

The following briefly summarizes procedures to accept and confirm the Plan:

## A.      PERSONS ENTITLED TO VOTE ON THE PLAN

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  Holders of Claims or Interests that are Unimpaired by the Plan are presumed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Holders of Claims or Interests that will not receive a distribution or retain any property under the Plan are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.

## 1.      Voting Class

Class 3 (the "***Voting Class***") is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

### 2.    Presumed Acceptance of the Plan

Classes 1, 2, 4 and 5 are Unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

### B.    THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

(a)    the Plan (either by paper copy or in "pdf" format on a CD-Rom, at the Debtor's discretion);

(b)    this Disclosure Statement (either by paper copy or in "pdf" format on a CD-Rom, at the Debtor's discretion) and all Exhibits thereto; and

(c)    the Ballot, Ballot Instructions, and Ballot return envelope.

The Voting Class shall be served the Solicitation Package.  A copy of the Solicitation Package (except Ballot) can be obtained by requesting a copy from the Debtor's Balloting and Tabulation Agent by calling +1 (646) 282-2500 or at tabulation@epiqsystems.com, indicating "Newland" in the subject line.

In addition to the Solicitation Package, certain Holders of Claims in the Voting Class were previously sent a copy of the Plan Support Agreement.  The Plan Support Agreement binds the signatories thereto to vote in favor of the restructuring described in the Plan Support Agreement.  The Plan is based upon the restructuring described in the Plan Support Agreement with certain modifications that the Company does not believe are material.  However, signing the Plan Support Agreement **does not** constitute a vote in favor of the Plan and all signatories to the Plan Support Agreement must separately submit a Ballot to vote on the Plan.

### C.    VOTING INSTRUCTIONS

Only the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan in accordance with Section 3.5 of the Plan (*see* Section V.C.5. above).

If you are entitled to vote, you should carefully review this Disclosure Statement, including the attached exhibits and the instructions accompanying the Ballot.  Then, indicate your acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot and return the Ballot in accordance with the Ballot Instructions.  Ballot Instructions are attached to each Ballot.  The deadline to vote on the Plan is **5:00 p.m. (Prevailing U.S. Eastern Time) on April 29, 2013** (the "***Voting Deadline***").  Please carefully review your Ballot Instructions as you may be required to submit your Ballot to your nominee prior to the Voting Deadline so that your nominee has sufficient time to record your vote on a Master Ballot an submit the Master Ballot to the Ballot and Tabulation Agent by the Voting Deadline.

The Company has engaged ACGM to act as Plan Solicitation Agent and Epiq Bankruptcy Solutions, LLC to act as the Balloting and Tabulation Agent. The Plan Solicitation Agent will, among other things, solicit votes and address questions from Noteholders, cause the Balloting and Tabulation Agent to provide additional copies of Solicitation Package materials, and hold dialogues or meetings with Noteholders which, as required, may include the Debtor and/or Gapstone, which will assist the Debtor and generally oversee the solicitation process. the Balloting and Tabulation Agent will, among other things, assist the Debtor in the printing and mailing of the Plan Solicitation Materials, and will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan. The Balloting and Tabulation Agent will also assist the Debtor in filing the Voting Report as soon as practicable before the Confirmation Hearing.

All Ballots must be properly executed, completed and delivered to the Balloting and Tabulation Agent, **so as to actually be received on or before the Voting Deadline** by using the envelope provided, or by delivery as follows:

**If sent in the envelope provided
or otherwise by <u>First Class Mail</u>:**

Newland International Properties, Corp. Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 5014, FDR Station
New York, NY 11050-5014

**If sent by <u>Overnight Courier</u>
or <u>Personal Delivery</u>:**

Newland International Properties, Corp. Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

**To be sure your Ballot is counted, your Ballot must be received by the Balloting and Tabulation Agent prior to the Voting Deadline. Your Ballot will not be counted if received after the Voting Deadline, unless allowed by the Debtor in its sole discretion.**

**A BENEFICIAL OWNER HOLDING PREPETITION SENIOR SECURED NOTES IN "STREET NAME" THROUGH A NOMINEE MAY VOTE AS FURTHER DESCRIBED BELOW.**

**IF YOU ARE DIRECTED TO RETURN YOUR BALLOT TO YOUR BANK, BROKER, OR OTHER NOMINEE, OR TO THEIR AGENT, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN A MASTER BALLOT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE EACH BALLOT ADVISES CREDITORS THAT IF THEY VOTE ON THE PLAN THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND**

DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES.

FOR PURPOSES OF THE NUMEROSITY REQUIREMENT OF SECTION 1126(C) OF THE BANKRUPTCY CODE, SEPARATE CLAIMS HELD BY A SINGLE CREDITOR IN A PARTICULAR CLASS WILL BE AGGREGATED AND TREATED AS IF SUCH CREDITOR HELD ONE CLAIM IN SUCH CLASS, AND ALL VOTES RELATED TO SUCH CLAIM WILL BE TREATED AS A SINGLE VOTE TO ACCEPT OR REJECT THE PLAN.

CREDITORS MUST VOTE ALL OF THEIR CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT THEIR VOTE; *A SINGLE BALLOT THAT PARTIALLY REJECTS AND PARTIALLY ACCEPTS* THE PLAN *SHALL NOT BE COUNTED*.

BALLOTS THAT *FAIL TO INDICATE AN ACCEPTANCE OR REJECTION* OF THE PLAN *SHALL NOT BE COUNTED*.

ONLY BALLOTS THAT ARE TIMELY RECEIVED PRIOR TO THE VOTING DEADLINE AND THAT ARE PROPERLY EXECUTED WILL BE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN UNLESS AN EXTENSION IS GRANTED BY THE DEBTOR. *UNSIGNED BALLOTS OR BALLOTS WITHOUT AN ORIGINAL SIGNATURE SHALL NOT BE COUNTED*.

BALLOTS POSTMARKED PRIOR TO THE VOTING DEADLINE, BUT RECEIVED AFTER THE VOTING DEADLINE, *SHALL NOT BE COUNTED*, EXCEPT IN THE DEBTOR'S DISCRETION.

BALLOTS THAT ARE ILLEGIBLE, OR CONTAIN INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CREDITOR, *SHALL NOT BE COUNTED*.

IF A CREDITOR CASTS MORE THAN ONE BALLOT VOTING THE SAME CLAIM PRIOR TO THE VOTING DEADLINE, THE LAST PROPERLY EXECUTED VALID BALLOT RECEIVED PRIOR TO THE VOTING DEADLINE SHALL BE DEEMED TO REFLECT THE VOTER'S INTENT AND SUPERSEDE ANY PRIOR RECEIVED BALLOTS.

IF A CREDITOR SIMULTANEOUSLY CASTS INCONSISTENT DUPLICATE BALLOTS, WITH RESPECT TO THE SAME CLAIM, SUCH BALLOTS *SHALL NOT BE COUNTED*.

IF A HOLDER OF A CLAIM OR INTEREST ELIGIBLE TO VOTE IN CLASS 3 VOTES TO ACCEPT THE PLAN, SUCH HOLDER SHALL BE DEEMED TO HAVE CONSENTED AND AGREED (I) TO THE DEBTOR'S USE OF CASH COLLATERAL FOR WORKING CAPITAL AND GENERAL CORPORATE PURPOSES AND TO FUND THE COSTS AND EXPENSES RELATED TO THE CHAPTER 11 CASE, SUBJECT TO THE PROPOSED CASH COLLATERAL BUDGET AND OTHER

**RELATED TERMS AND CONDITIONS AS SET FORTH IN THE CASH COLLATERAL ORDER, SUBSTANTIALLY IN THE FORM ANNEXED TO THE BALLOTS AS EXHIBIT A, THAT IS SUBJECT TO BANKRUPTCY COURT APPROVAL, (II) TO NOT OBJECT TO THE DEBTOR'S USE OF CASH COLLATERAL SUBSTANTIALLY IN ACCORDANCE WITH THE CASH COLLATERAL ORDER, (III) PROVIDED THAT AN ORDER SUBSTANTIALLY IN THE FORM OF THE CASH COLLATERAL ORDER IS PROMPTLY ENTERED, TO NOT FILE ANY MOTION SEEKING ADEQUATE PROTECTION WITH RESPECT TO THE USE OF CASH COLLATERAL OR IN CONNECTION WITH THE AUTOMATIC STAY OR OTHERWISE, AND (IV) THAT THIS BALLOT SHALL CONSTITUTE ITS INSTRUCTION TO THE INDENTURE TRUSTEE TO ACCEPT AND NOT OBJECT (OR SUPPORT ANY OBJECTION) TO THE USE OF CASH COLLATERAL CONSISTENT WITH THE CASH COLLATERAL ORDER, INCLUDING, WITHOUT LIMITATION, THE IMPOSITION OF THE AUTOMATIC STAY, AND TO NOT FILE A MOTION SEEKING ADEQUATE PROTECTION WITH RESPECT TO THE USE OF CASH COLLATERAL OR IN CONNECTION WITH THE AUTOMATIC STAY OR OTHERWISE.**

**IF A HOLDER OF A CLAIM OR INTEREST ELIGIBLE TO VOTE IN CLASS 3 <u>VOTES TO ACCEPT THE PLAN</u>, SUCH HOLDER <u>SHALL BE DEEMED TO HAVE IRREVOCABLY DIRECTED THE TRUSTEE</u> (I) TO NOT OPPOSE THE PLAN OR THE CCSA SETTLEMENT, (II) TO FORBEAR FROM SEEKING TO ENFORCE THE CCSA, (III) IF UNDER ANY CIRCUMSTANCES THE INDENTURE TRUSTEE OBTAINS ANY MONIES UNDER OR PURSUANT TO THE CCSA, TO RETURN SUCH MONIES TO THE CCSA PARTIES, AND (IV) TO ENTER INTO SUCH DOCUMENTS AS ARE APPROPRIATE TO REFLECT THE CCSA SETTLEMENT PROVIDED FOR IN THE PLAN.    NOTWITHSTANDING THE FOREGOING, IF THE PLAN IS WITHDRAWN OR DENIED, SUCH DIRECTION SHALL BE NULL AND VOID.**

**EACH CREDITOR SHALL BE DEEMED TO HAVE VOTED THE FULL AMOUNT OF ITS CLAIM.    UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT, QUESTIONS AS TO THE VALIDITY, FORM, ELIGIBILITY (INCLUDING TIME OF RECEIPT), ACCEPTANCE, AND REVOCATION OR WITHDRAWAL OF BALLOTS SHALL BE DETERMINED BY THE BALLOTING AND TABULATION AGENT AND THE DEBTOR, WHICH DETERMINATION SHALL BE FINAL AND BINDING.**

**ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.  DO NOT RETURN SECURITIES OR ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

<u>For all Holders of Claims in Class 3</u>:

By signing and returning a Ballot, each Holder of a Claim in Class 3 will be certifying to the Bankruptcy Court and the Debtor that, among other things:

- the Holder has been provided with a copy of the Plan and this Disclosure Statement;

- the solicitation of votes for the Plan is subject to all the terms and conditions set forth in this Disclosure Statement;

- the Holder has carefully read the Ballot and the accompanying instructions; and

- the vote reflected on the Ballot is binding on the Holder's successors, heirs and assigns including, without limitation, any transferee.

The Debtor will agree with the Cash Collateral Secured Parties regarding the Debtor's use of prepetition Cash Collateral, subject to Bankruptcy Court approval. Specifically, pursuant to the terms of the Cash Collateral Agreement, the Debtor is authorized to use Cash Collateral for working capital and general corporate purposes as well as to fund costs and expenses related to the Chapter 11 Case, subject to proposed budget and other related terms and conditions. Moreover, the Debtor has agreed to provide the Cash Collateral Secured Parties adequate protection to protect against any diminution in value of the Cash Collateral Secured Parties' interests in the Cash Collateral, including senior and additional replacement security interests and liens in all of the Debtor's assets, subject to the effect of applicable non-bankruptcy law, and allowed super-priority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code. As discussed more fully above in Section IV.A.2., the Debtor intends to file a motion seeking entry of an order authorizing the Debtor's use of Cash Collateral as set forth in the Cash Collateral Agreement.

It is important that creditors exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by it if it is accepted by the requisite holders of Claims. The amount and number of votes required for confirmation of the Plan are computed on the basis of the total amount and number of Claims actually voting.

The Debtor may commence the Chapter 11 Case prior to the Voting Deadline. If the Debtor does commence the Chapter 11 Case prior to the Voting Deadline, Holders of Claims in the Voting Class may still cast a vote to accept or reject the Plan, though the Debtor will not continue to solicit votes on the Plan. If the Chapter 11 Case is commenced prior to the Voting Deadline, any votes that are cast after the Chapter 11 Case has commenced but before the Voting Deadline will be counted as votes to accept or reject the Plan in the same manner as votes cast prior to the commencement of the Chapter 11 Case.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE DEBTOR'S CREDITORS AND THE BEST POSSIBLE PROSPECT FOR THE DEBTOR'S SUCCESSFUL REORGANIZATION. THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EACH AND EVERY CREDITOR AND URGESALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.**

Beneficial Holders:

79

A beneficial owner holding Prepetition Senior Secured Notes as record holder in its own name and who is entitled to vote on the Plan should vote on the Plan by completing and signing the enclosed "Beneficial Owner Ballot" and returning it directly to the Balloting and Tabulation Agent on or before the Voting Deadline, using the enclosed self-addressed, postage-paid envelope.

A beneficial owner holding Prepetition Senior Secured Notes in "street name" through a nominee may vote on the Plan by one of the following two methods (as selected by such beneficial owner's nominee):

• If your nominee has not pre-validated your Ballot, complete and sign the enclosed Beneficial Owner Ballot. Return the Ballot to the beneficial owner's nominee in the self-addressed postage prepaid envelope as promptly as possible and in sufficient time to allow such nominee to process the Ballot and include its vote on a "Master Ballot" (as further described herein) and return it to the Balloting and Tabulation Agent by the Voting Deadline. If no self-addressed, postage paid envelope was enclosed for this purpose, please contact the Balloting and Tabulation Agent for instructions; or

• If your nominee has pre-validated your Ballot, complete and sign the pre-validated Beneficial Owner Ballot (as described below) provided by such beneficial holder's nominee. Return the pre-validated Ballot to the Balloting and Tabulation Agent by the Voting Deadline using the return envelope provided with the Disclosure Statement.

Any Beneficial Owner Ballot returned to a nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Balloting and Tabulation Agent a Master Ballot that includes the vote of such beneficial owner. If any beneficial owner owns Prepetition Senior Secured Notes through more than one nominee, such beneficial owner may receive multiple mailings containing the Beneficial Owner Ballots.

The beneficial owner should execute a separate Beneficial Owner Ballot for each block of Prepetition Senior Secured Notes that it holds through any particular nominee and return each Ballot to the respective nominee in the return envelope provided therewith. Beneficial owners who execute multiple Beneficial Owner Ballots with respect to Prepetition Senior Secured Notes held through more than one nominee must indicate on each Beneficial Owner Ballot the names of ALL such other nominees and the additional amounts of such Existing Bonds so held and voted.

Nominees:

A nominee that is the holder of Prepetition Senior Secured Notes for one or more beneficial owners can obtain the votes of the beneficial owners of such Prepetition Senior Secured Notes, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

i. Pre-validated Ballots: The nominee may "pre-validate" a Beneficial Owner Ballot by (i) signing the Ballot; (ii) indicating on the Ballot the nominee's DTC participant number and name, the amount of Prepetition Senior Secured Notes held by the nominee for the beneficial

80

owner, and the account numbers for the accounts in which such Prepetition Senior Secured Notes are held by the nominee; and (iii) forwarding such Beneficial Owner Ballot, together with the Disclosure Statement, a preaddressed, postage-paid return envelope addressed to, and provided by, the Balloting and Tabulation Agent, and other materials requested to be forwarded, to the beneficial owner for voting. The beneficial owner must then complete the information requested on the Beneficial Owner Ballot, review the certifications contained on the Ballot, and return the Ballot directly to the Balloting and Tabulation Agent in the pre-addressed, postage-paid return envelope so that it is received by the Balloting and Tabulation Agent by the Voting Deadline.  A list of the beneficial owners to whom "pre-validated" Ballots were delivered should be maintained by nominees for inspection for at least one year from the Effective Date.

ii. Master Ballots: If the nominee elects not to pre-validate Beneficial Owner Ballots, the nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Beneficial Owner Ballots, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded. Each such beneficial owner must then indicate his, her or its vote on the Beneficial Owner Ballot, complete the information requested on the Ballot, review the certifications contained on the Ballot, execute the Ballot and return the Ballot to the nominee. After collecting the Beneficial Owner Ballots, the nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Owner Ballots, execute the Master Ballot, and deliver the Master Ballot to the Balloting and Tabulation Agent so that it is RECEIVED by the Balloting and Tabulation Agent by the Voting Deadline. All Beneficial Owner Ballots returned to a nominee by beneficial owners should be retained by nominees for inspection for at least one year from the Effective Date.

EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE BALLOTING AND CLAIMS AGENT SO THAT IT IS RECEIVED BY THE BALLOTING AND CLAIMS AGENT BY THE VOTING DEADLINE.

Any questions regarding (i) voting procedures, (ii) the Solicitation Package, (iii) the amount of a Claim, or (iv) a request for an additional copy of the Plan, Disclosure Statement, or any Exhibits to such documents should be directed to the Balloting and Tabulation Agent by calling +1 (646) 282-2500 or at tabulation@epiqsystems.com, indicating "Newland" in the subject line.

D.    VOTING TABULATION

To ensure that a vote is counted, the Holder of a Claim should:  (a) complete a Ballot; (b) indicate the Holder's decision either to accept or reject the Plan in the applicable boxes provided in the Ballot; and (c) sign and timely return the original Ballot to the address set forth on the enclosed return envelope by the Voting Deadline.

With respect to the tabulation of Ballots for the Prepetition Senior Secured Notes, each holder will be deemed to have voted the principal amount of its Prepetition Senior Secured Notes Claim. Votes cast by beneficial owners through nominees will be applied to the applicable

positions held by such nominees as of the Record Date, as evidenced by the record and depository listings; provided, however, that any principal amounts may be adjusted by the Balloting and Tabulation Agent to reflect the amount of the claim actually voted, including any prepetition interest.  Votes submitted by a nominee will not be counted in excess of the amount of Claims held by such nominee as of the Voting Record Date. If conflicting votes or "over-votes" are submitted by a nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Owner Ballot, the Balloting and Tabulation Agent will use reasonable efforts to reconcile discrepancies with the nominees. If over-votes on a Master Ballot or pre-validated Beneficial Owner Ballot are not reconciled, the Balloting and Tabulation Agent shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot or pre-validated Beneficial Owner Ballot that contained the over-vote, but only to the extent of the nominee's Voting Record Date position.

The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim.  Only Holders of Claims in the Voting Class shall be entitled to vote with regard to such Claims.

Ballots received after the Voting Deadline will not be counted, unless allowed by the Debtor in its sole discretion.  The method of delivery of the Ballots to be sent to the Balloting and Tabulation Agent is at the election and risk of each Holder of a Claim.  A Ballot will be deemed delivered only when the Balloting and Tabulation Agent actually receives the executed Ballot.  Delivery of a Ballot to the Balloting and Tabulation Agent by facsimile or other means of electronic submission will not be accepted.  No Ballot should be sent to the Company, the Company's agents (other than the Balloting and Tabulation Agent), or the Company's financial or legal advisors.  The Company expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).  The Bankruptcy Code requires the Company to disseminate, or cause its agents to disseminate through its agents, additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Plan Confirmation.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event a designation of lack of good faith with respect to a Claim is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

Neither the Company nor any other Person will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

The Balloting and Tabulation Agent will file the Voting Report with the Bankruptcy Court.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures (original or otherwise) or lacking necessary information, received via electronic transmission or damaged. The Balloting and Tabulation

Agent will be authorized to attempt to cure any deficiencies contained in Irregular Ballots received prior to the Voting Deadline to correct such deficiencies. The Voting Report also shall indicate the Company's intentions with regard to such Irregular Ballots.

## VII.    CONFIRMATION PROCEDURES

### A.    COMBINED DISCLOSURE STATEMENT AND CONFIRMATION HEARING

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. When the Debtor file the Chapter 11 Case, they will request by separate first day motion that the Bankruptcy Court schedule a Combined Hearing to consider the Debtor's solicitation procedures, the adequacy of the Disclosure Statement, and confirmation of the Plan. Notice of the Combined Hearing will be provided to holders of Claims and Interests or their representatives (the "***Combined Hearing Notice***") as set forth in the scheduling order of the Bankruptcy Court. Objections to the adequacy of this Disclosure Statement and confirmation of the Plan must be filed with the Bankruptcy Court by the date designated in the Combined Hearing Notice and will be governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Company or any successors thereto under the Plan.

- The Company has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Company will pay quarterly fees no later than the last day of the calendar month following the calendar quarter for which the fee is owed in the Company's Chapter 11 Case for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the Chapter 11 Case are closed.

### 1.    Best Interests of Creditors Test/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (a) accept the plan of reorganization or (b) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain under the plan of reorganization if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date. This requirement is referred to as the "best interests" test. To make these findings, a bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the assets of such debtor's estate were liquidated pursuant to chapter 7 of the Bankruptcy Code; (b) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

To demonstrate compliance with the "best interests" test, the Debtor prepared the Liquidation Analysis with the assistance of their advisors, attached hereto as **Exhibit D**.

The Liquidation Analysis estimates the range of Cash proceeds that may be generated from a hypothetical liquidation of two sets of assets that are separately but concurrently administered in Panamanian insolvency or liquidation proceedings and a parallel chapter 7 liquidation or chapter 15 recognition proceedings in the United States (collectively, the "*Liquidation Proceeding*").  The amount of Cash available from such a hypothetical Liquidation Proceeding would be equivalent to the net of Cash held by the Debtor at the time of commencement of the hypothetical liquidation plus the proceeds from the disposition of the Debtor's non-cash assets minus the costs and expenses of such liquidation.  Recoveries to Impaired Classes of Claims and Interests in the Debtor under such hypothetical Liquidation Proceeding are compared to recoveries under the Plan.

The Liquidation Analysis demonstrates that, in every instance, the amount that each Creditor in an Impaired Class would receive under the Plan is at least equal to, and in most instances exceeds, the amount that such Creditor would receive in a hypothetical Liquidation Proceeding.  Specifically, each Holder of Prepetition Senior Secured Notes Claims, the only Impaired Class of Claims and Interests in this chapter 11 proceeding, receives property with a face value equal to 95-100%[3] of its Claims under the Plan, compared to a recovery that ranges from 21.9% to 34% in a hypothetical Liquidation Proceeding.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL PANAMANIAN LIQUIDATION PROCEEDING AND EITHER PARALLEL CHAPTER 7 LIQUIDATION OR CHAPTER 15 RECOGNITION PROCEEDINGS IN THE UNITED STATES.  UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTOR'S MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR A CHAPTER 7 TRUSTEE.  IN ADDITION, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE.  THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN

---

[3]  The Holders of the Prepetition Senior Secured Notes Claims shall receive debt securities as consideration for the amendment of such claims pursuant to the Plan.  The actual value of such debt securities may be less than their respective face values.

DETERMINING THE LIQUIDATION VALUES OF THE DEBTOR'S ASSETS WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED WERE THE DEBTOR TO UNDERGO AN ACTUAL LIQUIDATION.

NEITHER THE DEBTOR NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE ACTUAL AMOUNT OF CLAIMS AGAINST THE DEBTOR'S ESTATE COULD VARY SIGNIFICANTLY FROM THE ESTIMATES SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED. ACCORDINGLY, THE ACTUAL LIQUIDATION VALUE OF THE DEBTOR IS SPECULATIVE IN NATURE AND COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

The Liquidation Analysis is subject to the qualifications and assumptions described above and in the schedules attached to **Exhibit D**.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization, unless the plan of reorganization contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Company analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Company analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The Company believes that with the restructured capital structure contemplated by the Plan, the Reorganized Debtor will have sufficient cash flow and loan availability to pay and service their debt obligations and to fund operations. This is demonstrated by the detailed Financial Projections ("***Projections***"), attached as **Exhibit C**.

The Projections are forward looking and are presented in this Disclosure Statement subject to the limitations set forth at pages d-f of this Disclosure Statement. Without limiting the generality of the foregoing, the Projections are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, Confirmation and consummation of the Plan in accordance with its terms; realization of the Debtor's operating strategy for the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, including environmental legislation or regulations or generally accepted accounting principles; general business and economic conditions; competition; adequate financing; absence of material contingent or unliquidated litigation, indemnity or other claims; and other matters many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives,

they are subject to change. The Projections were not prepared in accordance with the standards for projections promulgated by the American Institute of Certified Public Accountants, IFRS, or any similar foreign body, or with a view to compliance with published guidelines of the SEC, or any foreign regulatory body, regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtor's independent public accountants. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Accordingly, the Projections are only estimates that are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtor or any other Person that the results set forth in the Projections will be achieved. Neither the Debtor's independent public accountants, nor any other independent accountants or financial advisors, have compiled, examined or performed any procedures with respect to the Projections nor have they expressed any opinion or any other form of assurance on such information or its achievability. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein should not be regarded as a representation or warranty by the Debtor, the Reorganized Debtor, their advisors, or any other Person that the Projections can or will be achieved.

The Projections indicate that the Reorganized Debtor should have sufficient cash flow to service and pay its debt obligations and to fund its operations. Under the Plan, the Reorganized Debtor will emerge from chapter 11 with approximately $260.3 million of net debt ("***Net Debt***"), including debt issued pursuant to the New Notes. According to the Projections, by 2017, the Reorganized Debtor will reduce Net Debt to $0.

The Reorganized Debtor will emerge from chapter 11 with approximately $1 million of cash on hand. Additionally, at any time through the Projection period, the Reorganized Debtor will have in excess of $350,000 of cash on hand generated from the Reorganized Debtor's business operations, resulting in a minimum liquidity position throughout the Projection period in excess of that required by the New Notes. The cash flows in the Projections include necessary capital expenditures for continued operation of the Reorganized Debtor's business.

Based on the Projections, the Reorganized Debtor is projected to meet all financial covenants in the New Notes. Accordingly, the Company believes that the Plan satisfies the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.

### 3.    Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan of reorganization, accept the plan. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of

such claim or equity interest; or (b) cures any default and reinstates the original terms of such obligation.

Section 1126(c) of the Bankruptcy Code defines "acceptance of a plan by a class of impaired claims" as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those claims that actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Debtor shall tabulate all votes on the Plan for purposes of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code. If the Impaired Class does not accept the Plan, the Debtor may modify the Plan to appropriately address the rights of such Holder's Allowed Claims.

The Claims in Classes 1, 2, 4 and 5 are Unimpaired under the Plan, and, as a result, the Holders of such Claims and Interests are deemed to have accepted the Plan.

The Claims in Class 3 are Impaired under the Plan and entitled to vote. The Voting Class will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4.    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 5.    Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.

### VIII.    PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

A.    **RISK FACTORS RELATED TO CONFIRMATION, EFFECTIVENESS, AND IMPLEMENTATION**

1.    **Parties in Interest May Object to the Company's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtor believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **Failure to Satisfy Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtor may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3.    **The Company May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (b) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

The Liquidation Analysis for the Debtor is attached as **Exhibit D** to this Disclosure Statement.  Parties in interest in the Chapter 11 Case may oppose Confirmation of the Plan by alleging that the liquidation value of one or more of the Debtor is higher than reflected in the Liquidation Analysis and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan.  At the Confirmation Hearing, the Bankruptcy Court may hear

evidence regarding the views of the Debtor and opposing parties, if any, with respect to valuation of the Debtor.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan (see Section V.I. above).  There is a risk that some or all of the conditions to Confirmation may not be satisfied.

If the Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims and Interests would receive with respect to their Allowed Claims or Interests.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.        A Party in Interest May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, a party in interest may object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

### 5.        Risk of Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.  The occurrence of the Effective Date is subject to the conditions precedent listed in the Plan (see Section V.I.3. above).  Certain of the conditions precedent to the Effective Date described in Section V.I.3. above are waivable by the Debtor with the consent of the Steering Group, which consent shall not be unreasonably withheld.  Such conditions precedent may not occur or be waived and, as a result, the Plan may not become effective and the Restructuring may not be consummated.

### 6.        Contingencies Not to Affect Votes of Impaired Class to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

7.    **Debtor's Exclusive Period Challenges**

Under the Bankruptcy Code, the Debtor has an exclusive period of 120 days to file a plan of reorganization and an additional 60 days to obtain confirmation of such a plan. This period may be extended, on request by the Debtor, or it may be shortened, on request by a party in interest. The Debtor intends to file the Plan immediately upon commencement of the Chapter 11 Case and, thus, will have 180 days to obtain Confirmation of the Plan. However, a party in interest may argue that the exclusive periods should be shortened. Alternatively, a party in interest may argue that the exclusive periods should be terminated to enable them to file a competing plan. The Debtor intends vigorously to oppose any such arguments.

B.    **RISK FACTORS RELATED TO THE BUSINESS OF THE REORGANIZED DEBTOR AND THE DEBTOR'S INDUSTRY**

1.    **As a result of the ongoing global financial crisis and its effect on the Debtor's business, the Debtor has insufficient liquidity to fund its working capital and to meet its debt service obligations and there is substantial doubt about its ability to continue as a going concern.**

As a result of the ongoing global financial crisis and its effect on sales of units in Trump Ocean Club and the Debtor's ability to collect on receivables generated by such sales, the Debtor has insufficient liquidity to fund its working capital and to meet its debt service obligations.

The Debtor's future is dependent on its ability to restructure its financial indebtedness by means of this Plan and the success of its other restructuring and cost reduction measures. If the Debtor fails to restructure its financial indebtedness or if any of the other measures are not successful for any reason, the Debtor may not be able to continue as a going concern and could potentially be forced to undergo bankruptcy or insolvency proceedings.

2.    **Continued adverse developments in the credit markets and the risk of further credit market deterioration have adversely affected and may continue to adversely affect the Debtor's business, financial condition and results of operations.**

The Debtor's revenues are primarily dependent on the overall volume of activity and pricing in the real estate market. On-going disruptions in the global credit markets since 2008 have reduced the availability and significantly increased the cost of most sources of financing for the Debtor's target customers. In some cases, these financing sources have been eliminated.

Such disruptions in the credit markets have adversely affected and may continue to adversely affect the Debtor's business of selling units in Trump Ocean Club to prospective owners and the Debtor's ability to collect on receivables generated by such sales. If the Debtor's prospective clients are unable to procure credit on favorable terms or at all, there will be fewer completed acquisitions of property which would adversely affect the Debtor's business, results of operation and financial condition and the Debtor's ability to generate collateral to support the New Notes offered hereby.

91

The Debtor believes that the scope of recent disruptions in the credit markets since 2008 has been unprecedented and that many market participants did not fully anticipate them. As a result, the magnitude and duration of on-going credit market dislocations and liquidity disruptions are impossible to predict. This limits the Debtor's ability to plan for future developments and the Debtor believes that it limits the ability of other participants, including the Debtor's target customers, to do so as well. This uncertainty may lead market participants to plan and act more conservatively than in recent history, which may amplify decreases in the availability of financing for companies in the real estate market as well as adversely affect sales of units in Trump Ocean Club and the Debtor's ability to collect on receivables generated by such sales.

> **3.      The Debtor's business has been, and may continue to be, harmed by the global economic slowdown and the downturn in the real estate market.**

Continued economic weakness in the economies of the Debtor's target customer markets, declining employment levels in the Debtor's target customer markets and a reduced demand for real estate, among other factors, have reduced the Debtor's sales of real estate products and, as a result, the Debtor's overall revenue. These economic conditions have resulted in and could continue to result in a general decline in real estate market activity, and could potentially lead to a further decline in the value of real estate in Panama, which in turn could further reduce the Debtor's revenue from real estate sales and the Debtor's ability to collect on receivables generated by such sales. In addition, these conditions have led to, and may continue to further cause, a decline in sales prices as well as a decline in funds invested in real estate and related assets generally. The Debtor is unable to predict the duration and severity of the current disruption in financial and real estate markets, and is unable to predict the extent to which such disruptions could affect Panama. The Debtor's revenues and profitability depends on the overall demand for the Debtor's products from the Debtor's customers. While it is possible that an increase in distressed sales and resulting decrease in asset prices might eventually translate to greater market activity, the current overall reduction in sales transaction volume continues to materially and adversely impact the Debtor's business.

> **4.      Negative news regarding Trump Ocean Club and its credit relationships may deter future customers and lenders.**

The Debtor derives the majority of its operating cash flow from the sale of units in Trump Ocean Club, and potential buyers may be deterred from making purchases by negative news regarding the Debtor's relationships with the Debtor's major creditors, namely Noteholders of the Prepetition Senior Secured Notes. In addition, the Debtor needs continued access to credit from local financial institutions, suppliers, contractors and service providers, and negative news about Trump Ocean Club in its negotiations with international lenders may discourage such local financial institutions, suppliers, contractors and service providers from making available short- or long-term payment facilities.

An increasing proportion of the Debtor's customers may fail to fulfil their contractual payment obligations to Trump Ocean Club, which could result in increased rates of default on receivables.

92

The liquidity of the markets for real estate products in vacation destinations for use as second homes and rental properties has been significantly impaired as a result of the on-going global economic crisis, and property values may be subject to considerable declines. In certain cases, to the extent that the market value of a given Trump Ocean Club property declines to such an extent that it is lower than the amount due to be paid by the purchaser to Trump Ocean Club for such a property, it is possible that the Debtor will not be able to collect on the outstanding amounts due for such property, as the borrower's incentive to continue to make payments on the property may be significantly diminished.

5.      **Projections included in this Disclosure Statement may turn out to be inaccurate.**

The financial projections included in this Disclosure Statement should be considered speculative and are qualified in their entirety by the assumptions, information and risks disclosed in this Disclosure Statement.   The Debtor's financial projections are based on numerous assumptions about future events.   It should be emphasized that actual future conditions can be expected to vary substantially from the assumptions used in the Debtor's financial model, in terms both of amount and timing.   Variations in macroeconomic conditions and other matters that may affect the Debtor's financial projections are inherently unpredictable, beyond the Debtor's control and may not be foreseen at this time.   Accordingly, actual cash flows and balance sheet items may vary substantially from the Debtor's financial projections.   No form of assurance can be given with respect to the Debtor's financial projections, including whether or when they will be realized.   As a result, you should not unduly rely upon the Debtor's financial projections in making an investment decision with respect to the New Notes.   You should make your own assessment of the Debtor's assumptions and financial projections.   You are advised to consult with your legal, tax and business advisors concerning the validity and reasonableness of the factual, accounting and tax assumptions.   Except as may be required by law, the Debtor  does not intend to update or otherwise revise the Debtor's financial model or the Debtor's financial projections to reflect circumstances existing after the date of this Disclosure Statement or to reflect the occurrence of future events, even in the event the Debtor's assumptions or the estimates underlying the Debtor's assumptions are shown to be in error.

6.      **The Debtor is indirectly controlled by a small number of principal stockholders who may have diverging business interests.**

The Debtor is a wholly-owned subsidiary of Ocean, whose ownership is indirectly concentrated in a small group of stockholders that have a controlling interest.   Ocean and its controlling stockholders control the Debtor's management, business, affairs and policies.   These controlling stockholders may have diverging interests that result in the Debtor's taking, and refraining from taking, major business decisions.   The Debtor's operating performance depends largely on the interest and ability of the Debtor's controlling stockholders to reach agreement on major business decisions.   The disagreement of a controlling stockholder on a major business decision may have a material adverse effect on the Debtor's ability to meet the Debtor's own obligations.

7.      **A decrease in the perceived prestige of the Trump brand name or any of the Debtor's strategic partners or, more importantly, the quality of**

93

**their work could adversely impact the Debtor's ability to market and sell the Debtor's products.**

A key element of the Debtor's marketing and sales strategy has been to market the Debtor's project under the Trump brand name and work with internationally recognized strategic partners to design, construct and/or operate many of the Debtor's facilities, in order to achieve worldwide exposure for Trump Ocean Club and create greater appeal for the Debtor's product offerings. Negative publicity concerning the Trump name, any of the Debtor's strategic partners or, more importantly, the quality of their work as hotel operator and building administrator could adversely impact the Debtor's ability to market and sell the Debtor's products.

8. **The Debtor may be unable to attract and retain sales executives or brokerage firms for the Debtor's real estate products.**

The Debtor must attract and retain productive sales executives or brokerage firms in order to sell the Debtor's real estate products. The Debtor is currently dependent on the Debtor's sales and marketing consultant, Cervera Real Estate ("*Cervera*"), to expand and improve the efficiency and production of the Debtor's network of sales executives and brokerage firms. The Debtor cannot provide any assurance that the sales initiatives of Cervera will succeed in attracting and retaining productive sales executives or brokerage firms. The Debtor also cannot provide assurances that it will be able to find another sales and marketing consultant on favorable terms if Cervera does not perform its sales obligations. Sales of the Debtor's real estate products, the Debtor's cash flows and the Debtor's financial condition could be affected adversely if Cervera is unsuccessful in attracting and retaining productive sales executives or brokerage firms.

9. **The Debtor's operations are subject to extensive environmental and safety regulations, and the Debtor's inability to comply with existing environmental and safety regulations or requirements or changes in these regulations or requirements may have an adverse effect on the Debtor's financial position and cash flows.**

The Debtor is subject to extensive environmental, health and safety laws and regulations in Panama, which, among other things, require the Debtor to perform environmental impact studies, to obtain regulatory licenses, permits and other approvals and to comply with the requirements of such licenses, permits and regulations. Failure to comply with applicable environmental standards, stricter new laws and regulations, or stricter interpretation of existing laws or regulations, may impose new liabilities on the Debtor, increase the Debtor's costs of compliance or result in the revocation of the Debtor's licenses and permits, any or all of which could result in the need for additional investments or may adversely impact the Debtor's ability to operate and/or continue to market and sell units in the Trump Ocean Club as currently contemplated. This may have an adverse effect on the Debtor's business, financial condition and cash flows in the future.

10. **Competition from other Panamanian developers could slow or decrease the Debtor's sales and cash flows.**

94

The real estate industry in Panama is highly competitive and has experienced high growth rates over the last several years, resulting in an abundant supply of real estate products. The Debtor's ability to maintain current sales levels depends to some extent on competitive conditions, including price competition and the volume of product offerings in the market. Competition is likely to continue or intensify, and may lead to the cancellation or substantial modification of current real estate projects in Panama. The cancellation of any competing projects could have an adverse effect on the Debtor's ability to market the Debtor's products as exclusive and secure investments in Panama. Accordingly, competitive conditions may result in a decrease in the Debtor's sales and cash flows.

### C.    RISK FACTORS RELATED TO PANAMA

**1.    An economic downturn in Panama and further downturns in the U.S. economy could adversely affect the Debtor's sales and financial condition.**

The Debtor's only operations are in Panama. While Panama has continued to register positive GDP growth each year since the onset of the global economic crisis, and estimates positive GDP growth in 2012, any significant economic downturn in Panama could reduce nationwide real estate values, and in turn reduce the aggregate value of the Debtor's real estate sales. In addition, the appeal of becoming an owner of one of the Debtor's real estate units may diminish if potential purchasers do not regard Panama as an attractive primary home, second home or retirement destination.

Since 1904, Panama has used the U.S. dollar as legal tender and its sole paper currency, using the Balboa only as coinage and as a unit of account with an exchange rate set. Panama's monetary system is therefore linked to the United States and limited in its ability to conduct a stimulative monetary policy should Panama experience an economic downturn. Additionally, as a result of such linkages, further downturns in the U.S. economy could adversely affect the Panamanian economy. In addition, the Debtor also cannot assure you that the appreciation or depreciation of the U.S. dollar against other currencies or the existence of sustained higher levels of inflation in the U.S. economy (and the resultant effect on the value of the U.S. dollar) or increases or decreases in interest rates in the U.S. will not adversely affect the Panamanian monetary system or, indirectly, the Debtor.

**2.    A delay in the Panama Canal's expansion may adversely affect the economy and, as a result, the Debtor's sales and financial condition.**

On October 22, 2006, the Panamanian Government authorized an expansion of the Panama Canal to accommodate vessels that are too large to use the existing Canal. Expansion of the Canal is expected to preserve the Canal's competitive position as a key route for global shipping, thus enabling the Panama Canal Authority to sustain revenue growth and remain a significant source of income for the Panamanian Government. A delay in the implementation of, or a failure to implement, the expansion project, could result in lower levels of trade in Panama and could adversely affect the economy. Such delay, or failure, could adversely affect the market conditions that determine the prices for, and the returns on, Panamanian real estate investments, and could adversely affect the Debtor's ability to repay the New Notes.

3.    **Political events in Panama could adversely affect the Debtor's sales and financial condition.**

Panama has experienced different types of government and governmental policies. Prior to 1968, Panama generally had a constitutional democracy and a growing free market-based economy. In 1968, the military secured control over the government and military rule continued until 1989. A political crisis erupted in 1987 among the then ruling military dictator, General Manuel Antonio Noriega, and civilian organizations, political parties and the business community, all of which had been agitating for a return to democratic rule. In December 1989, General Noriega was deposed, largely as a result of U.S. military intervention, and Guillermo Endara, who had been elected by a majority of the Panamanian electorate in a popular vote earlier in the year, was sworn in as President.

Since the end of 1989, the Panamanian Government has maintained political and economic stability under successive democratically elected governments, and favorable relations with the U.S. have been fully restored. Future political events which could destabilize the Panamanian government could reduce the appeal of owning real estate in Panama and adversely affect the Debtor's financial condition and sales.

4.    **The Debtor may be adversely affected by governmental policies.**

The Panamanian Government has exercised, and continues to exercise, significant influence over the Panamanian economy. Through various statutory and other governmental initiatives, including enforcement of a rigid labor code, electricity subsidies related to the rise in fuel prices, tariff policies, regulatory policy, taxation and price controls, the Panamanian Government has had a significant impact on the economy. Accordingly, the Panamanian Government's actions regarding the economy, regulating certain industries and setting land development policies could have significant adverse effects on private sector entities in general and on the Debtor in particular, as well as on market conditions affecting the Debtor's remaining expenses and the prices for, and returns on, Panamanian real estate investments. It is not possible to determine what effect such plans or actions or the implementation thereof could have on the Panamanian economy, Panamanian real estate investments in general or on the Debtor's financial condition, sales and cash flows. Any of these or other events could reduce the appeal of owning real estate in Panama and, in turn, reduce the appeal of becoming an owner of one of the Debtor's real estate products, thereby adversely impacting the Debtor's sales, as well as the Debtor's ability to meet its obligations under the New Notes.

5.    **Compliance with applicable laws and regulations related to property developments such as Trump Ocean Club may subject the Debtor to additional costs and delays which could reduce the Debtor's profits or business prospects.**

The Debtor remains subject to a variety of Panamanian statutes, ordinances, rules, and regulations governing developments such as Trump Ocean Club, any of which may subject the Debtor to additional costs in terms of operations and post-construction sales. In particular, the Debtor may be required to obtain the approval of various governmental authorities regulating matters such as permitted land uses and the installation of utility services such as gas, electric,

water and waste disposal.  The Debtor also may be subject to additional costs or delays, building permit allocation ordinances, restrictions on the availability of utility services or similar governmental regulations that could be imposed in the future.  Any of these laws, ordinances, or restrictions could cause the Debtor's operating costs to increase, which would reduce the Debtor's profits and the ability to grow the Debtor's business.

6.      **Adverse political and economic conditions in other Latin American countries and world markets may adversely affect the Debtor.**

From time to time, the economies of other Latin American countries, particularly those in Central America, Brazil, Mexico and Argentina, have suffered from high rates of inflation, currency devaluation and/or other developments that have had an adverse effect not only on their economies but also on the economies of other countries in the region.  Although all of the Debtor's activities are concentrated in Panama, since most of the Debtor's buyers are located in the United States, Canada, Colombia, Venezuela and Panama, the Debtor may still be affected by adverse developments in other Latin American and world economies through adverse effects on the Panamanian economy in general, the market conditions affecting the Debtor's expenses, the prices for, and returns on, Panamanian real estate investments, or through adverse effects on the Debtor's customers, on the Debtor or on the trading values of the New Notes.

7.      **Lack of sufficient air service to Panama City, Panama could affect adversely the Debtor's financial position and sales.**

The majority of the Debtor's property owners and prospective customers travel to Panama by air.  Although the Debtor believes that the current level of air service to Panama City, Panama is more than adequate, any interruption or reduction of air service would prevent many prospective customers from visiting the project, reduce the Debtor's sales, and prevent many property owners from easily accessing their property.  These conditions could adversely affect the Debtor's competitive position, as compared to similar projects in Central America and the Caribbean enjoying adequate air service.  An unfavorable competitive position could adversely affect the Debtor's financial position and sales.

8.      **If the Panamanian Government were to impose exchange controls or other restrictions, the Debtor's ability to meet the Debtor's obligations under the New Notes could be affected.**

Currently there are no exchange controls or other restrictions imposed by Panamanian law on payments in U.S. dollars by the Debtor.  In the event that the Panamanian Government imposed foreign exchange or payment restrictions preventing remittances from Panama, the Debtor may be unable to make interest and principal payments to you with respect to the New Notes and your recourse would be limited to the Debtor's assets and operations in Panama.

D.      **RISK FACTORS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS**

1.      **Financial Information Is Based on the Company's Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

97

The financial information contained in this Disclosure Statement has not been audited unless otherwise stated. In preparing this Disclosure Statement, the Company relied on financial data derived from its books and records that was available at the time of such preparation. Although the Company has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Company believes that such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

> **2.      Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtor may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtor, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtor, including, without limitation, the Company's ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Company's ability to maintain market strength and receive vendor support.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees.   While the Company believes that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

> **E.      RISK FACTORS RELATED TO THE NEW NOTES**

> **1.      The New Notes have a later maturity than the Prepetition Senior Secured Notes and this may effectively increase the risk that the Debtor will be unable to repay or refinance the New Notes when they mature.**

Noteholders of Prepetition Senior Secured Notes are being offered New Notes with a later maturity than the Prepetition Senior Secured Notes they presently hold. Noteholders will therefore be exposed to the risk of non-payment on the New Notes they hold for a longer period of time than under the Prepetition Senior Secured Notes.

2. **The Debtor cannot assure you that an active trading market will develop for the New Notes.**

The New Notes are a new issue of notes. There is no active public trading market for the New Notes. While the Debtor intends to apply for listing of the New Notes on the Panama Stock Exchange, the Debtor cannot assure you that an active trading market will develop for the New Notes, that you will be able to sell the New Notes, or that, even if you can sell the New Notes, you will be able to sell them at an acceptable price. The trading price of the New Notes could be affected by many factors, including the number of holders of the New Notes, the overall market for similar New Notes, the Debtor's financial performance and prospects, and prospects for companies in the Debtor's industry generally.

3. **The consummation of the Plan may be delayed or may not occur at all.**

The Debtor is not obligated to complete the Plan unless and until all conditions to the Plan have been met. In addition, the Debtor may extend the Plan at any time and from time to time at the Debtor's sole discretion. Accordingly, Noteholders participating in the Plan may have to wait longer than expected to receive their New Notes if the Plan is consummated or to have their Prepetition Senior Secured Notes returned to them if the Plan is not consummated. From the time such Prepetition Senior Secured Notes are tendered into the Plan until they are validly withdrawn or the termination of the Plan, Noteholders of Prepetition Senior Secured Notes will not be able to transfer their Prepetition Senior Secured Notes.

4. **You should consider the U.S. federal income tax consequences of owning New Notes.**

Holders of Prepetition Senior Secured Notes Claims should carefully review Sections IX and X hereof to determine how the tax implications of the Plan may affect the Reorganized Debtor and ownership of the New Notes.

5. **Investors in the Debtor's New Notes may not receive the same level and type of disclosure that they would receive from public issuers in the U.S.**

The Debtor will be required to submit to the CNV information that must be made available to all Noteholders of the New Notes, specifically, audited financial statements on an annual basis accompanied by the report of independent accountants and an annual report of the Debtor's activities and developments, and unaudited financial statements on a quarterly basis along with a quarterly report of the Debtor's activities and developments. However, Panama's Securities laws governing publicly-traded debt notes impose disclosure requirements that differ from those in the U.S. in certain important respects. As a result, investors in the New Notes may not obtain information equivalent to that which is generally available from issuers subject to U.S. Securities laws.

6. **The terms of the New Notes restrict the Debtor's financial and operating flexibility.**

The New Indenture and the terms of the New Notes contain various covenants intended to benefit the interests of the Noteholders, including limitations on the Debtor's ability to incur additional indebtedness, issue certain equity interests, issue or sell capital stock of any future subsidiaries, create liens on assets, or enter into certain transactions with affiliates or related persons. These restrictive covenants could limit the Debtor's ability to pursue the Debtor's plan for the development of Trump Ocean Club, restrict the Debtor's flexibility in planning for, or reacting to, changes in the Debtor's business and industry and increase the Debtor's vulnerability to general adverse economic and industry conditions. See "Description of the New Notes" for more information on the limitations provided for in the New Indenture and the terms of the New Notes.

7.    **You may be subject to withholding for Panamanian capital gains taxes upon a sale of the New Notes, for which the Debtor will not indemnify you.**

On June 19, 2006, Panama passed Law 18 (the "*2006 Tax Law*"), which adopted a number of changes to Panama's tax law. Under the 2006 Tax Law, if the New Notes are not sold through an exchange or another organized market, (i) the seller will be subject to income tax in Panama on capital gains on the sale of the New Notes at a fixed rate of ten percent (10%) and (ii) the buyer would be required to withhold from the seller and remit to the Panamanian fiscal authorities an amount equal to five percent (5%) of the aggregate proceeds of the sale by withholding from the capital gains tax of the seller. The seller may, at its option, consider the amount so withheld by the buyer as payment in full of the capital gains tax, or in the event of overpayment, claim a tax credit in respect of the excess amount. If the amount withheld by the buyer is greater than the income tax regarding capital gain, the seller will be entitled to receive the amount in excess as a tax credit. The Debtor will not indemnify you if you are subject to withholding for Panamanian capital gains taxes under the 2006 Tax Law upon a sale of the New Notes.

8.    **The proceeds of a foreclosure sale of the collateral may not be sufficient to pay all or any portion of the New Notes.**

The market value of the real estate collateral securing the New Notes is subject to fluctuations based on factors that include, among others, the value of real estate in Panama, the ability to sell the collateral in an orderly sale, general economic conditions, the availability of buyers and other similar factors. The amount to be received upon a sale of the collateral would depend on numerous factors, including but not limited to the actual market value of the collateral at the time of the sale as well as the timing and the manner of the sale. Because the collateral consists primarily of real property, portions of the collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the Debtor cannot assure you that the proceeds from any sale or liquidation of the collateral will be sufficient to pay all the Debtor's obligations under the New Notes.

Accordingly, there may not be sufficient collateral to pay all of the amounts due on the New Notes. Any claim for the difference between the amount, if any, realized by holders of the New Notes from the sale of the collateral securing the New Notes and the Debtor's obligations

under the New Notes will rank equally in right of payment with all of the Debtor's other unsecured, unsubordinated indebtedness and other obligations, including trade payables.

> **9.    Panamanian bankruptcy laws are not as developed as U.S. insolvency and bankruptcy laws and their application may be subject to significant discretion of Panamanian courts.**

Because the Debtor conducts substantially all of its business in Panama, Panamanian courts would have jurisdiction in any insolvency proceeding involving the Debtor and would apply the laws of the Republic of Panama in any such insolvency proceeding. Panamanian bankruptcy law does not provide for reorganization similar to that provided under Chapter 11 of the U.S. Bankruptcy Code. Rather, Panamanian bankruptcies are purely liquidation proceedings aimed at the liquidation and distribution of a debtor's assets to its creditors.

Under Panamanian law, in the event the Debtor fails to duly pay any of the Debtor's financial obligations arising in commerce, an affected creditor could request that a Panamanian bankruptcy court declare the Debtor's bankruptcy. An affected creditor will not be required to prove the Debtor's insolvency, as is required in other jurisdictions. The Panamanian bankruptcy court will determine the effective bankruptcy date, which could be set retroactively up to four (4) years in the past and is typically set on the date the payments were suspended. Such date may be modified as the Panamanian bankruptcy judge deems just in the event the Panamanian bankruptcy judge discovers additional information. Any payments made or obligations incurred by the Debtor within 30 days prior to and after the effective date of the Panamanian bankruptcy may be declared null and void by the Panamanian bankruptcy court, including, but not limited to, any gratuitous act or contract as well as the payment of unenforceable and/or overdue debts. Upon declaration of bankruptcy or liquidation, all of the Debtor's existing contractual obligations and liabilities will be immediately deemed enforceable and collectable.

## F.    DISCLOSURE STATEMENT DISCLAIMER

### 1.    Disclosure Statement Not Yet Approved

The Debtor has not commenced bankruptcy cases under chapter 11 of the bankruptcy code at this time. Because no bankruptcy cases have been commenced, this Disclosure Statement has not been approved by any bankruptcy court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code. Nonetheless, if a chapter 11 case is subsequently commenced, the Debtor expect to promptly seek an order of the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the bankruptcy code and determining that the solicitation of votes on the Plan by means of this Disclosure Statement was in compliance with section 1126(b) of the Bankruptcy Code.

### 2.    Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes other than to determine how to vote on the Plan.

3.    **No Legal, Business, or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his, her or its own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

4.    **No Admissions Made**

The information and statements contained in this Disclosure Statement shall neither (a) constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations or (b) constitute or be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtor, the Reorganized Debtor, or any other Person.

5.    **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or the Plan.  The Debtor and the Reorganized Debtor, as the case may be, may seek to investigate, file and prosecute litigation claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such litigation claims or Objections to Claims.

6.    **Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Recover Transfers and Assets**

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Company or the Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Cause of Action of the Company or its Estate are specifically or generally identified herein.

7.    **Information Was Provided by the Company and Was Relied Upon by the Company's Professionals**

Counsel to and other Professionals retained by the Company have relied upon information provided by the Company in connection with the preparation of this Disclosure Statement.  Although counsel to and other Professionals retained by the Company have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

8.    **Potential Exists for Inaccuracies, and the Company Has No Duty to Update**

102

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and Holders of Claims and Interests Reviewing this Disclosure Statement should not infer at the time of such review that there has not been any change in the information set forth herein since the date hereof unless so specified. While the Company has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Company may subsequently update the information in this Disclosure Statement, the Company has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

This Disclosure Statement contains projected financial information regarding the Reorganized Debtor and certain other forward-looking statements, all of which are based on various estimates and assumptions. The Debtor's management prepared the projections with the assistance of their professionals. The Debtor's management did not prepare the projections in accordance with GAAP, IFRS, or to comply with the rules and regulations of the SEC or any foreign regulatory authority.

The projections and forward looking statements herein are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein. *See* Section VIII – "Plan-related Risk Factors and Alternatives to Confirmation and Consummation of the Plan." Consequently, actual events, circumstances, effects, and results may vary significantly from those included in or contemplated by the projected financial information and other forward-looking statements contained herein which, therefore, are not necessarily indicative of the future financial condition or results of operations of the Reorganized Debtor and should not be regarded as representations by the Debtor, the Reorganized Debtor, their advisors, or any other persons that the projected financial condition or results can or will be achieved. Neither the Debtor's independent auditors nor any other independent accountants have compiled, examined, or performed any procedures with respect to the financial projections and the liquidation analysis contained herein, nor have they expressed any opinion or any other form of assurance as to such information or its achievability.

The projections set forth herein are published solely for purposes of this Disclosure Statement. The projections are qualified in their entirety by the description thereof contained in this Disclosure Statement. There can be no assurance that the assumptions underlying the financial projections will prove correct or that the Debtor's or Reorganized Debtor's actual results will not differ materially from the information contained within this Disclosure Statement. The Debtor and their professionals do not undertake any obligation, express or implied, to update or otherwise revise any projections or information disclosed herein to reflect any changes arising after the date hereof or to reflect future events, even if any assumptions contained herein are shown to be in error. Forward-looking statements are provided in this Disclosure Statement pursuant to the safe harbor established under the Private Securities Litigation Reform Act of 1995 and should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein, including the consummation and implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, commodity price fluctuations,

currency exchange rate fluctuations, maintenance of good employee relations, existing and future governmental regulations and actions of governmental bodies, natural disasters and unusual weather conditions, acts of terrorism or war, industry-specific risk factors and other market and competitive conditions.

Holders of Claims and Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtor, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Reorganized Debtor's control. The Debtor cautions that no representations can be made or are made as to the accuracy of the projections or to the Reorganized Debtor's ability to achieve the projected results.

Some assumptions inevitably will be incorrect; moreover, events and circumstances occurring subsequent to the date on which the Debtor prepared the projections may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The projections may not be relied upon as a guaranty or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections and should consult with their own advisors.

In this Disclosure Statement, the Debtor rely on and refer to information and statistics regarding their industry. The Debtor obtained this market data from independent industry publications or other publicly available information. Although the Debtor believe that these sources are reliable, the Debtor has not independently verified and do not guarantee the accuracy and completeness of this information.

## 9. No Representations Outside this Disclosure Statement Are Authorized

No person is authorized by the Debtor in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation regarding this Disclosure Statement or the Plan other than as contained in this Disclosure Statement and the exhibits, appendices, and/or schedules attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by the Debtor.

## G. LIQUIDATION UNDER CHAPTER 7

If no plan can be Confirmed, the Company's Chapter 11 Case may be dismissed or converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Company for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Company's liquidation

analysis is set forth in Section VII – "Confirmation Procedures" and the Liquidation Analysis attached hereto as **Exhibit D**.

## IX.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Internal Revenue Code of 1986, as amended and as in effect on the date of this Disclosure Statement (the "*Tax Code*"), and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.   All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.   There can be no assurance that the Internal Revenue Service (the "*IRS*") will not take a contrary view with respect to one or more of the issues discussed below, and no opinion of counsel or ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to "U.S. Holders" (as defined below) of Claims.   For purposes of this summary, a "U.S. Holder" is a beneficial owner of a Claim that, for U.S. federal income tax purposes, is: (a) an individual citizen or resident of the United States; (b) a corporation created or organized in or under the laws of the United States or any state thereof (or the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over the trust's administration and (II) one or more United States persons (within the meaning of the Tax Code) have the authority to control all substantial decisions of such trust.

This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular Holder. The tax treatment of a Holder may vary depending upon such Holder's particular situation.   The following discussion does not address state, local, foreign, or alternative minimum tax considerations that may be applicable to Holders.  This summary does not address tax considerations applicable to Holders that may be subject to special tax rules, such as financial institutions, insurance companies, regulated investment companies, real estate investment trusts, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an interest in the Debtor as a position in a "straddle" or as part of a "hedging," "conversion," or "integrated" transaction for U.S. federal income tax purposes, U.S. Holders that have a "functional currency" other than the U.S. dollar, persons that acquired an interest in the Debtor in connection with the performance of services or persons that are not U.S. Holders.

If a partnership (or any other entity or arrangement treated as a partnership for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Any such partner or partnership should consult its tax advisor as to its tax consequences.

EACH HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE:**

**PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE TAX CODE. SUCH DESCRIPTION IS INCLUDED HEREIN BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **CONSEQUENCES OF EXCHANGING PREPETITION SENIOR SECURED NOTES FOR NEW NOTES**

Generally, the modification of a debt instrument will be treated, for U.S. federal income tax purposes, as a "deemed" exchange of an old debt instrument for a new debt instrument if such modification is "significant" as determined for U.S. federal income tax purposes. Under the Treasury Regulations that govern the determination of whether a modification is a significant modification, among other things (i) a modification that changes the timing of payments is a significant modification if it results in the material deferral of scheduled payments outside of a safe harbor period, either through an extension of the final maturity date or through a deferral of payments due prior to maturity, (ii) a modification that adds, deletes or alters customary accounting or financial covenants is not a significant modification, although there is no authority addressing the types of covenants that are considered customary accounting or financial covenants for these purposes, and (iii) a modification that adds collateral for or a guarantee on recourse debt is a significant modification if it results in a change in "payment expectations," defined as (to the extent relevant here) a substantial enhancement of the obligor's capacity to make required payments in circumstances where that capacity was "primarily speculative" prior to the modification. For the purposes of clause (i) above, the safe harbor period begins on the original due date of the first scheduled payment that is deferred and extends for a period equal to the lesser of five (5) years or 50 percent of the original term of the instrument. In addition, other modifications of a debt instrument not falling within clause (i), (ii) or (iii) above could result in a deemed exchange if those modifications, based on all the facts and circumstances and taking into account such modifications collectively, effect an alteration of the legal rights and obligations

under such debt instruments in a manner that is "economically significant" within the meaning of the Treasury Regulations.

If the modification of the Prepetition Senior Secured Notes does not constitute a significant modification, the modification would not result in a deemed exchange, and therefore a Holder would not recognize gain or loss as a result of a deemed exchange.  In such case, the U.S. Holder's tax basis and holding period in the New Notes would be the same as with respect to the Prepetition Senior Secured Notes immediately prior to the modification.  If, however, the receipt of the New Notes is treated as a significant modification of the Prepetition Senior Secured Notes, a U.S. Holder that receives the New Notes will be treated as having exchanged its unmodified Prepetition Senior Secured Notes for the modified New Notes for U.S. federal income tax purposes (an "exchange").  In general, an exchange of Prepetition Senior Secured Notes for New Notes would be a taxable event unless the recapitalization provisions of the Code apply to prevent recognition of any gain or loss realized.  An exchange will be treated as a recapitalization if both the Prepetition Senior Secured Notes and the New Notes are treated as "securities" under the relevant provisions of the Code.  Although the application of the law to the Plan is not definitive, the Prepetition Senior Secured Notes and the New Notes should be treated as securities for U.S. federal income tax purposes and, as a result, an exchange should be treated as a recapitalization.  The IRS could disagree with the position that the Prepetition Senior Secured Notes and New Notes should be treated as securities for U.S. federal income tax purposes, in which case, a deemed exchange would be fully taxable as described below.

Under the rules applicable to recapitalizations, (a) U.S. Holders would not recognize any gain or loss on the exchange, except to the extent that a portion of the New Notes is allocated to accrued but unpaid interest on the Prepetition Senior Secured Notes (and the U.S. Holder will be required to recognize ordinary income equal to that amount), and (b) except for any portion of the New Notes which may be allocated to such interest, a U.S. Holder should have the same adjusted tax basis in the New Notes as in the Prepetition Senior Secured Notes immediately prior to the exchange, and the holding period in the New Notes should include the holding period in the Prepetition Senior Secured Notes.

If an exchange does not qualify as a recapitalization for U.S. federal income tax purposes, a U.S. Holder would recognize capital gain or loss in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the Prepetition Senior Secured Notes and the "issue price" (as defined below) of the New Notes received in exchange therefor.  However, any such gain attributable to accrued but previously unrecognized market discount, and any portion of the New Notes attributable to accrued but unpaid interest, would be subject to tax as ordinary income.  The U.S. Holder's holding period in the New Notes would begin the day after the effective date of the exchange and such U.S. Holder's basis in the New Notes would equal the issue price thereof.  U.S. Holders should consult their own tax advisors regarding the timing and character of any recognized gain on a taxable exchange.

In the event of an exchange, the New Notes (a) may be issued with original issue discount ("*OID*") if their "stated redemption price at maturity" as defined in the Code exceeds their "issue price" (as defined below), or, alternatively (b) may be issued with bond premium (which may be amortizable using a constant yield method to the extent provided in Section 171 of the Code) if the adjusted tax basis of the New Notes exceeds the stated redemption price at

107

maturity.  Except where it falls under a statutory de minimis rule, any OID would be required to be included in the income of the U.S. Holders of the New Notes on a constant yield to maturity basis over the term of the New Notes and in advance of cash payments attributable to such income regardless of such U.S. Holder's regular method of tax accounting.  The amount of OID a U.S. Holder is required to include would be reduced to the extent the U.S. Holder's adjusted tax basis in the New Notes exceeds their issue price.  If the New Notes are "publicly traded" for purposes of the original issue discount provisions of the Code, then their issue price would be equal to the fair market value of the New Notes as of the date the New Notes are deemed to be issued.  If the New Notes are not publicly traded but the Prepetition Senior Secured Notes are publicly traded, then the issue price of the New Notes would be equal to the fair market value of the Prepetition Senior Secured Notes on the date the New Notes are deemed to be issued.  If neither the New Notes or the Prepetition Senior Secured Notes is treated as publicly traded, then the issue price of the New Notes would be equal to their principal amount.

Some additional consequences of an exchange would be as follows:

- If a U.S. Holder has a tax basis in the New Notes that is more than the issue price of such notes but less than the stated redemption price at maturity of such notes, such holder has acquisition premium with respect to such excess, and the Holder will not include OID on the New Notes in income to the extent of the acquisition premium.

  If a U.S. Holder has a tax basis in the New Notes that is less than the issue price of such Notes, the holder will be subject to the market discount rules (unless the amount of the excess of the issue price over the basis is less than a specified *de minimis* amount, in which case market discount is considered to be zero, or to the extent that such market discount is converted to OID as discussed below).  If a note is acquired with market discount, a U.S. Holder may elect (but is not required) to take market discount into income over the remaining life of the note, either on a ratable or economic yield basis.  Such an election generally applies to all taxable debt instruments held by the holder on or after the first day of the first taxable year to which the election applies, and may be revoked only with the consent of the IRS.  Unless a U.S. holder makes such election, the U.S. holder will be required to treat any principal payment on, and any gain on the sale, exchange, retirement or other disposition (including a gift) of, the New Notes as ordinary income to the extent of any accrued market discount that has not previously been included in income.  In general, market discount on the New Notes will accrue ratably over the remaining term of the New Notes or, at the election of the U.S. holder, under a constant yield method.

- If the "issue price" of the New Notes is considered to be less than the "issue price" of the Prepetition Senior Secured Notes, market discount on the Prepetition Senior Secured Notes may be converted to OID to the extent of such differential.  Although market discount is not required to be taken into income until a sale or other disposition of the New Notes (unless the election referred to above has been made), OID would be required to be included in the income on a constant interest basis over the term of the New Notes and in advance of cash payments attributable to such income.  A U.S. Holder that has market discount on the Prepetition Senior Secured

Notes should consult with its own tax advisor regarding the consequences of the deemed exchange.

## B.    PAYMENTS OF INTEREST ON NEW NOTES

Interest on the New Notes will generally be taxable to a U.S. Holder as ordinary income at the time it is paid or accrued in accordance with the U.S. Holder's method of accounting for tax purposes. In addition to interest on the New Notes (which includes any Panamanian tax withheld from such interest payments), a U.S. Holder will be required to include in income any additional amounts paid to the U.S. Holder in respect of such Panamanian tax withholding. The U.S. Holder may be entitled to deduct or credit this tax, subject to certain limitations (including that the election to deduct or credit foreign taxes applies to all of the U.S. Holder's foreign taxes for a particular tax year). Interest income (including any additional amounts paid on account of Panamanian tax withholding) on a note generally will be considered foreign source income and, for purposes of the United States foreign tax credit, generally will be considered passive income. A U.S. Holder will generally be denied a foreign tax credit for foreign taxes imposed with respect to the New Notes where the U.S. Holder does not meet a minimum holding period requirement during which the U.S. Holder is not protected from risk of loss. The rules governing the foreign tax credit are complex. Holders are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

## C.    SALE, EXCHANGE OR OTHER TAXABLE DISPOSITION OF NEW NOTES

Upon the sale, exchange, retirement, redemption or taxable disposition of a New Note, a U.S. Holder will recognize gain or loss equal to the difference between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as such) and (ii) the U.S. Holder's adjusted tax basis in the New Note. The amount realized by the U.S. Holder will include the amount of any cash and the fair market value of any other property received for the New Note. A U.S. Holder's gain or loss will generally constitute capital gain or loss (subject to the market discount rules discussed above) and will be long-term capital gain or loss if the U.S. Holder has held such note for longer than one year. The deductibility of capital losses is subject to limitations. Long-term capital gain will be taxed based on the rates in effect for the year of sale.

## D.    MEDICARE TAX AND FOREIGN ASSET REPORTING

Certain U.S. Holders that are individuals, estates or trusts will be required to pay an additional 3.8% tax on the lesser of (1) the U.S. Holder's "net investment income" for the relevant taxable year and (2) the excess of the U.S. person's modified gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000 depending on the individual's circumstances). Net investment income will generally include interest income and net gains from the disposition of the New Notes, unless such interest income or net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). In addition, certain U.S. Holders who are individuals that hold certain foreign financial assets (which may include the New Notes) are required to report information relating to such assets,

subject to certain exceptions. U.S. Holders should consult their tax advisors regarding the effect, if any, of these rules on their ownership and disposition of the notes.

### E.    BACKUP WITHHOLDING AND INFORMATION REPORTING

Information reporting to the IRS generally will be required with respect to payments on the New Notes and proceeds of the sale of the New Notes that are made within the United States or through certain U.S.-related financial intermediaries unless the Holder is an exempt recipient. A U.S. Holder may be subject to backup withholding on those payments at the applicable withholding rate unless the U.S. Holder provides a correct Taxpayer Identification Number ("*TIN*") and certifies that the U.S. Holder is a U.S. person, the TIN is correct (or that the U.S. Holder is awaiting a TIN) and the U.S. Holder is either (a) exempt from backup withholding, (b) has not been informed by the IRS that backup withholding is required due to underreporting of interest and dividends from payments made to the U.S. Holder or (c) has been informed by the IRS that backup withholding is no longer required. Backup withholding is not an additional tax. Any amount paid as backup withholding would be allowed as a credit against the U.S. Holder's federal income tax liability and may entitle the U.S. Holder to a refund, provided the required information is provided to the IRS.

### X.    CERTAIN PANAMANIAN TAX CONSEQUENCES

### A.    TAXATION OF INTEREST

Interest payable on the New Notes will be exempt from income tax or withholding requirements in Panama, provided that the New Notes are registered with the Panamanian National Securities Commission and, in addition, are placed through a Notes exchange or through an organized market in Panama. The New Notes are in the process of being registered with the Panamanian National Securities Commission and are expected to be initially placed on the Panama Stock Exchange. Accordingly, interest payments made on the New Notes will be exempt from income tax or withholding requirements in Panama. Should the New Notes not be initially placed on the Panama Stock Exchange, interest payments would be subject to a 5% income tax, which would have to be withheld by the Issuer.

### B.    TAXATION OF DISPOSITIONS

Under current Panamanian tax law, because the New Notes have been registered with the Panamanian National Securities Commission, any capital gains realized by a holder of the New Notes on the sale or other disposition of Notes will be exempt from income tax in Panama, provided that the sale or disposition of the New Notes is made through a Notes exchange or another organized market. The New Notes will be listed on the Panama Stock Exchange. Thus, any gains realized on the sale of the New Notes on this exchange will be exempt from income tax in Panama.

If the New Notes are not sold through a New Notes exchange or another organized market, pursuant to Law No. 18 of June 19, 2006, (i) the seller will be subject to income tax in Panama on capital gains realized on the sale of the New Notes calculated at a fixed rate of ten percent (10%); (ii) the buyer will be obligated to withhold from the seller an amount equal to five percent (5%) of the aggregate proceeds of the sale, as an advance in respect of the capital

gains income tax payable by the seller, and the buyer will be required to send to the fiscal authorities the withheld amount within ten (10) days following the date of withholding; (iii) the seller will have the option of considering the amount withheld by the buyer as payment in full of the seller's obligation to pay income tax on capital gains; and (iv) in the event the amount withheld by the buyer is greater than the amount of capital gains income tax payable by the seller, the seller will be entitled to recover the excess amount as a tax credit by filing a special sworn income tax declaration with the fiscal authorities.

### C.      STAMP AND OTHER TAXES

As the New Notes have been registered with the Panamanian National Securities Commission, the New Notes are not subject to stamp taxes.  There are no sales, transfer or inheritance taxes applicable to the sale or disposition of the New Notes.

### D.      FOREIGN INVESTORS

A person domiciled outside of Panama is not required to file a tax return in Panama, solely by reason of his or her investment in the New Notes, provided that gains realized on the sale and disposition of the New Notes are, in effect, exempt from income tax as indicated above.

### XI.      CONCLUSION AND RECOMMENDATION

The Company believes the Plan is in the best interest of all creditors and urges the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Company's Balloting and Tabulation Agent no later than **5:00 p.m. (Prevailing U.S. Eastern Time) on April 29, 2013.**

111

Dated:  March 29, 2013

Respectfully submitted,

**NEWLAND INTERNATIONAL
PROPERTIES, CORP.**

By:  _____

Name: Eduardo Saravia
Title: Secretary and Director

COUNSEL:

**GIBSON, DUNN & CRUTCHER LLP**
J. Eric Wise
Shira D. Weiner
200 Park Avenue
New York, NY 10166-0193
Telephone:     212.351.4000
Facsimile:      212.351.4035

COUNSEL FOR THE COMPANY

101343339.47

112

**EXHIBIT A**
**DESCRIPTION OF NOTES**

# EXHIBIT A

## DESCRIPTION OF NOTES

You can find the definitions of certain terms used in this description under the subheading "Certain Definitions." Certain defined terms used in this description but not defined below under "— Certain Definitions" will have the meanings assigned to them in the Indenture (as defined below). In this description, the phrase "Newland" or the "Company" refers to Newland International Properties, Corp. Solely for purposes of this Description of Notes, the phrase "Newland" or the "Company" shall be equivalent to the reference to "Reorganized Debtor" elsewhere in the Disclosure Statement dated March 29, 2013 of which this Description of Notes forms a part.

Newland will issue new notes (the "Notes"), in exchange for its existing 9.5% Senior Secured Notes due 2014 (the "Existing Notes"), under an indenture, dated as of the Effective Date (the "Indenture"), between Newland and CSC Trust Company of Delaware, as trustee (the "Trustee"). The Notes are being issued pursuant to a pre-packaged Chapter 11 bankruptcy plan (the "Pre-Packaged Plan") that would provide for the cancellation of the Existing Notes and the indenture governing the Existing Notes in exchange for the new Notes and the new Indenture. The "Effective Date" as used herein shall be the effective date of the Pre-Packaged Plan.

The following description is a summary of the material provisions of the Indenture and the Notes.  It does not restate these agreements in their entirety. Such agreements, and not this description, define your rights as holders of the Notes.

The registered holder of a Note (each, a "Noteholder") will be treated as the owner thereof for all purposes. Only registered holders will have rights under the Indenture and the Notes. The Notes will be secured by the Collateral as described below under "— Collateral and Security."

## Brief Description of the Notes

The Notes will be:

(1)      senior secured obligations of Newland;

(2)      secured by a first priority security interest in or first mortgage on the Collateral; and

(3)      rank equally in right of payment with all of our existing and future senior indebtedness, and senior in right of payment to all of our existing and future subordinated debt.

## Principal, Maturity and Interest

9.5% Senior Secured Notes (the "Notes"), in aggregate principal amount equal to $220.0 million plus the "Accrued Interest Amount." The "Accrued Interest Amount" shall be an amount

equal to the interest accrued and unpaid on the Existing Notes through the Effective Date, with such Accrued Interest Amount calculated in a manner consistent with the indenture governing the Existing Notes.

Interest on the Notes will accrue from the Effective Date at the rate of 9.5% per annum and will be payable semi-annually in arrears.  The first payment date (the "First Payment Date") for the payment of the first Minimum Scheduled Amortization Amount (as defined below) and accrued interest, if applicable, shall be (i) May 15, 2013, if the Effective Date occurs before May 15, 2013 or (ii) a Business Day no later than 60 calendar days following the Effective Date, as determined by Newland, if the Effective Date occurs on or after May 15, 2013.  Each subsequent payment date to the First Payment Date (a "Subsequent Payment Date" and together with the First Payment Date, each a "Payment Date") will be the calendar day falling on the semi-annual anniversaries of (i) May 15, 2013 (if the Effective Date occurs before May 15, 2013) or (ii) the Effective Date (if the Effective Date occurs on or after May 15, 2013), and, in each case, if such date is not a Business Day, on the next following Business Day, until the earlier of (i) the Notes having been paid in full and (ii) the Payment Date for the final Minimum Scheduled Amortization Amount.  The record date for any Payment Date will be the 15th calendar day preceding such Payment Date and interest payments will be made on Payment Dates to holders of record on the applicable record date. Interest on the Notes will accrue from the date of original issuance or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Principal payments on the Notes will consist of the "Minimum Scheduled Amortization Amounts" as set forth in the table below, which equals, in the aggregate, the original outstanding principal amount of $220.0 million of the Existing Notes, plus the Accrued Interest Amount which shall be applied across each Minimum Scheduled Amortization Amount on a pro rata basis.

"Minimum Scheduled Amortization Amount" means, with respect to a Payment Date, the respective amount shown for such Payment Date in the table below (which reflects the outstanding principal amount of the Existing Notes, provided that each payment below shall be increased to reflect the Accrued Interest Amount, which shall be applied across each Minimum Scheduled Amortization Amount on a pro rata basis); provided, that, the Minimum Scheduled Amortization Amount shall be decreased over the life of the Notes to the extent of any prepayments made as Mandatory Prepayments from Prime Unit Sales and other Asset Sales under the Indenture and to the extent of any Supplemental Amortizations, Optional Redemptions or "Open Market Repurchases" (as defined below) or any other purchases leading to cancellation in accordance with the Indenture, each as more fully described herein.

| **Date** | **Minimum Scheduled Amortization Amount** |
| --- | --- |
| First Payment Date | $5.0 million |
| Second Payment Date | $10.0 million |
| Third Payment Date | $15.0 million |
| Fourth Payment Date | $20.0 million |
| Fifth Payment Date | $21.0 million |

2

| | |
|---|---|
| Sixth Payment Date | $23.5 million |
| Seventh Payment Date | $26.5 million |
| Eighth Payment Date | $29.0 million |
| Ninth Payment Date | $70.0 million |

Amounts in the table above shall be increased to reflect the Accrued Interest Amount, which shall be applied across each Minimum Scheduled Amortization Amount on a pro rata basis. The Indenture executed on the Effective Date will reflect the Minimum Scheduled Amortization Amounts as adjusted for the pro-rata capitalization of the Accrued Interest Amount.

**Supplemental Amortization**

In addition to the Minimum Scheduled Amortization Amount for each Payment Date, on each Payment Date commencing with the First Payment Date, the Notes shall become due and payable on such date in an amount equal to the Supplemental Amortization Amount (as defined below) (each such payment amount, a "Supplemental Amortization").

The "Supplemental Amortization Amount" on each Payment Date shall be the balance, if any, in the Collection Account referred to in item (7) under "Priority of Payments and Reserves in the Collection Account" herein after application and/or reservation of amounts in items (1) – (6) in such section of this Description of Notes on the 5th Business Day prior to such Payment Date (the "Determination Date").

Supplemental Amortizations shall be applied to the reduction of the Minimum Scheduled Amortization Amounts remaining to be paid by a reduction of each such remaining scheduled amount in equal amounts across all such remaining Payment Dates (such amount to be calculated by dividing the Supplemental Amortization amount by the number of remaining Payment Dates).

**Mandatory Prepayment for Prime Unit Sales**

In the event of a sale by Newland of the Casino, Spa or Penthouse unit on the 66th floor of the Project (as defined herein) (each a "Prime Unit," and each such sale a "Prime Unit Sale"), Newland shall prepay (a "Mandatory Prepayment") the Notes at par in the amount of the Net Proceeds (as defined below), on the third Business Day following the date on which an officer of Newland has certified to the Trustee as to the calculation of the Net Proceeds and the Mandatory Prepayment in connection with any such sale or sales, which certification shall indicate that it has been reviewed by the Noteholder Representative (as defined  herein under "—Certain Definitions") who has no objection to the calculation.  Mandatory Prepayments pursuant to Prime Unit Sales shall be applied to the Minimum Scheduled Amortization Amounts in reverse order of maturity in an aggregate principal amount equal to the amount of such prepayment (for the avoidance of doubt, the full amount of such prepayment shall be applied in full to the final Minimum Scheduled Amortization Amount (e.g., until it has been prepaid in full, the Minimum Scheduled Amortization Amount for the Ninth Payment Date) existing at such time).

"Net Proceeds" shall mean the aggregate cash proceeds received by Newland in respect of any Prime Unit Sale, including in respect of any installment payment for such Prime Unit Sale, net of the commercially reasonable direct costs  related to such Prime Unit Sale required to be paid by Newland, including, without limitation, legal and accounting expenses of Newland, applicable Licensor license fees, the TOC Casino BC Loan Amount (as defined herein),

3

investment banking or advisory fees of Newland and other Brokers' Commissions (as defined herein), taxes paid or payable directly attributable to the Prime Unit Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, any reserve for adjustment in respect of performance obligations assumed by Newland in connection with the agreed sale price of such Prime Unit or Prime Units and any reserve for adjustment in respect of the sale price of such Prime Unit or Prime Units (in all cases until such reserve is released), and in all cases above established in accordance with IFRS and applicable Panamanian regulations.

An officer of Newland shall certify to the Trustee within 3 Business Days of closing of a Prime Unit Sale, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it, as to the calculation of the Net Proceeds and the Mandatory Prepayment. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from Newland and failure to provide such objection in such period shall constitute a deemed acceptance of such certification. A form of certification will be exhibited to the Indenture.

For the avoidance of doubt, any Prime Unit Sale shall not be considered an Asset Sale for purposes of the Indenture.

**TOC Casino Transaction Related to Unit Sale Financing**

In connection with one or more transactions governed under a master transaction agreement in which a purchaser (including any affiliates designated by such purchaser for such purposes, the "Casino Buyer") acquires one or more Units at the Project, and one of such acquired Units is the Casino for purposes of developing a gaming enterprise at the Project (the "TOC Casino Transaction"), Newland shall be permitted to sell Units (each an "Ancillary Unit") that are not Prime Units for purchase prices in aggregate not to exceed $7.0 million to the Casino Buyer in the TOC Casino Transaction on terms and conditions that comply with the Indenture; provided, however, that (i) any such Ancillary Unit sale will not be included in the calculations of prices under the Minimum Pricing Level covenant and (ii) the sale of Ancillary Units to the Casino Buyer may be for a combination of cash and one or more loans (each an "Ancillary Unit Loan") in favor of Newland for the non-cash balance of the purchase price set forth in each relevant UPA. The transfer of title to such Ancillary Units, and the release of the relevant Mortgage on such Ancillary Units, will occur at the time of sale of each Ancillary Unit under the respective UPA, provided the Casino Buyer shall register in the Registro Público de Panamá a mortgage in favor of Newland (with Newland as mortgagee) securing the obligations under the Ancillary Unit Loans in favor of Newland (the "Casino Buyer Mortgage"). Newland will then pledge its rights under the Casino Buyer Mortgage as Collateral to the Co-Trustee, as agent for the Trustee. The Casino Buyer shall also be responsible for making payment in respect of CAM and other owner expenses from the earlier of occupancy of any such Ancillary Unit or the closing date of any such sale.

For the avoidance of doubt, any Ancillary Unit sale in connection with a TOC Casino Transaction shall not be considered an Asset Sale for purposes of the Indenture.

4

Upon certification to the Co-Trustee and the Trustee (the "Casino UPA Certification") from Newland that a Unit Purchase Agreement has been signed with Sun International (as defined below) for the sale of the Units where the Casino will be located (a "Casino UPA"), the Co-Trustee shall consent to the registration of the Casino UPA (the "Casino UPA Registration Consent"), and any other Unit Purchase Agreement signed with Sun International, with the Registro Público de Panamá. The form of the Casino UPA Registration Consent will be set forth in an exhibit to the Indenture.

Upon the earlier to occur of (i) the termination of a Casino UPA and (ii) the termination of that certain Framework Agreement, dated November 26, 2012, by and among Sun International Limited ("Sun International"), Trump Panama Hotel Management LLC, and Newland, Newland shall provide a certification to the Co-Trustee and the Trustee to this effect (the "Casino UPA Termination Certification," and together with the Casino UPA Certification, the "Casino UPA Certifications"). Upon receipt of such Casino UPA Termination Certification, the Co-Trustee shall consent to such cancellation with the Registro Público de Panamá (the "Casino UPA Cancelation Consent"), and Newland shall promptly cancel such registration with the Registro Público de Panamá. The form of the Casino UPA Cancelation Consent will be set forth in an exhibit to the Indenture.

## Listing

The Notes will be listed on the *Bolsa de Valores de Panamá, S.A.* (the Panama Stock Exchange), a Panamanian company (*sociedad anónima*) duly registered and authorized by the National Securities Commission of Panama to maintain and operate (1) facilities where individuals can trade securities; or (2) a system, either electronic, mechanic or otherwise, which allows the trade of securities through the matching of purchase and sale offers.

The Notes will not be listed on any other exchange outside of Panama.

## Collateral and Security

The Collateral will include (i) the Subject Properties, (ii) the Receivables, (iii) the Accounts and all deposits therein, (iv) the Plans and Specifications, (v) the Trump License Agreement, (vi) Newland's rights to all other revenues arising from the operation of the Project, including, without limitation, revenues arising from the operation of the Casino and the hotel, restaurants and spa, and any leases relating thereto, as well as any and all of Newland's rights to the Beach Club (as defined herein) and Newland's rights to the BC Ferry, BC Ferry Payment and the BC Senior Loan, as applicable; (vii) 100% of the shares in Newland, along with an assignment of voting rights, stock power, or voting power (as applicable and for the avoidance of doubt, exercisable only upon payment default, voluntary or involuntary bankruptcy filing) (the "Stock Pledge") and the assignment of the Noteholder Swing Vote (as defined below) in accordance with the CCSA Settlement (as defined below); (viii) all Newland accounts not presently subject to the lien securing the Existing Notes (including any new accounts opened on or after the date hereof); (ix) any assets or revenue streams due to Newland and rights or licenses to which Newland is a party (to the extent permitted by the terms of such right or license) not in existence and part of collateral under the indenture for the Existing Notes; and (x) all proceeds of the foregoing.

5

The Subject Properties, the Receivables, the Panama Closing Account (excluding the Brokers' Commissions therein from time to time), the Panama Account, and all proceeds of the foregoing, will be pledged to the Co-Trustee, as agent for the Trustee, on behalf of the holders of the Notes. Additionally, any and all of Newland's rights to the BC Ferry, BC Ferry Payment and the BC Senior Loan, as applicable, will be pledged to the Co-Trustee, as agent for the Trustee, pursuant to Panama Law on behalf of the holders of the Notes under a beach club pledge agreement to be dated the Effective Date (the "Beach Club Pledge Agreement").

The Collateral that is not pledged to the Co-Trustee as agent for the Trustee shall be pledged directly to the Trustee on behalf of the holders of the Notes.

Newland will grant the Trustee and the Co-Trustee, as applicable, a first priority security interest in or first mortgage on the Collateral under the Indenture and the Notes to secure the payment of all obligations of Newland under the Indenture and the Notes; which grant to the Co-Trustee, as agent of the Trustee, of the mortgage on the Collateral under the Indenture and the Notes shall be by way of assignment of, and any necessary conforming amendment to, the existing mortgage on the collateral under the indenture for the Existing Notes, such that the first priority security interest on the existing mortgage on the collateral under the indenture for the Existing Notes remains in place and unencumbered. Except as otherwise permitted by the Indenture and the Notes, Newland will not be permitted to sell, encumber, lease or transfer any Collateral.

Enforcement against the Collateral will be subject to a limited non-disturbance-type agreement with Licensor, Trump Panama Condominium Management LLC and Trump Panama Hotel Management LLC (collectively, the "Trump Parties"), the principal terms of which can be found in Exhibit 2 to the Plan Support Agreement annexed to the Disclosure Statement of which this Description of Notes forms a part; provided, that, the provision described therein regarding Trump Parties' agreement that the Trustee or its designee can sell more than ten hotel units to a single purchaser subject to the Trump Parties' limited pre-approval rights shall remain subject to the restriction contained in the "Reglamento" (Co-Ownership Rules) Board and Administration, which presently prohibits sales in excess of ten hotel units to a single purchaser.

**CCSA Settlement and Partners' Limited Financial Guarantee**

Subject to the effectiveness of the Pre-Packaged Plan, the CCSA Parties shall execute and deliver a joint and several financial guarantee of payments on the Notes payable (i) ninety (90) days after an acceleration by holders of the Notes in accordance with the Indenture (provided such acceleration is not rescinded in accordance with the Indenture) or (ii) the scheduled final maturity date of the Notes, to the extent in each case the holders of the Notes have not been paid in full (the "Partners' Limited Financial Guarantee") and, provided, that, the maximum amount due and payable under such Partners' Limited Financial Guarantee shall under no circumstance exceed in the aggregate the amount of $5.0 million and the CCSA Parties' exposure under the Partners' Limited Financial Guarantee shall be limited to such $5.0 million amount. The effectiveness of the Pre-Packaged Plan, together with the delivery of the Partners' Limited Financial Guarantee and the Stock Pledge, shall result in the final settlement of that certain Construction Completion Support Agreement dated November 6, 2007 and the satisfaction and release of any and all obligations of the CCSA Parties thereunder without any liability to any of them (such transactions collectively, the "CCSA Settlement").

6

**Corporate Governance Requirements**

The Notes will provide that Shareholder voting agreements shall be entered by the Shareholders and a nominee ("Noteholders' Shareholder Nominee") of the Noteholders, to provide that 30% of the shareholder voting rights (but not economic entitlements) attributable to Newland's capital stock shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders (the "Noteholder Swing Vote"), such that shareholder voting by shareholders of Newland shall be effectively allocated as follows:  Upper Deck – 21%, Roger Khafif – 49%, and Noteholders' Shareholder Nominee 30% (together, "Voting Persons"). Notwithstanding the foregoing, the 30% shareholder voting rights of the Noteholders' Shareholder Nominee shall only be exercisable in the event of a shareholder voting dispute between Roger Khafif and Upper Deck; provided, that, the Noteholders' Shareholder Nominee shall receive the same information provided to, at the same time as received by, the other shareholders in respect of any voting to be undertaken by the shareholders, and shall be invited, sufficiently in advance, to attend all shareholder meetings at which voting will take place, whether in-person or telephonic, and shall timely receive (at the same time as the other shareholders) copies of all minutes, resolutions, and presentations prepared for or to reflect the outcome of such shareholder voting meeting.

Further, in connection with the shareholder voting arrangements described immediately above, Newland's Board of Directors (the "Board") shall be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the Board (the "Noteholders' Board Nominee"), which nominee (a natural person or an entity (in turn, represented by a natural person)) shall not have any voting rights, except as provided below. Newland's governing documents and any existing shareholder and/or voting agreements shall be modified to provide that all decisions by the Shareholders shall be taken unanimously and that, in the case of a non-unanimous vote, the Noteholders' Board Nominee shall have in such instance (and only in such instance) the ability to cast the deciding vote. The Noteholders' Board Nominee shall have unfettered access to all Board meetings and communications, shall receive same at the same time as members of the Board, and shall be invited, sufficiently in advance, to attend all meetings, whether in-person or telephonic, shall timely receive (at the same time as members of the Board) copies of all minutes, resolutions, and presentations, and shall be permitted to participate in such meetings as if it were a full-voting member of the Board.

After initial appointment by the Steering Group  (as defined herein under "—Certain Definitions") (which may be for the full term of the Notes), replacement, including through resignation or otherwise, of the Noteholders' Board Nominee and Noteholders' Shareholder Nominee shall be controlled by a majority in principal amount of the Notes ("Majority Holders"); provided, that, the Steering Group can, at its discretion, select an alternate Noteholders' Board Nominee and Noteholders' Shareholder Nominee before the Effective Date with the alternate assuming the position for the balance of the term up to the prior Nominee's resignation, death or incapacity.

Upon payment in full of the Notes, the Noteholders' Board Nominee shall resign from the Board.

Newland's governing documents shall provide indemnification for the Noteholders' Board Nominee as well as for all other members of the Board of Directors of Newland and for designated Officers of Newland.

The Noteholders' Board Nominee and the Noteholders' Shareholder Nominee can be the same person/entity, but need not be.

**The Subject Properties**

The Subject Properties will be subject to the Mortgage in the name of the Co-Trustee. "Subject Properties" means, at any time, (i) the real property relating to a Unit Purchase Agreement and (ii) the real property owned by Newland (other than pursuant to clause (i) above).

Subject Properties will from time to time give rise to Receivables. To the extent a Subject Property gives rise to a Receivable under a Unit Purchase Agreement, the Co-Trustee will release such Subject Property from the Mortgage once the Trustee and the Co-Trustee receive an officers' certificate from Newland certifying that the property relating to such Receivable has been purchased or financed by the obligor in accordance with the Unit Purchase Agreement and the Indenture and such Receivable will be pledged to the Trustee as security for the Notes.

Upon any casualty relating to the Subject Properties, any Insurance Proceeds will, subject to any provisions in the related Unit Purchase Agreements, be deposited into the Collection Account.

**The Accounts**

"Accounts" shall mean the Panama Closing Account, the Panama Account, the Release Account and the Collection Account. The Accounts to be opened and maintained with or by the Trustee or the Co-Trustee, as applicable, will be as follows:

(1)    Panama Closing Account.  An account maintained by the Co-Trustee at the Co-Trustee or an affiliate thereof into which payments on Receivables in connection with Unit Purchase Agreements shall be deposited and Brokers' Commissions as well as Property Transfer Fees shall be paid from (each as provided in the fourth supplemental indenture between Newland and the Trustee, dated December 10, 2012);

(2)    Panama Account.  An account maintained by the Co-Trustee at the Co-Trustee or an affiliate thereof into which Newland Unit Proceeds (as defined herein) shall be transferred from the Panama Closing Account twice weekly and into which Net Proceeds from Prime Unit Sales and Non-UPA Revenues (defined herein) shall be deposited;

(3)    Release Account.  An account maintained by the Trustee into which funds will be transferred from the Panama Account after transfers and payments from the Panama Account in accordance with the Priority of Payments from the Panama Account below; and

(4)    Collection Account.  An account maintained by the Trustee into which funds will be transferred from the Release Account (after deduction of Monthly Working Capital Amount (as defined below)).

8

Payments on Receivables, Brokers' Commissions and Property Transfer Fees by the related obligor will be made directly into the Panama Closing Account.  Newland Unit Proceeds will be promptly transferred from the Panama Closing Account into the Panama Account.

**Priority of Payments from the Panama Account**

The Co-Trustee will disburse and/or reserve amounts deposited into the Panama Account, in the manner specified below and in the order of priority set forth below (the "Panama Account Priority of Payments"):

(1)    on each Tuesday and Thursday of a calendar week, the Co-Trustee shall transfer to Licensor amounts sufficient to pay the fees due and payable to Licensor in respect of current unit sales in accordance with the Trump License Agreement (taking into account the Eighth Amendment thereto) ("Current License Fees");

(2)    on each Tuesday and Thursday of a calendar week (after payment to Licensor of any then due and payable Current License Fees pursuant to clause (1) above), amounts in the Panama Account shall be transferred to the Release Account, until the sum of $1.2 million (or such other smaller amount required by Newland, as certified by Newland to the Co-Trustee and the Trustee prior to the transfer of a sum of $1.2 million to the Release Account) has been transferred to the Release Account. For the avoidance of doubt, the $1.2 million sum permitted for transfer to the Release Account pursuant to this clause (2) shall be available on a one-time basis only, from the Effective Date until transferred in full, and not each calendar month;

(3)    once the sum of $1.2 million (or such other smaller amount certified by Newland) has been transferred to the Release Account pursuant to clause (2) above, in each calendar month thereafter (including the month in which such $1.2 million (or lesser amount) shall have been paid in full), the Co-Trustee shall reserve all amounts deposited into the Panama Account (other than those used to pay Current License Fees pursuant to clause (1) above) until the "Monthly Accrued Fee Payment Amount" (as defined below) for such calendar month has been accumulated (after holding back and paying to Licensor any amounts required to be paid as Current License Fees pursuant to clause (1) above) and (i) once such amount has been accumulated, the Co-Trustee shall transfer to Licensor the Monthly Accrued Fee Payment Amount (with such transfer occurring on the next business day following accumulation of such sum) or (ii) if the Monthly Accrued Fee Payment Amount for such month is not so accumulated in full during such month, the Co-Trustee shall on the last business day of such month transfer to Licensor the entire balance on deposit  in the Panama Account (after holding back and paying to Licensor any amounts required to be paid as Current License Fees pursuant to clause (1) above); and

(4)    following the transfer of the Monthly Accrued Fee Payment Amount in full to Licensor in the respective calendar month in accordance with clause (3)(i) above, all excess amounts, if any, subsequently deposited in the Panama Account during such calendar month (after holding back and paying to Licensor any amounts required to be paid as Current License Fees pursuant to clause (1) above) shall be transferred to the Release Account on Tuesday and Thursday of each calendar week  until the first day of the next succeeding calendar month (at which time the reservation and payment procedures in clause (3) above shall be re-instituted in each calendar month until the Monthly Accrued Fee Payment Amount for such month has been reserved and paid in accordance with that clause).

9

In the case of calculations with respect to the above Panama Account Priority of Payments, the Co-Trustee shall be entitled to rely upon Newland certifications as to amounts and timing. Such certifications delivered to the Co-Trustee shall concurrently be delivered to Licensor.

For the avoidance of doubt, no amounts on deposit in the Panama Account shall be transferred pursuant to clauses (3) and (4) above to the Release Account in any given calendar month, if the Monthly Accrued Fee Payment Amount for such month has not been paid to the Licensor in such calendar month or if Newland has not issued each of the certifications required of clauses (1) through (4) above.

The "Monthly Accrued Fee Payment Amount" shall be, for any calendar month, the sum of (i) $437,000 (or, in the case of the final monthly amount, such lesser amount as shall be necessary to cause the Total Accrued Fee Payment Amount (as defined below) to be paid in full), (ii) any shortfall in the payment of the Monthly Accrued Fee Payment Amount that was due and payable for the prior month, such shortfall being the amount of the Monthly Accrued Fee Payment Amount for such prior month (as determined pursuant to this paragraph), less the actual payment made in such prior calendar month pursuant to clause 3(ii) above (a "Shortfall"); (ii) any outstanding Default Interest (as defined below), as at the end of the prior calendar month; and (iii) any license fees due and payable for the prior calendar month in respect of commercial lease revenues under that certain Trump License Agreement (taking into account the Eighth Amendment thereto) ("Trump Lease Fees").

"Total Accrued Fee Payment Amount" shall mean (i) as of the Effective Date, the total outstanding amount of accrued license fees then owing to Licensor, as discounted by the agreed discount factor (as set forth in the Eight Amendment to the Trump License Agreement (the "Original Amount") (if calculated as of the date of this Description of Notes, such Original Amount would be approximately $7 million) and (ii) as of any subsequent date, the unpaid balance of such Original Amount, plus any accrued and unpaid Shortfall, Default Interest and Trump Lease Fees.

"Default Interest" shall mean default interest due and payable under the Trump License Agreement (taking into account the Eighth Amendment thereto) on any amounts due to Licensor, to the extent not paid when due (or beyond an applicable default interest grace period) under, and as specified more fully in, the Trump License Agreement (taking into account the Eighth Amendment thereto).

Notwithstanding anything to the contrary in this Description of Notes, the Indenture or in the Co-Trustee Agreement, if an Event of Default occurs and is continuing, the Co-Trustee may, and shall upon the direction of the Holders of at least one-third in aggregate principal amount of the then-outstanding Notes, discontinue releasing funds from the Panama Account for payment to Licensor until such Event of Default is cured or waived or such direction is withdrawn; it being understood and acknowledged that any such action shall not relieve Newland of its obligations to Licensor under the License Agreement.

**The Release Account**

Amounts on deposit in the Release Account will be held in the Release Account during each Monthly Collection Period until the Monthly Working Capital Amount has been accumulated (or, if the full Monthly Working Capital Amount is not accumulated during such

Monthly Collection Period, until the end of such Monthly Collection Period), whereupon (i) all collections in excess of the Monthly Working Capital Amount shall be transferred on Tuesday and Thursday of each calendar week to the Collection Account for application in accordance with the Priority of Payments, (ii) the Monthly Working Capital Amount (including Carry-Over Amounts) (or, if not accumulated in full, any amount so accumulated) will be transferred to Newland upon Newland's written request (with such request delivered in writing by Newland to the Trustee not less than 2 Business Days in advance of such date (which shall be a Tuesday or Thursday of a calendar week)), and (iii) all additional collections after the transfer of the Monthly Working Capital Amount to Newland, if any, transferred into the Release Account during such Monthly Collection Period will be transferred on Tuesday and Thursday of each calendar week to the Collection Account for application in accordance with the Priority of Payments.

If any payment made by an obligor under a Unit Purchase Agreement is received by Newland rather than the related account to which payment should have been made, Newland will be required to transfer such payment into the account into which such payment should have been made, promptly upon receipt.

The Panama Closing Account, the Panama Account, the Release Account and the Collection Account, along with any other accounts maintained by the Company, will constitute Accounts comprising the Collateral.

**Priority of Payments from, and Reserves in, the Collection Account**

On any Wednesday and Friday of a calendar month on which a disbursement is requested by Newland or otherwise required under the Indenture (each, a "Disbursement Date"), or where indicated below, on each Payment Date or Expense Payment Date (as defined herein under " – Certain Definitions"), the Trustee will reserve or reduce and/or disburse any prior reservation of amounts in the Collection Account, all as specified below and in the following order of priority (the "Priority of Payments"):

(1)     on an Expense Payment Date, in amounts sufficient to pay the fees, expenses and indemnities of the Trustee and Co-Trustee due and unpaid on such Expense Payment Date;

(2)     if requested by Newland (with such request delivered in writing by Newland to the Trustee not less than 2 Business Days in advance of such Disbursement Date): (x) to reserve, or reduce and/or disburse any prior reservation of, all or a portion of an amount up to the Monthly Working Capital Amount that has been previously transferred to the Collection Account from the Release Account and not previously withdrawn by Newland from the Release Account; and (y) to reserve, or reduce and/or disburse any prior reservation of, all or a portion of an amount up to the Monthly Working Capital Reserve Amount (as defined below); provided, that, in no instance shall Newland be permitted to draw under (x) or (y) for any month, an amount in excess of the Monthly Working Capital Amount for such month;

(3)     if requested by Newland (with such request delivered in writing by Newland to the Trustee not less than 2 Business Days in advance of such Disbursement Date): to reserve or reduce and/or disburse any prior reservation of all or a portion of the Contingency Reserve Amount (as defined below);

11

(4)      as directed by Newland (with such request delivered in writing by Newland to the Trustee not less than 2 Business Days in advance of such Disbursement Date): to reserve and/or disburse any prior reservation of all or a portion of an amount up to the Bulk 2 Repurchase Reserve Amount (as defined herein);

(5)      as directed by Newland (and with respect to clause (y) of this item (5), Newland shall be required to direct the Trustee) (with such request delivered in writing by Newland to the Trustee not less than 2 Business Days in advance of such Disbursement Date): (x) to reserve all remaining amounts until the Debt Service Reserve Amount (as defined below) is achieved; (y) on a Payment Date to apply all amounts previously reserved pursuant to this item (5) and any other amounts needed for such purpose to the payment of the Debt Service then due and payable; and (z) if requested by Newland to reserve or reduce any prior reservation of all or a portion of the Debt Service Reserve Amount for the second Payment Date following the date of such reservation or reduction;

(6)      if requested by Newland (with such request delivered in writing by Newland to the Trustee not less than 2 Business Days in advance of such Disbursement Date): to reserve, or reduce and/or disburse any prior reservation of, all or a portion of the (x) BC Senior Loan Reserve Amount and/or BC Ferry Payment Reserve Amount (each as defined herein); (y) Open Market Purchase or Optional Redemption (as defined herein) amounts to be paid by Newland; and (z) Net Proceeds in respect of a Prime Unit Sale, in the event any such Net Proceeds have been received by Newland and not yet applied to a Mandatory Prepayment for any reason; and

(7)      on the Determination Date, any balance remaining in the Collection Account after application and/or reservation of all items in (1) – (6) above shall constitute the Supplemental Amortization Amount to be paid on the Payment Date following such Determination Date.

With respect to item (4), any prior reservation of the Bulk 2 Repurchase Reserve Amount may only be reduced to fund a Debt Service payment.

In all cases, disbursements shall be permitted provided that they are in accordance with the other terms of the Indenture.

**Additional Amounts**

All payments made by Newland under or with respect to the Notes will be made free and clear of and without withholding or deduction for or on account of any present or future taxes, levies, imposts, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the Republic of Panama or any political subdivision or taxing authority of or in the Republic of Panama ("Taxes"), unless Newland is required to withhold or deduct any amount for or on account of Taxes by law or by the interpretation or administration of law. If Newland is so required to withhold or deduct any amount for or on account of Taxes from any payment made by Newland under or with respect to the Notes, Newland will pay such additional amounts ("Additional Amounts") as may be necessary so that the net amount (including Additional Amounts) received by each holder of Notes after withholding or deduction will not be less than the amount the holder would have received if Taxes had not been withheld or deducted.

12

However, no Additional Amounts will be payable by Newland with respect to a payment made to a holder of Notes with respect to any Tax which would not have been imposed, payable or due but for:

(1)      in the case that the holder or a Beneficial Owner of a Note is or was a domiciliary, national or resident of, or engages or engaged in business, maintains or maintained a permanent establishment or is or was physically present in the Republic of Panama, or otherwise has some present or former connection with the Republic of Panama other than the mere holding or enforcement of the Notes or the receipt of principal, premium, if any, or interest in respect of the Notes;

(2)      in the case that the holder or Beneficial Owner of Notes fails to comply with a request by Newland to satisfy any certification, identification or other reporting requirements which such holder or Beneficial Owner is legally entitled to satisfy, whether imposed by statute, treaty, regulation, administrative practice or otherwise, concerning the nationality, residence or connection with the Republic of Panama of such holder or Beneficial Owner;

(3)      if, where presentation by the holder is required to receive payment under the Notes, the presentation for payment had occurred within 30 days after the date such payment was due and payable or was provided for, whichever is later;

The obligation of Newland to pay Additional Amounts in respect of Taxes will not apply with respect to:

(1)      any estate, inheritance, gift, sales, transfer, personal property or any similar Tax; or

(2)      any Tax which is payable otherwise than by deduction or withholding from payments made under or with respect to the Notes.

Newland will be required to:

(1)      make any required withholding or deduction;

(2)      remit the full amount deducted or withheld to the relevant authority (the "Taxing Authority") in accordance with applicable law;

(3)      obtain certified copies of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Taxing Authority imposing such Taxes; and

(4)      promptly send the certified copies of such tax receipts to the Trustee (if the Trustee acts as the paying agent) or, if different, to the paying agent, in each case solely for the purpose of forwarding such receipts to any holder that has made a written demand for the certified copies to the Trustee or the paying agent, as the case may be.

13

If the receipts are not obtainable, Newland will be required to provide to the Trustee or the paying agent, as the case may be, such other evidence of the payments as Newland may reasonably obtain.

At least 30 days prior to each date on which any payment under or with respect to the Notes is due and payable (unless Newland's obligation to pay Additional Amounts arises after the 30th day prior to that date, in which case it will be promptly after Newland's obligation to pay Additional Amounts arises), if Newland will be obligated to pay Additional Amounts with respect to the payment, Newland will deliver to the Trustee and each paying agent an officers' certificate stating the fact that the Additional Amounts will be payable and the amounts so payable and will set forth other information necessary to enable the Trustee and each paying agent to pay the Additional Amounts to holders of Notes on the Payment Date. Each officer's certificate will be relied upon until receipt of a further officers' certificate addressing these matters.

Whenever in the Indenture, the Notes, or in this "Description of Notes" there is mentioned, in any context, the payment of amounts based upon the payment of principal, premium or interest or of any other amount payable under or with respect to any Note, such mention will be deemed to include mention of the payment of Additional Amounts as are, were or would be payable in respect of the payment of principal, premium or interest or of any other amount.

Interest payable on the Notes will be exempt from income tax or withholding requirements in Panama, provided that the Notes are registered with the Panamanian National Securities Commission and, in addition, are placed through a securities exchange or through an organized market in Panama. Newland will take steps such that the Notes will be registered with the Panamanian National Securities Commission and will be listed on the Panama Stock Exchange. Accordingly, interest payments made on the Notes will be exempt from income tax or withholding requirements in Panama. Should the Notes not be initially placed on the Panama Stock Exchange, interest payments will be subject to a 5% income tax, which would have to be withheld by the Newland.  See "Certain Republic of Panama Tax Considerations."

**Currency and Currency Indemnity**

All references to "dollars", "U.S. dollars" and "$" herein are to the lawful currency of the United States of America.

Newland will pay all sums due under the Indenture and the Notes solely in U.S. dollars.

Any amount that Newland pays in a currency other than U.S. dollars in respect of any sum due under the Indenture and the Notes (the "Foreign Currency Payment Amount") will only constitute a discharge to Newland to the extent of the U.S. Dollar amount that the holder would be able to purchase on the Payment Date with the Foreign Currency Payment Amount. If the Foreign Currency Payment Amount is less than the U.S. Dollar amount due under the Indenture and the Notes, Newland will indemnify such holder for the difference between the U.S. Dollar amount due and the U.S. Dollar amount which the holder is so able to purchase with the Foreign Currency Payment Amount (the "Foreign Currency Payment Amount Loss"). In the event a

holder of a Note purchases U.S. dollars on the Payment Date with all of the Foreign Currency Payment Amount, Newland will indemnify such holder for the reasonable transaction costs incurred in connection with such purchase of U.S. dollars. For the purposes of this paragraph, it will be sufficient for a holder to certify in writing that such holder suffered a Foreign Currency Payment Amount Loss; provided that such written certification is accompanied by documentation reasonably evidencing such Foreign Currency Payment Amount Loss.

**Paying Agent and Registrar for the Notes; Transfer and Exchange**

The Trustee will act as paying agent and registrar for the Notes. The office of the Trustee is currently located at 2711 Centerville Road, Suite 220 Wilmington, Delaware 19808.

A holder may transfer or exchange Notes in accordance with the provisions of the Indenture and the Notes. The registrar and the Trustee may require a holder, among other things, to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. Noteholders will be required to pay all taxes due on transfer. Newland is not required to transfer or exchange any Note selected for redemption. Also, Newland is not required to record the transfer or exchange of any Note for a period of 15 days prior to the date of redemption thereof.

**Redemption**

*Optional Redemption*

Newland may, at its option, upon not less than thirty (30) nor more than sixty (60) days' prior notice to holders of the Notes, redeem the Notes, pro rata, in whole or in part at a price equal to 100% of the outstanding amount of the Notes being redeemed (together with accrued and unpaid interest, if any, on the Notes to be so redeemed to (but excluding) the date fixed for redemption), plus any Additional Amounts; provided, that, any such Optional Redemption shall be subject to a minimum threshold of $10.0 million.

**Asset Sales**

Newland will not consummate an Asset Sale unless:

(1)    Newland receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of; and

(2)    at least 85% of the consideration received in the Asset Sale by Newland is in the form of cash or Cash Equivalents. For purposes of this provision, each of the following will be deemed to be cash:

(a)    any liabilities of Newland (other than contingent liabilities, liabilities that are by their terms subordinated to the Notes, and the Notes) that are assumed by the transferee of any such assets and as a result of which Newland is unconditionally released from further liability;

15

(b)    any securities, notes or other obligations received by Newland from such transferee that within 90 days are converted into cash or Cash Equivalents, to the extent of the cash or Cash Equivalents received in that conversion; and

(c)    any assets of the kind referred to in clause (3) of the next paragraph of this covenant.

Within 180 days after the receipt of any Net Proceeds from an Asset Sale, Newland may apply those Net Proceeds at its option:

(1)    to acquire all or substantially all of the assets of another Permitted Business;

(2)    to make a capital expenditure in a Permitted Business; or

(3)    to acquire other assets that are not classified as current assets under IFRS and that are used in a Permitted Business;

or enter into a binding commitment regarding clauses (1), (2) or (3) above, provided that such binding commitment shall be treated as a permitted application of Net Proceeds from the date of such commitment until and only until the earlier of (x) the date on which such acquisitions or expenditures are consummated and (y) the 90th day following the expiration of the aforementioned 180 day period. If such acquisition or expenditure is not consummated on or before such 90th day and Newland shall not have applied such Net Proceeds as described in clause (1), (2) or (3) of this paragraph on or before such 180th day, such commitment shall be deemed not to have been a permitted application of Net Proceeds.

Notwithstanding the foregoing, and for the avoidance of doubt, the "Asset Sales" covenant contained herein shall not override other provisions in this Description of Notes related to Prime Unit Sales, Mandatory Prepayments pursuant to Prime Unit Sales and the TOC Casino Transaction. Net Proceeds from Prime Unit Sales cannot be used for any purposes other than Mandatory Prepayments.

Proceeds from "Asset Sales" shall be deposited into the Collection Account. Non-compliance with the provisions of this covenant after failure by Newland for 30 days after notice to comply from the Trustee or holders of at least 25% in aggregate principal amount of the Notes shall constitute an Event of Default pursuant to clause (5) of the Events of Default, as set forth in "—Events of Default and Remedies." Newland shall certify to the Trustee all Asset Sales and applications of proceeds therefrom.

*Notice of Redemption*

If less than all of the Notes are to be redeemed at any time, the Trustee will select Notes for redemption on a pro rata basis.

Newland will provide notice of redemption to the Trustee by courier at least 35 days but not more than 65 days before, and the Trustee will mail notices of redemption by first class mail

16

at least 30 days but not more than 60 days before, the redemption date to each holder of Notes to be redeemed at its registered address, except that redemption notices may be mailed by the Trustee more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture and the Notes. Notices of redemption may not be conditional.

If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal amount of that Note that is to be redeemed. A new Note in principal amount equal to the unredeemed portion of the original Note will be issued in the name of the holder of Notes upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption.

Other than as provided herein with respect to repayment and redemption, Newland will not be required to make mandatory redemption payments or sinking fund payments with respect to the Notes. Newland may acquire Notes by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not violate the terms of the Indenture and provided that any Note so acquired by Newland will be cancelled.

## Open Market Repurchases

Newland may purchase Notes at market value prices provided those prices are below par, through tender offer or otherwise; provided, that Newland shall be prohibited from using more than $15.0 million in the aggregate toward the principal portion of Notes for such purchases (each such purchase, an "Open Market Repurchase").

Newland shall immediately cancel any Notes purchased pursuant an Open Market Repurchase, such that such Notes are no longer outstanding. No such Open Market Repurchase shall be made directly or indirectly from an Affiliate or a direct family member of a CCSA Party (as defined herein under "—Certain Definitions") ("Insiders").

For the avoidance of doubt, no Open Market Repurchase shall be permitted until and unless the Bulk 2 Repurchase Amount (as defined herein) shall have been reduced to zero. Open Market Repurchases will be made in compliance with applicable United States and Panamanian securities laws.

## Certain Negative Covenants

*(i) Restricted Payments*

Newland will not directly or indirectly:

(1)    declare or pay any dividend or make any other payment or distribution on account of Newland's Equity Interests or to the direct or indirect holders of Newland's Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests of Newland and other than dividends or distributions payable to Newland);

17

(2)     purchase, redeem or otherwise acquire or retire for value any Equity Interests of Newland or any direct or indirect parent of Newland (other than in exchange for Capital Stock of Newland);

(3)     make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of Newland that is contractually subordinated to the Notes, except a payment of interest or principal at the Stated Maturity thereof; or

(4)     make any Restricted Investment.

All such payments and other actions set forth in these clauses (1) through (4) above being collectively referred to as "Restricted Payments."

*(ii) Incurrence of Indebtedness*

Newland will not be permitted to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness; provided, however, that Newland may incur an amount of Indebtedness up to an aggregate of the Bulk 2 Repurchase Amount, pursuant to the terms as defined herein, for the redemption or replacement of the Bulk 2 Repurchase Transaction (as defined herein).

*(iii) No Layering of Indebtedness*

Newland will not incur, create, issue, assume, guarantee or otherwise become liable for any Indebtedness that is contractually subordinate or junior in right of payment to any senior Indebtedness of Newland and pari passu in right of payment to the Notes.

*(iv) Liens*

Newland will not directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset owned on the date of the Indenture or thereafter acquired, except Permitted Liens.

*(v) Sale and Leaseback Transactions*

Newland will not enter into any sale and leaseback transaction unless:

(1)     Newland could have (a) incurred Indebtedness in an amount equal to the Attributable Debt relating to such sale and leaseback transaction under the covenant described above under the caption "— Incurrence of Indebtedness" and (b) incurred a Lien to secure such Indebtedness pursuant to the covenant described above under the caption "— Liens"; and

(2)     the sale and leaseback transaction is made in compliance with the covenant described above under the caption "— Asset Sales."

*(vi) Merger, Consolidation or Sale of Assets*

Newland may not, directly or indirectly: (1) consolidate or merge with or into another Person; or (2) sell, assign, transfer, convey, lease or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to another Person; unless:

(1)     either: (a) Newland is the surviving corporation; or (b) the Person formed by or surviving any such consolidation or merger (if other than Newland) or to which such sale, assignment, transfer, conveyance, lease or other disposition has been made is a corporation organized or existing under the laws of the Republic of Panama, the United States, any state of the United States or the District of Columbia;

(2)     the Person formed by or surviving any such consolidation or merger (if other than Newland) or the Person to which such sale, assignment, transfer, conveyance, lease or other disposition has been made assumes by written agreement all the obligations of Newland under the Notes and the Indenture and the other Security Documents;

(3)     immediately after such transaction, no Default or Event of Default exists; and

(4)     the Person formed by or surviving any such consolidation or merger or the Person to which such sale, assignment, transfer, conveyance, lease or other disposition is made, shall have a Consolidated Net Worth not less than Newland's Consolidated Net Worth immediately prior thereto.

*(vii) Transactions with Affiliates*

Newland will not make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of Newland, the Shareholders or the CCSA Parties (each, an "Affiliate Transaction"), unless:

(1)     full prior disclosure to the Board of Directors of Newland has been made (including the Noteholder's Board Nominee (as defined below)) and upon demonstration to the Board that the terms of the transaction are arm's-length, market terms, and such transaction is approved by the Board of Directors of Newland;

(2)     such Affiliate Transaction is on terms that are not materially less favorable to Newland than those that would have been obtained in a comparable transaction by Newland with an unrelated Person; and

(3)     Newland delivers to the Trustee:

(a)     with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $1.0 million, a resolution of the Board of Directors set forth in an officers' certificate certifying that such Affiliate Transaction complies with this covenant; and

19

(b)    with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $5.0 million, an opinion as to the fairness to Newland of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of international standing.

The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of the prior paragraph:

(1)    the BC Ferry Payment (as defined herein);

(2)    the BC Senior Loan (as defined herein);

(3)    the TOC Casino Transaction with Sun International;

(4)    the settlement of any amounts owed in respect of the MTA Agreement (as defined herein);

(5)    any employment agreement, employee benefit plan, officer and director indemnification agreement or any similar arrangement entered into by Newland in the ordinary course of business; and

(6)    transactions effected pursuant to agreements in effect on the date of the Indenture (including, without limitation, the agreements in effect as of the Effective Date), and any amendment, modification, renewal, extension or replacement to such agreement provided that such amendment, modification, renewal, extension or replacement is not disadvantageous to the holders of the Notes in any respect.

In no instance shall the re-sale of any units purchased by Affiliates of Newland, the Shareholders or CCSA Parties be permitted while any of the Notes are outstanding unless all Units owned by Newland have been sold (or closed).  Affiliates of Newland, the Shareholders or CCSA Parties shall not be eligible to receive any future commissions (co-broker commission, finder's fee or other monetary arrangement) with respect to the sale of any assets comprising Collateral.

For the avoidance of doubt, upon consummation and closing of the Contadora Island Sale, the mortgage on the collateral consisting of Contadora Island shall be released and Net Proceeds shall be deposited into the Panama Account.

*(viii) Accounts*

Newland will not open accounts other than Accounts except where such accounts would be, and are made, subject to a Trustee lien.

*(ix) Business Activities*

Newland will not engage in any business other than Permitted Businesses.

20

*(x) Subsidiaries*

Newland does not have and will not be permitted to create or acquire any Subsidiaries.

*(xi) Payments for Consent*

Newland will not directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indenture or the Notes unless such consideration is offered to be paid and is paid to all holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

*(xii) Seller Financing*

Newland shall be permitted to offer seller financing for up to the lesser of 110 Units or $40.0 million (in aggregate) of Units at then applicable pricing. Terms for a seller financing shall include no more than a 2.5 year average life in addition to a maximum maturity date of the scheduled final maturity date of the Notes, a step-up in interest rate to be determined by Newland at the time of such seller financing of no less than 25 basis points at each six (6) month interval to encourage refinancing, and a maximum loan to value determined by Newland in its reasonable judgment based on the creditworthiness of the obligor not to exceed 60% of the purchase price of the Unit. Units purchased with a seller financing facility will be subject to a price no lower than the three month historical weighted average pricing of sales of comparable units (e.g., residential, commercial, hotel) in the Project; provided that if no applicable Unit sales occurred in the last three (3) months, such weighted average shall be based on the last three sales of such Units. A single buyer may acquire no more than two (2) Units with a seller financing facility. Seller financing terms shall specify that all common area maintenance (and other) charges will be payable by the buyer; terms will also require that the mortgages entered into in connection with the seller financing shall be pledged to the Co-Trustee for the benefit of the Noteholders.

For the avoidance of doubt, there shall be no Seller Financing for Prime Unit Sales or for Affiliate unit purchases.

Upon certification by a Company Officer to the Trustee and the Co-Trustee that such characteristics are met, the mortgage on a given pool of Units subject to seller financing may be released; Newland may then obtain a mortgage (with Newland as mortgagee) on such pool of Units and any such mortgage to be obtained by Newland will be pledged as Collateral; provided, further, that in all instances the certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from Newland and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.

*(xiii) Bulk 2 Refinancing*

Newland shall be permitted to refinance the Bulk 2 Repurchase Amount provided that any refinancing facility:

21

(i)     shall result in no net cash proceeds to Newland (provided, however, that Newland shall be permitted to receive any proceeds from such a refinancing facility, if such proceeds are used to immediately repay any bridge loans or refinancing facility to a third party in connection with such refinancing;

(ii)    shall carry an interest rate no greater than the interest rate on the Notes;

(iii)   shall have a term no greater than 12 months (if such facility requires payment of a penalty for early repayment); and

(iv)    require a collateralization ratio, calculated as the asset liquidation value of the applicable unit or units divided by the repurchase amount of the applicable unit or units, no greater than 2.0x.

Provided that such characteristics are met, and upon certification by a Company Officer to the Trustee and the Co-Trustee that such characteristics are met, the mortgage on a given pool of units may be released and used as collateral against such facility, provided further that in all instances the Noteholder Representative must confirm that the terms of such a refinancing facility satisfy these requirements.

## Certain Affirmative Covenants

Newland covenants for so long as the Notes are outstanding that it shall:

(i) comply with Noteholder Representative requirements (as more fully described herein and in an exhibit to the Indenture);

(ii) comply with Corporate Governance requirements (as described herein);

(iii) ensure all revenue streams of the Project, including all non-Unit Purchase Agreement revenue streams arising from any Collateral ("Non-UPA Revenue"), owed to Newland are deposited directly into the Panama Account, provided, however, if any such revenues are instead received by Newland, Newland shall promptly deposit those into the Panama Account; such amounts shall be net of any direct fees, commissions, property or transfer taxes or other costs and expenses payable under the contract giving rise to such Non-UPA Revenue;

(iv) comply with the a "Minimum Pricing Level" for units sold, which shall be a price per square meter equal to 75% of the average sale price of the preceding five (5) most comparable units (comparability of which shall be assessed based on product, line and floor). For the avoidance of doubt, "Product" shall refer to a given units classification within Hotel, Condo, Bayloft, Commercial; "Line" shall refer to a unit's position within each floor, as represented by the last two digits of a given unit number. The calculation of the Minimum Pricing Level covenant shall not include comparable units used for purposes of any financing, extension, or replacement transaction in respect of the Bulk 2 Repurchase Option (as defined herein) nor shall the calculation of the Minimum Pricing Level include unit sales deemed to be an Affiliate Transaction;

22

(v) comply with the MWC Budget, for such month and for such categories of uses as set for therein. With each draw of Monthly Working Capital, Newland shall certify to the Trustee that such funds are to be spent in accordance with the approved categories contained herein. The MWC Budget shall consist of four categories: (i) TOC Asset Completion & Preservation; (ii) Newland TOC Operations; (iii) Newland Corporate Operations; and (iv) Miscellaneous, which Miscellaneous category shall be available for expenses in each other category. To the extent that funds in a given category (including the "Miscellaneous" category) and month are unspent, such funds shall remain available to be used as "Carry-Over Amounts," which Carry-Over Amounts can be applied within the same category. To the extent such unused funds have been drawn by Newland such funds shall be transferred back to the Collection Account after expiration of the applicable period for Carry-Over Amounts;

(vi) comply with approved quarterly reporting (with monthly detail) requirements for sales, unit purchase defaults, related-party transactions and other performance metrics as shown in an exhibit to the Indenture;

(vii) pledge its rights under the Casino Buyer Mortgage as Collateral to the Trustee;

(viii) require the Chief Executive Officer to provide written approval to the Noteholder Representative for each unit sale (residential, commercial, hotel); facsimile and email approval by the Chief Executive Officer shall be acceptable;

(ix) provide that the Notes are rated by at least one ratings agency at all times through the maturity date of the Notes;

(x) (a) maintain insurance with reputable and financially sound carriers against such risks and in such amounts as are customarily carried by similarly situated businesses, including, without limitation, property, casualty and general liability insurance; (b) shall cause the Trustee (or, if required by applicable law, the Co-Trustee) to be designated as the primary beneficiary or loss payee under all insurance policies relating to the Subject Properties and shall deliver such endorsements as shall be necessary to effect such designation; and (c) upon any casualty relating to the Subject Properties, any Insurance Proceeds will, subject to any provisions in the related Unit Purchase Agreements, be deposited into the Collection Account; and

(xi) delivery to Licensor (concurrently with delivery thereof to the Trustee) any certifications or directions from Newland to the Co-Trustee certifying or directing payment of monies to Licensor from the Panama Account in respect of the Panama Account Priority of Payments.

For purposes of clause (iii) above and of clause (2) under the heading "The Accounts" herein, Non-UPA Revenues due to Newland that arise from hotel unit rental revenues pursuant to Section 1.1 of that certain Promoter/Developer Unsold Hotel Units Participation Agreement, dated April 13, 2011 ("Participation Agreement"), by and between Newland, Hotel TOC Inc., and Trump Panama Hotel Management LLC, that are to be deposited directly into the Panama Account shall be so deposited net of expenses that have been set off by Trump Panama Hotel Management LLC, as hotel operator, pursuant to Section 4.1 of the Hotel Rental Management

Agreement, entered into by and between Newland and Trump Panama Hotel Management LLC, pursuant to Section 1.1 of the Participation Agreement.

## Notices and Reports

Notices shall be deemed to have been given on the date of publication or, if published on different dates, on the date of the first such publication. In addition, notices will be mailed to holders of Notes at their registered addresses.

## Quarterly Reports

Newland will provide the Trustee with quarterly reports showing monthly detail with respect to sales, unit purchase defaults, related-party transactions, and all other performance metrics, with the form of such quarterly reports set forth in an exhibit to the Indenture.

## Available Information

Newland will provide to the Trustee and the Trustee will make available to the holders:

(1)    annual financial statements audited by an internationally recognized firm of independent public accountants within 90 days of the end of each fiscal year, and quarterly unaudited financial statements within 60 days of the end of each of the first three fiscal quarters of each fiscal year, in each case for Newland. Such annual and quarterly financial statements will be prepared in accordance with IFRS and such annual financial statements be accompanied by a summary management discussion on the results of operations of Newland for the periods presented; and

(2)    copies (including English translations of documents in other languages) of all public filings made by Newland with any stock exchange or securities regulatory agency within fifteen days after filing.

Newland will host a quarterly conference call for holders of the Notes to be held within a reasonable time, but in no event later than 30 days, after the delivery of the quarterly financial statements referred to above (or, in the case of the annual audited financial statements, within 90 days after the end of the fiscal year) by placing a notice and dial-in conference number on its website (www.trumpoceanclub.com) at least 48 hours in advance of the conference call.

## Noteholder Representative

The Steering Group will appoint a representative (including any duly authorized representative or designee of such representative, the "Noteholder Representative") to discharge the functions described below. The appointment of the Noteholder Representative shall be duly recorded in the Registro Público de Panamá and Newland's by-laws and, to the extent necessary (as determined by the Steering Group), other organizing documents would be amended or supplemented to recognize the Noteholder Representative and his/her rights and provide that his/her appointment and service would be governed by the Noteholders.

24

After initial appointment by the Steering Group, replacement, including through removal, resignation or otherwise, of the Noteholder Representative would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders"). The selection (including replacements thereof) of the Noteholder Representative shall be in each case subject to reasonable prior notice to Newland; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group).

The function of the Noteholder Representative shall be to communicate in writing to the Trustee defaults under the Indenture and to review certifications identified herein. In this regard, Newland shall covenant for all periods on or after the Effective Date that:

(i) Noteholder Representative shall have full access to, subject in all cases to confidentiality provisions, Newland's offices and all property, books, accounting and other records, invoices, contracts, and to attend internal and business meetings (but for the avoidance of doubt, not meetings unrelated to the operation of Newland) and to observe sales and marketing meetings; for the avoidance of doubt, this clause (i) shall not include internal electronic mail (email) communications; provided that from the Effective Date, a copy of any email communication used by the Chief Executive Officer of Newland as written approval of a unit sale must be delivered to the Noteholder Representative;

(ii) Noteholder Representative shall have full access to all information concerning the Project, performance data relating to any policies and budgets preapproved by the Steering Group pursuant to the Pre-Packaged Plan, and to attend construction, sales, marketing and management meetings. This includes access to weekly reports on sales and expenses, with supporting data; and

(iii) Noteholder Representative shall have full access to any contracts or other relevant documentation or details that pertain to the legal relationship between Newland and its Affiliates and the Affiliates of the Shareholders or CCSA Parties.

The Noteholder Representative shall execute a confidentiality agreement with the Company prior to appointment, which agreement shall be negotiated with the Steering Group before the Effective Date.

The Noteholder Representative function shall cease to exist following the date which is the later of eighteen (18) months following the Effective Date or three (3) months after the existence of an Event of Default, unless such Default has been earlier cured or waived.

The Noteholder Representative will not be required to communicate directly with, and shall not take direct instruction from, holders of the Notes.

**Events of Default and Remedies**

Each of the following is an "Event of Default" under the Indenture and the Notes:

25

(1)      default in the payment when due of interest on the Notes;

(2)      default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium, if any, on the Notes, including a failure to make payment on the Notes when due under a Prime Unit Sale;

(3)      failure by Newland to comply with the provisions described under the caption  "— Certain Covenants — Merger, Consolidation or Sale of Assets";

(4)      failure by Newland to comply with the provisions described under the captions "— Certain Covenants — Restricted Payments" or "— Certain Covenants — Incurrence of Indebtedness";

(5)      failure by Newland for 30 days after notice to comply from the Trustee or holders of at least 25% in aggregate principal amount of the outstanding Notes with any of the other covenants of Newland in the Indenture and the Notes or any of the other Security Documents;

(6)      default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness of Newland whether such Indebtedness now exists or is created after the date of the Indenture, if that default:

(a)      is caused by a failure to pay principal of, or interest or premium, if any, on such Indebtedness following the expiration of the grace period provided in such Indebtedness on the date of such default; or

(b)      results in the acceleration of such Indebtedness prior to its final date of maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a payment default described in (a) above or the maturity of which has been so accelerated, aggregates $2.0 million or more;

(7)      failure by Newland to pay final judgments aggregating in excess of $5.0 million, which judgments are not paid, waived, satisfied, discharged or stayed for a period of 90 days;

(8)      certain events of moratorium in the Republic of Panama or bankruptcy or insolvency of Newland, as described in the Indenture and the Notes; and

(9)      any Security Document or any Lien purported to be granted thereby is held in any judicial proceeding to be unenforceable or invalid, in whole or in part, or ceases for any reason (other than pursuant to a release that is delivered or becomes effective as set forth in the Indenture and the Notes) to be fully enforceable and perfected, or Newland shall so assert.

26

In the case of an Event of Default arising from certain events of bankruptcy or insolvency with respect to Newland, all outstanding Notes will become due and payable immediately without further action or notice. If any other Event of Default occurs and is continuing, the Trustee, by written notice to Newland, or the holders of at least 25% in aggregate principal amount of the then-outstanding Notes, by written notice to Newland and the Trustee, may declare all the Notes to be due and payable immediately.

Subject to certain limitations, holders of a majority in aggregate principal amount of the then-outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from holders of the Notes notice of any continuing Default or Event of Default if it determines that withholding notice is in their interest, except a Default or Event of Default relating to the payment of principal or interest.

Subject to the provisions of the Indenture and the Notes relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture and the Notes at the request or direction of any holders of Notes unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense. Except to enforce the right to receive payment of principal, premium (if any) or interest, if any, or when due, no holder of a Note may pursue any remedy with respect to the Indenture or the Notes unless:

(1)     such holder has previously given the Trustee notice that an Event of Default is continuing;

(2)     holders of at least 25% in aggregate principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

(3)     such holders have offered the Trustee reasonable security or indemnity satisfactory to it against any loss, liability or expense;

(4)     the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

(5)     holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

The holders of a majority in aggregate principal amount of the Notes then outstanding by written notice to the Trustee may, on behalf of the holders of all of the Notes, rescind an acceleration or waive any existing Default or Event of Default and its consequences under the Indenture and the Notes except a continuing Default or Event of Default in the payment of interest or premium on, or the principal of, the Notes.

In the event of a declaration of acceleration of the Notes because an Event of Default described in clause (6) above under "Events of Default and Remedies" has occurred and is continuing, such declaration shall be automatically annulled if, within 20 days after such Event of Default arose, the event triggering such Event of Default pursuant to such clause (6) shall be remedied or cured by Newland or waived by the holders of the relevant Indebtedness.

27

Newland is required to deliver to the Trustee annually a statement regarding compliance with the Indenture and the covenants specified in the Notes. Upon becoming aware of any Default or Event of Default, Newland is required to promptly deliver to the Trustee a statement specifying such Default or Event of Default.

**Legal Defeasance and Covenant Defeasance**

Newland may at any time terminate all of its Obligations with respect to the Notes ("Legal Defeasance"), except for certain Obligations, including those regarding any trust established for a Defeasance, to replace mutilated, destroyed, lost or stolen Notes and to maintain agencies in respect of the Notes.

In addition, Newland may at any time terminate all of its Obligations with respect to the Notes with respect to the covenants described above under "—Certain Covenants" (other than the covenant described under "—Certain Covenants —Merger, Consolidation or Sale of Assets"), and any omission to comply with such Obligations shall not constitute a Default with respect to the Notes Indenture ("Covenant Defeasance"). In order to exercise either Legal Defeasance or Covenant Defeasance, Newland must irrevocably deposit in trust, for the benefit of the holders of the respective tranche of Notes, cash in U.S. dollars or U.S. government obligations, or a combination thereof, in such amounts as will be sufficient to pay the principal of and interest on such tranche of Notes to the redemption date specified by Newland in accordance with the terms of the Indenture and the Notes and comply with certain other conditions, including the delivery of an opinion as to certain tax matters.

**Amendment, Supplement and Waiver**

Except as provided in the next three succeeding paragraphs, the Indenture or the Notes may be amended or supplemented with the consent of the holders of at least a majority in aggregate principal amount of the Notes then outstanding, and any existing Default or Event of Default or compliance with any provision of the Indenture or the Notes may be waived with the consent of the holders of a majority in aggregate principal amount of the then outstanding Notes.

Without the consent of each Noteholder affected, an amendment or waiver may not (with respect to any Notes held by a non-consenting holder):

(1)    reduce the principal amount of Notes whose holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal of or change the final maturity of any Note or alter the provisions with respect to the redemption of the Notes;

(3)    reduce the rate of or change the time for payment of interest on any Note;

(4)    waive a Default or Event of Default in the payment of principal of, or interest or premium, if any, on the Notes;

(5)    make any Note payable in money other than that stated in the Notes;

28

(6)      make any change in the provisions of the Indenture or Notes relating to waivers of past Defaults or the rights of holders of Notes to receive payments of principal of, or interest or premium, if any, on the Notes;

(7)      waive a redemption payment with respect to any Note;

(8)      except as otherwise expressly provided in the Indenture, effect any release of the Collateral or deprive the Trustee of the benefit of a first priority security interest in the Collateral; or

(9)      make any change in the preceding amendment and waiver provisions.

Notwithstanding the preceding, without the consent of any holder of Notes, Newland and the Trustee may amend or supplement the Indenture or the Notes:

(1)      to cure any ambiguity, defect or inconsistency;

(2)      to provide for the assumption of Newland's obligations to holders of Notes in the case of a merger or consolidation or sale of all or substantially all of Newland's assets;

(3)      to make any change that would provide any additional rights or benefits to the holders of Notes or that does not adversely affect the legal rights under the Indenture or Notes of any such holder;

(4)      to conform the text of the Indenture or the Notes to any provision of this Description of Notes to the extent that such provision in this Description of Notes was intended to be a verbatim recitation of a provision of the Indenture or the Notes;

(5)      to provide for the appointment of a successor Trustee or Co-Trustee; provided that the successor Trustee or Co-Trustee is otherwise qualified and eligible to act as such under the terms of the Indenture, Notes and Co-Trustee Agreement (in the case of a successor Co-Trustee); or

(6)      to add a new form of Unit Purchase Agreement in accordance or to make an amendment to a form of Unit Purchase Agreement in accordance with the Indenture and the Notes.

In addition, any amendment, waiver or supplement to the Indenture or the Notes, with or without consent of the holders of a majority of the aggregate principal amount of the Notes then outstanding, may be subject to prior approval or filing requirements of the Panamanian National Securities Commission pursuant to *Agreement* 4-2003.

The consent of the holders of the Notes is not necessary to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of such proposed amendment. After an amendment becomes effective, Newland is required to mail to each registered holder of the Notes a notice briefly describing such amendment. However, the

failure to give such notice to all holders of the Notes, or any defect therein, will not impair or affect the validity of the amendment.

## Satisfaction and Discharge

The Indenture and the Notes will be discharged and will cease to be of further effect as to all Notes issued thereunder, when:

(1)     either:

(a)     all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust and thereafter repaid to Newland, have been delivered to the Trustee for cancellation; or

(b)     all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and Newland has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the holders, cash in U.S. dollars, non-callable U.S. government obligations, or a combination of cash in U.S. dollars and non-callable U.S. government obligations in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption;

(2)     Newland has paid or caused to be paid all sums payable by it under the Indenture and the Notes; and

(3)     Newland has delivered irrevocable instructions to the Trustee under the Indenture and the Notes to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

In addition, Newland must deliver an officers' certificate and an opinion of counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

## Concerning the Trustee

The holders of a majority in aggregate principal amount of the then-outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee, subject to certain exceptions. Subject to such provisions, the Trustee will be under no obligation to exercise any of its rights or powers under the Indenture or the Notes at the request of any holder of Notes, unless such holder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

Pursuant to the Indenture and the Notes, the Trustee may at any time appoint one or more Persons to act as separate trustees or co-trustees.  Such an appointment will not relieve the

Trustee of any of its obligations, duties or responsibilities under the Indenture and the Notes.  In accordance with an amended and restated co-trustee agreement to be dated the Effective Date (the "Co-Trustee Agreement"), among Newland, HSBC Bank USA, N.A. (as trustee for the Existing Notes), the Trustee, HSBC Investment Corporation (Panama) S.A. (as co-trustee for the Existing Notes), and the Co-Trustee, the Co-Trustee will be the mortgagee of record under the Mortgage and will perform certain other duties as set forth therein.  Copies of the Indenture, the form of global notes for the Notes, and the Co-Trustee Agreement are available as set forth above under "—Notices and Reports; Available Information."

**Book-Entry, Delivery and Form**

The Notes will be issued on the Effective Date in registered, global form, without interest coupons, in minimum denominations of $10,000 and integral multiples of $1,000 in excess thereof in the form of a global note issued to holders who are "qualified institutional buyers" as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act") pursuant to a private placement under the Securities Act and in the form of a global note issued to holders who are not "U.S. persons" as such term is defined in Regulation S under the Securities Act in an offshore transaction pursuant to Regulation S under the Securities Act (collectively, the "Global Notes"). The Global Notes will be "restricted" securities within the meaning of Rule 144 under the Securities Act and will be subject to transfer restrictions as more fully set forth in the Indenture and in any restrictive legend set forth in the form of Global Note.

The Global Notes will be deposited upon issuance with the Trustee as custodian for DTC, in New York, New York, and registered in the name of DTC or its nominee, in each case, for credit to an account of a direct or indirect participant in DTC as described below.

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for definitive Notes in registered certificated form ("Certificated Notes") except in the limited circumstances described below. See "— Exchange of Global Notes for Certificated Notes." Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of Notes in certificated form.

*Depository Procedures*

The following description of the operations and procedures of DTC, Euroclear and Clearstream are provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. Neither we nor the initial purchaser take any responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

DTC has advised us that DTC is a limited-purpose trust company created to hold securities for its participating organization (collectively, the "Participants") and to facilitate the clearance and settlement of transactions in those securities between the Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchaser), banks, trust companies, clearing

31

corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

(1)      upon deposit of the Global Notes, DTC will credit the accounts of the Participants designated by the initial purchaser with portions of the principal amount of the Global Notes; and

(2)      ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

So long as DTC, Euroclear or Clearstream or their nominee are the registered owner or holders of any Global Notes, DTC, Euroclear or Clearstream or such nominee will be considered the sole owner or holder of the Notes represented by the Global Notes for all purposes under the Indenture and the Notes. No beneficial owner of an interest in any Note will be able to transfer such interest except in accordance with the applicable procedures of DTC, Euroclear, Clearstream or Latinclear, in addition to those provided for under the Indenture and the Notes.

Investors in the Global Notes who are Participants may hold their interests therein directly through DTC. Investors in the Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear, Clearstream and Latinclear) which are Participants. All interests in a Global Note, including those held through Euroclear, Latinclear or Clearstream, may be subject to the procedures and requirements of DTC. Those interests held through Euroclear, Latinclear or Clearstream may also be subject to the procedures and requirements of such systems. The laws of some states require that certain Persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such Persons will be limited to that extent. Because DTC can act only on behalf of the Participants, which in turn act on behalf of the Indirect Participants, the ability of a Person having beneficial interests in a Global Note to pledge such interests to Persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, owners of interests in the Global Notes will not have Notes registered in their names, will not receive physical delivery of Notes in certificated form and will not be considered the registered owners or "holders" thereof under the Indenture and the Notes for any purpose.**

32

Payments in respect of the principal of, and interest and premium, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the Indenture and the Notes. Under the terms of the Indenture and the Notes, Newland, the Trustee and any Paying Agent will treat the persons in whose names the Notes, including the Global Notes, are registered as the owners of the Notes for the purpose of receiving payments and for all other purposes. Consequently, none of Newland, the Trustee, any Paying Agent, the initial purchaser or any agent of the foregoing has or will have any responsibility or liability for:

   (1) any aspect of DTC's records or any Participant's or Indirect Participant's records relating to or payments made on account of beneficial ownership interest in the Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

   (2) any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised that its current practice, upon receipt of any payment in respect of securities such as the Notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the Payment Date unless DTC has reason to believe that it will not receive payment or such Payment Date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of Notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be the responsibility of DTC, the Trustee or us. None of Newland, the Trustee or any Paying Agent will be liable for any delay by DTC or any of the Participants or the Indirect Participants in identifying the beneficial owners of the Notes, and Newland, the Trustee and any Paying Agent may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Transfers between the Participants will be effected in accordance with DTC's procedures, and will be settled in same-day funds, and transfers between participants in Euroclear, Latinclear and Clearstream will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Notes described herein, cross-market transfer between the Participants, on the one hand, and Euroclear or Clearstream participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by their respective depositaries; however, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note in DTC,

33

and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream participants may not deliver instructions directly to the depositories for Euroclear or Clearstream.

DTC has advised us that it will take any action permitted to be taken by a holder of Notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the Notes as to which such Participant or Participants has or have given such direction. However, if there is an Event of Default under the Notes, DTC reserves the right to exchange the Global Notes for legended Notes in certificated form, and to distribute such Notes to its Participants.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures to facilitate transfers of interests in the Global Notes among participants in DTC, Euroclear and Clearstream, they are under no obligation to perform or to continue to perform such procedures, and may discontinue such procedures at any time. None of Newland, the Trustee, the Co-Trustee, any Paying Agent, the initial purchaser and any of their respective agents will have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Exchange of Global Notes for Certificated Notes**

A Global Note is exchangeable for Certificated Notes if:

(1)     DTC (a) notifies Newland or the Trustee that it is unwilling or unable to continue as depositary for the Global Notes or (b) has ceased to be a clearing agency registered under the Exchange Act and, in either case, Newland fails to appoint a successor depositary; or

(2)     there has occurred and is continuing a Default or Event of Default with respect to the Notes and holders representing 25% of more of the then-outstanding principal amount of the Notes request that such Global Notes be exchanged for Certificated Notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the Trustee by or on behalf of DTC in accordance with the Indenture and the Notes. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in Global Notes will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Notice to Investors," unless that legend is not required by applicable law.

*Exchange of Certificated Notes for Global Notes*

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Notes. See "Notice to Investors."

34

*Same Day Settlement and Payment*

We will make payments in respect of the Notes represented by the Global Notes (including principal, premium, if any, and interest, if any) by wire transfer of immediately available funds to the accounts specified by DTC or its nominee. We will make all payments of principal, interest and premium, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the Certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The Notes represented by the Global Notes are expected to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. We expect that secondary trading in any Certificated Notes will also be settled in immediately available funds.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a Participant will be credited, and any such crediting will be reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the settlement date of DTC. DTC has advised us that cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a Euroclear or Clearstream participant to a Participant will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

Subject to the satisfaction of certain conditions, on the settlement date for the Notes, local brokers whose bids were accepted by us will receive beneficial interests in the Global Note directly from us, through Latinclear, against payment therefor.

**Governing Law and Jurisdiction**

The Indenture, the Co-Trustee Agreement, the Notes, the Partners' Limited Financial Guarantee and the CCSA Settlement will each be governed by and construed in accordance with the laws of the State of New York. The Mortgage, the Stock Pledge, the Unit Purchase Agreements and the Beach Club Pledge Agreement will be governed by and construed in accordance with the laws of the Republic of Panama.

**Certain Definitions**

Set forth below are certain defined terms used in this Description of Notes, the Indenture and the Notes. Reference is made to the Indenture and the Notes for a full disclosure of all such terms, as well as any other capitalized terms used herein for which no definition is provided.

Terms not defined herein or in the Indenture shall be construed as provided in Section 1.02 of the Indenture and, in particular, terms used and not otherwise defined as provided herein shall be given the meanings assigned to such terms in accordance with IFRS.

"Accounts" means the Panama Closing Account, the Panama Account, the Release Account and the Collection Account and such other accounts opened by Newland, with the consent of, and subject to the lien of, the Trustee.

35

"Affiliates" means all direct and indirect subsidiaries, parents, or affiliates (which term "affiliate" shall mean any entity or person controlling, controlled by, under common control with such person or entity) of a given person or entity.  When the term Affiliate or Affiliates is used herein, such term shall refer to the Affiliate or Affiliates of Newland, except where expressly stated that such term refers instead to one or more of Newland, Shareholders or CCSA Parties.

"Ancillary Unit" means a Unit that is not a Prime Unit sold by Newland to the Casino Buyer for purchase prices in aggregate with all such Ancillary Units sold not to exceed $7.0 million in the TOC Casino Transaction on terms and conditions that comply with the Indenture.

"Ancillary Unit Loan" means one or more loans in favor of Newland for the non-cash balance of the purchase price set forth in a Unit Purchase Agreement for an Ancillary Unit.

"Asset Sale" means (i) the transfer, sale, lease, conveyance or other disposition of any assets or rights; provided that the sale, conveyance or other disposition of all or substantially all of the assets of Newland will be governed by the provisions of the Indenture and the Notes described above under the caption "— Certain Covenants — Merger, Consolidation or Sale of Assets" and not by the provisions of the Asset Sale covenant, and (ii) the sale of Equity Interests in any Person.

Notwithstanding the preceding paragraph, none of the following items will be deemed to be an Asset Sale:

(1)    any sale of real property pursuant to a Unit Purchase Agreement, in each case in accordance with the provisions of the Indenture and the Notes;

(2)    any single transaction or series of related transactions that involves assets other than real property having a Fair Market Value of less than $1.0 million;

(3)    the sale or lease of products, services, accounts receivable or other assets (other than real property) in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets in the ordinary course of business;

(4)    the sale or other disposition of cash or Cash Equivalents;

(5)    the granting of Liens not otherwise prohibited by the Indenture and the Notes;

(6)    surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims;

(7)    transactions permitted under the covenant described above under the caption " — Merger, Consolidation or Sale of Assets";

(8)    the licensing or sublicensing of intellectual property or other general intangibles and licenses, leases or subleases of other property (other than real property);

(9)    a Prime Unit Sale;

36

(10)    the BC Ferry Payment;

(11)    the BC Senior Loan;

(12)    the TOC Casino Transaction and Ancillary Unit sales in connection therewith; and

(13)    the Contadora Island Sale.

"Attributable Debt" in respect of a sale and leaseback transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with IFRS; provided, however, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"BC Ferry Payment" means an amount up to $1.25 million which will be incorporated into the Priority of Payments and which amount may be used by Newland toward the purchase of a ferry (the "BC Ferry") or for any approved transportation solution to transport residents to and from the Beach Club (as defined below) constructed in connection with the Project.

"BC Senior Loan" means a loan from Newland to Ocean Club Pearl Island Corp., relating to the land and related improvements for a beach club currently being constructed on Isla Viveros in the Pearl Islands archipelago of Panama (the "Beach Club").

"BC Senior Loan Reserve Amount" or "BC Ferry Payment Reserve Amount" as of a Payment Date shall be a reserve at Newland's discretion of an amount up to the amount of the BC Senior Loan or BC Ferry Payment reasonably expected to be incurred before the next following Payment Date; provided, that, Newland shall not maintain any reserve for the BC Ferry Payment from and after 18 months from the Effective Date. The BC Senior Loan Reserve Amount and the BC Ferry Payment Reserve Amount shall be released to Newland, upon certification by an Officer of Newland to the Trustee, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from Newland and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

37

"Board" and "Board of Directors" means:

       (1)     with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

       (2)     with respect to a partnership, the Board of Directors of the general partner of the partnership;

       (3)     with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

       (4)     with respect to any other Person, the board or committee of such Person serving a similar function.

Unless the context otherwise requires, "Board" and "Board of Directors" shall mean the board of directors of Newland.

"Brokers' Commissions" means, in respect of each Unit Purchase Agreement, the amount of the full purchase price under such Unit Purchase Agreement required to cover the brokerage commissions (including any gross-up for value added or sales tax levied in Panama on such brokerage commissions) that will be due in respect of the transfer of the respective Unit.  Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions that will be due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and thereafter all remaining payments will be attributed to Newland Unit Proceeds.  Notwithstanding the foregoing and for the avoidance of doubt, the Brokers' Commissions for the TOC Casino Transaction shall include any investment banking and advisory fees of Newland related to the TOC Casino Transaction.  For the further avoidance of doubt, amounts shall be treated as Brokers' Commissions only for so long as the relevant broker or brokers remain entitled to such payments at a future date upon the satisfaction of the conditions to the payment of their commissions, and in any event where a broker or brokers lose such entitlement the related Brokers' Commissions shall be thereafter treated as Newland Unit Proceeds.

"Bulk 2 Repurchase Amount" shall mean as of any date the outstanding principal balance of the Bulk 2 Repurchase Option (if fully exercised) as adjusted from time to time in accordance with its terms. For the avoidance of doubt, the Bulk 2 Repurchase Amount shall be zero once it is paid in full or otherwise expires in accordance with the terms of its contract.

"Bulk 2 Repurchase Option" means the option to purchase units under that certain Purchase Option Agreement between Global Realty Investments, S.A. and Newland International Properties Corp., dated July 13, 2011.

"Bulk 2 Repurchase Reserve Amount" as of a Payment Date shall be a reserve of an amount up to the Bulk 2 Repurchase Amount.

"Business Day" means any day other than a Saturday, Sunday or other day on which banking institutions in New York, New York, Panama City, the Republic of Panama or the

38

location of the corporate trust office of the Trustee are authorized or required by law to be closed.

"Capital Lease Obligation" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet in accordance with IFRS, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"Capital Stock" means:

(1)      in the case of a corporation, corporate stock or other equivalents (however designated);

(2)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)      in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Cash Equivalents" means:

(1)      U.S. dollars;

(2)      securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities);

(3)      certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or bankers' acceptances, in each case with any U.S. commercial bank having capital and surplus in excess of $500.0 million and a Thomson Bank Watch Rating of "B" or better;

(4)      repurchase obligations with a term of not more than ten days for underlying securities of the types described in clauses (2) and (3) above and clause (6) below entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)    commercial paper, at the time of acquisitions, having one of the two highest ratings obtainable from Moody's Investors Service, Inc. or Standard & Poor's Ratings Services;

(6)    marketable general obligations issued by any State of the United States of America or any political subdivision of any such State or any public instrumentality thereof and, at the time of acquisition, having one of the two highest ratings obtainable from Moody's Investors Service, Inc. or Standard & Poor's Ratings Services;

(7)    interests in any investment company or money market fund at least 95% of the assets of which constitute instruments of the kinds described in clauses (1) through (6) above; and

(8)    any demand, money market fund, common trust fund or time deposit or obligation, or interest-bearing or other security or investment not set forth in clauses (1) through (7) above, rated in the highest rating category by a Rating Agency (if rated by such Rating Agency);

and, in the case of each of clauses (2) through (8) above, maturing not later than the next Payment Date.

"Casino" means the casino developed as part of the Project.

"Casino Buyer Mortgage" means a mortgage in favor of Newland (with Newland as mortgagee) securing the obligations under the Ancillary Unit Loans in favor of Newland and registered in the Registro Público de Panamá.

"CCSA Parties" means Roger Khafif, Eduardo Saravia, and Carlos A. Serna (each, a "CCSA Party").

"Collateral" means (i) the Subject Properties, (ii) the Receivables, (iii) the Accounts and all deposits therein, (iv) the Plans and Specifications, (v) the Trump License Agreement, (vi) Newland's rights to all other revenues arising from the operation of the Project, including, without limitation, revenues arising from the operation of the Casino and the hotel, restaurants and spa, and any leases relating thereto, as well as Newland's rights to the Beach Club and Newland's rights to the BC Ferry, BC Ferry Payment and the BC Senior Loan, as applicable; (vii) 100% of the shares in Newland, along with an assignment of voting rights, stock power, or voting power (as applicable and for the avoidance of doubt, exercisable only upon payment default, voluntary or involuntary bankruptcy filing) and the assignment of the Noteholder Swing Vote (as defined below) in accordance with the CCSA Settlement; (viii) all Newland accounts not presently subject to the Trustee's lien (including any new accounts opened on or after the date hereof); (ix) any assets or revenue streams due to Newland and rights or licenses to which Newland is a party (to the extent permitted by the terms of such right or license) not in existence and part of Collateral before the date hereof; and (x) all proceeds of the foregoing.

"Collection Account" means an account maintained by the Trustee into which funds will be transferred from the Release Account.

"Consolidated Net Income" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person for such period, on a consolidated basis, determined in accordance with IFRS; provided that:

(1)     the Net Income (but not loss) of any Person that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the specified Person; and

(2)     the cumulative effect of a change in accounting principles will be excluded.

"Consolidated Net Worth" means, with respect to any Person at any date of determination, the consolidated stockholders' equity represented by the shares of such Person's capitalized stock outstanding as of such date, as determined on a consolidated basis.

"Contadora Island Sale" means the sale of all or a portion of Contadora Island by Newland.

"Contingency Amounts" shall mean an aggregate amount of $5.0 million over the life of the Notes. Contingency Amounts shall be released to Newland from time to time from the Collection Account, upon certification by an Officer of Newland to the Trustee, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it, that a Contingency Event has occurred and must be paid. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations based on any related judgment, official order, settlement agreement or the like. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from Newland and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.  After the term of the Noteholder Representative has expired, certification shall be to the Noteholders' Board Nominee. The certification by an Officer of Newland shall identify the Contingency Event and Contingency Amount and provide that such amount shall be disbursed for such Contingency Event promptly upon a disbursement from the Collection Account.

"Contingency Events" shall mean litigation related contingencies, post-sales related contingencies, tax contingencies, and Officers' liquidations (according to Colombian and/or Panamanian law) not budgeted for in the MWC Budget.

"Contingency Reserve Amount" as of a Payment Date shall be a reserve at Newland's discretion of an amount up to the Contingency Amounts reasonably expected to be incurred before the next following Payment Date.

"Co-Trustee" means Global Financial Funds Corp., a subsidiary of Global Bank Corporation. HSBC Investment Corporation (Panama) S.A., however, is the co-trustee for the Existing Notes until the Effective Date.

"Co-Trustee Agreement" means the Amended and Restated Agreement of Appointment and Acceptance of Co-Trustee, dated the Effective Date, among Newland, HSBC Bank USA, N.A. (as trustee for the Existing Notes), the Trustee, HSBC Investment Corporation (Panama) S.A. (as co-trustee for the Existing Notes), and the Co-Trustee.

41

"Debt Service" shall mean, as to any Payment Date, the amount of interest, Additional Amounts (if any), and of principal in respect of the Minimum Scheduled Amortization Amount (after adjustments to such amount resulting from any prior Optional Redemptions, Open Market Purchases, Supplemental Amortizations and Mandatory Prepayments up to and excluding such Determination Date) due on the Notes on such Payment Date.

"Debt Service Reserve Amount" shall be an amount up to the Debt Service then scheduled for the next Payment Date.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"Effective Date" means the effective date of the Pre-Packaged Plan, as determined by the U.S. bankruptcy court in which the Pre-Packaged Plan is filed.

"Eligible Investments" means (i) Cash Equivalents and (ii) securities issued by the government of the United States or the Republic of Panama, in each case having maturities not less than 180 days before the final Payment Date.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means any public or private issuance or sale of Equity Interests of Newland.

"Expense Payment Date" means the last Tuesday of each calendar month (or if such day is not a Business Day, on the next succeeding Business Day).

"Fair Market Value" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of Newland (unless otherwise provided in the Indenture and the Notes); provided that no such determination shall be required to be made by the Board of Directors in respect of any transaction (or series of related transactions) which involves, in the good faith determination of an officer of Newland, less than $1.0 million.

"Guarantee" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"Panama Account" means the account maintained at the Co-Trustee into which Newland Unit Proceeds (as defined herein) shall be transferred from the Panama Closing Account and into which Net Proceeds and Non-UPA Revenues shall be deposited.

"Panama Closing Account" means the account maintained at the Co-Trustee into which payments on Receivables in connection with Unit Purchase Agreements shall be deposited and Brokers' Commissions as well as Property Transfer Fees shall be paid from.

"IFRS" means the International Financial Reporting Standards and applicable accounting requirements published by the International Accounting Standards Board.

"Indebtedness" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

> (1)      in respect of borrowed money;

> (2)      evidenced by bonds, Notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

> (3)      in respect of banker's acceptances;

> (4)      representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions; or

> (5)      representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed.

if and to the extent any of the preceding items (other than letters of credit and Attributable Debt) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with IFRS. In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.

The amount of any Indebtedness outstanding as of any date will be (i) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; (ii) the principal amount of the Indebtedness, in the case of any other Indebtedness; and (iii) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of (a) the Fair Market Value of such assets at the date of determination and (b) the amount of the Indebtedness of the other Person.

"Insurance Proceeds" means any proceeds payable under an insurance policy as to which Newland or the Trustee is primary beneficiary or loss payee thereunder based upon a claim thereunder relating to a Subject Property.

"Investment" means, with respect to any Person, any direct or indirect investment by such Person in other Persons (including Affiliates) in the form of loans (including Guarantees or other obligations, other than advances to customers in the ordinary course of business that are recorded as accounts receivable), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other

43

securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with IFRS. The acquisition by Newland of a Person that holds an Investment in a third Person will be deemed to be an Investment by Newland in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in the final paragraph of the covenant described above under the caption "— Certain Covenants — Restricted Payments." Except as otherwise provided in the Indenture and the Notes, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"Latinclear" means Central Latinoamericana de Valores, S.A., a company organized under the laws of the Republic of Panama and a clearing house that is a participant in Clearstream.

"Licensor" means the licensor, Trump Marks Panama LLC.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell, give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"List Price" means, with respect to each Unit, the sale price for such Unit identified on the list of Units maintained by Cervera Real Estate Inc., the sales consultant for the Trump Ocean Club International Hotel & Tower in Panama City, Panama.

"Monthly Working Capital Amount" for each month shall be the amount set forth for such month and such category as set forth in an exhibit to the Indenture (the "MWC Budget"); provided, that, the Monthly Working Capital Amount for any month and category of expense shall be reduced to the extent of any amounts previously disbursed to Newland in such month and for such category from the Collection Account with respect to the Monthly Working Capital Amount for such month; provided, further, that, Monthly Working Capital Amount for any month and such category shall include any undrawn Monthly Working Capital Amounts from the preceding two months ("Carry-Over Amounts"), and provided further that the Monthly Working Capital Amount in any given month shall be increased by such amounts as are necessary to pay any bonus amounts then due under that certain Consulting Agreement, dated September 10, 2012, by and between Newland and Cervera Real Estate, Inc. (the "Cervera Contract") in such amounts  and on such payment dates as are provided in the Cervera Contract. Newland shall certify the amount of any such bonus payments under the Cervera Contract to the Trustee.  For the avoidance of doubt, Newland shall not be permitted in any month to have drawn from the Release Account or the Collection Account more than the Monthly Working Capital Amount for such month.

"Monthly Working Capital Reserve Amount" as of the first Business Day of any calendar month shall be a reserve at Newland's discretion of Monthly Working Capital Amounts for the next two following calendar months from such Business Day.  For the avoidance of doubt, Newland shall not be able to reserve more than two months of Monthly Working Capital

Amounts at any time. For the avoidance of doubt, such monies cannot be disbursed from the Collection Account to Newland but only reserved in the Collection Account by Newland.

"Monthly Collection Period" means the period beginning on and including the first day of each month (or, in the case of the first such period, the Effective Date), to but not including the first day of the next succeeding month.

"Mortgage" means the mortgage executed by Newland in favor of the Co-Trustee as agent for the Trustee pursuant to which Newland grants a mortgage to the Co-Trustee, as agent for the Trustee, over the Subject Properties to secure the payment and performance of its obligations under the Indenture and the Notes. The Mortgage shall be by way of assignment of, and any necessary conforming amendment to, the existing mortgage on the collateral under the indenture for the Existing Notes, such that the first priority security interest on the existing mortgage on the collateral under the indenture for the Existing Notes remains in place and unencumbered.

"MTA Agreement" means the currently existing agreement among Marvin Traub Associates ("MTA") and Newland which, among other things, provides for an amount payable to MTA by Newland based on certain amounts paid and payable by Newland to Licensor in respect of the Trump License Agreement, as such may be amended, restated, modified, supplemented, assigned and/or assumed on or prior to the Effective Date and from time to time thereafter.

"MTA Reserved Amount" shall mean as of any date an amount equal to the sum of all payments made to Marvin Traub Associates by or on behalf of Newland in respect of the Trump Reference Payments.

"Net Income" means, with respect to any specified Person, the net income (loss) of such Person, determined in accordance with IFRS and before any reduction in respect of preferred stock dividends, excluding, however:

(1)     any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with: (a) any Asset Sale; or (b) the disposition of any securities by such Person or the extinguishment of any Indebtedness of such Person; and

(2)     any extraordinary gain (but not loss), together with any related provision for taxes on such extraordinary gain (but not loss).

"Newland Unit Proceeds" means, in respect of a Unit Purchase Agreement, the total of all initial and subsequent deposits and installments (i.e., the purchase price) for a Unit under such Unit Purchase Agreement, less the Brokers' Commissions and Property Transfer Fees in respect of such Unit. Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions and Property Transfer Fees that will be due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and Property Transfer Fees and thereafter all remaining payments will be attributable to Newland Unit Proceeds. Notwithstanding the foregoing and for the avoidance of doubt, the Brokers' Commissions and Property Transfer Fees for the TOC

45

Casino Transaction shall include any investment banking and advisory fees of Newland related to the TOC Casino Transaction.

"Net Proceeds" shall mean the aggregate cash proceeds received by Newland in respect of any Prime Unit Sale, including in respect of any installment payment for such Prime Unit Sale, net of the commercially reasonable direct costs related to such Prime Unit Sale required to be paid by Newland, including, without limitation, legal and accounting expenses of Newland, applicable Licensor license fees, the TOC Casino BC Loan Amount (as defined herein), investment banking or advisory fees of Newland and other Brokers' Commissions (as defined herein), taxes paid or payable directly attributable to the Prime Unit Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, any reserve for adjustment in respect of performance obligations assumed by Newland in connection with the agreed sale price of such asset or assets and any reserve for adjustment in respect of the sale price of such asset or assets (in all cases until such reserve is released), and in all cases above established in accordance with IFRS and applicable Panamanian regulations.

"Non-Recourse Debt" means Indebtedness:

    (1)    as to which Newland (a) does not provide credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is not directly or indirectly liable as a guarantor or otherwise, or (c) does not constitute the lender;

    (2)    no default with respect to which would permit upon notice, lapse of time or both any holder of any other Indebtedness (other than the Notes) of Newland to declare a default on such other Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity; and

    (3)    as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of Newland.

"Noteholder Representative" means that certain representative, including any duly authorized representative or designee of such representative, appointed by the Steering Group to exercise certain duties and functions as more fully described herein and in an exhibit to the Indenture.

"Obligations" means any principal, interest, penalties, fees, expenses, indemnifications, reimbursements (including without limitation, reimbursement for legal fees and expenses), damages and other liabilities payable under the documentation governing any Indebtedness.

"Pari Passu Debt" means:

    (1)    all senior Indebtedness of Newland ranking pari passu with the Notes;

    (2)    any other Indebtedness of Newland permitted to be incurred under the terms of the Indenture and the Notes, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes; and

46

(3)      all Obligations with respect to the items listed in the preceding clauses (1) and (2).

Notwithstanding anything to the contrary in the preceding clauses (1), (2) and (3), Pari Passu Debt will not include:

(a)      any liability for federal, state, local or other taxes owed or owing by Newland;

(b)      any Indebtedness owed by Newland to any of its Affiliates;

(c)      any trade payables;

(d)      the portion of any Indebtedness that is incurred in violation of the Indenture and the Notes; or

(e)      Non-Recourse Debt.

"Permitted Business" means any of the lines of business conducted by Newland on the date of the Indenture and any businesses similar, related, incidental, complementary or ancillary thereto or that constitutes a reasonable extension or expansion thereof, including the construction, operation and management of the Project.

"Permitted Investments" means:

(1)      any Investment in Newland;

(2)      any Investment in an Eligible Investment;

(3)      any Investment by Newland in a Person, if as a result of such Investment, such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, Newland;

(4)      any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with the covenant described above under the caption "—Asset Sales";

(5)      any Investments received in compromise or resolution of (a) obligations of trade creditors or customers that were incurred in the ordinary course of business of Newland, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (b) litigation, arbitration or other disputes with Persons who are not Affiliates;

(6)      repurchases of the Notes pursuant to Mandatory Prepayments and Open Market Repurchases;

(7)      receivables owing to Newland created in the ordinary course of business;

(8)      Investments in existence on the date of the Indenture;

47

(9)    Investments in receivables arising from a seller financing transaction pursuant to, and in compliance with the terms of, the covenant "Seller Financing."

(10)    clauses 9-13, inclusive, of the definition of Asset Sale.

"Permitted Liens" means:

(1)    Liens arising through clauses 9-13, inclusive, of the definition of Asset Sale.

(2)    Liens on assets of Newland securing Pari Passu Debt that was permitted by the terms of the Indenture and the Notes to be incurred;

(3)    Liens in favor of Newland;

(4)    Liens on property of a Person existing at the time such Person is merged with or into or consolidated with Newland; provided that such Liens were not created in connection with or in contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with Newland;

(5)    Liens on property (including Capital Stock) existing at the time of acquisition of the property by Newland; provided that such Liens were in existence prior to, such acquisition, and not incurred in contemplation of, such acquisition;

(6)    Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(7)    Liens existing on the date of the Indenture;

(8)    Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(9)    Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business or good faith deposits in connection with bids, tenders, contracts or leases to which Newland is a party;

(10)    Liens created for the benefit of (or to secure) the Notes;

(11)    Liens arising out of judgments, decrees, orders or awards not giving rise to a Default in respect of which Newland shall in good faith be prosecuting on appeal or proceeding for review, which appeal or proceeding shall not have been finally terminated or if the period within such appeal or proceeding may be initiated shall not have expired;

(12)    encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and

48

other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of the real property of Newland or Liens incidental to the conduct of the business of Newland or to the ownership of its real property which do not in the aggregate materially adversely affect the value of said real property or materially impair its use in the operation of the business of Newland, in each case on property other than the Collateral;

(13)    any interest or title of a lessor under any operating lease;

(14)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution; provided that:

(a)    such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by Newland in excess of those set forth by regulations promulgated by the U.S. Federal Reserve Board; and

(b)    such deposit account is not intended by Newland to provide collateral to the depository institution; and

(15)    Liens for the purpose of securing the payment of all or a part of the purchase price of purchase money obligations or other payments incurred to finance the acquisition, lease, improvement or construction of, assets or property acquired or constructed in the ordinary course of business in connection with a Permitted Business provided that:

(a)    the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be incurred under the Indenture and the Notes and does not exceed the cost of the assets or property so acquired or constructed; and

(b)    such Liens are created within 180 days of construction or acquisition of such assets or property and do not encumber any other assets or property of Newland other than such assets or property and assets affixed or appurtenant thereto.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"Project" means the construction of the Trump Ocean Club International Hotel & Tower in Panama City, Panama.

"Property Transfer Fees" means any notary fees, recording fees, property or transfer taxes or other costs and expenses payable to the Panamanian government or any of its agencies in connection with the transfer of a Unit.

"Receivables" means all of Newland's rights and interests in and to (i) each Unit Purchase Agreement and all initial deposits and installment payments (including, without

limitation installment payments and cash payments made by the obligor thereunder in lieu of financing the related Unit) payable by the obligor thereunder, in each case limited to the amount of the Receivables under such Unit Purchase Agreement representing Newland Unit Proceeds (and not Brokers' Commissions), (ii) any payment under any contract of sale, lease, conveyance or other disposition of rights or interests in and to the Casino, restaurants and wellness spa to be developed as part of the Project, (iii) any Insurance Proceeds relating to the related Subject Property, (iv) any recoveries received from an obligor following a default by such obligor under the related Unit Purchase Agreement, and (v) all proceeds of all of the foregoing, and all Liens and other interests relating thereto.

"Release Account" means an account maintained by the Trustee into which funds will be transferred from the Panama Account.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Security Documents" means the Indenture, the Co-Trustee Agreement, the Mortgage, the Stock Pledge and the Beach Club Pledge Agreement.

"Shareholders" means the direct and indirect shareholders of Newland:  Ocean Point Development Corp. ("Ocean Point"); Roger Khafif; Upper Deck Properties, S.A. ("Upper Deck"); and Arias, Serna & Saravia; Espacios Urbanos, S.A.

"Stated Maturity" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of the Indenture or, if later, the date of incurrence of such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"Steering Group" means Greylock Capital Management, LLC, Moneda Asset Management, Polo Capital Management, Trinidad and Tobago Unit Trust Corporation and Portfolio Credit Management Limited, all via managed or controlled accounts or funds, collectively holding or controlling in excess of 41.76% of the outstanding principal amount of the Existing Notes.

"Subject Properties" means, at any time, (i) the real property relating to a Unit Purchase Agreement and (ii) the real property owned by Newland (other than pursuant to clause (i) above), which in each case shall be subject to the Lien of the Mortgage in favor of the Co-Trustee as agent for the Trustee.

"Subsidiary" means, with respect to any specified Person:

(1)    any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is

at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)      any partnership of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person (or any combination thereof).

"TOC Casino BC Loan Amount" means a portion of the BC Senior Loan in one or more advances an amount equal to the positive difference, if any, of (i) 5% of the gross purchase price of the TOC Casino Transaction minus (ii) the MTA Reserved Amount.

"TOC Casino Transaction" shall mean a transaction in which a purchaser acquires one or more units at the Project, and one of such acquired units is the casino unit, for purposes of developing a gaming enterprise at the Project.

"Trump License Agreement" means the License Agreement, dated as of March 16, 2006, originally, by and between Donald J. Trump, as original licensor, and K Group Developers, Inc., as original licensee, as assigned (i) to Licensor, pursuant to the assignment and assumption of license agreement, dated as of June 5, 2007, by and between Donald J. Trump and Trump Marks Panama LLC ("Licensor"), and (ii) to the Company, as licensee, pursuant the assignment and assumption of license agreement, dated as of June 5, 2007, among the Licensor, K Group Developers Inc. and the Company, as amended by the Eighth Amendment thereto, and as further amended from time to time after the Effective Date. Under the Trump License Agreement, the Company is required to pay variable license fees and royalties to Licensor for use of "Trump" name and marks.

"Trump Reference Payments" shall mean as of any date an amount equal to the cumulative sum of that portion of each payment made to Licensor on or prior to September 15, 2012 by or on behalf of Newland in respect of the Trump License Agreement which is applicable for the calculation of amounts due to Marvin Traub Associates by Newland pursuant to the MTA Agreement.

"Trustee" means CSC Trust Company of Delaware. HSBC Bank USA, N.A., however, is the trustee for the Existing Notes until the Effective Date.

"Unit" means the real property owned by Newland and subject to the Lien of the Mortgage in the name of the Co-Trustee that may be sold pursuant to a Unit Purchase Agreement.

"Unsold Unit" means a Unit for which there is not a related Unit Purchase Agreement that has been executed.

"Unit Purchase Agreement" means (i) a "Contract For A Promise Of Sale (Condominium Unit)," (ii) a "Contract For A Promise Of Sale (Hotel–Condominium Unit)" or (iii) a "Contract For A Promise Of Sale (Commercial Space)" between a purchaser of a unit in the Project, substantially in the forms thereof set forth as exhibits to the Indenture.

51

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

**EXHIBIT B**
**PREPACKAGED PLAN OF REORGANIZATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
IN RE:                                                       :    Chapter 11
                                                             :
NEWLAND INTERNATIONAL                                        :    Case No. _____ (___)
PROPERTIES, CORP.,                                           :
                                                             :
         DEBTOR.                                             :
                                                             :
-------------------------------------------------------------x


### PREPACKAGED PLAN OF REORGANIZATION FOR THE DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE


**GIBSON, DUNN & CRUTCHER LLP**
J. Eric Wise
Shira D. Weiner
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035


Proposed Attorneys for the Debtor
and Debtor in Possession


Dated:  March 29, 2013
         New York, New York

# TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

I. DEFINED TERMS, RULES OF INTERPRETATION, AND
    COMPUTATION OF TIME .......................................................................1
    1.1    Definitions....................................................................................1
    1.2    Rules of Construction ..................................................................1
    1.3    Computation of Time ...................................................................1

II. TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN:
    ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL
    COMPENSATION CLAIMS AND PRIORITY TAX CLAIMS ...................2
    2.1    Administrative Expense Claims....................................................2
    2.2    Professional Compensation Claims ..............................................2
    2.3    Indenture Trustee Fee Claims ......................................................3
    2.4    Priority Tax Claims......................................................................3
    2.5    U.S. Trustee Fees .........................................................................3

III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
    AND EQUITY INTERESTS........................................................................3
    3.1    Summary......................................................................................3
    3.2    Classification of Claims and Interests..........................................4
    3.3    Treatment of Class 1: Other Priority Claims ................................4
    3.4    Treatment of Class 2: Other Secured Claims ...............................4
    3.5    Treatment of Class 3: Prepetition Senior Secured Notes Claims. ...4
    3.6    Treatment of Class 4: General Unsecured Claims.........................5
    3.7    Treatment of Class 5: Interests ....................................................5
    3.8    Disclaimer Governing Unimpaired Claims ...................................5
    3.9    Controversy Concerning Impairment ...........................................5

IV. PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY
    IMPAIRED CLASS, AND CONSEQUENCES OF NON-
    CONFIRMABILITY .................................................................................6
    4.1    Voting Rights...............................................................................6
    4.2    Acceptance Requirements.............................................................6
    4.3    Tabulation of the Votes ................................................................6
    4.4    Non-Confirmability......................................................................6

V. MEANS FOR IMPLEMENTATION OF THE PLAN AND
    POSTPETITION GOVERNANCE OF REORGANIZED DEBTOR.........6
    5.1    General Settlement of Claims .......................................................6
    5.2    Sources of Consideration for Plan Distributions ...........................6
    5.3    Rule 2004 Examinations ..............................................................7
    5.4    Continued Existence ....................................................................7
    5.5    Re-vesting of Assets .....................................................................7

5.6       Implementation Transactions ...................................................................... 7
5.7       Cancellation or Amendment of Securities and Agreements ......................... 7
5.8       Reorganized Debtor ...................................................................................... 9
5.9       Post Effective Date Management .................................................................. 9
5.10      Noteholder Representative ............................................................................ 9
5.11      Directors and Officers of the Reorganized Debtor ..................................... 10
5.12      New Articles of Association and New Bylaws of the Reorganized
          Debtor ......................................................................................................... 10
5.13      Effectuating Documents; Further Transactions .......................................... 11
5.14      Entity Action .............................................................................................. 11
5.15      Section 1146 Exemption ............................................................................. 11
5.16      Preservation of Causes of Action ............................................................... 11
5.17      Non-occurrence of Effective Date .............................................................. 12

VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
     LEASES ................................................................................................................ 12
6.1       Assumption of Contracts and Unexpired Leases ........................................ 12
6.2       Cure of Defaults .......................................................................................... 13
6.3       Contracts and Leases Entered into after the Petition Date .......................... 13
6.4       Modifications, Amendments, Supplements, Restatements, or Other
          Agreements ................................................................................................. 13
6.5       Reservation of Rights .................................................................................. 14
6.6       Modification, Assumption and Non-Disturbance of Certain Plan
          Critical Agreements .................................................................................... 14

VII. PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR
      TREATING AND RESOLVING DISPUTED CLAIMS ............................................ 16
7.1       Distribution Record Date ............................................................................ 16
7.2       Date of Distributions ................................................................................... 17
7.3       Disbursing Agent ........................................................................................ 17
7.4       Rights and Powers of Disbursing Agent ..................................................... 17
7.5       Delivery of Distributions ............................................................................ 18
7.6       Withholding Taxes ...................................................................................... 18
7.7       Unclaimed Property .................................................................................... 18
7.8       Disputed Claims .......................................................................................... 19
7.9       Objections to Claims ................................................................................... 19
7.10      Setoffs and Recoupment ............................................................................. 19
7.11      Allocation of Plan Distributions Between Principal and Interest ............... 19
7.12      Allocation of Professional Fees .................................................................. 19
7.13      Compromises and Settlements .................................................................... 19
7.14      Reservation of Debtor's Rights ................................................................... 19
7.15      No Distributions Pending Allowance .......................................................... 19
7.16      Claims Paid or Payable by Third Parties .................................................... 20
7.17      Effect of Acceptance of Distribution .......................................................... 20

**VIII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED
     PROVISIONS**...................................................................................... **20**
     8.1    Discharge .................................................................................. 20
     8.2    Releases..................................................................................... 21
     8.3    No Successor Liability ............................................................... 25
     8.4    Term of Injunctions................................................................... 25
     8.5    Binding Effect............................................................................ 26
     8.6    Dissolution of the Committee .................................................... 26
     8.7    Post-Confirmation Date Retention of Professionals ................. 26
     8.8    Survival of Certain Indemnification Obligations...................... 26

**IX. CONDITIONS PRECEDENT TO CONSUMMATION** ....................... **26**
     9.1    Conditions Precedent ................................................................. 26
     9.2    Effect of Failure of Conditions Upon the Plan ........................ 28

**X. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT** ....... **29**
     10.1   Bankruptcy Court....................................................................... 29

**XI. MISCELLANEOUS PROVISIONS** ........................................................ **31**
     11.1   Plan Supplement ........................................................................ 31
     11.2   Exemption From Registration Requirements............................. 31
     11.3   Statutory Fees............................................................................ 31
     11.4   Third Party Agreements ............................................................. 31
     11.5   Amendment or Modification of the Plan ................................... 31
     11.6   Severability ................................................................................ 32
     11.7   Revocation or Withdrawal of the Plan....................................... 32
     11.8   Rules Governing Conflicts Between Documents ....................... 32
     11.9   Governing Law .......................................................................... 32
     11.10  Notices ....................................................................................... 32
     11.11  Interest and Attorneys' Fees ..................................................... 33
     11.12  Binding Effect............................................................................ 33
     11.13  No Admissions........................................................................... 33
     11.14  Exhibits ...................................................................................... 34

**APPENDIX A – UNIFORM GLOSSARY OF TERMS**.......................................**- 1 -**

## INTRODUCTION

Newland International Properties, Corp., as debtor and debtor in possession (the "**Debtor**"), respectfully proposes the following Prepackaged Plan of Reorganization pursuant to section 1121(a) of the Bankruptcy Code for the resolution of outstanding Claims against and Interests in the Debtor (the "**Plan**").

Reference is made to the Disclosure Statement with respect to the Plan, distributed contemporaneously herewith, for a discussion of the Debtor's history, business, property, operations, and risk factors, and a summary and analysis of the Plan and certain related matters. Subject to the restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor respectfully reserves the right to alter, amend, modify, revoke, or withdraw the Plan in the manner set forth herein prior to consummation of the Plan. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

THIS PLAN SHOULD BE CONSIDERED ONLY IN CONJUNCTION WITH THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED HEREWITH. THE DISCLOSURE STATEMENT IS INTENDED TO PROVIDE YOU WITH THE INFORMATION THAT YOU NEED TO MAKE AN INFORMED JUDGMENT WHETHER TO ACCEPT OR REJECT THIS PLAN.

## I.
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**1.1    Definitions.**  As used in the Plan, capitalized terms not otherwise defined herein shall have the meanings specified in Appendix A.  Unless the context otherwise requires, any capitalized term used and not defined in the Plan, but that is defined in the Bankruptcy Code, shall have the meaning assigned to that term in the Bankruptcy Code.

**1.2    Rules of Construction.**  For purposes of the Plan, unless otherwise provided herein:  (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement, whether existing or contemplated, or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, all references in the Plan to the Introduction, Articles, Sections, and Exhibits are references to the Introduction, Articles, Sections, and Exhibits of or to the Plan, as the same may be amended, waived, or modified from time to time; (c) captions and headings to Articles and Sections are intended for convenience of reference only and are not intended to be part of or to affect interpretation of the Plan; (d) the words "herein," "hereof," "hereunder," "hereto," and other words of similar import refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) whenever it appears appropriate from the context, each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; and (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**1.3    Computation of Time.**  In computing time prescribed or allowed by the Plan, unless otherwise expressly provided, Bankruptcy Rule 9006(a) shall apply.

**II.**

**TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN:
ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL COMPENSATION
CLAIMS AND PRIORITY TAX CLAIMS**

**2.1    Administrative Expense Claims.**    Other than in respect of Professional Compensation Claims (which shall be treated pursuant to Section 2.2 hereof) and Indenture Trustee Fee Claims (which shall be treated pursuant to Section 2.3 hereof), on the later of (a) the Effective Date or (b) if an Administrative Expense Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Expense Claim becomes Allowed, the Debtor will either (i) pay to each Holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim, or (ii) satisfy and discharge such Administrative Expense Claim in accordance with such other terms that the Debtor and such Holder shall have agreed upon; *provided*, *however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (i).   Other than with respect to Professional Compensation Claims and Cure Claims, notwithstanding anything in the Plan to the contrary, if an Administrative Expense Claim arises (x) based on liabilities incurred in, or to be paid in, the ordinary course of business during the Postpetition Period or (y) pursuant to an Executory Contract or Unexpired Lease, the Holder of such Administrative Expense Claim shall be paid in Cash by the Debtor (or after the Effective Date, by the Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Administrative Expense Claim without the need or requirement for the Holder of such Administrative Expense Claim to file a motion, application, claim or request for allowance or payment of an Administrative Expense Claim with the Bankruptcy Court, including those asserted by the Steering Group in connection with the payment of all reasonable fees and expenses of its professionals as provided for and set forth in the agreement memorialized in the order approving Cash Collateral and the Plan Support Agreement.

Notwithstanding any provision contained in the Plan to the contrary, unless otherwise agreed to by the respective Plan Critical Party, the reasonable, actual out-of-pocket legal expenses for outside counsel incurred by each Plan Critical Party for any non-adversarial legal matters relating to the Concessionary Amendments and the Chapter 11 Case prior to the Effective Date shall be paid in Cash on the Effective Date by the Debtor as Administrative Expense Claims, as and to the extent set forth in a side letter entered into among the Debtor and the Plan Critical Parties.

**2.2    Professional Compensation Claims.**  Notwithstanding any other provision of the Plan dealing with Administrative Expense Claims, any Person asserting a Professional Compensation Claim shall, no later than 45 days after the Confirmation Date, file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date.  To the extent that such an application is granted by the Bankruptcy Court, the requesting Person shall receive: (a) payment of Cash in an amount equal to the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Case, such payment to be made within the later of (i) the Effective Date or (ii) three Business Days after the order granting such Person's final fee application becomes a Final Order; or (b) payment on such other terms as may be mutually

2

agreed upon by the Holder of the Professional Compensation Claim and the Reorganized Debtor (but in no event shall the payment exceed the amount Allowed by the Bankruptcy Court less all interim compensation paid to such Professional during the Chapter 11 Case). After the Confirmation Date, any requirement that Professionals employed by the Debtor comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor shall be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval. All Professional Compensation Claims for services rendered after the Confirmation Date shall be paid by the Reorganized Debtor (or the Debtor prior to the Effective Date) upon receipt of an invoice therefor, or on such other terms as the Reorganized Debtor (or the Debtor prior to the Effective Date) and the Professional may agree, without the requirement of any order of the Bankruptcy Court.

**2.3    Indenture Trustee Fee Claims.** Notwithstanding any provision contained in this Plan to the contrary, unless otherwise agreed to by the Indenture Trustee and the Debtor, all Indenture Trustee Fee Claims incurred by the Indenture Trustee prior to the Effective Date and fees for services related to distributions pursuant to the Plan incurred other than as Disbursing Agent shall be paid in Cash on the Effective Date by the Debtor as Administrative Expense Claims, without the need for application to, or approval of, the Bankruptcy Court. An Indenture Trustee's Charging Lien will be discharged solely upon payment in full of the Indenture Trustee Fee Claims and fees incurred for services rendered as Disbursing Agent. Nothing herein shall be deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by the Debtor.

**2.4    Priority Tax Claims.** Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code or, at the Debtor's election upon notice to the Holder of an Allowed Priority Tax Claim no later than five days before the Confirmation Objection Deadline, in accordance with the terms set forth in section 1129(a)(9)(A) or 1129(a)(9)(B) of the Bankruptcy Code.

**2.5    U.S. Trustee Fees.** U.S. Trustee Fees incurred prior to the Effective Date will be paid on the Distribution Date in accordance with the applicable schedule for payment of such fees. Until the Chapter 11 Case is closed by entry of a final decree of the Bankruptcy Court, any additional U.S. Trustee Fees will be paid by the Reorganized Debtor.

## III.
## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**3.1    Summary.** Pursuant to section 1122 of the Bankruptcy Code, set forth below in Section 3.2 is a designation of Classes of Claims against and Interests in the Debtor. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed

Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, withdrawn, or otherwise settled prior to the Effective Date.

**3.2** **Classification of Claims and Interests.**  The classification of Claims against and Interests in the Debtor is as follows:

**3.2.1** **Class 1: Other Priority Claims.**  Other Priority Claims in Class 1 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.2** **Class 2: Other Secured Claims.**  Other Secured Claims in Class 2 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.3** **Class 3: Prepetition Senior Secured Notes Claims.**  Prepetition Senior Secured Notes Claims in Class 3 are Impaired and are entitled to vote on the Plan.

**3.2.4** **Class 4: General Unsecured Claims.**  General Unsecured Claims in Class 4 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.2.5** **Class 5: Interests.**  Interests in Class 5 are Unimpaired, are not entitled to vote on the Plan, and are presumed to accept the Plan.

**3.3** **Treatment of Class 1: Other Priority Claims**

**3.3.1** **Impairment and Voting.**  Class 1 is Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim in Class 1 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**3.3.2** **Treatment.**  On the Distribution Date, each Holder of an Allowed Other Priority Claim shall receive in full satisfaction, release, and discharge of and in exchange for such Claim: (a) payment of Cash in an amount equal to the unpaid portion of such Allowed Other Priority Claim, or (b) such other treatment that the Debtor and such Holder shall have agreed upon in writing; *provided, however*, that such agreed-upon treatment shall not be more favorable than the treatment provided in clause (a) of this Section 3.3.2.

**3.4** **Treatment of Class 2: Other Secured Claims**

**3.4.1** **Impairment and Voting.**  Class 2 is Unimpaired by the Plan.  Each Holder of an Allowed Other Secured Claim in Class 2 as of the Record Date is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**3.4.2** **Treatment.**  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed Other Secured Claim in Class 2 shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed Other Secured Claims.

**3.5** **Treatment of Class 3: Prepetition Senior Secured Notes Claims.**

**3.5.1  Impairment and Voting.**  Class 3 is Impaired by the Plan.  Each Holder of an Allowed Prepetition Senior Secured Notes Claim in Class 3 as of the Record Date is entitled to vote such Claim to accept or reject the Plan.

**3.5.2    Treatment.**  Each Holder of an Allowed Prepetition Senior Secured Notes Claim in Class 3 shall receive New Notes in an aggregate principal amount equal to the principal amount of such Holder's Allowed Prepetition Senior Secured Notes Claim plus interest accrued and unpaid thereon through the Effective Date.  The Prepetition Senior Secured Notes Claims shall be allowed in the amount of $220 million as of the date hereof plus any accrued interest up through the Effective Date.

### 3.6    Treatment of Class 4: General Unsecured Claims

**3.6.1  Impairment and Voting.**  Class 4 is Unimpaired by the Plan.  Each Holder of an Allowed General Unsecured Claim in Class 4 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**3.6.2    Treatment.**  To the extent that a Holder of an Allowed General Unsecured Claim has not been paid in full as of the Confirmation Date, unless such Holder agrees to a less favorable treatment, each Allowed General Unsecured Claim in Class 4 shall be reinstated, paid in full, or otherwise rendered Unimpaired and the Reorganized Debtor shall remain liable for the Allowed General Unsecured Claim.  Without limiting the generality of the foregoing, if an Allowed General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an Executory Contract or Unexpired Lease, the Holder of such General Unsecured Claim shall be paid in Cash by the Debtor (or, after the Effective Date, by the Reorganized Debtor) pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such Allowed General Unsecured Claim. The Debtor reserves its rights to dispute in the Bankruptcy Court or any other court with jurisdiction the validity of any General Unsecured Claim at any time prior to the Claims Objection Bar Date.

### 3.7    Treatment of Class 5: Interests

**3.7.1    Impairment and Voting.**  Class 5 is Unimpaired by the Plan. Each Holder of an Interest in Class 5 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**3.7.2    Treatment of Interests.**  Interests in Class 5 shall be reinstated.

### 3.8    Disclaimer Governing Unimpaired Claims

Except as otherwise provided herein, nothing under the Plan will affect the Reorganized Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of the assertion of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.9    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## IV.
## PROVISIONS REGARDING VOTING, EFFECT OF REJECTION BY IMPAIRED CLASS, AND CONSEQUENCES OF NON-CONFIRMABILITY

**4.1    Voting Rights.**  Each Holder of an Allowed Claim as of the Voting Deadline that is not (a) deemed to have rejected the Plan or (b) conclusively presumed to have accepted the Plan, and that held such Claim as of the Record Date, shall be entitled to vote to accept or reject the Plan.  The instructions for completion of the Ballots are set forth in the Ballot Instructions.  Approval for the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan will be sought in the Scheduling Motion.   The procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan are described in the Disclosure Statement.

**4.2    Acceptance Requirements.**  An Impaired Class of Claims shall have accepted the Plan if votes in favor of the Plan have been cast by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

**4.3    Tabulation of the Votes.**  If the Impaired Class does not vote to accept the Plan, the Debtor reserves the right to modify the Plan.

**4.4    Non-Confirmability.**  If the Plan has not been accepted by the Class of Claims entitled to vote with respect thereto in accordance with Section 4.2 hereof, and the Debtor determines that the Plan cannot be confirmed under section 1129(b) of the Bankruptcy Code, or if the Bankruptcy Court, upon consideration, declines to approve Confirmation of the Plan, the Debtor may seek to (a) propose a new plan or plans of reorganization for the Debtor, (b) amend the current Plan incorporated therein to satisfy any and all objections, (c) withdraw the Plan or (d) convert or dismiss the Chapter 11 Case.

## V.
## MEANS FOR IMPLEMENTATION OF THE PLAN AND POSTPETITION GOVERNANCE OF REORGANIZED DEBTOR

**5.1    General Settlement of Claims**.  As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  Subject to Article VII hereof, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**5.2    Sources of Consideration for Plan Distributions**

**5.2.1    Debtor's Available Cash.**   Cash will be available from the Debtor's operations.

**5.2.2    The New Notes.**   On the Effective Date, the Reorganized Debtor shall issue the New Notes.  Confirmation of the Plan shall be deemed approval of the New Notes (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith) and authorization and direction for the Debtor to issue the New Notes, subject to such modifications as the Reorganized Debtor, with the consent of the Steering Group (which consent shall not be unreasonably withheld), deems to be reasonably necessary to consummate such New Notes.

**5.2.3    Use of Proceeds.**   Cash available on the Effective Date shall be used by the Reorganized Debtor (a) to fund the Debtor's exit from the Chapter 11 Case, including, without limitation, the funding of (i) Allowed Administrative Expense Claims, (ii) Allowed Professional Compensation Claims, (iii) Indenture Trustee Fee Claims; (iv) Allowed Priority Tax Claims, (v) Allowed Other Priority Claims, and (vi) Distributions to be made on the Distribution Date; and (b) to fund ongoing operating expenses of the Reorganized Debtor.

**5.3    Rule 2004 Examinations.**   The power of the Debtor to conduct examinations pursuant to Bankruptcy Rule 2004 will be expressly preserved following the Effective Date.

**5.4    Continued Existence.**   Except as provided herein, the Debtor, as Reorganized Debtor, will continue to exist on or after the Effective Date as a corporate entity, with all the rights and powers applicable to such entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution, or otherwise) under applicable law.

**5.5    Re-vesting of Assets.**   Except as expressly provided herein, the Assets of the Debtor's Estate shall re-vest with the Reorganized Debtor on the Effective Date.   The Bankruptcy Court shall retain jurisdiction to determine disputes as to property interests created or vested by the Plan.  From and after the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, except as provided herein.   As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims and Interests, except as, and to the extent, provided in this Plan.

**5.6    Implementation Transactions.**   In connection with implementation of the Plan, the Debtor (or, after the Effective Date, the Reorganized Debtor) (a) shall effectuate the Plan through the transactions described in the Plan Supplement and (b) may engage in any other transaction in furtherance of the Plan.

**5.7    Cancellation or Amendment of Securities and Agreements.**   On the Effective Date, the Plan shall be consummated in accordance with the provisions set forth herein and, upon the effectiveness of such transactions on the Effective Date (including through execution and delivery of the New Notes and the other documents required to be executed and delivered on the Effective Date):  (a) the Prepetition Senior Secured Notes, and any other Certificate, Interest, share, note, bond, indenture, including the Indenture, except to the extent the Indenture is

7

amended and/or restated to permit the issuance of the New Notes under the Indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor (except the mortgage and such agreements, Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtor that are reinstated) shall be deemed cancelled and terminated as permitted by section 1123(a)(5)(F) of the Bankruptcy Code without further act or action under applicable agreements, law, orders, regulations or rules, and the Reorganized Debtor shall not have any continuing obligations therefor; (b) a first priority security interest in or first mortgage on the Collateral under the New Indenture and the New Notes to secure the payment of all obligations of the Debtor under the New Indenture and the New Notes shall be granted to the Indenture Trustee and Co-Trustee, as applicable, which grant to the Co-Trustee, as agent of the Indenture Trustee, shall be by way of assignment of, and any necessary conforming amendment to, the existing mortgage on the Collateral under the Indenture for the Prepetition Senior Secured Notes, such that the first priority security interest on the existing mortgage on the Collateral under the Indenture for the Prepetition Senior Secured Notes remains in place and unencumbered; and (c) the Claims against and Interests in the Debtor pursuant, relating, or pertaining to any agreements, indentures, including the Indenture, except to the extent the Indenture is amended and/or restated to permit the issuance of the New Notes under the Indenture, certificates of designation, bylaws, or certificate or articles of incorporation, formation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor (except the mortgage and such agreements, Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtor that are specifically reinstated) shall be released and discharged; *provided*, *however*, that notwithstanding Confirmation or consummation, the Prepetition Senior Secured Notes, the Indenture, or, if the Indenture is amended and/or restated, the Indenture prior to such amendment and/or restatement, and any other similar agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of: (i) allowing such Holder to receive Distributions under and in accordance with the Plan; (ii) allowing the Disbursing Agent and the Indenture Trustee (to the extent provided in the Plan) to make distributions, if any, on account of Allowed Claims; (iii) allowing the Disbursing Agent and the Indenture Trustee to perform any necessary administrative functions with respect to the distributions (if any) to be made on account of Allowed Claims; and (iv) permitting the Indenture Trustee to (a) maintain and assert any Charging Liens and any rights for payment of Indenture Trustee fees, costs, expenses, and indemnification, (b) seek compensation and reimbursement for any reasonable and documented fees and expenses, if any, incurred in making distributions pursuant to the Plan, (c) maintain and enforce any right to indemnification under the Indenture, (d) exercise its rights and obligations relating to the interest of their holders pursuant to the Indenture, and (e) appear in these Chapter 11 cases.

If the record holder of a Prepetition Senior Secured Note is the Depository Trust Company or its nominee or another securities depository or custodian thereof, and such Prepetition Senior Secured Notes are represented by a global security held by or on behalf of the Depository Trust Company or such other securities depository or custodian, then the beneficial holder of such a Prepetition Senior Secured Note shall be deemed to have surrendered such

holder's upon surrender of such global security by the Depository Trust Company or such other securities depository or custodian thereof.

5.8     **Reorganized Debtor.**  On the Effective Date, the New Board of the Reorganized Debtor shall be appointed, and shall adopt the New Articles of Association and/or New Bylaws. The Reorganized Debtor shall be authorized to adopt any other agreements, documents, and instruments and to take any other action necessary and desirable to consummate the Plan. The Corporate Governance Documents will be substantially in the form filed in the Plan Supplement.

5.9     **Post Effective Date Management.**  Pursuant to the provisions of the Corporate Governance Documents and the Reorganized Debtor's operative constituent documents, which may be amended from time to time in accordance with their terms and applicable law, the operation, management, and control of the Reorganized Debtor shall be the responsibility of its board of directors and senior officers (as provided under applicable law).  Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtor from the Petition Date through and until the Effective Date.

5.10     **Noteholder Representative.**  Prior to the Effective Date, the Steering Group will appoint a representative (including any duly authorized representative or designee of such representative, the "***Noteholder Representative***") to discharge certain reporting functions, as more fully described in the Plan Supplement.  The appointment of the Noteholder Representative shall be duly recorded in the Panamanian Public Registry and the Reorganized Debtor's by-laws and, to the extent necessary (to the satisfaction of the Steering Group), other organizing documents will be amended or supplemented to recognize the Noteholder Representative and his/her rights and provide that his/her appointment and service would be governed by the Noteholders holding a majority in principal amount of the Notes ("Majority Holders").  The selection (including replacements thereof) of the Noteholder Representative shall be in each case subject to reasonable prior notice to the Reorganized Debtor; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group).

The function of the Noteholder Representative shall be to communicate in writing to the trustee under the New Indenture defaults thereunder and to review certifications identified herein.  In this regard, the Reorganized Debtor shall covenant for all periods on or after the Effective Date that the Noteholder Representative shall have full access, subject in all cases to confidentiality provisions, to certain information and meetings, all as will be more fully described in the Plan Supplement.  The Noteholder Representative shall not be required to communicate with, or take directions from, holders of the New Notes.

The Noteholder Representative shall execute a confidentiality agreement with the Reorganized Debtor prior to appointment, which agreement shall be negotiated with the Steering Group before the Effective Date.

The Noteholder Representative function shall cease to exist following the date which is the later of eighteen (18) months following the Effective Date or three (3) months after the occurrence of an Event of Default under the Indenture, unless such Default has been earlier cured or waived.

9

**5.11    Directors and Officers of the Reorganized Debtor.**  On and after the Effective Date, the business and affairs of the Reorganized Debtor will be managed by the New Board and the officers, directors, managers or other responsible persons identified in the Plan Supplement. The New Board will be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the New Board (the "***Noteholders' Board Nominee***"), which Delegate shall not have any voting rights except to the limited extent described below.  The selection (including replacements thereof) of the Noteholders' Board Nominee shall be in each case subject to reasonable prior notice to the Reorganized Debtor; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group).  The Corporate Governance Documents shall provide that all New Board decisions shall be taken unanimously and that, in the case of a non-unanimous vote, the Nominee shall have in such instance (and only in such instance) the ability to produce the deciding vote.  Upon payment in full of the New Notes, the voting rights held by the Noteholders' Board Nominee shall be relinquished, the Noteholders' Board Nominee shall resign from the New Board, and the Noteholder Representative provisions in the Corporate Governance Documents shall be null and void. Biographical information regarding these proposed officers, directors, managers and other responsible persons will be set forth in the Plan Supplement.  A schedule of the annual compensation to be paid to persons serving as executives, officers, directors, managers or responsible persons as of the Effective Date will be set forth in the Plan Supplement.

Pursuant to the Plan, shareholder voting agreements will be entered into by the Shareholders and a nominee of the Noteholders (the "***Noteholders' Shareholder Nominee***"), which agreements shall provide that 30% of the Shareholder voting rights (but not economic entitlements) attributable to the Debtor's capital stock shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders, such that shareholder voting at the Debtor (and otherwise affecting the Trump Ocean Club) shall be effectively allocated as follows: Upper Deck (21%), Mr. Roger Khafif (49%), and Noteholders' Shareholder Nominee (30%) (together, the "***Voting Persons***").  For the avoidance of doubt, the 30% shareholder voting rights of the Noteholders' Shareholder Nominee shall only be applicable to break a vote tie between the other Voting Persons.  "Shareholders," as used herein, shall mean:  the direct and indirect shareholders of the Company:  Ocean Point Development Corp. ("Ocean Point"); Roger Khafif; Upper Deck Properties, S.A. ("Upper Deck"); Arias, Serna & Saravia; Espacios Urbanos, S.A.

Carlos Saravia shall be appointed as CEO, President and Legal Representative of the Reorganized Debtor.  Mr. Saravia may be replaced in such roles any time after September 30, 2013, but shall be given at least thirty (30) days' notice of any such intended replacement.  A more fulsome description of the duties and power of the CEO and the terms and provisions of Mr. Saravia's appointment will be included in the Plan Supplement.

For the avoidance of doubt, the appointment of corporate officers of the Reorganized Debtor (excluding the position of CEO) shall not be subject to preapproval of the Noteholders' Board Nominee.

**5.12    New Articles of Association and New Bylaws of the Reorganized Debtor.**  The New Bylaws and New Articles of Association (as applicable), among other things, shall prohibit

the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtor may amend and restate its New Bylaws and/or New Articles of Association (as applicable), as permitted under applicable laws, subject to the terms and conditions of such documents.

**5.13    Effectuating Documents; Further Transactions.**  On and after the Effective Date, the Reorganized Debtor and the officers and members of the New Board are authorized to and may, in the name of and on behalf of the Reorganized Debtor, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**5.14    Entity Action.**  Upon the Effective Date, to the extent permitted by applicable law, all actions contemplated by the Plan shall be deemed ratified, authorized, and approved in all respects, including but not limited to:  (a) the selection of the directors and officers for the Reorganized Debtor; (b) the issuance of the New Notes and related transaction security agreements and any other ancillary agreements relating to the foregoing; and (c) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the entity structure of the Debtor or the Reorganized Debtor and any entity action required by the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect without any requirement of further action by the security holders, directors, or officers of the Debtor or the Reorganized Debtor.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, including the New Notes and any and all other agreements, documents, securities, and instruments relating to any of the foregoing.  The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under any non-bankruptcy law.

**5.15    Section 1146 Exemption.**  Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any United States document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate United States state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**5.16    Preservation of Causes of Action.**  Unless expressly released or waived pursuant to Article VIII of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the

Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Person as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against such Person. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against any Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or consummation of the Plan.

The Reorganized Debtor reserves and will retain the Causes of Action notwithstanding the repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Person shall vest in the Reorganized Debtor, as the case may be. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**5.17    Non-occurrence of Effective Date.** In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## VI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.1    Assumption of Contracts and Unexpired Leases.** Except as otherwise provided herein or pursuant to the Confirmation Order, all Executory Contracts and Unexpired Leases that exist between the Debtor and any Person, including the Plan Support Agreement, shall be and shall be deemed to be assumed pursuant to section 365(a) of the Bankruptcy Code as of the Effective Date. Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases provided for herein. Each Executory Contract and Unexpired Lease assumed pursuant to this Section 6.1 or by any order of the Bankruptcy Court that has not been assigned to a third party prior to the Confirmation Date shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under section 365 of the Bankruptcy Code.

**6.2    Cure of Defaults.**  Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan, to the extent not already paid by the Debtor, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (a) the Cure Claim, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cure Claims shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  At least ten (10) days prior to the Confirmation Hearing, the Debtor shall provide for notices of proposed assumption and proposed Cure Claims to be sent to applicable third parties.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim must be filed and served in accordance with, and otherwise comply with, the provisions of the Scheduling Order related to assumption of Executory Contracts and Unexpired Leases.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim will be deemed to have assented to such assumption or Cure Claim.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**6.3    Contracts and Leases Entered into after the Petition Date.**  Contracts and leases entered into during the Postpetition Period by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**6.4    Modifications, Amendments, Supplements, Restatements, or Other Agreements.**  Unless otherwise provided in the Plan or in the order assuming an Executory Contract or Unexpired Lease, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.

Modifications, amendments, supplements, and restatements to any prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtor during the Postpetition

Period shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**6.5    Reservation of Rights.**  Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on a list of assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized Debtor, as applicable, shall have 30 days following entry of a Final Order to resolve and to alter its treatment of such contract or lease.

**6.6    Modification, Assumption and Non-Disturbance of Certain Plan Critical Agreements.**  The Debtor and the Debtor's principal assets are subject to certain Executory Contracts and an Unexpired Lease that the Debtor considers critical to the operations of Trump Ocean Club, the business of the Debtor and the success of the Plan, including the Trump License Agreement and other Hotel Agreements (collectively, the "***Plan Critical Agreements***"). Currently, and as of the Petition Date, the Debtor is and will be in continuing material default of its obligations under certain of the Plan Critical Agreements, including defaults in performance and payment obligations, which defaults remain to be cured or waived.  The Plan provides for the cure or waiver of such defaults (to the extent known and identified), for the assumption of each of the Plan Critical Agreements to which the Debtor is a party and for the non-disturbance of each other Plan Critical Agreement, subject to the certain Concessionary Amendments, as described in Section V.F.6 of the Disclosure Statement.  Such cures, waivers, modifications, assumptions and non-disturbance of the Plan Critical Agreements are integral to the Plan and are the basis for determining that each of the counterparties to the Plan Critical Agreements (each, a "***Plan Critical Counterparty***") is an Unimpaired Claimant and not entitled to vote on the Plan.

In pursuit of the Plan, the Debtor has negotiated the Concessionary Amendments, pursuant to which, among other things, Licensor, Manager, Hotel Manager and Hotel Asset Manager have accepted and granted material concessions for the benefit of the Debtor, Trump Ocean Club and the Plan, including substantial reductions and rescheduling of licensing and management fees, modification of certain performance obligations and the cure of certain known and identified defaults. While each of the Concessionary Amendments has been fully negotiated and executed by all parties thereto, each remains subject to certain conditions to effectiveness (as set forth in the Concessionary Amendments (the "***Concessionary Amendment Conditions***"), including, that (i) the Plan shall have become effective, by no later than July 15, 2013, subject to final documentation that is in substantial compliance with the Plan, as set forth herein and in the Disclosure Statement, and not materially adverse to the operations of the Trump Ocean Club as contemplated by the Plan Critical Agreements (as modified by the Concessionary Amendments) and to the interests of the Plan Critical Parties thereunder, (ii) the Debtor shall have assumed pursuant to the Plan each of the Plan Critical Agreements to which it is a party, and shall not otherwise disturb the other Plan Critical Agreements to which it may not be a direct party, in each case, as modified solely by the applicable Concessionary Amendments, and such assumptions shall have been approved as part of the Confirmation Order, such that, after giving effect to Plan, each of the Plan Critical Agreements shall remain in full force and effect, as in effect immediately prior to the Petition Date, subject only to the Concessionary Amendments,

14

(iii) the Indenture Trustee shall have entered into a non-disturbance agreement (the form of which has also been substantially negotiated), with respect to the Plan Critical Agreements, as modified solely by the Concessionary Amendment, (iv) at all times after the execution of the Concessionary Amendments, including after the Petition Date, until the satisfaction of the Concessionary Amendment Conditions, there shall be no newly discovered defaults, and no further deterioration of the level of performance, by the Debtor or its Affiliates under any of the Plan Critical Agreements, and (v) the release and discharge by the Debtor and each of its Affiliates of any Cause of Action it or they may have against any of the Plan Critical Counterparties, as set forth herein.

To effectuate the Plan, each of the Concessionary Amendments, and each of the Plan Critical Agreements to which the Debtor is a party, as modified solely by the Concessionary Amendments, shall be automatically assumed by the Debtor, and the entry of the Confirmation Order shall constitute approval of each such assumption, pursuant to section 365(a) of the Bankruptcy Code, in each case, without the requirement of any further action by the Debtor or any Plan Critical Counterparty, and without prejudice to the rights of the Debtor or any Plan Critical Counterparty, as party to an Executory Contract or Unexpired Lease, as a Claimant or otherwise in the Chapter 11 Case, including, without limitation, the right to file a Proof of Claim, to dispute a Cure Claim, to seek adequate assurance of future performance and/or to compel the assumption or rejection of a Plan Critical Agreement, in each case, based on the terms and conditions of the Plan Critical Agreements, without giving effect to the Concessionary Amendments, in the event that the Plan is not confirmed, any of the other Concessionary Amendment Conditions are not satisfied or a Bankruptcy Court order is entered or other event occurs, in the reasonable determination of a Plan Critical Counterparty, makes it unlikely that the Plan will be Confirmed or that any of the other Concessionary Amendment Conditions shall not be satisfied by July 15, 2013.  Each Plan Critical Counterparty shall be entitled to exercise such right at any time prior to the satisfaction of the Concessionary Amendment Conditions, notwithstanding any time bar for the exercise of such rights set forth in the Plan or any Scheduling Order.

Without limiting the foregoing, (x) until the Plan is confirmed and, with it, the Plan Critical Agreements are assumed, as modified solely by the Concessionary Amendments, and each of the other Concessionary Amendment Conditions are satisfied, no obligation of, or default by, the Debtor or its Affiliates under any of the Plan Critical Agreements (as in effect prior to the Concessionary Amendments), and no Claim by any of the Plan Critical Counterparties in respect thereof, shall be or be deemed cure, waived, released, discharged or time barred, in any respect, and (y) upon confirmation of the Plan, including assumption of each of the Plan Critical Agreements, modified solely by the Concessionary Amendments, and the satisfaction of all other Concessionary Amendment Conditions, except as expressly set forth in such Concessionary Amendments, or in any written agreement accompanying such Concessionary Amendment that shall have been executed by the applicable Plan Critical Counterparty, no obligation of, or default by, the Debtor or its Affiliates, and no Claim by any Plan Critical Counterparty, under or with respect to such Plan Critical Agreement, shall be or be deemed cure, waived, released or discharged in any respect, and (z) with respect to any such obligation or default that has not been cured, waived, released or discharged, the applicable Plan Critical Counterparty has, and shall be deemed to have, reserved all of its Claims, rights and remedies.

15

None of the Plan Critical Counterparties has participated in the preparation of the Plan, the Disclosure Statement or any other Plan Document.  No Plan Critical Counterparty has, or shall be deemed to have, made any representation or warranty with respect to the Plan, the Disclosure Statement or any other Plan Document, or any statements or information contained in any of the foregoing, or that any or all of the foregoing (in whole or in part) is accurate, complete, not misleading, sufficient or appropriate for any legal or other purpose.  In agreeing to execute the Concessionary Amendments and to allow the Plan Critical Agreements to be assumed, as modified by the Concessionary Amendments, each of the Plan Critical Counterparties is relying on information provided by the Debtor and its Affiliates, including as set forth in the Plan, Disclosure Statement and other Plan Documents, and has reserved its rights with respect to any material misrepresentations or other defects in such disclosures.  No other Claimant or other person shall be entitled to assert that such agreement by a Plan Critical Counterparty constitutes an endorsement of the Plan, the Disclosure Statement or any Plan Document, or to hold any of the Plan Critical Counterparties responsible or liable for any information or omissions contained herein or therein.  For purposes of the Plan, each of the Plan Critical Counterparties, and its respective members, directors, officers, employees, representative, advisors and agents, shall be and be deemed an Exculpated Party and a Released Party.

None of the Plan Critical Counterparties participated in the preparation of the Plan, including the Liquidation Analysis, Projections or any other information contained in the Plan Documents, and no representation, warranty or endorsement with respect to the Liquidation Analysis, Projections or any other statements or information contained in the Plan, or to the Plan itself, has been made or will be made by any of the Plan Critical Counterparties, nor may any such representation, warranty or endorsement be implied by the execution of the Concessionary Amendments, the assumption of the Hotel Agreements as modified by the Concessionary Amendments, the failure of any Plan Critical Counterparty to object to the Plan or to any statement or information contained in or omitted from any of the Plan Documents, nor any other action or inaction on the part of any the Plan Critical Counterparties.  The Debtor remains solely responsible for all statements, information and omissions contained in the Plan.

Except as otherwise disclosed in the Disclosure Statement or the Plan, or as may be required to be disclosed by the Bankruptcy Court or by law, the Debtor has agreed with certain Plan Critical Counterparties to maintain the confidentiality of the specific terms and conditions of the Hotel Agreements and Concessionary Amendments, which may be disclosed only on a need to know basis.  For that reason, copies of the Hotel Agreements and Concessionary Amendments shall be made available only to Claimants entitled to vote on the Plan and their representatives, subject to execution of a confidentiality agreement with respect to such agreements.

## VII.
## PROVISIONS GOVERNING DISTRIBUTIONS; PROCEDURES FOR TREATING AND RESOLVING DISPUTED CLAIMS

**7.1    Distribution Record Date.**  For purposes of the Plan, as of 5:00 p.m. prevailing U.S. Eastern Time on the Distribution Record Date, the records of ownership of Claims against the Debtor (including the claims register in the Chapter 11 Case) will be closed; *provided,*

*however*, the Distribution Record Date shall not apply to any distributions of securities.  For purposes of the Plan, the Debtor, the Estate, the Reorganized Debtor, and the Disbursing Agent shall have no obligation to recognize the transfer of any of the Claims against the Debtor occurring after the Distribution Record Date, and shall be entitled for all purposes relating to the Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date.

**7.2    Date of Distributions.**  Distributions pursuant to the Plan shall be made on the dates otherwise set forth in the Plan or as soon as practicable thereafter.  In the event that any payment or any act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**7.3    Disbursing Agent.** All distributions under the Plan shall be made by the Debtor as Disbursing Agent or such other entity designated as a Disbursing Agent by the Debtor on or after the Effective Date. The Indenture Trustee shall be the Disbursing Agent for the holders of Prepetition Senior Secured Notes Claims. The Debtor and the Indenture Trustee shall not be required to give any bond, surety, or any other security for the performance of their duties as Disbursing Agent unless otherwise ordered by the Bankruptcy Court.  If a Disbursing Agent is not the Debtor or the Indenture Trustee, such Person shall obtain a bond or surety for the performance of its duties, and all costs and expenses incurred to obtain the bond or surety shall be borne by the Debtor.  Furthermore, the Disbursing Agent shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any bond or surety that is obtained in connection with this Section 7.3.  The Debtor shall inform the U.S. Trustee in writing of any changes to the identity of the Disbursing Agent.

**7.4    Rights and Powers of Disbursing Agent.**

**7.4.1** *Powers of the Disbursing Agent*. The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**7.4.2** *Expenses Incurred on or After the Effective Date*. Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Debtor in the ordinary course of business or in the manner and upon such other terms as may be otherwise agreed by the Debtor and the Disbursing Agent.

**7.5**     **Delivery of Distributions.**

    **7.5.1**   Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Plan Debtors or their agents, as applicable, unless the Plan Debtors have been notified in writing of a change of address, including by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules.

    **7.5.2**   Notwithstanding the foregoing, distributions to holders of Prepetition Senior Secured Notes Claims will be made to or through the direction of the Indenture Trustee pursuant to the terms of the Indenture. Any distribution to the Indenture Trustee shall be deemed a distribution to the respective holder of a Prepetition Senior Secured Notes Claim under the Indenture.

**7.6**     **Withholding Taxes.**

    **7.6.1**   The Disbursing Agent shall comply with all withholding, reporting, certification, and information requirements imposed by any federal, state, local, or foreign taxing authority and all distributions hereunder shall, to the extent applicable, be subject to any such withholding, reporting, certification, and information requirements.

    **7.6.2**   Persons entitled to receive Distributions hereunder shall, as a condition to receiving such Distributions, provide such information and take such steps as the Disbursing Agent may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Disbursing Agent to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

    **7.6.3**   Any Person that does not provide the Disbursing Agent with requisite information after the Disbursing Agent has made at least three attempts (by written notice or request for such information, including on the Ballot) to obtain such information, may be deemed to have forfeited such Person's right to such Distributions, which shall be treated as unclaimed property under Section 7.7.

    **7.7**     **Unclaimed Property.**   Any Person that fails to claim any Distribution to be distributed hereunder (including, but not limited to, by failure to comply with the Distribution Procedures applicable to the relevant Distribution) by the Forfeiture Date will forfeit all rights to any Distributions hereunder, and shall have no claim whatsoever with respect thereto against the Debtor or its Estate, the Reorganized Debtor, or any Holder of an Allowed Claim to which Distributions are made. Upon the forfeiture of Cash, such Cash shall be the property of the Debtor or the Reorganized Debtor, as applicable; upon the forfeiture of the right to Distributions of any debt issued under the New Notes, such Distributions shall be cancelled. Nothing herein shall require further efforts by any Person to attempt to locate or notify any other Person with respect to any forfeited property.

7.8 **Disputed Claims.** If the Debtor, the Reorganized Debtor, or any other party in interest disputes any Claim against the Debtor, such dispute shall be (a) adjudicated in the Bankruptcy Court or in any other court having jurisdiction over such dispute, or (b) settled or compromised without any further notice to or action, order, or approval by the Bankruptcy Court, as the case may be, under applicable law. Among other things, the Debtor (on or before the Effective Date) or the Reorganized Debtor (after the Effective Date) may elect, at its sole option, to object to or seek estimation under section 502 of the Bankruptcy Code with respect to any Proof of Claim filed by or on behalf of a Holder of a Claim against the Debtor.

7.9 **Objections to Claims.** Unless a later or different time is set by Final Order or otherwise established by other provisions of the Plan, all objections to Claims must be filed by the Claims Objection Bar Date; *provided*, *however*, that no such objection may be filed with respect to any Claim after the Bankruptcy Court has determined by entry of a Final Order that such Claim is an Allowed Claim. The failure by any party in interest, including the Debtor and the Committee (if appointed) to object to any Claim, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's rights to object to, or re-examine, any such Claim in whole or in part. After the Effective Date, no party in interest shall have the right to object to Claims against the Debtor or its Estate other than the Reorganized Debtor.

7.10 **Setoffs and Recoupment.** The Debtor may, but shall not be required to, offset or recoup from any Claim or Interest, any Claims of any nature the Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtor of any such Claim it may have against such Claimant or Interest holder.

7.11 **Allocation of Plan Distributions Between Principal and Interest.** To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution, unless otherwise set forth explicitly in the Plan or its exhibits, shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amount.

7.12 **Allocation of Professional Fees.** The Debtor reserves its rights to allocate as overhead any claims for professional fees and expenses approved as payable by the Debtor that are or were incurred in connection with the negotiation, consummation and effectuating the transactions set forth in the Plan.

7.13 **Compromises and Settlements.** From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtor may compromise and settle all Claims and Causes of Action, without any further approval of the Bankruptcy Court.

7.14 **Reservation of Debtor's Rights.** Prior to the Effective Date, the Debtor expressly reserves the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against it or other claims it may have against other Persons.

7.15 **No Distributions Pending Allowance.** If a Claim or any portion of a Claim is Disputed, no payment or Distribution will be made on account of the Disputed portion of such

Claim (or the entire Claim, if the entire Claim is Disputed), unless such Disputed claim or portion thereof becomes an Allowed Claim.

**7.16    Claims Paid or Payable by Third Parties.** The Disbursing Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor, the Reorganized Debtor, or the Disbursing Agent.   Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not the Debtor, the Reorganized Debtor, or the Disbursing Agent on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the Distribution to the Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.   The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Disbursing Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

**7.17    Effect of Acceptance of Distribution.** Acceptance of any Distribution or other property under the Plan will constitute the recipient's acknowledgement and agreement that all Claims, demands, liabilities, other debts against, or Interests in, the Debtor (other than those created by the Plan) have been discharged and enjoined in accordance with Article IX of the Plan.

## VIII.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

**8.1    Discharge**

**8.1.1    Discharge of Claims Against the Debtor and the Reorganized Debtor.** Except as otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (a) discharge the Debtor, the Reorganized Debtor or any of their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including without limitation all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based on such debt has accepted the Plan; and (b) preclude all Persons from asserting against the Debtor, the Reorganized Debtor, or any of their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code.   The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest.

**8.1.2    Injunction Related to the Discharge.** Except as otherwise provided in the Plan or the Confirmation Order, all entities, wherever located in the world, that

have held, currently hold, or may hold Claims or other debts or liabilities against the Debtor, or any Interest in any or all of the Debtor, that are discharged pursuant to the terms of the Plan, are permanently enjoined, on and after the Effective Date, from taking, or causing any other entity to take, any of the following actions on account of any such Claims, debts, liabilities or Interests or rights:  (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt, liability, Interest, or right, other than to enforce any right to a Distribution pursuant to the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor, or any of their Assets on account of any such Claim, debt, liability, Interest or right; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor, the Reorganized Debtor, or any of their Assets on account of any such Claim, debt, liability, Interest, or right; (e) transferring or purporting to transfer, in whole or in part or any interest in, or asserting in any case, proceeding, or court in any jurisdiction, any Claim under the Prepetition Senior Secured Notes; and (f) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  Such injunction shall extend to any successor of the Debtor, the Reorganized Debtor, and any of their Assets.  Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

### 8.2    Releases

8.2.1    **Releases by the Debtor.**  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor in its individual capacity and as Debtor in Possession will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtor or its Estate at any time on or prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any

21

party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

> **8.2.2    Certain Waivers.**  Although the Debtor does not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, the Debtor hereby understands and waives the effect of section 1542 of the California Civil Code to the extent that such section is applicable to the Debtor.  Section 1542 of the California Civil Code provides:

> > **§1542.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

**THE DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND THE DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.  TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE DEBTOR WAIVES AND RELEASES ANY BENEFIT, RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

> **8.2.3    Releases by Holders of Claims and Interests.  For good and valuable consideration, the adequacy of which is hereby confirmed, and except as may be otherwise ordered by the Bankruptcy Court, on and after the Effective Date, (i) Holders of Claims that vote to accept the Plan (or are deemed to accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each Holder of a Claim that does not vote to accept the Plan, shall be deemed to have released and forever waived and discharged all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the**

Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiations, formulation, or preparation of the Plan, the related Disclosure Statement, the related Plan Supplement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtor or its Estate at any time up to immediately prior to the Effective Date against the Released Parties, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.   Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations (except Cure Claims that have not been filed timely) of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

8.2.4    **Releases by Opcorp and Kassir Development.**  In addition to the releases set forth in Section 8.2.3 above, through payment in full of the New Notes, after which such waivers and representations will be of no further force or effect: (i) Kassir Development shall waive its claim in the amount of $2,022,274.00 against the Debtor (and shall represent that it has no other claims against the Debtor); and (ii) Opcorp shall waive its claim in the amount of $4,787,742.45 against the Debtor (and shall represent that it has no other claims against the Debtor).

8.2.5    **CCSA Parties.**

8.2.5.1 *Releases by CCSA Parties*.  In addition to the releases set forth in Section 8.2.3 above, through payment in full of the New Notes, the CCSA Parties, on their own behalf and that of their respective Affiliates shall waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Debtor until such time as the New Notes have been paid in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the New Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except as disclosed on Exhibit 6 to the Term Sheet.

8.2.5.2 *Releases of CCSA Parties*.[1]  As of the Effective Date, for good and valuable consideration, which shall include the releases set forth in section 8.2.4.1 hereof and the CCSA Parties' pledging of their Interests and providing the $5 million Limited Financial Guarantee of the Debtor's obligations under the New Notes issued under the Plan, (i) each of the Debtor in its individual capacity and as Debtor in Possession, the Indenture Trustee, in its individual capacity and on behalf of the Holders, and the Holders will be deemed to release and forever waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or

---

[1]  Under discussion.

unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the CCSA, the Trump Ocean Club, the Debtor, the Chapter 11 Case, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any CCSA Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtor or its Estate at any time on or prior to the Effective Date against the CCSA Parties, other than Claims or liabilities arising out of or relating to any act or omission of a CCSA Party that constitutes willful misconduct or gross negligence, and (ii) the CCSA is terminated and is of no further force and effect, and the CCSA Parties are released from any and all obligations thereunder. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release the obligations of the CCSA Parties under the Share Pledge or the $5 million Limited Financial Guarantee pursuant to the terms thereof.

        8.2.6      **Exculpation.** On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action, or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, for any act or omission that occurred during and in connection with the Chapter 11 Case or in connection with the preparation and filing of the Chapter 11 Case, the formulation, negotiation, solicitation, and/or pursuit of confirmation of the Plan, the consummation of the Plan, and/or the administration of the Plan and/or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of any Exculpated Party, in each case subject to determination of such by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of the Plan, the Disclosure Statement, or the Confirmation Order shall be deemed to act upon or release any claims, Causes of Action, or liabilities that the Debtor, the Estate, or any party in interest may have against or to any Person for any act, omission, or failure to act that occurred prior to the Petition Date other than in connection with the preparation and filing of the Chapter 11 Case.

        8.2.7      **Injunction Related to Releases and Exculpation.** To the fullest extent allowed by law, and except as otherwise provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold claims, obligations, suits,

judgments, damages, demands, debts, rights, Causes of Action, and liabilities that are released, waived, or exculpated pursuant to Sections 8.2.1, 8.2.2, 8.2.3, 8.2.4 and 8.2.5 hereof will be permanently enjoined, on and after the Effective Date, from taking or causing any other Person to take, any of the following actions, at any time or at any place in the world, on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities:  (a) commencing or continuing in any manner any action or other proceeding of any kind against a Released Party or Exculpated Party with respect to any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without limitation any such actions arising from or related to the Prepetition Credit Agreements; (c) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or any Exculpated Party or any of its or their assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, including without limitation any such Lien or encumbrance arising from or related to the Prepetition Credit Agreements; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to any Released Party or any Exculpated Party or any of its or their Assets on account of any such claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities; and (e) commencing or continuing any action, in any manner, in any place in the world that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  Such injunction shall extend to any successor of any Released Party or any Exculpated Party or any of its or their assets.  Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

     **8.3**    **No Successor Liability.**  Except as otherwise expressly provided herein, none of the Released Parties or the Exculpated Parties shall be determined to be successors to the Debtor or to any Person for which the Debtor may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character.  The Released Parties and Exculpated Parties do not agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtor or the Reorganized Debtor, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Plan.

     **8.4**    **Term of Injunctions.**  All injunctions or stays provided in, or in connection with, the Chapter 11 Case, whether pursuant to section 105, section 362, or any other provision of the Bankruptcy Code, other applicable law or court order, in effect immediately prior to Confirmation will remain in full force and effect until the Effective Date and shall remain in full force and effect thereafter if so provided in the Plan, the Confirmation Order, or by their own terms.  In addition, as described in Section 8.2 hereof, the Confirmation Order shall incorporate the release, injunction, discharge, and exculpation provisions set forth in the Plan, which shall be in effect after the Effective Date and, on and after Confirmation Date, the Debtor may seek

further orders to preserve the status quo during the time between the Confirmation Date and the Effective Date or to enforce the provisions of the Plan.

**8.5    Binding Effect.**  The Plan will be binding upon, and inure to the benefit of, the Debtor and all Holders of Claims and Interests, and their respective successors and assigns, whether or not the Claims and Interests of such Holders are Impaired under the Plan and whether or not such Holders have accepted the Plan.

**8.6    Dissolution of the Committee.**  The Committee, if appointed, shall be dissolved on the Effective Date and shall not continue to exist thereafter except for the limited purposes of filing any remaining fee applications, and the Professionals retained by the Committee shall be entitled to compensation for services performed and reimbursement of expenses incurred in connection therewith.  Upon dissolution of the Committee, the members of the Committee shall be released and discharged of and from all duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Case.

**8.7    Post-Confirmation Date Retention of Professionals.**  After the Confirmation Date, any requirement that Professionals employed by the Debtor comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor shall be authorized to employ and compensate Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

**8.8    Survival of Certain Indemnification Obligations.**  Subject to Section 5.6 hereof, the obligations of the Debtor, pursuant to the Debtor's operating agreements, certificates of incorporation or formation, articles of association, by-laws, memoranda of association, or equivalent corporate governance documents, applicable statutes, or employment agreements, to indemnify individuals who prior to the Effective Date served as its directors, officers, managers, agents, employees, representatives, and Professionals, in respect of all present and future actions, suits, and proceedings against any of such officers, directors, managers, agents, employees, representatives, and Professionals, based upon any act or omission related to service with, for, or on behalf of the Debtor on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, shall not be discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the reorganization contemplated by the Plan and shall be performed and honored by the Reorganized Debtor regardless of such confirmation, consummation, and reorganization.

## IX.
## CONDITIONS PRECEDENT TO CONSUMMATION

**9.1    Conditions Precedent.**  The Plan shall not become effective unless and until the following conditions have been satisfied or waived.  The Debtor anticipates that all of such conditions to Confirmation and to the Effective Date will be satisfied or waived, and intends to present evidence at the Confirmation Hearing demonstrating such satisfaction or waiver. Notwithstanding the foregoing, there is a risk that some or all of the conditions to Confirmation or the Effective Date will not be satisfied or waived.

### 9.1.1        Conditions to Confirmation

9.1.1.1  *Plan Supplement.*  All documents to be provided in the Plan Supplement are in a form that is reasonably acceptable in all material respects to the Debtor and the Steering Group.

9.1.1.2  *Confirmation Order.*  The Confirmation Order must be entered by the Bankruptcy Court in a form reasonably acceptable in all material respects to the Debtor and the Steering Group.

### 9.1.2        Conditions to Effective Date

9.1.2.1  *Confirmation Order.*  The Bankruptcy Court shall have entered the Confirmation Order in a form reasonably acceptable in all material respects to the Debtor and the Steering Group.

9.1.2.2  *No Stay of Confirmation.*  There shall not be in force any order, decree, or ruling of any court or governmental body having jurisdiction, restraining, enjoining, or staying the consummation of, or rendering illegal the transactions contemplated by, the Plan.

9.1.2.3  *Receipt of Required Authorization.*  All authorizations, consents, and regulatory approvals (if any) necessary to effectuate the Plan shall have been obtained.

9.1.2.4  *New Notes.*  The documents evidencing the New Notes shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

9.1.2.5  *Delivery of Share Pledge and the Limited Financial Guarantees.* The documents evidencing the Share Pledge and $5 million Limited Financial Guarantee shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document shall have been satisfied or waived.

9.1.2.6  *Organizational Documents.*  The New Articles of Association, New Bylaws and New Shareholder Agreement shall each be in form and substance reasonably acceptable to the Debtor and the Steering Group.

9.1.2.7  *Implementation Transactions.*  The transactions that are required to be completed on or before the Effective Date have been completed in a manner reasonably acceptable in all material respects to the Debtor and the Steering Group, including the CCSA Parties' (1) waiver, on their own behalf and that of their respective affiliates, their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Company until such time as the New Notes have been paid in full or otherwise defeased pursuant to the terms of the New Notes, and (2) representations and warranties as set forth in the letter agreement by and among the CCSA Parties, dated as of the Effective Date.  Notwithstanding the foregoing conditions, no party that willfully causes the failure to satisfy a condition should be entitled to object to the consummation of the Plan on the grounds that such condition is not satisfied.

9.1.2.8    *Assumption.*   The Bankruptcy Court shall have entered an order approving the assumption of the Plan Support Agreement.

9.1.2.9   *Payment of Fees.*   The Debtor shall have paid all reasonable professional fees and expenses of the Steering Group as agreed under the Plan Support Agreement.

9.1.2.10    ***Kassir Development's Waiver.***   Kassir Development's wavier of its claim in the amount of $2,022,274.00 against the Debtor (and shall represent that it has no other claims against the Debtor).

9.1.2.11    ***Opcorp's Waiver.***   Opcorp shall waive its claim in the amount of $4,787,742.45 against the Debtor (and shall represent that it has no other claims against the Debtor).

9.1.2.12    ***CCSA Parties' Waiver.***   The CCSA Parties, on their own behalf and that of their respective Affiliates shall waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Debtor until such time as the New Notes have been paid for in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the New Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except as disclosed on Exhibit 6 to the Term Sheet.

**9.1.3    Trump Concessionary Amendments.**   Upon satisfaction of the conditions in Section 9.1.2 hereof, the condition to effectiveness of the Concessionary Amendments, requiring that the Plan be effective, will be deemed satisfied and the Concessionary Amendments, accordingly, will be concurrently deemed effective.

**9.1.4    Waiver.**   Any of the conditions set forth in Sections 9.1.1 and 9.1.2 hereof may be waived by the Debtor, with the consent of the Steering Group, which consent shall not be unreasonably withheld.

**9.2    Effect of Failure of Conditions Upon the Plan.**   In the event that the conditions specified in Section 9.1 have not been satisfied or waived in accordance with Section 9.1.3 hereof on or before 120 days after the Confirmation Date, then, the Debtor may seek an order from the Bankruptcy Court vacating the Confirmation Order.   Such request shall be served upon counsel for the Steering Group, the Committee (if appointed), and the U.S. Trustee.   If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects, (b) any settlement of Claims or Interests provided for hereby shall be null and void without further order of the Bankruptcy Court, and (c) the time within which the Debtor may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of 60 days after the date the Confirmation Order is vacated.

**X.**
**RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT**

    **10.1    Bankruptcy Court.** Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

    **11.1.1.** allow, disallow, determine, liquidate, classify, estimate, or establish the priority or Secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim or Priority Tax Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

    **11.1.2.** hear and rule upon all Causes of Action retained by the Debtor and commenced and/or pursued by the Debtor or the Reorganized Debtor;

    **11.1.3.** resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, and (c) any dispute regarding whether a contract or lease is or was executory or expired;

    **11.1.4.** ensure that Distributions on account of Allowed Claims are accomplished pursuant to the provisions of the Plan;

    **11.1.5.** decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

    **11.1.6.** adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

    **11.1.7.** enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

    **11.1.8.** enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

    **11.1.9.** resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the

Plan, or any Person's rights arising from or obligations incurred in connection with the Plan or such documents;

       **11.1.10.**  approve any modification of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or approve any modification of the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

       **11.1.11.**  hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 363, 503(b), 1103, and 1129(a)(9) of the Bankruptcy Code, which shall be payable by the Debtor, or the Reorganized Debtor, as applicable, only upon allowance thereof pursuant to the order of the Bankruptcy Court; *provided*, *however*, that the fees and expenses of the Debtor incurred after the Confirmation Date, including attorneys' fees, may be paid by the Reorganized Debtor in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

       **11.1.12.**  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation of the Plan, implementation, or enforcement of the Plan or the Confirmation Order;

       **11.1.13.**  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

       **11.1.14.**  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or if Distributions pursuant to the Plan are enjoined or stayed;

       **11.1.15.**  determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement, or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

       **11.1.16.**  enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

       **11.1.17.**  hear and determine all matters related to (a) the property of the Debtor and the Estate from and after the Confirmation Date and (b) all disputes regarding the existence, nature or scope of the Debtor's discharge;

       **11.1.18.**  enter an order or final decree concluding or closing the Chapter 11 Case; and

     **11.1.19.**  hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code.

For the avoidance of doubt, the Bankruptcy Court will not be retaining jurisdiction to interpret and enforce the provisions of the New Notes.

## XI.
## MISCELLANEOUS PROVISIONS

    **11.1    Plan Supplement.**  No later than ten (10) days prior to the Confirmation Hearing, the Debtor shall File with the Bankruptcy Court the Plan Supplement, which shall contain the documents identified herein and such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Holders of Claims or Interests may obtain a copy of the Plan Supplement upon written request to the Balloting and Tabulation Agent.

    **11.2    Exemption From Registration Requirements.**  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and Distribution of any securities contemplated by the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.  In addition, any securities contemplated by the Plan will be tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code; and (ii) the restrictions, if any, on the transferability of such securities and instruments.

    **11.3    Statutory Fees.**  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtor on or before the Effective Date.

    **11.4    Third Party Agreements.**  The Distributions to the various Classes of Claims and Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan.  Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.

    **11.5    Amendment or Modification of the Plan.**  As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtor, with the consent of the Steering Group (which consent shall not be unreasonably withheld), at any time before Confirmation, provided, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  The Debtor may modify the Plan at any time after Confirmation and before consummation of the Plan, *provided*, *however*, that the Plan, as modified, shall meet the requirements of sections 1122 and 1123 of the Bankruptcy Code, the Debtor shall have complied with section 1125 of the Bankruptcy Code, the Bankruptcy Court, after notice and a hearing, shall have confirmed the Plan as modified, under section 1129 of the

Bankruptcy Code, and the circumstances warrant such modifications. Except as specifically provided herein, a Holder of a Claim that has accepted the Plan prior to modification shall be deemed to have accepted such Plan as modified, *provided*, *however*, that the Plan, as modified, does not materially and adversely change the treatment of the Claim or Interest of such Holder.

**11.6    Severability.** In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void, or unenforceable, the Debtor may, at its option, and with the consent of the Steering Group, such consent not to be unreasonably withheld, (a) treat such provision as invalid, void, or unenforceable with respect to the Holder or Holders of such Claims or Interests that the provision is determined to be invalid, void, or unenforceable, in which case such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

**11.7    Revocation or Withdrawal of the Plan.** The Debtor reserves the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing at any time prior to the occurrence of the Effective Date. If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or Interests in, the Debtor or any other Person, (ii) prejudice in any manner the rights of the Debtor or any other Person, or (iii) constitute an admission of any sort by the Debtor or any other Person.

For the avoidance of doubt, if the Confirmation Hearing is adjourned, the Debtor reserves the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as it considers appropriate, subject to the provisions of the Bankruptcy Code.

**11.8    Rules Governing Conflicts Between Documents.** In the event of a conflict between the terms or provisions of the Plan and any Plan Documents other than the Plan, the terms of the Plan shall control over such Plan Documents. In the event of a conflict between the terms of the Plan or the Plan Documents, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control. In the event of a conflict between the information contained in this Disclosure Statement and the Plan or any other Plan Document, the Plan or other Plan Document (as the case may be) will control.

**11.9    Governing Law.** Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its conflicts of law principles.

**11.10    Notices.** Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery service, charges prepaid. If to the Debtor, any such notice shall be directed to the following at the addresses set forth below:

Newland International Properties, Corp.
Trump Ocean Club
Avenida Calle 82 # 10-33 Oficina 1001
Bogota, Columbia
Attention:    Carlos Saravia
              Chief Operating Officer

-- with copies to –

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
Attention:    Kevin W. Kelley, Esq.
              J. Eric Wise, Esq.
              Shira D. Weiner, Esq.

-and-

Adames, Duran, Alfaro & Lopez
Calle 50, Torre Global Bank
Piso 24, Oficina 2406
Panama, Republic of Panama
Attention:    Nadiuska López de Abood
              Beatriz L. Romero Alfaro

**11.11  Interest and Attorneys' Fees.**  Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order, or as otherwise required by the Bankruptcy Court or by applicable law.  No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

**11.12  Binding Effect.**  The Plan shall be binding upon the Debtor, the Reorganized Debtor, the Holders of all Claims and Interests, parties in interest, Persons, and Governmental Units and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

**11.13  No Admissions.**  As to contested matters, adversary proceedings, and other Causes of Action or threatened Causes of Action, nothing in the Plan, the Plan Supplement, the Disclosure Statement, or other Plan Documents shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.  The Plan shall not be construed to be conclusive advice on the tax, securities, and other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtor, as Debtor and Debtor in possession in the Chapter 11 Case.

     **11.14  Exhibits.**  All Exhibits and Schedules to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

The undersigned have executed this Plan of Reorganization as of the 29 day of March, 2013.

Dated:  March 29, 2013

Respectfully submitted,

**NEWLAND INTERNATIONAL
PROPERTIES, CORP.**

By: _____

Name: Eduardo Saravia
Title: Secretary and Director

## APPENDIX A – UNIFORM GLOSSARY OF TERMS

Unless the context otherwise requires, the following terms, when used in initially capitalized form in the Disclosure Statement, related exhibits, and Plan Documents, shall have the following meanings.  Such meanings shall be equally applicable to both the singular and plural forms of such terms.  Any term used in capitalized form that is not defined herein but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term by the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the event of a conflict or ambiguity).  Certain defined terms used in only one Section of the Disclosure Statement are defined in such Section.  The rules of construction set forth herein and in section 102 of the Bankruptcy Code shall apply.  All references to the "***Plan***" shall be construed, where applicable, to include references to the Plan and all its exhibits, appendices, schedules, and annexes (and any amendments made in accordance with their terms or applicable law).

1.      ***Administrative Expense*** means any cost or expense of administration of the Chapter 11 Case incurred before the Effective Date and allowable under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code including:  (a) any actual and necessary postpetition cost or expense of preserving the Estate or operating the business of the Debtor; (b) any payment required to cure a default on an assumed Executory Contract or Unexpired Lease; (c) any postpetition cost, indebtedness, or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of its business; (d) any cost or expense in respect of a Professional Compensation Claim; and (e) any cost or expense in respect of the Indenture Trustee Fee Claims.

2.      ***Administrative Expense Claim*** means any Claim for the payment of an Administrative Expense.

3.      ***Affiliate*** means An "Affiliate" and "Affiliates" of any person or entity shall be all direct and indirect subsidiaries, parents, or affiliates (which term "affiliate" shall mean any entity or person controlling, controlled by, under common control with such person or entity) of such person or entity.  When the term Affiliate or Affiliates is used herein, such term shall refer to the Affiliate or Affiliates of the Company, except where expressly stated that such term refers instead to one or more of the Company, Shareholders or CCSA Parties.

4.      ***Allowed*** means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is scheduled by the Debtor on its Schedules (to the extent the Debtor files Schedules in the Chapter 11 Case) as neither disputed, contingent, nor unliquidated, and as to which the Debtor or other party in interest have not Filed an objection by the Claims Objection Bar Date; (b) a Claim that either is not a Disputed Claim or has been Allowed by a Final Order; (c) a Claim that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Bar Date.

5.      ***Allowed Amount*** of any Claim or Interest means the amount at which that Claim or Interest is Allowed.

6.      ***Allowed Claim; Allowed Interest*** means any Claim or Interest in the Debtor or its Estate as to which no objection to the allowance thereof, or action to equitably subordinate or otherwise seek recovery from the Holder of the Claim or Interest, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order.

7.      ***Assets*** means all property wherever located in which the Debtor holds a legal or equitable interest, including all property described in section 541 of the Bankruptcy Code and all property disclosed in the Debtor's Schedules (to the extent the Debtor files Schedules in the Chapter 11 Case) and the Disclosure Statement.

8.      ***Ballot*** means the ballot form for voting to accept or reject the Plan distributed to all Holders of Impaired Claims entitled to vote on the Plan.

9.      ***Ballot Instructions*** means the instructions for completion of a Ballot; the Ballot Instructions applicable to a Ballot shall be distributed to a Holder concurrently with the Ballot.

10.     ***Balloting and Tabulation Agent*** means Epiq Bankruptcy Solutions, LLC, which has been retained by the Debtor (subject to the approval of the Bankruptcy Court).

11.     ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made, to the extent applicable to the Chapter 11 Case.

12.     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Case.

13.     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made, to the extent applicable to the Chapter 11 Case.

14.     ***Business Day*** means any day other than a Saturday, Sunday, or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

15.     ***Cash*** means the legal tender of the United States of America (USD), unless Panama (PAB) or the Euro (EUR) is specified.

16.     ***Causes of Action*** means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, in each case held by the Debtor, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter

- 2 -

arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date.

17.    **CCSA** means that certain Construction Completion Support Agreement, dated as of November 6, 2007, among Mr. Roger Khafif, Mr. Carlos A. Serna and Mr. Eduardo Saravia, and HSBC, in its capacity as Indenture Trustee under the Indenture.

18.    **CCSA Parties** means Mr. Roger Khafif, Mr. Eduardo Saravia, and Mr. Carlos A. Serna.

19.    **Certificate** means any instrument evidencing a Claim or an Interest.

20.    **Chapter 11 Case** means the chapter 11 case pending for the Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

21.    **Charging Lien** means any right of the Indenture Trustee to a Lien upon, or other priority with respect to, distributions to be made to holders of Prepetition Senior Secured Notes Claims for payment of any Indenture Trustee Fee Claims and Indenture Trustee Indemnification.

22.    **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code against the Debtor or the Estate, whether or not asserted.

23.    **Claimant** means the Holder of a Claim.

24.    **Claims Objection Bar Date** means, with respect to any Claim, the 120th day following the latest of the Effective Date, the date such Claim is Filed, and such later date as may be established from time to time by the Bankruptcy Court as the last date for filing objections to such Claims.

25.    **Class** means a category of Holders of Claims or Interests, as set forth in Articles III and IV of the Plan, pursuant to section 1122 of the Bankruptcy Code.

26.    **Collateral** means any property or interest in property of the Estate that is subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable law.

27.    **Committee** means the official committee of unsecured creditors for the Debtor, if any, appointed by the U.S. Trustee.

28.    **Concessionary Amendments** means certain amendments to the Hotel Agreements that have been executed by the parties thereto, to become effective only upon the Confirmation of the Plan and the satisfaction of certain additional conditions, as set forth therein, including the assumption by Debtor of each of the Hotel Agreement to which it is a party as modified solely by such Concessionary Amendments, and non-disturbance of all other Hotel Agreements to which Debtor is not a direct party as modified solely by the Concessionary Amendments, such that, after giving effect to the Plan, all Hotel Agreements shall remain in full force and effect, as modified solely by the Concessionary Amendments.

29.    ***Confirmation, Confirmation of the Plan, or Plan Confirmation*** means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

30.    ***Confirmation Date*** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

31.    ***Confirmation Hearing*** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

32.    ***Confirmation Objection Deadline*** means the last day set by the Bankruptcy Court for the filing of objections to Confirmation of the Plan.

33.    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 and other applicable sections of the Bankruptcy Code, approving the Disclosure Statement, and approving the Debtor's solicitation procedures.

34.    ***Consenting Parties*** means those Holders of Claims who are parties to the Plan Support Agreement.

35.    ***Corporate Governance Documents*** means the documents evidencing the corporate governance and equity structure applicable to the Reorganized Debtor, which documents will implement the provisions of the Term Sheet and will be substantially in the forms filed in the Plan Supplement.

36.    ***Co-Trustee*** means, as of the date of the Disclosure Statement, HSBC Investment Corporation (Panama) S.A.  On the Effective Date, Co-Trustee shall mean either HSBC Investment Corporation (Panama) S.A., if no successor co-trustee has been appointed on or prior to the Effective Date, or any such successor co-trustee appointed by the Reorganized Debtor as successor co-trustee under the Co-Trustee Agreement to HSBC Investment Corporation (Panama) S.A.

37.    ***Co-Trustee Agreement*** means Amended and Restated Agreement of Appointment and Acceptance of Co-Trustee, dated the Effective Date, among Newland, HSBC Bank USA, N.A., any successor trustee to HSBC Bank USA, N.A. appointed on or prior to the Effective Date, HSBC Investment Corporation (Panama) S.A., and any successor co-trustee to HSBC Investment Corporation (Panama) S.A. appointed on or prior to the Effective Date.

38.    ***Creditor*** means any Person holding a Claim against the Debtor's Estate or against property of the Debtor that arose or is deemed to have arisen on or prior to the Petition Date.

39.    ***Cure Claim*** means a Claim based upon the Debtors' defaults under an Executory Contract or Unexpired Lease existing as of the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

40.    ***Debtor*** means Newland International Properties, Corp.

41.     **Disbursing Agent** means the Debtor, the Reorganized Debtor or such other Person or Persons identified in the Plan Supplement as the disbursing agent for the Distributions required under the Plan in its capacity as a disbursing agent under the Plan.

42.     **Disclosure Statement** means that certain "Disclosure Statement" Filed in support of the Plan for the Debtor, dated March 29, 2013, including all exhibits attached thereto or referenced therein, pursuant to section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court in the Confirmation Order, as such Disclosure Statement may be further amended, supplemented, or modified from time to time with the further approval of the Bankruptcy Court.

43.     **Disputed** means, with respect to any Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order, a Claim (a) as to which no request for payment or Proof of Claim has been timely filed, that is listed in the Schedules (to the extent the Debtor files Schedules in the Chapter 11 Case) as unliquidated, contingent, or disputed; (b) as to which a request for payment or Proof of Claim has been timely filed, but as to which an objection or request for estimation has been filed by the applicable Claims Objection Bar Date, or which is otherwise disputed in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) as to which a request for payment or Proof of Claim was required to be timely filed, but as to which a request for payment or Proof of Claim was not timely or properly filed; (d) that is disputed in accordance with the provisions of the Plan; or (e) if not otherwise Allowed, as to which the applicable Claims Objection Bar Date has not expired.

44.     **Distribution** means any distribution by the Disbursing Agent to the Holders of Allowed Claims pursuant to Article VIII of the Plan.

45.     **Distribution Date** means the date that shall take place as soon as practicable after the later of: (a) the Effective Date; (b) the date a Claim becomes payable pursuant to any agreement with the Disbursing Agent; or (c) for any other Claim that is not an Allowed Claim on the Effective Date, expressly including any Allowed General Unsecured Claim which becomes due and payable after the Effective Date, on or as soon as reasonably practicable after the date on which such Claim becomes an Allowed Claim, but no later than 30 days after the date upon which the Claim becomes an Allowed Claim.

46.     **Distribution Record Date** means the record date for determining entitlement to receive distributions under the Plan on account of Allowed Claims, which date shall be five Business Days before the Confirmation Date, which record date shall not apply to publicly held securities.

47.     **Effective Date** means the date specified by the Debtor in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect and shall be substantially consummated, which date shall be after the later of (a) the date on which the Confirmation Order shall have been entered and is no longer subject to any stay; and (b) the date on which the conditions to the Effective Date provided for in Section 9.1.2 of the Plan have been satisfied or waived.

48.    ***Equity Security*** means (a) shares of common stock, preferred stock, other forms of ownership interest, or any interest or right to convert into such an equity or ownership interest or to acquire any equity or ownership interest or any interest or right for which the amount owing is determined by reference to an equity or ownership interest, in the Debtor that was in existence immediately prior to or on the Petition Date for such Debtor, and (b) Allowed Claims against the Reorganized Debtor arising out of, relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code.

49.    ***Estate(s)*** means the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.    ***Exculpated Parties*** means (a) the Debtor, (b) the Committee and its members, (c) the Indenture Trustee, (d) the Co-Trustee, (e) the Steering Group and its members, (f) the Plan Critical Counterparties, and the officers, directors, employees, professionals, Professionals and agents of the Persons listed in subsections (a) through (f) of this definition, along with the successors and assigns of each of the foregoing.

51.    ***Executory Contract*** means a contract to which the Debtor is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

52.    ***Federal Judgment Rate*** means the federal judgment interest rate which was in effect as of the Petition Date.

53.    ***File or Filed*** means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

54.    ***Final Order*** means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, reargument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, reargument, or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

55.    ***Financial Guarantee*** means the limited guarantee in the amount of $5.0 million, which will be payable to the trustee under the New Indenture for the benefit of holders of the New Notes in the event that the New Notes are not paid in full (resulting either from a payment default or a shortfall at final maturity), which shall be made in settlement of any obligations of the Shareholders under the CCSA and shall be included in the Plan Supplement.

56.    ***Forfeiture Date*** means the date that is the one year anniversary of the Effective Date.

57.    ***General Unsecured Claim*** means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.  A General Unsecured Claim shall be Allowed, to the extent such Claim is reflected in the books and records of the Debtor, in the amount reflected in such books and records, subject to the right of the Claimant to

object to such amount in accordance with normal and customary practice; a General Unsecured Claim that is not reflected in the books and records of the Debtor shall be Allowed, except to the extent Disputed by the Debtor pursuant to the dispute resolution procedures in the Plan.

58.    *Governmental Unit* has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

59.    *Holder* means any Person holding an Interest or Claim.

60.    *Hotel Agreements* means the Trump License Agreement, the Hotel Management Agreement, the PH Administration Agreement and certain other related agreements, collectively defined as "*Hotel Agreements*" in the Concessionary Amendments and listed as such on schedules to the Concessionary Amendments.

61.    *Hotel Management Agreement* means the Amended and Restated Hotel Management Agreement, dated as of April 13, 3011, as amended, among Trump Panama Hotel management, LLC ("*Hotel Operator*") the Company, Hotel TOC, Inc. ("*Hotel Owner*") and "*Owners Meeting*", as defined therein, consisting of the owners of units in Trump Ocean Club Owner and Owners Meeting.

62.    *HSBC* means HSBC Bank USA, N.A.

63.    *Impaired* means a Claim or a Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

64.    *Indenture Trustee* means HSBC, in its capacity as trustee under the Indenture (or any successor).

65.    *Indenture* means that certain Indenture, dated as of November 6, 2007, as amended from time to time, between the Company and HSBC, pursuant to which the Prepetition Senior Secured Notes were issued.

66.    *Indenture Trustee Fee Claim* means the accrued and unpaid fees, costs, and expenses of the Indenture Trustee (including of any predecessor indenture trustee) and the Co-Trustee, including the fees, costs, and expenses of the Indenture Trustee's (and any predecessor indenture trustee's) and the Co-Trustee's attorneys payable pursuant to the Indenture.

67.    *Interests* means any: (a) Equity Security of the Debtor, including all shares or similar securities in the Debtor, whether or not transferable or denominated "stock", and whether issued, unissued, authorized, or outstanding; (b) any warrants, options, or contractual rights to purchase, sell, subscribe or acquire such Equity Security at any time and all rights arising with respect thereto; and (c) any similar interest in the Debtor.

68.    *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

69.    *Liquidation Analysis* means the liquidation analysis attached as Exhibit D to the Disclosure Statement.

70.    ***New Articles of Association*** means any corporate governance documents equivalent to U.S. articles of association, which documents shall be substantially in the forms filed in the Plan Supplement.

71.    ***New Board*** means the initial board of directors (or its equivalent under applicable law) of the Reorganized Debtor.

72.    ***New Bylaws*** means any corporate governance documents equivalent to U.S. bylaws, which documents shall be substantially in the forms filed in the Plan Supplement.

73.    ***New Indenture*** means that certain amended and restated Indenture, dated as of the Effective Date, between Newland International Properties Corp. and CSC Trust Company of Delaware as Trustee, that will be entered into in connection with the Plan, pursuant to which the New Notes will be issued on the Effective Date.

74.    ***New Notes*** means the first lien secured notes to be issued in connection with the Plan to holders of Prepetition Senior Secured Notes Claims, as more fully described in section III.B. of the Disclosure Statement.

75.    ***Noteholder*** means a Holder of Prepetition Senior Secured Notes.

76.    ***Ocean Point*** means Ocean Point Development Corp., a Shareholder.

77.    ***Other Priority Claim*** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

78.    ***Other Secured Claim*** means any Secured Claim that is not a Claim under the Prepetition Senior Secured Notes.

79.    ***Person*** means any person, including without limitation, any individual, entity, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, estate, trust, unincorporated association or organization, official committee, ad hoc committee or group, governmental agency or political subdivision thereof, the U.S. Trustee, and any successors or assigns of any of the foregoing.

80.    ***Petition Date*** means the date on which the Chapter 11 Case was commenced with the filing of voluntary petition for relief under chapter 11 of the Bankruptcy Code.

81.    ***PH Administration Agreement*** means the P.H. TOC Management Agreement, dated April 13, 2011, as amended, between Trump Panama Condominium Management, LLC ("***Condominium Manager***" and, together with Licensor and Hotel Operator, the "***Trump Parties***") and Owners Meeting, Condominium Manager.

82.    ***Plan*** means the Prepackaged Plan of Reorganization for the Debtor under Chapter 11 of the Bankruptcy Code proposed by the Debtor, dated March 29, 2013, and all annexes and exhibits attached thereto or referenced therein including, without limitation, the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

83.    ***Plan Critical Counterparty*** means each of the counterparties to the Plan Critical Agreements (as defined in Section 6.6 of the Plan).

84.    ***Plan Documents*** means the Plan, the Plan Supplement, the Disclosure Statement, and all documents, attachments, annexes, and exhibits attached to the Plan or the Disclosure Statement that aid in effectuating the Plan, as the same may be amended, modified, or supplemented, in accordance with their terms.the counterparties to the Plan Critical Agreements .

85.    ***Plan Solicitation Agent*** means ACGM Inc., which has been retained by the Debtor for the pre-petition solicitation of votes on the Plan.

86.    ***Plan Supplement*** means the supplement to the Plan to be filed by the Debtor with the Bankruptcy Court not later than ten (10) days prior to the Confirmation Hearing, which supplement shall contain forms of substantially final documents required for the implementation of the Plan.

87.    ***Plan Support Agreement*** means that certain Plan Support Agreement, dated January 23, 2013, by and among the Debtor and the Consenting Parties, attached as Exhibit E to the Disclosure Statement.

88.    ***Postpetition Period*** means the period of time following the Petition Date through the Confirmation Date.

89.    ***Prepetition Senior Secured Notes*** means the 9.5% Senior Secured Notes due 2014 in aggregate principal amount of $220,000,000 issued under the Indenture.

90.    ***Priority Tax Claim*** means a Claim of a kind specified in section 507(a)(8) of the Bankruptcy Code.

91.    ***Pro Rata Share*** means, with reference to any Distribution on account of any Allowed Claim or Allowed Interest in Class 3, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such claim bears to the aggregate amount of all Allowed Claims or Allowed Interests in the Class.

92.    ***Professional Compensation Claim*** means each Administrative Expense Claim for compensation, indemnification, or reimbursement of expenses incurred by Professionals through the Confirmation Date pursuant to section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Case.

93.    ***Professionals*** means those Persons (a) employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(1) of the Bankruptcy Code and/or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court or is sought pursuant to section 503(b)(4) of the Bankruptcy Code.

94.    ***Proof of Claim*** means any proof of claim filed with the Bankruptcy Court or the Balloting and Tabulation Agent with respect to the Debtor pursuant to section 501 of the Bankruptcy Code and Bankruptcy Rules 3001 or 3002.

95.    ***Record Date*** means March 20, 2013.

96.    ***Released Parties*** means (a) the Debtor, (b) the Committee and its members, if any, (c) the Indenture Trustee, (d) the Co-Trustee, (e) the Steering Group and its members, (f) Holders of Impaired Class 3 Claims that voted to accept the Plan, (g) the Plan Critical Counterparties, and the respective officers, directors, employees, professionals, Professionals and agents of the Persons identified in subsections (a) through (g) of this definition, along with the successors and assigns of each of the foregoing.

97.    ***Reorganized Debtor*** means the Debtor and its successors on or after the Effective Date.

98.    ***Restructuring*** means the restructuring of the Debtor's capital structure implemented by the Plan and the transactions contemplated in connection therewith.

99.    ***Restructuring Transactions*** means the corporate and operational restructuring transactions provided for in Section 5.6 of the Plan.

100.    ***Schedules*** means the schedules, statements, and lists, if any, filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, if any, as may be amended or supplemented from time to time.

101.    ***Scheduling Motion*** means the motion filed by the Debtor, substantially contemporaneously with the filing of the Chapter 11 Case, satisfying the criteria set forth for a Scheduling Motion in Part III.A. of that certain General Order M-387, dated November 24, 2009, entered in the United States Bankruptcy Court for the Southern District of New York by The Honorable Stuart M. Bernstein and captioned In the Matter of the Adoption of Prepackaged Chapter 11 Case Amended Guidelines, Amending General Order 203.

102.    ***Scheduling Order*** means the order granting the Scheduling Motion and scheduling the Confirmation Hearing.

103.    ***Secured*** means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law,  or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.  For the avoidance of doubt, a Claim shall be "Secured" hereunder if such security would be recognized as valid and enforceable under applicable law of the foreign jurisdiction pursuant to which such security was created.

104.    ***Securities Act*** means the Securities Act of 1933, 15 U.S.C. §§ 77a-77m, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Case.

105.    ***Shareholders*** means the direct and indirect shareholders of the Company:  Ocean Point; Roger Khafif; Upper Deck; Arias, Serna & Saravia; Espacios Urbanos, S.A.

106.    ***Solicitation Package*** means the package mailed to Holders of Claims entitled to vote to accept or reject the Plan, which package contains, among other things, (a) a copy of the Plan, (b) a copy of the Disclosure Statement, and (c) a Ballot, Ballot Instructions, and Ballot return envelope.

107.    ***Steering Group*** means Greylock Capital Management, LLC, Moneda Asset Management, Polo Capital Management, Trinidad and Tobago Unit Trust Corporation and Portfolio Credit Management Limited, all via managed or controlled accounts or funds, collectively holding or controlling in excess of 41.76% of the outstanding principal amount of the Existing Notes.

108.    ***Term Sheet*** means the term sheet annexed to the Plan Support Agreement.

109.    ***Trump License Agreement*** means the License agreement, dated as of March 16, 2006, originally, by and between Donald J. Trump, as original licensor, and K Group Developers, Inc., as original licensee, as assigned (i) to Licensor, pursuant to the assignment and assumption of license agreement, dated as of June 5, 2007, by and between Donald J. Trump and Trump Marks Panama LLC ("***Licensor***"), and (ii) to the Company, as licensee, pursuant the assignment and assumption of license agreement, dated as of June 5, 2007, among the Licensor, K Group Developers Inc. and the Company, as amended. Under the Trump License Agreement, the Company is required to pay variable license fees and royalties to Licensor for use of "Trump" name and marks.

110.    ***Trump Ocean Club*** means Trump Ocean Club International Hotel & Tower, located in Panama City, Panama.

111.    ***Upper Deck*** means Upper Deck Properties, S.A., a Shareholder.

112.    ***U.S. Trustee*** means the United States Trustee for the Southern District of New York.

113.    ***U.S. Trustee Fees*** means all fees and charges assessed against the Estate under section 1930 of title 28 of the United States Code, and interest, if any, for delinquent quarterly fees pursuant to section 3717 of title 31 of the United States Code.

114.    ***Unclaimed Property*** means unclaimed Cash held by the Disbursing Agent and any Distributions returned to or otherwise held by the Disbursing Agent on the Forfeiture Date as well as any other Distributions not claimed on the Forfeiture Date.

115.    ***Unexpired Lease*** means a lease to the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

- 11 -

116.    ***Unimpaired*** means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

117.    ***Voting Deadline*** means 5:00 p.m. *(prevailing U.S. Eastern time)* on April 29, 2013, which is the deadline for submitting Ballots.

118.    ***Voting Report*** means the report prepared by the Balloting and Tabulation Agent which reports the results of the tabulation of votes to accept or reject the Plan.

**EXHIBIT C**
**PROJECTIONS**

# EXHIBIT C:  FINANCIAL PROJECTIONS

## I.    INTRODUCTION

As a condition to Confirmation of the Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court find that Confirmation is not likely to be followed by either a liquidation or the need for further financial restructuring of the Debtor.  In connection with developing the Plan and for purposes of determining whether the Plan satisfies feasibility standards, the Debtor's management and their financial advisors have, through the development of the Financial Projections, analyzed the Debtor's ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business in the ordinary course upon emergence from chapter 11.

The Financial Projections will also assist each Holder of a Claim or Interest in determining whether to accept or reject the Plan.  The Debtor and its financial advisors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtor's management and its financial advisors based on factors such as industry performance, general business, economic, competitive, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtor's control.  The estimates and assumptions in the Financial Projections, while considered reasonable by management and its advisors, may not be realized and are inherently subject to numerous uncertainties and contingencies. Although the Financial Projections represent the Debtor's good faith judgment (for which the Debtor believes it has a reasonable basis), because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Financial Projections were prepared may be different from those assumed or may be unanticipated.  The Debtor and its financial advisors expect that although the Financial Projections are presented with numerical specificity, the actual and projected results will differ and that actual results may be materially greater or less than those contained in the Financial Projections.  The Debtor and its financial advisors make no representations as to the accuracy of the Financial Projections or the ability to achieve the projected results of operations, financial position, and/or cash flows.  Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur. The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtor and its financial advisors considered or considers the Financial Projections to reliably predict future performance.  The Financial Projections are subjective in many respects, and thus are susceptible to multiple interpretations and periodic revisions based on ongoing and future developments.  The Financial Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections.  Furthermore, the Financial Projections have not been audited by the Debtor's independent accountants.  The Debtor does not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are in error.  For the foregoing reasons, the Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

The Financial Projections demonstrate that the Reorganized Debtor (to the extent sellout proceeds and other sources of revenue materialize as projected) will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments to Creditors owing on the Effective Date, and the Debtor believes that it will have sufficient liquidity to fund obligations as they arise, thereby preserving the value of their asset base and the continuity of their business lines.    The additional time and flexibility afforded by the restructuring of the

Notes, the marketability and sellout values of the Debtor's real estate products and the viability of the Debtor's related business lines will be significantly enhanced as shown in the Financial Projections. Accordingly, the Debtor believes the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated thereby will be consummated by the Effective Date. Any significant delay in the Effective Date may have a material adverse impact on the Debtor's business operations and financial performance, including, among other things, an increased risk of inability to meet revenue forecasts and the incurrence of higher restructuring expenses.

THE DEBTOR'S MANAGEMENT PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR PROFESSIONALS AND THEIR FINANCIAL ADVISORS. THE DEBTOR'S MANAGEMENT AND ITS FINANCIAL ADVISORS DID NOT PREPARE THE PROJECTIONS IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP") OR INTERNATIONAL FINANCIAL REPORTING STANDARDS ("IFRS") OR TO COMPLY WITH THE RULES AND REGULATIONS OF THE SEC OR ANY FOREIGN REGULATORY AUTHORITY. THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS. THE DEBTOR'S INDEPENDENT AUDITOR HAS NOT COMPILED OR EXAMINED THE FINANCIAL PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. NEITHER THE DEBTOR NOR ITS PROFESSIOALS AND ADVISORS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

## II.    SUMMMARY

### A.  Projections Horizon

The projections herein are being made over the Plan Period ending on May 15th, 2017, coincident with the legal final maturity of the Notes.

### B.  Reorganized Debtor

The Reorganized Debtor is Newland International Properties, Corp., developer of the Trump Ocean Club International Hotel and Tower ("***TOC***"). No other entities or affiliates are being consolidated with the Debtor in these proceedings.

### C.  Post-Confirmation Operations

From and after the Effective Date of the Plan, the Reorganized Debtor will continue to generate revenues from sales of real estate products, sales of private beach club memberships to TOC residents (with such beach club referred to herein as the "***Isla Viveros Beach Club***"), net profits from Hotel and Hotel Amenities operations, leasing of residential and commercial units at the TOC, and various ancillary revenues such as from asset sales and vendor recoveries.

### D.  Discontinued Operations

The Financial Projections will not separate out any discontinued operations.

### E.  Fresh Start Accounting

Upon emergence from Chapter 11, the Debtor is not expected to be eligible for fresh start accounting.

F.  **Estimated Revenues**

Over the Plan Period, the Debtor is expecting to receive in nominal terms, total revenues of $376.8 million. The sources of these revenues are estimated to be (1) unit sales, including condo units, condo hotel units, commercial units, restaurants, office spaces, the casino, and the spa; (2) beach club membership sales; residential and commercial lease revenues; (4) hotel and hotel amenities revenue; (5) other revenue, including storage locker sale and rental revenue, equipment sales, recoveries from vendor litigation, and sale of the Contadora Island land parcel.

G.  **Estimated Disbursements**

The Debtor estimates that it will incur no further construction costs in connection with the TOC during the Plan Period as all the TOC real estate products expected to be available for sale under the Plan have been fully constructed.  A post-sales budget has been established for maintenance of units and preparation of units for delivery to buyers closing on their units.

1.  **Interest and Principal Payments for the Notes**

The Debtor estimates that it will make payments of interest and principal on the Notes in an amount equal to approximately $293.9 million.

2.  **Interest and Principal Payments for the Bulk Sale Repurchase**

The Debtor estimates that it will generate sufficient cash from real estate sales and other operations to substantially, if not fully, repurchase the Bulk Sale portfolio. In the event that cash proceeds are insufficient to do so, the Debtor intends to refinance the portion of the Bulk Sale portfolio which has not been repurchased, and such refinancing facility will subsequently be repaid with cash generated from real estate sales and operations at a future date.

During the Plan Period, the Debtor estimates its interest costs on the Notes to be approximately $41 million. During the Plan Period, the Debtor estimates the principal on the Notes will be reduced according to the following schedule as set out in the Financial Projection set forth below in Table 4. To the extent that the expected sellout proceeds are received sooner than estimated, the Notes will be amortized more quickly, in accordance with the mechanisms specified in Exhibit A to the Disclosure Statement, "Description of Notes", and therefore the interest costs will also decrease from the figure noted above.

H.  **Estimated Expenses**

Estimated expenses include (a) asset completion, maintenance, and preservation expenses, including post-sales work and maintenance of unsold inventory, common area maintenance, electric and utility expenses, and  concession area and dock maintenance expenses;  (b) marketing and sales operations, including advertising and marketing, events and co-branding, sales operations, and brokerage, closing, and licensing fees; (c) corporate operations, including financial, legal, and tax related expenses, restructuring related expenses, corporate and administrative expenses, and settlement expenses for legal claims. Further detail is provided herein in Section C- "Expenses".

I.  **Impact of Delays in Chapter 11 Case**

While the Debtor expects to exit bankruptcy as quickly as reasonably possible, a brief period of delay in the chapter 11 process would not be expected to significantly impact the Debtor's Plan. Nevertheless, there could be adverse consequences for such a delay, including additional expenses incurred during the Chapter 11 Case and an adverse impact on the marketability of the

Debtor's assets due primarily to market sensitivity to the risk of a precipitous drop in the unit values were a conversion to occur.  The Plan provides some relief from the cash flow impact of such a brief delay by capitalizing accrued interest to the Plan Effective Date, allocating such amount across the maturity structure of the restructured Notes. The net impact of the foregoing is difficult to determine specifically; notwithstanding, a material delay in the Chapter 11 Case would require the Debtor to accelerate its sales velocity in order to achieve its projections over the Plan Period.  The Debtor believes that this requirement would be manageable for a period as long as eight months after filing to exit the chapter 11 case before sales velocity would be required to increase by an additional one unit per month.

# III.    FINANCIAL PROJECTIONS DETAIL

## A.  GENERAL METHODOLOGY

The Financial Projections consist of the selected income statement items and selected balance and cash flow items as of December 31st for each year for calendar years 2013 through 2016 and for a partial year to May 15, 2017, the legal final maturity of the Notes.  The Debtor's Financial Projections assume an Effective Date of May 15, 2013 and set forth the projected financial performance of the Debtor through the Confirmation and the Plan Period.  The Financial Projections do not reflect the impact of "fresh start" accounting, which could result in a material change to the projected values of assets and liabilities.  The Financial Projections are based on financial data derived from the Debtor's business planning process and reflect the Debtor's balance sheet and income projections.  The business planning process is undertaken periodically, at least annually, by the Debtor to provide sales and cost projections which assist the Debtor in managing its working capital needs and planning for anticipated capital expenditures and the servicing of its debt obligations.  The Financial Projections, among other things are based upon current and projected market conditions and assume emergence from chapter 11 on the Effective Date under the terms expected in the Plan.

## B.  REVENUES

### 1.  Residential and Commercial Unit Sales Revenues

The condominium units offered at the TOC include residential, hotel, office, retail, restaurant, hotel amenity, casino, and spa units.  The residential condominium units are further broken down by product lines such as Baylofts, Condo Curve Units, and Condo units, which include one, two, and three bedroom units.  The casino, spa, retail and restaurant commercial units, and the penthouse unit on the 66th floor are delivered to purchasers as gray space (i.e. bare concrete floor, ceilings, and walls with no finishes or appliances.)  The hotel condominium units and the bayloft residential units are delivered fully furnished. The balance of the residential condominium units are delivered as finished space with built-out kitchens and appliances but otherwise unfurnished.

Revenues from condominium unit sales are driven by the absorption of units at the TOC achieved by the inventory pricing and the marketing and sales strategies employed by the Debtor.  Table 1 below (the "*Sellout Matrix*") provides a breakdown of total units sold net of defaults at actual final sales prices ("*Sold Units*") along with units in inventory available for sale ("*Available Units*") as of February 28, 2013.

This values for Available Units are based on market prices for units at the TOC under current market conditions, the financial profile and market position of the Debtor, reasonable expectations for real estate price appreciation, and the historical market premium that the TOC has commanded prior to the events which put the Debtor in default and its inventory at risk of foreclosure and liquidation.

Table 1: Sellout Matrix

| | Sold or contracted | | | Available | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Units | US$MM | SQMT Th | Units | US$MM | SQMT Th | Units | US$MM | SQMT Th |
| *Residential Condominium Units* | | | | | | | | | |
| One Bedroom Units | 99 | 33.1 | 9.7 | 57 | 22.7 | 5.6 | 156 | 55.8 | 15.3 |
| Two Bedroom Units | 99 | 49.4 | 15.2 | 97 | 55.6 | 14.9 | 196 | 104.9 | 30.0 |
| Three Bedroom Units | 41 | 27.1 | 7.5 | 33 | 26.6 | 6.1 | 74 | 53.6 | 13.6 |
| Three Bedroom combo Units | 5 | 8.6 | 2.0 | 7 | 11.2 | 2.8 | 12 | 19.8 | 4.7 |
| 65th Floor Sun Units | - | - | - | 6 | 6.5 | 1.4 | 6 | 6.5 | 1.4 |
| Penthouse | - | - | - | 4 | 7.0 | 1.4 | 4 | 7.0 | 1.4 |
| Curve Units | 26 | 14.8 | 4.1 | 33 | 17.7 | 4.6 | 59 | 32.4 | 8.7 |
| Baylofts | 64 | 21.0 | 5.0 | 59 | 30.7 | 6.1 | 123 | 51.7 | 11.1 |
| Subtotal | 334 | 153.8 | 43.4 | 296 | 177.9 | 42.8 | 630 | 331.8 | 86.2 |
| | | | | | | | | | |
| *Hotel Condominium Units* | | | | | | | | | |
| One Bedroom Suite Units | 3 | 1.1 | 0.3 | 7 | 4.8 | 0.7 | 10 | 5.9 | 1.0 |
| One Bedroom Curve Units | 5 | 2.3 | 0.4 | 34 | 16.5 | 2.6 | 39 | 18.8 | 3.0 |
| Studio Units | 163 | 39.9 | 8.0 | 157 | 52.7 | 7.8 | 320 | 92.6 | 15.8 |
| Subtotal | 171 | 43.3 | 8.7 | 198 | 74.0 | 11.1 | 369 | 117.3 | 19.8 |
| **Total Residential and Hotel Units** | **505** | **197.1** | **52.1** | **494** | **252.0** | **53.9** | **999** | **449.1** | **106.0** |
| | | | | | | | | | |
| **Other Products** | | | | | | | | | |
| Commercial Units | 30 | 16.9 | 3.2 | - | - | - | 30 | 16.9 | 3.2 |
| Restaurants | 2 | 2.4 | 0.4 | 2 | 1.5 | 0.4 | 4 | 3.9 | 0.8 |
| Offices | 64 | 14.3 | 4.7 | - | - | - | 64 | 14.3 | 4.7 |
| Spa | 1 | 1.3 | 0.9 | - | - | - | 1 | 1.3 | 0.9 |
| Casino | - | - | - | 1 | 32.0 | 5.2 | 1 | 32.0 | 5.2 |
| **Total Commercial Space** | **97** | **34.8** | **9.2** | **3** | **33.5** | **5.6** | **100** | **68.3** | **14.7** |
| | | | | | | | | | |
| **Total Sell Out** | 602 | 231.9 | 61.3 | 497 | 285.5 | 59.5 | 1,099 | 517.4 | 120.8 |
| Membership Fee | - | 6.8 | - | - | 7.0 | - | - | 13.9 | - |
| **TOTAL SALES PLUS MEMBERSHIPS** | **602** | **238.8** | **61.3** | **497** | **292.5** | **59.5** | **1,099** | **531.3** | **120.8** |

The Sellout Matrix indicates a total sellout of 1,099 units at approximately $531.3 million, consisting of 602 Sold Units of $238.8 million, and 497 Available Units of $292.5 million, expressed in terms of the historical list price established and maintained by the Debtor since inception ("*List Price*") less a 25.0% discount, adhering to the Debtor's historical reporting convention (the "*Available Unit Value*"). Exceptions to this convention are the units subject to the agreement entered into between The Debtor and Sun International (the "*Sun Agreement*"), including the Casino, which has been assigned an Available Unit Value of $32 million, as well as the Penthouse and 65th Floor Units, which have been assigned Available Unit Values of $7 million and $6.5 million respectively, based on prices stipulated in the Sun Agreement.

Within the Sellout Matrix, Bulk No. 2 Units are classified as Sold Units at the conditional sale price (as further described below) of approximately $7.5 million (the "*Bulk Sale No. 2 Price*"). Upon a release of the Bulk No. 2 Units, the total Available Unit Values would increase by approximately $10.9 million to $303.4 million, based on the differential between the Bulk Sale No. 2 Price and the expected Available Unit Value of Bulk No. 2 Units when these units become Available Units, calculated at List Price less 25% for all units except the Spa, which itself is assumed to have an Available Unit Value of $2 million, the most recent offer received by the Debtor.

In addition, the Sun Agreement includes certain payments to the Debtor totaling $8.0 million subject to the Casino Operator attaining certain revenue targets, which if attained would increase the value of Available Units by $8 million to $311.4 million.

The total receivables balance as of February 28, 2013 consists of an aggregate receivables balance of $7.7 million. It is anticipated that $5.9 million of the existing balance should be collected, the majority of which is anticipated to be received within the next 60-90 days. The expected defaulting inventory consists of 7 units with an aggregate balance of $1.8 million, including 1 condo unit with an average size of 153 square meters, 3 condo-hotel units with an average size of 50 square meters, and 3 baylofts with an average size of 85 square meters.

Condo Unit Pricing

Unit price increase assumptions for the condo and bayloft units are based on projections for the Panamanian market and a partial recapture of the market premium (the "**Condo Unit Premium**") for TOC units vs. comparable luxury class A residential space in Panama.  Table 2 provides an historical analysis of the Condo Unit Premium.   As the table indicates, the historical Condo Unit Premium ranged from an 86.4% average during the pre-construction period of 2006 to 129.0% during the peak period ending in 2008.   Following the economic crisis which began in late 2008, the Condo Unit Premium dropped precipitously to an average of approximately 55.6% in 2009, reflecting, the sharp decline in global real estate prices, lack of available financing, and concerns about the Debtor's ability to complete the project.

The Condo Unit Premium is projected to ramp up from the current 44.9% level to a maximum premium of 85.3%, or 71.6% of the 2007-2008 post construction, pre-distressed average premium within a 4 year period, after which time this relative premium would be static and price increases thereafter would be in line with comparable class A products.   Under this assumption, the Condo Unit Premium assumptions are 48.7% of the post construction, pre-distressed average in 2013, rising to 57.9% by 2014, 66.1% by 2015, and peaking at 71.6% by 2016, before declining to 68.3% by 2017.

**Table 2 : TOC Historical Condo Unit Average Price Premium**

| HISTORICAL AVERAGE TOC CONDO PREMIUM PRICING | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Preconstruction 2006 | Post Construction, Pre-Distressed 2007 | 2008 | Distressed (Post-crisis) 2009 | 2010 | 2011 | 2012 | 2013E | 2014E | 2015E | 2016E | 2017E |
| Trump Average Historical Condo Price/ Sq Mtr | 3,628 | 4,561 | 5,267 | 3,562 | 3,647 | 3,316 | 3,061 | 3,545 | 4,023 | 4,521 | 4,977 | 5,174 |
| % change | | 25.7% | 15.5% | -32.4% | 2.4% | -9.1% | -7.7% | | | | | |
| Avg. Cl. A Panama Price/ Sq Mtr | 1946 | 2180 | 2300 | 2289 | 2011 | 2226 | 2112 | 2243 | 2382 | 2530 | 2687 | 2853 |
| % change | | 12.0% | 5.5% | -0.5% | -12.1% | 10.7% | -5.1% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% |
| Trump Historical % Premium to Class A Average | 86.4% | 109.2% | 129.0% | 55.6% | 81.3% | 49.0% | 44.9% | 58.0% | 68.9% | 78.7% | 85.3% | 81.3% |
| Trump premium as % of post-construction, pre-distressed average premium | | | | | | | | 48.7% | 57.9% | 66.1% | 71.6% | 68.3% |

Assumptions:
1- 4.70% annual inflation
2- Cl. A Prices increase 1.5% above inflation per year
3- Class A residential property price data source: CBRE Panama
4- Post Construction, pre-distressed average premium 199.1% (2007-2008)

Condo Hotel Unit Pricing

Hotel price increase assumptions are based on comparisons versus historical price premiums to condo units (the "**Condo Hotel Premium**"). Table 3 below provides an historical analysis of the Condo Hotel Premium.  As indicated in Table 3, the Condo Hotel Premium ranged from 37.3% in the 2006 pre-construction period to 48.9% at the peak period of 2008. During the economic crisis which began in late 2008 until 2011, virtually no hotel units were sold due to several factors, including concerns about lack of financing availability, continued anticipated price declines, the Debtor's ability to complete the project. In 2012, three hotel units were sold at an average premium of 59.1% to the condo unit pricing.

The Condo Hotel Premium is projected to remain at a premium in excess of 40% to the condo unit pricing over the life of the project, or 85.5% of the 2007-2008 post construction, pre-distressed average premium of 47.2%, and well below the 2012 level of 59.1%.

**Table 3 : TOC Historical Condo Hotel Unit Average Price Premium**

| HISTORICAL AVERAGE TOC CONDO HOTEL PREMIUM PRICING | Preconstruction | Post Construction, Pre-Distressed | | Distressed (Post-crisis) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013E | 2014E | 2015E | 2016E | 2017E |
| TOC Average Historical Condo Price/ Sq Mtr | 3,628 | 4,561 | 5,267 | 3,562 | 3,647 | 3,316 | 3,061 | 3,545 | 4,023 | 4,521 | 4,977 | 5,174 |
| % change | | 25.7% | 15.5% | -32.4% | 2.4% | -9.1% | -7.7% | 15.8% | 13.5% | 12.4% | 10.1% | 3.9% |
| TOC Average Historical Condo Hotel Price/ Sq Mtr | 4,981 | 6,641 | 7,842 | 8,471 | na | na | 4,871 | 4,976 | 5,648 | 6,347 | 6,988 | 7,263 |
| % change | | 33.3% | 18.1% | 8.0% | na | na | na | 2.1% | 13.5% | 12.4% | 10.1% | 3.9% |
| Avg. Condo Hotel Premium vs. Condo Price | 37.3% | 45.6% | 48.9% | 137.8% | na | na | 59.1% | 40.4% | 40.4% | 40.4% | 40.4% | 40.4% |
| Trump Hotel premium as % of post-construction, pre-distressed average premium | | | | | | | | 85.5% | 85.5% | 85.5% | 85.5% | 85.5% |

Notes:
1- 4.70% annual inflation
2- No condo hotels were sold in 2010-2011
3- Post-construction, pre-distressed average premium (2007-2008) was 47.2%

The Debtor receives revenues on unit sales net of brokerage commissions and certain other closing costs related to taxes, notary and recording fees as further described in the EXPENSES section below. The Debtor pays or causes to be paid from such net revenues the License Fees to Trump Marks and certain other co-brokerage commissions payable on installment payments on past sales.

The sales volumes achieved by the Debtor are assumed to remain in the range of five to fifteen units per month exhibiting seasonal patterns and achieving a sellout of all TOC inventory by May 2017. Sales volumes should proceed relatively slowly during the restructuring negotiations and Chapter 11 Case and increase post restructuring as the stigma and risk exposure to buyers of a foreclosure and liquidation of the TOC inventory is removed from the marketplace. The product mix of unit sales is projected to begin with a majority of residential condominium units. The proportion of hotel units sold will increase significantly once the casino and Isla Viveros Beach Club are operational, both of which the Debtor expects will have a positive influence on hotel operating performance and marketability of those units. The sales of commercial units will also occur in later periods as residential and hotel unit sales and the casino operations provide the necessary foot traffic to fully realize the value of these spaces at the TOC.

## 2. Revenues from Defaulting Purchasers Under Purchase Agreements

The Debtor typically retains the deposits of unit buyers defaulting on their payment balances. The Debtor predicts a low default rate on future purchases of units at the TOC due to several reasons, including that buyers are purchasing fully completed and deliverable units at market prices, the closing periods for unit purchases are now short term, and the customary practice among buyers has shifted to getting financing commitments in place prior to contracting for a unit. The Debtor nevertheless expects some level of defaults under unit purchase agreements to occur due in part to natural credit defaults occurring in the ordinary course. Defaults are calculated as discrete unit sales defaults based on typical contract deposits and are subject to a delay in collections. The revenue resulting from defaults from more recent sales at market prices and from future sales is estimated to be approximately 0.75% of gross sales.

## 3. Revenues From Hotel Unit Managed Rental Program

The Debtor receives revenues from its inventory of hotel condominium units in the form of profits allocated by the TOC hotel manager from a managed rental program offered to hotel condominium unit owners. The Debtor's revenues from the hotel unit rental operations are comprised of hotel room rental profits and certain ancillary revenues from room rentals such as phone and cancellation charges. Incidental items such as pay TV, minibar, food and beverage, meeting and banquet space rentals, business center, laundry and parking fees are part of other departmental revenues and are not figured in the rental program profits. These ancillary

revenue streams are highly correlated with the occupancy of the TOC hotel and to a lesser extent the average daily rate (the "*ADR*") for hotel room rentals achieved by the hotel operations. Profits from the managed rental program are calculated and disbursed to unit owners pursuant to a managed rental agreement. The TOC Hotel manager determines the gross and net distributable rental profits for each owner based on the following expenses: Common area maintenance ("*CAM*") charges, a fixed charge for hotel operations called the hotel operating service charge ("*HOS*"), a base management fee (which is included in the CAM), and any applicable asset management fees in order to arrive at a gross unit profit for each hotel unit. The CAM and HOS charges are assessed on a per-M$^2$ basis while the other charges are assessed as a percentage of gross revenues. The CAM and HOS rates are determined each year by the TOC hotel manager and are budgeted to cover all hotel operating expenses of the TOC hotel such as salaries and wages of all departmental and general staff, property and liability insurance, repairs and maintenance expenses, utilities expenses for water and electricity. Gross unit profits are then assessed an incentive management fee by the TOC hotel manager. The incentive fee is established in the rental management agreement and is currently 15% of gross unit profits with pre-specified escalations in future years. As per an amended rental management agreement, post Effective date of the Plan, the incentive fee will be eliminated until after the third year and then revert to 10% of gross unit profits. Further charges are assessed to arrive at a net unit profit payable to the unit owner. These further charges consist of a "Per-Use Fee" covering maintenance of the rooms, an FF&E reserve of approximately 3% of gross unit revenues to cover FF&E investment, and rental management fees covering such costs as Global Distribution Systems (GDS) and reservation system fees, travel agent commissions, marketing fees, and credit card processing fees.

The gross rental revenues of the hotel are based on the seasonal occupancy and ADR of the hotel based on historical performance, regional economic and industry trends, the competitive landscape, the customer base, and the continued ramp-up of the TOC hotel operations from its initial opening in July 2011. Additional factors were considered such as the expected future development of amenities at the TOC including the announced $105 million casino project with Sun International and the private Isla Viveros Beach Club. Based on these considerations, the TOC hotel is projected to ramp up from a 50.9% annual average occupancy rate and $182.68 annual average ADR in 2012 over approximately two years coinciding with the casino operations to achieve an average annual occupancy of 68% and an annual average ADR of $255. The composition of the ancillary rental revenues can be highly variable and typically grows proportionately with room rental revenue. These revenues are estimated at approximately 1.25% of unit rental revenues.

4. **Revenues From Hotel Amenities Operations**

The Hotel Amenities are comprised of the following units owned by the Debtor as part of its inventory:

Barcelona: an upscale tapas restaurant located on the restaurant floor one flight down from the Hotel Sky Lobby.

Tejas: an upscale restaurant located on the restaurant floor one flight down from the Hotel Sky Lobby.

Azul: a casual full service bar and restaurant serving the main pool deck.

Cava 15: an intimate wine lounge located in the sky lobby of the TOC.

Ballroom/Meeting Rooms & TOC Kitchen: ballroom, banquet and meeting rooms located in the hotel and a large capacity kitchen meet the food and beverage needs of the banquet, meeting spaces, and in-room dining.

The revenues from the Hotel Amenities operations are predominantly food and beverage ("*F&B*") revenues generated by patrons of the restaurants, banquet and meeting rooms and by guests of the TOC hotel using in-room dining services. F&B operating expenses consists of

costs necessary for the primary operation of the hotel's restaurant and banquet facilities and the kitchen. The Hotel Amenities revenues are seasonal and correlate to the occupancy of the TOC hotel; however, they also exhibit strong countercyclical behaviors due to the strong patronage from Panamanian residents. The Hotel Amenities gross revenues are projected to ramp-up from the current average level of $700,000 per month over approximately two years to coincide with the ramp-up of the casino operations to a monthly gross revenue of $1.65 Million. During this same ramp-up period, the net margins of the Hotel Amenities operations available are projected to climb from 15% to 27.5%. The Hotel Amenities were leased under a ten year lease to the Hotel condominium owners body, P.H. TOC. Under the Hotel Amenities lease, the operating costs and profits are for the account of P.H. TOC. The initial lease rate payable to the Debtor under the lease is a nominal $1/year; however, after the fourth anniversary of the lease, the lease rate converts to an amount equal to twenty five percent of the operating profit of the Hotel Amenities payable to the Debtor. After the lease term expires, the Hotel Amenities revert back to the Debtor.

5.  **Revenues From Isla Viveros Beach Club Membership Fees**

All unit purchase agreements for TOC residential and hotel units include an additional amount payable to the Debtor for the purchase of a permanent membership to a beach club. These beach club membership fees are priced according to the size of each unit and are in the range of $10,000 and $18,000 per unit based on features of each unit such as number of bedrooms. The original location for the beach club was on Contadora Island in the Pearl Island Archipelago of Panama. The parcel of land on Contadora Island was subsequently subject to a force majeure event precluding commercial development of the land. The Debtor's ultimate shareholders have since resolved to provide a beach club on a nearby island, Isla Viveros. The Isla Viveros Beach Club design, land parcel, and accessible beachfront is substantially larger than the original design on Contadora Island. Outstanding receivables in respect of beach club memberships from past sales is approximately $6 million. The Debtor has generally abstained from legal actions to collect such membership fees due to the fact that the Isla Viveros Beach Club is not yet developed. The Debtor estimates that the beach club memberships are priced below market value for such permanent beach club memberships, especially given the enhanced design of the Isla Viveros Beach Club, and the enhanced marketability such a permanent beach club membership brings to a given residential unit at the TOC. The Debtor expects the default rate on such beach club membership fees to be low. The expected beach club membership revenue on future sales of units in inventory is approximately $7 million.

6.  **Revenues From Residential and Commercial Leasing Activities**

**Commercial Lease Revenues**
The Debtor estimates that sales prices for its commercial units are depressed due to the slow rate of occupancy and foot traffic at the TOC. The delays in residential and hotel unit deliveries, the opening of the TOC , and the arrival of the casino and beach club had resulted in lower building occupancy and retail traffic than planned by retail commercial unit purchasers. Although the Debtor has seen significant improvements in offers and sales prices for its commercial retail units, it continues to believe that renting out these units until the hotel, casino, beach club, and residential occupancy is substantially ramped up will allow the Debtor to receive closer to full value for these units. Currently, there are 8 retail commercial units being leased generating monthly revenues of approximately $40,000.

**Residential Lease Revenues**
The rental market for the TOC is expected to be predominantly for furnished rentals. The Debtor has implemented a successful pilot program for furnished rentals at the TOC by incorporating the furniture packages into its residential leases with payback periods of approximately four months. Currently, there are 14 rentals at the TOC of which 11 are

furnished. The Debtor is expecting to grow its portfolio of furnished and unfurnished rentals up to a peak of approximately 60 units comprising 45 furnished and 15 unfurnished rentals. Rental rates are currently in the range of $1,800 to $2,850 for unfurnished and furnished one bedroom apartments, respectively with increased rental rates for larger, furnished units. Given the investor demand for units at the TOC, the rental program is expected to result in sales of leased units to investment oriented purchasers. and the recovery rate on furnished rental packages is expected to be high given the favorable pricing the Debtor receives from its furniture supplier(s).

### 7.  Revenues From the Ocean Deck Concession Area

The Debtor has a 20 year concession for certain areas extending from the TOC into the seabed underlying the marina landing (the "***Ocean Deck Concession Area***"). The Ocean Deck Concession Area is well suited to inviting operators of semi-enclosed food and beverage operations, tourism and excursion, water sports, and a sailing school. The Debtor is in discussions with various such operators and would lease space in the concession area to support these operations. Currently, some areas within the Ocean Deck Concession Area are being provided for use to certain tenants in the retail commercial units and to the operator of a restaurant.

### 8.  Revenues From the TOC Casino Transaction

On November 28, 2012, the Debtor announced that it had entered into a Framework Agreement with Sun International to purchase the Casino, the 66th floor Penthouse, and the 65th floor units for a total price of $45.5 million plus certain incentive revenues up to $8 million subject to certain revenue targets being attained. Sun International plans to invest approximately $105 million for its acquisition and complete build-out of the casino operations. The casino is slated to open by mid-2014. Sun International is currently in the process of completing the application to the Gaming Control Board of Panama for approval of its gaming license. The application includes, among other items, a business plan, the corporate structure of the casino operator and its relation to Sun International, and the form for the Process of Investigation as issued by the Gaming Control Board. The Debtor is also awaiting approval by MIVI (*Ministerio de Vivienda*), the Ministry of Housing, for approval of the Penthouse for commercial use, which was recently approved by a majority of unit owners at the annual owners meeting. The Debtor estimates that the casino will have a materially positive impact on the TOC operations, including food and beverage operations and will generate commercial traffic in the retail commercial areas of TOC.

### 9.  Revenues From the TOC Spa

The Debtor expects to sell the spa unit in the current year for approximately USD $2 million based on advanced discussions with a potential buyer, other recent discussions, and previous offers made for this unit. Any purchaser of the spa unit will be required to submit a build-out and operating plan to the TOC hotel manager to ensure it adheres to the design and operating standards of the Trump brand.

### 10.  Revenues From Storage Units Sales

The Debtor has recently begun offering residential unit owners storage units in the TOC. The cages have various measures and are located on certain floors and in the garage area. Prices for the units vary between $2,750 and $5,000 depending on the size and location. Storage units will be located on various residential floors with large units placed on certain floors of the garage. Revenues from sales of storage units are estimated to be approximately $4 million.

11. **POSA Working Capital Recapture**

During the pre-opening phase of the TOC Hotel, the Debtor made a $2,000,000 contribution to fund a working capital reserve (the "POSA Reserve") for the TOC Hotel operations.  Pursuant to such arrangement, the Debtor has the right to recoup its initial contribution from working capital charges assessed on unit sales, subject to, among other things, the POSA Reserve reaching a threshold amount of aggregate funding received.  The Debtor estimates that such recovery of its initial contribution would happen over 2014 and 2015, with the majority of such recapture occurring in 2015.

12. **Revenues from Other Asset Sales & Vendor Recoveries**

The Debtor previously engaged in various asset sales and bartering transactions, the vast majority of which were the selling and bartering of equipment and tools with its construction contractors and crews during 2012 when the sudden freezing of Trust Accounts left the Debtor's monthly working capital expenses at risk of going unfunded and also caused construction activities to come to a halt in early 2013. The Debtor currently has additional equipment which it intends to sell, has various potential recoveries from vendors, and owns a parcel of land on Contadora Island in the Pearl Islands archipelago (the original site for a TOC Beach Club) which it also intends to sell.  The Debtor's potential recoveries from vendors include a potential recovery to Noteholders from an approximately $20 million lawsuit commenced by Opcorp against Eurokitchen, the original supplier of millwork and kitchen finishes which defaulted on its supply contract and caused significant delays and cost increases in delivering the residential units.  Additionally, the Debtor has potential recoveries from cable, telecom, and utility providers which billed unoccupied units.  Finally, the debtor expects to recover monies from an existing corporate banking account currently under a court sequester in Panama initiated in late 2011 in connection with an ongoing lawsuit.  The Debtor has since that time taken measures to mitigate similar risks in the future.  The total receipts from such asset sales and recoveries are projected to be approximately $3 million.

C. **EXPENSES**

Estimated expenses are detailed below, including asset completion, maintenance, and preservation expenses, marketing and sales operations, and corporate operations.  The budget for such expenses is set forth in the Monthly Working Capital Exhibit 4A to the Term Sheet.

1. **TOC Asset Completion, Maintenance & Preservation**

Asset Maintenance/Preservation expenses are comprised of post sales expenses, CAM and electricity usage charges for the Debtor's unsold inventory, and expenses related to the maintenance of the Ocean Deck Concession Area.

**Post-Sales Works and Maintenance**

Post-sales expenses cover the labor crews, materials, and administrative staff needed for post-sales repairs and warranty works to recently delivered units and for cleaning and maintaining the unsold inventory at the TOC.   Purchasers of Condominium Units typically submit "punch lists" of repair items the Debtor reasonably determines to grant such purchaser.  The skilled labor crews required for post-sales works are comprised of foremen, carpentry, plumbing, HVAC, and electricians.  Additional unskilled labor crews are used for general cleaning and maintenance.  Post-sales works and  maintenance are expected to continue throughout the Plan Period, and are projected at approximately $800,000 per year.

**Common Area Maintenance**

CAM represents the monthly maintenance expenses assessed on all owners of condominium units at the TOC. The Debtor is required to pay monthly CAM on all unsold inventory as any other owner of a condominium unit. The CAM charges vary by each condominium component and by each unit based on percentages set in the condominium documents. The CAM represents each unit's pro-rata share of common area expenses typical of condominiums such as building staff, cleaning, repairs and maintenance, service contracts for elevators, HVAC, lighting, and other utilities, engineering, pool and health club management, décor, supplies, building administration, accounting, human resources, taxes, office and legal expenses. The CAM charges are expressed in US dollars per month per square meter of each unit and billed to each unit owner. In the case of the hotel component, the CAM includes the costs of operating and managing the TOC. The CAM rates are determined each year via an annual budget review by the condominium administrator and approved by the board of unit owners (the "Owner's Meeting"). Current CAM charges on a per square meter basis are $3.10 for condo and bayloft units, $4.80 for commercial units, $5.37 for offices, $7.84 for restaurants, $7.44 for the spa, and $4.74 for the casino. For hotel units, CAM is charged at $27.45 per square meter. Since July 2012, the hotel CAM has been more than offset by hotel and hotel amenities net revenue after fees, resulting in a profit to the Debtor on its owned hotel units.

**Electricity & Insurance**

CAM does not include electricity costs or insurance for individual condo units and commercial units owned by the Debtor and therefore the Debtor pays these costs separately to Trump. The Debtor incurs some electricity charges for unsold inventory because of the occasional need to control humidity and temperature in the units to avoid such things as mildew or moisture stains, which add to cleaning and maintenance costs. Current electric costs are projected at $45 per unit per month and escalate at an annual rate of 3%. Insurance costs are estimated at $23 per unit per month with a 3% annual escalation.

**Concession Area & Dock Maintenance Expenses**

The Debtor also pays to the condominium administrator a monthly expense, similar in nature to CAM, for maintenance and a deemed share of common area expenses of the Ocean Deck Concession Area. The Ocean Deck Concession Area provides additional revenue opportunities for the Debtor to lease out to or operate an outdoor food, beverage, and an entertainment venue. The Debtor also pays for the maintenance, insurance, and servicing of the marina landing. The Debtor expects to cover its marina landing expenses by engaging a dockmaster in the near future to further develop the marina landing areas with kiosks and various watersport and ferry services. Currently, these fees are running at approximately $13,000 per month.

**2.  The Debtor's TOC Marketing & Sales Operations**

**Asset Enhancement & Show Room Floor**

Based on recommendations made by Cervera, certain enhancements were made to areas and associated with the sales process, most noteworthy being the establishment of the showroom floor. The showroom floor is the 40th floor of the TOC on which eight different units of various types and sizes were designed and furnished to showcase TOC as the premier luxury residence in Panama. The show rooms were outfitted with premium furniture and fixtures designed to showcase the unique quality offered at TOC and to recapture its price premium versus other luxury buildings in Panama. The asset enhancements and the show room floor are substantially finished and therefore further expenses for these areas are expected to be negligible.

**Advertising & Marketing**

The Debtor engaged LGD Communications and AMGW to provide strategic marketing and creative development for the sales and marketing campaign launched with Cervera. These services include the creative development and advertising in various media, search engine optimization, an integrated and redesigned website, and public relations campaigns. Marketing

and sales work product also includes display and signage, photography and videography for sales office and in-room brochures and web delivered virtual tours of the building, its amenities, and its show floor units. Approximately $100,000 of additional one-time creative development expenses are expected to be incurred through July of this year.

## Events & Co-Branding

Events/co-branding are critical activities needed to engage the brokerage community channels to reach a broad buyer base while also using the lifestyle channels to differentiate the lifestyle aspects of the TOC including its unrivaled on-site amenities, marina activities, private beach club memberships, and globally recognized casino operator. The TOC has been used as a venue for various celebrity functions, product launches, and filming locations which reach a broad-based lifestyle audience. Other initiatives include the launching of the TOC Owner Privilege Card which will provide exclusive privileges, priorities, and discounted prices to differentiate owners from visitors at the TOC. Events and co-branding expenses, which are currently running at approximately $10,000 per month, are expected to ramp down as inventory is sold, resulting in an average monthly expense of approximately $8,500 through maturity of the Notes.

## Sales Center

The Debtor covers the expenses for Cervera, which maintains a sales center on the showroom floor which allows for a more high touch sales experience for buyers. Previously, the sales center was located off-site from the TOC. Sales Center expenses are currently running at approximately $23,000 per month, but are expected to ramp down to a monthly average of approximately $4,850.

## Sales Operations (Ex Brokerage)

Expenses related to the sales operations are comprised of the salaries of the on-site sales manager, closing coordinators, and internal legal and administrative support for financial closing and transfer documentation, bonus payments for reaching sales targets, the costs of maintaining local brokerage licensing, IT systems and software, certain taxes, notary fees, and external legal support for deeds and for litigation and settlement of claims. Sales operations expenses may also include refunds to purchasers for floor area ratio adjustments and reimbursements for certain past re-sales transactions. These expenses are projected to be incurred at a rate of approximately $28,000 per month.

## The Debtor's Brokerage, Closing & Licensing Fees

Brokerage, closing costs, and license fees are incurred for each sale of real estate by the Debtor and payable generally upon the financial closing of such purchase. The brokerage and closing costs are comprised of one or more of the following: Cervera and co-brokerage commissions, advisory and legal fees typically regarding material transactions such as the Casino transaction, notary and public registry recording fees, property taxes and applicable transfer taxes, and tax compliance certificate fees. In addition, license fees of Trump Marks Panama S.A. ("***Trump Marks***") are payable on units sales. Brokerage and closing costs will be paid upon closing of each unit from a closing account and the net purchase price will be payable to the Debtor. A portion of the notary, tax and recording fees are borne by purchasers directly in the form of closing costs. The Debtor estimates that the average costs for Cervera and co-brokerage commissions will average approximately 7% inclusive of local sales tax ("***ITBMS***"). This rate reflects a blended average rate based on reasonable assumptions for the proportion of direct sales versus co-broker assisted sales. There are also sales bonuses of $150,000 payable to Cervera for achieving each $75 million in gross sellout value for residential units and hotel unit sales. In addition, there may be past-due co-brokerage fees in an amount up to approximately $580,000 payable to local brokerage firms by the previous master-broker for the TOC, International Sales Group, but which were left unpaid. The Debtor is currently reviewing these payables in light of the vital role of local brokerage firms in the Debtor's real estate sales.

The Trump License Fees are determined pursuant to an amended license agreement between the Debtor and Trump based on certain fee concessions as more fully described in Section V.F.6 of the Disclosure Statement.

**3.   The Debtor's Corporate Operations**

The Debtor's expenses for its corporate functions are comprised of corporate officers' salaries and certain overhead expenses, legal, accounting, financing and banking fees, and tax expenses.

**The Debtor's Financial, Legal & Tax Related Expenses**

The security arrangement for the Notes requires Panamanian and New York Trustees which are paid annual trustee fees plus expenses for ancillary administrative tasks and external legal support.   The Debtor also employs a Panamanian Trustee to administer a closing account and certain accounts used by the Debtor.   The Debtor incurs ordinary banking fees for payment remittances, DTC fees, and fees to maintain credit ratings on the Notes.   The Debtor engages external law firms and an accounting firm, BDO, to support its control functions and to maintain compliance with applicable laws and ordinances, and to manage its legal exposure from its developer sales activities.    The Debtor also engages lawyers and advisers for transactional work such as for the Bulk Sales transactions and the Casino Transaction.   In addition, The Debtor incurs tax expenses for land, property, and corporate income. The Debtor's tax liabilities have been reduced by its net operating losses and also by qualifying for certain tax exemptions related to land development and to the tourism designation of the hotel. Post-restructuring, these expenses are projected to run initially at slightly less than $200,000 per month and ramp down before stabilizing at a monthly run-rate of approximately $55,000.

**Restructuring Related Expenses**

The Debtor will incur restructuring related expenses in connection with the Plan.   These restructuring related expenses are generally the costs of its legal and financial advisers, the legal and financial advisers to the Steering Group, and the ongoing expense of the Noteholder Representative pursuant to the Plan.   These expenses are provided in further detail in Cash Collateral Budget set forth in Exhibit 4B of the Termsheet.

**The Debtor's Corporate & Administrative Expenses**

Corporate and administrative expenses are generally fixed in nature and include expenses directly attributable to the corporate functions and control groups such as the salaries of corporate officers, insurance, IT and telecommunications, travel, and miscellaneous office expenses.   The largest component of these expenses is the salaries of corporate officers and the sales manager and their respective professional and administrative support staff. These expenses are estimated at approximately $80,000 per month through maturity of the Notes.

**Settlement of Spanish Unit Buyers**

The Debtor has agreed to return to a group of four Spanish investors a total amount of $324,299 in deposits upon resale of their four bayloft units by the Debtor.   The total size of the units in question is 246 square meters.

## D.   DISBURSEMENTS & DEBT SERVICE

Disbursements consist of capital expenditures, debt service on the Notes, and any bulk sale repurchase expenditures.

1. **Capital Expenditures**

With the TOC substantially completed and all condominium units available for delivery and with certificates of occupancy, the Debtor expects minimal additional development expenditures for the TOC other than expenditures of a maintenance capex nature such as with post-sales works and other general maintenance covered under EXPENSES.

2. **Bulk Sale Repurchases**

The Debtor intends to fully exercise its existing repurchase option with respect to the Bulk No. 2 Units by June 2013 and return the underlying units to inventory with cash disbursements and, to the extent of any shortfalls, with a replacement transaction to provide additional time for such repurchases.  Until such time, the Debtor pays monthly option fees to preserve its repurchase option and the applicable exercise prices for repurchasing the underlying units.

3. **BC Senior Loan**

In order to support the development of the Isla Viveros Beach Club and therefore the availability of private memberships for sale to unit purchasers at the TOC, the Debtor has granted to the Isla Viveros Beach Club the BC Senior Loan, to be disbursed, subject to certain conditions, in installments toward FF&E and toward development costs, (directly or indirectly by the Debtor shareholders advancing funds) as further described in the Plan.  Additionally, to the extent required and the availability of funds, the Debtor may fund a wholly-owned special purpose vehicle for the purpose of the purchase or concession of a ferry for transportation between the TOC and the Isla Viveros Beach Club.

4. **Debt Service on the New Notes**

The debt service on the Notes is comprised of interest payable, minimum scheduled amortizations, and early payments of principal with excess cash collections.  The Indenture for the Notes establishes three mechanisms for such early payments of principal:  i.) early redemptions of Notes from excess funds; ii.) to a limited extent market purchases and cancellation of Notes; and iii.) an excess cash sweep mechanism for prepayments of future minimum scheduled amortizations.

E. **TERMINAL VALUE OF CERTAIN OPERATING ASSETS OF THE DEBTOR**

At the end of the Plan Period, the Debtor is expected to have certain operating assets including the Hotel Amenities and may have developed potential ancillary revenue sources, such as in connection with the Ocean Deck Concession Area.  The terminal valuation for these particular assets is expected to be approximately $21.4 million, including $18.4 million for the Hotel Amenities and $3 million for the Ocean Deck Concession Area.  The estimated terminal value for Hotel Amenities and the Ocean Deck Concession Area are based on applying capitalization rates to the net operating profits and assumed lease revenues, as applicable, for the operations and the physical property, respectively.   The assumed rental rates in this estimate were approximately 10% of gross revenues for the Hotel Amenities and 20% of gross revenues for the Ocean Deck Concession Area. Capitalization rates were assumed to be approximately10% for the real estate and 30% for operations.

**Table 4: The Debtor's Cashflow Projections for Plan of Reorganization**

**Newland International Properties, Corp**
**Cashflow Projections to the Plan of Reorganization**

| | Full Year 2013 | Full Year 2014 | Full Year 2015 | Full Year 2016 | 15-May-17 2017 | Total |
|---|---|---|---|---|---|---|
| **BOP Total Corp/Trust Cash Balance** | **7,655,391** | **6,778,294** | **6,424,686** | **6,214,114** | **6,612,336** | **7,655,391** |
| **Revenue Receipts** | | | | | | |
| Condominium Unit Sales | 90,026,116 | 66,214,962 | 67,846,230 | 71,918,271 | 28,926,604 | 324,932,184 |
| Beach Club Sales | 2,183,969 | 3,477,032 | 3,134,131 | 3,383,316 | 1,162,052 | 13,340,500 |
| Residential & Commercial Lease Revenues | 1,061,404 | 2,390,241 | 3,372,350 | 2,248,017 | 481,562 | 9,553,575 |
| Revenues from Hotel & Amenities Operations | 1,601,904 | 5,254,308 | 5,494,329 | 3,955,572 | 854,202 | 17,160,315 |
| Storage Locker Sales & Rentals | 704,616 | 1,042,703 | 994,946 | 1,066,582 | 222,868 | 4,031,714 |
| POSA Working Capital Recapture | | 835,819 | 1,164,181 | | | 2,000,000 |
| Equipment Sales/Contadora/Vendors/Recoveries | 560,000 | 1,312,500 | 1,500,000 | | | 3,372,500 |
| Revenues from Future UPA Defaults | 291,824 | 646,603 | 565,237 | 641,357 | 294,717 | 2,439,738 |
| **Total Revenues** | 96,429,833 | 81,174,168 | 84,071,403 | 83,213,115 | 31,942,006 | 376,830,525 |
| **Other Receipts** | | | | | | |
| Release of Funds Under Sequestro | - | 990,344 | - | - | - | 990,344 |
| Financial Guarantee Funds | - | - | - | - | - | - |
| **Total Other Receipts** | - | 990,344 | - | - | - | 990,344 |
| **Disbursements** | | | | | | |
| Allocated Development Costs | | | | | | |
| Isla Viveros BC Senior Loan | 1,653,321 | - | 772,878 | 172,555 | 76,245.39 | 2,675,000 |
| **Total Disbursements** | 1,653,321 | - | 772,878 | 172,555 | 76,245 | 2,675,000 |
| **Expenses** | | | | | | |
| Asset Maintenance & Preservation Expenses | 3,549,261 | 2,187,737 | 1,592,991 | 1,201,638 | 235,161 | 8,766,789 |
|    Payroll | *822,826* | *711,109* | *632,213* | *624,775* | *150,605* | *2,941,529* |
|    Other | *2,726,434* | *1,476,628* | *960,778* | *576,863* | *84,557* | *5,825,260* |
| Sales, Marketing, Brokerage & Licensing Expenses | 12,989,597 | 14,135,055 | 8,115,741 | 5,751,977 | 1,805,019 | 42,797,389 |
|    Brokerage and Payroll | *5,415,925* | *5,204,140* | *5,043,791* | *5,415,997* | *1,762,415* | *22,842,267* |
|    Trump & MTA License Fees | *6,354,542* | *7,594,215* | *2,697,948* | *21,269* | *1,241* | *16,669,214* |
|    Other | *1,219,131* | *1,336,701* | *374,002* | *314,712* | *41,363* | *3,285,909* |
| General & Administrative Expenses | 9,710,457 | 2,002,655 | 1,610,078 | 1,567,133 | 385,159 | 15,275,481 |
|    External Legal | *3,097,326* | *415,879* | *348,615* | *281,197* | *59,764* | *4,202,782* |
|    Financial Advisory | *4,937,500* | *-* | *-* | *-* | *-* | *4,937,500* |
|    Payroll | *767,072* | *952,612* | *804,633* | *829,106* | *211,187* | *3,564,610* |
|    Other | *908,558* | *634,163* | *456,830* | *456,830* | *114,208* | *2,570,589* |
| **Total Expenses** | 26,249,314 | 18,325,447 | 11,318,810 | 8,520,749 | 2,425,339 | 66,839,659 |
| **Total Disbursements & Expenses** | 27,902,635 | 18,325,447 | 12,091,688 | 8,693,305 | 2,501,585 | 69,514,659 |
| **Cash Flow Before Interest & Tax** | 68,527,198 | 63,839,065 | 71,979,716 | 74,519,810 | 29,440,421 | 308,306,210 |
| **Tax Expenses** | 282,098 | 81,000 | 81,000 | 81,000 | 20,250 | 545,348 |
| **Debt Interest & Bulk Sales Option Fees** | 12,496,480 | 18,255,195 | 13,838,738 | 8,111,828 | 1,617,730 | 54,319,970 |
| **Amortization of Debt & Bulk Sales** | 56,230,387 | 45,856,478 | 58,270,550 | 65,928,761 | 34,057,479 | 260,343,654 |
|   Notes | | | | | | |
|     Opening Balance | *220,000,000* | *198,373,994* | *158,256,789* | *99,986,239* | *34,057,479* | *220,000,000* |
|     Interest Capitalized | *32,862,000* | | | | | *32,862,000* |
|     Interest Paid | *(11,737,969)* | *(18,028,858)* | *(13,838,738)* | *(8,111,828)* | *(1,617,730)* | *(53,335,122)* |
|     Principal Decrease | *(54,488,006)* | *(40,117,206)* | *(58,270,550)* | *(65,928,761)* | *(34,057,479)* | *(252,862,000)* |
|     Ending Balance | *198,373,994* | *158,256,789* | *99,986,239* | *34,057,479* | *-* | *-* |
|   Bulk Sale 2 | | | | | | |
|     Opening Balance | *7,481,654* | *5,739,272* | *-* | *-* | *-* | *7,481,654* |
|     Interest Capitalized | *-* | *-* | | | | *-* |
|     Interest Paid | *(758,511)* | *(226,337)* | *-* | *-* | *-* | *(984,848)* |
|     Principal Decrease | *(1,742,381)* | *(5,739,272)* | *-* | *-* | *-* | *(7,481,654)* |
|     Ending Balance | *5,739,272* | *-* | *-* | *-* | *-* | *-* |
| **EOP Total Corp/Trust Cash Balance** | **6,778,294** | **6,424,686** | **6,214,114** | **6,612,336** | **357,299** | **357,299** |

**EXHIBIT D**
**LIQUIDATION ANALYSIS**

# EXHIBIT D: LIQUIDATION ANALYSIS

**Introduction**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of an impaired allowed claim or interest in such class either (a) has accepted the plan of reorganization or (b) will receive or retain under the plan, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain under the plan of reorganization if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, a bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's chapter 11 case was converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

In a chapter 7 case, holders of claims and interests of a debtor are generally paid from available assets in the following order: (a) holders of secured claims (up to the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.  Such payment structure remains subject to the principle, however, that no junior class receives any payments until all amounts due to senior classes have been paid fully or any such payment is provided for.  Because the key assets of the Debtor are located in Panama, in order to determine whether the "best interests" test has been met, it is necessary to determine the cash proceeds that would be generated by a liquidation of the Debtor's assets pursuant to a Panamanian insolvency or liquidation proceeding.

The liquidation analysis herein (the "***Liquidation Analysis***") estimates the range of cash proceeds that may be generated from a hypothetical liquidation of two sets of assets that would be separately but concurrently administered in Panamanian insolvency or liquidation proceedings and a parallel chapter 7 liquidation or chapter 15 recognition proceedings  in the United States (collectively, the "***Liquidation Proceeding***").  The amount of cash available from such a Liquidation Proceeding would be equivalent to the net cash held by the Debtor at the time of commencement of the Liquidation Proceeding plus the proceeds from the disposition of the Debtor's non-cash assets minus the costs and expenses of such Liquidation Proceeding.  Recoveries to impaired classes of claims and interests in the Debtor under such Liquidation Proceeding are compared to recoveries under the Plan.

Prior to determining whether the Best Interests Test has been met, further reductions would be required to cover amounts necessary to satisfy administrative, tax, and other priority claims that are senior to general unsecured claims, including any incremental administrative claims that may result from the termination of the Debtor's business and the liquidation of its assets, as well as any local Panamanian "third party intervention" claims that could be approved during the liquidation process.

The liquidation analysis herein assumes that unsecured creditors would seek to recover their debt through either an ordinary action, an executory action, or a bankruptcy proceeding. An ordinary action would be required for a creditor that does not possess documentation indicating evidence of a claim, and therefore must make its case through the submission of evidence to the court. An executory action would apply to a creditor which has evidence in writing either from the Debtor or through a judgment from a Panamanian court or from a judicial resolution having executor force under the Panama rules of procedure. Finally, a Panamanian bankruptcy proceeding could be filed by two or more creditors holding a liquid and past due commercial claim against the Debtor.

Because (a) the Debtor's unsecured creditors' claims are junior to the bondholders to the extent of the value of the collateral securing the bonds; (b) the collateral value in a liquidation is estimated to be insufficient to fully repay the Noteholders; and (c) there are no material unencumbered assets, it is assumed that there would be little or no recovery to unsecured creditors.

The results of the liquidation analysis herein in Tables 1 and 2 reflects the estimated cash proceeds, net of liquidation related costs, that would be available to the Noteholders if the Debtor's assets were to be liquidated in Panama. Underlying the Liquidation Analysis are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtor's management and their professionals, are inherently subject to significant legal, business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor and its management.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

**Methodology**

This liquidation analysis was prepared by the Debtor's management with the assistance of its professionals. It is assumed that the liquidation of the Debtor's cash in the New York trust account would commence under a Chapter 7 proceeding in New York, while the Debtor's Panamanian assets would be liquidated in a foreclosure proceeding under the direction of a Panamanian court and would continue for a period of approximately 36 months, during which time the Debtor's assets would either be sold or conveyed to the respective lien holders. The cash proceeds from the liquidation, net of liquidation-related costs, would then be distributed to Noteholders, except in cases where the Noteholders were to expressly direct the Trustee to divert funds for an alternative purpose, such as to fund maintenance of the Trump Ocean Club building. There are no assurances that all assets would be completely liquidated during the period indicated.

The liquidation analysis was prepared based on a review of the Debtor's assets and estimates of liquidation values were determined by the Debtor and its financial advisors. For the preparation of this analysis, the Debtor did not retain third party experts to value individual assets.

The liquidation analysis necessarily contains an estimate of the amount of claims that will ultimately become allowed claims. Estimates for various classes of claims are based solely upon the Debtor's books and records. No order of finding has been entered by any court estimating or otherwise fixing the amount of claims at the projected levels set forth in this liquidation analysis.

Liquidation would likely prompt certain other events to occur, including the rejection of remaining executory contracts and unexpired leases. Such events would likely create a larger number of unsecured creditors and would subject the Debtor's estate to additional damage claims for the rejection of those contracts. Such claims would also increase the aggregate amount of unsecured claims against the Debtor and would potentially dilute recoveries to holders of unsecured claims. No attempt has been made to estimate additional unsecured claims that may result from such events.

In addition, under Panamanian law, certain parties have the right in a liquidation proceeding to file a "third party intervention" in the liquidation process. An example of such an intervention would be a claim filed by the PH administrator of the Trump Ocean Club seeking access to funds for common area maintenance charges as well as maintenance costs for unsold units, which, if authorized by the Court, would be paid after satisfaction in full of the Noteholders' claims but prior to any payments to other unsecured creditors. However, despite such an intervention, if Noteholders are not paid in full, it is unlikely that such maintenance fees would be paid.

In a liquidation proceeding, a trustee would be appointed by the court to manage liquidation proceeds. A majority of bondholders could direct the court appointed trustee to make payments to cover payments to cover certain vital expenses and unsecured creditors. As the liquidation proceeding does not allow for payment of operating expenses of the Debtor, any payments made would be deducted from the value of their ultimate recovery, as the Noteholders would not have the ability to authorize the trustee to make payments on behalf of the Debtor, as they are currently doing through monthly working capital allocations.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

**Liquidation Scenarios**

In order to set forth the ranges of possibilities under a liquidation proceeding, two scenarios have been assumed: Scenario 1 - a foreclosure on the mortgage, but with voluntary payments to certain unsecured creditors made in order to maintain the value of the asset base; and Scenario 2 - foreclosure with all payments made for the account of the Noteholders, and unsecured creditors left solely with any residual proceeds after payment of the Notes in full.  Both analyses will provide estimates of the estimated proceeds from liquidation of the assets, including condo and condo hotel units, commercial spaces, casino, and spa.  Estimated proceeds from hotel and hotel amenities profits are also included, as are proceeds from beach club memberships as well. Proceeds from commercial and residential lease revenues are estimated, as well as other miscellaneous revenues.

**Assumptions – Liquidation Scenario 1**

Liquidation Scenario 1 assumes that the Noteholders foreclose on the mortgage in Panama and a Chapter 7 or 15 proceeding is commenced in New York, but the Noteholders are successful in allowing for limited payments to certain unsecured creditors and to cover certain operating expenses deemed by the Noteholders to be vital to their recovery, including a payment or partial payment of fees to certain Trump entities, as well as full payment of certain other expenses, including common area maintenance, electric bills, post sales expenses, and consultant fees.   Under Liquidation Scenario 1, it is estimated that Noteholders would obtain a nominal principal recovery of approximately $88 million after payment of expenses and interest, representing a 34.8% nominal principal recovery value versus an estimated $252.9 million of par value principal of the Notes, including $220 million of principal at original issue and $32.9 million of interest accrued over the liquidation period.

**Table 1: Liquidation Scenario 1**
**Foreclosure with Limited Payments of Certain Vital Expenses**

| NEWLAND INTERNATIONAL PROPERTIES CORP. | | |
|---|---|---|
| Liquidation Analysis: Scenario 1 | | |
| | Notes | Amount (US$) |
| Proceeds Available for Distribution US$ MM) | A | |
| Cash on Hand | | 7,012,417 |
| Unit Sales | | 165,327,186 |
| Hotel and Hotel Amenities Revenue | | 1,776,401 |
| Beach Club Membership Sales | | 0 |
| Commercial and Residential Lease Revenue | | 3,847,060 |
| Other Revenue | | 634,500 |
| *Total Proceeds from Liquidation* | | 180,373,965 |
| Less Liquidation Fees: | B | |
| Legal, Professional, Administrative, Tax, Notary, Other (Panama) | | 15,000,000 |
| *Proceeds available for Distribution* | | 165,373,965 |
| Payments Authorized to Unsecured Creditors: | | |
| Electric | | 664,562 |
| Trump Entities | | 12,359,833 |
| Hotel TOC (Building Maintenance) | | 693,749 |
| Post Sales (skeleton crew) | | 621,371 |
| Consultant fees | | 1,316,771 |
| *Proceeds available to Noteholders* | | 149,717,679 |
| Interest Payments | | 61,644,828 |
| Principal Payments | | 88,072,851 |
| Noteholder Claims | | 252,862,000 |
| Nominal Prinicpal Recovery as % of Par Value Principal of Notes | | 34.8% |
| Proceeds available for Administrative and Priority Claims | C | 0 |
| *Recovery %* | | 0% |
| Proceeds available for Unsecured Claims | D | 0 |
| *Recovery %* | | 0% |
| *Cash Proceeds available to Equity Interests* | E | 0 |

## Note A – Proceeds for Distribution

Liquidation Scenario 1 assumes that the Debtor's real estate assets are sold in a foreclosure process on a unit-by-unit basis by the Panamanian courts, whose procedures do not accommodate bulk sales of units. Under Liquidation Scenario 1, the Noteholders, through a local Panamanian trustee hired by the court to manage liquidation proceeds, would allow certain payments to be made for certain expenses that are vital to maintaining asset value, including payments to Trump entities, in order to maintain the Trump brand and Trump administration of the Trump Ocean Club. In addition, Noteholders would authorize allocations to cover Trump Ocean Club building maintenance costs, which would decline as the building is sold down. A limited budget would be allocated for common area maintenance, electricity, a limited post-sales staff required to prepare the units for delivery, and retention of  a small consulting staff to handle operational matters.

Under this scenario, the Debtor believes that total proceeds from liquidation of units would be approximately $165 million, implying a 49.1% reduction to the $324.9 million revenue from unit sales included in the financial projections indicated in Table 4 of Exhibit D to the Disclosure Statement (the "Financial Projections"). Given the constraints of Panamanian courts in conducting sales of units in bulk volumes, the estimated timeframe for complete liquidation of the inventory is 36 months. It is also assumed that all non-UPA revenues would accrue for the benefit of Noteholders, as implied by the granting clause of the Indenture for the existing Notes. Under these assumptions, total liquidation proceeds are estimated to be $180 million, a 52.1% reduction to the $376.8 million of total revenue included in the Financial Projections.

The Debtor is estimated to have cash on hand of approximately $8.4 million as of January 31, 2013, including $7.0 million of unencumbered cash and $1.4 million under *secuestro* (a Panamanian seizure process) pending resolution by the 8th District Court of Panama. A Chapter 7 proceeding would be commenced in order to access the cash in the New York trust accounts. It is not anticipated that the Debtor would access the funds under *secuestro* in the event of a liquidation.

Liquidation Scenario 1 assumes that there would be no collections of receivables balances on previously sold units, reflecting the fact that buyers would not likely pay their remaining balances without assurances that the Debtor could transfer the deed evidencing ownership, an assurance that the Debtor would be unable to provide once the Noteholders exercised their foreclosure rights. Thus, sales of condo units, hotel units, other units (including commercial units, restaurants, offices, and the spa) as well as the casino, assume that all units currently sold are defaulted and returned to the inventory base, including the Bulk No. 2 Units.

### 1.   Condo and Condo Hotel Unit Sales

Revenue from unit sales revenue would be significantly reduced as a result of a liquidation proceeding through the Panamanian courts, resulting in total revenue well below the estimated figures assumed in the Financial Projections. Liquidation of the units takes place on a unit-by-unit basis by the Panamanian court, whose procedures are not designed to accommodate bulk sales. Furthermore, brokers are not permitted to be utilized to market the units as there is no mechanism to compensate them within the liquidation proceeding. In addition, it is likely that Sun International would seek to exit its agreement with the Debtor to purchase the casino, penthouse, and 65th floor units. Under this scenario, it is estimated that total proceeds from the entire portfolio of units would be approximately $165 million, a 49.1% reduction from the $324.9 million total revenue figure included in the Financial Projections.

### 2.   Net Revenue from Hotel and Hotel Amenities Operations

Net revenue from the Hotel Unit Managed Rental Program and Hotel Amenities Operations after expenses, including common area maintenance, is estimated at $1,776,401, an 89.6% decline from the levels forecast in the Financial Projections over the same time period, due to the negative impact of the foreclosure on the Trump Ocean Club's average daily rates and occupancy as well as on the performance of the hotel amenities, including the restaurants, ballroom, and meeting rooms, as a result of the lower profile of the building, a reduction in foot traffic, and a significant reduction in the wealth profile of the average client. In addition, it is anticipated that the Debtor's shareholders would not proceed to fund the construction of the Beach Club, further adversely impacting hotel performance and hotel unit average sale prices.

### 3.   Revenue from Isla Viveros Beach Club Membership Fees

As part of the Plan, current shareholders of the Debtor are planning to construct a Beach Club on Isla Viveros. It is anticipated that the Debtor's shareholders would not proceed to fund the construction of the Beach Club in the event of a liquidation, thereby eliminating any collection of the expected $12.6 million

of receivables associated with the Beach Club while also having a significantly adverse affect on average unit prices and hotel performance.

### 4.  Commercial and Residential Lease Revenues

Under Liquidation Scenario 1, commercial and residential lease revenue would decline significantly to $3.8 million under a liquidation proceeding, 59.7% below the amount forecast in the Financial Projections over the same 3 year period, due to a decline in foot traffic, anticipated reduction in the aggregate financial profile of the client base, and expected deterioration in the quality of the building amenities and the building itself.

### 5.  Other Revenue

Other Revenue includes revenue from storage unit sales, sales of remaining construction equipment, sales of miscellaneous assets, including the parcel of land on Contadora Island (original location for the Beach Club), anticipated recovery of funds from sequestered accounts, revenues from future defaults, and potential vendor recoveries, including from cable, telecom, and utility providers for billing charges associated with unoccupied units. Potential recoveries from litigation, including a potential $20 million recovery to Noteholders from a lawsuit commenced by Opcorp against the original millwork provider, Eurokitchen, would likely be eliminated as these litigation proceedings ceased. Total recovery from these sources is estimated to be $634,500, a 94.6% reduction from the expected levels in the Financial Projections.

### Note B – Liquidation Fees

Liquidation Scenario 1 assumes that fees associated with the foreclosure and liquidation process will total $15 million, including legal, financial, accounting, administrative fees, as well as taxes, notary, and other fees and expenses. The majority of these expenses would be incurred in Panama, while a portion of expenses will be incurred in association with the required Chapter 7 filing in New York in order to obtain the release of all funds in the New York trust accounts.

### Note C – Administrative and Priority Claims

Administrative and priority Claims include any Claims senior to unsecured creditor Claims, including potential "third party" intervention Claims as previously described. Under Liquidation Scenario 1, it is not anticipated that there would be any "third party" intervention Claims, as it is assumed that the Noteholders would agree to allow coverage from liquidation proceeds for the expenses of the most likely parties to file such Claims.

### Note D – Unsecured Claims

Unsecured Claims reflect the estimated amounts of unsecured liabilities as of the date of this liquidation analysis. Unsecured Claims include accrued but unpaid fees to Trump entities, MTA settlement Claims, unpaid broker commissions, re-sales reimbursements, legal fees, advisory fees, and other miscellaneous unsecured creditor Claims.

Unsecured creditors not accommodated by the Noteholders would need to file alternative proceedings in Panama in order to enforce their Claims, as they would not be considered in a foreclosure proceeding initiated by Noteholders. Any recovery of unsecured Claims would be net of any legal and administrative expenses associated with such proceedings. As it is not anticipated that the liquidation of the Trump Ocean Club's assets would result in a full recovery to the Noteholders, and it is assumed that there would

be no residual proceeds for unsecured creditors or for funding the expense of Panamanian bankruptcy proceedings.

## Note E – Equity Interests

Any excess proceeds after full recovery to Noteholders and unsecured creditors would flow to holders of equity interests in the Debtor. Given that there is expected to be only a partial recovery for Noteholders and no recovery for unsecured creditors other than partial amounts voluntarily ceded by the Noteholders, it is not anticipated that under Scenario 1 there would be any return of capital to holders of the Debtor's equity interests.

## Assumptions - Liquidation Scenario 2

Liquidation Scenario 2 assumes that Noteholders foreclose on the mortgage in Panama and a Chapter 7 or 15 proceeding is commenced in the US, and all proceeds after expenses are distributed to the Noteholders before any payments to other parties. Under this scenario, it is estimated that Noteholders would receive a nominal principal recovery of approximately $55.8 million after payment of expenses and interest, representing a 21.9% nominal recovery value versus an estimated $252.9 million of par value principal of the Notes, including $220 million of principal at original issue and $32.9 million of accrued interest.

**Table 2: Liquidation Scenario 2**
**Foreclosure with No Payments of Certain Vital Expenses**

| NEWLAND INTERNATIONAL PROPERTIES CORP. | | |
|---|---|---|
| Liquidation Analysis: Scenario 2 | | |
| | | |
| Proceeds Available for Distribution | Notes | Amount (US$) |
| | A | |
| Cash on Hand | | 7,012,417 |
| Unit Sales | | 126,249,851 |
| Hotel and Hotel Amenities Revenue | | 0 |
| Beach Club Membership Sales | | 0 |
| Commercial and Residential Lease Revenue | | 1,923,530 |
| Other Revenue | | 634,500 |
| *Total Proceeds from Liquidation* | | 135,820,298 |
| | | |
| Less Liquidation Fees: | B | |
| Legal, Professional, Administrative, Tax, Notary, Other (Panama) | | 15,000,000 |
| *Proceeds available for Distribution* | | 120,820,298 |
| *Proceeds available to Noteholders* | | 120,820,298 |
| Interest Payments | | 64,975,414 |
| Principal Payments | | 55,844,884 |
| Noteholder Claims | | 252,862,000 |
| Nominal Principal Recovery as % of Par Value Principal of Notes | | 22.1% |
| Proceeds available for Administrative and Priority Claims | C | 0 |
| *Recovery %* | | 0% |
| Proceeds available for Unsecured Claims | D | 0 |
| *Recovery %* | | 0% |
| *Cash Proceeds available to Equity Interests* | E | 0 |

## Note A – Proceeds for Distribution

### Condo and Condo Hotel Units

Liquidation Scenario 2 assumes no payments are made to unsecured creditors. Under this scenario, it is anticipated that the Trump entities would exit the project, resign as PH administrator and remove its name from the building.  Removal of the Trump brand would likely result in a complete elimination of the price premium the building currently enjoys versus comparable luxury units in Panama. Maintenance fees, which are currently funded by the Debtor as owner of approximately half of the units   would be completely eliminated, resulting in a significant physical deterioration of the building and/or a significant increase in the maintenance bill of existing clients, either or both of which would have an  additional adverse impact on unit valuations, resulting in estimated total proceeds of revenue of approximately $126 million, 61.1% below the figures provided in the Financial Projections.

### Net Revenue from Hotel and Hotel Amenities Operations

It is expected that net revenue from the Hotel Unit Managed Rental Program and Hotel Amenities Program would be insufficient to cover all charges, including common area maintenance charges, as the expected departure of the Trump entities would lead to significant reductions in average daily rates and/or occupancy rates as well as dramatic reductions in operations of the restaurants, ballroom, and meeting rooms. Currently the Trump Ocean Club enjoys a 5 star rating and has been cited for awards by leading publications such as *Conde Nast*. It is expected that the building's rating would decline to no more than a 3 star as the Trump entities would likely be replaced by an administrator without the global brand name recognition of Trump and without their stringent quality standards.

### Revenue from Isla Viveros Beach Club Membership Fees

It is anticipated that the Debtor's shareholders would withdraw their commitment to fund construction of the Beach Club, eliminating the expected $12.6 million of receivables associated with Beach Club memberships while causing further deterioration of hotel performance and hotel and condo unit average sale prices.

### Commercial and Residential Lease Revenues

It is anticipated that commercial and residential lease revenue would decline to $1.9 million under a liquidation proceeding, 79.8% below the amount forecast in the Financial Projections over a similar time period, due to an expected decline in foot traffic, anticipated reduction in the aggregate financial profile of the client base, and expected deterioration of the building resulting from the liquidation proceeding and the departure of the Trump entities and their brand.

### Other Revenue

It is anticipated that Other Revenue (as described above in previous scenario) would decline to $634,500, a 94.6% reduction from the levels expected in the Financial Projections, generated primarily from the sale of the parcel of land on Contadora Island and from the sale of remaining equipment.

## Note B –  Liquidation Fees

It is estimated that fees associated with the process of foreclosure in Panama with a parallel Chapter 7 proceeding in New York will total approximately $15 million, including legal, financial, accounting, administrative fees, as well as taxes, notary, and other fees.

## Note C – Administrative and Priority Claims

Administrative and priority Claims include any Claims senior to unsecured creditor Claims, including potential "third party" intervention Claims as previously described. Under Panamanian law, certain parties have the right in a liquidation proceeding to file a "third party intervention" in the liquidation process. An example of such claim which could be approved would be a claim filed by the building administer of the Trump Ocean Club seeking access to funds for maintenance of unpaid units, which, if authorized by the Court, would be paid after satisfaction in full of the Noteholders' Claims but prior to any payments to unsecured creditors. As this claim is subject to availability of funds, it is unlikely that such filing would result in proceeds to unsecured claimants, leaving the building administrator to either significantly reduce the maintenance budget of the building, substantially raise the maintenance rate for existing owners, or both.

## Note D – Unsecured Claims

It is assumed that unsecured Claims would not enforce their Claims in a Panamanian bankruptcy proceeding, given the lack of funding for such proceeding and the expected minimal recovery outcome.

## Note E – Equity Interests

Any excess proceeds after full recovery to the Noteholders and unsecured creditors would flow to the Debtor's equity interests. Given that there is expected to be only a partial recovery for Noteholders and no return to unsecured creditors in Scenario 2, it is not anticipated that there would be any return of capital to the Debtor's equity interests.

**THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF GENERATING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN A PANAMANIAN LIQUIDATION PROCEEDING WITH PARALLEL CHAPTER 7 LIQUIDATION OR CHAPTER 15 RECOGNITION PROCEEDINGS IN THE UNITED STATES WHEN COMPARED TO RECOVERIES UNDER THE PLAN. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION.**

Based upon the Liquidation Analysis, the Debtor and its financial advisors believe that, in every instance, each Creditor in an Impaired Class will receive equal or greater value as of the Effective Date than such Creditor would receive in a Liquidation Proceeding and that the Plan will meet the "best interests" test provided in section 1129(a)(7) of the Bankruptcy Code.

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtor's assets is an uncertain process involving extensive use of estimates and assumptions that, although considered reasonable by the Debtor and its financial advisors, are inherently subject to significant business, economic, competitive and operational changes, uncertainties, and contingencies that are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Liquidation Proceeding, and unanticipated events and circumstances could affect the ultimate results in an actual Liquidation Proceeding. The

Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtor were engaged in a Liquidation Proceeding.  The Liquidation Analysis is not intended and should not be used for any other purpose.

THE LIQUIDATION ANALYSIS DEPENDS ON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE MANAGEMENT AND THE ADVISORS OF THE DEBTORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, BUSINESS, REGULATORY, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THEIR MANAGEMENT AND ADVISORS.  THE LIQUIDATION ANALYSIS IS ALSO BASED ON THE DEBTORS' BEST JUDGMENT OF HOW NUMEROUS DECISIONS IN THE LIQUIDATION PROCESS WOULD BE RESOLVED.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY AND ADVERSELY FROM THOSE CONTAINED HEREIN.

THIS LIQUIDATION ANALYSIS ASSUMES VALUES BASED ON APPRAISALS, WHERE AVAILABLE, AND THE DEBTORS' AND ITS ADVISORS' BUSINESS JUDGMENT, WHERE APPRAISALS ARE NOT AVAILABLE.  NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION OR ADMISSION OF THE DEBTORS.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS.  ACCORDINGLY, THE ACTUAL LIQUIDATION VALUE OF THE DEBTOR IS SPECULATIVE IN NATURE AND COULD MATERIALLY VARY FROM THE ESTIMATES PROVIDED HEREIN.

**EXHIBIT E**
**PLAN SUPPORT AGREEMENT**

**PLAN SUPPORT AGREEMENT**

This PLAN SUPPORT AGREEMENT (this "Agreement") is made and entered into as of January 23, 2013 by and among (i) Newland International Properties, Corp. ("Newland" or the "Company" or "Debtor"); and (ii) the holders or investment advisers or managers of discretionary accounts that hold the Prepetition Notes (as defined below) that collectively hold not less than a majority in aggregate principal amount of Prepetition Notes (the "Initial Supporting Noteholders"; each, an "Initial Supporting Noteholder") and have executed this Agreement on or before the Agreement Effective Date (as defined below). The Debtor, each Initial Supporting Noteholder and each person or entity that becomes a party hereto in accordance with the terms hereof are collectively referred to as the "Parties" and individually as a "Party."[1]

**R E C I T A L S**

WHEREAS, the Debtor and the Initial Supporting Noteholders are seeking to implement restructuring transactions with respect to the capital structure of the Debtor, including the Debtor's obligations under its 9.50% Senior Secured Notes due 2014 (the "Prepetition Notes") issued by the Debtor pursuant to that certain indenture, dated as of November 21, 2007, as supplemented by the first supplement thereto, dated as of May 14, 2010, as further supplemented by the second supplement thereto, dated as of March 29, 2012, and as further supplemented by the third supplemental indenture thereto, dated as of July 12, 2012, and as further supplemented by the fourth supplemental indenture thereto, dated as of December 10, 2012, by and among the Debtor and HSBC Bank USA, N.A., as trustee (the "Trustee") (with any further supplements, collectively, the "Indenture"), pursuant to the terms and conditions set forth in the Settlement Term Sheet attached hereto as Exhibit A (the "Term Sheet") and in this Agreement which are intended to form the basis, effectively, of an exchange made by the Debtor to the holders of Prepetition Notes in which the Debtor shall issue "New Notes" in exchange for the Prepetition Notes through a pre-packaged bankruptcy (the "Pre-Pack Case") by the Debtor (as same is set forth in the Term Sheet and this Agreement, (the "Transaction") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**AGREEMENT**

**Section 1.      Agreement Effective Date and Joinder**

1.1      Agreement Effective Date.  This Agreement shall become effective and binding upon each of the Parties (the "Agreement Effective Date") on the later of: (i) the date on which counterpart signature pages of this Agreement shall have been executed by the Debtor and

---

[1]  Capitalized terms not defined herein are as defined in the Term Sheet (defined in the text infra).

delivered to Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), as counsel to the Debtor, and (ii) the date on which counterpart signature pages to this Agreement shall have been executed by the Initial Supporting Noteholders and delivered to the Debtor. Thereafter, the Agreement Effective Date as to each Subsequent Supporting Noteholder (as defined below) shall be the date they execute a Joinder Agreement (as defined below).

1.2    Joinder. Each holder of Prepetition Notes, or investment adviser or manager of discretionary accounts that hold the Prepetition Notes, that is not an Initial Supporting Noteholder and which executes a Joinder Agreement substantially in the form attached hereto as Exhibit B ("Joinder Agreement") shall be deemed, as of the date of such execution, for all purposes of this Agreement to be a Party to this Agreement (each, a "Subsequent Supporting Noteholder") as a Consenting Noteholder (as defined below), and this Agreement shall be deemed to have been amended as of such date to include such holder of Prepetition Notes or investment adviser or manager of discretionary accounts that hold the Prepetition Notes as a Consenting Noteholder; provided, that, except as expressly amended as contemplated by this section, each provision of this Agreement shall remain in full force and effect, unamended.

### Section 2.    Term Sheet

The Term Sheet is expressly incorporated herein and is made part of this Agreement by reference. The general terms and conditions of the Transaction are set forth in the Term Sheet; provided, however, that the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Term Sheet, this Agreement shall govern. Capitalized terms used but not defined herein have the meanings set forth in the Term Sheet.

### Section 3.    Commitments Regarding the Transaction

3.1    Noteholder Support of the Transaction. So long as this Agreement has not been terminated in accordance with the terms hereof, each Initial Supporting Noteholder and each Subsequent Supporting Noteholder (such holders together, the "Consenting Noteholders" and each a "Consenting Noteholder") agrees, in compliance with the timeframes set forth in this Agreement, that it shall, subject to the terms and conditions contained herein:

(i)    on a timely basis, negotiate in good faith all documentation relating to the Transaction, including those documents that implement the Term Sheet, applicable court materials and all other documentation relating to the Transaction (collectively, the "Transaction Documents"), which Transaction Documents shall contain provisions consistent in all respects with the Term Sheet and this Agreement and shall contain such other provisions as are reasonably satisfactory to Consenting Noteholders constituting the lesser of (i) a majority in aggregate principal amount of the Prepetition Notes and (ii) all Consenting Noteholders;

(ii)    permit all necessary disclosures in the Transaction Documents of the contents of this Agreement (provided, that, except as required in a ballot, the amount of Prepetition Notes held by each Consenting Noteholder shall not be publicly disclosed);

2

(iii)    support the Pre-Pack Case and the Transaction contemplated therein and thereby, including, without limitation, by (A) provided that it has been provided with a Pre-Pack Plan, related Disclosure Statement and Ballot in advance thereof, voting all claims held by them in favor of the Chapter 11 plan proposed in the Pre-Pack Case incorporating the Transaction (the "Pre-Pack Plan"), and (B), should the amount of Prepetition Notes held by the Consenting Holders continue to constitute a majority of the aggregate principal amount of the Prepetition Notes, deliver a direction to the Trustee (at no liability to themselves in respect of such direction) in respect of the Prepetition Notes to take such actions as are necessary or appropriate to conduct the Pre-Pack Case, including by directing the Trustee to agree to and not oppose the Debtor's use of the cash collateral ("Cash Collateral Use") securing the Prepetition Notes solely pursuant to the Term Sheet and the cash collateral budget that is attached to the Term Sheet (the "CC Budget");

(iv)    not, directly or indirectly, in any material respect, (A) object to, delay, impede, or take any other action to interfere with confirmation or consummation of the Pre-Pack Plan, and acceptance or implementation of the Transaction or (B) propose, file, support, solicit or vote for any restructuring, workout, plan of arrangement, or plan of reorganization for the Debtor, other than the Pre-Pack Plan, notwithstanding the foregoing, each Consenting Noteholder may raise and be heard on any issue arising in the Pre-Pack Case so long as such Consenting Noteholder is not in breach of, or attempting to breach any of, the provisions of this Agreement; and

(v)    enter into, support, and not object to any and all transactions consistent with the Term Sheet including, without limitation, any and all transactions contemplated by the Term Sheet and the New Notes described in the Term Sheet whether or not such transactions are permitted or prohibited under the Prepetition Notes.

3.2    Commitment of the Debtor.  As long as this Agreement has not been terminated in accordance with the terms hereof, the Debtor hereby agrees, in compliance with the timeframes set forth in this Agreement, that it shall, subject to the terms and conditions set forth herein:

(i)    support and complete the Transaction embodied in this Agreement and the Term Sheet; and

(ii)    do all things necessary and appropriate in furtherance of the Transaction embodied in the Term Sheet and this Agreement, including, without limitation: (a) cooperate and work in good faith with the Company's management, counsel and advisors to prepare and cause the preparation of the Transaction Documents, (b) pursue, support, and use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transaction embodied in the Term Sheet and this Agreement, (c) pursue, support, and use commercially reasonable efforts to complete the Transaction in good faith, and use commercially reasonable efforts to do all things that are reasonably necessary and appropriate in furtherance of, and to consummate and make effective, the Transaction, including, without limitation, using

3

commercially reasonable efforts to satisfy the conditions precedent set forth in this Agreement, and (d) not take any action that is materially inconsistent with, or is intended or is likely to interfere with consummation of, the restructuring and the Transaction embodied in the Term Sheet and this Agreement.

3.3    Transfer of Prepetition Notes.  Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Noteholder (a "Transferor") to sell, assign, transfer or otherwise dispose of ("Transfer") any of its Prepetition Notes; provided, however, that for the period commencing as of the Agreement Effective Date until termination of this Agreement pursuant to the terms hereof, no Consenting Noteholder shall transfer any Prepetition Notes unless the transferee (the "Transferee"): (a) is a Consenting Noteholder or (b) prior to the Transfer, such Transferee delivers to the Debtor, at or prior to the time of the proposed Transfer, an executed copy of the Joinder pursuant to which such Transferee shall become a Party to, and bound by the terms and conditions of, this Agreement as a Consenting Noteholder in accordance with Section 1.2 of this Agreement in respect of the Prepetition Notes being transferred.  If a Transferee does not execute a Joinder Agreement or is not already a Consenting Noteholder, the sale, transfer, assignment or other disposition of the Prepetition Notes shall be deemed void ab initio.  Any Consenting Noteholder that acquires Prepetition Notes after executing this Agreement shall notify the Debtor of such acquisition within (3) three business days after the closing of such trade and shall disclose to the Debtor in writing the principal amount of any such Prepetition Notes so acquired, and (b) any such additional Prepetition Notes shall automatically and immediately upon acquisition by a Consenting Noteholder be deemed subject to all of the terms of this Agreement whether or not notice is given to the Debtor of such acquisition.

3.4    Representations of Consenting Noteholders.  Each of the Consenting Noteholders severally and not jointly represents and warrants that as of the Agreement Effective Date:

(i)    (x) it is the sole beneficial owner of the outstanding principal amount of the Prepetition Notes, or is the nominee, investment manager, or advisor for beneficial holders of the Prepetition Notes, and has the power and authority to bind the beneficial holders of such Prepetition Notes to the terms of this Agreement, as reflected in such Consenting Noteholder's signature block to this Agreement or the Joinder Agreement, as the case may be, and (y) the principal amount of Prepetition Notes reflected in such Consenting Noteholder's signature block to this Agreement or the Joinder Agreement, as the case may be, constitutes all of the Prepetition Notes that are legally or beneficially owned by such Consenting Noteholder or over which such Consenting Noteholder has the power to vote or dispose;

(ii)    other than pursuant to this Agreement and applicable law, such Prepetition Notes are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed;

(iii)    it is either (x) not a "U.S. person," as such term is used in Regulation S under the Securities Act of 1933, as amended (the "Securities Act") or (y) (i) it is an "accredited investor" within the meaning of Rule 501 of the Securities and Exchange Commission under the Securities Act, with sufficient knowledge and experience to evaluate properly the terms and conditions of the Term Sheet and this Agreement, and has been afforded the opportunity to discuss the Term Sheet and other information concerning the Debtor with the Debtor's representatives, and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and (ii) it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction and will not seek rescission or revocation of this Agreement;

(iv)    any securities acquired in the Transaction will have been acquired for investment and not with a view to distribution or resale;

(v)    it is not aware of any fact, obligation or event, including any fiduciary or similar duty to any other person, that would prevent it from taking any action required of it under this Agreement; and

(vi) it will not object to (and will not support any person in objecting to) or otherwise take any action to prohibit or limit any transactions entered into by the Debtor that would not violate the terms of the Term Sheet including without limitation the New Notes described in the Term Sheet whether or not such transactions are permitted or prohibited under the Prepetition Notes.

3.5    Representations of the Debtor.  The Debtor hereby represents and warrants as of the date the Debtor executes and delivers this Agreement (and Debtor acknowledges that each of the Consenting Noteholders is relying upon such representations and warranties) that:

(i)    the Board of Directors of the Debtor has approved, adopted and declared advisable this Agreement and the Transaction and agreements contemplated hereby and determined that this Agreement is in the best interest of the Debtor and the Company has resolved to recommend approval of this Agreement and the Transaction and agreements contemplated hereby to holders of the Prepetition Notes;

(ii)    the Transaction Documents comply with all applicable laws in all material respects and do not, as of the date of this Agreement, and will not, as of the date of any Transaction Document, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and

(iii)    (x) it has been advised by professionals of nationally recognized standing and experience in transactions of this nature, and has been afforded the opportunity to discuss and evaluate the terms and conditions of the Term Sheet and this Agreement, and to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and (y) it has made its own analysis and decision to enter into this Agreement

5

and otherwise investigated this matter to its full satisfaction and will not seek rescission or revocation of this Agreement.

### Section 4.    Mutual Representations, Warranties, and Covenants

Each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

4.1    <u>Enforceability</u>.  It is validly existing and in good standing under the laws of the jurisdiction of its organization, and this Agreement has been duly executed and delivered by such Party and is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

4.2    <u>No Consent or Approval</u>.  Except as expressly provided for in this Agreement, the Bankruptcy Code, and such approvals as may be required by the federal securities laws, state blue sky laws or Panamanian law in connection with the Transaction, no consent or approval is required by any other person or entity in order for it to carry out the Transaction contemplated by, and perform their respective obligations under, this Agreement.

4.3    <u>Power and Authority</u>.  It has all requisite power and authority to enter into this Agreement and to carry out the Transaction contemplated by, and perform its respective obligations under, this Agreement.

4.4    <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part.

4.5    <u>No Conflicts</u>.  The execution, delivery, and performance by it of this Agreement does not and shall not (i) violate any provision of law, rule, or regulation applicable to a Party or any of its affiliates, or its certificate of incorporation or bylaws or other organizational documents or those of any of its affiliates, or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which a Party or any of its affiliates is a party, that would in any way impede the ability to consummate the Transaction.

4.6    <u>Scope of Representations and Warranties</u>.  Except as expressly set forth in this Agreement, none of the Parties hereto makes any representation or warranty, written or oral, express or implied.

### Section 5.    Termination Events

5.1    This Agreement shall automatically terminate and, except as otherwise provided herein, all obligations of the Parties shall immediately terminate and be of no further force and effect upon the occurrence and continuation of any of the following events:

(i)    The filing by the Debtor of any motion or other request for relief seeking to (1) dismiss the Pre-Pack Case, (2) convert the Pre-Pack Case to a case under Chapter 7 of the Bankruptcy Code, or (3) appoint a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in the Pre-Pack Case, unless such motion or other request is withdrawn prior to the earlier of (x) three (3) business days after filing such motion or other request for relief with the Bankruptcy Court, and (y) entry of any order by the Bankruptcy Court approving the requested relief (whether such relief is sought by the Debtor or a third party);

(ii)    An examiner is appointed pursuant to Section 1104(c)(1) of the Bankruptcy Code with expanded powers to run the business of the Debtor, or a trustee under Chapter 11 of the Bankruptcy Code is appointed for the Debtor in the Pre-Pack Case;

(iii)    A court of competent jurisdiction shall enter a final nonappealable judgment or order declaring this Agreement to be unenforceable;

(iv)    The entry of a final non-appealable judgment or order in the Pre-Pack Case rejecting this Agreement;

(v)    The commencement of an involuntary bankruptcy proceeding against the Debtor that is not dismissed or converted to a voluntary proceeding within thirty (30) business days (provided that no Consenting Noteholder sought or supported such order);

(vi)    The conversion of the Pre-Pack Case to a case under chapter 7 of the U.S. Bankruptcy Code or dismissal of the Pre-Pack Case; or

(vii)    The determination of the Debtor in good faith and based on the advice of outside legal counsel to the Debtor's Board of Directors that continued performance under this Agreement would be inconsistent with the exercise of applicable fiduciary or similar duties imposed on the Debtor's Board of Directors, shareholders or officers by law; provided, however, that as of the date of this Agreement, the Debtor represents and warrants to the Consenting Noteholders that nothing in this Agreement conflicts with applicable fiduciary duties imposed on the Debtor's Board of Directors by law.

5.2    This Agreement may be terminated on the occurrence of any of the following events, so long as such Termination Event (as defined below) is not waived pursuant to Section 6.1 of this Agreement (subject to written notice of any such event and the passage of any cure period as provided below):

(i)    By a Consenting Noteholder if the Debtor has not commenced the Pre-Pack Case in the Bankruptcy Court, together with the filing of the Pre-Pack Plan and Disclosure Statement, and motions to approve the Cash Collateral Use and this Agreement on or before March 8, 2013 (the "Commencement Date"), subject to the ability of the Debtor, with written approval of the Steering Group as evidenced by the signature of its legal counsel, to extend the Commencement Date by up to seven (7) business days;

(ii)    By a Consenting Noteholder if the Pre-Pack Plan, the Disclosure Statement, any Cash Collateral Use, or the CC Budget has been amended, modified or supplemented, such that the Plan, Disclosure Statement, Cash Collateral Use or the CC Budget is not consistent in all material respects with the Term Sheet;

(iii)    By a Consenting Noteholder if the Debtor shall in any material respect (A) fail to comply with the CC Budget, or (B) undertake any related party expenditures, transfers or transactions (other than the payment of ordinary course salaries and professional fees in accordance with the CC Budget attached to the Term Sheet);

(iv)    By a Consenting Noteholder if the business, properties, assets or financial condition of the Debtor and any of its direct or indirect subsidiaries taken as a whole shall have been materially and adversely affected since the date of this Agreement;

(v)    By a Consenting Noteholder if the Pre-Pack Plan shall not have been confirmed and the Disclosure Statement approved on or before the date which is ninety (90) calendar days after the Commencement Date;

(vi)    By a Consenting Noteholder if the Pre-Pack Plan shall not have become effective (the "Effective Date") within twenty (20) calendar days after or shall not have been substantially consummated within thirty (30) days after confirmation of the Pre-Pack Plan;

(vii)    By a Consenting Noteholder in the case of a breach in any material respect by the Debtor of any of the obligations, representations, warranties, or covenants of the Debtor set forth in this Agreement; provided, however, that the Debtor shall have five (5) Business Days after receiving such notice to cure such breach; provided, further, that this clause (vii) shall not be actionable as a Termination Event if Consenting Noteholders collectively holding a majority in aggregate principal amount of Prepetition Notes have transmitted a notice to the Debtor waiving any such breach within five (5) Business Days of such event;

(viii)    By the Company in the case of a breach in any material respect by any of the Consenting Noteholders of any of the representations, warranties, or covenants of such Consenting Noteholders set forth in this Agreement; provided, however, that the Debtor shall transmit a notice to the Consenting Noteholders detailing any such breach, and the breaching Consenting Noteholders shall have five (5) Business Days after receiving such notice to cure any breach;

(ix)    By a Consenting Noteholder in the case of an issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Transaction; provided, however, that the Debtor shall have ten (10) Business Days after receiving such notice of any ruling or order to cure any such Termination Event;

(x)    By a Consenting Noteholder in the event of a termination of, material modification of, or breach in any material respect by the Shareholders of that certain Letter Agreement, dated January 23, 2013, by and among Ocean Point Development

Corp., Roger Khafif, Upper Deck Properties, S.A., Arias, Serna & Saravia, Espacios
Urbanos, S.A., Eduardo Saravia Calderón, and Carlos and Alberto Serna Londoño
(together, the "Shareholders") and the Company regarding their support for the Pre-Pack
Plan; provided, however, that the Debtor shall have five (5) Business Days after receiving
such notice to cure such breach; provided, further, that this clause (vii) shall not be
actionable as a Termination Event if Consenting Noteholders collectively holding a
majority in aggregate principal amount of Prepetition Notes have transmitted a notice to
the Debtor waiving any such breach within five (5) Business Days of such event;

      (xi)   By a Consenting Noteholder in the case of a reversal on appeal or vacation
of any order authorizing Cash Collateral Use, approving the disclosure statement, or
confirming the Pre-Pack Plan; or

      (xii)   By a Consenting Noteholder or the Company if the Trustee fails to take
any action with respect to any matter necessary or proper to support the Pre-Pack Case
and the Transaction;

provided, however, that no Party shall have the right to so terminate its obligations under this
Agreement upon the occurrence of any of the events and conditions described above in this
Section 5.2 (the "Termination Events") unless such Party has given written notice ("Notice of
Termination") thereof to each of the other Parties hereto specifically identifying the alleged
Termination Event, and, except where a cure period is provided within this Section 5.2, the event
or condition giving rise to such right is not cured within three (3) Business Days of receipt of
such written notice.

      5.3    This Agreement and the obligations of all Parties hereunder may be terminated by
mutual agreement among (a) the Debtor and (b) Consenting Noteholders representing a majority
in aggregate principal amount of Prepetition Notes.

      5.4    Upon termination of this Agreement under Section 5.1, 5.2, or 5.3 except as
otherwise provided herein, this Agreement shall be of no further force and effect, except for the
provisions in Section 7 other than Section 7.1 and 7.12, each of which shall survive termination
of this Agreement, and each Party (and, for the avoidance of doubt, in the case of an individual
Consenting Noteholder, that Consenting Noteholder, and in the case of the Company, all Parties)
shall be released from its commitments, undertakings, and agreements under or related to this
Agreement, including any votes or consents delivered in furtherance hereof (provided, that, a
vote or consent delivered in furtherance hereof shall be revoked in the event of a termination
under Section 5.2 hereof only as to such terminating Party and only if the terminating Party in its
Notice of Termination or in connection therewith indicates its intention to nullify its vote or
consent), and shall have the rights and remedies that it would have had it not entered into this
Agreement, and shall be entitled to take all actions, whether with respect to the Transaction or
otherwise, that it would have been entitled to take had it not entered into this Agreement.

      5.5    The Consenting Noteholders shall have no liability to the Debtor or each other for
any termination of this Agreement in accordance with the terms hereof. The Debtor shall have no

liability to the Consenting Noteholders for any termination of this Agreement in accordance with the terms hereof.

### Section 6.    Amendments and Waiver

6.1    This Agreement, including the Term Sheet, may not be modified, amended, or supplemented and no provisions of this Agreement may be waived (except as expressly provided herein or therein) except in writing signed by the Debtor and Consenting Noteholders representing a majority in aggregate principal amount of Prepetition Notes.

### Section 7.    Miscellaneous

7.1    Payment to Initial Supporting Noteholders Advisors.  In consideration of the efforts of the Initial Supporting Noteholders in connection with the Pre-Pack Plan, this Agreement, the Term Sheet, and the overall restructuring of the Company, the Company shall continue to make payments to the advisors to the Initial Supporting Noteholders (Seward & Kissel LLP, Morgan & Morgan, BroadSpan Capital LLC), and such advisors shall be paid in full for all services rendered and disbursements incurred through the Commencement Date before the Commencement Date and any fees and expenses incurred or payable thereafter shall be paid on or before and as a condition to the Effective Date (including in connection with Cash Collateral Use).

7.2    Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Transaction, as applicable.

7.3    Complete Agreement.  Except as expressly provided herein, this Agreement and all Exhibits hereto is the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

7.4    Parties.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided herein.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

7.5    Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

7.6    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY: THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH

STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States Bankruptcy Court for the Southern District of New York or any New York State court sitting in New York City (the "Chosen Courts"), and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party. Each Party irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the Transaction contemplated hereby.

7.7    Execution of Agreement. This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

7.8    Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

7.9    Relationship among Parties.

(i)    it is understood and agreed that no Consenting Noteholder has any fiduciary duty or other duty of trust or confidence in any form with any other Consenting Noteholder, and, except as provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Consenting Noteholder may trade in the Prepetition Notes without the consent of the Debtor or any other Consenting Noteholder, subject to applicable securities laws and the terms of this Agreement; provided, however, that no Consenting Noteholder shall have any responsibility for any such trading by any other entity by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Consenting Noteholders shall in any way affect or negate this understanding and agreement;

(ii)    Except as otherwise provided herein, this Agreement applies only to each Consenting Noteholder's Prepetition Notes and to each Consenting Noteholder solely with respect to its legal and/or beneficial ownership of, or its investment and voting discretion over its Prepetition Notes (and not, for greater certainty, to any other types or classes of securities, loans or obligations that may be held, acquired or sold by such Consenting Noteholder or any client of such Consenting Noteholder whose funds or accounts are managed by such Consenting Noteholder or managed by a different investment advisor) and, without limiting the generality of the foregoing, shall not apply to: (x) (any securities, loans or other obligations (including Prepetition Notes) that may be held, acquired or sold by, or any activities, services or businesses conducted or provided by, any group or business unit within or affiliate of a Consenting Noteholder (A) that has not been involved in and is not acting at the direction of or with knowledge

11

of the Debtor's affairs provided by any person involved in the Transaction discussions or (B) is on the other side of an information firewall with respect to the officers, partners and employees of such Consenting Noteholder who have been working on the Transaction and is not acting at the direction of or with knowledge of the Debtor's affairs provided by any officers, partners and employees of such Consenting Noteholder who have been working on the Transaction; and (y) (any securities, loans or other obligations that may be beneficially owned by clients of a Consenting Noteholder, including accounts or funds managed by the Consenting Noteholder, that are not Prepetition Notes.

7.10    Notices.  All notices hereunder shall be deemed given if in writing and delivered, if sent by telecopy, electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as shall be specified by like notice):

> (i)    if to the Debtor to:

> > Newland International Properties, Corp.
> > Calle 53 Obarrio
> > Plaza 53
> > Panama City, Republic of Panama
> > Attention:  Mr. Carlos Saravia
> > Fax:  (507) 223-0225
> > Electronic Mail:  charlies@trumpoceanclub.com

> with copy to:

> > Gibson, Dunn & Crutcher LLP
> > 200 Park Avenue
> > New York, New York, 10166
> > Attn:  Kevin Kelley and Eric Wise
> > Fax:  (212) 351-5322

> (i)    if to an Initial Supporting Noteholders or a transferee thereof, to the addresses or telecopier numbers following the Consenting Noteholder's signature (or as directed by any transferee thereof), or set forth in a Joinder Agreement,

> with a copy to:

> > Seward & Kissel LLP
> > One Battery Park Plaza
> > New York, NY 10004
> > Attn:  John R. Ashmead
> > Fax:  (212) 480-8421

7.11    <u>Waiver</u>.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Noteholder or the ability of each of the Consenting Noteholders to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against the Debtor.  If the Transaction is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, defenses and counterclaims.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

7.12    <u>Specific Performance</u>.  Except as otherwise provided herein, it is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of a Chosen Court, or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

7.13    <u>Several, and not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

7.14    <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

7.15    <u>No Third Party Beneficiaries</u>. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

7.16    <u>Good Faith Cooperation</u>.  Each Party hereby covenants and agrees to cooperate with each other and negotiate in good faith in all matters concerning the drafting of the Transaction Documents, implementation and consummation of the Transaction and the Pre-Pack Case and in supporting the Transaction Documents, the Transaction and the Pre-Pack Plan.

7.17    <u>Acknowledgement</u>.  This Agreement is not and shall not be deemed a solicitation of votes for the acceptance of the Pre-Pack Plan or a solicitation to tender or exchange any Prepetition Notes.

7.18    <u>Interpretation</u>.  This agreement is the product of negotiations among the Initial Supporting Noteholders and the Debtor, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted this Agreement, or caused this Agreement, or any portion hereof to be drafted, shall not be effective in regard to the interpretation hereof.

7.19    <u>Severability</u>.  If any portion of this Agreement shall be held to be invalid, void, or otherwise unenforceable, then that portion shall be deemed modified (only to the extent necessary and in a manner consistent with the remainder of this Agreement) so as to be valid and

enforceable, or, if such modification is not reasonably feasible, shall be deemed to have been severed out of this Agreement, and the Parties acknowledge that the balance of this Agreement shall in any event be valid and enforceable unless the effect shall be to materially alter the terms and conditions of this Agreement.

7.20    <u>Confidentiality.</u>  Each Party hereto hereby agrees that until the Pre-Pack Plan is launched, this Agreement is to be kept confidential and that no Party can make a public disclosure regarding this Agreement without the consent of the other Parties.

7.21    <u>Exculpation and Release</u>.  The Pre-Pack Plan shall provide for a customary release and exculpation of the Consenting Noteholders, the Steering Group and their advisors, and the Debtor shall use its reasonable best efforts to support such provisions.

7.22    <u>Fiduciary Duties</u>.  Notwithstanding anything to the contrary herein, none of the Consenting Noteholders shall have any fiduciary duty or other duties or responsibilities to each other, any other Noteholder, the Debtor or any of the Debtor's creditors or other stakeholders.

7.23    <u>Appointment to Statutory Committee; Discretion to Exercise Fiduciary Responsibilities</u>.  Anything else in this Agreement to the contrary notwithstanding, if a Consenting Noteholder is appointed to and serves on a statutory committee established in the Pre-Pack Case, the terms of this Agreement shall not be construed to limit such Party's exercise, in its sole discretion, of its fiduciary duties to any person arising from its service on such committee, and any exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement.  To the extent that the United States Trustee declines to appoint a Consenting Noteholder to any such statutory committee based upon such Consenting Noteholder's execution of this Agreement, this Agreement shall be deemed to be terminated as to one or more such Consenting Noteholders so as to allow such Consenting Noteholders to be appointed to such statutory committee, but only to the extent that after giving effect to such terminations(s), the remaining Consenting Noteholders hold a majority of outstanding Prepetition Notes.

7.24    <u>Time</u>.  Time is of the essence in the performance of the Parties' respective obligations.  Any date, time or period referred to in this Agreement shall be of the essence, except to the extent to which the Parties agree in writing to vary any date, time or period, in which event the varied date, time or period shall be of the essence.

[signature pages follow]

14

Newland International Properties, Corp.

By: _____

Name: ROGER KHAFIF

Title: President

and authorized signatory of Newland International Properties, Corp.

[Initial Supporting Noteholder signatures on following pages]

Initial Supporting Noteholder Signature Page

[Initial Supporting Noteholder]

By: _____
Name:
Title:

Principal amount of
Prepetition Notes held: $_____

**Exhibit A**

**Term Sheet**

FRE 408 SETTLEMENT COMMUNICATION                          FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                        PRIVILEGED AND CONFIDENTIAL

# NEWLAND INTERNATIONAL PROPERTIES, CORP.

## SETTLEMENT TERM SHEET

### January 23, 2013

This Settlement Term Sheet ("Term Sheet") sets forth the principal indicative terms of a proposed settlement (the "Settlement") negotiated among the Company (as defined below), the Steering Group (as defined below), the Shareholders (as defined below) and the CCSA Parties (as defined below) (the forgoing parties together, the "Settlement Parties") of certain disputes concerning the Company's existing defaults (together, the "Default") on, and a restructuring of the terms of, the Company's secured notes due 2014 (the "Existing Notes") issued to or held by investors ("Noteholders") under that certain indenture, dated as of November 7, 2007, as supplemented by the first supplemental indenture, dated as of May 14, 2010, the second supplemental indenture dated as of March 29, 2012, the third supplemental indenture dated as of July 12, 2012, and the fourth supplemental indenture dated as of December 10, 2012 (including all documents executed and delivered with the foregoing, the "Existing Indenture")[1], among the Company and HSBC Bank USA, N.A., as trustee (the "Trustee"), relating to the financing and development of the Trump Ocean Club in Panama (the "Project") and certain other related obligations.

The transactions contemplated by this Term Sheet are subject to further terms and conditions to be set forth in definitive documents that are consistent in all material respects with the terms set forth herein. This Term Sheet shall not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a Chapter 11 plan. Any such offer or solicitation shall only be made in compliance with all applicable laws. This Term Sheet is strictly confidential to the Settlement Parties and their respective legal and financial advisers, not to be disclosed to third parties, and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import applicable to the parties and the subject matter hereof, until such time as it is included in solicitation materials in connection with the acceptances of a Chapter 11 plan. This Term Sheet is being presented for discussion and settlement purposes only. Any binding agreement or commitment between the Settlement Parties would result only from the execution and delivery by each party of a definitive agreement or agreements, when and if executed and delivered, containing such terms and conditions consistent in all material respects with the terms set forth herein. Capitalized terms not defined herein shall have the meanings ascribed thereto in the Existing Indenture.

THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE RESTRUCTURING TRANSACTION, EACH ELEMENT OF WHICH IS

---

[1] Note – if sufficient consents are obtained, the Existing Indenture is to be adjusted to include a Fifth Amendment as of the date that amendment is effective concerning the registration of the Unit Purchase Agreements in connection with the sale of the Casino. The Fifth Amendment is to be in the form of the amendment recently circulated to Noteholders.

FRE 408 SETTLEMENT COMMUNICATION                          FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                         PRIVILEGED AND CONFIDENTIAL

CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE COMPANY. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, OR DEFENSES OF THE COMPANY, THE STEERING GROUP (INCLUDING ITS MEMBERS IN THEIR INDIVIDUAL CAPACITIES), THE SHAREHOLDERS AND THE CCSA PARTIES.

I.   **Settlement Parties and Other Important Parties**

| | |
|---|---|
| **Company:** | Newland International Properties, Corp., a Republic of Panama corporation ("Newland" or the "Company"). |
| **Shareholders:** | The direct and indirect shareholders of the Company: Ocean Point Development Corp. ("Ocean Point"); Roger Khafif; Upper Deck Properties, S.A. ("Upper Deck"); Arias, Serna & Saravia; Espacios Urbanos, S.A (together, the "Shareholders"). |
| **CCSA Parties:** | Roger Khafif, Eduardo Saravia, and Carlos A. Serna (each, a "CCSA Party"; together, the "CCSA Parties"). |
| **Affiliates:** | An "Affiliate" and "Affiliates" of any person or entity shall be all direct and indirect subsidiaries, parents, or affiliates (which term "affiliate" shall mean any entity or person controlling, controlled by, under common control with such person or entity) of such person or entity. When the term Affiliate or Affiliates is used herein, such term shall refer to the Affiliate or Affiliates of the Company, except where expressly stated that such term refers instead to one or more of the Company, Shareholders or CCSA Parties. |
| **Steering Group:** | Greylock Capital Management, LLC, Moneda Asset Management, Polo Capital Management, Trinidad and Tobago Unit Trust Corporation and Portfolio Credit Management Limited, all via managed or controlled accounts or funds, collectively holding or controlling in excess of 41.76% of the outstanding principal amount of the Existing Notes (the "Steering Group"). |
| **Trump:** | The Licensor as defined in Exhibit 2 attached hereto and its affiliates, as applicable ("Trump"). |
| **Trustee:** | The Trustee as defined above, and also as context dictates, HSBC Investment Corporation (Panama), acting in its capacity as Co-Trustee under the Indenture (individually referred to as the "Co-Trustee"). The references to the Trustee herein and in the Exhibits appended hereto are solely to the Trustee in its capacity as Trustee and its representative capacity for holders of the Existing Notes, and not in its individual capacity. |

2

## II.    Settlement Overview

| | |
|---|---|
| **Restructuring:** | The Settlement contemplates a restructuring transaction ("Restructuring") pursuant to a plan support agreement (the "Plan Support Agreement") among the Company, the Shareholders, the CCSA Parties and the members of the Steering Group and other holders that execute and deliver the Plan Support Agreement, which Restructuring shall be implemented through a pre-packaged Chapter 11 bankruptcy plan (the "Pre-Packaged Plan") that would provide for (a) the cancellation of the Existing Indenture and Existing Notes in exchange for a new indenture and new notes similar to the Existing Indenture and Existing Notes in all material respects except as set forth herein,[2] (b) the new notes (the "Notes") having, among other things set forth below, revised amortization, certain collateral package enhancements, the deletion of, addition of and amendments to covenants and certain other rights and remedies, and (c) the as settlement of certain other issues, as summarized herein, all the foregoing to be documented in, among other things, the new indenture executed pursuant to the Pre-Packaged Plan (the "Indenture").<br><br>The Pre-Packaged Plan shall also provide for, the final settlement of the Construction Completion Support Agreement, dated as of November 6, 2007 (the "CCSA"), and any and all obligations of the CCSA Parties thereunder, all on the conditions and terms to the settlement of the CCSA as are set forth in Exhibit 1 hereto (the "CCSA Settlement").<br><br>In exchange for all the consideration set forth in Exhibit 1 hereto, the effectiveness of the Pre-Packaged Plan shall result in the final settlement of the CCSA and the satisfaction and release of any and all obligations of the CCSA Parties thereunder without any liability to any of them. In furtherance thereof, the Pre-Packaged Plan and confirmation order (the "Confirmation Order") shall direct the Trustee to execute and deliver any and all documents required, if any, to effectuate the CCSA Settlement, with no liability to the Trustee and with the Trustee being released and exculpated under the Pre-Packaged Plan for taking any such action. In addition, each vote in favor of the Pre-Packaged Plan by a holder of Existing Notes shall constitute an effective irrevocable direction to the Trustee not to oppose the Pre-Packaged Plan or the CCSA Settlement, to forbear from seeking to enforce the CCSA, and, if under any circumstance the Trustee obtains any monies under or |

---

[2]    Notwithstanding the execution of the Indenture and issuance of Notes in consideration of the Existing Indenture and Existing Notes, the Settlement Parties intend there to be no loss of perfection or priority in the Collateral as same exists as of the date hereof.

|  | pursuant to the CCSA Agreement, to return such monies to the CCSA Parties.

The "Effective Date" as used herein shall be the effective date of the Pre-Packaged Plan. |

## III.   New Notes

| Notes: | New Senior Secured Notes due May 15, 2017.  Pursuant to the Pre-Packaged Plan, the Notes will represent the US$220,000,000[3] Existing Notes, plus the Accrued Interest Amount (as defined below)  in accordance with the Pre-Packaged Plan which shall be capitalized on a pro-rata basis (as described below), and shall be governed by the terms of the Indenture.

"Accrued Interest Amount" shall be an amount equal to the interest accrued and unpaid on the Existing Notes through the Effective Date. |
| Interest: | The Notes shall accrue interest from the Effective Date at 9.5% which shall be payable in cash twice yearly in arrears on each Payment Date; provided, that, the first payment of interest in respect of the Notes shall be the Payment Date falling on May 15, 2013. |
| Minimum Scheduled Amortization: | Principal payments on the Notes will consist of the Minimum Scheduled Amortization Amounts as set forth in the table below, which equals, in the aggregate, the original (and presently remaining) outstanding principal amount of $220 million of the Existing Notes; provided, that the outstanding principal amount of the Existing Notes shall be increased to reflect the Accrued Interest Amount (such that the Minimum Scheduled Amortization Amounts below shall be increased on a pro-rata basis to reflect such capitalization).

"Minimum Scheduled Amortization Amount" means, with respect to a Payment Date, the respective amount shown for such Payment Date in the table below (which outstanding principal amount of the Existing Notes shall be increased to reflect the Accrued Interest Amount, which shall be applied across each Minimum Scheduled Amortization Amount on a pro rata basis); provided, that, the Minimum Scheduled Amortization Amount shall be decreased over the life of the Notes to the extent of any prepayments made due to Net Proceeds (as defined below) prepaid as Mandatory Prepayments from Prime Unit Sales and other Asset Sales under |

---

[3]      Every reference to currency herein (including the Exhibits hereto) shall mean U.S. currency.

|  | the Indenture and to the extent of any Supplemental Amortizations, Optional Redemptions or cancellation of the Notes following "Open Market Repurchases" (as defined below) or otherwise cancelled in accordance with the Indenture, each as more fully described herein. |
|---|---|
|  | **Date**    **Minimum Scheduled Amortization Amount** |
|  | 15 May 2013    $5 million[4] |
|  | 15 Nov 2013    $10 million |
|  | 15 May 2014    $15 million |
|  | 15 Nov 2014    $20 million |
|  | 15 May 2015    $21 million |
|  | 15 Nov 2015    $23.5 million |
|  | 15 May 2016    $26.5 million |
|  | 15 Nov 2016    $29 million |
|  | 15 May 2017    $70 million |
| **Supplemental Amortization:** | In addition to the Minimum Scheduled Amortization Amount for each Payment Date, on each Payment Date commencing with the first Payment Date on May 15, 2013, the Notes shall become due and payable on such date in an amount equal to the Supplemental Amortization Amount (as defined below) (each such payment amount, a "Supplemental Amortization").<br><br>The "Supplemental Amortization Amount" on each Payment Date shall be the positive balance, if any, in the Collection Account reserve referred to in item (7) under "Priority of Payments and Reserves in the Collection Account" below after application of items (1) – (6) in such section of this Term Sheet on the 5th Business Day prior to such Payment Date (the "Determination Date").<br><br>Supplemental Amortizations shall be applied to the reduction of the Minimum Scheduled Amortization Amounts remaining to be paid by a reduction of each such remaining scheduled amount in equal amounts across all such remaining Payment Dates (i.e., per capita not pro rata). |
| **Mandatory Prepayment** | In the event of a sale by the Company of the Casino[5], Spa or Penthouse unit on the 66th floor (each a "Prime Unit", and each |

---

[4]    If the Effective Date occurs after May 15, 2013, then the May 15, 2013 Minimum Scheduled Amortization for the Notes may be set to a later date following the Effective Date but not later than 60 days following the Effective Date.

FRE 408 SETTLEMENT COMMUNICATION                           FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                          PRIVILEGED AND CONFIDENTIAL

| from Prime Unit Sales: | such sale a "Prime Unit Sale"), the Company shall prepay (a "Mandatory Prepayment") the Notes at par in the amount of the Net Proceeds (as defined below), on the third Business Day following the date on which a Company Officer has certified to the Trustee as to the calculation of the Net Proceeds and the Mandatory Prepayment, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to the calculation.  Mandatory Prepayments pursuant to Prime Unit Sales shall be applied to the Minimum Scheduled Amortization Amounts in reverse order of maturity in an aggregate principal amount equal to the Net Proceeds (for the avoidance of doubt, the full amount of such prepayment shall be applied in full to the final Minimum Scheduled Amortization Amount (e.g., until it has been prepaid in full, the May 15, 2017 Minimum Scheduled Amortization Amount) existing at such time). |
| | "Net Proceeds" shall mean the aggregate cash proceeds received by Newland in respect of any Prime Unit Sale, including in respect of any installment payment for such Prime Unit Sale, net of the commercially reasonable direct costs  related to such Prime Unit Sale required to be paid by the Company, including, without limitation, legal and accounting expenses of the Company, applicable Trump license fees, the TOC Casino BC Loan Amount (as defined in Exhibit 3), investment banking or advisory fees of the Company and other Brokers' Commissions (as defined herein), taxes paid or payable directly attributable to the Prime Unit Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, any reserve for adjustment in respect of performance obligations assumed by Newland in connection with the agreed sale price of such Prime Unit or Prime Units and any reserve for adjustment in respect of the sale price of such Prime Unit or Prime Units (in all cases until such reserve is released), and in all cases above established in accordance with IFRS and applicable Panamanian regulations. |
| | A Company Officer shall certify to the Trustee within 3 Business Days of closing of a Prime Unit Sale, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it, as to the calculation of the Net Proceeds and the Mandatory Prepayment. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the |

---

[5]    In connection with any actions taken by the Trustee in connection with a sale of the Casino Unit, the Trustee shall be entitled to any and all information required in order to satisfy its internal policies and procedures with respect to anti-money laundering laws and regulations to which the Trustee is subject.

FRE 408 SETTLEMENT COMMUNICATION                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                              PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance of such certification. |
| **Accounts:** | "Accounts" shall mean the HSBC Panama Closing Account, the HSBC Panama Account, the Release Account, and the Collection Account. The Accounts to be maintained with or by the Trustee or the Co-Trustee, as applicable, are:<br><br>(1)    HSBC Panama Closing Account.  The account, currently existing, at HSBC Panama into which payments on Receivables in connection with Unit Purchase Agreements shall be deposited and Brokers' Commissions as well as Property Transfer Fees (each as defined herein) shall be paid from as provided in the fourth supplemental indenture dated December 10, 2012;<br><br>(2)    HSBC Panama Account.  The account, currently existing, into which Newland Unit Proceeds (as defined herein) shall be transferred from the HSBC Panama Closing Account twice weekly and into which proceeds of Prime Unit Sales and Non-UPA Revenues (defined below) shall be deposited;<br><br>(3)    Release Account.  The account, currently existing, into which funds will be transferred from the HSBC Panama Account twice weekly (after deducting an amount necessary to permit the Company pay the Trump license fees per the Existing Indenture); and<br><br>(4)    Collection Account.  The account, currently existing, into which_funds will be transferred from the Release Account (after deduction of Monthly Working Capital Amount (defined below)). |
| **Priority of Payments and Reserves in the Collection Account:** | On any Business Day on which a disbursement is requested by the Company or otherwise required under the Indenture (each, a "Disbursement Date"), or where indicated below, on each Payment Date or Expense Payment Date, the Trustee will reserve or reduce and/or disburse any prior reservation of amounts in the Collection Account, all as specified below and in the following order of priority (the "Priority of Payments"):<br><br>(1)    (x) on an Expense Payment Date, in amounts sufficient to pay the fees, expenses and indemnities of the Trustee and Co-Trustee due and unpaid on such Expense Payment Date; and (y) to reserve funds in an amount up to the Minimum Collection Account Balance (but only for so long as provided and as defined in the second supplemental indenture between the Company and the Trustee, dated as of March 29, 2012);<br><br>(2)    (x) if requested by the Company, to reserve, or reduce and/or disburse any prior reservation of, all or a portion of an amount up to the Monthly Working Capital Amount (defined below) to the |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

extent not previously withdrawn by the Company from the Release Account; and (y) if requested by the Company, to reserve, or reduce and/or disburse any prior reservation of, all or a portion of an amount up to the Monthly Working Capital Reserve Amount (as defined below); provided, that, in no instance shall the Company be permitted to draw under (x) or (y) an amount in excess of the Monthly Working Capital Amount for any month;

(3)    if requested by the Company, to reserve or reduce and/or disburse any prior reservation of all or a portion of the Contingency Reserve Amount (as defined below);

(4)    as directed by the Company, to reserve and/or disburse any prior reservation of all or a portion of an amount up to the Bulk 2 Repurchase Reserve Amount (as defined below);

(5)    as directed by the Company, (x) to reserve all remaining amounts until the Debt Service Reserve Amount (as defined below) is achieved; (y) on a Payment Date to apply all amounts previously reserved pursuant to this item (5) and any other amounts needed for such purpose to the payment of the Debt Service then due and payable; and (z) if requested by the Company to reserve or reduce any prior reservation of all or a portion of the Debt Service Reserve Amount for the second Payment Date following the date of such reservation or reduction;

(6)    if requested by the Company, to reserve, or reduce and/or disburse any prior reservation of, all or a portion of the (x) BC Senior Loan Reserve Amount and/or BC Ferry Payment Reserve Amount (as defined below); (y) Open Market Purchase or Optional Redemption (as defined below) amounts to be paid by the Company; and (z) Net Proceeds in respect of a Prime Unit Sale, in the event any such Net Proceeds have been received by the Company and not yet applied to a Mandatory Prepayment for any reason; and

(7)    on the Determination Date, any balance remaining in the Collection Account after application and reservation of all items in (1) – (6) above shall constitute the Supplemental Amortization Amount to be paid on the Payment Date following such Determination Date.

With respect to the items above, to be agreed with the Trustee in the final documentation reasonable time periods for payments, for notice to the Trustee and for frequency of disbursements.

With respect to item (4), any prior reservation of the Bulk 2 Repurchase Reserve Amount may only be reduced to fund a Debt Service payment.

In all cases, disbursements shall be permitted provided that they

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | are in accordance with the other terms of the Indenture. |
| **Certain Defined Terms:** | Unless otherwise defined herein, terms used in this Term Sheet are used as defined in the Existing Indenture and if not defined herein or in the Existing Indenture shall be construed as provided in Section 1.02 of the Existing Indenture and, in particular, terms used and not otherwise defined as provided herein shall be given the meanings assigned to such terms in accordance with IFRS. |
| | "Debt Service" shall mean, as to any Payment Date, the amount of interest, Additional Amounts (defined below) (if any), and of principal in respect of the Minimum Scheduled Amortization Amount (after adjustments to such amount resulting from any prior Optional Redemptions (defined below), Open Market Purchases (defined below), Supplemental Amortizations and Mandatory Prepayments up to and excluding such Determination Date) due on the Notes on such Payment Date. |
| | "Debt Service Reserve Amount" shall be an amount up to the Debt Service then scheduled for the next Payment Date. |
| | "Monthly Working Capital Amount" for each month shall be the amount set forth for such month and each category as set forth in Exhibit 4A annexed hereto (the "MWC Budget"); provided, that, the Monthly Working Capital Amount for any month and category of expense shall be reduced to the extent of any amounts previously disbursed to the Company in such month and for such category from the Collection Account with respect to the Monthly Working Capital Amount for such month; provided, further, that, Monthly Working Capital Amount for any month and such category shall include any undrawn Monthly Working Capital Amounts from the preceding two months ("Carry-Over Amounts"), and provided further that the Monthly Working Capital Amount in any given month shall be increased by such amounts as are necessary to pay any bonus amounts then due under that certain Consulting Agreement, dated September 10, 2012, by and between the Company and Cervera Real Estate, Inc. (the "Cervera Contract") in such amounts and on such payment dates as are provided in the Cervera Contract.[6] For the avoidance of doubt, the Company shall not be permitted in any month to have drawn from the Release Account or the Collection Account more than the Monthly Working Capital Amount for such month. |
| | "Monthly Working Capital Reserve Amount" as of the first Business Day of any calendar month shall be a reserve at the Company's discretion of Monthly Working Capital Amounts for the next two following calendar months from such Business Day. |

---

[6]     Any such bonus payments that increase the Monthly Working Capital Amount shall be certified to the Trustee.

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE
FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

For the avoidance of doubt, the Company shall not be able to reserve more than two months of Monthly Working Capital Amounts at any time. For the avoidance of doubt, such monies cannot be disbursed from the Collection Account to the Company but only reserved in the Collection Account by the Company.

"Contingency Events" shall mean litigation related contingencies, post-sales related contingencies, tax contingencies, and Officers' liquidations (according to Colombian and/or Panamanian law) not budgeted for in the MWC Budget.

"Contingency Amounts" shall mean an aggregate amount of $5,000,000 over the life of the Notes. Contingency Amounts shall be released to the Company from time to time from the Collection Account, upon certification by a Company Officer to the Trustee, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it, that a Contingency Event has occurred and must be paid. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations based on any related judgment, official order, settlement agreement or the like. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification. After the term of the Noteholder Representative has expired, certification shall be to the Noteholders' Board Nominee (defined below). The certification by a Company Officer shall identify the Contingency Event and Contingency Amount and provide that such amount shall be disbursed for such Contingency Event promptly upon a disbursement from the Collection Account.

"Contingency Reserve Amount" as of a Payment Date shall be a reserve at the Company's discretion of an amount up to the Contingency Amounts reasonably expected to be incurred before the next following Payment Date.

"Bulk 2 Repurchase Reserve Amount" as of a Payment Date shall be a reserve of an amount up to the Bulk 2 Repurchase Amount.

"BC Senior Loan Reserve Amount" or "BC Ferry Payment Reserve Amount" as of a Payment Date shall be a reserve at the Company's discretion of an amount up to the amount of the BC Senior Loan (as defined in Exhibit 3 herein) or BC Ferry Payment (as defined in Exhibit 3 herein) reasonably expected to be incurred before the next following Payment Date; provided, that, the Company shall not maintain any reserve for the BC Ferry Payment from and after 18 months from the Effective Date. The BC Senior Loan Reserve Amount and the BC Ferry Payment Reserve Amount shall be released to the Company, upon certification by a Company

FRE 408 SETTLEMENT COMMUNICATION    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE    PRIVILEGED AND CONFIDENTIAL

Officer to the Trustee, which certification shall indicate that it has been reviewed by the Noteholder Representative who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.

"Brokers' Commissions" means, in respect of each Unit Purchase Agreement, the amount of the full purchase price under such Unit Purchase Agreement required to cover the brokerage commissions (including any gross-up for value added or sales tax levied in Panama on such brokerage commissions) that will be due in respect of the transfer of the respective unit ("Unit"). Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions that will be due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and thereafter all remaining payments will be attributed to Newland Unit Proceeds. Notwithstanding the foregoing and for the avoidance of doubt, the Brokers' Commissions for the TOC Casino Transaction shall include any investment banking and advisory fees of the Company related to the TOC Casino Transaction. For the further avoidance of doubt, amounts shall be treated as Brokers' Commissions only for so long as the relevant broker or brokers remain entitled to such payments at a future date upon the satisfaction of the conditions to the payment of their commissions, and in any event where a broker or brokers lose such entitlement the related Brokers' Commissions shall be thereafter treated as Newland Unit Proceeds.

"Newland Unit Proceeds" means, in respect of a Unit Purchase Agreement, the total of all initial and subsequent deposits and installments (i.e., the purchase price) for a Unit under such Unit Purchase Agreement, less the Brokers' Commissions and Property Transfer Fees in respect of such Unit. Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions and Property Transfer Fees that will be due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and Property Transfer Fees and thereafter all remaining payments will be attributable to Newland Unit Proceeds. Notwithstanding the foregoing and for the avoidance of doubt, the Brokers' Commissions and Property Transfer Fees for the TOC Casino Transaction shall include any investment banking and advisory fees of the Company related to the TOC Casino

11

|  | Transaction. |
|---|---|
|  | "Property Transfer Fees" means any notary fees, recording fees, property or transfer taxes or other costs and expenses payable to the Panamanian government or any of its agencies in connection with the transfer of a Unit. |
| **Optional Redemption:** | The Company may, at its option, upon not less than thirty (30) nor more than sixty (60) days' prior notice to holders of the Notes, redeem the Notes, pro rata, in whole or in part at a price equal to 100% of the outstanding amount of the Notes being redeemed (together with accrued and unpaid interest, if any, on the Notes to be so redeemed to (but excluding) the date fixed for redemption, plus any Additional Amounts (as defined below); provided, that, any such Optional Redemption shall be subject to a minimum threshold of $10 million. |
| **Open Market Repurchases:** | The Company may purchase Notes at market value prices provided those prices are below par, through tender offer or otherwise; provided, that, the Company shall be prohibited from using more than $15,000,000 in the aggregate toward the principal portion of Notes for such purchases (each such purchase, an "Open Market Repurchase"). |
|  | The Company shall immediately cancel any Notes purchased pursuant to an Open Market Repurchase, such that such Notes are no longer outstanding.[7] No such Open Market Repurchase shall be made directly or indirectly from an Affiliate or a direct family member of a CCSA Party ("Insiders"). |
|  | For the avoidance of doubt, no Open Market Repurchase shall be permitted until and unless the Bulk 2 Repurchase Amount shall have been reduced to zero. Open Market Repurchases will be made in compliance with applicable United States and Panamanian securities laws. |
| **Additional Amounts:** | All payments made by the Company under or with respect to the Notes will be made free and clear of and without withholding or deduction for or on account of any present or future taxes, levies, imposts, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the Republic of Panama or any political subdivision or taxing authority of or in the Republic of Panama ("Taxes"), unless the Company is required to withhold or deduct any amount for or on account of Taxes by law or by the interpretation or administration of law. If the Company is required to withhold or deduct any amount for or on account of Taxes from any payment made by the Company under or with |

---

[7]    For the avoidance of doubt, the "Global Note" representing the Notes and deposited with The Depository Trust Company shall not be cancelled; the Global Note shall be marked down to reflect the book-entry interests purchased pursuant to such Open Market Repurchase.

| | |
|---|---|
| | respect to the Notes, the Company will, subject to certain customary exemptions ("Additional Amounts"), pay such additional Amounts ("Additional Amounts") as may be necessary so that the net amount (including Additional Amounts) received by each holder of Notes after withholding or deduction will not be less than the amount the holder would have received if Taxes had not been withheld or deducted. |
| **Collateral:** | "Collateral" for the Notes shall consist of the Collateral as defined under the Existing Indenture together with the following additions and clarifications: |
| | (i) 100% of the shares in the Company, along with an assignment of voting rights/stock power/voting power (exercisable only upon payment default, voluntary or involuntary bankruptcy filing) and the assignment of the Noteholder Swing Vote (as defined below) in accordance with the CCSA Settlement; |
| | (ii) all Company accounts not presently subject to the Trustee's lien (including any new accounts opened on or after the date hereof); and |
| | (iii) any assets or revenue streams due to the Company and rights or licenses to which the Company is a party (to the extent permitted by the terms of such right or license) not part of Collateral before the date hereof. |
| **Covenants, Representations and Warranties:** | The Notes shall enjoy all covenants, representations and warranties set forth in the Existing Indenture (brought down as of the Effective Date), subject to such additions, deletions and adjustments as provided below, or otherwise set forth in this Term Sheet: |
| | **Negative Covenants** |
| | The Company shall not: |
| | (i) open accounts other than Accounts except where such accounts would be subject to a Trustee lien; (ii) incur additional debt, except as specifically agreed by the Steering Group in the final documentation, and a debt basket shall be created for the redemption or replacement of the Bulk 2 Repurchase Transaction (as defined herein); and |
| | (iii) enter into transactions with Affiliates of the Company, the Shareholders or CCSA Parties except upon full prior disclosure to the Board (including the Noteholder's Board Nominee (as defined below)) and upon demonstration to the Board that the terms of the transaction are arm's-length, market terms, and such transaction is approved by the Board; provided, further, that, in no instance shall |

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

the re-sale of any units purchased by Affiliates of the Company, the Shareholders or CCSA Parties be permitted while any of the Notes are outstanding unless all Units owned by the Company have been sold (or closed). For the avoidance of doubt, the transactions with Affiliates covenant shall include all necessary exceptions for purposes of effectuating the Beach Club settlement and Casino/MTA Arrangements, in each case as set forth in Exhibit 1 hereto.

Notwithstanding the foregoing, Affiliates of the Company, the Shareholders or CCSA Parties shall not be eligible to receive any future commissions (co-broker commission, finder's fee or other monetary arrangement) with respect to the sale of any assets comprising Collateral.

The Collateralization Ratio covenant and the $20 million debt basket in the Existing Indenture shall be deleted.

**Affirmative Covenants**

The Company shall:

(i) comply with Noteholder Representative covenants;
(ii) comply with Corporate Governance requirements (as described below);and
(iii) ensure all revenue streams of the Project owed to the Company are deposited directly into the HSBC Panama Account, provided, however, if any such revenues are instead received by the Company, the Company shall promptly deposit those into the HSBC Panama Account.


The CCSA Parties shall:

(i) subject to all of the other conditions to the Settlement being satisfied, provide the financial guarantee and pledge their respective shares in the Company, in each case as more fully described in Exhibit 1 hereto, and in each case subject to the full release without liability to any of them under the CCSA Agreement as described elsewhere in this Term Sheet; and

(ii) individually, and not jointly and severally, shall agree that neither they nor their Affiliates or Insiders shall purchase Existing Notes or Notes (except for permitted Open Market Repurchases by the                                                Company).


**Representations by Company:**

(i) all assets, rights and claims of and owed to the Company are pledged as part of the Collateral (except for Brokers' Commissions and Property Transfer Fees as provided for herein);

(ii) the Company has made full disclosure of all related party

14

| | |
|---|---|
| | transactions and relationships with Affiliates of the Company, the Shareholders or CCSA Parties, and that no Affiliates of the Company, the Shareholders or CCSA Parties derive any economic benefit from the Project except as has been fully disclosed in writing to the Steering Group in advance of the filing of the Pre-Packaged Plan. |
| | **Representations of the CCSA Parties, which representations shall be made by each of them severally and not jointly, with respect to themselves and their respective Affiliates:** |
| | (i) to the best knowledge of each such CCSA Party, neither it, nor any of its Affiliates, are party to any agreements with the Company other than has been fully disclosed in writing to the Steering Group in advance of the filing of the Pre-Packaged Plan; |
| | (ii) to the best knowledge of each such CCSA Party, neither it, nor any of its Affiliates or Insiders owns or controls Existing Notes. |
| **Pre-Approved Policies and Budgets; Reporting:** | The Company shall comply with: |
| | (i) MWC Budget shall be as set forth in Exhibit 4A hereto, for such month and for such categories of uses as set for in Exhibit 4A. With each draw of Monthly Working Capital, the Company shall certify to the Trustee that such funds are to be spent in accordance with the approved categories contained herein. The MWC Budget shall consist of four categories, as set forth in Exhibit 4A hereto: (i) TOC Asset Completion & Preservation; (ii) Newland TOC Operations; (iii) Newland Corporate Operations; and (iv) Miscellaneous, which Miscellaneous category shall be available for expenses in each other category. To the extent that funds in a given category (including the Miscellaneous category) and month are unspent, such funds shall remain available to be used as Carry-Over Amounts, which Carry-Over Amounts can be applied within the same category.  To the extent such unused funds have been drawn by the Company such funds shall be transferred back to the Collection Account after expiration of the applicable period for Carry-Over Amounts; |
| | (ii) the Minimum Pricing Level, which shall be a price per square meter equal to 75% of the average sale price of the preceding five (5) most comparable units (comparability of which shall be assessed based on product, line and floor). For the avoidance of doubt, "Product" shall refer to a given units classification within Hotel, Condo, Bayloft, Commercial; "Line" shall refer to a unit's position within each floor, as represented by the last two digits of a given unit number. The calculation of the Minimum Pricing Level covenant shall not include comparable units used for purposes of any financing, extension, or replacement transaction in respect of |

| | |
|---|---|
| | the Bulk 2 Repurchase Option (as defined herein) nor shall the calculation of the Minimum Pricing Level include unit sales deemed to be an Affiliate transaction; and |
| | (iii) Approved quarterly reporting (with monthly detail) requirements for sales, unit purchase defaults, related-party transactions, and all other performance metrics as shown in Exhibit 5. |
| **Noteholder Representative:** | The Steering Group will appoint a representative (including any duly authorized representative or designee of such representative, the "Noteholder Representative") to discharge the functions described below.   The appointment of the Noteholder Representative shall be duly recorded in the Panamanian Public Registry and the Company's by-laws and, to the extent necessary (as determined by the Steering Group), other organizing documents would be amended or supplemented to recognize the Noteholder Representative and his/her rights and provide that his/her appointment and service would be governed by the Noteholders. After initial appointment by the Steering Group, replacement, including through removal, resignation or otherwise, of the Noteholder Representative would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders").   The selection (including replacements thereof) of the Noteholder Representative shall be in each case subject to reasonable prior notice to the Company; provided, that, the selection shall remain in the sole discretion of the Majority Holders (and until the Effective Date, such decision shall be made by the Steering Group). |
| | The function of the Noteholder Representative shall be to communicate in writing to the Trustee defaults under the Indenture and to review certifications identified herein.[8] In this regard, the Company agrees for all periods on or after the Effective Date that: |
| | (i) Noteholder Representative shall have full access to, subject in all cases to confidentiality provisions to be agreed prior to the Chapter 11 filing,[9] the Company's offices and all property, books, accounting and other records, invoices, contracts, and to attend internal and business meetings (but for the avoidance of doubt, not meetings unrelated to the operation of the Company) and to observe sales and marketing meetings; for the avoidance of doubt, |

---

[8]        The Noteholder Representative's reporting function shall be independent of the Company's reporting obligations under the Indenture.

[9]        For the avoidance of doubt, the Noteholder Representative's fulfilling its obligation to report to the Trustee would not be a breach of any confidentiality obligation.

16

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | this clause (i) shall not include internal electronic mail (email) communications; provided that from the Effective Date, a copy of any email communication used by the CEO as written approval of a unit sale must be delivered to the Noteholder Representative;<br><br>(ii) Noteholder Representative shall have full access to all information concerning the Project, performance data relating to the Pre-Approved Policies and Budgets, and to attend construction, sales, marketing and management meetings.  This would include access to weekly reports on sales and expenses, with supporting data;<br><br>(iii) Noteholder Representative shall have full access to any contracts or other relevant documentation or details that pertain to the legal relationship between the Company and its Affiliates and the Affiliates of the Shareholders or CCSA Parties;<br><br>(iv) Noteholder Representative compensation to be agreed with SG prior to the solicitation date of the Pre-Packaged Plan and paid by Company; and<br><br>(v) Each Noteholder Representative shall execute a Confidentiality Agreement with the Company prior to appointment.<br><br>The Noteholder Representative function shall cease to exist following the date which is the later of eighteen (18) months following the Effective Date or three (3) months after the existence of an Event of Default, unless such Default has been earlier cured or waived. |

## IV.    <u>**Corporate Governance**</u>

| | |
|---|---|
| **Shareholder and Board Control; Noteholder Voting Rights:** | As part of the Restructuring and the CCSA Settlement (described below), shareholder voting agreements shall be entered by the Shareholders and a nominee ("Noteholders' Shareholder Nominee") of the Noteholders (or effective documents shall be executed in favor of the Noteholders and enforceable by the Trustee and the Noteholders' Shareholder Nominee, to provide that 30% of the shareholder voting rights (but not economic entitlements) attributable to the Company's capital stock shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders (the "Noteholder Swing Vote"), such that shareholder voting by shareholders of the Company shall be effectively allocated:  Upper Deck – 21%, Roger Khafif – 49%, and Noteholders' Shareholder Nominee 30% (together, "Voting Persons").  Notwthstanding the foregoing, the 30% shareholder |

voting rights of the Noteholders' Shareholder Nominee shall only be exercisable in the event of a shareholder voting dispute between Khafif and Upper Deck; provided, that, notwithstanding the foregoing, the Noteholders' Shareholder Nominee shall receive the same information provided to, at the same time as received by, the other shareholders in respect of any voting to be undertaken by the shareholders, and shall be invited, sufficiently in advance, to attend all shareholder meetings at which voting will take place, whether in-person or telephonic, and shall timely receive (at the same time as the other shareholders) copies of all minutes, resolutions, and presentations prepared for or to reflect the outcome of such shareholder voting meeting.

Further, in connection with the shareholder voting arrangements described immediately above, the Company's Board of Directors (the "Board") shall be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the Board (the "Noteholders' Board Nominee"), which nominee (a natural person or an entity (in turn, represented by a natural person)) shall not have any voting rights, except as provided below. The Company's governing documents and any existing shareholder and/or voting agreements shall be modified to provide that all decisions by the Board shall be taken unanimously and that, in the case of a non-unanimous vote, the Noteholders' Board Nominee shall have in such instance (and only in such instance) the ability to cast the deciding vote. For the avoidance of doubt, the Noteholders' Board Nominee shall have unfettered access to all Board meetings and communications, shall receive same at the same time as members of the Board, and shall be invited, sufficiently in advance, to attend all meetings, whether in-person or telephonic, shall timely receive (at the same time as members of the Board) copies of all minutes, resolutions, and presentations, and shall be permitted to participate in such meetings as if s/he were a full-voting member of the Board.

After initial appointment by the Steering Group (which may be for the full term of the Notes), replacement, including through resignation or otherwise, of the Noteholders' Board Nominee and Noteholders' Shareholder Nominee would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders"); provided, that, the Steering Group can, at its discretion, select an alternate Noteholders' Board Nominee and Noteholders' Shareholder Nominee before the Effective Date with the alternate assuming the position for the balance of the term up to the prior Nominee's resignation, death or incapacity.

Upon payment in full of the Notes, the Noteholders' Board

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                  PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | Nominee shall resign from the Board<br><br>The Company's governing documents shall provide indemnification for the Noteholders' Board Nominee as well as for all other members of the Board of Directors of the Company and for designated Officers of the Company.<br><br>The Noteholders' Board Nominee and the Noteholders' Shareholder Nominee can be the same person/entity, but need not be. |
| **Senior Officer Appointments:** | As part of the Restructuring, Carlos Saravia shall be appointed as Chief Executive Officer ("CEO"), President and Legal Representative of the Company. Carlos Saravia may be replaced in such roles anytime after September 30, 2013, but shall be given at least 30 days' notice of any such intended replacement. An executive search to replace Carlos Saravia will be initiated before his anticipated departure; furthermore, the replacement Chief Executive Officer shall be selected prior to Carlos Saravia's departure. Roger Khafif, Eduardo Saravia Calderón, Carlos Alberto Serna Londoño shall, directly or indirectly, only hold non-executive roles with no corporate officer responsibilities or powers, or roles or powers related to the Owners meeting of the PH (as defined in the "Reglamento" (Co-ownership Rules) Board and Administration.<br><br>For the avoidance of doubt, the appointment of corporate officers of the Company (excluding the position of CEO) shall not be subject to preapproval of the Noteholders' Board Nominee.<br><br>Further, Carlos Saravia, as Chief Executive Officer shall have all requisite power to sign all legal documentation of the Company on behalf of the Company, including sales documentation. Such power and authority shall be expressly provided in the governing documentation of the Company and registered in the applicable Panamanian public registry and by means of power-of-authority from the remaining officers authorized by the governing documentation of the Company to sign legal documentation on behalf of the Company.<br><br>The Company shall also execute a "professional services contract" under Panama law with Carlos Saravia, outlining his role as Chief Executive Officer. The Company shall also implement a succession plan for the Chief Executive Officer role; such succession plan shall provide for the Chief Financial Officer to become interim CEO in the event the CEO resigns or otherwise |

19

|  | ceases to perform its duties prior to securing a replacement and for the means by which a full-time replacement CEO shall be selected. Any CEO of the Company after Carlos Saravia shall have education and experience commensurate with the position, with the hiring of the replacement CEO shall approved by the Board. Furthermore, the replacement can only be consummated if not objected to by the Noteholders' Board Nominee. The Noteholders' Board Nominee shall recite any reasons for any objection on the record at a Board meeting or, at his/her choice, in a separate writing to the Company. |

## V.    **Additional Terms**

| ISG: | Steering Group to be satisfied with any potential settlement of the Company's obligations, if any, to and disassociation with ISG. |
|---|---|
| **CEO Approval of Sales:** | There must be a written approval by the Company's CEO for each unit sale (residential, commercial or hotel). For the avoidance of doubt, facsimile and email approval by the CEO shall be acceptable. |
| **Bulk 2 Units:** | "Bulk 2 Repurchase Amount" shall mean as of any date the outstanding principal balance of the Bulk 2 Repurchase Option (as defined below) (if fully exercised) as adjusted from time to time in accordance with its terms. For the avoidance of doubt, the Bulk 2 Repurchase Amount shall be zero once it is paid in full or otherwise expires in accordance with the terms of its contract.

If prior to the Effective Date, there is a full or partial settlement, extension, or replacement (each a "Bulk 2 Repurchase Transaction") of the Bulk 2 Repurchase Amount, the Steering Group shall be satisfied with the proposal related to such Bulk 2 Repurchase Transaction.

The Company shall be permitted to refinance the Bulk 2 Repurchase Amount, provided that such transaction is acceptable to the Steering Group if to be consummated prior to the Effective Date, and if after the Effective Date, provided that any refinancing facility:

   (i)  Shall result in no net cash proceeds to the Company;
   (ii) Shall carry an interest rate no greater than the interest rate on the Notes;
   (iii) Shall have a term of no greater than 12 months in the absence of such facility allowing for prepayments without penalty or premium;
   (iv) Require a collateralization ratio of no greater than 2.0x. |

FRE 408 SETTLEMENT COMMUNICATION                                      FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                      PRIVILEGED AND CONFIDENTIAL

|  |  |
|---|---|
|  | Provided that such characteristics are met, the mortgage on a given pool of units may be released and used as collateral against such facility, provided further that in all instances the Noteholder Representative must confirm that the terms of such a refinancing facility satisfy these requirements.<br><br>"Bulk 2 Repurchase Option" means the option to repurchase units under that certain contract between Global Realty Investments, S.A. and the Company, dated July 13, 2011. |
| **Seller Financing:** | (i) Company shall be permitted to offer seller financing for up to the lesser of 110 Units or $40 million (in aggregate) of Units at then                    applicable                    pricing;<br><br>(ii) Terms for a seller financing shall include no more than a 2.5 year average life in addition to a maximum maturity date of the scheduled final maturity date of the Notes (such date the "Seller Financing Horizon Date") and a step-up in interest rate at each six (6) month interval to encourage refinancing, a maximum loan to value determined by Newland in its reasonable judgment based on the creditworthiness of the obligor not to exceed 60% of the purchase price of the Unit;<br><br>(iii) Units purchased with a seller financing facility will be subject to a price no lower than the three month historical weighted average pricing of sales of comparable units (e.g., residential, commercial, hotel) in the Project; provided that if no applicable Unit sales occurred in the last three (3) months, such weighted average shall be based on the last three sales of such Units;<br><br>(iv) A single buyer may acquire no more than two (2) Units with a seller financing facility;<br><br>(v) Seller financing terms shall specify that all CAM (and other) charges will be payable by the buyer; terms will also require that the mortgages entered into in connection with the seller financing shall be pledged to the Co-Trustee for the benefit of the Noteholders.<br><br>For the avoidance of doubt, there shall be no Seller Financing for Prime Unit Sales or for Affiliate unit purchases.<br><br>Upon certification by a Company Officer to the Trustee that such characteristics are met, the mortgage on a given pool of units subject to seller financing may be released; the Company may then obtain a mortgage (with the Company as mortgagee) on such pool of Units and any such mortgage to be obtained by the Company will be pledged as Collateral; provided, further, that, in all instances the certification shall indicate that it has been reviewed |

FRE 408 SETTLEMENT COMMUNICATION                                        FOR DISCUSSION PURPOSES ONLY
    NOT FOR DISCLOSURE                                                    PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | by the Noteholder Representative who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification. |
| **Non-UPA Revenue**: | All non-UPA revenue due to the Company (including payments, receipts, fees due the Company from lease, hotel, food and beverage, Beach Club Membership Fees, Casino, Spa), from any Collateral shall be deposited directly, or caused to be deposited by the Company, to the HSBC Panama Account.  Such amounts shall be net of any fees, commissions, property or transfer taxes or other costs and expenses payable under the contract giving rise to such non-UPA revenue. |
| **Casino/MTA/Beach Club Agreement:** | See Exhibit 3 hereto. |
| **TOC Casino Transaction Related Unit Sale Financing** | In connection with one or more transactions governed under a master transaction agreement (the "TOC Casino Transaction") in which a purchaser (including any affiliates designated by such purchaser for such purposes, the "Casino Buyer") acquires one or more Units at the Project, and one of such acquired Units is the Casino for purposes of developing a gaming enterprise at the Project, the Company shall be permitted to sell Units (each an "Ancillary Unit") that are not Prime Units for purchase prices in aggregate of up to $7 million to the Casino buyer in the TOC Casino Transaction on terms and conditions that comply with the Indenture; provided, however, that (i) any such Ancillary Unit sale will not be included in the calculations of prices under the Minimum Pricing Level covenant and (ii) the sale of Ancillary Units to the Casino Buyer may be for a combination of cash and one or more loans (each an "Ancillary Unit Loan") in favor of the Company for the balance of the purchase price set forth in each relevant UPA. The transfer of title to such Ancillary Units, and the release of the relevant Mortgage on such Ancillary Units, will occur at the time of sale of each Ancillary Unit under the respective UPA, provided the Casino Buyer shall register in the Panamanian Public Registry a mortgage in favor of the Company (with the Company as mortgagee) securing the obligations under the Ancillary Unit Loans in favor of the Company (the "Casino Buyer Mortgage"). The Company will then pledge its rights under the Casino Buyer Mortgage as Collateral to the Co-Trustee. The Casino Buyer shall also be responsible for making payment in respect of CAM and other owner expenses from the earlier of occupancy of any such Ancillary Unit or the closing date of any |

FRE 408 SETTLEMENT COMMUNICATION                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                   PRIVILEGED AND CONFIDENTIAL

|  | such sale. |
|---|---|
| **Ratings:** | The Notes shall be rated by at least one ratings agency satisfactory to Steering Group. |

## VI.   **Other Conditions**

| **Trump:** | The Trump arrangements shall be as provided in Exhibit 2 hereto. Further, subject to appropriate confidentiality provisions agreed by Trump, the Company and the Steering Group or as may be ordered by the Bankruptcy Court (as defined below), all documentation, contracts and agreements between the Company and Trump shall be made available for review by the Steering Group prior to the Effective Date. |
|---|---|
| **MTA Agreement:** | On or prior to the Effective Date, the Company shall agree to and execute a settlement of any amounts owed in respect of the MTA Agreement that is acceptable to the Steering Group. For the purposes of this Term Sheet, "MTA Agreement" shall mean the currently existing agreement among Marvin Traub Associates ("MTA") and Newland which, among other things, provides for an amount payable to MTA by Newland based on certain amounts paid and payable by Newland to Trump in respect of the Trump License Agreement. |
| **Contadora Sale:** | Within 6 months from the Effective Date, the Company shall commence a sale process related to its interest in the parcel at Contadora Island, with the terms of such sale process to be acceptable to the Noteholder Representative and the Noteholder Board Nominee. Upon such sale, the mortgage on the collateral consisting of Contadora Island shall be released and net proceeds shall be deposited to the HSBC Panama Account. |
| **CCSA Liability:** | The CCSA and any liabilities under the CCSA shall be settled as set forth in Exhibit 1 hereto. <br><br> Delivery by Independent Engineer of certificate of Construction Completion occurred on January 8, 2013. |
| **Definitive Documentation:** | Definitive documentation shall be in form and in substance reflecting the terms herein and consistent in all material respects with this Term Sheet. |
| **Fees and Expenses:** | All fees and expenses of professional advisors to the Steering Group (BroadSpan, Seward & Kissel, Morgan & Morgan), Trustee (Chadbourne & Parke, Morgan & Morgan) and Company (Gibson Dunn, Adural, Gapstone, DLA Piper and Noteholder Representative) shall have been paid in full in cash by the Company on or before the Effective Date, with legal advisors to |

| | |
|---|---|
| | the Steering Group and Company paid on a current basis and in full before any filing of the Chapter 11 Case (as defined below). |

## VII.    Chapter 11 Case

| | |
|---|---|
| **Chapter 11 Case:** | Subject to the consent of the Steering Group, which consent shall not unreasonably be withheld, the Company shall file a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The plan of reorganization describing the Pre-Packaged Plan (the "Plan of Reorganization") and the disclosure statement describing the Plan of Reorganization (the "Disclosure Statement") shall be filed on the same day as the filing of the Chapter 11 Case (the "Petition Date"). The Plan of Reorganization shall be in all material respects consistent with the elements of this Term Sheet. |
| **Motions and Other Bankruptcy Court Filings:** | All motions and other filings with the Bankruptcy Court, including any proposed orders (including, without limitation, the order confirming the Plan of Reorganization (the "Confirmation Order")) shall be in form and substance reflecting all material elements of this Term Sheet and reasonably acceptable to the Steering Group and the Company. Additionally, the Noteholders party to the Plan Support Agreement shall (i) (A) consent and not object to the use of cash collateral pursuant to a cash collateral stipulation/order to be agreed by the Steering Group in advance of the filing of the Chapter 11 Case (which shall provide adequate protection in the form of professional fees and expenses for advisors to the Steering Group and the Trustee), and (B) not file any motion seeking adequate protection with respect to the use of cash collateral or in connection with the automatic stay or otherwise (subject to (A) above) and (ii) direct the Trustee (subject to (A) above) (X) to consent and not object (or support any noteholder in objecting) to the use of cash collateral without providing adequate protection for any reason, including, without limitation, the imposition of the automatic stay, and (Y) not to file any motion seeking adequate protection with respect to the use of cash collateral or in connection with the automatic stay or otherwise; provided that items (x) and (y) are subject to provision of the adequate protection set forth above. |

## EXHIBIT 1

## CCSA SETTLEMENT TERM SHEET

As an integral part of the Restructuring, any and all obligations under the Construction Completion Support Agreement, dated as of November 6, 2007 (the "CCSA"), of Roger Khafif, Eduardo Saravia, and Carlos A. Serna (each, a "CCSA Party"; together, the "CCSA Parties") shall be compromised and settled as follows (the "CCSA Settlement"):[10]

| | |
|---|---|
| **Plan Support/Stock Pledge** | The CCSA Parties shall agree, severally and not jointly, to support the Pre-Packaged Plan and as provided in the Term Sheet execute a stock pledge and deliver stock powers as Collateral for the Notes. |
| **Release/Waiver** | Through payment in full of the Notes, after which such waivers and representations will be of no further force or effect: <br><br>(i) Kassir Development shall waive its claim in the amount of US$2,022,274.00 against the Company (and represent it has no other claims against the Company); <br><br>(ii) Opcorp Arsesa International, Inc. shall waive its claim in the amount of US$4,787,742.45 against the Company (and represent it has no other claims against the Company); and <br><br>(iii) the CCSA Parties, on their own behalf and that of their respective Affiliates shall waive its/their rights to any management fees or expenses or reimbursements payable directly or indirectly by the Company until such time as the Notes have been paid in full or otherwise discharged, and with respect to asset management fees related to the operation of the hotel or its amenities, the earlier of such time as (i) the Notes have been paid in full or otherwise discharged and (ii) when all remaining hotel units are sold; in each case, except as disclosed on Exhibit 6 hereto[11]. |

---

[10]    Terms not defined herein shall be as defined in the Settlement Term Sheet.

[11]    NB: Arias Serna & Saravia through an affiliate currently pays salaries of some Newland officers with concurrent reimbursement by Newland out of the MWC; labor contracts are between the employees and Arias Serna; these contracts and arrangements will be specified in an exhibit and carved-out of this clause (iii).

| **Swing Voting Rights** | Shareholder voting agreements shall be entered by the Shareholders and a nominee ("Noteholders' Shareholder Nominee") of the Noteholders (or effective documents shall be executed in favor of the Noteholders and enforceable by the Trustee and the Noteholders' Shareholder Nominee, to provide that 30% of the shareholder voting rights (but not economic entitlements) attributable to the Company's capital stock (the "Noteholder Swing Vote") shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders, such that shareholder voting by shareholders of the Company shall be effectively allocated:  Upper Deck – 21%, Roger Khafif – 49%, and Noteholders' Shareholder Nominee 30% (together, "Voting Persons"). Notwthstanding the foregoing, the 30% shareholder voting rights of the Noteholders' Shareholder Nominee shall only be exercisable in the event of a shareholder voting dispute between Khafif and Upper Deck; provided, that, notwithstanding the foregoing, the Noteholders' Shareholder Nominee shall receive the same information provided to, at the same time as received by, the other shareholders in respect of any voting to be undertaken by the shareholders, and shall be invited, sufficiently in advance, to attend all shareholder meetings at which voting will take place, whether in-person or telephonic, and shall timely receive (at the same time as the other shareholders) copies of all minutes, resolutions, and presentations prepared for or to reflect the outcome of such shareholder voting meeting.<br><br>After initial appointment by the Steering Group (which may be for the full term of the Notes), replacement, including through resignation or otherwise, of the Noteholders' Shareholder Nominee would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders"); provided, that, the Steering Group can, at its |
|---|---|

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                              PRIVILEGED AND CONFIDENTIAL

|  |  |
|---|---|
|  | discretion, select an alternate Noteholders' Shareholder Nominee before the Effective Date, with the alternate assuming the position for the balance of the term up to the prior Nominee's resignation, death or incapacity. |
| **Board Seat/Noteholder Nominee** | Further, in connection with the shareholder voting arrangements described immediately above, the Company's Board of Directors (the "Board") shall be reconstituted to reflect that the Noteholders shall have a right to appoint a delegate to the Board (the "Noteholders' Board Nominee"), which nominee (a natural person or an entity (in turn, represented by a natural person)) shall not have any voting rights, except as provided below.  The Company's governing documents and any existing shareholder and/or voting agreements shall be modified to provide that all decisions by the Board shall be taken unanimously and that, in the case of a non-unanimous vote, the Noteholders' Board Nominee shall have in such instance (and only in such instance) the ability to cast the deciding vote. For the avoidance of doubt, the Noteholders' Board Nominee shall have unfettered access to all Board meetings and communications, shall receive same at the same time as members of the Board, and shall be invited, sufficiently in advance, to attend all meetings, whether in-person or telephonic, shall timely receive (at the same time as members of the Board) copies of all minutes, resolutions, and presentations, and shall be permitted to participate in such meetings as if s/he were a full-voting member of the Board.

After initial appointment by the Steering Group (which may be for the full term of the Notes), replacement, including through resignation or otherwise, of the Noteholders' Board Nominee would be controlled by Noteholders holding a majority in principal amount of the Notes ("Majority Holders"); provided, that, the Steering Group can, at its discretion, select an alternate Noteholders' Board Nominee before the Effective Date, with |

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                         PRIVILEGED AND CONFIDENTIAL

|  |  |
|---|---|
|  | the alternate assuming the position for the balance of the term up to the prior Nominee's resignation, death or incapacity.<br><br>Upon payment in full of the Notes, the Noteholders' Board Nominee shall resign from the Board<br><br>The Company's governing documents shall provide indemnification for the Noteholders' Board Nominee.<br><br>The Noteholders' Board Nominee and the Noteholders' Shareholder Nominee can be the same person/entity, but need not be. |
| **CEO Replacement** | If the CEO of the Company is to be replaced for any reason, the replacement can only be consummated if not objected to by the Noteholders' Board Nominee.  The Noteholders' Board Nominee shall recite any reasons for any objection on the record at a Board meeting or, at his/her choice, in a separate writing to the Company. |
| **Financial Guarantee** | Subject to the effectiveness of the Pre-Packaged Plan, the CCSA  Parties shall execute and deliver a joint and several financial guarantee of payments on the Notes payable ninety (90) days after (i) an acceleration by holders of the Notes in accordance with the Indenture (provided such acceleration is not rescinded in accordance with the Indenture) or (ii) at the scheduled final maturity date of the Notes, to the extent in each case the holders of the Notes have not been paid in full (the "Partners' Financial Guarantee") and, provided, that, the maximum amount due and payable under such Partners' Financial Guarantee shall under no circumstance exceed in the aggregate the amount of US$5 million and the CCSA Parties' exposure under the Partners' Financial Guarantee shall be limited to such US$5 million amount. |
| **Beach Club** | The CCSA Parties shall make or cause their Affiliates to make the commitments with |

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                              PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | respect to the Beach Club as set forth in Exhibit 3 hereto. |
| **Satisfaction and Release** | In exchange for all the foregoing consideration, the effectiveness of the Pre-Packaged Plan shall result in the final settlement of the CCSA and the satisfaction and release of any and all obligations of the CCSA Parties thereunder without any liability to any of them.  In furtherance thereof, the Pre-Packaged Plan and confirmation order shall direct the Trustee to execute and deliver any and all documents required, if any, to effectuate the CCSA Settlement, with no liability to the Trustee and with the Trustee being exculpated under the Pre-Packaged Plan for taking any such action. In addition, each vote in favor of the Pre-Packaged Plan by a holder of Existing Notes shall constitute an effective irrevocable direction to the Trustee not to oppose the Pre-Packaged Plan or the CCSA Settlement, to forbear from seeking to enforce the CCSA, and, if under any circumstance the Trustee obtains any monies under or pursuant to the CCSA Agreement, to return such monies to the CCSA Parties. |

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                  PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 2

## TRUMP RELATED TERMS

| | |
|---|---|
| License Fee to Licensor | The amount payable to Trump Marks Panama LLC ("Licensor") based on current formula (with fixed CAP) but reduced ▮▮▮▮ to be paid according to current priority and timing with respect to Closings (as defined in the License Agreement); but with respect to any Unit, no earlier than the Closing for such Unit; provided that initial payments shall be made in accordance with the License Fee Payment Plan (to be determined) which shall provide a payment schedule over months for amounts calculated as payable in respect of License Fees pursuant to this clause; provided further that subsequent to the end of such payment schedule, amounts calculated as payable in respect of License Fees shall be paid according to the priority and timing established in the current Indenture. |
| Hotel Management Agreement | 1. Reduce Hotel Management Fee and Hotel Amenities Management Fee ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These management fees are for services rendered for operating the Hotel, the Hotel Amenities, and for the PH Administration.<br>2. Eliminate the minimum fee ▮▮▮▮▮▮ for Hotel Units that are in the Hotel Operator rental program. The minimum fee for non-participating units to be reduced ▮▮▮▮▮.<br>3. Incentive Fee to be eliminated until the start of year 4. Commencing at the start of year 4, Incentive Fee to be ▮▮▮ instead of ▮▮<br>4. Newland to use best efforts to open Spa, Casino and Beach Club; performance termination to be tolled until delivery of Spa, Casino and Beach Club. |
| PH Administration | Eliminate the ▮▮▮▮ annual condominium management fees paid to the PH administrator, Trump Panama Condominium Management LLC (the "PH Administrator"). |
| Seller Financing | Seller Financing would be explicitly provisioned in the Indenture and UPA forms and subject to the conditions set forth in the term sheet.<br><br>License Agreement to be amended as necessary to |

30

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                      PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | preserve the rights of the Licensor in respect of any Unsold Unit delivered pursuant to such seller financing arrangement. |
| Non-disturbance terms | Trustee, Trump and Newland shall enter into an agreement in accordance with the following terms: |
| | 1. The pledge of the majority of the equity interests in Newland to the Trustee shall not alter Newland's obligations under the terms and conditions of the agreements with Trump in connection with the licensing, management and operation of the Project. |
| | 2. In the event the Trustee or its designee becomes the owner of the majority of the equity interests of Newland, such event shall not alter (i) Newland's obligations under all of the terms and conditions of the agreements with Trump in connection with the licensing, management and operation of the Project , and (ii) Newland's obligations to appoint the board members of the condominium and entities affiliated with the ownership and operation of the Project. |
| | 3. In the event that Trustee or its designee becomes the owner of hotel units or hotel amenities units then the Trustee or its designee (i) will be subject to all of the obligations of a hotel unit owner and hotel amenities unit owner under the condominium documents, (ii) shall enter into an agreement whereby the unsold hotel units shall enter into the rental program, (iii) shall not be limited to the restriction which prohibits any one owner from owning more than 10 hotel units, (iv) shall have the right to sell more than 10 hotel units to any single purchaser, provided, that such purchaser is pre-approved by Trump. |

FRE 408 SETTLEMENT COMMUNICATION                      FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                            PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 3

## BEACH CLUB
## TERMS RELATED TO THE RESTRUCTURING

As an integral part of the Restructuring, the following terms are agreed and shall be implemented related to the completion and operation of a beach club on Isla Viveros ("Beach Club") which shall grant memberships to residential and hotel condominium units at the TOC.

| Parties and Definitions: [12] | "Pearl" means Ocean Club Pearl Island Corp, the owner of the Beach Club.<br><br>"RKCo" means one or more entities owned and/or controlled by Roger Khafif to act as a shareholder in Pearl or a lender under the BC Bridge Loan.<br><br>"BC Bridge Loan" shall mean an unsecured loan agreement in respect of the Beach Club, subordinated to the BC Senior Loan (defined below), between Pearl and RKCo, Upper Deck and/or such other entity that will act as a lender thereunder, as lenders and which shall have an effective maturity date consisting of 20 years (with automatic and mandatory 20 year renewals) and will not accrue any interest. The amount and use of proceeds for the BC Bridge Loan must be certified by an officer of Pearl to the Newland Board and the Noteholder Representative.<br><br>"BC Completion Date" shall mean the date on which construction completion of the Beach Club, as certified by the project contractor to the Newland Board and the Noteholder Representative, has occurred in accordance with the relevant plans and specifications provided to the Steering Group on or before the date hereof (the "BC Plans"), which date shall be deemed to be the later of (i) six months from the Effective Date and (ii) September 30, 2013.<br><br>"BC Net Operating Cost" shall be for each month an amount equal to the operating cost of the Beach Club reduced by the revenue generated from sales of beach club passes to persons who are not BC Members, each as reported by Pearl in its quarterly operating statement (which statement shall contain monthly detail).<br><br>"BC Ferry Net Operating Costs" shall be for each month an amount equal to the cost incurred by Pearl for the BC Ferry operation or to pay a third party operator under the BC Ferry Concession (defined below), as applicable, reduced by any revenue received by Pearl, directly or indirectly, from operation of the BC |

---

[12]    Terms not defined herein shall be as defined in the Settlement Term Sheet.

FRE 408 SETTLEMENT COMMUNICATION        FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                        PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| | Ferry, each as reported by Pearl in its quarterly operating statement (which statement shall contain monthly detail).<br><br>"BC Ferry Concession" means a concession to a third party operator to run the BC Ferry operation.<br><br>"MTA Disclosure Date" shall be September 15, 2012.<br><br>"MTA Reserved Amount" shall mean as of any date an amount equal to the sum of all payments made to MTA by or on behalf of Newland in respect of the Trump Reference Payments (as defined below).<br><br>"TOC Casino Transaction" shall mean a transaction in which a purchaser acquires one or more units at the Project, and one of such acquired units is the casino unit, for purposes of developing a gaming enterprise at the Project.<br><br>"TOC Casino BC Loan Amount" shall be a portion of the BC Senior Loan in one or more advances an amount equal to the positive difference, if any, of (i) 5% of the gross purchase price of the TOC Casino Transaction minus (ii) the MTA Reserved Amount.<br><br>"Trump Reference Payments" shall mean as of any date an amount equal to the cumulative sum of that portion of each payment made to Trump on or prior to the MTA Disclosure Date by or on behalf of Newland in respect of the Trump License Agreement which is applicable for the calculation of amounts due to MTA by Newland pursuant to the MTA Agreement. |
| **Beach Club and Certain Commitments:** | The Beach Club comprises land and related improvements currently being constructed on Isla Viveros in the Pearl Islands archipelago of Panama and is owned by Pearl.<br><br>The CCSA Parties shall cause the Beach Club to be completed in a commercially reasonable manner consistent in all respects with the BC Plans by the BC Completion Date.  The Beach Club will be constructed by RKCo and Upper Deck without funds from the Company other than the BC Senior Loan.<br><br>The Beach Club will operate as a private beach club for its members.  Permanent memberships at the Beach Club (each a "BC Membership" and each underlying member a "BC Member") will be offered to qualifying candidates with a unique sequential identifying number ("BC Member ID") and governed by a membership agreement ("BC Members Agreement") establishing |

| | |
|---|---|
| | among other things the Beach Club rules and regulations, monthly membership dues, and remedies available to Pearl to enforce compliance. BC Members' monthly dues (the "BC Monthly Dues") will be assessed on all BC Members without discrimination based on each BC Member's share of the sum of (i) BC Net Operating Costs and (ii) BC Ferry Net Operating Costs, if any; provided that such share will be allocated in a fair and equitable manner such that BC Memberships held by TOC Residents shall not be unfairly discriminated versus BC Memberships not held by TOC Residents.<br><br>The access/use of the Beach Club to TOC residents will be governed by an agreement (the "TOC Membership Agreement") between Pearl and Newland. The TOC Membership Agreement shall irrevocably provide at no cost to Newland BC Memberships (which shall, in the hands of TOC residents be treated in all respects no less favorably than BC Memberships not held by TOC residents), adjusted for any Declined Memberships (as defined below), representing each residential and hotel condominium unit at the TOC. Each BC Membership granted under the TOC Membership Agreement will not be transferable except with the transfer of the underlying TOC unit. For the avoidance of doubt, TOC Residents can decline BC Memberships, as set forth in "—BC Membership Sales at TOC". |
| **BC Senior Loan** | The Company may make disbursements under a senior secured loan (the "BC Senior Loan") to Pearl, with the following principal terms:<br><br>Disbursements:<br><br>(i) Subject to the Priority of Payments, $500,000 on or prior to BC Completion Date, the proceeds of which will be used by Pearl to supplement its furniture, fixtures and equipment budget; and<br><br>(iii) Upon the receipt of any proceeds from the TOC Casino Transaction which in aggregate exceed the MTA Reserved Amount, an amount equal to such excess up to the TOC Casino BC Loan Amount, which shall be used for general corporate purposes of Pearl including to repay the BC Bridge Loan; provided, that, any repayment of the BC Bridge Loan shall be prohibited until the later of (x) the BC Completion Date and (y) November 20, 2013.<br><br>Collateral and Certain Covenants, Events of Default and Conditions: |

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                           PRIVILEGED AND CONFIDENTIAL

The collateral for the BC Senior Loan shall be secured by a first priority security interest and include all assets of the Beach Club, including but not limited to the following:

i.)  100% of the common stock of Pearl;

ii.) The Land Development Agreement or agreements involving the contribution of land or fees in exchange for Beach Club memberships;

iii.) The BC Members Agreements;

iv.) Insurance policies and proceeds there of;

v.) BC Ferry lease agreement (if applicable);

vi.) Any and all real and personal property. The BC Senior Loan will have an effective maturity date consisting of 20 years (with automatic and mandatory 20 year renewals) and will not accrue any interest; in addition:

The BC Senior Loan will be senior in priority to any other debt or equity capital instrument of Pearl, including the BC Bridge Loan; and the BC Senior Loan will be secured by a pledge of 100% of the common stock of Pearl (for the avoidance of doubt, not to be limited to the portion of common stock held currently by RKCo and Upper Deck).

The BC Senior Loan will cross-default to the Notes and to the TOC Membership Agreement, with such relevant events of default as specified in the final documentation, such that Events of Default under the Notes will cause a default under the BC Senior Loan; provided, further, that Events of Default under the BC Senior Loan shall have a cure period of 45 days.

Any Event of Default under the BC Bridge Loan shall cross-default to the BC Senior Loan, which shall have a first priority claim over the BC Bridge Loan over any collateral and shall be senior in right of repayment.

As a condition of the BC Senior Loan, Pearl and the CCSA Parties shall represent that no Affiliates of the Company, Pearl or the CCSA Parties derive any economic benefit from the Beach Club, except as has been fully disclosed in writing to the Steering Group in advance of the filing of the Pre-Packaged Plan.

FRE 408 SETTLEMENT COMMUNICATION                                            FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                                   PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| **BC Membership Sales at TOC:** | Sales of residential and hotel units at the TOC include BC Membership in the Beach Club for a one-time payment (the "Membership Fee") in the UPA.  Membership Fees to be paid by owners of Units in the Project pursuant to Unit Purchase Agreements are payable to the Company and deposited in the HSBC Panama Account.  Sold BC Memberships shall be issued in sequence based on the BC Member ID.<br><br>Newland will notify the applicable purchaser(s) under each UPA for a residential or hotel condominium unit that payment of the Membership Fee is required within three months from the later of (i) the closing date of such UPA and (ii) the BC Completion Date, after which if the Membership Fee remains unpaid, the underlying BC Membership shall be considered declined (each a "Declined Membership") and will revert back to Pearl; provided that the proceeds of any subsequent sale of a Declined Membership must be used to repay the BC Senior Loan. |
| **Beach Club Ferry:** | Up to $1.25MM (the "BC Ferry Payment") will be incorporated into the Priority of Payments which amount may be used by Newland toward the purchase of a ferry (the "BC Ferry") or for any approved transportation solution to transport residents of the TOC to and from the Beach Club, as described below.  Newland will contribute any needed portion of the BC Ferry Payment utilized toward the purchase of the BC Ferry into a special purpose entity (the "BC SPV") for such purpose, which shall be owned 100% by Newland.<br><br>If and when acquired, the BC Ferry will be leased to Pearl under an operating lease ("BC Ferry Lease") under which Pearl shall be responsible for operating and maintaining the BC Ferry (without charge-back to Newland for any such costs or services).  The BC Ferry Lease will establish the pricing and methods for reserving seats on the BC Ferry for TOC residents and non-residents, which shall be subject to approval of Newland.  Newland shall be able to defer the purchase of the BC Ferry and instead either arrange a BC Ferry Concession.  Any use of funds in respect of the BC Ferry Payment toward such a transportation solution will require written notice to the Noteholder Representative and the Noteholder Representative indicating no objection (with any objection being reasonable and described in writing to the Newland Board) to the transportation solution and related arrangements.<br><br>Newland's obligation to make the BC Ferry Payment shall expire on the date that is eighteen months from the Effective Date. |

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                    PRIVILEGED AND CONFIDENTIAL

# EXHIBIT 4A
## MONTHLY WORKING CAPITAL BUDGET

| Monthy Working Capital Period | | Monthly Woring Capital Categories | | | |
|---|---|---|---|---|---|
| Post Closing Monthly Period | Expected Month/Year | TOC Asset Completion & Preservation | Newland TOC Operations | Newland Corporate Operations | Miscellaneous Monthly Working Capital |
| Closing Month | April-2013 | $ 210,000 | $ 430,000 | $ 240,000 | $ 245,000 |
| + 1 Month | May-2013 | $ 210,000 | $ 430,000 | $ 240,000 | $ 245,000 |
| + 2 Month | June-2013 | $ 220,000 | $ 345,000 | $ 230,000 | $ 255,000 |
| + 3 Month | July-2013 | $ 210,000 | $ 255,000 | $ 235,000 | $ 225,000 |
| + 4 Month | August-2013 | $ 210,000 | $ 200,000 | $ 225,000 | $ 240,000 |
| + 5 Month | September-2013 | $ 205,000 | $ 185,000 | $ 225,000 | $ 235,000 |
| + 6 Month | October-2013 | $ 205,000 | $ 200,000 | $ 230,000 | $ 215,000 |
| + 7 Month | November-2013 | $ 180,000 | $ 110,000 | $ 120,000 | $ 215,000 |
| + 8 Month | December-2013 | $ 185,000 | $ 110,000 | $ 120,000 | $ 210,000 |
| + 9 Month | January-2014 | $ 150,000 | $ 35,000 | $ 105,000 | $ 210,000 |
| + 10 Month | February-2014 | $ 155,000 | $ 35,000 | $ 105,000 | $ 200,000 |
| + 11 Month | March-2014 | $ 155,000 | $ 35,000 | $ 110,000 | $ 195,000 |
| + 12 Month | April-2014 | $ 155,000 | $ 40,000 | $ 110,000 | $ 190,000 |
| + 13 Month | May-2014 | $ 155,000 | $ 40,000 | $ 115,000 | $ 185,000 |
| + 14 Month | June-2014 | $ 155,000 | $ 40,000 | $ 115,000 | $ 185,000 |
| + 15 Month | July-2014 | $ 140,000 | $ 35,000 | $ 105,000 | $ 190,000 |
| + 16 Month | August-2014 | $ 140,000 | $ 35,000 | $ 110,000 | $ 185,000 |
| + 17 Month | September-2014 | $ 145,000 | $ 35,000 | $ 105,000 | $ 185,000 |
| + 18 Month | October-2014 | $ 145,000 | $ 40,000 | $ 105,000 | $ 180,000 |
| + 19 Month | November-2014 | $ 140,000 | $ 40,000 | $ 110,000 | $ 180,000 |
| + 20 Month | December-2014 | $ 130,000 | $ 35,000 | $ 100,000 | $ 180,000 |
| + 21 Month | January-2015 | $ 130,000 | $ 35,000 | $ 100,000 | $ 180,000 |
| + 22 Month | February-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 23 Month | March-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 24 Month | April-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 25 Month | May-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 175,000 |
| + 26 Month | June-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 27 Month | July-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 28 Month | August-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 29 Month | September-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 30 Month | October-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 31 Month | November-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 32 Month | December-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 33 Month | January-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 34 Month | February-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 35 Month | March-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 36 Month | April-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 37 Month | May-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 38 Month | June-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 39 Month | July-2016 | $ 90,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 40 Month | August-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 41 Month | September-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 42 Month | October-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 43 Month | November-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 44 Month | December-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 45 Month | January-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 46 Month | February-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 47 Month | March-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 48 Month | April-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 49 Month | May-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 50 Month | Thereafter May 2017 | $ - | $ - | $ - | $ - |

38

FRE 408 SETTLEMENT COMMUNICATION                                    FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                  PRIVILEGED AND CONFIDENTIAL

These Monthly Working Capital numbers shall become available effective on the date of the issuance of the new restructured Notes, and if the date of such issuance is other than the first day of a calendar month then the amount available for that month shall be the total amount set forth for that month reduced on a pro rata basis to cover the number of days remaining during that month following the date of such issuance.

FRE 408 SETTLEMENT COMMUNICATION                     FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                    PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 4B
## PROJECTED CASH COLLATERAL BUDGET

| | Filing Date Month | Chap 11 1st Month | Monthly Average [1] | Effective Date Month [2] |
|---|---|---|---|---|
| **Newland Payable Brokerage & Licensing Fees** | | | | |
| MTA Success Fees Payable | - | - | - | 1,125,000 |
| Master & Co-Broker Fees | 37,500 | 21,500 | 21,500 | 27,500 |
| Total Newland Payable Brokerage & Licensing Fees | **37,500** | **21,500** | **21,500** | **1,152,500** |
| **Asset Maintenance/Preservation** | | | | |
| Post Sales Materials Costs | 6,000 | 6,000 | 6,000 | 6,000 |
| Common & Concession Area Maintenance | 190,000 | 187,000 | 187,000 | 174,500 |
| Electricity Bills | 334,500 | 22,000 | 22,000 | 21,500 |
| Salaries: Asset Maintenance/Preservation | 81,000 | 81,000 | 81,000 | 81,500 |
| Total Asset Maintenance/Preservation | **611,500** | **296,000** | **296,000** | **283,500** |
| **Asset Re-Positioning / Marketing Launch** | | | | |
| Advertising Creative Development | 22,000 | 16,500 | 16,500 | 16,500 |
| Media & Public Relations | 21,000 | 15,000 | 15,000 | 15,000 |
| Marketing & Sales Workproduct | 78,000 | 54,500 | 54,500 | 57,500 |
| Events/Co-Branding | 15,500 | 10,000 | 10,000 | 10,000 |
| Sales Center Misc | 25,000 | 19,500 | 19,500 | 19,500 |
| Total Asset Re-Positioning / Marketing Launch | **161,500** | **115,500** | **115,500** | **118,500** |
| **Sales & Marketing Operations (Ex Brokerage)** | | | | |
| ACRE Sales Manager & Panama Brokerage License | 14,500 | 14,500 | 14,500 | 14,500 |
| Salaries: Newland Closing Coordinators | 11,500 | 11,500 | 11,500 | 11,500 |
| Closings: Transfer Taxes/Notary Fees | 24,000 | 24,500 | 24,000 | 25,000 |
| Salaries: Legal Support for Closing | 3,000 | 3,000 | 3,000 | 3,000 |
| Re-Sales & Floor Area Ratio Reimbursements | - | - | - | 88,500 |
| Total Sales & Marketing Operations (Ex Brokerage) | **53,000** | **53,500** | **53,000** | **142,500** |
| **Newland Financial, Legal & Tax Related** | | | | |
| Trustee/Program/Banking Fees & Expenses | 17,000 | 17,000 | 17,000 | 67,000 |
| Rating Agency Fees & Expenses | - | - | - | 161,000 |
| Court Filing/US Trustee/Translation Expenses | 27,500 | 15,000 | 15,000 | 15,000 |
| Claims Agent / Ballot Tabulation Agent | 25,000 | 20,000 | 20,000 | 15,000 |
| Legal Professionals Debtor | 331,000 | 321,000 | 321,000 | 336,000 |
| Legal Professionals Steering Group | 100,000 | 100,000 | 100,000 | 100,000 |
| Legal Professionals Trustee | 15,000 | 40,000 | 40,000 | 40,000 |
| Restructuring/Financial Advisor Debtor | 5,000 | 5,000 | 5,000 | 4,000,000 |
| Financial Advisor Steering Group | 30,000 | 30,000 | 30,000 | 690,000 |
| Bulk Sale Re-Purchase Option Fees | 112,000 | 112,000 | 112,000 | 112,000 |
| Revenue & Developer Taxes | - | - | - | 60,000 |
| Total Newland Financial, Legal & Tax Related | **662,500** | **660,000** | **660,000** | **5,596,000** |
| **Newland Corporate & Administrative** | | | | |
| Salaries: Newland Officers | 19,500 | 19,500 | 19,500 | 19,500 |
| Salaries: Newland Control & Administrative | 33,500 | 33,500 | 33,500 | 33,500 |
| Salaries: Newland Sales & Marketing | 10,000 | 10,000 | 10,000 | 10,000 |
| Newland Corp & Admin Miscellaneous | 57,000 | 17,000 | 17,000 | 17,000 |
| Total Newland Corporate & Administrative | **120,000** | **80,000** | **80,000** | **80,000** |
| **Miscellaneous Cash Collateral Usage** | **50,000** | **50,000** | **50,000** | **50,000** |
| **Total** | **1,696,000** | **1,276,500** | **1,276,500** | **7,423,000** |

1 The line-item amounts as presented above shall be subject to a carry forward of any unused amounts and a carry back of future amounts, subject to parameters and variances to be reasonably agreed with the Steering Group, it being understood among the parties that (i) line-items pertaining to service providers shall have a carry forward or carry back reasonably consistent with the nature of the service provided and (ii) that variances from line-items shall not

40

FRE 408 SETTLEMENT COMMUNICATION                                      FOR DISCUSSION PURPOSES ONLY
NOT FOR DISCLOSURE                                                        PRIVILEGED AND CONFIDENTIAL

exceed a material portion of a given monthly allocation (with such materiality threshold to be agreed).

2 The budget duration shall be for such number of months as are contemplated to complete the Restructuring in accordance with the terms of the Plan Support Agreement as the same may be amended from time to time.

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 5

# FORM OF QUARTERLY REPORT OF MONTHLY DATA

## SELLOUT (UNITS CONTRACTED TO BE SOLD AND AVAILABLE UNITS)

| | | Sold or contracted to be sold | | | | | | Available | | | Total Sellout | | |
| | January | | | February | | | March | | | Total thru 1Q13 | | | as of 1Q13 | | | as of 1Q13 | | |
| | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residential Condominium Units** | | | | | | | | | | | | | | | | | | |
| One Bedroom Units | | | | | | | | | | | | | | | | | | |
| Two Bedroom Units | | | | | | | | | | | | | | | | | | |
| Three Bedroom Units | | | | | | | | | | | | | | | | | | |
| Three Bedroom combo Units | | | | | | | | | | | | | | | | | | |
| Penthouse | | | | | | | | | | | | | | | | | | |
| Curve Units | | | | | | | | | | | | | | | | | | |
| Baylofts | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | |
| **Hotel Condominium Units** | | | | | | | | | | | | | | | | | | |
| One Bedroom Suite Units | | | | | | | | | | | | | | | | | | |
| One Bedroom Curve Units | | | | | | | | | | | | | | | | | | |
| Studio Units | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | |
| **Total Residential and Hotel Units** | | | | | | | | | | | | | | | | | | |
| **Other Products** | | | | | | | | | | | | | | | | | | |
| Commercial Units | | | | | | | | | | | | | | | | | | |
| Restaurants | | | | | | | | | | | | | | | | | | |
| Offices | | | | | | | | | | | | | | | | | | |
| Spa | | | | | | | | | | | | | | | | | | |
| Casino | | | | | | | | | | | | | | | | | | |
| **Total Commercial Space** | | | | | | | | | | | | | | | | | | |
| **Total Sell Out** | | | | | | | | | | | | | | | | | | |
| Membership Fee | | | | | | | | | | | | | | | | | | |
| **TOTAL SALES PLUS MEMBERSHIPS** | | | | | | | | | | | | | | | | | | |

## TOTAL UNITS SOLD (CLOSED VS. UNCLOSED)

Mar. 31, 2013
US$ Thousands

| | Closed | | | | | | | | | | | | Unclosed | | | | | Total Sold | | |
| | January | | | February | | | March | | | as of 1Q13 | | | as of 1Q13 | | | | | | | |
| | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Receivables (US$) | Units | Sq Mtrs | Sales Amount US$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bayloft | | | | | | | | | | | | | | | | | | | |
| Condo | | | | | | | | | | | | | | | | | | | |
| Hotel | | | | | | | | | | | | | | | | | | | |
| Commercial | | | | | | | | | | | | | | | | | | | |
| Restaurant | | | | | | | | | | | | | | | | | | | |
| Office | | | | | | | | | | | | | | | | | | | |
| **Total general** | | | | | | | | | | | | | | | | | | | |

42

FRE 408 SETTLEMENT COMMUNICATION

NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY

PRIVILEGED AND CONFIDENTIAL

## COLLECTIONS

**Mar. 31, 2013**

**US$ Thousands**

|  | January | February | March | Collections YTD (US$) |
|---|---|---|---|---|
| New Sales Cash Mortgages |  |  |  |  |
| **Total** |  |  |  |  |

## NEW SALES

**Mar. 31, 2013**

**US$ Thousands**

|  | January | | | February | | | March | | | Total YTD |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | |
| Condo Hotel Commercial |  |  |  |  |  |  |  |  |  |  |
| Total |  |  |  |  |  |  |  |  |  |  |

## DEFAULTS

**Mar. 31, 2013**

**US$ Thousands**

|  | January | | | February | | | March | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ |
| Bayloft |  |  |  |  |  |  |  |  |  |  |  |  |
| Condo |  |  |  |  |  |  |  |  |  |  |  |  |
| Hotel |  |  |  |  |  |  |  |  |  |  |  |  |
| Commercial |  |  |  |  |  |  |  |  |  |  |  |  |
| Restaurant |  |  |  |  |  |  |  |  |  |  |  |  |
| Office |  |  |  |  |  |  |  |  |  |  |  |  |
| Casino |  |  |  |  |  |  |  |  |  |  |  |  |
| Total |  |  |  |  |  |  |  |  |  |  |  |  |

## DEEDS PROCESSING

43

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE
FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

**Mar. 31, 2013**

| Recording Status | January | February | March |
|---|---|---|---|
| Deed to be signed by Newland | | | |
| Deed in process with bank | | | |
| Deed in Notary office | | | |
| Deed payments procesing in public registry | | | |
| Deed to be Recorded | | | |
| RECORDED | | | |
| **Total** | | | |

## RELATED PARTY TRANSACTIONS

**Mar. 31, 2013**

**US$ Thousands**

| Date | Related Party | Relation to Newland | Counterparty | Description | Amount (US$) |
|---|---|---|---|---|---|
| | | | | | |

44

FRE 408 SETTLEMENT COMMUNICATION
NOT FOR DISCLOSURE

FOR DISCUSSION PURPOSES ONLY
PRIVILEGED AND CONFIDENTIAL

## EXHIBIT 6

## INDIVIDUALS WORKING FOR NEWLAND EMPLOYED BY ARIAS SERNA SARAVIA

| NAME | Position |
|------|----------|
| Andres Romero | IT |
| Carlos Saravia | COO |
| Catalina Rodriguez | CFO |
| Evelin Cardenas | Accounting assistant |
| Flor Leon | Deed process coordinator |
| Francisco Franco | Technical office Director |
| Juan Cruz | Inhouse lawyer |
| Juan Sierra | Financial Planner |
| Luis Serna | ASyS Construction Manager |
| Rafael Rojas | Deliveries and post sales coordinator |
| Rosella Violi | Sales Director |
| Soraya Avendaño | Accounting Director |
| Yenny Robayo | Financial Assistant |

## Exhibit B

## Joinder Agreement

The undersigned transferee (the "Transferee") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of January __, 2013 (the "Agreement"), by and among Newland and the Initial Supporting Noteholders (each as defined therein), and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed an Initial Supporting Noteholder under the terms of the Agreement.

Date Executed: _____ __, 2013

**TRANSFEREE**

Name of Institution:

By:

Name:

Telephone:

Principal Amount of Notes Held:

With a Copy to: