## Exhibit A

**NEWLAND INTERNATIONAL PROPERTIES, CORP.**

**9.50% SENIOR SECURED NOTES DUE 2017**

_____

**INDENTURE**

**Dated as of [\*], 2013**

_____

**CSC TRUST COMPANY OF DELAWARE**

**Trustee**

_____

# TABLE OF CONTENTS

<u>Page</u>

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ............................... 2

    Section 1.01    Definitions. ............................................................................... 2
    Section 1.02    Rules of Construction. ........................................................... 22

ARTICLE 2 THE NOTES ................................................................................ 22

    Section 2.01    Form and Dating. ................................................................... 22
    Section 2.02    Execution and Authentication. ............................................... 23
    Section 2.03    Registrar and Paying Agent. ................................................... 24
    Section 2.04    Paying Agent To Hold Money in Trust. .................................. 24
    Section 2.05    Holder Lists. .......................................................................... 25
    Section 2.06    Transfer and Exchange. ......................................................... 25
    Section 2.07    Replacement Notes. ............................................................... 32
    Section 2.08    Outstanding Notes. ................................................................ 32
    Section 2.09    Treasury Notes. ..................................................................... 32
    Section 2.10    Temporary Notes. .................................................................. 32
    Section 2.11    Cancellation. ......................................................................... 33
    Section 2.12    Defaulted Interest. ................................................................. 33
    Section 2.13    Notes Listed on Panama Stock Exchange. .............................. 33

ARTICLE 3 REDEMPTION AND PREPAYMENT .................................................. 34

    Section 3.01    Notices to Trustee. ................................................................ 34
    Section 3.02    Selection of Notes To Be Redeemed or Purchased. ............... 34
    Section 3.03    Notice of Redemption. ........................................................... 35
    Section 3.04    Effect of Notice of Redemption. ............................................ 36
    Section 3.05    Deposit of Redemption or Purchase Price. ............................ 36
    Section 3.06    Notes Redeemed or Purchased in Part. .................................. 36
    Section 3.07    Optional Redemption. ............................................................ 36
    Section 3.08    Reserved. ............................................................................... 37
    Section 3.09    Mandatory Prepayment for Prime Unit Sales. ....................... 37
    Section 3.10    Open Market Repurchases. .................................................... 37

ARTICLE 4 COVENANTS ............................................................................... 38

    Section 4.01    Payment of Notes. ................................................................. 38
    Section 4.02    Maintenance of Office or Agency. ......................................... 38
    Section 4.03    Reports. ................................................................................. 39
    Section 4.04    Compliance Certificate. ......................................................... 40
    Section 4.05    Taxes. .................................................................................... 40
    Section 4.06    Stay, Extension and Usury Laws. .......................................... 40
    Section 4.07    Restricted Payments. ............................................................. 40

# TABLE OF CONTENTS
## (continued)

Section 4.08       Reserved..............................................................................................41
Section 4.09       Incurrence of Indebtedness. ...............................................................41
Section 4.10       Asset Sales. .........................................................................................41
Section 4.11       Transactions with Affiliates.................................................................42
Section 4.12       Liens.....................................................................................................43
Section 4.13       Business Activities...............................................................................44
Section 4.14       Corporate Existence. ...........................................................................44
Section 4.15       Reserved. .............................................................................................44
Section 4.16       No Layering of Indebtedness. ..............................................................44
Section 4.17       Limitation on Sale and Leaseback Transactions...................................44
Section 4.18       Payments for Consent. .........................................................................44
Section 4.19       Reserved. .............................................................................................45
Section 4.20       Reserved. .............................................................................................45
Section 4.21       Additional Amounts..............................................................................45
Section 4.22       Reserved. .............................................................................................46
Section 4.23       Unit Purchase Agreements....................................................................46
Section 4.24       Insurance. .............................................................................................47
Section 4.25       Accounts. .............................................................................................47
Section 4.26       Subsidiaries. .........................................................................................47
Section 4.27       Seller Financing. ..................................................................................48
Section 4.28       Bulk 2 Refinancing. .............................................................................49
Section 4.29       Sale, Encumbrance, Lease of Collateral. .............................................49
Section 4.30       Noteholder Representative Requirements..............................................49
Section 4.31       Senior Officer Requirements and Corporate Governance
                   Requirements. ......................................................................................49
Section 4.32       Revenue Streams...................................................................................50
Section 4.33       Minimum Pricing Level ........................................................................50
Section 4.34       Monthly Working Capital .....................................................................50
Section 4.35       Casino Buyer Mortgage .......................................................................51
Section 4.36       CEO Approval of Unit Sales.................................................................51
Section 4.37       Ratings .................................................................................................51
Section 4.38       Delivery of Certifications to Licensor. .................................................51

ARTICLE 5 SUCCESSORS.............................................................................................51

Section 5.01       Merger, Consolidation or Sale of Assets. .............................................51
Section 5.02       Successor Corporation Substituted. ......................................................52

ARTICLE 6 DEFAULTS AND REMEDIES......................................................................52

Section 6.01       Events of Default. .................................................................................52
Section 6.02       Acceleration. ........................................................................................54
Section 6.03       Other Remedies.....................................................................................54
Section 6.04       Waiver of Past Defaults. .......................................................................54

# TABLE OF CONTENTS
**(continued)**

Page

Section 6.05     Control by Majority. ........................................................................ 55
Section 6.06     Limitation on Suits. ......................................................................... 55
Section 6.07     Rights of Holders of Notes To Receive Payment. .................................... 55
Section 6.08     Collection Suit by Trustee. ................................................................. 55
Section 6.09     Trustee May File Proofs of Claim. ....................................................... 56
Section 6.10     Priorities. ...................................................................................... 56
Section 6.11     Undertaking for Costs. ...................................................................... 57
Section 6.12     Foreclosure. .................................................................................... 57

ARTICLE 7 TRUSTEE ........................................................................................ 57

Section 7.01     Duties of Trustee. ............................................................................ 57
Section 7.02     Rights of Trustee. ............................................................................ 58
Section 7.03     Individual Rights of Trustee. .............................................................. 60
Section 7.04     Trustee's Disclaimer. ....................................................................... 60
Section 7.05     Notice of Defaults. ........................................................................... 61
Section 7.06     Entry into NDA. .............................................................................. 61
Section 7.07     Compensation and Indemnity. ............................................................ 61
Section 7.08     Replacement of Trustee. .................................................................... 62
Section 7.09     Successor Trustee by Merger, etc. ....................................................... 63
Section 7.10     Eligibility; Disqualification. ............................................................... 63
Section 7.11     Separate Trustees and Co-Trustees. ...................................................... 63
Section 7.12     TOC Casino Transaction and Registration of Certain Unit Purchase
                 Agreements Related to Sale of Casino. ................................................. 65

ARTICLE 8 LEGAL DEFEASANCE AND COVENANT DEFEASANCE ............................ 66

Section 8.01     Option To Effect Legal Defeasance or Covenant Defeasance. .................... 66
Section 8.02     Legal Defeasance and Discharge. ......................................................... 66
Section 8.03     Covenant Defeasance. ....................................................................... 67
Section 8.04     Conditions to Legal or Covenant Defeasance. ......................................... 67
Section 8.05     Deposited Money and Government Obligations To Be Held in
                 Trust; Other Miscellaneous Provisions. ................................................ 68
Section 8.06     Repayment to Company. .................................................................... 69
Section 8.07     Reinstatement. ................................................................................ 69

ARTICLE 9 AMENDMENT, SUPPLEMENT AND WAIVER .......................................... 70

Section 9.01     Without Consent of Holders of Notes. ................................................... 70
Section 9.02     With Consent of Holders of Notes. ....................................................... 71
Section 9.03     Revocation and Effect of Consents. ...................................................... 72
Section 9.04     Notation on or Exchange of Notes. ....................................................... 72
Section 9.05     Trustee To Sign Amendments, etc. ....................................................... 72
Section 9.06     Additional Consents. ........................................................................ 73

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE 10 ACCOUNTS, RELEASES AND DISBURSEMENTS ........................................ 73

Section 10.01    Panama Closing Account and Panama Account. ...................................... 73
Section 10.02    Panama Account Priority of Payments. ................................................... 74
Section 10.03    Release Account and Collection Account ................................................ 76
Section 10.04    Priority of Payments from, and Reserves in, the Collection
Account ...................................................................................................... 77

ARTICLE 11 COLLATERAL, SECURITY AND LIMITED FINANCIAL
GUARANTEE ................................................................................................................... 79

Section 11.01    Security Interest. ..................................................................................... 79
Section 11.02    Receivables. ............................................................................................ 80
Section 11.03    Recordings and Opinion. ........................................................................ 80
Section 11.04    Release of Subject Properties. ................................................................ 81
Section 11.05    Limited Financial Guarantee. ................................................................. 81

ARTICLE 12 RESERVED ................................................................................................. 82

ARTICLE 13 SATISFACTION AND DISCHARGE ....................................................... 82

Section 13.01    Satisfaction and Discharge. .................................................................... 82
Section 13.02    Application of Trust Money ................................................................... 83

ARTICLE 14 MISCELLANEOUS .................................................................................... 83

Section 14.01    Notices. ................................................................................................... 83
Section 14.02    Certificate and Opinion as to Conditions Precedent. ............................ 85
Section 14.03    Statements Required in Certificate or Opinion. ..................................... 85
Section 14.04    Rules by Trustee and Agents. ................................................................. 85
Section 14.05    No Personal Liability of Directors, Officers, Employees and
Stockholders ............................................................................................. 85
Section 14.06    Governing Law. ...................................................................................... 86
Section 14.07    Jurisdiction. ............................................................................................ 86
Section 14.08    Process Agent. ........................................................................................ 86
Section 14.09    Immunity. ................................................................................................ 87
Section 14.10    No Adverse Interpretation of Other Agreements. .................................. 87
Section 14.11    Successors. .............................................................................................. 87
Section 14.12    Severability. ............................................................................................ 87
Section 14.13    Counterpart Originals. ............................................................................ 87
Section 14.14    Table of Contents, Headings, etc. .......................................................... 87
Section 14.15    Currency Indemnity. ............................................................................... 87
Section 14.16    Currency Calculation. ............................................................................. 88

## EXHIBITS

Exhibit A    FORM OF GLOBAL NOTE
Exhibit B    FORM OF CERTIFICATE OF TRANSFER
Exhibit C    FORMS OF UNIT PURCHASE AGREEMENTS
Exhibit D    FORM OF CERTIFICATION REQUESTING RELEASE OF COLLATERAL
Exhibit E    FORM OF COMPANY CERTIFICATION FOR ADDITIONAL
             CONTRIBUTIONS
Exhibit F    FORM OF NOTICE ASSIGNING THE RECEIVABLES
Exhibit G    FORM OF BROKERS' COMMISSIONS AND PROPERTY TRANSFER FEES
             INSTRUCTION CERTIFICATION
Exhibit H    FORM OF BROKERS' COMMISSIONS AND PROPERTY TRANSFER FEES
             PAYMENT INSTRUCTIONS
Exhibit I    FORM OF CASINO UPA REGISTRATION CONSENT
Exhibit J    FORM OF CASINO UPA CANCELLATION CONSENT
Exhibit K    FORM OF NOTEHOLDER REPRESENTATIVE CERTIFICATION
Exhibit L    FORM OF QUARTERLY REPORTING EXHIBIT
Exhibit M    FORM OF PANAMA ACCOUNT PRIORITY OF PAYMENTS
             CERTIFICATION
Exhibit N    MONTHLY WORKING CAPITAL
Exhibit O    FORM OF STOCK PLEDGE AGREEMENT
Exhibit P    FORM OF LIMITED FINANCIAL GUARANTEE
Exhibit Q    FORM OF NON-DISTURBANCE AGREEMENT
Exhibit R    LIST OF DOCUMENTATION TO BE EXECUTED BY THE TRUSTEE
Exhibit S    FORM OF RELEASE ACCOUNT AND COLLECTION ACCOUNT
             CERTIFICATION

## SCHEDULES

Schedule 1    Agreements in Effect on the date of this Indenture
Schedule 2    Senior Officer Appointments, Corporate Governance Requirements and
              Noteholder Representative Requirements

INDENTURE dated as of [*], 2013 between Newland International Properties, Corp., a company organized under the laws of the Republic of Panama (the "Company") and CSC Trust Company of Delaware, a Delaware corporation, not in its individual capacity, but solely as trustee (the "Trustee").

## WITNESSETH THAT:

The Company is duly authorized to execute and deliver this Indenture to provide for the issuance of the Company's 9.50% Senior Secured Notes due 2017 (the "Notes") as provided in this Indenture.  All covenants and agreements made by the Company, if any, herein are for the benefit and security of the Holders (as defined herein) and the Trustee.  The Company is entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

The Notes are being issued pursuant to a pre-packaged Chapter 11 bankruptcy plan (the "Pre-Packaged Plan") that provides for the cancellation of the Company's existing 9.50% Senior Secured Notes due 2014 (the "Existing Notes") and the indenture governing the Existing Notes, dated as of November 7, 2007, as supplemented by the first, second, third, fourth and fifth supplements thereto, in each case by and among the Company and HSBC Bank USA, N.A. as trustee thereunder, in exchange for the Notes issued hereby.

All things necessary to make this Indenture a valid agreement of the Company in accordance with its terms have been done.

## GRANTING CLAUSE

The Company hereby grants to the Trustee at the Closing Date, for the benefit and security of the Holders, all of the Company's right, title and interest in and to, whether now existing or hereafter created, but subject to the lien of the Co-Trustee set forth below, (i) the Subject Properties, (ii) the Receivables, (iii) the Accounts and all Eligible Investments on deposit therein, (iv) the Trump License Agreement, (v) the Company's rights to all other revenues arising from the operation of the Project, including, without limitation, any and all revenues arising from the operation, sale or lease of the Casino and the hotel, restaurants and spa, and any leases relating thereto, as well as any and all of the Company's rights to the Beach Club, the BC Ferry, BC Ferry Payment and the BC Senior Loan, as applicable; (vi) all Company deposit accounts (including any new deposit accounts opened on or after the date hereof); (vii) any assets or revenue streams due to the Company and rights or licenses to which the Company is a party (to the extent permitted by the terms of such right or license); and (viii) all proceeds of the foregoing (collectively, with the collateral granted under the Stock Pledge and the assignment of the Noteholder Swing Vote, the "Collateral").

In furtherance of the foregoing grants and to better secure them under the laws of the Republic of Panama, the Company also grants a first priority lien on: (a) the Subject Properties, the Receivables, the Panama Closing Account (excluding the Brokers' Commissions therein from time to time), the Panama Account, [the Corporate Accounts,] and all proceeds of the foregoing, to the Co-Trustee, on behalf of the Holders of the Notes and (b) any and all of the Company's rights to the BC Ferry, BC Ferry Payment and the BC Senior Loan, as applicable, to

the Co-Trustee, pursuant to Panama Law on behalf of the Holders of the Notes. The Collateral that is not pledged to the Co-Trustee shall be pledged directly to the Trustee on behalf of the Holders of the Notes.

The Company also grants to the Trustee and the Co-Trustee, as applicable, a first priority security interest in or first Mortgage (as defined herein) on the Subject Properties to secure the payment of all obligations of the Company under this Indenture and the Notes, which grant to the Co-Trustee, of a Mortgage on the Subject Properties shall be by way of assignment of, and any necessary conforming amendment to, the existing mortgage on the subject properties under the indenture for the Existing Notes, such that the first priority security interest on the existing mortgage on the subject properties under the indenture for the Existing Notes remains in place and unencumbered.

The foregoing grants are made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The Trustee, as trustee on behalf of the Holders, acknowledges such grants, accepts the trust under this Indenture in accordance with the provisions hereof and agrees to perform its duties as Trustee as required herein.

**ARTICLE 1**

**DEFINITIONS AND INCORPORATION
BY REFERENCE**

**Section 1.01   Definitions.**

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture.

"**Additional Amounts**" has the meaning assigned to it in Section 4.21 of this Indenture.

"**Accounts**" means the Panama Closing Account, the Panama Account, the Release Account, the Collection Account and the Corporate Accounts and such other deposit accounts opened by the Company, with the consent of, and subject to the lien of, the Trustee.

"**Affiliates**" means all direct and indirect subsidiaries, parents, or affiliates (which term "affiliate" shall mean any entity or person controlling, controlled by, under common control with such person or entity) of a given person or entity.

"**Affiliate Transaction**" has the meaning assigned to it in Section 4.11 of this Indenture.

"**Agent**" means any Registrar, co-registrar, authenticating agent, Paying Agent or additional paying agent

"**Ancillary Unit**" has the meaning assigned to it in Section 7.12 of this Indenture.

"**Ancillary Unit Loan**" has the meaning assigned to it in Section 7.12 of this Indenture.

"**Applicable Procedures**" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Latinclear, Euroclear and Clearstream that apply to such transfer or exchange.

"**Asset Sale**" means (i) the transfer, sale, lease, conveyance or other disposition of any assets or rights; provided that the sale, conveyance or other disposition of all or substantially all of the assets of the Company will be governed by the provisions of this Indenture and the Notes described in Section 5.01 of this Indenture and not by the provisions of Section 4.10 of this Indenture, and (ii) the sale of Equity Interests in any Person.

Notwithstanding the preceding paragraph, none of the following items will be deemed to be an Asset Sale:

(a)      any sale of real property pursuant to a Unit Purchase Agreement;

(b)      any single transaction or series of related transactions that involves assets other than real property having a Fair Market Value of less than $1.0 million;

(c)      the sale or lease of products, services, accounts receivable or other assets (other than real property) in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets in the ordinary course of business;

(d)      the sale or other disposition of cash or Cash Equivalents;

(e)      the granting of Liens not otherwise prohibited by this Indenture and the Notes;

(f)      surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims;

(g)      transactions permitted under Section 5.01 of this Indenture;

(h)      the licensing or sublicensing of intellectual property or other general intangibles and licenses, leases or subleases of other property (other than real property); and

(i)      a Prime Unit Sale;

(j)      the BC Ferry Payment;

(k)      the BC Senior Loan;

(l)      the TOC Casino Transaction and Ancillary Unit sales in connection therewith;

(m)      the Contadora Island Sale; and

(n)      a Restricted Payment that does not violate Section 4.07 of this Indenture or a Permitted Investment.

3

"**Attributable Debt**" in respect of a sale and leaseback transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with IFRS; provided, however, that if such sale and leaseback transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligation."

"**Authentication Order**" has the meaning assigned to it in Section 2.02 of this Indenture.

"**Bankruptcy Law**" means any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including, without limitation, the United States Bankruptcy Code, Title 11 of the United States Code, as amended, and any similar law of the Republic of Panama for the relief of debtors.

"**BC Ferry**" has the meaning assigned to it in the definition of BC Ferry Payment.

"**BC Ferry Payment**" means an amount up to $1.25 million which may be used by the Company toward the purchase of a ferry (the "BC Ferry") or for any approved transportation solution to transport residents to and from the Beach Club constructed in connection with the Project.

"**BC Senior Loan**" means a loan from the Company to Ocean Club Pearl Island Corp., in connection with the land and related improvements for a beach club currently being constructed on Isla Viveros in the Pearl Islands archipelago of Panama (the "Beach Club") and its subsequent operations.

"**BC Senior Loan Reserve Amount**" and "**BC Ferry Payment Reserve Amount**" has the meaning assigned to it in Section 10.04(c) of this Indenture.

"**Beach Club**" has the meaning assigned to it in the definition of BC Senior Loan.

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "Beneficially Owns" and "Beneficially Owned" have a corresponding meaning.

"**Board**" and "**Board of Directors**" means:

(a)      with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

4

(b)        with respect to a partnership, the Board of Directors of the general partner of the partnership;

(c)        with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(d)        with respect to any other Person, the board or committee of such Person serving a similar function.

Unless the context otherwise requires, "Board" and "Board of Directors" shall mean the board of directors of the Company.

"**Brokers' Commissions**" means, in respect of each Unit Purchase Agreement, the amount of the full purchase price under such Unit Purchase Agreement required to cover the brokerage commissions (including any gross-up for value added or sales tax levied in Panama on such brokerage commissions) due or that will be due in respect of the transfer of the respective Unit.  Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and thereafter all remaining payments under such Unit Purchase Agreement will be attributed to Newland Unit Proceeds.  Notwithstanding the foregoing, the Brokers' Commissions for the TOC Casino Transaction shall include any investment banking and advisory fees of the Company related to the TOC Casino Transaction.  For the further avoidance of doubt, amounts shall be treated as Brokers' Commissions only for so long as the relevant broker or brokers remain entitled to such payments at a future date upon the satisfaction of the conditions to the payment of their commissions, and in any event where a broker or brokers lose such entitlement the related Brokers' Commissions shall be thereafter treated as Newland Unit Proceeds.

"**Bulk 2 Repurchase Amount**" shall mean as of any date the outstanding amount of the Bulk 2 Repurchase Option (if fully exercised) as adjusted from time to time. The Bulk 2 Repurchase Amount shall be zero once it is paid in full or otherwise expires.

"**Bulk 2 Repurchase Option**" means the option to purchase some or all of the units under that certain Purchase Option Agreement between Global Realty Investments, S.A. and Newland International Properties Corp., dated as of July 13, 2011.

"**Bulk 2 Repurchase Reserve Amount**" has the meaning assigned to it in Section 10.04(d) of this Indenture.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which banking institutions or trust companies in New York, New York, Wilmington, Delaware, Panama City, the Republic of Panama or the location of the corporate trust office of the Trustee are authorized or required by law to be closed.

"**Capital Lease Obligation**" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet in accordance with IFRS, and the Stated Maturity thereof shall be

the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"**Capital Stock**" means:

(a)     in the case of a corporation, corporate stock or other equivalents (however designated);

(b)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(d)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Cash Equivalents**" means:

(a)     United States dollars;

(b)     securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities);

(c)     certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or bankers' acceptances, in each case with any U.S. commercial bank having capital and surplus in excess of $500.0 million and a Thomson Bank Watch Rating of "B" or better;

(d)     repurchase obligations with a term of not more than ten days for underlying securities of the types described in clauses (2) and (3) above and clause (6) below entered into with any financial institution meeting the qualifications specified in clause (3) above;

(e)     commercial paper, at the time of acquisitions, having one of the two highest ratings obtainable from Moody's Investors Service, Inc. or Standard & Poor's Ratings Services;

(f)     marketable general obligations issued by any State of the United States of America or any political subdivision of any such State or any public instrumentality thereof and, at the time of acquisition, having one of the two highest ratings obtainable from Moody's Investors Service, Inc. or Standard & Poor's Ratings Services;

(g)     interests in any investment company or money market fund at least 95% of the assets of which constitute instruments of the kinds described in clauses (a) through (f) above; and

(h)     any demand, money market fund, common trust fund or time deposit or obligation, or interest-bearing or other security or investment not set forth in clauses (a) through

(g) above, rated in the highest rating category by a Rating Agency (if rated by such Rating Agency). Such investments in this subsection (h) may include money market mutual funds or common trust funds for which the Trustee, or an affiliate thereof, serves as an investment advisor, administrator, shareholder servicing agent, and/or custodian or subcustodian, notwithstanding that (i) the Trustee or an affiliate thereof charges and collects fees and expenses from such funds for services rendered, (ii) the Trustee or an affiliate thereof charges and collects fees and expenses for services rendered pursuant to this Indenture, and (iii) services performed for such funds and pursuant to this Indenture may converge at any time.   The Company specifically authorizes the Trustee or an affiliate thereof to charge and collect from the trust fund such fees as are collected from all investors in such funds for services rendered to such funds (but not to exceed investment earnings thereon);

and, in the case of each of clauses (b) through (h) above, maturing not later than the next Payment Date.

"**Casino**" means the casino being developed as part of the Project.

"**Casino Buyer**" has the meaning assigned to it in Section 7.12 of this Indenture.

"**Casino Buyer Mortgage**" has the meaning assigned to it in Section 7.12 of this Indenture.

"**Clearstream**" means Clearstream Banking, S.A.

"**Collateral**" has the meaning set forth in the Granting Clause of this Indenture.

"**Collateral Assignment Agreement**" means the collateral assignment agreement dated the date hereof and which creates a security interest under Panamanian law over any and all of the Issuer's rights in the Beach Club, BC Ferry, BC Ferry Payment, BC Senior Loan, the Casino Buyer Mortgage and any Seller Financing Mortgage.

"**Collection Account**" has the meaning assigned to it in Section 10.03(b) of this Indenture.

"**Commission**" means the United States Securities and Exchange Commission.

"**Company**" means Newland International Properties, Corp., and any and all successors thereto.

"**Consolidated Net Worth**" means, with respect to any Person at any date of determination, the consolidated stockholders' equity represented by the shares of such Person's capitalized stock outstanding as of such date, as determined on a consolidated basis.

"**Contadora Island Sale**" means the sale of all or a portion of Contadora Island by the Company.

"**Contingency Amounts**" has the meaning assigned to it in Section 10.04(e) of this Indenture.

"**Contingency Events**" has the meaning assigned to it in Section 10.04(e) of this Indenture.

"**Contingency Reserve Amount**" has the meaning assigned to it in Section 10.04(e) of this Indenture.

"**Corporate Accounts**" means the corporate deposit accounts of the Company maintained in Panama [and subject to the lien of the Co-Trustee].

"**Corporate Trust Office of the Trustee**" will be at the address of the Trustee specified in Section 14.01 hereof or such other address as to which the Trustee may give notice to the Company.

"**Co-Trustee**" means Global Financial Funds Corp., a banking institution organized under the laws of Panama and subsidiary of Global Bank Corporation.

"**Co-Trustee Agreement**" means the Amended and Restated Agreement of Appointment and Acceptance of Co-Trustee, dated as of [*], 2013, among the Company, the Trustee, Co-Trustee, HSBC Bank USA, N.A. and HSBC Investment Corporation (Panama) S.A.

"**Covenant Defeasance**" has the meaning assigned to it in Section 8.03 of this Indenture.

"**Custodian**" means the Trustee, as custodian for the Depositary or its nominee with respect to the Notes in global form, or any successor entity thereto.

"**Debt Service**" shall mean, as to any Payment Date, the amount of interest, Additional Amounts (if any), and of principal in respect of the Minimum Scheduled Amortization Amount (after adjustments to such amount resulting from any prior Optional Redemptions, Open Market Purchases, Supplemental Amortizations and Mandatory Prepayments up to and excluding such Determination Date) due on the Notes on such Payment Date.

"**Debt Service Reserve Amount**" has the meaning assigned to it in Section 10.04(f) of this Indenture.

"**Default**" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"**Default Interest**" has the meaning assigned to it in Section 10.02(b) of this Indenture.

"**Definitive Note**" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"**Depositary**" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"**Determination Date**" shall be the 5th Business Day prior to a Principal Payment Date.

"**Disbursement Date**" has the meaning assigned to it in Section 10.04(a) of this Indenture.

"**DTC**" has the meaning assigned to it in Section 2.03 of this Indenture.

"**Eligible Investments**" means (i) Cash Equivalents and (ii) securities issued by the government of the United States or the Republic of Panama, in each case having maturities not less than 180 days before the final Payment Date.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**Equity Offering**" means any public or private issuance or sale of Equity Interests of the Company.

"**Euroclear**" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system.

"**Event of Default**" has the meaning assigned to it in Section 6.01 of this Indenture.

"**Exchange Act**" has the meaning assigned to it in the recitals hereof.

"**Existing Notes**" has the meaning assigned to it in the recitals hereof.

"**Expense Payment Date**" means the last Wednesday of each calendar month (or if such day is not a Business Day, on the next succeeding Business Day).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Fair Market Value**" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company (unless otherwise provided in this Indenture and the Notes); provided that no such determination shall be required to be made by the Board of Directors in respect of any transaction (or series of related transactions) which involves, in the good faith determination of an officer of the Company, less than $1.0 million.

"**Fitch**" means Fitch Ratings and any successor or successors thereto.

"**Global Note Legend**" means the legend set forth in Section 2.06(f)(2), which is required to be placed on all Global Notes issued under this Indenture.

"**Global Notes**" means, individually and collectively, each of the Restricted Global Note and the Regulation S Global Note deposited with or on behalf of and registered in the name of the Depository or its nominee, substantially in the form of Exhibit A hereto and that bears the

Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.02 or 2.06(h) hereof.

"**Government Obligations**" means direct obligations of, or obligations guaranteed by, the United States of America for the payment of which guarantees or obligations the full faith and credit of the United States is pledged.

"**Guarantee**" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"**Holder**" means a Person in whose name a Note is registered.

"**IFRS**" means the International Financial Reporting Standards and applicable accounting requirements published by the International Accounting Standards Board, as in effect from time to time.

"**Incur**" has the meaning assigned to it in Section 4.09 of this Indenture.

"**Indebtedness**" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

(a)       in respect of borrowed money;

(b)       evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(c)       in respect of banker's acceptances;

(d)       representing Capital Lease Obligations or Attributable Debt in respect of sale and leaseback transactions; or

(e)       representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed.

if and to the extent any of the preceding items (other than letters of credit and Attributable Debt) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with IFRS. In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.

The amount of any Indebtedness outstanding as of any date will be (i) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; (ii) the

principal amount of the Indebtedness, in the case of any other Indebtedness; and (iii) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of (a) the Fair Market Value of such assets at the date of determination and (b) the amount of the Indebtedness of the other Person.

"**Indenture**" means this Indenture, as amended or supplemented from time to time in accordance with its terms.

"**Indirect Participant**" means a Person who holds a beneficial interest in a Global Note through a Participant.

"**Insurance Proceeds**" means any proceeds payable under an insurance policy as to which the Company or the Trustee is primary beneficiary or loss payee thereunder based upon a claim thereunder relating to a Subject Property.

"**Interest Payment Date**" means each [*] and [*], commencing on [*], 2013, which are the semi-annual payment dates on which interest accruing on the Notes will be payable in arrears.

"**Investment**" means, with respect to any Person, any direct or indirect investment by such Person in other Persons (including Affiliates) in the form of loans (including Guarantees and other obligations, other than advances to customers in the ordinary course of business that are recorded as accounts receivable), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with IFRS. The acquisition by the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person in such third Person in an amount determined as provided in the final paragraph of the covenant described above under Section 4.07 of this Indenture. Except as otherwise provided in this Indenture and the Notes, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"**Latinclear**" means Central Latinoamericana de Valores, S.A., a company organized under the laws of the Republic of Panama and a clearing house that is a participant in Clearstream.

"**Legal Defeasance**" has the meaning assigned to it in Section 8.02 of this Indenture.

"**Licensor**" means the licensor, Trump Marks Panama LLC.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell, give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"**Limited Financial Guarantee**" has the meaning assigned to it in Section 11.05 of this Indenture.

"**Majority Holders**" means the Holders of a majority in principal amount of the outstanding Notes.

"**Majority Owners**" means beneficial holders of the Notes who have a beneficial interest through the registered Holder in a majority in aggregate principal amount of the Notes then outstanding.

"**Mandatory Prepayment**" has the meaning assigned to it in Section 3.09 of this Indenture.

"**Mandatory Prepayment Date**" has the meaning assigned to it in Section 3.09(a) of this Indenture.

"**Monthly Accrued Fee Payment Amount**" has the meaning assigned to it in Section 10.02(b) of this Indenture.

"**Monthly Collection Period**" means the period beginning on and including the first day of each month, to but not including the first day of the next succeeding month; in the case of the first such period, [*insert Effective Date*], to but not including the first day of the next succeeding month.

"**Monthly Working Capital Amount**" has the meaning assigned to it in Section 10.03(c) of this Indenture.

"**Monthly Working Capital Reserve Amount**" has the meaning assigned to it in Section 10.04(g) of this Indenture.

"**Moody's**" means Moody's Investors Service, Inc. and any successor or successors thereto.

"**Mortgage**" means the (i) real property mortgage (*contrato de primera hipoteca y anticresis*) dated November 19, 2007 executed under public deed number 28,523 and registered in the Mortgage Section of the Panamanian Public Registry at Microjacket number 414457 and Document Redi number 1248229, as has been amended from time to time which was executed by the Company in favor of HSBC Investment Corporation (Panama) S.A., in its capacity as co-trustee and as agent of HSBC Bank USA, N.A. under the indenture for the Existing Notes pursuant to which the Company granted a mortgage over the Subject Properties to secure the payment and performance of its obligations under the indenture for the Existing Notes and the Existing Notes; and (ii) the amendment to be executed as of the date of the Co-Trustee Agreement, in the form attached as Exhibit B to the Co-Trustee Agreement, under which the existing mortgage is transferred to the Co-Trustee, by way of assignment of, and any necessary conforming amendment to, including amending the secured obligations to include the Notes, such that the first priority security interest on the existing mortgage on the collateral under the indenture for the Existing Notes remains in place and unencumbered.

"**MTA Agreement**" means the agreement dated January 16, 2013 among Marvin Traub Associates ("MTA") and the Company which, among other things, provides for an amount payable to MTA by the Company based on certain amounts paid and payable by the Company to Trump in respect of the Trump License Agreement, as such may be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

"**MTA Reserved Amount**" shall mean as of any date an amount equal to the sum of all payments made to Marvin Traub Associates by or on behalf of the Company in respect of the Trump Reference Payments.

"**MWC Budget**" has the meaning assigned to it in Section 10.03 of this Indenture.

"**NDA**" has the meaning assigned to it in Section 7.06 of this Indenture.

"**Newland Unit Proceeds**" means, in respect of a Unit Purchase Agreement, the total of all initial and subsequent deposits and installments (i.e., the purchase price) for a Unit under such Unit Purchase Agreement, less the Brokers' Commissions and Property Transfer Fees in respect of such Unit. Under each Unit Purchase Agreement, the first payments, up to the full amount of the Brokers' Commissions and Property Transfer Fees that will be due in respect of such Unit Purchase Agreement, made by the buyer in respect of the purchase price thereunder will be attributed to Brokers' Commissions and Property Transfer Fees and thereafter all remaining payments will be attributable to Newland Unit Proceeds. Notwithstanding the foregoing, the Brokers' Commissions and Property Transfer Fees for the TOC Casino Transaction shall include any investment banking and advisory fees of the Company related to the TOC Casino Transaction.

"**Net Proceeds**" shall mean the aggregate cash proceeds received by the Company in respect of any Prime Unit Sale, including in respect of any installment payment for such Prime Unit Sale, net of the commercially reasonable direct costs related to such Prime Unit Sale required to be paid by the Company, including, without limitation, legal and accounting expenses of the Company, applicable Licensor license fees, the TOC Casino BC Loan Amount, investment banking or advisory fees of the Company and other Brokers' Commissions, taxes paid or payable directly attributable to the Prime Unit Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, any reserve for adjustment in respect of performance obligations assumed by the Company in connection with the agreed sale price of such Prime Unit or Prime Units and any reserve for adjustment in respect of the sale price of such Prime Unit or Prime Units (in all cases until such reserve is released), and in all cases above established in accordance with IFRS and applicable Panamanian regulations.

"**Non-Recourse Debt**" means Indebtedness:

(a)      as to which the Company (a) does not provide credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is not directly or indirectly liable as a guarantor or otherwise, or (c) does not constitute the lender;

(b)      no default with respect to which would permit upon notice, lapse of time or both any holder of any other Indebtedness (other than the Notes) of the Company to declare a default

on such other Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity; and

(c)     as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Company.

"**Noteholder Representative**" has the meaning given to it in Schedule 2 hereto.

"**Noteholder Swing Vote**" has the meaning given to it in Schedule 2 hereto.

"**Noteholders' Board Nominee**" has the meaning given to it in Schedule 2 hereto.

"**Note Rate**" means 9.50% per annum.

"**Notes**" has the meaning assigned to it in the recitals to this Indenture.

"**Obligations**" means any principal, interest, penalties, fees, expenses, indemnifications, reimbursements (including without limitation, reimbursement for legal fees and expenses), damages and other liabilities payable under the documentation governing any Indebtedness.

"**Officer**" means, with respect to any Person, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, the Chief Accounting Officer or the General Counsel of such Person.

"**Officers' Certificate**" means a certificate signed on behalf of the Company by two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Company, that meets the requirements of Section 14.03 hereof.

"**Opinion of Counsel**" means, with respect to any matter, a written legal opinion addressed to the Trustee and each Rating Agency, in form and substance reasonably satisfactory to each addressee thereof, that meets the requirements of Section 14.03 hereof, from an outside counsel nationally recognized in such counsel's jurisdiction and experienced in such matters.

"**Panama Account**" means the account maintained by the Co-Trustee at the Co-Trustee or an affiliate thereof into which all Newland Unit Proceeds will be transferred from the Panama Closing Account twice weekly and into which  all Non-UPA Revenues (as defined in Section 4.32 of this Indenture) shall be deposited.

"**Panama Closing Account**" means the account maintained by the Co-Trustee at the Co-Trustee or an affiliate thereof into which payments on Receivables in connection with Unit Purchase Agreements shall be deposited and Brokers' Commissions as well as Property Transfer Fees shall be paid from and into which all Net Proceeds from Prime Unit Sales shall be deposited.

"**Panama Account Priority of Payments**" has the meaning assigned to it in Section 10.02(a) of this Indenture

"**Pari Passu Debt**" means:

(a)      all senior Indebtedness of the Company ranking pari passu with the Notes;

(b)      any other Indebtedness of the Company permitted to be incurred under the terms of this Indenture and the Notes, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of payment to the Notes; and

(c)      all Obligations with respect to the items listed in the preceding clauses (a) and (b).

Notwithstanding anything to the contrary in the preceding clauses (a), (b) and (c), Pari Passu Debt will not include:

(1)      any liability for federal, state, local or other taxes owed or owing by the Company;

(2)      any Indebtedness owed by the Company to any of its Affiliates;

(3)      any trade payables;

(4)      the portion of any Indebtedness that is incurred in violation of this Indenture and the Notes; or

(5)      Non-Recourse Debt.

"**Participant**" means, with respect to the Depositary, Latinclear, Euroclear or Clearstream, a Person who has an account with the Depositary, Latinclear, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Latinclear, Euroclear and Clearstream).

"**Parties**" means Roger Khafif, Eduardo Saravia, and Carlos A. Serna (each, a "Party").

"**Paying Agent**" has the meaning assigned to it in Section 2.03 of this Indenture.

"**Payment Date**" means an Interest Payment Date and/or a Principal Payment Date.

"**Payment Default**" has the meaning assigned to it in Section 6.01 of this Indenture.

"**Permitted Business**" means any of the lines of business conducted by the Company on the date of this Indenture and any businesses similar, related, incidental, complementary or ancillary thereto or that constitutes a reasonable extension or expansion thereof, including the construction, operation and management of the Project.

"**Permitted Investments**" means:

(a)      any Investment in the Company;

(b)      any Investment in an Eligible Investment;

(c)      any Investment by the Company in a Person, if as a result of such Investment, such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company;

(d)      any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with the covenant described above under Section 4.10 of this Indenture;

(e)      any Investments received in compromise or resolution of (i) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Company, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (ii) litigation, arbitration or other disputes with Persons who are not Affiliates;

(f)      repurchases of the Notes pursuant to Mandatory Prepayments and Open Market Repurchases;

(g)      receivables owing to the Company created in the ordinary course of business;

(h)      Investments in existence on the date of this Indenture;

(i)      Investments in receivables arising from a seller financing transaction pursuant to, and in compliance with the terms of, the covenant contained in Section 4.27 of this Indenture;

(j)      Investments made pursuant to the terms of Section 4.28 with respect to a Bulk 2 Repurchase Transaction; and

(k)      subclauses 1-4, inclusive, of the second paragraph of Section 4.11 of this Indenture.

"**Permitted Liens**" means:

(a)      Liens arising through subclauses 1-4, inclusive, of the second paragraph of Section 4.11 of this Indenture.

(b)      Liens on assets of the Company securing Pari Passu Debt that was permitted by the terms of this Indenture and the Notes to be incurred;

(c)      Liens in favor of the Company;

(d)      Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Company; provided that such Liens were not created in connection with or in contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with the Company;

(e)      Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Company; provided that such Liens were in existence prior to, such acquisition, and not incurred in contemplation of, such acquisition;

(f)     Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(g)     Liens existing on the date of this Indenture;

(h)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(i)     Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens, in each case, incurred in the ordinary course of business or good faith deposits in connection with bids, tenders, contracts or leases to which the Company is a party;

(j)     Liens created for the benefit of (or to secure) the Notes;

(k)     Liens arising out of judgments, decrees, orders or awards not giving rise to a Default in respect of which the Company shall in good faith be prosecuting on appeal or proceeding for review, which appeal or proceeding shall not have been finally terminated or if the period within such appeal or proceeding may be initiated shall not have expired;

(l)     encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of the real property of the Company or Liens incidental to the conduct of the business of the Company or to the ownership of its real property which do not in the aggregate materially adversely affect the value of said real property or materially impair its use in the operation of the business of the Company, in each case on property other than the Collateral;

(m)     any interest or title of a lessor under any operating lease;

(n)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution; provided that:

(1)     such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Company in excess of those set forth by regulations promulgated by the U.S. Federal Reserve Board; and

(2)     such deposit account is not intended by the Company to provide collateral to the depository institution;

(o)     Liens for the purpose of securing the payment of all or a part of the purchase price of purchase money obligations or other payments incurred to finance the acquisition, lease, improvement or construction of, assets or property acquired or constructed in the ordinary course of business in connection with a Permitted Business provided that:

17

(1)        the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be incurred under this Indenture and the Notes and does not exceed the cost of the assets or property so acquired or constructed; and

(2)        such Liens are created within 180 days of construction or acquisition of such assets or property and do not encumber any other assets or property of the Company other than such assets or property and assets affixed or appurtenant thereto; and

(p)        Liens incurred pursuant to the terms of Section 4.28 with respect to a Bulk 2 Repurchase Transaction.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"**Pre-Packaged Plan**" has the meaning assigned to such term in the recitals hereof.

"**Prime Unit**" has the meaning assigned to such term in Section 3.09 hereof.

"**Prime Unit Sale**" has the meaning assigned to such term in Section 3.09 hereof.

"**Principal Payment Date**" means each of the following dates on which principal of the Notes will be repaid: [*dates to be populated from amortization schedule*].

"**Priority of Payments**" has the meaning assigned to it in Section 10.04(a) of this Indenture.

"**Private Placement Legend**" means the legend set forth in Section 2.06(f)(1) to be placed on all Notes issued under this Indenture.

"**Process Agent**" has the meaning assigned to it in Section 14.08 of this Indenture.

"**Project**" means the construction of the Trump Ocean Club International Hotel & Tower in Panama City, Panama.

"**Property Transfer Fees**" means any notary fees, recording fees, property or transfer taxes or other costs and expenses to be payable to the Panamanian government or any of its agencies in connection with the transfer of a Unit.

"**QIB**" means a "qualified institutional buyer" as defined in Rule 144A under the Securities Act.

"**Rating Agency**" means each of Moody's, for so long as any of the Notes are rated by Moody's (including any private or confidential rating), and Fitch, for so long as any of the Notes are rated by Fitch (including any private or confidential rating).

"**Rating Condition**" means, with respect to any action taken or to be taken hereunder or under any Transaction Document, a condition that is satisfied when each Rating Agency (or, if

one or more specific Rating Agencies are specified, each such Rating Agency) has confirmed in writing to the Company and the Trustee that such action will not result in the withdrawal, reduction or other adverse action with respect to its then-current rating (including any private or confidential rating) of the Notes; *provided* that, in order for the Rating Condition to be satisfied with respect to any such action, the Company (or any other party on behalf of the Company) shall provide 30 days' prior written notice to each such Rating Agency of any such proposed action.

"**Receivables**" means all of the Company's rights and interests in and to (i) each Unit Purchase Agreement and all initial deposits and installment payments (including, without limitation installment payments and cash payments made by the obligor thereunder in lieu of financing the related Unit) payable by the obligor thereunder, in each case limited to the amount of the Receivables under such Unit Purchase Agreement representing Newland Unit Proceeds (and not Brokers' Commissions or Property Transfer Fees), (ii) any payment under any contract of sale, lease, conveyance or other disposition of rights or interests in and to the Casino, restaurants and wellness spa to be developed as part of the Project, (iii) any Insurance Proceeds relating to the related Subject Property, (iv) any recoveries received from an obligor following a default by such obligor under the related Unit Purchase Agreement, and (v) all proceeds of all of the foregoing, and all Liens and other interests relating thereto.

"**Record Date**" means the date on which the Holders entitled to receive a payment in respect of principal or interest on the succeeding Payment Date or Redemption Date are determined, such date as to any Payment Date or Redemption Date being the first day (whether or not a Business Day) of the month of such Payment Date or Redemption Date.

"**Registrar**" has the meaning assigned to it in Section 2.03 of this Indenture.

"**Regulation S**" means Regulation S promulgated under the Securities Act.

"**Regulation S Global Note**" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes issued outside of the United States in reliance on Rule 903 of Regulation S.

"**Release Account**" has the meaning assigned to it in Section 10.03(a) of this Indenture.

"**Responsible Officer**" means, when used with respect to the Trustee, any officer of the Trustee having direct responsibility for the administration of this Indenture.

"**Restricted Global Note**" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with, or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes issued in the United States pursuant to a private placement under the Securities Act.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

19

"**Rule 144A**" means Rule 144A promulgated under the Securities Act.

"**Rule 903**" means Rule 903 promulgated under the Securities Act.

"**Rule 904**" means Rule 904 promulgated under the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Security Documents**" means this Indenture, the Co-Trustee Agreement, the Mortgage, the Stock Pledge and the NDA.

"**Seller Financing Mortgage**" has the meaning assigned to it in Section 4.27(c) of this Indenture.

"**Shareholders**" means the direct and indirect shareholders of the Company:  Ocean Point Development Corp. ("Ocean Point"); Roger Khafif; Upper Deck Properties, S.A. ("Upper Deck"); and Arias, Serna & Saravia; Espacios Urbanos, S.A.

"**Standard & Poor's**" means Standard & Poor's Ratings Services and any successor or successors thereto.

"**Stated Maturity**" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of this Indenture or, if later, the date of incurrence of such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"**Stock Pledge**" means the pledge dated the date hereof of 100% of the shares in the Company in favor of the Co-Trustee, along with an assignment of voting rights, stock power, or voting power (as applicable and exercisable only upon payment default or a voluntary or involuntary bankruptcy filing).

"**Subject Properties**" means, at any time, (i) the real property relating to a Unit Purchase Agreement and (ii) the real property owned by the Company (other than pursuant to clause (i) above), which in each case shall be subject to the Lien of the Mortgage in favor of the Co-Trustee.

"**Subsidiary**" means, with respect to any specified Person:

(a)        any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(b)      any partnership of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person (or any combination thereof).

"**Taxes**" has the meaning assigned to it in Section 4.21 of this Indenture.

"**TOC Casino BC Loan Amount**" means a portion of the BC Senior Loan in one or more advances an amount equal to the positive difference, if any, of (i) 5% of the gross purchase price of the TOC Casino Transaction minus (ii) the MTA Reserved Amount.

"**TOC Casino Transaction**" has the meaning assigned to it in Section 7.12 of this Indenture.

"**Total Accrued Fee Payment Amount**" has the meaning assigned to it in Section 10.02(b) of this Indenture.

"**Transaction Documents**" means this Indenture, the Co-Trustee Agreement, the Notes, the Mortgage, the Stock Pledge, NDA, the Limited Financial Guarantee and the Collateral Assignment Agreement.

"**Trump License Agreement**" means the License Agreement, dated as of March 16, 2006, originally, by and between Donald J. Trump, as original licensor, and K Group Developers, Inc., as original licensee, as assigned (i) to Licensor, pursuant to the assignment and assumption of license agreement, dated as of June 5, 2007, by and between Donald J. Trump and Licensor, and (ii) to the Company, as licensee, pursuant the assignment and assumption of license agreement, dated as of June 5, 2007, among the Licensor, K Group Developers Inc. and the Company, as amended prior to the date of this Indenture and as amended by the Eighth Amendment thereto. Under the Trump License Agreement, the Company is required to pay variable license fees and royalties to Licensor for use of "Trump" name and marks.

"**Trump Reference Payments**" shall mean as of any date an amount equal to the cumulative sum of that portion of each payment made to Licensor on or prior to September 15, 2012 by or on behalf of the Company in respect of the Trump License Agreement which is applicable for the calculation of amounts due to Marvin Traub Associates by the Company pursuant to the MTA Agreement.

"**Trustee**" means the party named as such in the preamble to this Indenture until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"**Unit**" means the real property owned by the Company and subject to the Lien of the Mortgage in the name of the Co-Trustee that may be sold pursuant to a Unit Purchase Agreement.

"**Unsold Unit**" means a Unit for which there is not a related Unit Purchase Agreement that has been executed.

"**Unit Purchase Agreement**" means a (i) a "Contract For A Promise Of Sale (Condominium Unit)", (ii) a "Contract For A Promise Of Sale (Hotel–Condominium Unit)", or (iii) a "Contract For A Promise Of Sale (Commercial Space)", in each case substantially in the forms set forth in Exhibit C hereto.

"**U.S. Person**" shall have the meaning given to it in Regulation S under the Securities Act.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

**Section 1.02   Rules of Construction.**

Unless the context otherwise requires:

(a)     a term has the meaning assigned to it;

(b)     "or" is not exclusive;

(c)     words in the singular include the plural, and in the plural include the singular;

(d)     "will" shall be interpreted to express a command;

(e)     provisions apply to successive events and transactions;

(f)     references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the Commission from time to time; and

(g)     all references to "dollars," "U.S. dollars" and "$" shall refer to the lawful currency of the United States of America.

Terms used and not otherwise defined in this Indenture shall be given the meanings assigned to such terms in accordance with IFRS.

## ARTICLE 2

## THE NOTES

**Section 2.01   Form and Dating.**

(a)     *General*.   The Notes and the Trustee's certificate of authentication will be substantially in the form of Exhibit A hereto.   The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage.   Each Note will be dated the date of its authentication.   The Notes shall be in minimum denominations of $10,000 and integral multiples of $1 in excess thereof.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Company, the Trustee and the Co-Trustee, by their

execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes*.  Notes issued in global form in reliance on a private placement exemption from the Securities Act (the "Global Note") will be substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Notes issued in definitive form will be substantially in the form of Exhibit A hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

Notes offered and issued in reliance on Regulation S will be initially represented by a single, permanent global note (in substantially the form of Exhibit A hereto) in fully registered book entry form without interest coupons (the "Regulation S Global Note"). Beneficial interests in the Regulation S Global Note will be represented through book-entry accounts of financial institutions acting on behalf of owners as direct and indirect participants in Euroclear or Clearstream for credit to the respective accounts of such purchasers (or to such other accounts as they may direct) at Euroclear and Clearstream. The aggregate principal amount of the Regulation S Global Note may from time to time be increased or decreased by adjustments made on the records of the Registrar, Euroclear or Clearstream, as hereinafter provided.

### Section 2.02   Execution and Authentication.

At least one Officer must sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee.  The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by two Officers (an "Authentication Order"), authenticate Notes for original issue; *provided* that on the date the Notes are issued, only up to $[*insert 220 million plus capitalized interest as of Effective* Date] of aggregate principal amount of the Notes may be so authenticated.

The Trustee may, but is not obligated to, appoint an authenticating agent acceptable to the Company to authenticate Notes.  An authenticating agent may authenticate Notes whenever the

Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.

### Section 2.03    Registrar and Paying Agent.

The Company will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar") and an office or agency where Notes may be presented for payment ("Paying Agent").  The Registrar will keep a register of the Notes and of their transfer and exchange.  The Company may appoint one or more co-registrars and one or more additional paying agents.  The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent.

The Company initially appoints The Depository Trust Company ("DTC") to act as Depositary and custodian for the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent with respect to the Global Notes.

Any additional or successor Paying Agent shall be appointed by the Company with written notice thereof to the Trustee; *provided*, that so long as Notes are rated by the Rating Agencies and with respect to any additional or successor Paying Agent for the Notes, either (a) the additional or successor Paying Agent for the Notes has a rating of not less than "Aa3" and not less than "P-1" by Moody's or a rating of not less than "A" and not less than "F1+" by Fitch or (b) the Rating Condition with respect to the appointment of such additional or successor Paying Agent shall have been satisfied.  In the event that (i) such additional or successor Paying Agent ceases to have a rating of at least "A2" and "P-1" by Moody's and a rating of at least "A" and of "F1+" by Fitch or (ii) the Rating Condition with respect to the appointment of such additional or successor Paying Agent shall not have been satisfied, the Company shall promptly remove such additional or successor Paying Agent and appoint a successor Paying Agent.  The Company shall not appoint any Paying Agent (other than an initial Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities.

### Section 2.04    Paying Agent To Hold Money in Trust.

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal or premium, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment.  While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee.  The Company at any time may require a Paying Agent to pay all money held by it to the Trustee.  Upon payment over to the Trustee, the Paying Agent (if other than the Company) will have no further liability for the money.  If the Company acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent.  Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee will serve as Paying Agent for the Notes.

### Section 2.05    Holder Lists.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders.  If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes.

### Section 2.06    Transfer and Exchange.

(a)    *Transfer and Exchange of Global Notes*.  A Global Note may not be transferred as a whole except by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.  All Global Notes will be exchanged by the Company for Definitive Notes if:

(1)    the Depository notifies the Company or the Trustee that it is unwilling or unable to continue to act as Depositary for the Global Notes or that it is no longer a clearing agency registered under the Exchange Act and, in either case, the Company fails to appoint a successor Depositary within 120 days after the date of such notice from the Depositary; or

(2)    there has occurred and is continuing a Default or Event of Default with respect to the Notes and Holders representing 25% of more of the then outstanding principal amount of the Notes request that such Global Notes be exchanged for Definitive Notes.

Upon the occurrence of either of the preceding events in (1) or (2) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee.  Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof.  Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note.  A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b) or (c) hereof.

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*.  The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Global Notes bearing the Private Placement Legend will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1)    *Transfer of Beneficial Interests in the Same Global Note*.  Beneficial interests in any Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Global Note in accordance with the transfer restrictions set

forth in the Private Placement Legend.  No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2)     *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*.  In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar either:

(A)     both:

(i)     a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)     instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(B)     both:

(i)     if one of the events listed in Section 2.06(a) shall have occurred and be continuing; a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii)     instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (i) above.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(g) hereof.

(3)     *Transfer of Beneficial Interests to Another Global Note*.  A beneficial interest in any Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A)     if the transferee will take delivery in the form of a beneficial interest in the Restricted Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

   (B) if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

  (c) *Transfer of Beneficial Interests for Definitive Notes*.

   (1) *Beneficial Interests in Global Notes to Definitive Notes*.  If any holder of a beneficial interest in a Global Note proposes to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon receipt by the Registrar of the following documentation:

    (A) if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof; or

    (B) if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(g) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount.  Any Definitive Note issued in exchange for a beneficial interest in a Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant.  The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered.  Any Definitive Note issued in exchange for a beneficial interest in a Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

  (d) *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

   (1) *Definitive Notes to Beneficial Interests in Global Notes*.  If any Holder of a Definitive Note proposes to exchange such Note for a beneficial interest in a Global Note or to transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Global Note, then, upon receipt by the Registrar of the following documentation:

    (A) if such Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof; or

    (B) if such Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof,

the Trustee will cancel the Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the Restricted Global Note, and in the case of clause (B) above, the Regulation S Global Note.

(e)     *Transfer and Exchange of Definitive Notes for Definitive Notes*.  Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing.   In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1)     *Definitive Notes to Definitive Notes*.   Any Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Definitive Note if the Registrar receives the following:

(A)     if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)     if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(f)     *Legends*.  The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1)     *Private Placement Legend*.

Each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) (a) IN THE UNITED

STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER OR BUYERS IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (b) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO REGISTRATION OF TRANSFER OF THIS SECURITY AS SET FORTH ABOVE, WE MAY REQUIRE DELIVERY OF ANY DOCUMENTS OR OTHER EVIDENCE THAT WE, IN OUR ABSOLUTE DISCRETION, DEEM NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH SUCH EXEMPTION, (2) TO NEWLAND INTERNATIONAL PROPERTIES, CORP. OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN (A) ABOVE."

(2)     *Global Note Legend*.  Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED

REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(g)    *Cancellation and/or Adjustment of Global Notes*.  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(h)    *General Provisions Relating to Transfers and Exchanges*.

(1)    To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(2)    No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, and 9.04 hereof).

(3)    The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the

Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5)     Neither the Registrar nor the Company will be required:

(A)     to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection;

(B)     to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C)     to register the transfer of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

(6)     Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7)     The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(8)     All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile or electronic mail.

(9)     The Trustee shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.06 (other than Notes received for transfer or exchange which will be destroyed pursuant to the Trustee's standard procedures).  The Company shall have the right to require the Trustee to deliver to the Company, at the Company's expense, copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Trustee.

(10)     In connection with any transfer of any Note, the Trustee and the Company shall be entitled to receive, shall be under no duty to inquire into, may conclusively presume the correctness of, and shall be fully protected in relying upon the certificates, opinions and other information referred to herein (or in the forms provided herein, attached hereto or to the Notes, or otherwise) received from any Holder and any transferee of any Note regarding the validity, legality and due authorization or any such transfer, the eligibility of the transferee to receive such Note and any other facts and circumstances related to such transfer.

### Section 2.07   Replacement Notes.

If any mutilated Note is surrendered to the Trustee or the Company, or if each of the Trustee, the Paying Agent and the Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee, an Agent or the Company, an indemnity bond or other guaranty of indemnification must be supplied by the Holder that is sufficient in the judgment of the Trustee, such Agent and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced prior to any such replacement.   The Company may charge for its expenses in replacing a Note.   Every replacement Note is an additional obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

### Section 2.08   Outstanding Notes.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section as not outstanding.   Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company or an Affiliate thereof) holds, on a redemption date or maturity date, money sufficient to pay all principal and interest remaining outstanding on the Notes on such date, then on and after such date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

### Section 2.09   Treasury Notes.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes (or beneficial interests therein) owned by the Company or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company, will be considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned will be so disregarded.

### Section 2.10   Temporary Notes.

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes with such variations as

may be appropriate for temporary Notes.  Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

### Section 2.11    Cancellation.

The Company at any time may deliver Notes to the Trustee for cancellation.  The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will destroy such canceled Notes in accordance with its internal procedures.  Certification of the destruction of all canceled Notes at such time as the Trustee is required to do so pursuant to its internal procedures will be delivered to the Company upon its written request therefor.  The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

### Section 2.12    Defaulted Interest.

If the Company defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest at the rate of 1% thereon, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof.  The Company will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment.  The Company will fix or cause to be fixed each such special record date and payment date, provided that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest.  At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee on behalf of the Company) will mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

### Section 2.13    Notes Listed on Panama Stock Exchange.

The Notes will be listed on the *Bolsa de Valores de Panamá, S.A.* (the Panama Stock Exchange), a Panamanian company (*sociedad anónima*) duly registered and authorized by the National Securities Commission of Panama to maintain and operate (1) facilities where individuals can trade securities or (2) a system, either electronic, mechanic or otherwise, which allows the trading of securities through the matching of purchase and sale offers. The Notes will not be listed on any other exchange outside of Panama.

## ARTICLE 3

## REDEMPTION AND PREPAYMENT

### Section 3.01    Notices to Trustee.

If the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof, it must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officers' Certificate setting forth:

(a)    the clause of this Indenture pursuant to which the redemption shall occur;

(b)    the redemption date;

(c)    the principal amount of Notes to be redeemed;

(d)    the redemption price;

(e)    applicable CUSIP numbers of the Notes to be redeemed; and

(f)    a statement that such redemption is authorized and permitted pursuant to this Indenture.

### Section 3.02    Selection of Notes To Be Redeemed or Purchased.

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee will select Notes for redemption or purchase as follows:

(a)    if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(b)    if the Notes are not listed on any national securities exchange, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate (which shall include DTC's normal methods for partial redemptions).

In the event of partial redemption or purchase by lot, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the redemption or purchase date by the Trustee from the outstanding Notes not previously called for redemption or purchase.

The Trustee will promptly notify the Company in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased. Notes and portions of Notes selected will be in amounts of $1,000 or whole multiples of $1,000; except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed or purchased.  Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

**Section 3.03    Notice of Redemption.**

Subject to the provisions of Section 3.09, the Company will provide notice of redemption to the Trustee by courier at least 35 days but not more than 65 days before, and the Trustee will forward such notice of redemption by first class mail at least 30 days but not more than 60 days before, the redemption date to each holder of Notes to be redeemed at its registered address, except that redemption notices may be mailed by the Trustee more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture.  Notices of redemption may not be conditional.

The notice will identify the Notes to be redeemed and will state:

(a)    the redemption date;

(b)    the redemption price;

(c)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note;

(d)    the name and address of the Paying Agent;

(e)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)    that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(g)    the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(h)    that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

The notice if mailed in the manner herein provided shall be conclusively presumed to have been given, whether or not the Holder receives such notice.  In any case, failure to give such notice by mail or any defect in the notice to the Holder of any Note designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Notes.

### Section 3.04   Effect of Notice of Redemption.

Once notice of redemption is mailed in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price.  A notice of redemption may not be conditional.

### Section 3.05   Deposit of Redemption or Purchase Price.

One Business Day prior to the redemption or purchase date, the Company will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued interest on all Notes to be redeemed or purchased on that date.  The Trustee or the Paying Agent will promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption or purchase price of, and accrued interest on all Notes to be redeemed or purchased.

If the Company complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase.  If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Interest Payment Date, then any accrued and unpaid interest, if any, shall be paid to the Person in whose name such Note was registered at the close of business on such Record Date.  If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

### Section 3.06   Notes Redeemed or Purchased in Part.

Upon surrender of a Note that is redeemed or purchased in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Company a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.

### Section 3.07   Optional Redemption.

(a)       Subject to Section 3.03 of this Indenture, the Company may redeem all or part of the Notes, at any time  at a redemption price equal to 100% of the outstanding principal amount of Notes redeemed plus any Additional Amounts, and accrued and unpaid interest to, but excluding, the redemption date, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Payment Date. Any such Optional Redemption pursuant to this clause (a) shall be subject to a minimum threshold of $10.0 million.

(b)       Unless the Company defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

(c)       Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

36

**Section 3.08    Reserved.**

**Section 3.09    Mandatory Prepayment for Prime Unit Sales.**

(a)      In the event of a sale by the Company of the Casino, Spa or Penthouse unit on the
66th floor of the Project (each a "Prime Unit," and each such sale a "Prime Unit Sale"), the
Company shall prepay (a "Mandatory Prepayment") the Notes from the amount of the Net
Proceeds arising from such Prime Unit Sale, on the third Business Day following the date on
which an officer of the Company has certified to the Trustee as to the calculation of the Net
Proceeds and the Mandatory Prepayment in connection with any such sale or sales, which
certification shall indicate that it has been reviewed by the Noteholder Representative (but only
during the time period in which the Noteholder Representative function exists pursuant to
Schedule 2 of this Indenture) who has no objection to the calculation, at a redemption price equal
to 100% of the outstanding principal amount of Notes redeemed plus any Additional Amounts,
and accrued and unpaid interest to, but excluding, the redemption date, subject to the rights of
Holders on the relevant Record Date to receive interest due on the relevant Payment Date (a
"Mandatory Prepayment Date").

(b)      Mandatory Prepayments pursuant to Prime Unit Sales shall be applied to the
Minimum Scheduled Amortization Amounts (as defined in the Global Note) in reverse order of
maturity in an aggregate principal amount equal to the amount of such prepayment. The full
amount of such prepayment shall be applied in full to the final Minimum Scheduled
Amortization Amount due and payable on [*], 2017 until the total amount of the outstanding
Notes shall have been prepaid in full.

(c)      An officer of the Company shall certify to the Trustee within 3 Business Days of
closing of a Prime Unit Sale, which certification shall indicate that it has been reviewed by the
Noteholder Representative (but only during the time period in which the Noteholder
Representative function exists pursuant to Schedule 2 of this Indenture) who has no objection to
it, as to the calculation of the Net Proceeds and the Mandatory Prepayment. The Noteholder
Representative's review of such certification shall be a verification only of the relevant items,
events and calculations. Any objection by the Noteholder Representative must be provided in a
reasonably detailed writing within 3 Business Days of receipt of the certification from the
Company and failure to provide such objection in such period shall constitute a deemed
acceptance of such certification. The form of certification is set forth in Exhibit K hereto.

**Section 3.10    Open Market Repurchases.**

(a)      The Company may purchase Notes in the open market at market value prices
provided the price (excluding any amount representing accrued and unpaid interest) is below par,
through tender offer or otherwise; provided, that the Company shall be prohibited from using
more than $15.0 million in the aggregate toward the principal portion of Notes for such
purchases (each such purchase, an "Open Market Repurchase").

(b)      The Company shall instruct the Trustee to cancel any Notes purchased pursuant to
an Open Market Repurchase and delivered to the Trustee for cancellation, such that such Notes

are no longer outstanding. No such Open Market Repurchase shall be made directly or indirectly from an Affiliate or a direct family member of a CCSA Party ("Insiders").

(c)    No Open Market Repurchase shall be permitted until after such time as the Bulk 2 Repurchase Amount shall have been reduced to zero.

(d)    Open Market Repurchases will be made in compliance with applicable United States and Panamanian securities laws.

## ARTICLE 4

### COVENANTS

**Section 4.01    Payment of Notes.**

(a) Interest on the Notes will accrue from the date of original issuance or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months. The Company will pay or cause to be paid the principal of, premium, if any, and interest, if any, on the Notes on the dates and in the manner provided in the Notes.  Principal, premium, if any, and interest, if any, will be considered paid on the date due if the Paying Agent, if other than the Company, holds as of 10:00 a.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.

(b) The Company shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) and principal at the Note Rate to the extent lawful under applicable law.(c) The Company shall register the Notes with the Panamanian National Securities Commission and list the Notes with a securities exchange or organized market in Panama. The Company shall maintain such registration and listing through the final Principal Payment Date.

**Section 4.02    Maintenance of Office or Agency.**

The Company will maintain in the City of New York or Wilmington, Delaware, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission will in any manner relieve the Company of its obligation to maintain an office or agency in the City of New York or City of Wilmington, Delaware for such purposes.  The Company will give

prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the offices of the Trustee as one such office or agency of the Company in accordance with Section 2.03 hereof.

### Section 4.03    Reports.

(a)    So long as any Notes are outstanding, the Company will deliver, or cause to be delivered, to the Trustee and the Trustee will make available to the Holders of Notes:

(1)    annual financial statements audited by an internationally recognized firm of independent public accountants within 90 days of the end of each fiscal year, and quarterly unaudited financial statements (in each case including English translations of documents in other languages) within 60 days of the end of each of the first three fiscal quarters of each fiscal year, in each case for the Company.  Such annual and quarterly financial statements will be prepared in accordance with IFRS and such annual financial statements be accompanied by a summary management discussion on the results of operations of the Company for the periods presented; and

(2)    copies (including English translations of documents in other languages) of all public filings made by the Company with any stock exchange or securities regulatory agency within ten days after filing.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

(b)    The Company shall take all action necessary to provide information to permit resales of the Notes pursuant to Rule 144A under the Securities Act, including furnishing to any holder of a Note or beneficial interest in a Global Note, or to any prospective purchaser designated by such holder, upon request of such holder, financial and other information required to be delivered under Rule 144A(d)(4) (as amended from time to time and including any successor provision) unless, at the time of such request, the Company is subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act or is exempt from such requirements pursuant to Rule 12g3-2(b) under the Exchange Act (as amended from time to time and including any successor provision).

(c)    The Company will host a quarterly conference call for Holders to be held within a reasonable time, but in no event later than thirty (30) days, after the delivery of the quarterly financial statements referred to above (or, in the case of the annual audited financial statements, within 90 days after the end of the fiscal year) by placing a notice and dial-in conference number on its website (www.trumpoceanclub.com) at least 48 hours in advance of the conference call.

(d) The Company covenants that for so long as the Notes are outstanding it shall comply with approved quarterly reporting (with monthly detail) requirements for sales, unit purchase

defaults, related-party transactions and other performance metrics as more fully detailed in Exhibit L hereto and shall provide copies of such quarterly reports to the Trustee.

**Section 4.04   Compliance Certificate.**

(a)      The Company shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officers' Certificate stating that a review of the activities of the Company during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto).

(b)      So long as any of the Notes are outstanding, the Company will deliver to the Trustee, immediately upon any Officer becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

**Section 4.05   Taxes.**

The Company will pay prior to delinquency all taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings.

**Section 4.06   Stay, Extension and Usury Laws.**

The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

**Section 4.07   Restricted Payments.**

(a)      The Company will not, directly or indirectly:

(1)      declare or pay any dividend or make any other payment or distribution on account of the Company's Equity Interests or to the direct or indirect holders of the Company's Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests of the Company and other than dividends or distributions payable to the Company);

(2)     purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent of the Company (other than in exchange for Capital Stock of the Company);

(3)     make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Indebtedness of the Company that is contractually subordinated to the Notes, except a payment of interest or principal at the Stated Maturity thereof; or

(4)     make any Restricted Investment.

All such payments and other actions set forth in clauses (1) through (4) above being collectively referred to as "Restricted Payments."

**Section 4.08   Reserved.**

**Section 4.09   Incurrence of Indebtedness.**

The Company will not directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "incur") any Indebtedness, *provided*, *however*, that the Company may incur an amount of Indebtedness up to an aggregate of the Bulk 2 Repurchase Amount pursuant to the terms of Section 4.28 herein for the redemption or replacement of the Bulk 2 Repurchase Transaction.

**Section 4.10   Asset Sales.**

(a)     The Company will not consummate an Asset Sale unless:

(1)     the Company receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of; and

(2)     at least 85% of the consideration received in the Asset Sale by the Company is in the form of cash or Cash Equivalents.  For purposes of this provision, each of the following shall be deemed to be cash:

(A)     any liabilities of the Company (other than contingent liabilities, liabilities that are by their terms subordinated to the Notes, and the Notes) that are assumed by the transferee of any such assets and as a result of which the Company is unconditionally released from further liability;

(B)     any securities, notes or other obligations received by the Company from such transferee that within 90 days are converted by the Company into cash or Cash Equivalents, to the extent of the cash or Cash Equivalents received in that conversion;

(C)     any stock or assets of the kind referred to in Section 4.10(b)(3).

(b)      Within 180 days after the receipt of any net proceeds from an Asset Sale, the
Company may apply those net proceeds at its option:

(1)      to acquire all or substantially all of the assets of another Permitted
Business;

(2)      to make a capital expenditure in a Permitted Business; or

(3)      to acquire other assets that are not classified as current assets under IFRS
and that are used in a Permitted Business,

or enter into a binding commitment regarding clauses (1), (2) or (3) above, provided that such
binding commitment shall be treated as a permitted application of net proceeds from the date of
such commitment until and only until the earlier of (x) the date on which such acquisitions or
expenditures are consummated and (y) the 90th day following the expiration of the
aforementioned 180 day period. If such acquisition or expenditure is not consummated on or
before such 90th day and the Company shall not have applied such net proceeds as described in
clause (1), (2) or (3) of this paragraph (b) on or before such 90th day, such commitment shall be
deemed not to have been a permitted application of net proceeds.

(c)      Notwithstanding the foregoing, this Section 4.10 shall not override other
provisions of this Indenture related to Prime Unit Sales, Mandatory Prepayments pursuant to
Prime Unit Sales and the TOC Casino Transaction. Net Proceeds from Prime Unit Sales cannot
be used for any purposes other than Mandatory Prepayments.

(d)      Net proceeds from Asset Sales not applied as permitted under Section 4.10(b)
shall be transferred to the Trustee for deposit into the Collection Account. The Company shall
promptly certify to the Trustee all Asset Sales and applications of proceeds therefrom.

### Section 4.11   Transactions with Affiliates.

(a)      The Company will not make any payment to, or sell, lease, transfer or otherwise
dispose of any of its properties or assets to, or purchase any property or assets from, or enter into
or make or amend any transaction, contract, agreement, understanding, loan, advance or
guarantee with, or for the benefit of, any Affiliate of the Company, the Shareholders or the
Parties (each, an "Affiliate Transaction"), unless:

(1)      full prior disclosure to the Board of Directors of the Company has been
made, including the Noteholders' Board Nominee (as defined in Schedule 2 hereto), and upon
demonstration to the satisfaction of the Board that the terms of the transaction are arm's-length,
market terms, and such transaction is approved by the Board of Directors of the Company;

(2)      such Affiliate Transaction is on terms that are not materially less favorable
to the Company than those that would have been obtained in a comparable transaction by the
Company with an unrelated Person; and

(3)      the Company delivers to the Trustee (x) with respect to any Affiliate
Transaction or series of related Affiliate Transactions involving aggregate consideration in

42

excess of $1.0 million, a resolution of the Board of Directors set forth in an officers' certificate certifying that such Affiliate Transaction complies with this covenant and (y) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $5.0 million, an opinion as to the fairness to the Company of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of international standing.

(b)    The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of Section 4.11(a):

(1)    the BC Ferry Payment;

(2)    the BC Senior Loan;

(3)    the TOC Casino Transaction with Sun International;

(4)    the settlement of any amounts owed in respect of the MTA Agreement;

(5)    any employment agreement, employee benefit plan, officer and director indemnification agreement, or any similar arrangement entered into by the Company in the ordinary course of business;

(6)    transactions effected pursuant to agreements in effect on the date of this Indenture, including, without limitation, the agreements described on Schedule 1 hereto and any amendment, modification, renewal, extension or replacement to such agreement (provided that such amendment, modification, renewal, extension or replacement is not disadvantageous to the Holders in any respect).

(c)    In no instance shall the re-sale of any units purchased by Affiliates of the Company, the Shareholders or the Parties be permitted while any of the Notes are outstanding unless all Units owned by the Company have been sold pursuant to a Unit Purchase Agreement and the public deed of sale executed by the parties thereto.

(d)    Affiliates of the Company, the Shareholders or the Parties shall not be eligible to receive any future commissions (co-broker commission, finder's fee or other monetary arrangement) with respect to the sale of any assets comprising Collateral.

(e)    Upon closing of the Contadora Island Sale, as certified by the Company to the Co-Trustee and the Trustee pursuant to Exhibit D hereto, the mortgage on the Subject Property consisting of Contadora Island shall be released and Net Proceeds deposited into the Panama Closing Account.

### Section 4.12   Liens.

The Company will not directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

**Section 4.13   Business Activities.**

The Company will not engage in any business other than Permitted Businesses.

**Section 4.14   Corporate Existence.**

Subject to Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(a)      its corporate existence, and the corporate, partnership or other existence, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company; and

(b)      the rights (charter and statutory), licenses and franchises of the Company.

**Section 4.15   Reserved.**

**Section 4.16   No Layering of Indebtedness.**

The Company will not incur, create, issue, assume, guarantee or otherwise become liable for any Indebtedness that is contractually subordinate or junior in right of payment to any senior Indebtedness of the Company and *pari passu* in right of payment to the Notes.

**Section 4.17   Limitation on Sale and Leaseback Transactions.**

The Company will not enter into any sale and leaseback transaction unless:

(a)      the Company could have incurred a Lien to secure such Indebtedness pursuant to the provisions of Section 4.12 hereof; and

(b)      the sale and leaseback transaction is made in compliance with Section 4.10 hereof.

**Section 4.18   Payments for Consent.**

The Company will not directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any holder of Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

**Section 4.19   Reserved**

**Section 4.20   Reserved**

**Section 4.21   Additional Amounts.**

(a)       All payments of amounts due in respect of the Notes by the Company shall be made free and clear of and without withholding or deduction for or on account of any present or future taxes, levies, imposts, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the Republic of Panama or any political subdivision or taxing authority of or in the Republic of Panama ("**Taxes**"), unless the withholding or deduction of any amount for or on account of such Taxes is required by law or by the interpretation or administration of law.  If the Company is so required to withhold or deduct any amount for or on account of Taxes from any payment made under or with respect to the Notes, the Company will pay such additional amounts ("**Additional Amounts**") as may be necessary so that the net amount (including Additional Amounts) received by each Holder after withholding or deduction will not be less than the amount the Holder would have received if Taxes had not been withheld or deducted; *provided*, *however*, that no Additional Amounts will be payable with respect to a payment made to a Holder with respect to any Tax which would not have been imposed, payable or due:

(1)       but for the fact that the Holder or a Beneficial Owner of a Note is or was a domiciliary, national or resident of, or engages or engaged in business, maintains or maintained a permanent establishment or is or was physically present in the Republic of Panama, or otherwise has some present or former connection with the Republic of Panama other than the mere holding or enforcement of the Notes or the receipt of principal, premium, if any, or interest in respect of the Notes;

(2)       but for the failure of the Holder or Beneficial Owner of Notes to comply with a request by the Company to satisfy any certification, identification or other reporting requirements which such Holder or Beneficial Owner is legally entitled to satisfy, whether imposed by statute, treaty, regulation, administrative practice or otherwise, concerning the nationality, residence or connection with the Republic of Panama of such Holder or Beneficial Owner; or

(3)       if, where presentation by the Holder is required to receive payment under the Notes, the presentation for payment had occurred after 30 days after the date such payment was due and payable or was provided for, whichever is later.

(b)       The obligation of the Company to pay Additional Amounts in respect of Taxes will not apply with respect to:

(1)       any estate, inheritance, gift, sales, transfer, personal property or any similar Tax; or

(2)       any Tax which is payable otherwise than by deduction or withholding from payments made under or with respect to the Notes.

45

(c)     The Company shall:

(1)     make any required withholding or deduction;

(2)     remit the full amount deducted or withheld to the relevant authority (the "Taxing Authority") in accordance with applicable law;

(3)     obtain certified copies of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Taxing Authority imposing such Taxes; and

(4)     promptly send the certified copies of such tax receipts to the Trustee (if the Trustee acts as the paying agent) or, if different, to the Paying Agent, in each case solely for the purpose of forwarding such receipts to any Holder that has made a written demand for the certified copies to the Trustee or the Paying Agent, as the case may be.

(d)     If the above receipts are not obtainable, the Company shall provide to the Trustee or the Paying Agent, as the case may be, such other evidence of the payments as the Company may reasonably obtain.

(e)     At least 30 days prior to each date on which any payment under or with respect to the Notes is due and payable (unless the Company's obligation to pay Additional Amounts arises after the 30th day prior to that date, in which case it will be promptly after the Company's obligation to pay Additional Amounts arises), if the Company will be obligated to pay Additional Amounts with respect to the payment, the Company will deliver to the Trustee and each Paying Agent an Officers' Certificate stating the fact that the Additional Amounts will be payable and the amounts so payable and will set forth other information necessary to enable the Trustee and each Paying Agent to pay the Additional Amounts to Holders on the applicable Interest Payment Date or Principal Payment Date.  Each Officers' Certificate will be relied upon until receipt of a further Officers' Certificate addressing these matters.

(f)     Whenever in this Indenture there is mentioned, in any context, the payment of amounts based upon the payment of principal, premium or interest or of any other amount payable under or with respect to any Note, such mention will be deemed to include mention of the payment of Additional Amounts as are, were or would be payable in respect of the payment of principal, premium or interest or of any other amount.

**Section 4.22   Reserved**

**Section 4.23   Unit Purchase Agreements.**

(a)     The Company shall not:

(1)     amend, supplement or otherwise modify the "Notice of Assignment" provision contained in any Unit Purchase Agreement;

(2)     amend, supplement or modify any of the material terms included in the forms of Unit Purchase Agreements set forth in Exhibit C hereto, unless the Board of Directors determines that such amendment, supplement or modification is necessary to accommodate the

46

sales practices of the Company; *provided* that no such amendment, supplement or modification shall (A) extend the period for final payment of the purchase price or delivery of the applicable property for more than 24 months from the dates for payment of the purchase price or delivery included in the forms set forth in Exhibit C hereto, (B) affect the interests or Lien of the Company on the real property subject to any such Unit Purchase Agreement, except to the extent otherwise permitted pursuant to this Indenture or (C) amend, supplement or modify the "Notice of Assignment" provisions contained in any form of Unit Purchase Agreement attached hereto as Exhibit C;

        (3)     waive any default under or breach of any Unit Purchase Agreement; or

        (4)     take any other action under the Unit Purchase Agreement not required by the terms thereof that would impair the value of any Receivable.

        (b)     With respect to the forms of Unit Purchase Agreements that are not in existence on the date of this Indenture, the Company shall promptly submit to the Trustee for review by the Noteholder Representative (but only during the time period in which the Noteholder Representative function exists pursuant to Schedule 2 of this Indenture) the forms of such new Unit Purchase Agreements which forms shall be substantially consistent with the forms of Unit Purchase Agreements set forth in Exhibit C hereto, subject to the provisions of subsection (a)(2) above.  The Company may request that the Trustee include in Exhibit C any such new form of Unit Purchase Agreement in accordance with Section 9.01 hereof.

### Section 4.24   Insurance.

        (a)     The Company shall maintain insurance with reputable and financially sound carriers against such risks and in such amounts as are customarily carried by similarly situated businesses, including, without limitation, property, casualty and general liability insurance.

        (b)     The Company shall cause the Trustee (or, if required by applicable law, the Co-Trustee) to be designated as the primary beneficiary or loss payee under all insurance policies relating to the Subject Properties and shall deliver such endorsements as shall be necessary to effect such designation.

        (c)     Upon any casualty relating to the Subject Properties, any Insurance Proceeds will, subject to any provisions in the related Unit Purchase Agreements to the contrary, be deposited into the Collection Account.

### Section 4.25   Accounts.

        The Company will not open deposit accounts other than Accounts except where such deposit accounts would be, and are made, subject to a first priority Lien in favor of the Trustee on behalf of the Holders.

### Section 4.26   Subsidiaries.

        The Company will not create or acquire any Subsidiaries.

**Section 4.27   Seller Financing.**

(a)      The Company may offer seller financing for up to the lesser of 110 Units or $40.0 million (in aggregate) of Units at then applicable pricing. Terms for a seller financing shall include:

(1)      no more than a 2.5 year average life in addition to a final maturity date not later than the scheduled final maturity date of the Notes;

(2)      a step-up in interest rate to be determined by the Company at the time of such seller financing of no less than 25 basis points at each six (6) month interval starting from the date such seller financing is first extended;

(3)      a maximum loan to value determined by the Company in its reasonable judgment based on the creditworthiness of the obligor not to exceed 60% of the purchase price of the Unit;

(4)      units purchased with a seller financing facility will be subject to a sales price no lower than the three month historical weighted average pricing of sales of comparable units (e.g., residential, commercial, hotel) in the Project; provided that if no applicable Unit sales occurred in the last three (3) months, such weighted average shall be based on the last three sales of such comparable Units;

(5)      a single buyer may acquire no more than two (2) Units with a seller financing facility;

(6)      all common area maintenance (and other) charges will be payable by the buyer; and

(7)      mortgages entered into in connection with the seller financing shall be pledged by the Company to the Co-Trustee as Collateral.

(b)      Seller financing shall not be permitted for Prime Unit Sales or for Affiliate unit purchases.

(c)      Upon certification pursuant to Exhibit D hereto by a Company Officer to the Trustee and the Co-Trustee that subclauses (a)-(b) above are satisfied, the Mortgage on a given pool of Units subject to seller financing may be released. The Company may then obtain a mortgage (with the Company as mortgagee) on such pool of units and any such mortgage to be obtained by the Company will be pledged to the Co-Trustee as Collateral (a "Seller Financing Mortgage"); provided, further, that in all instances the certification shall indicate that it has been reviewed by the Noteholder Representative (but only during the time period in which the Noteholder Representative function exists pursuant to Schedule 2 of this Indenture) who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.

48

**Section 4.28    Bulk 2 Refinancing.**

(a)    The Company may refinance all or a portion of the Bulk 2 Repurchase Amount, provided that any refinancing facility:

(1)    shall result in no net cash proceeds to the Company (provided, however, that the Company shall be permitted to receive any proceeds from such a refinancing facility, if such proceeds are used to immediately repay any bridge loans or refinancing facility to a third party in connection with such refinancing);

(2)    shall carry an interest rate no greater than 9.5% per annum;

(3)    shall have a term no greater than 12 months (if such facility requires payment of a penalty for early repayment); and

(4)    require a collateralization ratio, calculated as the asset liquidation value of the applicable unit or units divided by the repurchase amount of such applicable unit or units, no greater than 2.0x.

(b)    Provided that the characteristics set forth in subclause (a) above are met, and upon certification pursuant to Exhibit D hereto by a Company Officer to the Trustee and Co-Trustee that such characteristics are met, the Mortgage on a given pool of units (including any units substituted therefore, where the substituted units would have been eligible for the release of the Mortgage thereon pursuant to Section 4 of Exhibit D of this Indenture and, as a result of any such substitution or substitutions, the collateralization ratio does not exceed that set forth above) may be released and used as collateral against such facility, provided further that in all instances the Noteholder Representative must confirm that the terms of such a refinancing facility satisfy these requirements (but only during the time period in which the Noteholder Representative function exists pursuant to Schedule 2 of this Indenture).

**Section 4.29    Sale, Encumbrance, Lease of Collateral.**

(a)    Except as otherwise permitted by this Indenture and the Notes, the Company shall not be permitted to sell, encumber, lease or transfer any Collateral.

**Section 4.30    Noteholder Representative Requirements**

The Company covenants that for so long as the Notes are outstanding it shall comply with the Noteholder Representative requirements set forth in Schedule 2 hereto (but only during the time period in which the Noteholder Representative function exists pursuant to Schedule 2 of this Indenture).

**Section 4.31    Senior Officer Requirements and Corporate Governance Requirements**

The Company covenants that for so long as the Notes are outstanding it shall comply with the Senior Officer requirements and Corporate Governance requirements set forth in Schedule 2 hereto.

### Section 4.32   Revenue Streams

(a) The Company covenants that for so long as the Notes are outstanding: (i) it shall ensure all revenue streams of the Project, including all non-Unit Purchase Agreement revenue streams arising from any Collateral ("Non-UPA Revenues"), owed to the Company are deposited directly into the Panama Account, provided, however, if any such revenues are instead received by the Company, the Company shall promptly deposit those into the Panama Account; such amounts shall be net of any fees, commissions, property or transfer taxes or other costs and expenses payable under the contract giving rise to such Non-UPA Revenue; and (ii) net proceeds from Asset Sales not applied as permitted under Section 4.10(b) shall be deposited into the Collection Account.

(b) Non-UPA Revenues due to the Company that arise from hotel unit rental revenues pursuant to Section 1.1 of that certain Promoter/Developer Unsold Hotel Units Participation Agreement, dated as of April 13, 2011 ("Participation Agreement"), by and between the Company, Hotel TOC Inc., and Trump Panama Hotel Management LLC, that are to be deposited directly into the Panama Account shall be so deposited net of expenses that have been set off by Trump Panama Hotel Management LLC, as hotel operator, pursuant to Section 4.1 of the Hotel Rental Management Agreement, entered into by and between the Company and Trump Panama Hotel Management LLC, pursuant to Section 1.1 of the Participation Agreement.

### Section 4.33   Minimum Pricing Level

The Company covenants that for so long as the Notes are outstanding it shall comply with a "Minimum Pricing Level" for units at the time the contract for sale is signed, which shall be a price per square meter at least equal to 75% of the average sale price of the preceding five (5) most comparable units (comparability of which shall be assessed based on product, line and floor). "Product" shall refer to a given units classification within Hotel, Condo, Bayloft, Commercial; "Line" shall refer to a unit's position within each floor, as represented by the last two digits of a given unit number. The calculation of the Minimum Pricing Level covenant shall not include comparable units used for purposes of any financing, extension, or replacement transaction in respect of the Bulk 2 Repurchase Option nor shall the calculation of the Minimum Pricing Level include unit sales deemed to be an Affiliate Transaction.

### Section 4.34   Monthly Working Capital

The Company covenants that for so long as the Notes are outstanding it shall comply with the MWC Budget, for such month and for such categories of uses as set for therein. With each draw of Monthly Working Capital, the Company shall certify to the Trustee that such funds are to be spent in accordance with the approved categories contained herein. The MWC Budget shall consist of four categories: (i) "TOC Asset Completion & Preservation"; (ii) "Newland Corporate Operations"; (iii) "Newland TOC Operations"; and (iv) "Miscellaneous", which Miscellaneous category shall be available for expenses in each other category. To the extent that funds in a given category (including the "Miscellaneous" category) and month are unspent, such funds shall remain available to be used as Carry-Over Amounts, which Carry-Over Amounts can be applied within the same category. To the extent such unused funds have been drawn by the

Company, after expiration of the applicable period for Carry-Over Amounts, the Company shall transfer such funds back to the Collection Account.

### Section 4.35    Casino Buyer Mortgage

The Company covenants that for so long as the Notes are outstanding it shall maintain a first priority perfected security interest over its rights under the Casino Buyer Mortgage as Collateral to the Co-Trustee.

### Section 4.36    CEO Approval of Unit Sales

The Company covenants that for so long as the Notes are outstanding it shall require the Chief Executive Officer to provide written approval for each unit sale (residential, commercial, hotel), copies of which shall be timely provided to the Noteholder Representative (but only during the time period in which the Noteholder Representative function exists pursuant to Schedule 2 of this Indenture); facsimile and email approval by the Chief Executive Officer of Newland shall be acceptable.

### Section 4.37    Ratings

The Company covenants that for so long as the Notes are outstanding it shall provide that the Notes are rated by at least one ratings agency. The Company covenants that the Notes shall be rated pursuant to this Section 4.37 within 60 days of the date of issuance of the Notes.

### Section 4.38    Delivery of Certifications to Licensor.

(a) The Company shall deliver to Licensor (concurrently with delivery thereof to the Co-Trustee) any certifications or directions from the Company to the Co-Trustee certifying or directing payment of monies to Licensor from the Panama Account in respect of the Panama Account Priority of Payments.

## ARTICLE 5

## SUCCESSORS

### Section 5.01    Merger, Consolidation or Sale of Assets.

The Company may not, directly or indirectly:  (i) consolidate or merge with or into another Person; or (ii) sell, assign, transfer, convey lease or otherwise dispose of all or substantially all of the properties or assets of the Company, in one or more related transactions, to another Person; unless:

(a)    either:

(1)    the Company is the surviving corporation; or

(2)    the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance, lease or other

disposition has been made is a corporation organized or existing under the laws of the Republic of Panama, the United States, any state of the United States or the District of Columbia;

(b)      the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance, lease or other disposition has been made assumes by written agreement all the obligations of the Company under the Notes and this Indenture and the other Security Documents;

(c)      immediately after such transaction, no Default or Event of Default exists; and

(d)      the Person formed by or surviving any such consolidation or merger or the Person to which such sale, assignment, transfer, conveyance, lease or other disposition is made, shall have a Consolidated Net Worth not less than the Company's Consolidated Net Worth immediately prior thereto.

**Section 5.02   Successor Corporation Substituted.**

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof, the successor corporation formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor corporation and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein; *provided*, *however*, that the predecessor Company shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a sale of all of the Company's assets in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof.

# ARTICLE 6

# DEFAULTS AND REMEDIES

**Section 6.01   Events of Default.**

Each of the following is an "Event of Default":

(a)      default in the payment when due of interest on the Notes;

(b)      default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium, if any, on the Notes, including a failure to make payment on the Notes when due under a Prime Unit Sale;

(c)      failure by the Company to comply with the provisions of Section 5.01 hereof;

(d)      failure by the Company to comply with Sections 4.07 or 4.09 hereof;

(e)      failure by the Company for 30 days after notice to comply with any of the other covenants of the Company in this Indenture or any of the other Security Documents, including any covenants relating to the Noteholder Representative, Senior Officer and Corporate Governance requirements set forth in Sections 4.30, 4.31 and Schedule 2 hereto;

(f)      default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness of the Company whether such Indebtedness now exists or is created after the date of this Indenture, if that default:

(1)      is caused by a failure to pay principal of, or interest or premium, if any, on such Indebtedness following the expiration of the grace period provided in such Indebtedness on the date of such default (a "Payment Default"); or

(2)      results in the acceleration of such Indebtedness prior to its final date of maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $2.0 million or more;

(g)      failure by the Company to pay final judgments aggregating in excess of $5.0 million, which judgments are not paid, waived, satisfied, discharged or stayed for a period of 90 days;

(h)      a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future bankruptcy, insolvency or similar law or appointing a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities and reorganization or similar proceedings, or for the winding up or liquidation of its affairs, shall have been entered against the Company and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days;

(i)      the Company shall voluntarily file a petition for bankruptcy, reorganization, assignment for the benefit of creditors or similar proceeding or consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities, or similar proceedings of, or relating to, the Company or of, or relating to, all or substantially all of the assets of the Company;

(j)      the government of the Republic of Panama shall declare a general moratorium on banking activities within the Republic of Panama and, in each case, such moratorium continues for a period of 180 successive days; or

(k)      any Security Document or any Lien purported to be granted thereby is held in any judicial proceeding in the United States or Panama to be unenforceable or invalid, in whole or in part, or ceases for any reason (other than pursuant to a release that is delivered or becomes effective according to the terms of this Indenture) to be fully enforceable and perfected, or the Company shall so assert.

**Section 6.02   Acceleration.**

(a)      In the case of an Event of Default specified in clause (h) or (i) of Section 6.01 hereof, all outstanding Notes will become due and payable immediately without further action or notice.  If any other Event of Default occurs and is continuing, the Trustee, by written notice to the Company, or the Holders of at least 25% in aggregate principal amount of the then-outstanding Notes, by written notice to the Company and the Trustee, may declare all the Notes to be due and payable immediately.  Upon any such declaration of acceleration, the Notes shall become due and payable immediately.

(b)      In the event of a declaration of acceleration of the Notes because an Event of Default specified in clause (f) of Section 6.01 hereof, such declaration shall be automatically annulled if, within 20 days after such Event of Default arose, the event triggering such Event of Default pursuant to such clause (f) shall be remedied or cured by the Company or waived by the holders of the relevant Indebtedness.

(c)      Notwithstanding anything to the contrary in this Indenture or in the Co-Trustee Agreement, if an Event of Default occurs and is continuing, the Co-Trustee may, and shall upon the direction of the Trustee acting on direction of the Holders of at least one-third in aggregate principal amount of the then-outstanding Notes, discontinue releasing funds from the Panama Account for payment to Licensor until such Event of Default is cured or waived or such direction is withdrawn.

(d)      Subject to certain limitations set forth herein, the Majority Holders may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders notice of any continuing Default or Event of Default if it determines that withholding such notice is in their interest, except a Default or Event of Default relating to the payment of principal or interest.

**Section 6.03   Other Remedies.**

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal and premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

**Section 6.04   Waiver of Past Defaults.**

The Majority Holders by written notice to the Trustee may, on behalf of the Holders of all of the Notes, rescind an acceleration or waive any existing Default or Event of Default and its consequences under this Indenture except a continuing Default or Event of Default in the payment of interest or premium on, or the principal of, the Notes.

### Section 6.05    Control by Majority.

The Majority Holders may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it, so long as the Trustee is provided full indemnity satisfactory to it against any loss, liability or expenses that may arise in connection therewith.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be prejudicial to the rights of other Holders of Notes or that may involve the Trustee in personal liability.

### Section 6.06    Limitation on Suits.

Except to enforce the right to receive payment of principal, interest or premium, if any, or when due, no Holder may pursue any remedy with respect to this Indenture or the Notes unless:

(a)     such Holder has previously given the Trustee notice that an Event of Default is continuing;

(b)     Holders of at least 25% in aggregate principal amount of the outstanding Notes have requested the Trustee to pursue the remedy;

(c)     such Holders have offered the Trustee reasonable security or indemnity satisfactory to the Trustee against any loss, liability or expense;

(d)     the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity; and

(e)     Majority Holders have not given the Trustee a direction inconsistent with such request within such 60-day period.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

### Section 6.07    Rights of Holders of Notes To Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal and premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

### Section 6.08    Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee is authorized but not required to recover judgment in its own name and as Trustee of an express trust against the Company for the whole amount of principal of and premium, if any, and interest remaining unpaid on the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of

collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

### Section 6.09    Trustee May File Proofs of Claim.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation (including for the Trustee's time rendered), expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof. To the extent that the payment of any such compensation (including for the Trustee's time rendered), expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

### Section 6.10    Priorities.

If the Trustee collects any money pursuant to this Article 6 or Section 11.05, it shall pay out the money in the following order:

*First:  pro rata*, to the Trustee in respect of fees, expenses and indemnities of the Trustee, and to the Co-Trustee in respect of fees, expenses and indemnities of the Co-Trustee, in each case including the fees and expenses of their attorneys and agents;

*Second*:  to Holders of Notes for amounts due and unpaid on the Notes for principal and premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and premium, if any, and interest, respectively; and

*Third*:  to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a Record Date and Payment Date for any payment to Holders of Notes pursuant to this Section 6.10.

### Section 6.11    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in principal amount of the then outstanding Notes.

### Section 6.12    Foreclosure.

Upon an Event of Default, if foreclosure is sought pursuant to Section 6.03 of this Indenture, the Trustee shall receive from the Co-Trustee a Budget (as defined in the Co-Trustee Agreement) for the expenses associated with any such foreclosure.  The Trustee shall forward such Budget to the Holders for approval.  The Trustee shall provide a Foreclosure Notice Confirmation (as defined in the Co-Trustee Agreement) to the Co-Trustee if the Majority Holders consent to such Budget within twenty Business Days from the date of the consent solicitation and shall reject such budget, and as a result not continue with the foreclosure, if the Majority Holders reject such Budget.  If a Holder does not respond to such consent solicitation within twenty Business Days of the date thereof, such Holder shall be deemed to have consented to such Budget.

## ARTICLE 7

## TRUSTEE

### Section 7.01    Duties of Trustee.

(a)    If an Event of Default of which a Responsible Officer of the Trustee shall have actual knowledge has occurred and is continuing, the Trustee will exercise such of the rights and powers and only such rights and powers vested in it specifically by this Indenture, and will use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    The Trustee shall not be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished by the Company or the Noteholder Representative hereunder or under any other Transaction Document.

(c)    Except during the continuance of an Event of Default of which a Responsible Officer of the Trustee shall have actual knowledge:

(1)    the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

57

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.

(d)     The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)     this paragraph does not limit the effect of paragraph (c) of this Section 7.01;

(2)     the Trustee will not be liable, as trustee or in its individual capacity, for any error of judgment made in good faith by a Responsible Officer or other Officers of the Trustee, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee will not be liable, as trustee or in its individual capacity, with respect to any action it takes, allows or omits to take in good faith in accordance with this Indenture or a direction received by it pursuant to Section 6.05 hereof.

(e)     Whether or not therein expressly so provided, every provision of this Indenture or any other Transaction Document that in any way relates to the Trustee is subject to paragraphs (a), (b), (c) and (d) of this Section 7.01.

(f)     No provision of this Indenture will require the Trustee to expend or risk its own funds or otherwise incur any liability.  The Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any Holders (or the Majority Holders) unless such Holders (or the Majority Holders) have offered to the Trustee reasonable indemnity or security against the costs, expenses and liabilities that might be incurred by it in compliance with such request or direction.

(g)     The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by applicable law.

**Section 7.02   Rights of Trustee.**

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, Opinion of Counsel, certificates of auditors or any other certificates, statement instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document (whether in original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document.

(b)     Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both, at the Company's expense. The Trustee will not be liable for any action it takes, allows or omits to take in good faith in reliance on an Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel and any advice or opinion of such counsel or any Opinion of Counsel will be full and complete authorization and

protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder through its attorneys, agents or custodians and will not be responsible for the misconduct or negligence of any attorney, agent or custodian appointed with due care.

(d)     The Trustee will not be liable for any action it takes, allows or omits to take in good faith that it believes to be authorized or within the discretion, the rights or powers conferred upon it by this Indenture.

(e)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Officer of the Company.

(f)      Before the Trustee provides any consent, authorization or instruction hereunder or under the other Transaction Documents, it may require direction from the Majority Holders (or such lower threshold of beneficial Holders as expressly specified in Section 6.02(c) and 10.02 of this Indenture).

(g)     In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), whether or not any such damages were foreseeable or contemplate, irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(h)     The Trustee shall not be required to take notice or be deemed to have notice or knowledge of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any Default or Event of Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)     The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(k)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Majority Holders; *provided*, *however*, that if the payment within a reasonable time to the Trustee of the costs, expenses, including the costs of agents or counsel, or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to

59

the Trustee by the security afforded to it by the terms of this Indenture, the Trustee may require indemnity satisfactory to the Trustee against such cost, expense or liability as a condition to taking any such action. The reasonable expense of every such examination shall be paid by the Company or, if paid by the Trustee, shall be repaid by the Company upon demand from the Company's own funds.

(l)    The right of the Trustee to perform any discretionary act enumerated in this Indenture shall not be construed as a duty, and the Trustee shall not be answerable for other than its negligence or willful misconduct in the performance of such act.

(m)    The Trustee shall have no duty (A) to effect any recording, filing or depositing of this Indenture or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to monitor or maintain any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to obtain any insurance or (C) to effect the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the trust fund.

(n)    The Trustee shall not be required to give any bond or surety in respect of the execution of the trust fund created hereby or the powers granted hereunder.

(p)    In connection with any actions taken by the Trustee in connection with the sale of the Casino Unit, the Trustee shall be entitled to receive from the Company any and all information required in order to satisfy its internal policies and procedures with respect to anti-money laundering laws and regulations to which the Trustee is subject.

(q)    The Trustee shall not be required to take any actions under this Indenture or any other Transaction Document if the Trustee reasonably determines or is advised by counsel in writing that such action is contrary to the terms of this Indenture, or is otherwise contrary to law.

(r)    Notwithstanding anything to the contrary contained herein, the Trustee shall be entitled to accept direction from the Majority Owners in lieu of the Majority Holders and shall be fully protected in so relying.

### Section 7.03    Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee.

### Section 7.04    Trustee's Disclaimer.

Neither the Trustee nor the Co-Trustee will be responsible for and makes any representation as to the validity or adequacy of this Indenture, the Notes or the validity, perfection or enforceability of the Mortgage or the Collateral, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee or Co-Trustee,

respectively, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

### Section 7.05   Notice of Defaults.

(a)      Promptly (and in no event later than two Business Days) after the occurrence of any Event of Default known to a Responsible Officer of the Trustee or after any declaration of acceleration has been made or delivered to the Trustee, the Trustee shall (for so long as any Notes are Outstanding) mail (with a copy to the Company) to each Rating Agency, the Paying and Transfer Agent, and to all Holders, as their names and addresses appear on the Note Register, notice of all Events of Default hereunder known to such Responsible Officer, unless such Events of Default shall have been cured or waived.

(b)      Except in the case of an Event of Default in payment of principal or premium, if any, or interest on, any Note, the Trustee may withhold the notice if it determines that withholding the notice is in the interests of the Holders of the Notes.

### Section 7.06   Entry into NDA

Simultaneously with the execution and delivery hereof, the Trustee shall enter into a Non-Disturbance Agreement ("NDA") in substantially the form set forth in Exhibit Q hereto, and subject to the terms of this Article 7, the Trustee and the Co-Trustee (and any separate trustee or co-trustee appointed pursuant to Section 7.11) shall have the authority to perform any obligations of the Trustee or the Co-Trustee thereunder.

### Section 7.07   Compensation and Indemnity.

(a)      The Company will pay to the Trustee from time to time compensation for its acceptance of this Indenture and services hereunder as agreed to in writing between the Trustee and the Company.  The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust.  The Company will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.   Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

(b)      The Company will indemnify the Trustee against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Company (including this Section 7.07) and defending itself against any claim (whether asserted by the Company, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense as shall be determined to have been caused by the Trustee's own negligent action, negligent failure to act, willful misconduct or bad faith.  The Trustee will notify the Company promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Company will not relieve the Company of its obligations hereunder.  The Company will defend the claim and the Trustee will cooperate in the defense.  The Trustee may

have separate counsel and the Company will pay the reasonable fees and expenses of such counsel.  The Company need not pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c)      The obligations of the Company under this Section 7.07 will survive the resignation and removal of the Trustee, and the satisfaction and discharge of this Indenture.

(d)      To secure the Company's payment obligations in this Section 7.07, each of the Trustee and the Co-Trustee (*pari passu*) will have a Lien prior to the Notes on all money or property held or collected by the Trustee and the Co-Trustee, respectively, except that held in trust to pay principal and interest on particular Notes.  Such Lien will survive the resignation and removal of the Trustee and the Co-Trustee, respectively, and the satisfaction and discharge of this Indenture and the Co-Trustee Agreement.

(e)      When the Trustee incurs expenses or renders services after an Event of Default specified in Sections 6.01(h) or (i) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

### Section 7.08   Replacement of Trustee.

(a)      A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b)      The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company.  The Majority Holders may remove the Trustee by so notifying the Trustee and the Company in writing.  The Company may remove the Trustee only if:

(1)      the Trustee fails to comply with Section 7.10 hereof;

(2)      the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3)      a custodian or public officer takes charge of the Trustee or its property; or

(4)      the Trustee becomes incapable of acting.

(c)      If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company will promptly appoint a successor Trustee.  Unless a successor trustee shall have been so appointed and have accepted appointment within 60 days after such resignation or removal, the resigning or removed trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

(d)      If the Trustee fails to comply with Section 7.10 hereof, any Holder who has been a Holder for at least six months, may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company.   Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.   The successor Trustee will mail a notice of its succession to Holders.   The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee, provided all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof.   Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof will continue for the benefit of the retiring Trustee.

(f)    Any successor trustee appointed as provided in this Section shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it hereunder, and the Company and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

### Section 7.09   Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee.

### Section 7.10   Eligibility; Disqualification.

There will at all times be a Trustee hereunder that is a corporation or banking association organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus together with its affiliates of at least $50.0 million.

### Section 7.11   Separate Trustees and Co-Trustees.

(a)    Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting legal requirements applicable to it in the performance of its duties hereunder, the Trustee shall have the power to, and shall execute and deliver all instruments to, appoint one or more Persons to act as separate trustees or co-trustees hereunder, jointly with the Trustee, of any portion of the Collateral subject to this Indenture, and any such Persons shall be such separate trustee or co-trustee, with such powers and duties consistent with this Indenture as shall be specified in the instrument appointing such Person but without thereby releasing the Trustee from any of its duties hereunder.   If the Trustee shall request the Company to do so, the Company shall join with the Trustee in the execution of such instrument, but the Trustee shall have the power to make such appointment without making such request.   A separate trustee or

co-trustee appointed pursuant to this Section 7.11 need not meet the eligibility requirements of Section 7.10.  No trustee hereunder shall be personally liable because of any act or omission of any other trustee hereunder and any appointed separate or co-trustee hereunder shall not be deemed an agent of the appointing trustee.

(b)     Every separate trustee and co-trustee shall, to the extent not prohibited by law, be subject to the following terms and conditions:

(1)     the rights, powers, duties and obligations conferred or imposed upon such separate or co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate or co-trustee jointly, as shall be provided in the appointing instrument, except to the extent that under any law of any jurisdiction in which any particular act is to be performed any nonresident trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee;

(2)     all powers, duties, obligations and rights conferred upon the Trustee, in respect of the custody of all cash deposited hereunder shall be exercised solely by the Trustee; and

(3)     the Trustee may at any time by written instrument accept the resignation of or remove any such separate trustee or co-trustee, and, upon the request of the Trustee, the Company shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to make effective such resignation or removal, but the Trustee shall have the power to accept such resignation or to make such removal without making such request.  A successor to a separate trustee or co-trustee so resigning or removed may be appointed in the manner otherwise provided herein.

(c)     Such separate trustee or co-trustee, upon acceptance of such trust, shall be vested with the estates or property specified in such instruments, jointly with the Trustee, and the Trustee shall take such action as may be necessary to provide for (i) the appropriate interest in the Collateral to be vested in such separate trustee or co-trustee and (ii) the execution and delivery of any transfer documentation or bond powers that may be necessary to give effect to the transfer of the Lien of this Indenture and the Mortgage to the co-trustee.  Any separate trustee or co-trustee may, at any time, by written instrument constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent permitted by law, do all acts and things and exercise all discretion authorized or permitted by it, for and on behalf of it and in its name.  The Trustee shall not be responsible for any action or inaction of any separate trustee or co-trustee.  If any separate trustee or co-trustee shall be dissolved, become incapable of acting, resign, be removed or die, all the estates, property, rights, powers, trusts, duties and obligations of said separate trustee or co-trustee, so far as permitted by law, shall vest in and be exercised by the Trustee, without the appointment of a successor to said separate trustee or co-trustee, until the appointment of a successor to said separate trustee or co-trustee is necessary as provided in this Indenture.

(d)     Any notice, request or other writing, by or on behalf of any Holder, delivered to the Trustee shall be deemed to have been delivered to all separate trustees and co-trustees.

(e)     Although co-trustees may be jointly liable, no co-trustee or separate trustee shall be severally liable by reason of any act or omission of the Trustee or any other such trustee hereunder.

(f)     No appointment of a separate trustee or co-trustee pursuant to this Section 7.11 shall relieve the Trustee of any of its obligations, duties or responsibilities hereunder in any way or to any degree.

**Section 7.12    TOC Casino Transaction and Registration of Certain Unit Purchase Agreements Related to Sale of Casino.**

(a)     In connection with one or more transactions governed under a master transaction agreement in which a purchaser (including any affiliates designated by such purchaser for such purposes, the "Casino Buyer") acquires one or more Units at the Project, and one of such acquired Units is the Casino for purposes of developing a gaming enterprise at the Project (the "TOC Casino Transaction"), the Company shall be permitted to sell Units (each an "Ancillary Unit") that are not Prime Units for purchase prices in aggregate not to exceed $7.0 million to the Casino Buyer in the TOC Casino Transaction on terms and conditions that comply with this Indenture; provided, however, that (i) any such Ancillary Unit sale will not be included in the calculations of prices under the Minimum Pricing Level covenant and (ii) the sale of Ancillary Units to the Casino Buyer may be for a combination of cash and one or more loans (each an "Ancillary Unit Loan") in favor of the Company for the non-cash balance of the purchase price set forth in each relevant Unit Purchase Agreement. The transfer of title to such Ancillary Units, and the release of the relevant Mortgage on such Ancillary Units, will occur at the time of sale of each Ancillary Unit under the respective Unit Purchase Agreement, provided the Casino Buyer shall register in the Panamanian Public Registry a mortgage in favor of the Company (with the Company as mortgagee) securing the obligations under the Ancillary Unit Loans in favor of the Company (the "Casino Buyer Mortgage"). The Company will then create a security interest over its rights under the Casino Buyer Mortgage as Collateral to the Co-Trustee. The Casino Buyer shall also be responsible for making payment in respect of common area maintenance and other owner expenses from the earlier of occupancy of any such Ancillary Unit or the closing date of any such sale. Any Ancillary Unit sale in connection with a TOC Casino Transaction shall not be considered an Asset Sale for purposes of this Indenture.

(b)     Upon certification to the Co-Trustee and the Trustee (the "Casino UPA Certification") from the Company that a Unit Purchase Agreement has been signed with Sun International Limited or an affiliate of Sun International Limited ("Sun International") for the sale of the Units where the Casino will be located (a "Casino UPA"), the Co-Trustee shall consent to the registration of the Casino UPA (the "Casino UPA Registration Consent"), and any other Unit Purchase Agreement signed with Sun International, with the Panamanian Public Registry. The form of the Casino UPA Registration Consent is set forth in Exhibit I hereto.

(c)     Upon the earlier to occur of (i) the termination of a Casino UPA and (ii) the termination of that certain Framework Agreement, dated as of November 26, 2012, by and among Sun International, Trump Panama Hotel Management LLC, and the Company, the Company shall provide a certification to the Co-Trustee and the Trustee of such termination event (the "Casino UPA Termination Certification", and together with the Casino UPA

Certification, the "Casino UPA Certifications"). Upon receipt of such Casino UPA Termination Certification, the Co-Trustee shall consent to such cancellation with the Panamanian Public Registry (the "Casino UPA Cancelation Consent"), and the Company shall promptly cancel such registration with the Panamanian Public Registry. The form of the Casino UPA Cancelation Consent is set forth in Exhibit J hereto.

(d)    The Company and the Trustee acknowledge that any of the above required documentation pursuant to this Section 7.12, including the Casino UPA Certifications sent by the Company to the Co-Trustee, and any other relevant information, will be at the Company's expense and subject to no verification or other obligation of the Co-Trustee with respect to such documents, including, but not limited to, any liability arising as a result of delays by the Company in delivering to the Co-Trustee any of the Casino UPA Certifications. It is also understood by the Company and the Trustee that pursuant to this Section 7.12, the Spanish versions of Exhibit I and Exhibit J, for purposes of their registration into the Panamanian Public Registry, in case of any discrepancy or conflict with the English translations, will prevail over the same, as the said English translations are for reference purposes only and not for registration into the Panamanian Public Registry.

## ARTICLE 8

## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

### Section 8.01    Option To Effect Legal Defeasance or Covenant Defeasance.

The Company may, at its option and at any time, elect to have either Section 8.02 or 8.03 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

### Section 8.02    Legal Defeasance and Discharge.

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Company will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from its obligations with respect to all outstanding Notes on the date the conditions set forth below are satisfied (hereinafter, "Legal Defeasance").  For this purpose, Legal Defeasance means that the Company will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in clauses (1) and (2) below, and to have satisfied all its other obligations under such Notes and this Indenture (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same which shall be reasonably satisfactory to the Noteholder Representative (but only during the time period in which the Noteholder Representative function exists pursuant to Schedule 2 of this Indenture)), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(a)      the rights of Holders of outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, on such Notes when such payments are due from the trust referred to in Section 8.04 hereof;

(b)      the Company's obligations with respect to such Notes under Article 2 and Section 4.02 hereof;

(c)      the rights, powers, trusts, duties and immunities of the Trustee hereunder and the Company's obligations in connection therewith; and

(d)      this Article 8.

Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

**Section 8.03    Covenant Defeasance.**

Upon the Company's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Company will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from its obligations under the covenants contained in Sections 4.03, 4.04, 4.07, 4.09, 4.10, 4.11, 4.12, 4.13, 4.16, 4.17, 4.21, 4.25, 4.26, 4.27, 4.28, 4.30, 4.31, 4.32, 4.33, 4.34, 4.35, 4.36 and 4.37 hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "Covenant Defeasance"), and the Notes will thereafter be deemed "outstanding" for all purposes hereunder.  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes will be unaffected thereby.

**Section 8.04    Conditions to Legal or Covenant Defeasance.**

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03 hereof:

(a)      the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in U.S. dollars, in amounts as will be sufficient, in the opinion of a United States nationally recognized investment bank, appraisal firm or firm of independent public accountants to pay the principal of, or interest and premium, if any, on the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Company must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(b)      in the case of an election under Section 8.02 hereof, the Company shall have delivered to the Trustee an Opinion of Counsel confirming that:

(1)      the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(2)      since the date of this Indenture, there has been a change in the applicable federal income tax law;

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)      in the case of an election under Section 8.03 hereof, the Company shall have delivered to the Trustee an Opinion of Counsel confirming that the Holders of the outstanding Notes will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)      no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company is a party or by which the Company is bound;

(e)      such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture) to which the Company is a party or by which the Company is bound;

(f)      the Company must deliver to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the Holders of Notes over the other creditors of the Company with the intent of defeating, hindering, delaying or defrauding creditors of the Company or others; and

(g)      the Company must deliver to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

**Section 8.05   Deposited Money and Government Obligations To Be Held in Trust; Other Miscellaneous Provisions.**

Subject to Section 8.06 hereof, all money deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in

respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver to the Company from time to time upon the request of the Company any money held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(1) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

### Section 8.06   Repayment to Company.

Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of or premium, if any, or interest on any Note and remaining unclaimed for two years after such principal or premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, will thereupon cease; *provided, however*, that the Trustee or such Paying Agent, before being required to make any such repayment, may (but shall not be required to) at the expense of the Company cause to be published once, in *The New York Times* and *The Wall Street Journal* (national edition) and in a newspaper of broad distribution in Panama, notice that such money remains unclaimed and that, after a date specified therein, which will not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Company.

### Section 8.07   Reinstatement.

If the Trustee or Paying Agent is unable to apply any United States dollars in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided, however*, that, if the Company makes any payment of principal of or premium, if any, or interest on any Note following the reinstatement of its obligations, the Company will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 9

## AMENDMENT, SUPPLEMENT AND WAIVER

### Section 9.01    Without Consent of Holders of Notes.

Notwithstanding Section 9.02 of this Indenture, without the consent of any Holder of Notes, the Company and the Trustee may amend or supplement this Indenture or the Notes (with the prior written consent of the Co-Trustee in the event that any such amendment or supplement affects the Co-Trustee):

(a)    to cure any ambiguity, defect or inconsistency;

(b)    to provide for the assumption of the Company's obligations to Holders, in the case of a merger or consolidation or sale of all or substantially all of the Company's assets;

(c)    to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights under this Indenture of any such Holder;

(d)    to conform the text of this Indenture or the Notes to any provision of the "Description of Notes" section of the Company's Disclosure Statement dated March 29, 2013, relating to the initial offering of the Notes;

(e)    to provide for the appointment of a successor Trustee or Co-Trustee; provided that the successor Trustee or Co-Trustee is otherwise qualified and eligible to act as such under the terms of this Indenture, the Notes and Co-Trustee Agreement (in the case of a successor Co-Trustee); or

(f)    to include in Exhibit C a new form of Unit Purchase Agreement in accordance with Section 4.23(b) or to make an amendment to a form of Unit Purchase Agreement in accordance with Section 4.23(a)(2).

Prior to the execution of any amendment to this Indenture, the Trustee shall be entitled to receive and rely on an Opinion of Counsel stating that the execution of such amendment is authorized and permitted by this Indenture.

After an amendment becomes effective, the Company is required to mail to each registered Holder of the Notes a notice briefly describing such amendment.  However, the failure to give such notice to all Holders, or any defect therein, will not impair or affect the validity of the amendment.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 9.05 hereof, the Trustee will join with the Company in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or

supplemental indenture that affects its own rights, duties, liabilities or immunities under this Indenture or otherwise.

### Section 9.02    With Consent of Holders of Notes.

(a)       Except as provided below in this Section 9.02, the Company and the Trustee may amend or supplement this Indenture (including, without limitation, Sections 3.09 and 4.10 hereof) and the Notes with the consent of the Majority Holders (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes) (with the prior written consent of the Co-Trustee in the event that any such amendment or supplement affects the Co-Trustee), and, subject to Sections 6.04 and 6.07 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of or premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture or the Notes may be waived with the consent of the Majority Holders (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes).  Section 2.08 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence reasonably satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.05 hereof, the Trustee will join with the Company in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture.

The consent of the Holders under this Section 9.02 is not necessary to approve the particular form of any proposed amendment or waiver. It is sufficient if such consent approves the substance of such proposed amendment, supplement or waiver.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company will mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver.  Any failure of the Company to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

(b)       Subject to Sections 6.04 and 6.07 hereof, the Majority Holders may waive compliance in a particular instance by the Company with any provision of this Indenture or the Notes.   However, without the consent of each Holder affected thereby, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1)       reduce the percentage of the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)      reduce the principal of or change the final maturity of any Note or alter the provisions with respect to the redemption of the Notes;

(3)      reduce the rate of or change the time for payment of interest on any Note;

(4)      waive a Default or Event of Default in the payment of principal of, or interest or premium, if any, on the Notes;

(5)      make any Note payable in a currency other than that stated in the Notes;

(6)      make any change in the provisions of this Indenture relating to waivers of past Defaults or the rights of Holders of Notes to receive payments of principal of, or interest or premium, if any, on the Notes;

(7)      waive a redemption payment with respect to any Note;

(8)      except as otherwise expressly provided herein, effect any release of the Collateral or deprive the Trustee of the benefit of a first priority security interest in the Collateral; or

(9)      make any change in the amendment and waiver provisions in this Section 9.02(b).

### Section 9.03    Revocation and Effect of Consents.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

### Section 9.04    Notation on or Exchange of Notes.

The Trustee may but shall not be obligated to place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

### Section 9.05    Trustee To Sign Amendments, etc.

The Trustee may, but shall not be obligated enter into any amendment or supplement that adversely affect the rights, duties, liabilities or immunities of the Trustee.  In executing any

amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Section 14.02 hereof, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.

**Section 9.06    Additional Consents.**

In addition, any amendment, waiver or supplement to this Indenture or the Notes, with or without consent of the Majority Holders, may be subject to prior approval or filing requirements of the Panamanian National Securities Commission pursuant to Agreement 4-2003.

## ARTICLE 10

## ACCOUNTS, RELEASES AND DISBURSEMENTS

**Section 10.01  Panama Closing Account and Panama Account.**

(a)    From the date hereof until principal of and interest on all Notes have been paid in full, the Company shall cause all Unit Purchase Agreements to provide that obligors thereunder are required to make initial deposits and installment payments directly into the Panama Closing Account from which account (i) the monies representing Newland Unit Proceeds will be transferred, in accordance with, and subject to the terms and conditions of, the Co-Trustee Agreement, to the Panama Account and (ii) the monies representing Brokers' Commissions and Property Transfer Fees will be used as and when due to pay the respective payees of such obligations, in accordance with, and subject to the terms and conditions of, the Co-Trustee Agreement. If any payment of an initial deposit or installment payment by a buyer under a Unit Purchase Agreement is received by the Company, the Company shall promptly transfer such payment into the Panama Closing Account, in accordance with, and subject to the terms and conditions of, the Co-Trustee Agreement. The Company shall provide a certification to the Trustee and the Co-Trustee in the form of Exhibit G hereto as to the value of the Brokers' Commissions, Property Transfer Fees and the Newland Unit Proceeds breakdown of all deposits and installments made into the Panama Closing Account. Monies representing Brokers' Commissions as and when due will be used to pay the respective payees of such obligations pursuant to wiring instructions in the form of Exhibit H hereto.

(b)    From the date hereof until principal of and interest on all Notes have been paid in full, the Company shall cause (x) all Net Proceeds from Prime Unit Sales to be deposited directly into the Panama Closing Account and (y) all Non-UPA Revenues to be  deposited directly into the Panama Account.  If any Net Proceeds from Prime Unit Sales and Non-UPA Revenues are received by the Company, the Company shall promptly transfer such amounts into the Panama Closing Account or Panama Account, respectively, in accordance with, and subject to the terms and conditions of, the Co-Trustee Agreement.

(c)    Pursuant to the Co-Trustee Agreement, the Co-Trustee shall cause (x) all Net Proceeds from Prime Unit Sales on deposit in the Panama Closing Account to be transferred to the Collection Account and (y) amounts on deposit in the Panama Account to be transferred to

the Release Account in accordance with the "Panama Account Priority of Payments" set forth in Section 10.02 of this Indenture.

**Section 10.02  Panama Account Priority of Payments.**

(a)     Pursuant to the Co-Trustee Agreement, the Co-Trustee will disburse and/or reserve amounts deposited into the Panama Account, in the manner specified below and in the order of priority set forth below (the "Panama Account Priority of Payments"):

(1)     on each Tuesday and Thursday of a calendar week, the Co-Trustee shall transfer to Licensor amounts sufficient to pay the fees due and payable to Licensor in respect of current unit sales in accordance with the Trump License Agreement (taking into account the Eighth Amendment thereto) ("Current License Fees"), excluding Default Interest (as defined below) thereon;

(2)     on each Tuesday and Thursday of a calendar week (after payment to Licensor of any then due and payable Current License Fees pursuant to clause (1) above), amounts in the Panama Account shall be transferred to the Release Account in U.S. dollars, until the sum of $1.2 million (or such other smaller amount required by the Company, as certified by the Company to the Co-Trustee and the Trustee prior to the transfer of a sum of $1.2 million to the Release Account) has been transferred to the Release Account. The $1.2 million sum permitted for transfer to the Release Account pursuant to this clause (2) shall be available on a one-time basis only, from the date of this Indenture until such amount is transferred in full, and not each calendar month;

(3)     once the sum of $1.2 million (or such other smaller amount certified by the Company) has been transferred to the Release Account pursuant to clause (2) above, in each calendar month thereafter (including the month in which such $1.2 million (or lesser amount) shall have been paid in full), the Co-Trustee shall reserve all amounts deposited into the Panama Account (other than those used to pay Current License Fees pursuant to clause (1) above) until the Monthly Accrued Fee Payment Amount for such calendar month has been accumulated (after holding back and paying to Licensor any amounts required to be paid as Current License Fees pursuant to clause (1) above) and (i) once such amount has been accumulated, the Co-Trustee shall transfer to Licensor the Monthly Accrued Fee Payment Amount (with such transfer occurring on the next Tuesday or Thursday following accumulation of such sum) or (ii) if the Monthly Accrued Fee Payment Amount for such month is not so accumulated in full during such month, the Co-Trustee shall on the last Business Day of such month which is a Tuesday or Thursday transfer to Licensor the entire balance on deposit in the Panama Account (after holding back and paying to Licensor any amounts required to be paid as Current License Fees pursuant to clause (1) above); and

(4)     following the transfer of the Monthly Accrued Fee Payment Amount in full to Licensor in the respective calendar month in accordance with clause (3)(i) above, all excess amounts, if any, subsequently deposited in the Panama Account during such calendar month (after holding back and paying to Licensor any amounts required to be paid as Current License Fees pursuant to clause (1) above) shall be transferred to the Release Account on Tuesday and Thursday of each calendar week until the first day of the next succeeding calendar month (at

74

which time the reservation and payment procedures in clause (3) above shall be re-instituted in each calendar month until the Monthly Accrued Fee Payment Amount for such month has been reserved and paid in accordance with that clause).

In the case of calculations with respect to the above Panama Account Priority of Payments, the Co-Trustee shall receive and be entitled to rely upon Company certifications as to amounts and timing and shall have no obligation to confirm the authenticity or review the calculations contained therein. Such certifications delivered to the Co-Trustee shall concurrently be delivered to Licensor. The form of such certification is set forth in Exhibit M hereto.

No amounts on deposit in the Panama Account shall be transferred pursuant to clause (4) above to the Release Account in any given calendar month, if the Monthly Accrued Fee Payment Amount for such month has not been paid to the Licensor in such calendar month or if the Company has not issued each of the certifications required of clauses (1) through (4) above.

Notwithstanding anything to the contrary in this Indenture or in the Co-Trustee Agreement, if an Event of Default occurs and is continuing, the Co-Trustee may, and shall upon the direction of the Trustee acting on direction of the beneficial holders of at least one-third in aggregate principal amount of the then-outstanding Notes, discontinue releasing funds from the Panama Account for payment to Licensor until such Event of Default is cured or waived or such direction is withdrawn.

(b) (i) "Monthly Accrued Fee Payment Amount" shall be, for any calendar month, the sum of: (w) $437,000 (or, in the case of the final monthly amount, such lesser amount as shall be necessary to cause the Total Accrued Fee Payment Amount shall be paid in full); (x) any shortfall in the payment of the Monthly Accrued Fee Payment Amount that was due and payable for the prior month, such shortfall being the amount of the Monthly Accrued Fee Payment Amount for such prior month (as determined pursuant to this paragraph), less the actual payment made in such prior calendar month pursuant to clause 3(ii) of Section 10.02 (a "Shortfall"); (y) any outstanding Default Interest, as at the end of the prior calendar month; and (z) any license fees due and payable for the prior calendar month in respect of commercial lease revenues under that certain Trump License Agreement (taking into account the Eighth Amendment thereto) ("Trump Lease Fees"). (ii) "Total Accrued Fee Payment Amount" shall mean (x) as of [*insert Effective Date*], the total outstanding amount of accrued license fees then owing to Licensor, as discounted by the agreed discount factor (as set forth in the Eight Amendment to the Trump License Agreement (the "Accrued Amount") and (y) as of any subsequent date, the unpaid balance of such Accrued Amount, plus any accrued and unpaid Shortfall, Default Interest and Trump Lease Fees. As of the date hereof, the Total Accrued Fee Payment Amount is [*]; (iii) "Default Interest" shall mean default interest due and payable under the Trump License Agreement (taking into account the Eighth Amendment thereto) on any amounts due to Licensor, to the extent not paid when due (or beyond an applicable default interest grace period) under, and as specified more fully in, the Trump License Agreement (taking into account the Eighth Amendment thereto).

[(c) In the event of any conflict between the provisions set forth below in clauses (a) or (b) above and those provisions set forth in Section 6(c) of the Co-Trustee Agreement, the provisions set forth in the Co-Trustee Agreement shall control.]

**Section 10.03  Release Account and Collection Account.**

(a)      On or prior to the date of this Indenture, the Trustee shall have established, in the name of the Trustee, for the benefit of the Holders, an account (the "Release Account") into which the Co-Trustee shall deposit amounts as set forth herein.  Amounts on deposit in the Release Account will be held in the Release Account during each Monthly Collection Period until the Monthly Working Capital Amount has been accumulated (or, if the full Monthly Working Capital Amount is not accumulated during such Monthly Collection Period, until the end of such Monthly Collection Period), whereupon (i) all collections in excess of the Monthly Working Capital Amount shall be transferred on Wednesday and Friday of each calendar week to the Collection Account for application in accordance with the Priority of Payments, (ii) the Monthly Working Capital Amount (including Carry-Over Amounts) (or, if not accumulated in full during such Monthly Collection Period, any amount so accumulated) will be transferred to the Company upon the Company's written request (such request delivered in writing by the Company to the Trustee not less than 2 Business Days in advance of such date (which shall be a Wednesday or Friday of a calendar week)), and (iii) all additional collections after the transfer of the Monthly Working Capital Amount to the Company, if any, transferred into the Release Account during such Monthly Collection Period will be transferred on Wednesday and Friday of each calendar week to the Collection Account for application in accordance with the Priority of Payments.

(b)      On or prior to the date of this Indenture, the Trustee shall have established, in the name of the Trustee, for the benefit of the Holders, an account (the "Collection Account") in which the Trustee shall deposit (x) all collections remaining in the Release Account, if any, following distribution of the Monthly Working Capital Amount, as provided in Section 10.03(a) above, (y) net proceeds from Asset Sales pursuant to Section 4.10(d) of this Indenture, and (z) Insurance Proceeds pursuant to Section 4.24(c) of this Indenture.

(c) "Monthly Working Capital Amount" for each month shall be the amount set forth for such month and such category as set forth in Exhibit N hereto (the "MWC Budget"); provided, that, the Monthly Working Capital Amount for any month and category of expense shall be reduced to the extent of any amounts previously disbursed to the Company in such month and for such category from the Collection Account; provided, further, that, Monthly Working Capital Amount for any month and such category shall be increased to include any undrawn Monthly Working Capital Amounts from the preceding two months ("Carry-Over Amounts"), and provided, further, that the Monthly Working Capital Amount in any given month shall be increased by such amounts as are necessary to pay any bonus amounts then due under that certain Consulting Agreement, dated as of September 10, 2012, by and between the Company and Cervera Real Estate, Inc. (the "Cervera Contract") in such amounts and on such payment dates as are provided in the Cervera Contract and as certified by the Company to the Trustee.   The Company shall certify in writing the amount of any such bonus payments under the Cervera Contract to the Trustee. The Company shall not be permitted in any month to have drawn from the Release Account (or the Collection Account, in the event of a disbursement of all or a portion of the Monthly Working Capital Reserve Amount) more than the Monthly Working Capital Amount for such month.

76

(d) Monthly Working Capital Amount monies shall become available effective on the date of the issuance of the Notes, and if the date of such issuance is other than the first day of a calendar month then the amount available for that month shall be the total amount set forth for that month reduced on a pro rata basis to cover the number of days remaining during that month following the date of such issuance.

(e) If any payment made by an obligor under a Unit Purchase Agreement is received by the Company rather than the related account to which payment should have been made, the Company will be required to transfer such payment into the account into which such payment should have been made promptly upon receipt.

### Section 10.04  Priority of Payments from, and Reserves in, the Collection Account

(a)       On Wednesday and Friday of a calendar week on which a disbursement is requested by the Company or otherwise required under this Indenture (each, a "Disbursement Date"), or where indicated below, on each Payment Date or Expense Payment Date or Mandatory Prepayment Date, the Trustee will reserve and/or reduce and/or disburse any prior reservation of amounts in the Collection Account, all as specified below and in the following order of priority (the "Priority of Payments"):

(1)       (x) on a Mandatory Prepayment Date, to apply any Net Proceeds from a Prime Unit Sale to a Mandatory Prepayment in accordance with Section 3.09 of this Indenture; and (y) on an Expense Payment Date, in amounts sufficient to pay the fees, expenses and indemnities of the Trustee and Co-Trustee due and unpaid on such Expense Payment Date;

(2)       if requested by the Company (with such request delivered in writing by the Company to the Trustee not less than 2 Business Days in advance of such Disbursement Date): to reserve and/or reduce and/or disburse any prior reservation of, all or a portion of an amount up to the Monthly Working Capital Reserve Amount; provided, that, in no instance shall the Company draw an amount in excess of the Monthly Working Capital Amount for any month;

(3)       if requested by the Company (with such request delivered in writing by the Company to the Trustee not less than 2 Business Days in advance of such Disbursement Date): to reserve and/or reduce and/or disburse any prior reservation of all or a portion of the Contingency Reserve Amount;

(4)       as directed by the Company (with such request delivered in writing by the Company to the Trustee not less than 2 Business Days in advance of such Disbursement Date): to reserve and/or disburse any prior reservation of all or a portion of an amount up to the Bulk 2 Repurchase Reserve Amount;

(5)       as directed by the Company (and with respect to clauses (x) and (y) of this item (5), the Company shall be required to direct the Trustee) (with such request delivered in writing by the Company to the Trustee not less than 2 Business Days in advance of such Disbursement Date): (x) to reserve all remaining amounts until the Debt Service Reserve Amount is achieved; (y) on a Payment Date to apply all amounts previously reserved pursuant to this item (5) and any other amounts needed for such purpose to the payment of the Debt Service then due and payable; and (z) if requested by the Company to reserve or reduce any prior

reservation of all or a portion of the Debt Service Reserve Amount for the second Payment Date following the date of such reservation or reduction;

(6)    if requested by the Company (with such request delivered in writing by the Company to the Trustee not less than 2 Business Days in advance of such Disbursement Date): to reserve and/or reduce and/or disburse any prior reservation of, all or a portion of the (x) BC Senior Loan Reserve Amount and/or BC Ferry Payment Reserve Amount; and (y) Open Market Purchase or Optional Redemption amounts to be paid by the Company;; and

(7)    on the Determination Date, any balance remaining in the Collection Account after application and/or reservation of all items in (1) – (6) above shall constitute the Supplemental Amortization Amount to be paid on the Payment Date following such Determination Date.

With respect to item (4), any prior reservation of the Bulk 2 Repurchase Reserve Amount may only be reduced to fund a Debt Service payment. In all cases, disbursements shall be permitted provided that they are in accordance with the other terms of this Indenture.

(b)    The Trustee shall cause amounts on deposit in the Collection Account to be invested in Eligible Investments upon the prior written direction of the Company to the Trustee. In addition, the Company may, at any time and from time to time, upon prior notice to the Trustee in the form of Exhibit E hereto, contribute further amounts to the Collection Account.

(c)    "BC Senior Loan Reserve Amount" or "BC Ferry Payment Reserve Amount" as of a Payment Date shall be a reserve at the Company's discretion of an amount up to the amount of the BC Senior Loan or BC Ferry Payment reasonably expected to be incurred before the next following Payment Date; provided, that, the Company shall not maintain any reserve for the BC Ferry Payment from and after 18 months from [*insert Effective Date*]. The BC Senior Loan Reserve Amount and the BC Ferry Payment Reserve Amount shall be released to the Company, upon certification by an Officer of the Company to the Trustee, which certification shall indicate that it has been reviewed by the Noteholder Representative (as defined in Schedule 2 and only for the time period in which the Noteholder Representative function exists pursuant to Schedule 2 of this Indenture) who has no objection to it. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification.

(d)    "Bulk 2 Repurchase Reserve Amount" as of a Payment Date shall be a reserve of an amount up to the Bulk 2 Repurchase Amount.

(e) (i) "Contingency Reserve Amount" as of a Payment Date shall be a reserve at the Company's discretion of an amount up to the Contingency Amounts reasonably expected to be incurred before the next following Payment Date. (ii) "Contingency Amounts" shall mean an aggregate amount of $5.0 million over the life of the Notes. Contingency Amounts shall be released to the Company from time to time from the Collection Account, upon certification by an Officer of the Company to the Trustee, which certification shall indicate that it has been

reviewed by the Noteholder Representative who has no objection to it, that a Contingency Event has occurred and must be paid. The Noteholder Representative's review of such certification shall be a verification only of the relevant items, events and calculations based on any related judgment, official order, settlement agreement or the like. Any objection by the Noteholder Representative must be provided in a reasonably detailed writing within 3 Business Days of receipt of the certification from the Company and failure to provide such objection in such period shall constitute a deemed acceptance to such certification. After the term of the Noteholder Representative has expired, certification shall be to the Noteholders' Board Nominee (as defined in Schedule 2 hereto). The certification by an Officer of the Company shall identify the Contingency Event and Contingency Amount and that such amount shall be disbursed for such Contingency Event promptly upon a disbursement from the Collection Account. (iii) "Contingency Events" shall mean litigation related contingencies, post-sales related contingencies, tax contingencies, and Officers' liquidations (according to Colombian and/or Panamanian law) not budgeted for in the MWC Budget.

(f) "Debt Service Reserve Amount" shall be an amount up to the Debt Service then scheduled for the next Payment Date.

(g) "Monthly Working Capital Reserve Amount" as of the first Business Day of any calendar month shall be a reserve in an amount at the Company's discretion of up to the full amount of the Monthly Working Capital Amounts for the next two following calendar months, as set forth in Exhibit N hereto, from such Business Day. Such Monthly Working Capital Reserve Amount monies can only be disbursed to the Company in accordance with the Priority of Payments. Such monies can only be disbursed from the Collection Account to the Company pursuant to Section 10.04(a)(2) of this Indenture.

(h) In the case of calculations with respect to the disbursements, payments, reservations or reductions of reservations contemplated under Sections 10.03 and 10.04, the Trustee shall be entitled to rely upon the Company certifications as to amounts and timing and shall have no obligation to confirm their authenticity or review the calculations contained therein. Such certifications shall be delivered concurrently to the Noteholder Representative. The form of such certification is set forth in Exhibit S hereto.

## ARTICLE 11

## COLLATERAL, SECURITY AND LIMITED FINANCIAL GUARANTEE

### Section 11.01 Security Interest.

(a)     The due and punctual payment of the principal of and interest and premium, if any, on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of and interest and premium, if any, on the Notes and performance of all other obligations of the Company to the Holders of Notes are secured by a first priority security interest in the Collateral.

(b)      The Company shall do or cause to be done all such acts and things as may be necessary or proper or as may be required by the provisions of the Security Documents, to assure and confirm to the Trustee the security interests in the Collateral contemplated hereby, by the Security Documents or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of the Holders of Notes.

### Section 11.02  Receivables.

On and subsequent to the date of this Indenture, the Company shall deliver to existing obligors under the Unit Purchase Agreements notices assigning the Receivables to the Co-Trustee in the form of Exhibit F.

### Section 11.03  Recordings and Opinion.

(a)      The Company shall furnish to the Trustee on the date of this Indenture Opinions of Counsel as to New York law and Panamanian law, at the Company's expense, either:

(1)      stating that, in the opinion of such counsel, all action has been taken with respect to the recording, registering and filing of this Indenture, financing statements or other instruments necessary to make effective the Lien intended to be created by the Security Documents, and reciting with respect to the security interests in the Collateral, the details of such action; or

(2)      stating that, in the opinion of such counsel, no such action is necessary to make such Lien effective.

(b)      The Company shall furnish to the Trustee within 30 days after January 1 in each year beginning with January 1, 2014, Opinions of Counsel as to New York law and Panamanian law, dated as of such date, either:

(1)      stating that, in the opinion of such counsel, action has been taken with respect to the recording, registering, filing, re-recording, re-registering and re-filing (to the extent applicable) of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as is necessary to maintain the Lien of the Security Documents and reciting with respect to the security interests in the Collateral the details of such action or referring to prior opinions of counsel in which such details are given, and (B) stating that, in the opinion of such counsel, based on relevant laws as in effect on the date of such Opinion of Counsel, all financing statements and continuation statements (if applicable) have been executed and filed that are necessary as of such date and during the succeeding 12 months fully to preserve and protect, to the extent such protection and preservation are possible by filing, the rights of the Holders of Notes and the Trustee under the Security Documents with respect to the security interests in the Collateral; and

(2)      stating that, in the opinion of such counsel, no further action is necessary to maintain such Lien and assignment.

**Section 11.04  Release of Subject Properties.**

(a)    Subject to the other provisions of this Section 11.04 and the terms of the other Security Documents, the Trustee will determine the circumstances and manner in which the Collateral will be disposed of, including the determination of whether to release all or any part of the Collateral from the security interests created by the Security Documents and whether to foreclose on the Collateral following the occurrence of an Event of Default.  Collateral may be released from the Liens and security interests created by the Security Documents at any time or from time to time in accordance with the provisions of the Security Documents and as provided in this Section 11.04 and in Section 4.11(e), 4.27(c) and 4.28(b).

(b)    To the extent a Subject Property gives rise to a Receivable under a Unit Purchase Agreement, the Co-Trustee shall release (at the sole cost and expense of the Company) such Subject Property from the Mortgage upon receipt of an Officers' Certificate from the Company addressed to the Trustee and the Co-Trustee (in the form of Exhibit D hereto) certifying that the property relating to such Receivable has been purchased or financed by the obligor in accordance with a Unit Purchase Agreement and this Indenture and such Receivable will be pledged to the Trustee as security for the Notes.

(c)    In connection with any release of the Lien on Subject Properties:

(1)    the Company shall provide a certification in the form of Exhibit D hereto certifying to the Trustee and the Co-Trustee that one of the events identified therein allowing for such release shall have occurred;

(2)    upon receipt of the item identified in clause (1) above, the Trustee shall direct the Co-Trustee to release or cause to be released the Lien on the related Subject Properties by following the applicable local procedures as set forth in the Mortgage; and

(d)    If the Subject Property and the Mortgage have not been subdivided as set forth in Section 3(b)(xi) of the Co-Trustee Agreement, after recording a release pursuant to this Section 11.04(c), the Company shall deliver to the Co-Trustee (with a copy to the Trustee) an authenticated copy of the deed(s) reflecting the mortgage(s) recorded in favor of the Co-Trustee for the portion (if any) that has not been released.

**Section 11.05  Limited Financial Guarantee**

(a)    The Parties and the Trustee shall execute the Limited Financial Guarantee (as defined below) to be provided by the Parties, which Limited Financial Guarantee shall be payable (i) ninety (90) days after an acceleration by Holders of the Notes in accordance with this Indenture (provided such acceleration is not rescinded in accordance with this Indenture) or (ii) at the scheduled final maturity date of the Notes, to the extent in each case the Holders of the Notes have not been paid in full (the "Limited Financial Guarantee"). The maximum amount due and payable under such Limited Financial Guarantee shall under no circumstance exceed in the aggregate the amount of $5.0 million and the Parties' exposure under the Limited Financial Guarantee shall be limited to such $5.0 million amount.

(b)      The Company and the Trustee hereby acknowledge that the purpose and intent of the Parties in providing the Limited Financial Guarantee is to give effect to the agreement of the Parties to pay the Limited Financial Guarantee upon receipt of notice from the Trustee that the conditions for payment of the Limited Financial Guarantee set forth in Section 11.05(a) hereby have occurred. The Trustee shall promptly apply any funds it receives pursuant to the Limited Financial Guarantee in accordance with Section 6.10 of this Indenture.

## ARTICLE 12

## RESERVED

## ARTICLE 13

## SATISFACTION AND DISCHARGE

**Section 13.01 Satisfaction and Discharge.**

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(a)      either:

(1)      all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust and thereafter repaid to the Company), have been delivered to the Trustee for cancellation; or

(2)      all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal and premium, if any, and accrued interest to the date of maturity or redemption;

(b)      no Default or Event of Default has occurred and is continuing on the date of the deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company is a party or by which the Company is bound;

(c)      the Company has paid or caused to be paid all sums then payable by it under this Indenture and the Co-Trustee Agreement; and

(d)      the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

In addition, the Company must deliver an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (2) of clause (a) of this Section 13.01, the provisions of Sections 13.02 and 8.06 will survive. In addition, nothing in this Section 13.01 will be deemed to discharge those provisions of Section 7.07 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

### Section 13.02  Application of Trust Money.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 13.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Obligations in accordance with Section 13.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 13.01 hereof; *provided* that if the Company has made any payment of principal of, premium, if any, or interest on any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Obligations held by the Trustee or Paying Agent.

## ARTICLE 14

## MISCELLANEOUS

### Section 14.01  Notices.

Any notice, direction, waiver, consent or other communication by the Company or the Trustee to the others shall be given in writing and delivered in Person or mailed by first class mail (registered or certified, return receipt requested), overnight courier guaranteeing next day delivery, or facsimile or electronic mail followed up (except for notices under Article 10) by first class mail (registered or certified) or overnight courier, to the others' address:

> If to the Trustee:
> CSC Trust Company of Delaware
> 2711 Centerville Road, Suite 400
> Wilmington, Delaware 19808
> Attention:  Corporate Trust Administration
> Email:  csctrust@cscglobal.com

> With copy to:
> Chadbourne & Parke LLP
> 30 Rockefeller Plaza
> New York, New York 10112
> Attention: Marian Baldwin Fuerst
> Electronic Mail: mbaldwinfuerst@chadbourne.com
>
> If to the Company:
>
> Newland International Properties, Corp.
> Punta Colon Street, Punta Pacifica
> P.H. Trump Ocean Club Building, 9th floor
> Panama City, Republic of Panama
> Attention:  Mr. Carlos Saravia
> Electronic Mail: charlies@trumpoceanclub.com
>
> With copy to:
> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166
> Fax: (212) 351-5322
> Attention: Kevin Kelley
> Electronic Mail: kkelley@gibsondunn.com

The Company or the Trustee, by notice to the other, may designate additional or different addresses for subsequent notices or communications.

All notices, directions, waivers, consents and other communications by the Holders to the Trustee or an Agent shall be in writing and mailed or otherwise delivered to the above address.

All notices, directions, waivers, consents and other communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice, direction, waiver, consent and other communication to a Holder will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company mails a notice or communication to Holders, it will mail a copy to the Trustee and each Agent at the same time.

**Section 14.02  Certificate and Opinion as to Conditions Precedent.**

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee (except that the Opinion of Counsel referred to in Section 14.02(2) hereof shall not be required in connection with the Authentication Order):

(a)    an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.03 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)    an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.03 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with.

**Section 14.03  Statements Required in Certificate or Opinion.**

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture must include:

(a)    a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)    a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d)    a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

**Section 14.04  Rules by Trustee and Agents.**

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

**Section 14.05  No Personal Liability of Directors, Officers, Employees and Stockholders.**

No director, officer, employee, incorporator or stockholder of the Company, as such, will have any liability for any obligations of the Company under the Notes, this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part

of the consideration for issuance of the Notes.  The waiver may not be effective to waive liabilities under the federal securities laws.

### Section 14.06  Governing Law.

THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS INDENTURE AND EACH NOTE AND ALL MATTERS ARISING OUT OF OR RELATING IN ANY WAY WHATSOEVER (WHETHER IN CONTRACT, TORT OR OTHERWISE) TO THIS INDENTURE OR ANY NOTE SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK. THE MORTGAGE, THE STOCK PLEDGE, THE UNIT PURCHASE AGREEMENTS AND THE COLLATERAL ASSIGNMENT AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE REPUBLIC OF PANAMA.

### Section 14.07  Jurisdiction.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY IRREVOCABLY AGREES THAT ANY LEGAL SUIT, ACTION OR PROCEEDING BROUGHT BY ANY HOLDER OR BY ANY PERSON WHO CONTROLS SUCH HOLDER OR THE TRUSTEE ON BEHALF OF SUCH HOLDER ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, NEW YORK, AND IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, AND IRREVOCABLY SUBMITS TO THE NON−EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING.

### Section 14.08  Process Agent.

The Company has appointed CT Corporation System (the "Process Agent"), as its agent to receive on its behalf service of copies of the summons and complaints and any other process which may be served in any suit, action or proceeding arising out of or relating to this Indenture, the Notes or the transactions contemplated hereby brought in such New York State or federal court sitting in The City of New York.  The Company further agrees to take any and all action as may be necessary to maintain such designation and appointment of such agent in full force and effect for a period of five years from the date of this Indenture.  Such service may be made by delivering a copy of such process to the Company, in care of the Process Agent, at the address for the Process Agent and obtaining a receipt therefor, and the Company hereby irrevocably authorize and direct such Process Agent to accept such service on its behalf. The Company represents and warrants that the Process Agent has agreed to act as said agent for service of process, and agrees that service of process in such manner upon the Process Agent shall be deemed, to the fullest extent permitted by applicable law, in every respect effective service of process upon the Company in any such suit, action or proceeding.

### Section 14.09  Immunity.

To the extent that the Company has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set−off or any legal process (whether service or notice, attachment in aid or otherwise) with respect to itself or any of its property, the Company hereby irrevocably waives and agrees not to plead or claim such immunity in respect of its obligations under this Indenture or the Notes.

### Section 14.10  No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

### Section 14.11  Successors.

All agreements of the Company in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its respective successors and permitted assigns.

### Section 14.12  Severability.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

### Section 14.13  Counterpart Originals.

The parties may sign any number of copies of this Indenture.  Each signed copy will be an original, but all of them together represent the same agreement.

### Section 14.14  Table of Contents, Headings, etc.

The Table of Contents and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

### Section 14.15  Currency Indemnity.

The U.S. dollar is the sole currency of account and payment for all sums payable by the Company in connection with the Notes.  Any amount received or recovered in a currency other than the U.S. dollar in respect of any sum due under this Indenture (whether as a result of, or for the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by the Trustee or any Holder in respect of any sum expressed to be due to it from the Company will constitute a discharge of the Company only to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not possible to make that purchase on that date, on the first date on which it is possible to do so).  If

that U.S. dollar amount is less than the U.S. dollar amount expressed to be due to the recipient under any Note, the Company will indemnify the recipient against any loss sustained by it as a result. In any event the Company will indemnify the recipient against the cost of making any such purchase.

For the purposes of this Section 14.15, it will be sufficient for a Holder or the Trustee to certify in writing that it suffered a loss; provided that such written certification is accompanied by documentation reasonably evidencing such loss. These indemnities constitute a separate and independent obligation from the other obligations of the Company, will give rise to a separate and independent cause of action, will apply irrespective of any waiver granted by any Holder or the Trustee and will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment or order.

### Section 14.16 Currency Calculation.

Except as otherwise expressly set forth herein, for purposes of determining compliance with any U.S. dollar-denominated restriction herein, the U.S. dollar-equivalent amount for purposes hereof that is denominated in a non-U.S. dollar currency shall be calculated based on the relevant currency exchange rate in effect at the Trustee's foreign currency exchange desk on the date such non-U.S. dollar amount is incurred or made, as the case may be.

[Signatures on following pages]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed all as of the date first written above.

**NEWLAND INTERNATIONAL PROPERTIES, CORP.,** as Issuer

By:_____
      Name:
      Title:

**CSC TRUST COMPANY OF DELAWARE,** as Trustee

By:_____
      Name:
      Title:

**EXHIBIT A**

**FORM OF GLOBAL NOTE**

[Face of Note]

[Global Note Legend]

THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.01 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[Private Placement Legend]

"THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN

THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) SUCH SECURITY MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) (a) IN THE UNITED STATES TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER OR BUYERS IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (b) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT (PROVIDED THAT AS A CONDITION TO REGISTRATION OF TRANSFER OF THIS SECURITY AS SET FORTH ABOVE, WE MAY REQUIRE DELIVERY OF ANY DOCUMENTS OR OTHER EVIDENCE THAT WE, IN OUR ABSOLUTE DISCRETION, DEEM NECESSARY OR APPROPRIATE TO EVIDENCE COMPLIANCE WITH SUCH EXEMPTION, (2) TO NEWLAND INTERNATIONAL PROPERTIES, CORP. OR (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN (A) ABOVE."

---

**CUSIP: [*]**

**ISIN: [*]**

**9.50% Senior Secured Notes due 2017**

No. 1

$[*220 MILLION PLUS ACCRUED INTEREST AS OF EFFECTIVE DATE*]

**NEWLAND INTERNATIONAL PROPERTIES, CORP. (the "Company")** promises to pay to CEDE & CO. or registered assigns, the principal sum of $*[220 million plus accrued interest amount as of Effective Date]* payable on each Principal Payment Date to the extent described herein and in the Indenture. Interest on the Notes will accrue at the rate of 9.5% per annum and will be payable semi-annually in arrears on  each Interest Payment Date. The Company will make each interest payment to the holders of record on the immediately preceding Record Date. Interest on the Notes will accrue from the date of original issuance or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Principal payments on the Notes will consist of the "Minimum Scheduled Amortization Amounts" as set forth in the table below, which equals in the aggregate $*[220 million plus accrued interest amount as of Effective Date]*. "Minimum Scheduled Amortization Amount" means, with respect to a Principal Payment Date, the respective amount shown for such Principal Payment Date in the table below; provided, that, the Minimum Scheduled Amortization Amount shall be decreased over the life of the Notes to the extent of any prepayments made as Mandatory Prepayments from Prime Unit Sales and other Asset Sales under the Indenture, and to the extent of any Supplemental Amortizations, Optional Redemptions, Open Market Repurchases or any other purchases leading to cancellation in accordance with the Indenture, each as more fully described herein and in the Indenture.

| Date | Minimum Scheduled Amortization Amount |
|:---:|:---:|
| [*] | $[*] million |
| [*] | $[*] million |
| [*] | $[*] million |
| [*] | $[*] million |
| [*] | $[*] million |
| [*] | $[*] million |
| [*] | $[*] million |
| [*] | $[*] million |
| [*] | $[*] million |

A-3

**Supplemental Amortization**

In addition to the Minimum Scheduled Amortization Amount for each Principal Payment Date, on each Payment Date commencing with the first Payment Date on [*], the Notes shall become due and payable on such date in an amount equal to the Supplemental Amortization Amount (each payment amount, a "Supplemental Amortization").

The "Supplemental Amortization Amount" on each Principal Payment Date shall be the balance, if any, in the Collection Account referred to in item (7) under Section 10.04(a) of the Indenture after application and/or reservation of amounts in items (1) – (6) in such section on the 5th Business Day prior to such Principal Payment Date (the "Determination Date").

Supplemental Amortizations shall be applied to the reduction of the Minimum Scheduled Amortization Amounts remaining to be paid by a reduction of each such remaining scheduled amount in equal amounts across all such remaining Principal Payment Dates, with such amount to be calculated by dividing the Supplemental Amortization Amount by the number of remaining Payment Dates.

Dated: [*], 2013

Dated: [*], 2013

**NEWLAND INTERNATIONAL
PROPERTIES, CORP.**

By: _____
Name:
Title:

This is one of the Notes referred to
in the within-mentioned Indenture:

**CSC TRUST COMPANY DELAWARE,**

**not in its individual capacity but solely as
Trustee**

By: _____
Name:
Title:

Back of Note 9.50% Senior Secured Notes due 2017

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.     **Interest**.  The Company promises to pay interest on the principal amount of this Note at 9.50% *per annum* from the first Payment Date until maturity.  The Company will pay interest, semi-annually in arrears on each Interest Payment Date, or if any such day is not a Business Day, on the next succeeding Business Day. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; *provided* that if there is no existing Default in the payment of interest, and if this Note is authenticated between a Record Date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; *provided further* that the first Interest Payment Date shall be [*], 2013.  The Company will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 1% *per annum* in excess of the rate then in effect; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful.  Interest on the Notes will accrue from the date of original issuance or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.     **Method of Payment**.   The Company will pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders of Notes at the close of business on [*] or [*] next preceding the Interest Payment Date, even if such Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  The Notes will be payable as to principal and premium, if any, and interest at the office or agency of the Company maintained for such purpose, or, at the option of the Company, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and interest and premium, if any, on, all Global Notes and all other Notes the Holders of which will have provided wire transfer instructions to the Company or the Paying Agent.  Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

3.     **Paying Agent and Registrar**.  Initially, CSC Trust Company of Delaware, the Trustee under the Indenture, will act as Paying Agent and Registrar.  The Company may change any Paying Agent or Registrar without notice to any Holder in accordance with Section 2.03 of the Indenture.

4.     **Indenture**.  The Company issued the Notes under an Indenture dated as of [*], 2013 (the "**Indenture**") between the Company and the Trustee.  The terms of the Notes include those stated in the Indenture.  The Notes are subject to all such terms, and Holders are referred to the Indenture.  To the extent any provision of this Note conflicts with the express provisions of

the Indenture, the provisions of the Indenture shall govern and be controlling. The Notes are senior secured obligations of the Company.

      5.      **Optional Redemption.**

      (a)      The Company may also redeem all or part of the Notes, at any time, upon not less than 30 or more than 60 days' prior notice, at a redemption price equal to 100% of the outstanding principal amount of Notes redeemed plus any Additional Amounts, and accrued and unpaid interest to, but excluding, the redemption date, subject to the rights of Holders on the relevant Record Date to receive interest due on the relevant Payment Date. Any such Optional Redemption pursuant to this clause (a) shall be subject to a minimum threshold of $10.0 million.

      6.      **Notice of Redemption**. Notice of redemption will be mailed at least 30 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction or discharge of the Indenture. Notes in denominations larger than $1,000 may be redeemed in part but only in whole multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed. On and after the redemption date interest ceases to accrue on Notes or portions thereof called for redemption.

      7.      **Denominations, Transfer, Exchange**. The Notes are in registered form without coupons in denominations of $10,000 and integral multiples of $1 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a Record Date and the corresponding Interest Payment Date.

      8.      **Persons Deemed Owners**. The registered Holder of a Note may be treated as its owner for all purposes.

      9.      **Amendment, Supplement and Waiver**. Subject to certain exceptions, the Indenture or the Notes may be amended or supplemented with the consent of the Majority Holders, and any existing Default or Event of Default or compliance with any provision of the Indenture or the Notes may be waived with the consent of the Majority Holders. Without the consent of any Holder of a Note, the Indenture or the Notes may be amended or supplemented to cure any ambiguity, defect or inconsistency, to provide for the assumption of the Company's obligations to Holders of Notes in the case of a merger or consolidation or sale of all or substantially all of the Company's assets, to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights under the Indenture of any such Holder, to conform the text of the Indenture or the Notes to any provision of the "Description of Notes" section of the Company's Disclosure Statement dated as of March

29, 2013, relating to the initial offering of the Notes, to provide for the appointment of a successor Trustee or Co-Trustee under the terms of the Indenture or Co-Trustee Agreement, as the case may be or to add a new form of Unit Purchase Agreement or to make an amendment to a form of Unit Purchase Agreement in accordance with the terms of the Indenture.

10.  **Defaults and Remedies**.  The Events of Default are set forth in the Indenture.  If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable.  Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Notes will become due and payable without further action or notice.  Holders may not enforce the Indenture or the Notes except as provided in the Indenture. Subject to certain limitations, the Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders notice of any continuing Default or Event of Default, except a Default or Event of Default relating to the payment of principal or interest, if it determines that withholding notice is in their interest.  The Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or Event of Default and its consequences under the Indenture except a continuing Default or Event of Default in the payment of interest on, or the principal of, the Notes.  The Company is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Company is required upon becoming aware of any Default or Event of Default, to promptly deliver to the Trustee a statement specifying such Default or Event of Default.

11.  **Trustee Dealings with Company**.  The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

12.  **No Recourse Against Others**.  A director, officer, employee, incorporator or stockholder, of the Company, as such, will not have any liability for any obligations of the Company under the Notes or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Notes.

13.  **Authentication**.  This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

14.  **Abbreviations**.  Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

15.  **CUSIP Numbers**.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as

printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

16.  **Governing Law**.  This Note shall be governed by and construed in accordance with, the laws of the State of New York.

The Company will furnish to any Holder upon written request and without charge a copy of the Indenture. Requests may be made to:

Newland International Properties, Corp.
Punta Colon Street, Punta Pacifica
P.H. Trump Ocean Club Building, 9th floor
Panama City, Republic of Panama
Telephone: (507) 223-0225

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to:_____
(Insert assignee's legal name)

_____
(Insert assignee's soc. sec. or tax I.D. no.)
_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to
transfer this Note on the books of the Company.  The agent may substitute another to act for him.

* Participant in a recognized
Signature Guarantee
Medallion Program (or other
signature guarantor
satisfactory to the Trustee).

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 3.10 of the Indenture, check the appropriate box below:

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 3.10 of the Indenture, state the amount you elect to have purchased: $_____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor satisfactory to the Trustee).

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

* THIS SCHEDULE SHOULD BE INCLUDED ONLY IF THE NOTE IS ISSUED IN GLOBAL FORM.

**EXHIBIT B**

## FORM OF CERTIFICATE OF TRANSFER

Newland International Properties, Corp.
Plaza 53, Building 53
Street Obarrio, Ground Floor
Panama City, Republic of Panama

CSC Trust Company of Delaware
2711 Centerville Road
Wilmington, Delaware 19808

Re:  9.50% Senior Secured Notes due 2017

  Reference is hereby made to the Indenture, dated as of [*], 2013 (the "Indenture"), between Newland International Properties, Corp., as issuer (the "**Company**") and CSC Trust Company of Delaware, as trustee.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

  _____, (the "**Transferor**") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "**Transfer**"), to _____ (the "**Transferee**"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

**[CHECK ALL THAT APPLY]**

  1.   ☐  CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE RESTRICTED GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO RULE 144A.  The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A, and the rules and regulations thereunder, in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Note and/or the Definitive Note and in the Indenture and the Securities Act.

2.   ☐ CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE REGULATION S GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO REGULATION S.   The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Definitive Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

By:

Name:

Dated:

STATE OF _____   )
                                                    )
COUNTY OF _____   )

On this ____ day of ____, 20 ____, before me, a notary public within and for said county, personally appeared _____ to me personally known who being duly sworn, did say that s/he is the _____ of _____, one of the persons described in and which executed the foregoing instrument, and acknowledges said instrument to be the free act and deed of said persons.

**By:** _____

**Title:  Notary Public,**

No.:

Qualified in:

Commission Expires:

**ANNEX A TO CERTIFICATE OF TRANSFER**

1.      The Transferor owns and proposes to transfer the following:

**[CHECK ONE OF (a), (b) OR (c)]**

     (a)    ☐ a beneficial interest in the:

         (i)    ☐ Restricted Global Note (CUSIP _____); or

         (ii)    ☐ Regulation S Global Note (CUSIP _____); or

     (b)    ☐ a Definitive Note.; or

     (c)    ☐ a Regulation S Definitive Note

2.      After the Transfer the Transferee will hold:

**[CHECK ONE]**

     (a)    ☐ a beneficial interest in the:

         (i)    ☐ Restricted Global Note (CUSIP _____); or

         (ii)    ☐ Regulation S Global Note (CUSIP _____);  or

     (b)    ☐ a Definitive Note; or

     (c)    ☐ a Regulation S Definitive Note,

in accordance with the terms of the Indenture.

EXHIBIT C

## FORMS OF UNIT PURCHASE AGREEMENTS

CONTRATO DE PROMESA DE COMPRAVENTA/ CONTRACT FOR A PROMISE OF SALE

UNIDAD CONDO. _____ RECÁMARAS _ / _ BEDROOMS CONDOMINIUM UNIT ____

Entre los suscritos a saber **CARLOS ALBERTO SARAVIA CALDERON** actuando en su condición de Director Ejecutivo de la sociedad anónima denominada **NEWLAND INTERNATIONAL PROPERTIES CORP.,** (en adelante el "Promotor"), constituida de conformidad con las leyes de la República de Panamá, inscrita a la Ficha 521258, Documento 929232 Sección Mercantil del Registro Público de Panamá, que en adelante se denominará **EL PROMITENTE VENDEDOR**, por una parte y por la otra

_____

**Y/O CORPORACION A SER ESTABLECIDA,** de nacionalidad _____, portador del pasaporte número _____, actuando en nombre y representación de

_____

una sociedad constituida de conformidad con las leyes de la República de Panamá registrada en _____ documento _____ del Registro Público de Panamá, quien en adelante se denominará **EL PROMITENTE COMPRADOR**, hemos convenido en celebrar un contrato de promesa de compraventa, en adelante la **Promesa de Compraventa**, sujeta en un todo a las siguientes cláusulas:

**PRIMERA: EL PROMITENTE VENDEDOR** declara que es Promotor y Propietario de la Finca Nº 234240 inscrita al Rollo 607870 de la Sección de Propiedad , Provincia de Panamá, del Registro Público ubicada en Punta Pacífica, Ciudad de Panamá, por lo que en dichas condiciones celebra esta **Promesa de Compraventa**.

**SEGUNDA: EL PROMITENTE VENDEDOR** quien igualmente es el Promotor declara que sobre la Finca indicada en la cláusula primera anterior en

Between the undersigned, to wit: CARLOS ALBERTO **SARAVIA CALDERON**, acting in his condition as Chief Executive Officer of **NEWLAND INTERNATIONAL PROPERTIES CORP.** (herein the "Developer")**,** a corporation incorporated under the laws of the Republic of Panama, recorded in Card 521258, Document Redy 929232 of the Mercantile Public Register of Panama, hereinafter called **THE PROMISSOR SELLER** on one part; and_____

**___AND/OR CORPORATION TO BE FORMED**, a _____ citizen with Passport Number _____, acting on behalf of _____

a corporation incorporated under the laws of the Republic of Panama, registered at Microjacket _____, Document _____of the mercantile section of the public registry of Panama, hereinafter called the **PROMISSOR BUYER**, have agreed to enter into this Agreement or Contract for a Promise of Sale, hereinafter the **Promise of Sale**, subject to the following clauses:

**ONE:** The **PROMISSOR SELLER** states that he is Developer and Owner of Lot No. 234240, recorded in Document Redy 607870, of Province of Panama, Property Section, Public Registry Office of Panama, located in Punta Pacifica, Panama City due to which said conditions enters into this **Promise of Sale**.

**TWO:** The **PROMISSOR SELLER**, who is Owner of the Lot mentioned in **Clause One** above has built a 66 story building with 13 stories and a basement to be destined for parking, and approximately 926 units for residential use to be divided between residential condominium units and hotel-condominium units. The Building has offices and commercial locales located on different levels. The Developer has been

su calidad de Promotor ha construido un edificio de sesenta y seis (66) pisos de los cuales trece (13) niveles y un (1) sótano se destinarán a estacionamientos y novecientos veintiséis (926) unidades inmobiliarias para uso habitacional divididas entre unidades de condominio y unidades de condominio-hotelero, así como varias Oficinas y Locales Comerciales ubicados en diversos pisos y niveles, edificio que el Promotor tiene licencia para denominarlo **"Trump Ocean Club Internacional Hotel & Tower"**, en adelante se denominará simplemente **"el Edificio"**, el que está sometido a Régimen de Propiedad Horizontal, en adelante simplemente el **Reglamento de Propiedad Horizontal**.

**TERCERA: EL PROMITENTE VENDEDOR** declara que **"el Edificio"** ha sido construido con sujeción a los lineamientos y especificaciones de la licencia del nombre **Trump®** y de conformidad con el diseño arquitectónico elaborado por la firma **Arias Serna y Saravia S.A.** con la intervención del Arquitecto Edwin Brown.

**CUARTA: EL PROMITENTE COMPRADOR** se obliga en virtud de esta **Promesa de Compraventa** a comprar libre de gravámenes, los derechos de propiedad y posesión de la **Unidad Inmobiliaria de Condominio** N° _____ de **"el Edificio"**, en adelante simplemente **"la Unidad"**.

"Cada Unidad" tendrá una superficie de _____ metros cuadrados (M2) equivalente a _____ pies cuadrados (ft2) y constará de sala-comedor, terraza                    o                    balcón, _____ (___) recámaras _____ (___) baños.

(b) **"La Unidad"** tendrá los siguientes terminados: Piso de mármol, todas las divisiones repelladas y pintadas en ambas caras, cocinas modulares con mesón en granito, mesones en granito en los baños, closets de madera estilo europeo, puertas y marcos de madera.

(c) Adicionalmente, la propiedad de **"la Unidad"** le da derecho a **EL PROMITENTE COMPRADOR** al uso exclusivo de _____ (___) estacionamiento, NUMERO (___) y al uso

further licensed to name the above mentioned building **"Trump Ocean Club International Hotel & Tower"** herein after **The Building,** which is subject to the incorporation, by-laws and the rules and regulations of the Condominium Association, hereinafter the **Condominium Regulations**.

**THREE**: The **PROMISSOR SELLER** states that **The Building** has been constructed subject to the guidelines and specifications in the **Trump® License** and in accordance with the architectural design prepared by **Arias, Serna & Saravia S.A.** with participation of the Architect **Edwin Brown.**

**FOUR**: Under this **Promise of Sale** the **PROMISSOR BUYER** agrees to buy lien free, all property and possession rights of the real estate **Unit of the Condominium** number _____ of **The Building**, hereinafter called **The Unit**.

(a) **Each Unit** will have an area of _____ sq. mtrs. (_____ sq.ft.) and will include a living room / dining room area, kitchen/ kitchenette, terrace, _____ (___) bedrooms and _____ (___) bathrooms.

(b) **The Unit** will be finished as follows: marble floors, divisions will be plastered and painted on both sides, kitchens/ kitchenettes with granite tops, bathrooms with granite tops, closets European style, wood doors and frames.

(c) **The Unit** will entitle the **PROMISSOR BUYER** to exclusive use of _____ (___) parking space, NUMBER (____) and the common use of additional parking spaces in **The Building.**

**FIVE:** In addition to **The Unit** price, the **PROMISSOR BUYER** agrees to purchase and pay the price of a membership, hereinafter called the **Membership**, to use the **Building's** Beach Club. The **Membership** price will be determined according to the following table, based on the number of bedrooms in **The Unit** and payment thereof will be made together with the balance due on **The Unit** price as stated in **CLAUSE SIX**.

comunal de estacionamientos adicionales en **"el Edificio.**

**QUINTA**: **EL PROMITENTE COMPRADOR** se obliga a adquirir y pagar en forma adicional al precio de **"la Unidad"**, el valor de una acción o membresía en adelante **"la Acción"**, para el uso del Club de Playa de **"el Edificio"**. El precio de **"la Acción"** se determina según la siguiente tabla elaborada con base en el número de recámaras que tenga **"la Unidad"** y su pago se hará junto con el pago del saldo del precio de **"la Unidad"** conforme se indica en la **Cláusula SEXTA**.

| Tipo de Unidad | Clase de Acción | Precio (US$) |
|---|---|---|
| 1 Recámara | A | 10,000 |
| 2 Recámaras | B | 14,000 |
| 3 Recámaras | C | 18,000 |

**SEXTA:** Las partes declaran que el precio de venta de **"la Unidad"** objeto de este contrato es la suma de

_____

**DÓLARES AMERICANOS CON 00/100 (US** _____) y que el precio de venta de **"la Accion"** es la suma de

_____ -
**DÓLARES AMERICANOS CON 00/100 (US $** _____). Los dos conceptos totalizan

_____

**DÓLARES AMERICANOS CON 00/100 (US $** _____).

(a) Esta última suma será pagada por **EL PROMITENTE COMPRADOR** a la orden del **PROMITENTE VENDEDOR** de la siguiente forma:

    i)    La suma de

    _____ -
    **Dólares (US** _____)
    equivalente al

    _____

| Type of Unit | Type of Share | Price ( in US$) |
|---|---|---|
| 1 bedroom | A | 10,000 |
| 2 bedroom | B | 14,000 |
| 3 bedroom | C | 18,000 |

**SIX:** The parties hereby declare that the sale price of **The Unit is**

_____ **U.S. DOLLARS AND 00/100 (US$** _____ **)** and that the sale price of the **Membership is**

_____ **U.S. DOLLARS AND 00/100 (US$** _____ **).** Together, they add up to

_____
**U.S. DOLLARS AND 00/100 (US $** _____ **).**

(a) The **PROMISSOR BUYER** will pay the **PROMISSOR SELLER** this last sum as follows:

    i)  _____

    **U.S. DOLLARS AND 00/100 (US$** _____ **)** equal to _____ per cent (_____%) of the sale price of **The Unit** upon the execution of this **Promise of Sale**, this amount to be deposited in HSBC FID 3035 Panama Closing Account to the Escrow Account No. 0109704115.

    ii)  _____

    **U.S. DOLLARS AND 00/100 (US$** _____ **)** equal to _____ per cent (_____%) of the sale price of **The Unit** on _____/_____/2013, of this **Promise of Sale**, this amount to be deposited in HSBC FID 3035 Panama Closing Account to the Escrow Account No. 0109704115.

_____ (____%)
del precio de venta de **"la Unidad"**, a
la firma de la presente **Promesa de
Compraventa**, suma a ser depositada
en el HSBC FID 3035 Panama Closing
Account en la cuenta de garantía o
Escrow Account No. 0109704115.

ii)    La            suma    de
_____
_____-

**Dólares (US _____)**
equivalente                    al

_____ (____%)
del precio de venta de **"la Unidad"**, en
_____/_____/2013 de la **Promesa de
Compraventa**, suma a ser depositada
en el HSBC FID 3035 Panama Closing
Account en la cuenta de garantía o
Escrow Account No. 0109704115.

iii)   El saldo restante del precio de venta de
**"la Unidad"**, en _____/_____/2013,
adicionado en el precio total de venta
de **"la Acción"**, conceptos que
conjuntamente totalizan la suma de -

_____

**DOLARES (US $_____)**
a ser pagados a satisfacción del
**PROMETIENTE        VENDEDOR**
mediante transferencia bancaria o
cheque certificado o de gerencia de un
banco aceptable para este a mas tardar
el mismo día de la firma de la
**Escritura Pública de Compraventa**,
en caso que **EL PROMITENTE
COMPRADOR** pague directamente
dicho saldo sin crédito o financiación
de una entidad bancaria o financiera, o
en el caso que opte por un crédito para
el pago de la suma indicada en esta
sección iv), este pago se hará al
momento de la inscripción en el
Registro Público de la citada **Escritura
Pública de Compraventa** de **"la
Unidad"**, a través de un banco de
primer orden de la Ciudad de Panamá,
aceptable para **EL PROMITENTE
VENDEDOR**, según constará en Carta

iii)   The balance due on the sale price of **The
Unit**, together with the sale price of the
**Membership**, which together adds up to

_____
_____
**U.S.   DOLLARS   AND   00/100   (US
_____)**   to be paid on
_____/_____/2013, to the **PROMISSOR
SELLER'S** satisfaction by wire transfer
or certified check from a bank accepted
by the **PROMISSOR SELLER** no later
than on the date of execution of the
**Public Deed of Sale,** in the event that the
**PROMISSOR    BUYER**   pays    said
balance    directly    without   credit   or
financing from a banking or financial
entity;    in    the    event    that    the
**PROMISSOR BUYER** uses a loan to
pay the balance stated in this section,
payment will be made when recording the
above mentioned **Public Deed of Sale** of
**The Unit** in the Public Registry, through
a first class bank in Panama, accepted by
the **PROMISSOR SELLER**  as stated in
a Letter of Irrevocable Payment issued by
the bank in favor of the **PROMISSOR
SELLER** or of the person or legal entity
appointed    by    the    **PROMISSOR
SELLER**. Presenting said Letter of
Irrevocable Payment is a precondition to
the execution of the **Public Deed of Sale.
PROMISSOR    BUYER'S**   obligations
hereunder    are    not   conditional   upon
his/her    ability    to    obtain   credit   or
financing.

(b) In the event that the **PROMISSOR BUYER**
fails to pay the price according to the amounts,
procedures and dates agreed in sections i) through
iv) of paragraph (a) of the above, or otherwise fails
to perform his/her promises under this **Promise of
Sale**, the **PROMISSOR SELLER** may unilaterally
and without prior judicial action or representation of
any type or kind, determine that the **PROMISSOR
BUYER** has unilaterally refrained from buying **The
Unit** and has defaulted under this Agreement**,** in
which case the **PROMISSOR SELLER** in its sole
discretion will be free to demand full compliance
hereof, or to exercise the right to terminate the

C-4

Irrevocable de Pago expedida por dicha entidad bancaria a favor del **PROMITENTE VENDEDOR** o de la persona natural o jurídica que éste designe, carta que deberá presentarse como condición previa para firmar la **Escritura Pública de Compraventa**. Las obligaciones del **PROMITENTE COMPRADOR** aquí indicadas no está sujetas ni condicionadas a la aprobación de créditos o financiamientos a su favor.

(b)   En caso que **EL PROMITENTE COMPRADOR** no cumpla en oportunidad con el pago del precio conforme a las cantidades, formas de pago y fechas establecidas en las secciones i) a iv) del literal (a)  de esta **Cláusula SEXTA**, o incumple cualquier obligación derivada de esta **Promesa de Compraventa**, **EL PROMITENTE VENDEDOR** queda facultado para determinar a su exclusivo criterio y sin la necesidad de declaración judicial previa de ningún tipo, que **EL PROMITENTE COMPRADOR** ha desistido unilateralmente de comprar **"la Unidad"** y ha incumplido este Contrato, por lo que queda **EL PROMITENTE VENDEDOR** en libertad de exigir o bien el fiel cumplimiento del presente contrato, o alternativamente de declararlo terminado de pleno derecho, por causa expresa prevista por las partes; en esta última hipótesis puede **EL PROMITENTE VENDEDOR** volver a disponer en forma libre e inmediata a cualquier título y sin ningún tipo de restricción, de **"la Unidad"** y de **"la Acción"** objeto de esta **Promesa de Compraventa**.

(c)   En caso que **EL PROMITENTE COMPRADOR** incumpla sus obligaciones conforme a lo indicado en el literal (b) precedente y **EL PROMITENTE VENDEDOR** en consecuencia declare terminado de pleno derecho esta **Promesa de Compraventa**, todas las sumas que **EL PROMITENTE COMPRADOR** hubiere abonado a buena cuenta del precio de **"la Unidad"** quedarán a favor de **EL PROMITENTE VENDEDOR** a título de restablecimiento acordado por daños y perjuicios sin necesidad de ningún tipo de declaración judicial previa.

**SÉPTIMA: EL PROMITENTE VENDEDOR**

**Promise of Sale**  for cause, which is expressly acknowledged by the Parties. In the latter event, the **PROMISSOR SELLER** may freely and immediately dispose of **The Unit** and the **Membership** hereof, under any title and without any type of restriction.

(c) Should the **PROMISSOR BUYER** fail to fulfill the obligations agreed to herein and the **PROMISSOR SELLER** terminates this **Promise of Sale,** all sums paid by the **PROMISSOR BUYER** as part of the price of **The Unit**, will remain and belong in favor of the **PROMISSOR SELLER** as a liquidated and agreed upon damages without any need of any prior judicial action or representation.

**SEVEN:** The **PROMISSOR SELLER** will make **The Unit** available to the **PROMISSOR** BUYER when the following conditions are met:

i)    That the corresponding authorities issue the Occupation Permit, requisite that has been achieved in accordance with the Occupancy Permit No. 2141-11 and 3010-11 issued by the Panamanian Municipal Government on November 21st, 2011.

ii)   That the **PROMISSOR BUYER** has made every payment referred to in **Clause Six** above and the **Public Deed of Sale** is signed and,

iii)  That any balance due on the Price of **The Unit** and **the membership** is made in cleared funds or when the **Public Deed of Sale** is executed, the **PROMISSOR BUYER** has provided the **PROMISSOR SELLER** with a Letter of Irrevocable Payment issued by a bank accepted by the **PROMISSOR SELLER** to pay said balance due on the price of **The Unit** and the **Membership** effective when the **Public Deed of Sale** is recorded.

**EIGHT:** According to Panama Law, the execution of the **Public Deed of Sale** is the legal document under which ownership changes hands. Consequently, the **PROMISSOR BUYER** must execute said document during the following 90 days

pondrá a disposición **"la Unidad"** para su entrega y recibo por parte de **EL PROMITENTE COMPRADOR**, una vez se cumpla con las siguientes condiciones:

    i)    Que se haya expedido el permiso de Ocupación por parte de las autoridades competentes, requisito que a la fecha se encuentra cumplido en virtud del permiso de ocupación No.2141-11 y 3010-11 expedido por el Municipio de Panama desde el 21 de Noviembre de 2,011.

    ii)    Que **EL PROMITENTE COMPRADOR** haya efectivamente hecho los pagos a que se refiere la **cláusula SEXTA** de esta **Promesa de Compraventa** y se haya firmado la **Escritura Pública de Compraventa** y

    iii)    Que en caso que aún faltase por abonar efectivamente el saldo del precio de **"la Unidad"** y de "**La Acción**" en el momento de la firma de la **Escritura Pública de Compraventa**, **EL PROMITENTE COMPRADOR** haya entregado una Carta Irrevocable de Pago emitida por un banco aceptado por **EL PROMITENTE VENDEDOR** para pagar el saldo pendiente del precio de **"la Unidad"** y de **"la Acción**, a ser efectiva cuando quede inscrita la **Escritura Pública de Compraventa**.

**OCTAVA:** **La Escritura Pública de Compraventa** es el documento jurídico que conforme a la ley panameña perfecciona esta negociación al transferir la propiedad por lo que su firma por parte de **EL PROMITENTE COMPRADOR** debe efectuarse a más tardar 90 Días luego de haberse firmado la presente promesa de compra venta.

**NOVENA:** Las partes contratantes convienen en que en caso que **EL PROMITENTE COMPRADOR** incumpla alguna de las obligaciones contraídas en esta **Promesa de Compraventa**, **EL PROMITENTE VENDEDOR** podrá a su arbitrio o bien exigir el cumplimiento de

after this promise of sale has been executed.

**NINE:** The contracting parties under this **Promise of Sale** agree that in the event of default by **PROMISSOR BUYER** of any obligation agreed to hereunder, **PROMISSOR SELLER** may freely decide in it sole discretion whether to demand compliance thereof or terminate the **Promise of Sale** without the need for any prior statement or determination by any authority, in which case **PROMISSOR SELLER** shall keep all sums paid by the **PROMISSOR BUYER** as part of the price of **The Unit**.

**TEN**: The **PROMISSOR BUYER** or any legitimate assignee thereof, irrevocably agrees to the following responsibilities and obligations:

    i)    To execute the **Public Deed of Sale 90 days after executing this Unit Purchase Agreement.**

    ii)    To comply with and adjust to the obligations and limitations contained in the **Condominium Regulations** as approved for th e **Building** and to pay the monthly administration and maintenance fee established**,** from the date in which the Public Deed is executed.

    iii)    To provide the **PROMISSOR SELLER** with the necessary debt-free certificate and all other documents required for the **Closing** and for recording the **Public Deed of Sale**.

    iv)    To accept the **PROMISSOR SELLER** or any individual appointed thereby as Manager and Representative of **The Building** and the Condominium for a period of thirty six (36) months after the occupancy permit after which the Co-Owners' Meeting can decide otherwise through the special quorum established in the **Condominium Regulations**.

    v)    To pay to the **PROMISSOR SELLER** the monthly sums set forth herein starting on the date in which the Deed is executed.

la obligación que se trate, o bien dar por terminado la **Promesa de Compraventa** sin previo pronunciamiento de ninguna autoridad y en este caso retendrá para sí por incumplimiento de la **Promesa de Compraventa** las sumas de dinero abonadas por **EL PROMINENTE COMPRADOR** a buena cuenta del precio de **"la Unidad"**.

<u>**DÉCIMA:** EL PROMITENTE COMPRADOR</u> o sus cesionarios legítimos asumen irrevocablemente las siguientes responsabilidades y obligaciones:

 i) Firmar en tiempo la **Escritura Pública de Compraventa** a más tardar 90 días luego de haber sido firmada la presente promesa de compraventa.

 (ii) Cumplir y ajustarse a las obligaciones y restricciones que imponga el **Reglamento de Propiedad Horizontal** que se apruebe para **"el Edificio"** y pagar la cuota mensual que sea fijada por la Asamblea de Propietarios para los gastos de administración y mantenimiento de las áreas comunes, a partir de la fecha en que se firme la escritura pública de compra venta.

 (iii) Entregar oportunamente al **PROMITENTE VENDEDOR** cuando lo solicite y en las fechas que este indique, los certificados de Paz y Salvo y los demás documentos que sean requeridos para la firma de la **Escritura Pública de Compraventa** y posteriormente para su inscripción en el Registro Público.

 (iv) Aceptar como Administrador y Representante de **"el Edificio"** y de la copropiedad al **PROMITENTE VENDEDOR** o a quien él designe por un periodo de treinta y seis (36) meses desde la expedición del Permiso de Ocupación y posteriormente hasta la fecha en que la Asamblea de Propietarios decida otra cosa con el quórum especial calificado que

 vi) To refrain from requesting alterations or additional structure, ornamentation, equipment or finishing details.

 vii) To pay the contribution established to create the initial fund that will be used and managed by the Condominium of **The Building**.

 viii) To accept that, according to the **Condominium Regulations**, the ownership and sale of the rooftop if any will be decided solely and exclusively by the **PROMISSOR SELLER.**

 ix) To accept that the **PROMISSOR SELLER** will have parking spaces and storage rooms in the **Building**, and that the **PROMISSOR SELLER** may decide whether to sell them or not and that any sale thereof of any type corresponds solely and exclusively to the **PROMISSOR SELLER** and its sole discretion.

<u>**ELEVEN:** PROMISSOR BUYER</u> hereby states having knowledge of and accepting the following:

 i) That the **PROMISSOR SELLER'S** liability for damages resulting from construction defects is limited to one (1) year only, starting on the date in which the unit is received and closing occurs.

 ii) That enclosing balconies or terraces or any alterations to the exterior design of the **Building** is not permitted.

<u>**TWELVE:**</u> The fact that either one of the parties allows, one or several times, non-compliance by the other party, or an imperfect compliance, or compliance otherwise than as agreed upon, or does not insist on the compliance of such obligations, or does not exercise any corresponding contractual or legal rights in a timely fashion, shall not be deemed as nor be equivalent to an amendment hereof, nor ban in any case such party from insisting on the faithful and specific compliance of the obligations to be fulfilled by the other party, or from exercising its conventional or legal rights.

constará en el **Reglamento de Propiedad Horizontal**.

(v) Pagarle a **EL PROMITENTE VENDEDOR** a partir de la fecha de la firma de la escritura de compraventa, las sumas mensuales que esta **Promesa de Compraventa** establece.

(vi) A no solicitar cambios ni adiciones en su estructura, ornamentación, dotación o acabados.

(vii) Aportar la suma de dinero destinada a constituir el fondo inicial para uso y disposición de la Asamblea de Propietarios de **"el Edificio"**.

(viii) Aceptar que sobre la terraza de **"el Edificio"** y de conformidad con el **Reglamento de Propiedad Horizontal**, la propiedad y disposición de la misma será de criterio exclusivo de **EL PROMITENTE VENDEDOR**.

(ix) Aceptar que habrá espacios de parqueaderos y depósitos en **"el Edificio"** de propiedad de **EL PROMITENTE VENDEDOR**, los que podrán ser vendidos o no por este y cuya disposición a cualquier título le corresponde en forma exclusiva a **EL PROMITENTE VENDEDOR**.

**DÉCIMO PRIMERA: EL PROMITENTE COMPRADOR** manifiesta conocer y acepta lo siguiente:

(i) Que el límite de responsabilidad del **PROMITENTE VENDEDOR** en concepto de daños por defectos de construcción es de un (1) año solamente contados a partir de la fecha del recibo de la unidad.

(ii) Que no está permitido el cierre de los balcones o terrazas y ningún cambio o modificación en la fachada de **"el Edificio"**.

**DÉCIMO SEGUNDA:** El hecho de que una de las

**THIRTEEN**: All legal and notary expenses caused by the **Public Deed of Sale** and of mortgage as the case may be, such as expenses incurred when recording in the Public Registry, will be exclusively payable by the **PROMISSOR BUYER**. All fiscal and stamp tax related expenses resulting from this **Promise of Sale**, as well as all notary, legal, recording, legal fees or any other expenses resulting from the **Public Deed of Sale** shall be paid exclusively by the **PROMISSOR BUYER.**

**FOURTEEN:** All communications and notices to be made by the **PROMISSOR SELLER** to the **PROMISSOR BUYER** or vice-versa and related to this **Promise of Sale** must be addressed via courier, through certified mail and / or e-mail to the following addresses and / or telephones as the case may be:

**PROMISSOR BUYER**

_____
_____
_____
_____
_____
_____

**PROMISSOR SELLER**
Newland International Properties Corp.
Panama City, Rep. of Panama.
(507) 223-0200 (office)
(507) 223-0225 (fax)

**FIFTEEN:** This contract is subject to the laws of the Republic of Panama and any dispute concerning it will be subject first and foremost to the courts of Panama City, Republic of Panama.

**SIXTEEN:** The parties to the **Promise of Sale** hereby represent that:

a) This agreement has been drafted in English and that a counterpart in Spanish is included to accomplish with Panama Law.

b) Previous to the execution of this **Promise of Sale** the **PROMISSOR BUYER** had enough time as he wishes to have to:

partes permita una o varias veces que la otra incumpla sus obligaciones o las cumpla parcialmente o imperfectamente, o en forma distinta a lo pactado, o no insista en el cumplimiento de tales obligaciones, o no ejerza oportunamente los derechos contractuales o legales que le correspondan, no se reputará como modificación del presente contrato, ni obstará en ningún caso para que dicha parte en el futuro insista en el fiel cumplimiento de las obligaciones a cargo de la otra, o ejerza los derechos que le correspondan de conformidad con las leyes y esta **Promesa de Compraventa**.

**DÉCIMO TERCERA:** Los gastos de abogados, los notariales de la **Escritura Pública de Compraventa**, de hipoteca si es el caso, así como los gastos para su inscripción en el Registro Público, correrán de cuenta y cargo exclusivo del **PROMITENTE COMPRADOR**. Todos los gastos fiscales y de timbres que la presente **Promesa de Compraventa** ocasione, así como todos los gastos notariales, de registro, honorarios legales o cualesquiera otros que ocasione la **Escritura Pública de Compraventa** serán de cuenta y cargo exclusivo de **EL PROMITENTE COMPRADOR**.

**DÉCIMO CUARTA:** Todas las comunicaciones y notificaciones que **EL PROMITENTE VENDEDOR** deba a realizar a **EL PROMITENTE COMPRADOR** o viceversa relacionadas con esta **Promesa de Compraventa** deben ser dirigidas vía courier, correo físico con constancia de recibo y/o correo electrónico a las siguientes direcciones y/o teléfonos según el caso:

**EL PROMITENTE COMPRADOR**
_____
_____
_____
_____
_____
_____

(a)      EL PROMITENTE VENDEDOR

Newland International Properties Corp.
Panama City, Rep. of Panama.
(507) 223-0200 (office)

i)   Read carefully and understand this document;

ii)   Ask the **PROMISSOR SELLER** all the questions he might consider necessary concerning **The Building, The Unit** and this document;

iii)   Seek and obtain independent real estate, legal and/or financial counsel when needed.

The Parties hereby state that they are fully empowered to act and agree to the obligations contained herein and that consequently, each one accepts each and every clause contained herein in the terms and under the conditions hereby stated.

IN WITNESS WHEREOF, the parties execute this Agreement, the **Promise of Sale**, in _____ and Panama City, Republic of Panama, in two counterparts having the same content and effect, on this date _____, in the year 2013.

(507) 223-0225 (fax)

**DÉCIMO QUINTA:**   Este contrato está sujeto a las leyes de la República de Panamá y cualquier controversia que surja con relación al mismo, se someterá a los tribunales de justicia con sede en la Ciudad de Panamá, República de Panamá, con preferencia sobre cualquiera otra sede o domicilio.

**DÉCIMO SEXTA:**.  Las partes en esta **Promesa de Compraventa** manifiestan entender y aceptar que

a) Esta **Promesa de Compraventa** ha sido redactada en Inglés y una versión en Español está incluida para efectos de cumplimiento de la ley panameña.

b) Antes de la firma de esta **Promesa de Compraventa EL PROMITENTE COMPRADOR** tuvo suficiente tiempo según fuese su deseo para:

    i)    Leer cuidadosamente este documento y entenderlo.

    ii)    Formular al **PROMITENTE VENDEDOR** todas las preguntas relativas a **"El Edificio"** a **"La Unidad"** y a este documento que consideró necesarias

    iii)    Solicitar opinión a su propio asesor de finca raíz, legal o financiero con relación a esta **Promesa de Compraventa**

Declaran las partes que tienen plena capacidad jurídica para obligarse en lo previsto en esta **Promesa de Compraventa**, y que en consecuencia aceptan todas y cada una de las cláusulas del presente documento en los términos y condiciones expresadas. EN FE DE LO CUAL las partes suscriben este Contrato en _____ y en la ciudad de Panamá, República de Panamá, en dos (2) ejemplares del mismo tenor y efecto a los _____ días, del mes de _____ de 2013.

**EXHIBIT D**

**FORM OF CERTIFICATION REQUESTING RELEASE OF COLLATERAL**

CSC Trust Company of Delaware
2711 Centerville Road, Suite 220
Wilmington, Delaware 19808

Global Financial Funds Corp.
PB, Torre Global Bank, Street 50,
P.O. Box 55-1843,
Paitilla, Panamá City, Repúblic of Panamá

    I, _____, hereby certify that I am the _____ of Newland International Properties, Corp. (the "Company") and, in connection with the Indenture, dated as of [*], 2013, between the Company and CSC Trust Company of Delaware, as trustee (the "Trustee"), and the Amended and Restated Co-Trustee Agreement dated as of [*], 2013, between the Company, the Trustee, Global Financial Funds Corp., a subsidiary of Global Bank Corporation, HSBC Bank USA, N.A. and HSBC Investment Corporation (Panama), S.A., I hereby certify that:

<b>[CHECK ALL THAT APPLY]</b>

    1.    ☐ _____ (identify real estate) has given rise to a Receivable under a Unit Purchase Agreement, and

        (a)    ☐ the property relating to such Receivable has been financed by the related obligor in accordance with the Unit Purchase Agreement and the Indenture and such Receivable has been pledged to the Trustee as security for the Notes; or

        (b)    ☐ the obligor under such Unit Purchase Agreement purchased the related property for cash.

    2.    ☐ The Company has consummated the Contadora Island Sale.

    3.    ☐ The requirements under Section 4.27 relating to Seller Financing have been satisfied with respect to [*insert description of relevant units*].

    4.    ☐ The requirements under Section 4.28 for Bulk 2 Refinancing have been satisfied.

    The Company, therefore, requests that the Co-Trustee release or cause to be released such Subject Property from the Mortgage.

D-1

Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

Certified this _____ day of _____, 20__.

By: _____

Name:

Title:

**EXHIBIT E**

### FORM OF COMPANY CERTIFICATION FOR ADDITIONAL CONTRIBUTIONS

_____, on behalf of Newland International Properties, Corp. (the "Company"), hereby certify to the Trustee on the basis of a review made on _____, 20___, as follows:

Pursuant to Section 10.04(b) of the Indenture dated as of [*], 2013, between the Company and CSC Trust Company of Delaware, as trustee, the Company wishes to contribute an amount of $[_____] to the Collection Account;

After giving effect to such contribution, the aggregate amount on deposit in the Company's Corporate Accounts shall be equal to or greater than $[            ]; and

Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

Certified this ____ day of _____, 20__.

By: _____

Name:

Title:

**EXHIBIT F**

**FORM OF NOTICE ASSIGNING THE RECEIVABLES**

*[In order to comply with the laws of the Republic of Panama, this document will be executed in Spanish.  The following is a translation of the Spanish version of this document.]*

[NEWLAND LETTERHEAD]

*[Name of Promissory Buyer]*
*[Address]*

Dear Sir:

Reference is made to that certain Unit Purchase Agreement (the "Agreement") entered into on _____ ___, 20__ with Newland International Properties, Corp. (the "Company") for the purchase of a Unit (as such term is defined the Agreement) in the Trump Ocean Club development in Panama City, Republic of Panama (the "Project").

We hereby give notice that the Company has transferred and assigned all of its rights to receive payments due under the Agreement to Global Financial Funds Corp., a bank incorporated under the laws of the Republic of Panama. Accordingly, we hereby instruct you to make all payments due to the Company under the Agreement to the following account at [*insert relevant Co-Trustee account details*]:

[*Insert bank account information and wiring instructions*]

If you have any questions or doubts, please do not hesitate to contact our executives at telephone number: 507-223-0225, or by e-mail at the following address: charlies@trumpoceanclub.com.

Yours truly,

Newland International Properties, Corp.


By: _____
Name:
Title:

**EXHIBIT G**

### FORM OF BROKERS' COMMISSIONS AND PROPERTY TRANSFER FEES INSTRUCTION CERTIFICATION

I, _____, hereby certify that I am the _____ of Newland International Properties, Corp. (the "Company").

In connection with the Indenture, dated as of [*], 2013, (the "Indenture"), between the Company and CSC Trust Company of Delaware, as trustee, the Company hereby certifies to the Trustee under the Indenture and to the Co-Trustee under that certain Co-Trustee Agreement, dated as of [*], 2013, among the Company, CSC Trust Company of Delaware, Global Financial Funds Corp., a subsidiary of Global Bank Corporation, HSBC Bank USA, N.A., and HSBC Investment Corporation (Panama) S.A. (the "Co-Trustee Agreement"), as follows in respect of each Unit Purchase Agreement the following instructions:

*[Brokers' Commissions]*

| Unit/Unidad | |
|---|---|
| | |
| **Date of Sale/Fecha de Venta** | |
| | |
| **Buyer/Comprador** | |
| | **Amount** |
| **Sales Price/Precio de Venta** | |
| | |
| **% Commission/% Comisión** | |
| | |
| *Amount considered "Brokers' Commissions" under the Indenture (Amount to be held in the Panama Closing Account)* | |
| | |
| *Amount considered "Newland Unit Proceeds" under the Indenture (Amount to be transferred to the Panama Account)* | |

*[Property Transfer Fees]*

| Unit/Unidad | |
|---|---|
| | |
| **Date of Sale/Fecha de Venta** | |
| | |
| **Buyer/Comprador** | |
| | **Amount** |
| **Sales Price/Precio de Venta** | |
| | |
| **Property Transfer Fees** | |

| | |
|---|---|
| ***Amount considered "Property Transfer Fees" under the Indenture (Amount to be held in the Panama Closing Account)*** | |
| | |
| ***Amount considered "Newland Unit Proceeds" under the Indenture (Amount to be transferred to the Panama Account)*** | |

Terms used but not defined herein are as defined in the Indenture.

Certified this _____ day of _____, 20__.

**NEWLAND INTERNATIONAL
PROPERTIES, CORP.**

By: _____
Name:
Title:

**Exhibit H**

### FORM OF BROKERS' COMMISSIONS AND PROPERTY TRANSFER FEES PAYMENT INSTRUCTIONS

I, _____, hereby certify that I am the _____ of Newland International Properties, Corp. (the "Company").

In connection with the Indenture, dated as of [*], 2013, (the "Indenture"), between the Company and CSC Trust Company of Delaware, as trustee, the Company hereby certifies to the Trustee under the Indenture and to the Co-Trustee under that certain Co-Trustee Agreement, dated as of [*], 2013, among the Company, CSC Trust Company of Delaware, Global Financial Funds Corp., a subsidiary of Global Bank Corporation, HSBC Bank USA, N.A., and HSBC Investment Corporation (Panama) S.A. (the "Co-Trustee Agreement"), as follows in respect of Brokers' Commissions and Property Transfer Fees to be paid pursuant to [*insert specific UPA giving rise to Brokers' Commissions/Property Transfer Fees*]:

*[Brokers' Commissions]*

| | |
|---|---|
| **Amount 1:** | _____ |
| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |
| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| Final Beneficiary: | _____ |
| Account No.: | _____ |
| **Amount 2:** | _____ |
| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |
| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| Final Beneficiary: | _____ |
| Account No.: | _____ |

*[Property Transfer Fees]*

**Amount 1:**                    _____

Intermediary Bank in the
US:                              _____

Swift/ABA:                       _____

Beneficiary Bank:               _____

Account No.:                     _____

Swift/ABA:                       _____

Final Beneficiary:              _____

Account No.:                     _____


**Amount 2:**                    _____

Intermediary Bank in the
US:                              _____

Swift/ABA:                       _____

Beneficiary Bank:               _____

Account No.:                     _____

Swift/ABA:                       _____

Final Beneficiary:              _____

Account No.:                     _____


Terms used but not defined herein are as defined in the Indenture.

Certified this _____ day of _____, 20__.

**NEWLAND INTERNATIONAL
PROPERTIES, CORP.**


By: _____
Name:
Title:

**Exhibit I**

## FORM OF CASINO UPA REGISTRATION CONSENT

(English)

That [_____], [male/female], Panamanian, banker, of legal age, [single/married], with personal identity card number [_____ (_____)], resident of this city, acting on behalf and representing Global Financial Funds Corp., a corporation organized and existing under the laws of the Republic of Panama, registered in the Mercantile Section of the Public Registry of the Republic of Panama in Micro Jacket one hundred and eighty thousand five hundred ninety-eight (180598), Roll nineteen thousand eight hundred thirty-eight (19838) and Image sixty-two (62), appeared personally in her capacity as proxy, [as recorded in the power of attorney registered in the Mercantile Section of the Public Registry in Micro Jacket _____ (_____), Document Redi _____ (_____), who hereinafter will be named the CO TRUSTEE AND MORTGAGE CREDITOR], person whom I know and requested me to record as in effect I do, the following:

FIRST: That by Public Deed number twenty-eight thousand five hundred twenty-three (28523) of November nineteen (19) two thousand seven (2007), issued by the Notary Public First Circuit of Panama and registered in Micro Jacket  number four hundred and fourteen thousand four hundred and fifty and seven (414457), Document Redi one million two hundred forty-eight thousand two hundred twenty-nine (1248229), of the MORTGAGES AND ANTICHRESIS section of the Public Registry, the corporation NEWLAND INTERNATIONAL PROPERTIES CORP., constituted FIRST MORTGAGE AND ANTICHRESIS in favor of GLOBAL FINANCIAL FUNDS CORP., in its capacity as co-trustee for the benefit of the BONDHOLDERS under the TRUST as defined in said Public Deed, on property number two hundred thirty-four thousand two hundred forty (234240), registered in Document six hundred seven thousand eight hundred and seventy (607870), of the Property Section, Province of Panama, of the Public Registry and also on Property number ninety thousand seven hundred eighty-four (90784), registered in Roll two thousand one hundred thirty-nine (2139), Document three (3) of the Property Section, Province of Panama, of the Public Registry, to ensure the GUARANTEED OBLIGATIONS as detailed in such Public Deed.

SECOND: That by Public Deed Number five thousand two hundred and seventy (5270) of March eleven (11), two thousand eleven (2011), issued by the Notary Fifth of the Circuit of Panama and registered at Document Redi one million nine hundred forty-five thousand fifty-three (1945053) of the Horizontal Property Section, Province of Panama, of the Public Registry, the CO – TRUSTEE AND MORTGAGE CREDITOR granted its express consent to the corporation  NEWLAND INTERNATIONAL PROPERTIES CORP., to declare the construction of improvements in Property number two hundred thirty-four thousand two hundred forty (234240) and have it incorporated into the Tourism Regime for Horizontal Property and to the Horizontal Property Regime, resulting in Property three hundred thirty-five thousand five hundred ninety (335590), of the Horizontal Property Section, Province of Panama, of the Public Registry, from which the real estate units that make up the PH TOC BUILDING were segregated to form separate registration properties (hereinafter, the "NEW PROPERTIES"), remaining on

the NEW PROPERTIES the mortgage and antichresis liens constituted in favor of the CO-TRUSTEE AND MORTGAGE CREDITOR.

THIRD: That hereby, the CO-TRUSTEE AND MORTGAGE CREDITOR, in its condition as Mortgage and Antichresis Creditor, grants its consent so that NEWLAND INTERNATIONAL PROPERTIES CORP., proceeds with the notarization and registration in the Public Registry of Panama of the Promise of Sale of the units [_____] (hereinafter, the "Units").

FOURTH: The CO – TRUSTEE AND MORTGAGE CREDITOR, declares that, the authorization granted for the notarization and registration in the Public Registry of Panama of the Promise of Sale of the Units, with the liens that they bear, that is the First Mortgage and Antichresis in favor of the  CO- TRUSTEE AND MORTGAGE CREDITOR, means that the term of the First Mortgage and Antichresis that bear over them will continue under the same terms and conditions registered and as was agreed with the CO – TRUSTEE AND THE MORTGAGE CREDITOR. Accordingly, the previously described Units, and the rest of the NEW PROPERTIES, will continue to guarantee the obligations of NEWLAND INTERNATIONAL PROPERTIES, CORP., as contained in said Public Deed number twenty-eight thousand five hundred twenty-three (28523) of November nineteen (19 ) two thousand and seven (2007), issued by the Notary Public First Circuit of Panama and registered at Micro Jacket number four hundred and fourteen thousand four hundred fifty-seven (414457), Document Redi one million two hundred forty-eight thousand two hundred twenty-nine (1248229), of the MORTGAGES AND ANTICHRESIS Section of the Public Registry.

FIFTH: The CO-TRUSTEE AND MORTGAGE CREDITOR declares, that NEWLAND INTERNATIONAL PROPERTIES CORP shall bear the expenses incurred in the preparation of this Minutes of Consent.

(Spanish)

Compareció personalmente, [_____], [mujer/varón], panameñ[o/a], banquer[o/a], mayor de edad, [casado(a)/soltero(a)], con cédula de identidad personal número [_____ (_____)], vecina de esta ciudad, actuando en nombre y representación de GLOBAL FINANCIAL FUNDS CORP., sociedad anónima organizada y existente de conformidad con las leyes de la República de Panamá, inscrita en la Sección Mercantil del Registro Público de la República de Panamá a la Ficha ciento ochenta mil quinientos noventa y ocho (180598), Rollo diecinueve mil ochocientos treinta y ocho (19838) e Imagen sesenta y dos (62), en su calidad de apoderada, según consta en el poder inscrito en la Sección Mercantil del Registro Público [a la Ficha _____ (_____), Documento Redi número _____ (_____)], quien en lo sucesivo se denominará la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, persona a quien conozco y me pidió que hiciera constar como en efecto hago, lo siguiente:

PRIMERO: Que mediante Escritura Pública número veintiocho mil quinientos veintitrés (28523) de diecinueve (19) de noviembre de dos mil siete (2007), extendida en la Notaría Pública Primera del  Circuito de Panamá e inscrita a la Ficha número cuatrocientos catorce mil cuatrocientos cincuenta y siete (414457), Documento Redi número un millón doscientos cuarenta y ocho mil doscientos veintinueve (1248229), de la Sección de HIPOTECAS Y ANTICRESIS,

del Registro Público, la sociedad NEWLAND INTERNATIONAL PROPERTIES CORP., constituyó PRIMERA HIPOTECA Y ANTICRESIS a favor de GLOBAL FINANCIAL FUNDS CORP., en su calidad de co-fiduciaria en beneficio de los TENEDORES DE BONOS en virtud del CONTRATO DE FIDEICOMISO que se define en la citada Escritura Pública, sobre la Finca número doscientos treinta y cuatro mil doscientos cuarenta (234240), debidamente inscrita al Documento seiscientos siete mil ochocientos setenta (607870), de la Sección de Propiedad, Provincia de Panamá, del Registro Público y también sobre la Finca número noventa mil setecientos ochenta y cuatro (90784), debidamente inscrita al Rollo dos mil ciento treinta y nueve (2139), Documento tres (3) de la Sección de Propiedad, Provincia de Panamá, del Registro Público, para garantizar las OBLIGACIONES GARANTIZADAS según se detalla en dicha Escritura Pública.

SEGUNDO: Que mediante Escritura Pública número cinco mil doscientos setenta (5270) de once (11) de marzo de dos mil once (2011), extendida en la Notaría Quinta del Circuito de Panamá e inscrita al Documento Redi número un millón novecientos cuarenta y cinco mil cincuenta y tres (1945053) de la Sección de Propiedad Horizontal, Provincia de Panamá, del Registro Público, la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA otorgó su consentimiento expreso para que la sociedad NEWLAND INTERNATIONAL PROPERTIES CORP., declarara la construcción de mejoras en su Finca número doscientos treinta y cuatro mil doscientos cuarenta (234240) y la incorporara al Régimen Turístico de Propiedad Horizontal y al Régimen de Propiedad Horizontal, resultando la Finca trescientos treinta y cinco mil quinientos noventa (335590), de la Sección de Propiedad Horizontal, Provincia de Panamá, del Registro Público, de la cual se segregaron las unidades inmobiliarias que conforman el EDIFICIO P.H. TOC para formar fincas registrales aparte (en adelante, las "NUEVAS FINCAS"), manteniéndose sobre las NUEVAS FINCAS los gravámenes hipotecarios y anticréticos constituidos a favor de la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA.

TERCERO: Que por este medio, la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, en su condición de Acreedora Hipotecaria y Anticrética, otorga su consentimiento para que NEWLAND INTERNATIONAL PROPERTIES CORP., proceda con la protocolización e inscripción en el Registro Público de Panamá del Contrato de Promesa de Compraventa de las unidades [_____] (en adelante, las "Unidades").

CUARTO: Declara la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA que, la autorización que otorga para la protocolización e inscripción en el Registro Público de Panamá del Contrato de Promesa de Compra Venta de las Unidades, con los gravámenes que sobre ellas pesan, es decir, Primera Hipoteca y Anticresis a favor de la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, implica que la vigencia de la Primera Hipoteca y Anticresis que pesa sobre las mismas continuará bajo los mismos términos y condiciones tal como consta inscrita y como fuera pactada con la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA. En consecuencia, las Unidades antes descritas, y las NUEVAS FINCAS, continuarán garantizando las obligaciones contraídas por NEWLAND INTERNATIONAL PROPERTIES, CORP., en la forma contenida en la citada Escritura Pública número veintiocho mil quinientos veintitrés (28523) de diecinueve (19) de noviembre de dos mil siete (2007), extendida en la Notaría Pública Primera del Circuito de Panamá e inscrita a la Ficha número cuatrocientos catorce mil cuatrocientos cincuenta y siete (414457), Documento Redi número un millón doscientos cuarenta

y ocho mil doscientos veintinueve (1248229), de la Sección de HIPOTECAS Y ANTICRESIS, del Registro Público.

QUINTO: Declara la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, que correrán por cuenta de NEWLAND INTERNATIONAL PROPERTIES CORP., los gastos incurridos en la confección de esta Minuta de Consentimiento.

**Exhibit J**

## FORM OF CASINO UPA CANCELLATION CONSENT

### (English)

That [            ], [male/female], Panamanian, banker, of legal age, single, with personal identity card number _____ (_____)], resident of this city, acting on behalf and representing GLOBAL FINANCIAL FUNDS CORP., a corporation organized and existing under the laws of the Republic of Panama, registered in the Mercantile Section of the Public Registry of the Republic of Panama in Micro Jacket one hundred and eighty thousand five hundred ninety-eight (180598), Roll nineteen thousand eight hundred thirty-eight (19838) and Image sixty-two (62), personally appeared in her capacity as proxy, as recorded in the power of attorney registered in the Mercantile Section of the Public Registry in [Micro Jacket _____ (_____), Document Redi _____ (_____)], who hereinafter will be named the CO TRUSTEE AND MORTGAGE CREDITOR, person whom I know and requested me to record as in effect I do, the following:

FIRST: That by Public Deed number twenty-eight thousand five hundred twenty-three (28523) of November nineteen (19) two thousand seven (2007), issued by the Notary Public First Circuit of Panama and registered in Micro Jacket  number four hundred and fourteen thousand four hundred and fifty and seven (414457), Document Redi one million two hundred forty-eight thousand two hundred twenty-nine (1248229), of the MORTGAGES AND ANTICHRESIS section of the Public Registry, the corporation NEWLAND INTERNATIONAL PROPERTIES CORP., constituted FIRST MORTGAGE AND ANTICHRESIS on behalf of GLOBAL FINANCIAL FUNDS CORP., in its capacity as co-trustee for the benefit of the BONDHOLDERS under the TRUST as defined in said Public Deed, on property number two hundred thirty-four thousand two hundred forty (234240), registered in Document six hundred seven thousand eight hundred and seventy (607870), of the Property Section, Province of Panama, of the Public Registry and also on Property number ninety thousand seven hundred eighty-four (90784), registered in Roll two thousand one hundred thirty-nine (2139), Document three (3) of the Property Section, Province of Panama, of the Public Registry, to ensure the GUARANTEED OBLIGATIONS as detailed in such Public Deed.

SECOND: That by Public Deed Number five thousand two hundred and seventy (5270) of March eleven (11), two thousand eleven (2011), issued by the Notary Fifth of the Circuit of Panama and registered at Document Redi one million nine hundred forty-five thousand fifty-three (1945053) of the Horizontal Property Section, Province of Panama, of the Public Registry, the CO – TRUSTEE AND MORTGAGE CREDITOR granted its express consent to the corporation  NEWLAND INTERNATIONAL PROPERTIES CORP., to declare the construction of improvements in Property number two hundred thirty-four thousand two hundred forty (234240) and have it incorporated into the Tourism Regime for Horizontal Property and to the Horizontal Property Regime, resulting in Property three hundred thirty-five thousand five hundred ninety (335590), of the Horizontal Property Section, Province of Panama, of the Public Registry, from which the real estate units that make up the PH TOC BUILDING were segregated to form separate registration properties (hereinafter, the "NEW PROPERTIES"), remaining on

the NEW PROPERTIES the mortgage and antichresis liens constituted in favor of the CO-TRUSTEE AND MORTGAGE CREDITORS.

THIRD: That by Public Deed Number [_____] of [___] of [____] 2 [___], issued by the Notary [_____] of the Circuit of Panama and registered Document Redi number [_____] Section [_____ ], of the Province of Panama, of the Public Registry, NEWLAND INTERNATIONAL PROPERTIES CORP., with the consent of the CO – TRUSTEE AND MORTGAGE CREDITOR, in its capacity as Mortgage and Antichresis Creditor, grants its consent so that NEWLAND INTERNATIONAL PROPERTIES CORP., registers a Promise of Sale Agreement of units [_____] (hereinafter, the "Units").

FOURTH: That by this means, the CO – TRUSTEE AND MORTGAGE CREDITOR, in its capacity as Mortgage and Antichresis Creditor, grants its consent to NEWLAND INTERNATIONAL PROPERTIES CORP., to proceed with the notarization and registration in the Public Registry of Panama of the notary statement executed before the Notary [_____] of the Circuit of Panama, on the [___] of [___] 20 [___] through Public Deed number [_____] of [____] 20 [___], by which NEWLAND INTERNATIONAL PROPERTIES CORP. declares that the Promise of Sale of the Units has been properly terminated (hereinafter the "Declaration of Termination of the Promise of Sale of the Units").

FIFTH: The CO – TRUSTEE AND MORTGAGE CREDITOR declares that, the authorization granted for the notarization and registration in the Public Registry of Panama of the Declaration of Termination of the Promise of Sale of the Units, with the liens that the Units bear, that is the First Mortgage and Antichresis in favor of the CO- TRUSTEE AND MORTGAGE CREDITOR, means that the term of the First Mortgage and Antichresis that bear over them will continue under the same terms and conditions registered and as was agreed with the CO – TRUSTEE AND THE MORTGAGE CREDITOR. Accordingly, the Units as described above, and the rest of the NEW PROPERTIES, will continue to guarantee the obligations of NEWLAND INTERNATIONAL PROPERTIES, CORP., as contained in said Public Deed number twenty-eight thousand five hundred twenty-three (28523) of November nineteen (19 ) two thousand and seven (2007), issued by the Notary Public First Circuit of Panama and registered at Micro Jacket number four hundred and fourteen thousand four hundred fifty-seven (414457), Document Redi one million two hundred forty-eight thousand two hundred twenty-nine (1248229), of the MORTGAGES AND ANTICHRESIS Section of the Public Registry.

SIXTH: The CO-TRUSTEE AND MORTGAGE CREDITOR declares, that NEWLAND INTERNATIONAL PROPERTIES CORP shall pay for the expenses incurred in the preparation of this Minutes of Consent.

(Spanish)

Compareció personalmente, [_____], [varón/mujer], panameñ[o/a], banquer[o/a], mayor de edad, soltera, con cédula de identidad personal número [_____ (_____)], vecina de esta ciudad, actuando en nombre y representación de GLOBAL FINANCIAL FUNDS CORP., sociedad anónima organizada y existente de conformidad con las leyes de la República de Panamá, inscrita en la Sección Mercantil del Registro Público de la República de Panamá a la Ficha ciento ochenta mil quinientos noventa y ocho (180598), Rollo diecinueve mil ochocientos treinta y ocho (19838) e Imagen sesenta y dos (62), en su calidad de apoderada, según consta en el poder inscrito en la Sección Mercantil del Registro Público a la [Ficha _____ (_____), Documento Redi número _____ (_____)], quien en lo sucesivo se denominará la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, persona a quien conozco y me pidió que hiciera constar como en efecto hago, lo siguiente:

PRIMERO: Que mediante Escritura Pública número veintiocho mil quinientos veintitrés (28523) de diecinueve (19) de noviembre de dos mil siete (2007), extendida en la Notaría Pública Primera del Circuito de Panamá e inscrita a la Ficha número cuatrocientos catorce mil cuatrocientos cincuenta y siete (414457), Documento Redi número un millón doscientos cuarenta y ocho mil doscientos veintinueve (1248229), de la Sección de HIPOTECAS Y ANTICRESIS, del Registro Público, la sociedad NEWLAND INTERNATIONAL PROPERTIES CORP., constituyó PRIMERA HIPOTECA Y ANTICRESIS a favor de GLOBAL FINANCIAL FUNDS CORP., en su calidad de co-fiduciaria en beneficio de los TENEDORES DE BONOS en virtud del CONTRATO DE FIDEICOMISO que se define en la citada Escritura Pública, sobre la Finca número doscientos treinta y cuatro mil doscientos cuarenta (234240), debidamente inscrita al Documento seiscientos siete mil ochocientos setenta (607870), de la Sección de Propiedad, Provincia de Panamá, del Registro Público y también sobre la Finca número noventa mil setecientos ochenta y cuatro (90784), debidamente inscrita al Rollo dos mil ciento treinta y nueve, Documento tres (3) de la Sección de Propiedad, Provincia de Panamá, del Registro Público, para garantizar las OBLIGACIONES GARANTIZADAS según se detalla en dicha Escritura Pública.

SEGUNDO: Que mediante Escritura Pública número cinco mil doscientos setenta (5270) de once (11) de marzo de dos mil once (2011), extendida en la Notaría Quinta del Circuito de Panamá e inscrita al Documento Redi número un millón novecientos cuarenta y cinco mil cincuenta y tres (1945053) de la Sección de Propiedad Horizontal, Provincia de Panamá, del Registro Público, la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA otorgó su consentimiento expreso para que la sociedad NEWLAND INTERNATIONAL PROPERTIES CORP., declarara la construcción de mejoras en su Finca número doscientos treinta y cuatro mil doscientos cuarenta (234240) y la incorporara al Régimen Turístico de Propiedad Horizontal y al Régimen de Propiedad Horizontal, resultando la Finca trescientos treinta y cinco mil quinientos noventa (335590), de la Sección de Propiedad Horizontal, Provincia de Panamá, del Registro Público, de la cual se segregaron las unidades inmobiliarias que conforman el EDIFICIO P.H. TOC para formar fincas registrales aparte (en adelante, las "NUEVAS FINCAS"), manteniéndose sobre las NUEVAS FINCAS los gravámenes hipotecarios y anticréticos constituidos a favor de la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA.

TERCERO: Que mediante Escritura Pública número [_____] de [____] de
[____] de 2'[__], extendida en la Notaría [_____] del Circuito de Panamá e inscrita al
Documento Redi número [_____] de la Sección [_____], Provincia de Panamá,
del Registro Público , NEWLAND INTERNATIONAL PROPERTIES CORP., con el
consentimiento de la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, en su condición de
Acreedora Hipotecaria y Anticrética, otorga su consentimiento para que NEWLAND
INTERNATIONAL PROPERTIES CORP., registró un Contrato de Promesa de Compraventa de
las unidades [_____] (en adelante, las "Unidades").

CUARTO: Que por este medio, la CO - FIDUCIARIA y ACREEDORA
HIPOTECARIA, en su condición de Acreedora Hipotecaria y Anticrética, otorga su
consentimiento para que NEWLAND INTERNATIONAL PROPERTIES CORP., proceda con
la protocolización e inscripción en el Registro Público de Panamá de la declaración notarial
otorgada ante el Notario [_____] del Circuito de Panamá, el [____] de [____] de 20[____]
mediante la Escritura Público número [_____] de [____] de 20[____], por la cual NEWLAND
INTERNATIONAL PROPERTIES CORP. declara que el Contrato de Promesa de Compraventa
de las Unidades ha sido debidamente terminado (en adelante, la "Declaración de Terminación del
Contrato de Promesa de Compraventa de las Unidades").

QUINTO: Declara la CO – FIDUCIARIA y ACREEDORA HIPOTECARIA que, la
autorización que otorga para la protocolización e inscripción en el Registro Público de Panamá
de  la Declaración de Terminación del Contrato de Promesa de Compraventa de las Unidades,
con los gravámenes que sobre las Unidades pesan, es decir, Primera Hipoteca y Anticresis a
favor de la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, implica que la vigencia de la
Primera Hipoteca y Anticresis que pesa sobre la misma continuará bajo los mismos términos y
condiciones tal como consta inscrita y como fuera pactada con la CO - FIDUCIARIA y
ACREEDORA HIPOTECARIA. En consecuencia, las Unidades antes descritas, y el resto de las
NUEVAS FINCAS, continuarán garantizando las obligaciones contraídas por NEWLAND
INTERNATIONAL PROPERTIES, CORP., en la forma contenida en la citada Escritura Pública
número veintiocho mil quinientos veintitrés (28523) de diecinueve (19) de noviembre de dos mil
siete (2007), extendida en la Notaría Pública Primera del Circuito de Panamá e inscrita a la Ficha
número cuatrocientos catorce mil cuatrocientos cincuenta y siete (414457), Documento Redi
número un millón doscientos cuarenta y ocho mil doscientos veintinueve (1248229), de la
Sección de HIPOTECAS Y ANTICRESIS, del Registro Público.

SEXTO: Declara la CO - FIDUCIARIA y ACREEDORA HIPOTECARIA, que correrán por
cuenta de NEWLAND INTERNATIONAL PROPERTIES CORP., los gastos incurridos en la
confección de esta Minuta de Consentimiento.

**Exhibit K**

**FORM OF NOTEHOLDER REPRESENTATIVE CERTIFICATION**

I, _____, hereby certify that I am the _____ of Newland International Properties, Corp. (the "Company").

In connection with the Indenture, dated as of [*], 2013, (the "Indenture"), between the Company and CSC Trust Company of Delaware, as trustee, the Company hereby certifies to the Trustee under the Indenture and to the Co-Trustee under that certain Co-Trustee Agreement, dated as of [*], 2013, among the Company, CSC Trust Company of Delaware, Global Financial Funds Corp., a subsidiary of Global Bank Corporation, HSBC Bank USA, N.A., and HSBC Investment Corporation (Panama) S.A. (the "Co-Trustee Agreement"), as follows:

[*If applicable*]

Pursuant to Section 10.04(a)(6) of the Indenture, the Company hereby requests the disbursement of $_____, with respect to the BC Senior Loan Reserve Amount and the disbursement of $_____, with respect to the BC Ferry Payment Reserve Amount.

[*If applicable*]

Pursuant to Section 10.04(a)(3) of the Indenture, the Company hereby certifies that a Contingency Event has occurred and requests the disbursement of a Contingency Amount of $_____. The Contingency Event which has occurred consists of [*insert relevant description*].

[*If applicable*]

Pursuant to Section 3.09 of the Indenture, the Company hereby certifies that a Prime Unit Sale has occurred and Net Proceeds of $_____ shall be applied as a Mandatory Prepayment of the Notes on the third business day following this certification.

[*If applicable*]

Pursuant to Section 4.27 of the Indenture, the Company hereby certifies that the criteria for seller financing has been satisfied in respect of [*insert relevant Unit Purchase Agreements*] and the Company hereby requests the release of the Mortgage in respect of [*insert relevant Unit Purchase Agreements*].

[*If applicable*]

Pursuant to Section 4.28 of the Indenture, the Company hereby certifies that the criteria for the Bulk 2 refinancing has been satisfied in respect of [*insert relevant Unit Purchase Agreements*] and the Company hereby requests the release of the Mortgage in respect of [*insert relevant Unit Purchase Agreements*].

This certification has been reviewed by the Noteholder Representative who has no objection to it. The Noteholder Representative's review of such certification consisted of a verification only of the relevant items, events and calculations.

Terms used but not defined herein are as defined in the Indenture.

Certified this _____ day of _____, 20__.

**NEWLAND INTERNATIONAL
PROPERTIES, CORP.**

By:  _____
Name:
Title:

Acknowledged and Agreed:

_____,
**NOTEHOLDER REPRESENTATIVE**

By:  _____
Name:
Title:

**Exhibit L**

## FORM OF QUARTERLY REPORTING EXHIBIT*

## SELLOUT (UNITS CONTRACTED TO BE SOLD AND AVAILABLE UNITS)

| | Sold or contracted to be sold | | | | | | | | | | | Available | | | Total Sellout | | |
| | January | | | February | | | March | | | Total thru 1Q13 | | | as of 1Q13 | | | as of 1Q13 | | |
| | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Residential Condominium Units* | | | | | | | | | | | | | | | | | | |
| One Bedroom Units | | | | | | | | | | | | | | | | | | |
| Two Bedroom Units | | | | | | | | | | | | | | | | | | |
| Three Bedroom Units | | | | | | | | | | | | | | | | | | |
| Three Bedroom combo Units | | | | | | | | | | | | | | | | | | |
| Penthouse | | | | | | | | | | | | | | | | | | |
| Curve Units | | | | | | | | | | | | | | | | | | |
| Baylofts | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | |
| *Hotel Condominium Units* | | | | | | | | | | | | | | | | | | |
| One Bedroom Suite Units | | | | | | | | | | | | | | | | | | |
| One Bedroom Curve Units | | | | | | | | | | | | | | | | | | |
| Studio Units | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | |
| **Total Residential and Hotel Units** | | | | | | | | | | | | | | | | | | |
| **Other Products** | | | | | | | | | | | | | | | | | | |
| Commercial Units | | | | | | | | | | | | | | | | | | |
| Restaurants | | | | | | | | | | | | | | | | | | |
| Offices | | | | | | | | | | | | | | | | | | |
| Spa | | | | | | | | | | | | | | | | | | |
| Casino | | | | | | | | | | | | | | | | | | |
| **Total Commercial Space** | | | | | | | | | | | | | | | | | | |
| **Total Sell Out** | | | | | | | | | | | | | | | | | | |
| Membership Fee | | | | | | | | | | | | | | | | | | |
| **TOTAL SALES PLUS MEMBERSHIPS** | | | | | | | | | | | | | | | | | | |

## TOTAL UNITS SOLD (CLOSED VS. UNCLOSED)

Mar. 31, 2013
US$ Thousands

| | Closed | | | | | | | | | | | | | Unclosed | | | | Total Sold | | |
| | January | | | February | | | March | | | as of 1Q13 | | | as of 1Q13 | | | | | | |
| | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Units | Sq Mtrs | Sales Amount US$ | Receivables (US$) | Units | Sq Mtrs | Sales Amount US$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bayloft | | | | | | | | | | | | | | | | | | | |
| Condo | | | | | | | | | | | | | | | | | | | |
| Hotel | | | | | | | | | | | | | | | | | | | |
| Commercial | | | | | | | | | | | | | | | | | | | |
| Restaurant | | | | | | | | | | | | | | | | | | | |
| Office | | | | | | | | | | | | | | | | | | | |
| **Total general** | | | | | | | | | | | | | | | | | | | |

# COLLECTIONS

**Mar. 31, 2013**

**US$ Thousands**

| | January | February | March | Collections YTD (US$) |
|---|---|---|---|---|
| New Sales Cash Mortgages | | | | |
| **Total** | | | | |

# NEW SALES

**Mar. 31, 2013**

**US$ Thousands**

| | January | | | February | | | March | | | Total YTD |
|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | Units | Sq Mtrs | US$ | |
| Condo Hotel Commercial | | | | | | | | | | |
| Total | | | | | | | | | | |

# DEFAULTS

**Mar. 31, 2013**

**US$ Thousands**

| | January | | | February | | | March | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ | # of units | sq mtrs | US$ |
| Bayloft | | | | | | | | | | | | |
| Condo | | | | | | | | | | | | |
| Hotel | | | | | | | | | | | | |
| Commercial | | | | | | | | | | | | |
| Restaurant | | | | | | | | | | | | |
| Office | | | | | | | | | | | | |
| Casino | | | | | | | | | | | | |
| Total | | | | | | | | | | | | |

# DEEDS PROCESSING

**Mar. 31, 2013**

| **Recording Status** | January | February | March |
|---|---|---|---|
| Deed to be signed by Newland | | | |
| Deed in process with bank | | | |
| Deed in Notary office | | | |
| Deed payments processing in public registry | | | |
| Deed to be Recorded | | | |
| RECORDED | | | |
| **Total** | | | |

## RELATED PARTY TRANSACTIONS

**Mar. 31, 2013**

**US$ Thousands**

| Date | Related Party | Relation to Newland | Counterparty | Description | Amount (US$) |
|------|--------------|---------------------|--------------|-------------|--------------|
|      |              |                     |              |             |              |

*Dates are provided above by way of illustration only*

Exhibit M

**FORM OF PANAMA ACCOUNT PRIORITY OF PAYMENTS CERTIFICATION**

I, _____, hereby certify that I am the _____ of Newland International Properties, Corp. (the "Company").

In connection with the Indenture, dated as of [*], 2013, (the "Indenture"), between the Company and CSC Trust Company of Delaware, as trustee, the Company hereby certifies to the Trustee under the Indenture and to the Co-Trustee under that certain Co-Trustee Agreement, dated as of [*], 2013, among the Company, CSC Trust Company of Delaware, Global Financial Funds Corp., a subsidiary of Global Bank Corporation, HSBC Bank USA, N.A., and HSBC Investment Corporation (Panama) S.A. (the "Co-Trustee Agreement"), as follows:

[*If applicable*]

Pursuant to Section 10.02(a)(1) of the Indenture, Current License Fees for [*insert relevant UPA*] are $_____ and shall be paid to Licensor pursuant to the payment instructions below:

|                     |   |
|--------------------:|---|
| Beneficiary Bank:   | _____ |
| Account No.:        | _____ |
| Swift/ABA:          | _____ |
|                     |   |
| Final Beneficiary:  | _____ |
| Account No.:        | _____ |

[*If applicable, check box below indicating sum of $1.2 million (or such less amount decided upon by the Company) has been reached and should be transferred in full*]

[   ]   Pursuant to Section 10.02(a)(3) of the Indenture, the Company hereby certifies that the sum of $1.2 million has been transferred in full from the Panama Account to the Release Account.

[   ]   Pursuant to Section 10.02(a)(3) of the Indenture, the Company hereby certifies that the sum of $[*Company to insert lesser amount*] million has been transferred in full from the Panama Account to the Release Account.

[*If applicable*]

Pursuant to Section 10.02(a)(3) of the Indenture, the Monthly Accrued Fee Payment Amount of $_____ for the month of_____ has been reached and shall be transferred on the next business day to Licensor pursuant to the payment instructions below:

Beneficiary Bank:    _____

Account No.:    _____

Swift/ABA:    _____

Final Beneficiary:    _____

Account No.:    _____

[As the Monthly Accrued Fee Payment Amount of $_____ for the month of_____ has been reached, all remaining sums on deposit in the Panama Account for the month of _____ can be transferred to the Release Account.]

[*If applicable - to be delivered in time for the last release date of the month if by last release date of the month the Monthly Accrued Fee Payment Amount hasn't been earlier released in full*]

Pursuant to Section 10.02(a)(3) of the Indenture, the Monthly Accrued Fee Payment Amount of $_____ for the month of_____ has <u>not</u> been reached as of today, the last business day of such month, and all amounts on deposit ($_____) in the Panama Account and shall be transferred to Licensor on the date hereof pursuant to the payment instructions below:

Beneficiary Bank:    _____

Account No.:    _____

Swift/ABA:    _____

Final Beneficiary:    _____

Account No.:    _____

[*If applicable*]

[Pursuant to Section 10.02(a)(4) of the Indenture, the Total Accrued Fee Payment Amount ($_____) has been reached.]

[*Signature page follows*]

M-2

Terms used but not defined herein are as defined in the Indenture.

Certified this _____ day of _____, 20__.

**NEWLAND INTERNATIONAL
PROPERTIES, CORP.**

By: _____

Name:

Title:

**Exhibit N**

## MONTHLY WORKING CAPITAL*

| Monthy Working Capital Period | | Monthly Woring Capital Categories | | | |
|---|---|---|---|---|---|
| Post Closing Monthly Period | Expected Month/Year | TOC Asset Completion & Preservation | Newland TOC Operations | Newland Corporate Operations | Miscellaneous Monthly Working Capital |
| Closing Month | April-2013 | $ 210,000 | $ 430,000 | $ 240,000 | $ 245,000 |
| + 1 Month | May-2013 | $ 210,000 | $ 430,000 | $ 240,000 | $ 245,000 |
| + 2 Month | June-2013 | $ 220,000 | $ 345,000 | $ 230,000 | $ 255,000 |
| + 3 Month | July-2013 | $ 210,000 | $ 255,000 | $ 235,000 | $ 225,000 |
| + 4 Month | August-2013 | $ 210,000 | $ 200,000 | $ 225,000 | $ 240,000 |
| + 5 Month | September-2013 | $ 205,000 | $ 185,000 | $ 225,000 | $ 235,000 |
| + 6 Month | October-2013 | $ 205,000 | $ 200,000 | $ 230,000 | $ 215,000 |
| + 7 Month | November-2013 | $ 180,000 | $ 110,000 | $ 120,000 | $ 215,000 |
| + 8 Month | December-2013 | $ 185,000 | $ 110,000 | $ 120,000 | $ 210,000 |
| + 9 Month | January-2014 | $ 150,000 | $ 35,000 | $ 105,000 | $ 210,000 |
| + 10 Month | February-2014 | $ 155,000 | $ 35,000 | $ 105,000 | $ 200,000 |
| + 11 Month | March-2014 | $ 155,000 | $ 35,000 | $ 110,000 | $ 195,000 |
| + 12 Month | April-2014 | $ 155,000 | $ 40,000 | $ 110,000 | $ 190,000 |
| + 13 Month | May-2014 | $ 155,000 | $ 40,000 | $ 115,000 | $ 185,000 |
| + 14 Month | June-2014 | $ 155,000 | $ 40,000 | $ 115,000 | $ 185,000 |
| + 15 Month | July-2014 | $ 140,000 | $ 35,000 | $ 105,000 | $ 190,000 |
| + 16 Month | August-2014 | $ 140,000 | $ 35,000 | $ 110,000 | $ 185,000 |
| + 17 Month | September-2014 | $ 145,000 | $ 35,000 | $ 105,000 | $ 185,000 |
| + 18 Month | October-2014 | $ 145,000 | $ 40,000 | $ 105,000 | $ 180,000 |
| + 19 Month | November-2014 | $ 140,000 | $ 40,000 | $ 110,000 | $ 180,000 |
| + 20 Month | December-2014 | $ 130,000 | $ 35,000 | $ 100,000 | $ 180,000 |
| + 21 Month | January-2015 | $ 130,000 | $ 35,000 | $ 100,000 | $ 180,000 |
| + 22 Month | February-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 23 Month | March-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 24 Month | April-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 180,000 |
| + 25 Month | May-2015 | $ 125,000 | $ 35,000 | $ 105,000 | $ 175,000 |
| + 26 Month | June-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 27 Month | July-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 28 Month | August-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 29 Month | September-2015 | $ 110,000 | $ 35,000 | $ 95,000 | $ 175,000 |
| + 30 Month | October-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 31 Month | November-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 32 Month | December-2015 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 33 Month | January-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 34 Month | February-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 35 Month | March-2016 | $ 105,000 | $ 35,000 | $ 100,000 | $ 175,000 |
| + 36 Month | April-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 37 Month | May-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 38 Month | June-2016 | $ 90,000 | $ 30,000 | $ 90,000 | $ 180,000 |
| + 39 Month | July-2016 | $ 90,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 40 Month | August-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 41 Month | September-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 42 Month | October-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 43 Month | November-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 44 Month | December-2016 | $ 85,000 | $ 30,000 | $ 95,000 | $ 175,000 |
| + 45 Month | January-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 46 Month | February-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 47 Month | March-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 48 Month | April-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 49 Month | May-2017 | $ 70,000 | $ 30,000 | $ 85,000 | $ 175,000 |
| + 50 Month | Thereafter May 2017 | $ - | $ - | $ - | $ - |

*These Monthly Working Capital numbers shall become available effective on the date of the issuance of the Notes, and if the date of such issuance is other than the first day of a calendar month then the amount available for that month shall be the total amount set forth for that month reduced on a pro rata basis to cover the number of days remaining during that month following the date of such issuance.

**Exhibit O**

## FORM OF STOCK PLEDGE AGREEMENT

### CONTRATO DE PRENDA MERCANTIL

Entre los suscritos, a saber: (i) GLOBAL FINANCIAL FUNDS CORP., una sociedad organizada y existente de acuerdo a las leyes de la República de Panamá, inscrita en la Sección Mercantil del Registro Público de la República de Panamá a la Ficha trescientos seis mil quinientos once (306511), Rollo cuarenta y siete mil doscientos cincuenta y seis (47256) e Imagen veintidós (22), con licencia fiduciaria cuatro- noventa y seis (4-96) del dieciséis (16) de febrero de mil novecientos noventa y seis (1996),  actuando en su calidad de co-fiduciario y no a título personal, en virtud del ACUERDO DE DESIGNACION Y ACEPTACION DEL CO-FIDUCIARIO ENMENDADO Y REFORMULADO celebrado el [_____] de [_____] de dos mil trece (2013) entre Newland International Properties, Corp., en calidad de emisor, CSC TRUST COMPANY, en calidad de fiduciario, HSBC INVESTMENT CORPORATION (PANAMA), S.A., en calidad de co-fiduciario saliente, y HSBC BANK USA, N.A., en calidad de fiduciario saliente, conforme a las leyes del Estado de Nueva York de los Estados Unidos de América, el cual consta también en la Escritura Pública número [_____] de [_____] de [_____] de dos mil trece (2013), extendida en la Notaría Pública [_____] del Circuito de Panamá e inscrita a la Ficha número [_____] ([_____]), Documento Redi número [_____] ([_____]), de la Sección de Hipotecas, del Registro Público, actuando en su capacidad de agente del Fiduciario y éste última actuando a favor de los titulares de bonos, debidamente representado por MONICA GARCIA DE PAREDES DE CHAPMAN, mujer, panameña, mayor de edad, casada, vecina de esta ciudad, portadora de la cédula de identidad personal número ocho-doscientos sesenta y dos (8-262-262), debidamente autorizada para este acto según consta en el poder inscrito a la Ficha tres cero seis cinco uno uno (306511), Documento uno seis cero siete seis tres dos (1607632), de la Sección de Micropelículas (Mercantil) del Registro Público desde el seis (6) de julio de dos mil nueve (2009), denominado de aquí en adelante "EL ACREEDOR PRENDARIO"; y, por la otra parte, (ii) OCEAN POINT DEVELOPMENT CORP., debidamente inscrita a Ficha cuatrocientos veinticuatro mil treinta (424030), Documento trescientos noventa y ocho mil seiscientos treinta y uno (398631)  de la Sección Micropelículas (Mercantil) del Registro Público, debidamente representado por ROGER

KHAFIF, varón, Panameño, de edad legal, casado, portador de la cédula de identidad personal número "N"- diecisiete – seiscientos treinta (N-17-630), debidamente facultado para este acto sobre la base del Acta de una Reunión Extraordinaria de los Accionistas de fecha  dieciséis (16) del mes de mayo del año dos mil trece (2013) que se encuentra adjunta al presente contrato, llamado de aquí en adelante "EL GARANTE PRENDARIO"; y, por la otra parte, (iii) NEWLAND INTERNATIONAL PROPERTIES, CORP., una sociedad anónima y organizada de acuerdo con la Leyes de la República de Panamá, inscrita a la Ficha quinientos veintiún mil doscientos cincuenta y ocho (521258), Documento novecientos veintinueve mil doscientos treinta y dos (929232), de la Sección Mercantil del Registro Público, debidamente representado por el señor EDUARDO SARAVIA CALDERON, varón, colombiano, casado, mayor de edad, empresario, portador del pasaporte colombiano número PE cero seis siete dos uno cinco (PE067215), debidamente autorizado para este acto según consta en la Resolución de la Junta Directiva de dicha sociedad de fecha veintiuno (21) de marzo de dos mil trece (2013), según certifica el Secretario de dicha sociedad en Certificado que firma el día de fecha veintiuno (21) de marzo de dos mil trece (2013), llamado de aquí en adelante "EL DEUDOR" o "EL EMISOR", por el presente celebran un contrato de prenda mercantil (llamado de aquí en adelante el "Contrato de Prenda Mercantil" o el "Contrato") en conformidad con las siguientes declaraciones, términos y condiciones:

PRIMERO: EL EMISOR y EL GARANTE PRENDARIO declaran lo siguiente:

1) EL EMISOR y el CSC TRUST COMPANY, en su calidad de fiduciario (,llamado de aquí en adelante el "FIDUCIARIO"), suscribieron una contrato del contrato de fideicomiso (en inglés "indenture") de fecha [__] de [_____] de 2013 en relación con su reorganización bajo el Capítulo 11 del Código de Quiebras de los Estados Unidos, mediante el cual acuerdan la emisión de bonos (en inglés "Notes", según dicho término se define en el CONTRATO DE FIDEICOMISO, ), llamado de aquí en adelante los "BONOS") al nueve punto cincuenta por ciento (9,50%) con vencimiento en el dos mil diecisiete (2017) por un monto de DOSCIENTOS VEINTE MILLONES DE DÓLARES, moneda legal de los Estados Unidos de América (US$220,000,000) llamado de aquí en adelante, en su forma enmendada, completar o modificar de tiempo en tiempo, el CONTRATO DE FIDEICOMISO.

2) EL ACREEDOR PRENDARIO, EL EMISOR, el FIDUCIARIO, HSBC INVESTMENT
   CORPORATION (PANAMA), S.A., en calidad de co-fiduciario saliente, y HSBC
   BANK USA, N.A., en calidad de fiduciario saliente, conforme a las leyes del Estado de
   Nueva York de los Estados Unidos de América, suscribieron un ACUERDODE
   DESIGNACIÓN Y ACEPTACIÓN DE CO-FIDUCIARIO ENMENDADO Y
   REFORMULADO (denominado en inglés, "Amended and Restated Agreement of
   Appointment and Acceptance of Co-Trustee"), llamado de aquí en adelante ACUERDO
   DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO, por
   el cual EL EMISOR, y EL FIDUCIARIO bajo el CONTRATO DE FIDEICOMISO,
   designan al ACREEDOR PRENDARIO como co-fiduciario bajo el ACUERDO DE
   DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO, con el fin
   de crear, mantener, y poseer ciertas garantías y entre ellas las siguientes: (i) una
   determinada primera hipoteca y anticresis sobre bienes inmuebles otorgada por EL
   EMISOR. al ACREEDOR PRENDARIO, y (ii) una cierta prenda de acciones y cesión de
   derechos de voto otorgados por el GARANTE PRENDARIO al ACREEDOR
   PRENDARIO, actuando en su capacidad de agente del FIDUCIARIO, este último quien
   actúa en beneficio de los titulares de bonos emitidos al amparo del CONTRATO DE
   FIDEICOMISO.

   EL EMISOR ha emitido los BONOS debidamente y recibido el pago a su entera
   satisfacción por la totalidad de los BONOS y de la emisión, en conformidad con las
   disposiciones establecidas en el CONTRATO DE FIDEICOMISO.

3) EL EMISOR, en conformidad con el CONTRATO DE FIDEICOMISO, está obligado a
   hacer determinados pagos al FIDUCIARIO y al ACREEDOR PRENDARIO, en calidad
   de agente del FIDUCIARIO,,  este último quien actúa a favor de los titulares de BONOS.

SEGUNDO: EL GARANTE PRENDARIO quien a su vez es el propietario del cien por ciento
(100%) de las acciones emitidas y en circulación de EL EMISOR, constituye la presente prenda
mercantil a favor del ACREEDOR PRENDARIO con el fin de garantizar a EL ACREEDOR
PRENDARIO el fiel cumplimiento por parte del DEUDOR de cualesquiera de las siguientes
obligaciones garantizadas (llamado de aquí en adelante, las "Obligaciones Garantizadas"):

(A) El pago puntual y completo de todas y cada una de las obligaciones y deudas contraídas
(incluyendo, sin limitación, el capital de los BONOS hasta por la suma de DOSCIENTOS

VEINTE MILLONES DE DOLARES, moneda de curso legal de los Estados Unidos de América (US$220,000,000.00), más intereses, intereses moratorios, Sumas Adicionales (en inglés "Additional Amounts"), según dicho término se define en la sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO, indemnizaciones, comisiones, honorarios, gastos y otras sumas), así como la ejecución y el cabal cumplimiento de todos los términos, condiciones, cargas y acuerdos, e cualquier tipo o naturaleza, contraídos por el EMISOR, o que en el futuro éste contraiga, para con el CO-FIDUCIARIO, el FIDUCIARIO, los tenedores de BONOS o con todos, que surjan del CONTRATO DE FIDEICOMISO de los BONOS o de los demás DOCUMENTOS DE LA TRANSACCIÓN (en inglés, "Transaction Documents", según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO o que tengan relación con éstos; así como la ejecución y el cumplimiento debido por parte el EMISOR de todos los términos, condiciones y acuerdos estipulados en el CONTRATO DE FIDEICOMISO, en los BONOS y en los demás DOCUMENTOS DE LA TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO)o que tengan relación con éstos;

(B) el pago puntual y completo por parte del EMISOR de todas y cada una de las sumas a pagar al CO-FIDUCIARIO, y el cumplimiento de otras obligaciones contraídas para con el CO-FIDUCIARIO, en virtud de este CONTRATO, de los BONOS, y los demás DOCUMENTOS DE LA TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO), con el fin de conservar, mantener, defender, proteger, administrar, custodiar y ejecutar la prenda constituida en virtud del presente Contrato;

(C) en caso de que se inicie un proceso, ya sea judicial o extrajudicial, para cobrar a los que se refieren las obligaciones, deudas, sumas y compromisos a los que se refieren los párrafos (A) y (B) anteriores, los gastos de valorar, preparar para su venta, vender, traspasar, aprovechar, ejecutar o de cualquier otra forma disponer de los BIENES HIPOTECADOS y en general cualesquiera otros que se incurran para ejecutar la primera hipoteca y anticresis constituidas sobre éstos; así como los gastos en que incurra el CO-FIDUCIARIO en el ejercicio o la defensa de sus derechos en virtud de este CONTRATO DE HIPOTECA, de los BONOS y los demás DOCUMENTOS DE LA TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO) (incluyendo, sin limitación, gastos de abogados, costas, gastos judiciales, primas de seguros o bonos y otros), en todos estos casos

con intereses a la tasa de interés anual que paguen los BONOS desde la fecha en que dicho pago sea requerido; y

(D) todas las sumas que debe pagar el EMISOR al CO-FIDUCIARIO de conformidad con este CONTRATO.

Las OBLIGACIONES GARANTIZADAS incluyen las obligaciones derivadas del CONTRATO DE FIDEICOMISO, de este CONTRATO, de los BONOS, del ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO y de los demás DOCUMENTOS DE LA TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO) existentes a la fecha, así como las derivadas de cualesquiera otros contratos o acuerdos que lleguen  a existir entre las partes en el futuro por razón de aquellos y que estipulen estar garantizados por el presente CONTRATO, y las derivadas de todas las modificaciones, reformas, suplementos, extensiones, renovaciones o reemplazos de todos ellos.

TERCERO: Por el presente EL GARANTE PRENDARIO constituye, durante toda la vigencia de las Obligaciones Garantizadas, una prenda mercantil a favor del ACREEDOR PRENDARIO para garantizar el íntegro y cabal cumplimiento de todas y cada una de dichas obligaciones. EL GARANTE PRENDARIO constituye prenda mercantil sobre quinientas (500) acciones a su nombre del EMISOR, y sobre los certificados que las representan, las cuales están detalladas en el presente a continuación (las "Acciones Pignoradas"):

a) Certificado Número ___ por  trescientas quince (315) acciones Clase A

b) Certificado Número ___ por  ciento treinta y cinco (135) acciones Clase B

c) Certificado Número ___ por  treinta y cinco (35) acciones Clase C

d) Certificado Número ____ por  quince (15) acciones Clase C

CUARTO: EL GARANTE PRENDARIO designa al ACREEDOR PRENDARIO  como depositario de las acciones dadas en prenda y, con ese fin y a su vez con la finalidad de perfeccionar la prenda sobre las Acciones Pignoradas, en la fecha de firma de este Contrato de Prenda:

(A)  EL GARANTE PRENDARIO entregará al ACREEDOR PRENDARIO los originales de todos los certificados de acciones representativos de las Acciones Pignoradas, cuyos certificados deberán estar acompañados de un endoso en blanco, mediante instrumento

separado, debidamente notarizado, usando el modelo adjunto como Anexo A al presente Contrato;

(B) EL GARANTE PRENDARIO entregará al ACREEDOR PRENDARIO una certificación expedida por el secretario del DEUDOR, mediante la cual se haga constar que se ha anotado la prenda de las Acciones Pignoradas en el libro de registro de acciones del DEUDOR; y

(C) EL GARANTE PRENDARIO declara y garantiza que han sido obtenidas todas las autorizaciones corporativas necesarias para que éste firme y otorgue este Contrato de Prenda Mercantil y constituya esta prenda mercantil sobre las Acciones Pignorados.

No obstante la constitución de la prenda sobre las Acciones Pignoradas, mientas el ACREEDOR PRENDARIO no reciba instrucción del FIDUCIARIO en cuanto a la ocurrencia de un evento de incumplimiento bajo EL CONTRATO DE FIDEICOMISO y/o cualquiera de los DOCUMENTOS DE LA TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO), eL GARANTE PRENDARIO retendrá y preservará la facultad para ejercer el derecho a voto, y cualesquiera otros derechos políticos que puedan corresponder a dichas acciones durante la vigencia de la prenda mercantil de este Contrato; comprometiéndose, sin embargo, el GARANTE PRENDARIO a no votar a favor de ninguna acción que directa o indirectamente contradiga o viole los términos de este Contrato de Prenda Mercantil, el ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO o los demás DOCUMENTOS DE LA TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO), menoscabe el valor de las Acciones Pignoradas o la efectividad de esta prenda. Bastará con la notificación por parte del GARANTE PRENDARIO, quien actuará conforme a las instrucciones del FIDUCIARIO, para que el GARANTE PRENDARIO pierdan inmediatamente el derecho de recibir convocatorias a las asambleas de accionistas, asistir a dichas asambleas y ejercer el voto con respecto a las Acciones Pignoradas, quedando el ACREEDOR PRENDARIO investido de dichos derechos, los cuales podrá ejercer a través del Custodio (conforme dicho término se define a continuación).

QUINTO: La prenda mercantil constituida sobre los Acciones Pignoradas en virtud de este Contrato de Prenda Mercantil:

(A)     continuará en pleno vigor y efecto hasta que todas las Obligaciones
Garantizadas sean pagadas en su totalidad;

(B)     será exigible al GARANTE PRENDARIO y a sus respectivos sucesores; y

(C)     redundará a favor del ACREEDOR PRENDARIO, para beneficio del
FIDUCIARIO, quien actuará en beneficio delos tenedores de los BONOS y para beneficio
propio, así como a favor y para el beneficio de sus respectivos sucesores y cesionarios.

Sin limitar los estipulado en el párrafo (C) de esta cláusula y sujeto a los términos
y condiciones del CONTRATO DE FIDEICOMISO, cualquier tenedor de los BONOS podrá
ceder o de cualquier otra forma transferir los BONOS, en todo o en parte, a otra persona,
quedando dicha otra persona investida de todos los derechos y beneficios respecto de dicho
BONO, incluyendo, los derechos y beneficios conferidos por la prenda sobre los Acciones
Pignoradas constituida de conformidad con este Contrato de Prenda, los cuales no se verán
afectados por razón de dichas cesiones o transferencias.

SEXTO: Todas las obligaciones del GARANTE PRENDARIO y EL DEUDOR asumidas en
virtud del presente Contrato de Prenda y la prenda constituida en virtud del mismo tienen
carácter absoluto e incondicional y permanecerán en pleno vigor y efecto y no serán liberadas,
canceladas, suspendidas, afectadas, terminadas o de cualquiera otra forma afectadas por ningún
hecho, circunstancia o condición, incluyendo:

(A)     la renovación, extensión, reforma o modificación del CONTRATO DE
FIDEICOMISO, ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y
REFORMULADO y de los demás DOCUMENTOS DE LA TRANSACCIÓN (según dicho
término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE
FIDEICOMISO), o por la cesión de los mismos;

(B)     la renuncia de cualquier derecho o el consentimiento para el cumplimiento
imperfecto de obligaciones adquiridas por EL GARANTE PRENDARIO o EL DEUDOR en
virtud del CONTRATO DE FIDEICOMISO, el ACUERDO DE DESIGNACIÓN DE CO-
FIDUCIARIO ENMENDADO Y REFORMULADO, de los demás DOCUMENTOS DE LA

TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del
CONTRATO DE FIDEICOMISO) y este Contrato de Prenda;

(C)    la constitución de garantías adicionales o la liberación de otras garantías;

(D)    la invalidez o la no exigibilidad de las Obligaciones Garantizadas, hasta el
máximo permitido por la ley;

(E)    la insolvencia, la quiebra, el concurso de acreedores, la disolución o la
liquidación del GARANTE PRENDARIO y/o EL DEUDOR; y

(F)    hasta el máximo permitido por ley, cualquier hecho, circunstancia o
condición (salvo por la terminación d este Contrato) que podría constituir una defensa o servir de
base para liberar al EMISOR o al GARANTE HIPOTECARIO.

SEPTIMO: Este Contrato de Prenda y la prenda sobre las Acciones Pignoradas terminarán (salvo
por las obligaciones adquiridas en virtud de las cláusulas Décimo Quinta y Décimo Séptima de
este Contrato de Prenda, las cuales subsistirán dicha terminación) cuando todas las Obligaciones
Garantizadas hayan sido pagadas y satisfechas en su totalidad a satisfacción del ACREEDOR
PRENDARIO (conforme a notificación al efecto que reciba del FIDUCIARIO), y a partir de
dicho momento, a solicitud de EL GARANTE PRENDARIO y/o EL DEUDOR, de haber
Acciones Pignoradas que no hubiesen sido ejecutados, los mismos serán devueltos por el
ACREEDOR PRENDARIO al GARANTE PRENDARIO durante los dos (2) días hábiles
siguientes a la recepción de la notificación del GARANTE PRENDARIO, quedando el
ACREEDOR PRENDARIO obligado a firmar (sin responsabilidad alguna y a expensas del
GARANTE PRENDARIO) cualquier documento necesario y hacer cuanto razonablemente fuese
necesario a juicio del ACREEDOR PRENDARIO para liberar la prenda sobre los Acciones
Pignoradas, incluyendo, informar a EL DEUDOR de la liberación de la prenda.

OCTAVO: En el caso de cualquier evento de incumplimiento (en inglés, "Event of Default",
según dicho término se define en la Sección seis punto cero uno del CONTRATO DE
FIDEICOMISO) de acuerdo a la Sección seis punto cero uno (6.01) del CONTRATO DE
FIDEICOMISO y siempre que el ACREEDOR PRENDARIO hubiese recibido la instrucción por
parte del FIDUCIARIO conforme a la sección CINCO (5) del ACUERDO DE DESIGNACION
Y ACEPTACION DEL CO-FIDUCIARIO, EL ACREEDOR PRENDARIO, bien sea

directamente o a través de apoderados o el Custodio (conforme dicho término se define a continuación), podrá declarar la obligación de plazo vencido y exigible, y promover la ejecución de la presente prenda.. EL ACREEDOR PRENDARIO podrá, a su entera discreción y sin necesidad de resolución judicial proceder así:

1. Disponer de la prenda en virtud de las disposiciones establecidas en el Párrafo Primero del Artículo 820 del Código de Comercio. A ese efecto, EL ACREEDOR PRENDARIO procederá a vender la prenda en subasta privada con el siguiente procedimiento: cinco (5) días por adelantado de la fecha de la subasta, EL ACREEDOR PRENDARIO publicará por una sola vez en un periódico de la ciudad de Panamá un aviso de lo mismo. En la fecha de la subasta, las posturas deberán ser recibidas hasta las 4 de la tarde, en las oficinas de EL ACREEDOR PRENDARIO ubicadas en Global Financial Funds Corp., Planta Baja, Torre Global Bank, Calle 50, teléfono 206-2000, Apartado 55-1843, Paitilla, Panamá, República de Panamá.

   EL ACREEDOR PRENDARIO no estará obligado a aceptar ninguna postura por debajo de las sumas adeudadas bajo las Obligaciones Garantizadas, más cualesquiera gastos que puedan ser causados por la subasta. EL ACREEDOR PRENDARIO podrá presentar una postura de la totalidad o parte de las sumas adeudadas bajo las Obligaciones Garantizadas que resulte de las sumas adeudadas. En el caso de que no se presentara ninguna postura o de que las que se hayan presentado no sean al menos por suma mínima aceptable, EL ACREEDOR PRENDARIO podrá proceder a la venta de la prenda por el precio y en los términos que ellos puedan considerar conveniente, quien actuará conforme a las instrucciones que al efecto reciba del FIDUCIARIO, podrá incluso apropiarse de los Acciones Pignoradas y aplicarlos al pago de las Obligaciones Garantizadas. En el evento de que el ACREEDOR PRENDARIO presente la única oferta de compra extrajudicial de venta de los Acciones Pignoradas o que el ACREEDOR PRENDARIO proceda con la apropiación de los Acciones Pignoradas, a dicha compra o apropiación se le asignará el valor (a) que haya sido determinado conforme al punto 2 siguiente.

2. Tomar posesión de la prenda en conformidad con las disposiciones establecidas en los Artículos 821 y 822 del Código de Comercio. A ese efecto, la prenda será evaluada por una persona que deberá ser designado por EL ACREEDOR PRENDARIO, dentro de un periodo de treinta (30) días a partir de [_____], y quien deberá ser una empresa (o un empleado clave principal de esta empresa) con al menos diez (10) años de trayectoria en el mercado, incluyendo áreas de hotelería, construcción o similares.

3. .En ningún caso EL ACREEDOR PRENDARIO asumirá la propiedad de las acciones por una suma que sea inferior al valor indicado por el perito mencionado en el punto 2 anterior. Los gastos que puedan ser incurridos por EL ACREEDOR PRENDARIO en dicho concepto deberán ser por cuenta de EL GARANTE PRENDARIO.

Lo que antecede se entiende sin perjuicio del derecho de EL ACREEDOR PRENDARIO de proceder al cobro de las Obligaciones Garantizadas. En tal caso, EL ACREEDOR PRENDARIO [no estará obligado a observar ningún procedimiento y podrá aplicar las sumas recibidas al pago de las Obligaciones Garantizadas.]

El ACREEDOR PRENDARIO no será responsable por la decisiones de venta o rechazo de ofertas, ni por demoras en la ejecución de las Acciones Pignoradas, ni por disminución en el valor de los mismos, ni por la insuficiencia del precio recibido por éstos para satisfacer las Obligaciones Garantizadas o porque se haya recibido un precio inferior al que EL DEUDOR o EL GARANTE PRENDARIO estime que es el valor de dichas Acciones Pignoradas.

Las sumas que se reciban de la ejecución, venta, cesión, traspaso, disposición o apropiación de las Acciones Pignoradas, netas de los gastos relacionados con la preservación y ejecución de las Acciones Pignoradas y demás gastos y honorarios contemplados en este Contrato de Prenda Mercantil, serán utilizadas por el ACREEDOR PRENDARIO de acuerdo a lo estipulado en el ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO.

En caso de que las sumas que se reciban de la ejecución, venta, cesión, traspaso, disposición o apropiación de las Acciones Pignoradas resulten insuficientes para el pago total de las Obligaciones Garantizadas, EL ACREEDOR PRENDARIO, tendrán derecho a recurrir contra cualesquiera de EL DEUDOR o EL GARANTE PRENDARIO, o contra cualquier activo de

DEUDOR o EL GARANTE PRENDARIO, ya sea que esté o no dado en garantía al ACREEDOR PRENDARIO, hasta lograr el pago total de las Obligaciones Garantizadas.

A medida que las Acciones Pignoradas vayan siendo vendidas de conformidad con lo establecido en la presente cláusula de este Contrato de Prenda, el ACREEDOR PRENDARIO, sin recurso contra él o responsabilidad alguna, completará el endoso en blanco de los certificados de acciones con el nombre de la persona que hubiese adquirido las Acciones Pignoradas y entregará los certificados de acciones correspondientes al DEUDOR e instruirá al DEUDOR para que anoten el traspaso de dichas Acciones Pignoradas en sus respectivos  libros de registro de acciones y emitan nuevos certificados de acciones a favor de la persona que hubiese adquirido dichas Acciones Pignoradas. Las Acciones Pignoradas así traspasadas serán entregadas al comprador libres de toda prenda, gravamen o reclamo de terceros, comprometiéndose EL GARANTE ´PRENDARIO a defender al comprador contra cualquier reclamo o acción de terceros.

NOVENO: El GARANTE PRENDARIO y EL DEUDOR declaran a favor del ACREEDOR PRENDARIO y del FIDUCIARIO, para beneficio de los tenedores de los BONOS, lo siguiente:

(A)    Existencia y Capacidad. EL GARANTE PRENDARIO y el DEUDOR son sociedades anónimas debidamente organizadas y en existencia de conformidad con las leyes de la República de Panamá y con la capacidad (corporativa y legal) para dedicarse a los negocios y actividades a las que se dedican, y en el caso del GARANTE PRENDARIO para otorgar la prenda constituida en virtud de este Contrato de Prenda.

(B)    Acciones Pignoradas.  Las Acciones Pignoradas son todas las acciones del DEUDOR propiedad del GARANTE PRENDARIO y que representan el cien por ciento (100%) del total de acciones emitidas y en circulación del DEUDOR. Todas las Acciones Pignoradas fueron debidamente autorizadas, válidamente emitidas, totalmente pagadas y liberadas y se encuentran debidamente registradas en el libro de registro de acciones del DEUDOR a nombre del GARANTE PRENDARIO.

(C)    Título sobre las Acciones Pignoradas. El GARANTE PRENDARIO es el único y legítimo propietario de todos las Acciones Pignoradas, libres de todo gravamen, limitación, restricción, reclamo o derecho de terceros, salvo por la prenda constituida en virtud de este Contrato de Prenda.

(D)    Facultades y Autorizaciones Corporativas. El GARANTE PRENDARIO
tiene la capacidad corporativa para firmar y otorgar este Contrato de Prenda y para cumplir con
las obligaciones contraídas en el mismo, incluyendo para constituir prenda mercantil sobre las
Acciones Pignoradas a favor del GARANTE PRENDARIO. Todas las autorizaciones
corporativas necesarias para que el GARANTE PRENDARIO firme y otorgue este Contrato de
Prenda, constituyan prenda mercantil sobre las Acciones Pignoradas y cumplan con las
obligaciones que ha contraído en virtud de este Contrato de Prenda han sido debida y
válidamente obtenidas conforme a la ley, al pacto social y a los estatutos de EL GARANTE
PRENDARIO y  EL DEUDOR a los acuerdos de accionista de los que EL GARANTE
PRENADRIO sea parte.

(E)    Autorizaciones Gubernamentales y de Otras Personas. La firma y el
otorgamiento por parte del GARANTE PRENDARIO de este Contrato de Prenda, así como el
cumplimiento de las obligaciones contraídas por EL GARANTE PRENDARIO y EL DEUDOR
en este Contrato de Prenda y la constitución de la prenda mercantil sobre las Acciones
Pignoradas, no requieren de autorización, aprobación o consentimiento alguno por parte de una
entidad, organismo, autoridad o funcionario gubernamental ni de cualquiera otra persona
(incluyendo, sin limitación, acreedores bancarios), ni requieren que se dé notificación o se haga
inscripción o registro alguno ante dicha entidad, organismo, autoridad o funcionario
gubernamental u otra persona.

(F)    Validez y Exigibilidad. Este Contrato de Prenda ha sido debidamente
firmado y otorgado por un representante autorizado del GARANTE PRENDARIO y EL
DEUDOR y constituye una obligación legal, válida y exigible al GARANTE PRENDARIO y EL
DEUDOR de conformidad con sus términos.

(G)    Ausencia de Contravenciones. Ni la firma ni el otorgamiento por parte del
GARANTE PRENDARIO o EL DEUDOR de este Contrato de Prenda, ni el cumplimiento de las
obligaciones contraídas por GARANTE PRENDARIO o EL DEUDOR en este Contrato de
Prenda, ni la constitución de la prenda mercantil sobre los Acciones Pignoradas (i) contraviene el
pacto social o los estatutos del GARANTE PRENDARIO o DEL DEUDOR, o un acuerdo de
accionistas del que EL GARANTE PRENDARIO o EL DEUDOR sean parte, (ii) contraviene o
viola una ley, un decreto o una resolución, sentencia u orden judicial o administrativa que le sea

aplicable a EL GARANTE PRENDARIO o EL DEUDOR, (iii) constituye una violación de los términos de algún contrato, convenio o acuerdo del que EL GARANTE PRENDARIO o EL DEUDOR sean parte, o (iv) acarrea la terminación, suspensión, cancelación o pérdida de algún permiso, licencia, autorización, registro, concesión o franquicia de EL DEUDOR.

(H)     Perfeccionamiento de la Prenda.  Todas las acciones requeridas por la ley para el perfeccionamiento de la prenda mercantil constituida en virtud de este Contrato de Prenda a favor del ACREEDOR PRENDARIO sobre las Acciones Pignoradas han sido debidamente cumplidas y el ACREEDOR PRENDARIO goza con respecto a los Acciones Pignoradas de todos los derechos, privilegios y prelaciones de crédito que corresponden a un acreedor prendario de conformidad con la ley.

(I)     Litigios. No existe investigación, reclamo, demanda, litigio o proceso alguno (incluyendo, sin limitación, acciones de secuestro o embargo de bienes que no hayan sido debidamente caucionadas), ante autoridad civil, penal, administrativa o arbitral, ni a su leal saber amenaza concreta de los mismos, que (i) afecte los Acciones Pignoradas o (ii) impida o pueda impedir la firma y el otorgamiento del presente Contrato de Prenda o el cumplimiento de las obligaciones contraídas por EL GARANTE PRENDARIO en este Contrato de Prenda, en particular la constitución de la prenda mercantil sobre los Acciones Pignoradas.

(J)     Impuestos. Todos los impuestos que recaen sobre los Acciones Pignoradas se encuentran pagados a la fecha de este Contrato de Prenda.

(K)     Pasivos y Garantías. EL GARANTE PRENDARIO y el DEUDOR no mantienen deuda alguna salvo por los BONOS, ya sea garantizada o no, salvo las deudas relacionadas al curso ordinario de su negocio, y ninguno de sus activos está gravado con garantía alguna, salvo por aquellas constituidas o permitidas de acuerdo a los DOCUMENTOS DE LA TRANSACCIÓN (según dicho término está definido en la Sección uno punto cero uno (1.01) del CONTRATO DE FIDEICOMISO).

DÉCIMO: EL GARANTE PRENDARIO se compromete y obliga a defender los derechos del ACREEDOR PRENDARIO como acreedor prendario sobre las Acciones Pignoradas, así como la prenda constituida en favor del ACREEDOR PRENDARIO sobre las Acciones Pignoradas en virtud de este Contrato de Prenda, contra todo reclamo o demanda interpuesta por terceras

personas.  De igual forma, el GARANTE PRENDARIO se compromete y obliga a hacer cuanto el ACREEDOR PRENDARIO de tiempo en tiempo razonablemente le solicite con el fin de preservar o ejercer los derechos del ACREEDOR PRENDARIO bajo este Contrato de Prenda.

DECIMO PRIMERO: A menos que EL GARANTE PRENDARIO obtenga el consentimiento previo y por escrito del ACREEDOR PRENDARIO, se compromete y obliga a:

(A)     mantener y causar que se mantenga la existencia del DEUDOR como sociedad anónima constituidas de conformidad con las leyes de Panamá y no causar o consentir a la disolución de las mismas; y

(B)     mantener y preservar la existencia del GARANTE PRENDARIO como sociedad constituida de conformidad con las leyes de Panamá.

DÉCIMO SEGUNDO: EL GARANTE PRENDARIO no podrán vender, ceder, dar en fideicomiso, donar, enajenar o de cualquier otra forma traspasar los Acciones Pignoradas, ni otorgar una opción de compra o promesa de venta respecto de los Acciones Pignoradas, ni constituir una prenda o gravamen alguno sobre los Acciones Pignoradas, ni imponer o crear limitaciones o restricciones a la propiedad o transferibilidad de los Acciones Pignoradas, sin el consentimiento previo del ACREEDOR PRENDARIO (quien lo otorgará en base a instrucción del FIDUCIARIO).

DÉCIMO TERCERO: EL GARANTE PRENDARIO no ejercerá, y por este medio renuncia irrevocablemente a ejercer, cualquier reclamo, derecho o remedio que tenga o pudiera en un futuro tener contra EL DEUDOR, según corresponda, en relación con este Contrato de Prenda, incluyendo, sin limitación, cualquier reclamo, derecho o remedio de subrogación, contribución, reembolso, exoneración, indemnización o participación conforme a cualquier contrato, de acuerdo a la ley aplicable o de cualquier otra forma en cualquier reclamo, derecho o remedio del ACREEDOR PRENDARIO en contra del DEUDOR o cualquier otra persona que el ACREEDOR PRENDARIO tenga o llegue a tener. En caso de que, a pesar de la oración anterior, cualquier suma sea pagada al GARANTE PRENDARIO en virtud de cualquier derecho de subrogación en cualquier momento en que las Obligaciones Garantizadas no hayan sido totalmente pagadas, dicha suma será segregada de los demás fondos del GARANTE PRENDARIO, según corresponda, y entregada al ACREEDOR PRENDARIO en exactamente la misma forma en que fue recibida (debidamente endosada por el GARANTE PRENDARIO al

ACREEDOR PRENDARIO, de ser necesario) para ser aplicada conforme lo establecido en el ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO.

DÉCIMO CUARTO: EL GARANTE PRENDARIO por este medio, designan irrevocablemente al ACREEDOR PRENDARIO durante la vigencia de este Contrato de Prenda como su apoderado con facultades tan amplias como en derecho son permitidas para que en nombre y representación del GARANTE PRENDARIO, como propietarios de las Acciones Pignoradas, firme y otorgue todos los documentos y haga cuanto a juicio del ACREEDOR PRENDARIO, quien actuará conforme a las instrucciones que al efecto reciba del FIDUCIARIO, sea necesario o conveniente para permitirle cumplir con los términos y fines de este Contrato de Prenda, en particular, sin limitación, para vender y disponer de las Acciones Pignoradas y establecer los términos de venta y su precio; para recibir el precio de venta de las Acciones Pignoradas; para instruir al DEUDOR a registrar el traspaso de las Acciones Pignoradas en el libro de registro de acciones; para recibir los dividendos pagados por las Acciones Pignoradas; para ejercer los derechos de voto y todos los demás derechos de un accionista respecto de las Acciones Pignoradas; y para iniciar procesos judiciales para defender sus derechos y título respecto de las Acciones Pignoradas; quedando entendido, sin embargo, que las facultades antes descritas se ejercerán de acuerdo a lo estipulado en este Contrato de Prenda y ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO.

DÉCIMO QUINTO: Los poderes y facultades conferidos al ACREEDOR PRENDARIO en virtud de este Contrato de Prenda tienen como finalidad exclusiva proteger los derechos del ACREEDOR PRENDARIO con respecto a las Acciones Pignoradas y no imponen obligación alguna al ACREEDOR PRENDARIO de ejercer dichos poderes y facultades. El ACREEDOR PRENDARIO actuará conforme a las instrucciones que de tiempo en tiempo reciba del Agente de Garantía conforme lo estipulado en el Instrumento de Fideicomiso. Por lo tanto, el ACREEDOR PRENDARIO queda liberado, entre otras, de toda responsabilidad y obligación de tener que ejercer sus poderes y facultades para preservar los derechos que se tengan sobre las Acciones Pignoradas vis-a-vis terceras personas y para tomar acciones en relación con redenciones, conversiones, vencimientos y aceptaciones de ofertas que corresponda tomar al accionista de las Acciones Pignoradas.

DÉCIMO SEXTO: Sujeto a lo estipulado en la cláusula Décimo Octavo de este Contrato de Prenda, el ACREEDOR PRENDARIO cuidará los Acciones Pignoradas y ejercerá las

obligaciones asumidas de conformidad con este Contrato de Prenda con el mismo cuidado y diligencia que el ACREEDOR PRENDARIO emplea o emplearía en el cuidado y ejecución de Acciones Pignoradas para beneficio propio. No obstante lo anterior, el ACREEDOR PRENDARIO no será responsable, salvo en caso de negligencia grave o dolo de su parte.

DÉCIMO SEPTIMO: EL GARANTE PRENDARIO indemnizará al ACREEDOR PRENDARIO y a sus sucesores, cesionarios, directores, empleados, agentes y afiliadas contra todo reclamo, demanda, pérdida, daño, perjuicio o responsabilidad, y reembolsarán todos los gastos incurridos por éstos, incluyendo los gastos razonables y documentados de honorarios y gastos de abogados, en relación con este Contrato de Prenda o que surjan del mismo o del ejercicio por parte del ACREEDOR PRENDARIO de sus derechos en virtud de este Contrato de Prenda, salvo por aquellos reclamos, demandas, pérdidas, daños, perjuicios y responsabilidades que resulten de la [fraude, negligencia grave o dolo] de dicha persona.

DÉCIMO OCTAVO: En el caso de que los certificados de las Acciones Pignoradas o algunos de ellos deban ser custodiados por una central de custodia por razón de encontrarse de forma desmaterializada, el ACREEDOR PRENDARIO tendrá derecho de nombrar a un custodio o apoderado de los Acciones Pignoradas que se encuentren en esa situación (en lo sucesivo, el "Custodio") con poderes y facultades suficientes para ejercer todos los derechos que como acreedor pignoraticio puedan corresponderle al ACREEDOR PRENDARIO según este Contrato de Prenda, incluyendo, sin limitación, el derecho de custodiar físicamente los certificados de acciones de las Acciones Pignoradas y los demás Acciones Pignoradas y el derecho de ejecutar la prenda constituida sobre las Acciones Pignoradas con las mismas facultades, derechos, privilegios, derechos de indemnización y otros que tiene el ACREEDOR PRENDARIO por razón de este Contrato de Prenda, incluyendo, sin limitación, el derecho de establecer los términos y precio de venta, de acuerdo con lo establecido en la cláusula Octava de este Contrato, y procedimiento de ejecución de las Acciones Pignoradas y la contratación de asesores, evaluadores y agentes, pudiendo el Custodio actuar como el legítimo representante del ACREEDOR PRENDARIO ante el GARANTE PRENDARIO, EL DEUDOR y terceras personas para todos los propósitos de este Contrato de Prenda. El ACREEDOR PRENDARIO notificará al GARANTE PRENDARIO y EL DEUDOR de la designación del Custodio y de los poderes y facultades conferidos a éste.

El ACREEDOR PRENDARIO podrá remover al Custodio en cualquier momento, con o sin causa, debiendo dar notificación de ello al GARANTE PRENDARIO y EL DEUDOR.

Los honorarios y gastos razonables y documentados del Custodio serán considerados como gastos del ACREEDOR PRENDARIO en el cumplimiento de sus obligaciones bajo este Contrato de Prenda y serán reembolsados por EL DEUDOR y/o GARANTE PRENDARIO al ACREEDOR PRENDARIO, a requerimiento de éste, de conformidad con lo estipulado en este Contrato y el ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO; quedando entendido que el ACREEDOR PRENDARIO no tendrá que adelantar fondos propios para cubrir los honorarios y gastos del Custodio.

DÉCIMO NOVENO: EL GARANTE PRENDARIO compensará al ACREEDOR PRENDARIO por los servicios prestados por razón de este Contrato de Prenda y lo reembolsarán por todos los gastos incurridos por razón de este Contrato de Prenda de conformidad con lo establecido en este Contrato y en el ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO, lo que incluirá, sin limitación, todos los gastos razonables y documentados de preparación de este Contrato de Prenda, perfeccionamiento de la prenda sobre las Acciones Pignoradas, gastos razonables y documentados de conservación de las Acciones Pignoradas, cualquier reforma o modificación al Contrato de Prenda, gastos de la ejecución de la prenda y del ejercicio y defensa de derechos conferidos por este Contrato de Prenda y gastos de liberación de la prenda sobre las Acciones Pignoradas, incluyendo, sin limitación, los gastos razonables y documentados de gastos notariales y de registro, timbres fiscales e impuestos, gastos y costas judiciales, honorarios de asesores, evaluadores y agentes y honorarios de abogados.

VIGÉSIMO: EL GARANTE PRENDARIO por el presente exonera a EL ACREEDOR PRENDARIO de toda responsabilidad por (i) los daños y perjuicios que podrían ser invocados como resultado del cobro de las Obligaciones Garantizadas, siempre y cuando no haya mediado dolo o negligencia grave por parte del ACREEDOR PRENDARIO; (ii) la aplicación de las mismas a las Obligaciones Garantizadas o (ii) con cualquier procedimiento a ser llevado a cabo en el ejercicio de los derechos y autoridades que les fueron conferidos a ellos en esta suma.

De igual modo, EL GARANTE PRENDARIO renuncia el domicilio, así como también la presentación de cualesquiera reclamos y/o acciones legales contra EL ACREEDOR PRENDARIO en el caso de que la Prenda Mercantil sujeto del presente contrato sea ejecutada.

EL DEUDOR acepta como válidos los saldos reflejados en los libros del FIDUCIARIO, quien remitirá la información al EL ACREEDOR PRENDARIO.

DÉCIMO NOVENA: Cualesquiera avisos u otras comunicaciones requeridos de conformidad con el presente Contrato de Prenda será dada de conformidad con la Sección [10] del ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO.

VIGÉSIMA: Este Contrato sólo podrá ser reformado, y sus cláusulas renunciadas, mediante documento escrito, en el caso de reforma otorgado por todas las partes a este Contrato de Prenda por escrito y con el consentimiento previo del FIDUCIARIO, y en el caso de renuncia por la parte renunciante.

VIGÉSIMA PRIMERA: Este Contrato de Prenda es vinculante para el ACREEDOR PRENDARIO y EL DEUDOR y sus respectivos sucesores (o, en el caso del ACREEDOR PRENDARIO, sus substitutos conforme al ACUERDO DE DESIGNACIÓN DE CO-FIDUCIARIO ENMENDADO Y REFORMULADO), pero los derechos y obligaciones de GARANTE PRENDARIO y EL DEUDOR no podrán ser objeto de cesión por ninguno de éstos sin el consentimiento previo y por escrito del ACREEDOR PRENDARIO.

VIGÉSIMA SEGUNDA: La declaratoria de nulidad, invalidez o ineficacia de algunas de las cláusulas o estipulaciones de este Contrato de Prenda no se entenderá que afecta de modo alguno la plena validez, obligatoriedad y eficacia de las demás cláusulas y estipulaciones del mismo, las cuales serán interpretadas y aplicadas para darles la máxima validez, obligatoriedad y eficacia según lo pactado.

VIGÉSIMA TERCERA: El hecho de que una de las partes permita, una o varias veces, que las otras partes incumplan o cumplan imperfectamente o en forma distinta a la pactada o tardía las obligaciones que le corresponden en virtud de este Contrato de Prenda, o no insista en el cumplimiento exacto y puntual de las mismas, o no ejerza oportunamente los derechos contractuales o legales que le correspondan, no se reputará ni equivaldrá a una modificación de este Contrato de Prenda, ni impedirá en ningún caso que dicha parte en el futuro insista en el cumplimiento fiel y específico de las obligaciones que corren a cargo de las otras partes o que ejerza los derechos convencionales o legales de que sea titular.

VIGÉSIMA CUARTA: El presente Contrato de Prenda Mercantil se establece de conformidad a las leyes de la República de Panamá, y cualquier conflicto que de él se origine deberá ser resuelto de conformidad a las leyes panameñas y ante tribunales competentes en la materia.

VIGÉSIMA QUINTA: Ambas partes aceptan la Prenda Mercantil en los términos y condiciones

establecidos en el presente aquí anteriormente.

[HOJA DE FIRMA EN LA SIGUIENTE PÁGINA]

En testimonio de lo cual, las partes firman y otorgan este Contrato de Prenda Mercantil en la Ciudad de Panamá, República de Panamá, a los _____ días del mes de _____ del año _____.

OCEAN POINT DEVELOPMENT CORP., como EL GARANTE PRENDARIO

Por: _____
      Nombre: ROGER KHAFIF
      Cargo: Apoderado Especial
      Cédula N-17-630

NEWLAND INTERNATIONAL PROPERTIES, CORP., como EL DEUDOR

Por: _____
      Nombre: EDUARDO SARAVIA CALDERON
      Cargo: Apoderado Especial
      Pasaporte No. PE067215

GLOBAL FINANCIAL FUNDS CORP., como ACREEDOR PRENDARIO

Por: _____
      Nombre: MONICA GARCIA DE PAREDES DE CHAPMAN
      Cargo: Apoderada General
      Cédula No. 8-262-262

## ANEXO A

### TEXTO DE ENDOSO

Por valor recibido, el suscrito, _____, una sociedad anónima organizada y existente de conformidad con las leyes de _____, por este medio cede y traspasa a favor de _____ las _____ acciones comunes de [_____] S.A., representadas por el certificado de acción No. ___, fechado __ de _____ de _____.

Fecha: ____ de _____ de 20[__].

Por:_____
Nombre:
Cargo:

**Exhibit P**

### FORM OF LIMITED FINANCIAL GUARANTEE

### LIMITED FINANCIAL GUARANTY

### [*], 2013

This LIMITED FINANCIAL GUARANTY (this "Guaranty"), dated [*], 2013, is entered into by each of Roger Khafif ("Khafif"), Eduardo Saravia ("Saravia") and Carlos Serna ("Serna", and collectively with Khafif and Saravia, the "Guarantors"), for the benefit of CSC Trust Company of Delaware, having an address at 2711 Centerville Road, Wilmington, Delaware 19808, as trustee for the Holders of Newland International Properties, Corp.'s 9.50% Senior Secured Notes due 2017 (together with its successors and/or assigns, the "Trustee").

### W I T N E S S E T H :

A.     Pursuant to that certain Indenture, dated as of [*], 2013 (the "Indenture"), by and among Newland International Properties, Corp. (the "Issuer" and the "Debtor") and the Trustee, the Issuer has issued [*] in aggregate principal amount of its 9.50% Senior Secured Notes due 2017 (the "Notes"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Indenture.

B.     Pursuant to that certain Plan of Reorganization of the Debtor, dated [*], 2013 (the "Plan"), approving the pre-packaged bankruptcy of the Debtor, pursuant to which the Debtor is distributing to the holders of claims in respect of its 9.50% Senior Secured Notes due 2014 (the "Prepetition Notes") the Notes, the Guarantors have agreed to provide a joint and several financial guarantee of amounts due under the Notes in an aggregate amount not to exceed US$5 million and payable under the circumstances described herein in consideration for the full release of any and all such Guarantors' obligations under the CCSA (as defined below) pursuant to the CCSA Release (as defined below) to be executed and delivered by the Trustee on behalf of all the Holders of the Notes.

C.     Concurrently with the effectiveness of this Guaranty and the Effective Date (as defined in the Plan) of the Plan, the Guarantors and the Trustee will execute a satisfaction and release to that certain Construction Completion Support Agreement, dated November 6, 2007 (the "CCSA"), by and among the Guarantors and the Trustee on behalf of all Holders of the Notes (the "CCSA Release").

NOW, THEREFORE, as an inducement to the Guarantors to execute this Guaranty, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

### ARTICLE 1
### NATURE AND SCOPE OF LIMITED FINANCIAL GUARANTY

Section 1.1     <u>Guaranteed Obligations</u>.

(a)    Each of the Guarantors hereby jointly and severally, as primary obligor and not merely as surety, hereby irrevocably, unconditionally and absolutely guarantees to the Trustee, on behalf of the Holders of the Notes, the full and prompt payment when due of the obligations of the Issuer under the Notes and the Indenture, whether for principal, interest, fees, expenses, costs or otherwise, in an amount not to exceed in the aggregate US$5 million pursuant to and in accordance with the conditions set forth below (the "Guaranteed Obligations").  **The obligations of the Guarantors under this Guaranty shall be limited in amount as set forth herein and shall only be due and payable ninety (90) days after the occurrence of either of the two following events:  (i) a declaration of acceleration by Holders of the Notes or the Trustee in accordance with the Indenture (provided such declaration of acceleration is not rescinded in accordance with the Indenture) or (ii) at the scheduled final maturity date of the Notes, to the extent in each case that all amounts due on the Notes have not previously been paid in full, subject to the reinstatement provision set forth in clause (c) below.  The maximum amount payable under this Guaranty shall under no circumstance exceed in the aggregate US$5 million and the Guarantors' total aggregate exposure under this Guaranty shall in all events be limited to such US$5 million amount. This Guaranty may not be revoked by any Guarantor and shall continue to be effective with respect to any Guaranteed Obligations after any attempted revocation by any Guarantor, in each case until such time as either the maximum aggregate amount has been paid under this Guaranty or until the Notes have been paid in full, subject to the reinstatement herein set forth in clause (c) below.**  This Guaranty may be enforced by the Trustee, on behalf of the Holders of the Notes, upon occurrence of one of the events set forth in sub clauses (i) or (ii) above and the Guarantors agree to pay the Trustee any and all costs and expenses (including without limitation, reasonable legal fees and expenses) incurred by the Trustee in enforcing its rights under this Guaranty.

(b)    Notwithstanding anything to the contrary in this Guaranty or in the Indenture, the Trustee shall not be deemed to have waived any right which the Trustee or a holder of the Notes may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Notes or to require that all Collateral shall continue to secure all of the Notes.

(c)    This Guaranty will continue to be effective or be reinstated, as the case may be, if at any time any payment of any Guaranteed Obligation is rescinded or must otherwise be returned by the Trustee to the Guarantors upon the insolvency, bankruptcy or reorganization by the Issuer or otherwise, all as though such payment had not been made.

Section 1.2    <u>Guaranteed Obligations Not Reduced by Offset</u>.    The Guaranteed Obligations and the liabilities and obligations of each Guarantor to the Trustee shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of the Issuer or any other party against the Trustee, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise (other than the defense that the Guaranteed Obligations have been paid in full).  The Trustee's rights, on behalf of the Holders of the Notes, under this Guaranty shall be in addition to all other rights of the Trustee under the Indenture.

Section 1.3    No Duty To Pursue Others.  It shall not be necessary for the Trustee (and each Guarantor hereby waives any rights which such Guarantor may have to require the Trustee), in order to enforce the obligations of the Guarantors hereunder, first to (i) institute suit or exhaust its remedies against the Issuer or any other Guarantor, (ii) enforce the Trustee's rights against the Collateral, (iii) join the Issuer or any other Guarantor in any action seeking to enforce this Guaranty, or (iv) resort to any other means of obtaining payment of the Guaranteed Obligations. The Trustee shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Section 1.4    Waivers.  Each Guarantor hereby waives notice of (i) any amendment of or waiver of the provisions of the Indenture or any other Security Document, (ii) the execution and delivery by the Issuer of any promissory note or other document arising under the Indenture or in connection with the Notes, (iii) the occurrence of (A) any breach by the Issuer of any of the terms or conditions of the Indenture or any of the other Security Documents, or (B) an Event of Default, (iv) the sale or foreclosure (or the posting or advertising for the sale or foreclosure) of any Collateral under the Indenture, (v) protest, proof of non-payment or default by the Issuer, or (vi) any other action at any time taken or omitted by the Issuer or the Trustee and, generally, all demands and notices of every kind in connection with this Guaranty, the Indenture, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations, and (vii) further renounces to any *beneficio de excusion and beneficio de division* it may have under the laws of its home jurisdiction.

Section 1.5    Waiver    of    Subrogation,    Reimbursement    and    Contribution. Notwithstanding anything to the contrary contained in this Guaranty, for so long as the Notes are outstanding, each Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating such Guarantor to the rights of the Trustee), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from the Issuer for any payment made by such Guarantor under or in connection with this Guaranty or otherwise.

## ARTICLE 2
## EVENTS AND CIRCUMSTANCES NOT REDUCING
## OR DISCHARGING GUARANTOR'S OBLIGATIONS

Each Guarantor hereby consents and agrees to each of the following and agrees that such Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including, without limitation, rights to notice) which such Guarantor might otherwise have as a result of or in connection with any of the following:

Section 2.1    Modifications.  Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Notes, the Indenture, the other Security Documents or any other document, instrument, contract or understanding between the Issuer, the Trustee, the Co-Trustee or any other parties pertaining to the Notes. In furtherance and not in limitation of the foregoing, each Guarantor hereby authorizes the Issuer and the Trustee, without giving notice to such Guarantor or obtaining such Guarantor's consent and without affecting the liability of such

Guarantor, from time to time to modify, amend or waive any provisions of the Indenture, the Amended & Restated Co-Trustee Agreement or any other Security Document.

Section 2.2    Adjustment.  Any adjustment, indulgence, forbearance or compromise that might be granted or given by the Trustee to the Issuer.

Section 2.3    Condition of Borrower or Guarantor.   The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of the Issuer, such Guarantor or any other Person at any time liable for the payment of all or part of the Notes; or any dissolution of the Issuer; or any sale, lease or transfer of any or all of the assets of the Issuer or such Guarantor; or any changes in the direct or indirect shareholders, partners or members, as applicable, of the Issuer; or any reorganization of the Issuer.

Section 2.4    Invalidity of Notes.  The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, the Notes or any document or agreement executed in connection with the Guaranteed Obligations or the Notes for any reason whatsoever, including, without limitation, the fact that (i) the Notes or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Notes or any part thereof is ultra vires, (iii) the officers or representatives executing the Notes, the Mortgage, the Indenture or any other Security Document or otherwise creating the Notes acted in excess of their authority, (iv) the Notes violate applicable usury laws, (v) the Issuer has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Notes wholly or partially uncollectible from the Issuer, (vi) the creation, performance or repayment of the Notes (or the execution, delivery and performance of any document or instrument representing part of the Notes or executed in connection with the Notes or given to secure the repayment of the Notes) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage, the Indenture or any of the other Security Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that such Guarantor shall remain liable hereon regardless of whether the Issuer or any other Person be found not liable on the Notes or any part thereof for any reason.

Section 2.5    Other Collateral.  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations or the Notes.

Section 2.6    Care and Diligence.  The failure of the Issuer, the Co-Trustee, the Trustee or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any Collateral or other property or security, including, but not limited to, any neglect, delay, omission, failure or refusal of the Trustee (i) to take or prosecute any action for the collection of any of the Notes, or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Notes.

Section 2.7    Unenforceability.  The fact that any Collateral or other security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Notes, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being

recognized and agreed by such Guarantor that such Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the Collateral for the Notes.

Section 2.8    Offset.    Any existing or future right of offset, claim or defense of the Issuer against the Trustee, or any other party, or against payment of the Notes, whether such right of offset, claim or defense arises in connection with the Notes (or the transactions creating the Notes) or otherwise.

Section 2.9    Merger.    The reorganization, merger or consolidation of the Issuer into or with any other Person.

Section 2.10    Preference.    Any payment by the Issuer to the Trustee or Paying Agent is held to constitute a preference under any Bankruptcy Laws or for any reason the Trustee or Paying Agent is required to refund such payment or pay such amount to Issuer or to any other Person.

Section 2.11    Law, Regulations.    Any law, regulation, decree or order of any jurisdiction affecting the term of any Guaranteed Obligation or the Trustee's rights with respect thereto.

Section 2.12    Suretyship Defenses.    Any other circumstance that might otherwise constitute a defense available to, or a legal or equitable discharge of, the Issuer or any Guarantor or any other guarantor or surety.

Section 2.13    Independent Obligations.    The obligations of each Guarantor under this Guaranty are independent of the Issuer's obligations under the Indenture, the Notes and the other Security Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether an action is brought against the Issuer or any other Guarantor or whether the Issuer or any other Guarantor is joined in any such action.  To the extent it may lawfully do so, each Guarantor, on behalf of itself and on behalf of each Person claiming by, through or under such Guarantor, hereby irrevocably and unconditionally waives any right to object to the Trustee bringing simultaneous actions to (i) recover the Notes against the Issuer or any other Guarantor or under the Indenture, the Notes or any other Security Document, at law or in equity, or (ii) recover any amounts due under this Guaranty.

Section 2.14    Survival.    This Guaranty shall survive the exercise of remedies following an Event of Default under the Indenture, and shall remain in full force and effect until all sums due under the Indenture have been indefeasibly paid in full to the Trustee or the Paying Agent, as applicable and the Guaranteed Obligations have been indefeasibly paid in full or fully completed, as applicable, or until the maximum amount payable under this Guaranty has been paid, subject to the reinstatement provision herein.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Each Guarantor hereby severally represents and warrants as follows:

Section 3.1   <u>No Representation By Issuer</u>.  Neither the Issuer nor any other party has made any representation, warranty or statement to such Guarantor in order to induce such Guarantor to execute this Guaranty.

Section 3.2   <u>Legality</u>.  This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms.

Section 3.3   <u>Survival</u>.  All representations and warranties made by such Guarantor herein shall survive the execution hereof so long as this Guaranty remains outstanding.

## ARTICLE 4
## MISCELLANEOUS

Section 4.1   <u>Waiver</u>.  No failure to exercise, and no delay in exercising, on the part of the Trustee, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of the Trustee, on behalf of the Holders of Notes, hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor any consent to any departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

Section 4.2   <u>Notices</u>.  All notices, demands, requests, consents, approvals or other communications required, permitted or desired to be given hereunder shall be given to each Guarantor at the address for the Issuer and in accordance with the Indenture.

Section 4.3   <u>Governing Law; Jurisdiction; Service of Process</u>.   (a)      THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ANY GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND EACH GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH GUARANTOR IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. EACH GUARANTOR AGREES THAT SERVICE OF PROCESS UPON SUCH GUARANTOR MAY BE SERVED UPON THE PROCESS AGENT OF THE ISSUER PURSUANT TO THE INDENTURE AND HEREBY APPOINTS SUCH PROCESS AGENT AS ITS PROCESS AGENT FOR SERVICE OF PROCESS HEREUNDER. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF THE TRUSTEE TO SERVE

PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE
LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY GUARANTOR IN
ANY OTHER JURISDICTION.

Section 4.4    Invalid Provisions.  If any provision of this Guaranty is held to be illegal,
invalid, or unenforceable under present or future laws effective during the term of this Guaranty,
such provision shall be fully severable and this Guaranty shall be construed and enforced as if
such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and
the remaining provisions of this Guaranty shall remain in full force and effect and shall not be
affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty,
unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic
understandings and intentions of the parties as expressed herein.

Section 4.5    Amendments.  This Guaranty may be amended only by an instrument in
writing executed by the party(ies) against whom such amendment is sought to be enforced.

Section 4.6    Parties Bound; Assignment.  This Guaranty shall be binding upon and
shall inure to the benefit of the parties hereto and their respective successors, permitted assigns,
heirs and legal representatives.

Section 4.7    Headings.  Section headings are for convenience of reference only and
shall in no way affect the interpretation of this Guaranty.

Section 4.8    Recitals.  The recitals and introductory paragraphs hereof are a part
hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts
and documents referred to therein.

Section 4.9    Counterparts.  To facilitate execution, this Guaranty may be executed in as
many counterparts as may be convenient or required.  It shall not be necessary that the signature
of, or on behalf of, each party, or that the signature of all persons required to bind any party,
appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It
shall not be necessary in making proof of this Guaranty to produce or account for more than a
single counterpart containing the respective signatures of, or on behalf of, each of the parties
hereto.  Any signature page to any counterpart may be detached from such counterpart without
impairing the legal effect of the signatures thereon and thereafter attached to another counterpart
identical thereto except having attached to it additional signature pages.

Section 4.10    Rights and Remedies.  The exercise by the Trustee of any right or remedy
hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent
or subsequent exercise of any other right or remedy.

Section 4.11    Entirety.  THIS GUARANTY EMBODIES THE FINAL, ENTIRE
AGREEMENT OF THE GUARANTORS AND TRUSTEE WITH RESPECT TO THE
GUARANTORS' GUARANTY OF THE GUARANTEED OBLIGATIONS AND
SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS,
REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL,
RELATING TO THE SUBJECT MATTER HEREOF.  THIS GUARANTY IS INTENDED BY
THE GUARANTORS AND AGENT AS A FINAL AND COMPLETE EXPRESSION OF THE

TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN THE GUARANTORS AND THE ISSUER OR THE TRUSTEE, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY.  THERE ARE NO ORAL AGREEMENTS BETWEEN THE GUARANTORS AND THE ISSUER OR THE TRUSTEE.

Section 4.12    Waiver of Right To Trial By Jury.    EACH GUARANTOR AND THE TRUSTEE HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE GUARANTEED OBLIGATIONS, THE INDENTURE OR ANY OTHER SECURITY DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.

Section 4.13    Consequential Damages.    In no event shall any party hereto be liable for any consequential, punitive, or special damages hereunder

Section 4.14    Effectiveness.    Effectiveness of this Guaranty shall be conditioned on the simultaneous execution, delivery and effectiveness of the CCSA Release and the Effective Date of the Plan. Each of the parties hereto reserves the right to waive any or all of the conditions to effectiveness of this Guaranty if done so in writing.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, each Guarantor has executed this Guaranty as of the day and year first above written.

_____

Roger Khafif


_____

Eduardo Saravia


_____

Carlos A. Serna


ACKNOWLEDGED AND AGREED:


_____

Newland International Properties, Corp.
Name:
Title:

**Exhibit Q**

### FORM OF NON-DISTURBANCE AGREEMENT

NON-DISTURBANCE AGREEMENT

This NON-DISTURBANCE AGREEMENT (this **"Agreement"**) is made as of the ___
day of _____, 2013, by and among **NEWLAND INTERNATIONAL PROPERTIES
CORP.**, a Panamanian corporation ("**Promoter/Developer**"), **TRUMP MARKS PANAMA,
LLC**, a Delaware limited liability company ("**Licensor**"), **TRUMP PANAMA
CONDOMINIUM MANAGEMENT LLC,** a Delaware limited liability company ("**P.H. TOC
Manager**") and **TRUMP PANAMA HOTEL MANAGEMENT LLC,** a Delaware limited
liability company ("**Operator**" and, together with Licensor and P.H. TOC Manager, collectively,
the "**Trump Parties**"), **CSC TRUST COMPANY OF DELAWARE**,  a Delaware corporation**,**
solely in its capacity as Trustee (the "**Trustee**") under that certain Indenture (defined below), and
**GLOBAL FINANCIAL FUNDS CORP,** a *sociedad anonima*, solely in its capacity Co-Trustee
("**Co-Trustee**") under that certain Co-Trustee Agreement (defined below). Promoter/Developer,
Licensor, Operator, P.H. TOC Manager, Trustee and Co-Trustee are referred to herein, each,
individually, as a "**Party**" and, collectively, as the "**Parties**".

RECITALS

A.      Promoter/Developer has registered with the Property Section, Panama Province,
of the Public Registry, the Co-Ownership Regulations (as amended, restated, modified or
supplemented, from time to time, the "**Co-Ownership Regulations**") of that certain Horizontal
Property Regime known as the P.H. TOC (the "**P.H. TOC**"), established over that certain real
property two hundred and thirty four thousand two hundred and forty (234240) (referred to
herein as the "**Property**"), registered in Document six hundred and seven thousand eight hundred
and seventy (607870), location Code eight seven zero eight (8708) of the Property Section,
Panama Province, of the Public Registry, in accordance with the Legal Provisions of Law thirty
one (31) of June eighteenth (18), two thousand and ten (2010) and other pertinent legal
provisions, (hereinafter the "**P.H. Law**"), improved and consisting of a 70 story building (the
"**Building**") subdivided into casino units ("**Casino Units**"), commercial units ("**Commercial
Units**"), hotel units ("**Hotel Units**"), a hotel administrative unit ("**Hotel Administrative Unit**"),
hotel amenities units ("**Hotel Amenities Units**"), office units ("**Office Units**") and residential
units ("**Residential Units**" and, collectively with the Casino Units, Commercial Units, Hotel
Units, Hotel Administrative Unit, Hotel Amenities Units and Office Units, the "**Units**"), all as
more particularly described in the Co-Ownership Regulations.

B.      Pursuant to the Co-Ownership Regulations, an Owners Meeting (as defined
therein), consisting of all owners of Units in the P.H. TOC, has been established as the supreme
body of the P.H. TOC ("**Owners Meeting**"). Hotel TOC Inc., a Panamanian corporation
("**Owner**"), has been established as an entity owned by the Hotel TOC Foundation, a private
interest foundation formed under the laws of Panama (the "**Foundation**"), the beneficiaries of
which are all of the owners of the Hotel Units ("**Hotel Unit Owners**"), for the purpose of
collectively exercising the rights and performing the obligations of the Hotel Unit Owners in
connection with the operation of the Hotel Units and Hotel Amenities Units as a hotel (the

"**Hotel**"), and performing the operating, management and maintenance services required for the Hotel, subject to the supervision and direction of the Operator;

C.    In connection with the development and operations of the Building and the Hotel, Promoter/Developer, the Trump Parties, Owners Meeting and Owner, in various combinations among themselves and with other parties, have entered into and are parties to various licensing, management, operating and other agreements, as described on **Exhibit A** hereto (collectively, the "**Hotel Agreements**");

D.    Trustee is the trustee under that certain Indenture,  dated as of <mark>____</mark>, 2013 (as the same may hereafter be amended, supplemented, assigned and/or replaced, the "**Indenture**"), pursuant to which Promoter/Developer has issued its 9.50%  Senior Secured Notes due 2017, in the aggregate principal amount of $<mark>_____</mark> (the "**Notes**").  Co-Trustee is the co-trustee under that certain Amended and Restated Agreement of Appointment and Acceptance of Co-Trustee, dated as of <mark>_____</mark>, 2013 (the "**Co-Trustee Agreement**"), by and among Promoter/Developer, Trustee, HSBC Bank USA, N.A., a national banking association (in its capacity as trustee under the Extinguished Notes, as defined in the Co-Trustee Agreement), HBSC Investment Corporation (Panama), S.A. (in its capacity as co-trustee under the Extinguished Notes, as defined in the Co-Trustee Agreement), and Co-Trustee and, in such capacity, Co-Trustee is also the mortgagee under that certain Panamanian registered mortgage on the Building (the "**Mortgage**"), trustee with respect to certain trust accounts ("**Trust Accounts**") and trustee, pledgee or secured party with respect to certain other collateral  documents securing the Notes and the Indenture (the Notes, the Indenture, the Co-Trustee Agreement, the Mortgage and all other agreements, instruments and documents evidencing, securing or ancillary to any of the foregoing, collectively, the **Indenture Documents**").

E.    The Notes were issued to refinance, replace and restructure the outstanding balance and other amounts owing under certain prior existing 9.50% Senior Secured Notes Due 2014 previously issued by Promoter/Developer (the "**Notes Restructuring**"), the proceeds of which replaced notes had been loaned to Promoter/Developer to complete the development and construction of the Building.  In connection with the Notes Restructuring, the Mortgage was assigned to Co-Trustee, certain trust accounts were established with or transferred to Co-Trustee (the "**Trust Accounts**") and substantially all of Promoter/Developers assets, and 100% of Promoter/Developers shares (the "**Pledged Equity**"), were assigned, pledged or granted as collateral security to the Trustee or Co-Trustee, as additional collateral security for the Notes (all of the foregoing, collectively, the "**Notes Collateral**").

F.    The Notes Restructuring was consummated pursuant that certain Prepackaged Plan of Reorganization for the Debtor under Chapter 11 of the Bankruptcy Code, In Re: Newland International Properties, Corp, as debtor, Case No. <mark>___(__)</mark> (the "**Plan**"), as filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in a proceeding under Chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Case**"), and as confirmed by final order of the Bankruptcy Court entered on entered

2

�_____, 2013 (the "**Confirmation Order**"),

     G.     The Trustee and the Co-Trustee have been directed to enter into this Agreement pursuant to the Confirmation Order and the terms of the Indenture.

     H.     Prior to and in anticipation of the Chapter 11 Case and Notes Restructuring, Promoter/Developer requested certain concessions under the Hotel Agreements from the Trump Parties and others, including with respect to their fees and other matters, pursuant to those certain amendments to Hotel Agreements listed on **Exhibit C** (the "**Concessionary Amendments**"). Promoter/Developer, the Trump Parties and the other parties to the Concessionary Agreements executed the Concessionary Amendments prior to the confirmation of the Chapter 11 Case, subject, however, to certain express conditions to effectiveness as set for therein (the "**Amendment Conditions**"), including the prior or concurrent confirmation and effectiveness of the Plan, substantially as set forth in certain drafts of the Plan previously provided to Trump Parties for review, the concurrent effectiveness of each of the Concessionary Amendments, the prior or concurrent effectiveness of the Indenture and Co-Trustee Agreement, each of which to include language authorizing the Trustee and Co-Trustee to enter into and to  perform this Agreement and the prior or concurrent effectiveness of this Agreement, all pursuant to and in compliance with the Confirmation Order.

     I.     Concurrently with the execution and delivery of this Agreement, each of the Concessionary Amendments shall become effective, subject to the prior or concurrent satisfaction of each of the Amendment Conditions (or, in the case of any particular Amendment Condition, its written waiver by all necessary parties).

     NOW, THEREFORE, in consideration of the Concessionary Amendments, the mutual covenants in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

     1.     <u>Definitions</u>.  Certain agreements and regulations referenced herein are described or  defined in **Exhibit A**).

     2.     <u>Non-Disturbance</u>. In consideration of each of the Trump Parties' execution and delivery of the Concessionary Amendments, and in acknowledgement of the agreement of all of the Parties that the Concessionary Amendments are integral to the Plan, the parties agree as follows:

     2.1     <u>Effect of Notes Restructuring on Promoter/Developer Obligations</u>.  The pledge of the majority of the equity interests in Promoter/Developer to the Trustee or Co-Trustee shall not alter Promoter/Developer's payment or performance obligations under the terms and conditions of the Hotel Agreements.  In the absence of the Co-Trustee's exercise of its default remedies under the Indenture Documents (and subject to all rights and protections contained therein), and in reliance on certifications provided by Promoter/Developer pursuant to the terms of the

3

Indenture Documents, Co-Trustee shall in accordance with and subject to the terms of the Indenture Documents release from the Panama Account (as such term is defined in the Indenture), to the extent of available funds, the funds required to pay license fees and other amounts payable by Promoter/Developer under the Hotel Agreements.

2.2     Effect of an Exercise by Trustee of the Equity Pledge.

a.     Hotel Agreements.    In the event that the Trustee, Co-Trustee or a designee of the Trustee or Co-Trustee acting on behalf of all of (or representing the beneficial interest of all of) the holders of the Notes ("**Designee**") exercises the pledge of the Pledged Equity or otherwise becomes the owner of the majority of the Pledged Equity (as distinguished from a Direct Acquisition (defined below) of the property or any portion of it), such change of ownership or control of Promoter/Developer shall not alter or affect the obligations of Promoter/Developer or its Affiliates, or the rights of any of the Trump Parties and/or their Affiliates and/or the Owner or Owner's Meeting, under and in respect of any of the Hotel Agreements, as modified by the Concessionary Amendments.

b.     Hotel TOC Foundation and Board Appointments.     In the event that the Trustee, Co-Trustee or a Designee (each as applicable, a "**Trustee Entity**") exercises the pledge of the Pledged Equity or otherwise becomes the owner of the majority of the Pledged Equity (as distinguished from a Direct Acquisition (defined below) of the property or any portion of it), such change of ownership or control of Promoter/Developer shall not alter or affect the obligations of Promoter/Developer to appoint (i) the members of the Foundation Council, in accordance with the Foundation Charter of the Foundation (as such terms are defined in the Pre-Opening Services Agreement, as defined in **Exhibit A**), as in effect on the date hereof, and (ii) the members of the Board of Directors of Owner, as defined in and in accordance with the Articles of Incorporation of Owner as in effect on the date hereof.

2.3     Effect of Foreclosure or Direct Acquisitions. In the event that a Trustee Entity becomes the owner of any Units through foreclosure or other form of assignment or sale of the Property or any portion of it (as distinguished from an exercise of the Equity Pledge) (a "**Direct Acquisition**"), the following shall apply:

a.     All Units.  With respect to each Unit so acquired by a Trustee Entity, such Trustee Entity shall have all of the rights and be subject to all of the obligations of a Unit Owner under the Co-Ownership Regulations.

b.     Hotel Units. With respect to each Hotel Unit so acquired by a Trustee Entity, (i) such Trustee Entity, shall have all the rights and be subject to all of the obligations of a Hotel Unit Owner under the Co-Ownership Regulations, including the obligation to enter into and comply with the terms of a Hotel Unit Maintenance Agreement for each Hotel Unit and (ii) so long as (A) Licensor, Operator and P.H. TOC Manager are not in material default under the Hotel Agreements (beyond any applicable notice and cure period), and (B) Operator continues to

4

manage the Hotel under the Hotel Management Agreement, such Trustee Entity shall enter into an agreement whereby the unsold Hotel Units shall be entered into the rental program and become subject to the Beach Club Membership Agreement (as defined in and) upon terms and conditions substantially as set forth in the Unsold Hotel Units Participation Agreement (as defined in **Exhibit A**).

       c.    <u>Hotel Amenities Unit</u>.  With respect to all the Hotel Amenities Units so acquired, a Trustee Entity shall have all the rights and be subject to all of the obligations of a Hotel Amenities Unit Owner under the Co-Ownership Regulations, including the obligation to enter into and comply with the terms of the Hotel Amenities Units Maintenance Agreement for the Hotel Amenities Unit.

       d.    <u>Bulk Unit Transfers</u>.  In the event that a Trustee Entity acquires more than ten (10) Hotel Units ("**Trustee Units**"), then, if and to the extent permitted under the Co-Ownership Regulations and applicable law as then in effect, the Trustee Entity shall be permitted to sell such Trustee Units in bulk sales of more than ten (10) Trustee Units (the Parties acknowledge that such bulk sales are not currently permitted under the Co-Regulations), *provided* that (i) the purchaser of such bulk sale (a "**Bulk Purchaser**") shall be subject to any restrictions on transfer as may then be contained in the Co-Ownership Regulations, (ii) the Bulk Purchaser shall enter into an agreement whereby each of the acquired Trustee Units shall be entered into the rental program and become subject to the Beach Club Membership Agreement upon terms and conditions substantially as set forth in the Unsold Units Participation Agreement and (iii) such Bulk Purchaser shall be pre-approved by Operator, within thirty (30) days of request, which approval shall not be withheld, except in the event of the following restrictions on transfer:

       i.    the proposed Bulk Purchaser has been convicted of a felony or crime of moral turpitude;

       ii.    the proposed Bulk Purchaser is engaged in the business of licensing or franchising of one or more hotels, condo-hotels and/or other lodging facilities;

       iii.    the proposed Bulk Purchaser is not generally regarded in the business community as a person of high character and with a favorable reputation for integrity, honesty and veracity;

       iv.    the proposed Bulk Purchaser's ownership or operation of Trustee Units will cause Donald J. Trump or his descendants, Operator or any of its or their Affiliates to lose, to have suspended or to fail to qualify for or renew any gaming license, real estate brokerage license, and real estate mortgage brokerage license, real estate mortgage banking license or liquor license; or

5

v.    a reasonable sophisticated business person would conclude that the proposed Bulk Purchaser would otherwise have a materially adverse effect on the interests of the Owner's Meeting, Owner or Operator.

2.4    <u>Amendments</u>.  The foregoing provisions of this Agreement are subject to the condition that, for so long as the Property remains subject to the Mortgage, the Hotel Unit Maintenance Agreement, Hotel Amenities Units Maintenance Agreement and Hotel Rental Maintenance Agreement, and the related operational provisions of the Hotel Agreements, shall not be amended or modified in any respect materially adverse to Promoter/Developer or any Trustee Entity, as owner or potential owner of a Hotel Unit or Hotel Amenities Unit, without the prior approval of the Trustee (it being understood that the Trustee is entitled to seek direction from the holders of the Notes prior to providing such approval).

2.5    <u>Non-Waiver of Defaults</u>.    Notwithstanding anything to the contrary stated in this <u>Section 2</u>, the exercise of the Equity Pledge or any foreclosure or other Direct Acquisition of the Property (or any portion thereof) or any Units shall not cure or constitute a waiver of any then existing default under any of the Hotel Agreements (as herewith or hereafter amended or otherwise modified) by any party thereto, or any rights or remedies with respect to any such default that, subject to any applicable notice and cure provisions, may then or thereafter be available to a non-defaulting party under such agreement or applicable law, including, if applicable, the right to terminate such agreement.

3.    <u>Notice to Operator</u>. The Trustee, as a courtesy only, shall provide to Licensor and Operator a copy of any notice of breach or default or other material event under the Indenture Documents delivered to Promoter/Developer (an "**Indenture Default Notice**") promptly after delivery thereof to Promoter/Developer, and any supplement, replacement or amendment to the Indenture Documents ("**Indenture Amendment**"), promptly after the execution and delivery thereof.  The Trustee's failure to provide an Indenture Default Notice or Indenture Amendment to Licensor and Operator shall not (i) defeat or render invalid any notice of breach or default to Promoter/Developer or any Indenture Amendment, nor (ii) affect any of the Trustee's rights or remedies under the Indenture Documents, including as amended by any such Indenture Amendment.

4.    <u>Effect of Amendment and Refinancing of Notes</u>. This Agreement shall continue in full force and effect among the Parties notwithstanding any amendment, modification, replacement, exchange or restatement  of the Indenture Documents or refinancing of the Notes, regardless of whether any such amendment, modification, replacement, exchange, restatement or refinancing shall have been approved by any of the Trump Parties, <u>provided</u>, however, that no such amendment, modification, replacement, exchange, restatement or refinancing shall limit the obligations of the Trustee, Co-Trustee or any Trustee Entity under this Agreement, except to the extent expressly agreed by the Trump Parties in writing**.**

6

5.      <u>Representations and Warranties</u>.

      5.1      <u>Representations and Warranties of Trustee and Co-Trustee</u>.

(a)      Trustee is a trust company validly existing under the laws of the State of Delaware.

(b)      Co-Trustee is a *sociedad anomima* validly existing under the laws of the Republic of Panama.

(c)      Each of the Trustee and Co-Trustee has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and has taken all necessary action to authorize the execution, delivery and performance of this Agreement.

(d)      This Agreement has been duly executed and delivered by each of the Trustee and Co-Trustee, pursuant to and in compliance with the Confirmation Order.

      5.2      <u>Representations and Warranties of Trump Parties</u>.

(a)      Each of the Trump Parties is a limited liability company, validly existing under the laws of the State of Delaware.

(b)      Each of the Trump Parties has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and has taken all necessary action and received all necessary approvals to authorize the execution, delivery and performance of this Agreement.

(c)      This Agreement has been duly executed and delivered by each of the Trump Parties.

      5.3      <u>Representations and Warranties of Promoter/Developer</u>.

(a)      Promoter/Developer is a corporation, validly existing under the laws of the Republic of Panama.

(b)      Promoter/Developer has the requisite power and authority to execute, deliver and perform its obligations under this Agreement and has taken all necessary action and received all necessary approvals to authorize the execution, delivery and performance of this Agreement.

(c)      The Agreement has been duly executed and delivered by Promoter/Developer.

7

(d)     After giving effect to the Notes Restructuring, nothing contained in the Indenture Documents alters Promoter/Developer's payment or performance obligations under the Hotel Agreements, as modified by the Concessionary Amendment.

6.     Notices

6.1     Method of Delivery. All notices to be given by a Party to any other Party under this Agreement shall be in writing and shall be delivered (i) in person, (ii) by certified U.S. mail, with postage prepaid and return receipt requested, (iii) by overnight courier service, or (iv) by facsimile transmittal, with a verification copy sent by overnight courier service, to the other Party at the following address or facsimile number (or to such other address or facsimile number as a Party may designate hereafter by written notice to the other Parties pursuant to this Section 6):

A.     If to Trustee:
CSC Trust Company of Delaware
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808
Attention:  Corporate Trust Administration
Fax: (302) 636-8666
Electronic mail:  csctrust@cscglobal.com

With a copy to:

Marian Baldwin-Fuerst
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York,  New York 10112
Fax: (646) 710-5231
Electronic Mail: mbaldwin@chadbourne.com

B.     If to Co-Trustee:

Global Financial Funds Corp.
_____
_____
_____
Fax: _____
Electronic Mail: _____

With a copy to the Trustee.

C.     If to Promoter/Developer:

8

Newland International Properties Corp.
c/o Newland International Properties
Trump Plaza
53 Street, Obarrio, Ground Floor
Panama City, Republic of Panama
Attention: _____
Fax: _____
Electronic Mail: _____


With a copy to:

Nelson F. Migdal, Esq.
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, DC  20037
Facsimile No.: (202) 261-4757

D.    If to Licensor, Operator or P.H. TOC Manager all of the following:

Allen Weisselberg
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 26th floor
New York, NY 10022
ph: (212) 715-7224
fx:  (212) 832-5396
weisselberg@trumporg.com

Jason Greenblatt, Esq.
c/o Trump International Hotels Management LLC
725 Fifth Avenue
26th floor
New York, NY 10022
ph: (212) 715-7212
fx:  (212) 980-3821
jgreenblatt@trumporg.com

Donald J. Trump, Jr.
c/o Trump International Hotels Management LLC
725 Fifth Avenue
26th floor

9

New York, NY 10022
ph: (212) 715-7247
fx:  (212) 688-8135
djtjr@trumporg.com

Ivanka Trump
c/o Trump International Hotels Management LLC
725 Fifth Avenue
26th floor
New York, NY 10022
ph: (212) 715-7256
fx:  (212) 688-8135
itrump@trumporg.com

Eric Trump
c/o Trump International Hotels Management LLC
725 Fifth Avenue
26th floor
New York, NY 10022
ph: (212) 715-7260
fx:  (212) 688-8135
etrump@trumporg.com

Jim Petrus
c/o Trump International Hotels Management LLC
725 Fifth Avenue
New York, NY 10022
ph: (212) 715-7227
fx: (212) 688-8135
jpetrus@trumporg.com

6.2    Receipt of Notice. All notices delivered by a Party under this Agreement shall be deemed to have been received by the Party to whom such notice is sent upon (i) delivery to the offices of such Party, provided that such delivery is made prior to 5:00 p.m. (local time for such Party) on a business day, otherwise the following business day, or (ii) the attempted delivery of such notice if (A) such Party refuses delivery of such notice, or (B) such Party is no longer at such address, and such Party failed to provide the sending Party with its current address pursuant to this Section 6.

6.3    Delivery by Legal Counsel. The Parties agree that the attorney for a Party shall have the authority to deliver notices to the other Parties pursuant to this Section 6.

7.    Successors and Assigns; Third-Party Beneficiaries. This Agreement shall be

10

WDC 372804645v5

binding upon and inure to the benefit of the Parties, and their respective successors and assigns. This Agreement shall not confer any rights or remedies upon any other third party.

8.    Prevailing Party. If a Party commences a legal proceeding to interpret or enforce the terms of this Agreement, the prevailing Party shall be entitled to recover its costs and expenses incurred in such legal proceeding, including, without limitation, reasonable attorneys fees and expenses, from the losing Party in such proceeding.

9.    Governing Law; Jurisdiction and Venue. This Agreement shall be governed by the laws of the State of New York, without giving effect to any conflict of law principles. Each of the Parties (a) irrevocably submit and consent to the exclusive jurisdiction of the federal and state courts of the State of New York and agree that all suits, actions or other legal proceedings with respect to this Agreement shall be brought only in the State of New York, (b) waive and agree not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceedings any claim that it is not personally subject to the jurisdiction of the federal and state courts of the State of New York, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Agreement or the subject matter hereof may not be enforced in such courts, and (c) agree to accept service of process in any such suit, action or proceeding anywhere in the world, whether within or without the jurisdiction of any such court, in accordance with the procedures for giving notices under this Agreement.

10.    Recitals. Each of the Recitals is hereby incorporated by references and made a part of this Agreement.

11.    Severability. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected terms or provisions at any other time or in any other jurisdiction.

12.    Entire Agreement. This Agreement (including the recitals to this Agreements which are incorporated herein) sets forth the entire understanding and agreement of the Parties hereto any other agreements and understandings (written or oral) among the Parties on or prior to the date of this Agreement with respect to the matters set forth herein.

13.    Amendments to Agreement. No amendment or modification to any terms of this Agreement, waiver of the obligations of any Party hereunder, or termination of this Agreement (other than pursuant to the terms of the Agreement), shall be valid unless in writing and signed by the Party against whom enforcement of such provision is sought.

14.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute

11

one agreement with the same effect as if the parties had signed the same signature page.

15.     <u>The Trustee and Co-Trustee</u>. The Trustee and Co-Trustee enter into this Agreement solely in their respective capacities as Trustee and Co-Trustee under the Indenture and not in their individual capacities.  Neither the Trustee nor the Co-Trustee (each, in its personal capacity) shall have any liability to any of the Trump Parties.   Any liability which may arise against the Trustee or Co-Trustee in their respective trust capacities shall be limited to the Collateral (as defined in the Indenture).

Neither the Trustee nor Co-Trustee shall have any obligation to any party hereto or to others with respect to the transactions contemplated hereby, except those obligations of the Trustee or Co-Trustee, as applicable, expressly set forth in this Agreement.

Neither the Trustee or Co-Trustee shall be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished by any other party hereto.

No provision of the Agreement will require the Trustee or Co-Trustee to expend or risk its own funds or otherwise incur any personal financial liability unless it receives indemnity satisfactory to it against any loss, liability or expense.

Each of the Trustee and Co-Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder through its attorneys, agents or custodians.

In no event shall either the Trustee or Co-Trustee (each, in its personal capacity) be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), whether or not any such damages were foreseeable or contemplated, irrespective of whether the Trustee or Co-Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

Neither the Trustee nor Co-Trustee will be responsible for, and make no representation as to, the validity or adequacy of this Agreement.   Neither the Trustee nor Co-Trustee will be responsible for any statement or recital herein other than the representations expressly made by them in Section 5.1.

As between Trustee and/or Co-Trustee, on the one hand, and Promoter/Developer, on the other hand, each of the Trustee and Co-Trustee shall be entitled to the rights, protections, immunities and indemnities set forth in the Indenture and the Co-Trustee Agreement, as specifically set forth therein.

Nothing contained in this Agreement shall restrict the right of the Trump Parties, or any of them, to enforce this Agreement by an action for specific performance, injunctive relief or any other remedy available in equity, or to seek and obtain damages against Promoter/Developer and/or the Collateral in the event of a breach of this Agreement by any of Trustee, Co-Trustee,

WDC 372804645v5

Promoter/Developer or any other person or entity acting through any of them.

[Signatures on following page]

13

*WDC 372804645v5*

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the date first above written.

**PROMOTER/DEVELOPER**:                    **LICENSOR**:

**NEWLAND INTERNATIONAL**                  **TRUMP MARKS PANAMA LLC**
**PROPERTIES CORP.**

                                           By:    _____
By:    _____                     Name: Donald J. Trump
Name:                                      Title:  President
Title:


**TRUSTEE**:                               **OPERATOR**:

**CSC TRUST COMPANY OF**                   **TRUMP PANAMA HOTEL**
**DELAWARE**                               **MANAGEMENT LLC**

By:    _____                     By:    _____
Name:                                      Name: Donald J. Trump
Title:                                     Title:  President

By:    _____
Name:
Title:


**CO-TRUSTEE**                             **P.H. TOC MANAGER:**

**GLOBAL FINANCIAL FUNDS CORP**            **TRUMP PANAMA CONDOMINIUM**
                                           **MANAGEMENT LLC**

By:    _____
Name:                                      By:    _____
Title:                                      Name: Donald J. Trump
                                            Title:   President
By:    _____
Name:
Title:]

14

NON-DISTURBANCE AGREEMENT

Exhibit A

**Hotel Agreements**

1. Co-Ownership Regulations:  The Co-Ownership Regulations (defined above).

2. Pre-Opening Agreement:  Pre-Opening Services Agreement dated as of April 13, 2011 among Promoter/Developer, Ocean Point Development Corp. (an affiliate of Promoter/Developer) and Operator, and as it may be amended, restated, modified, supplemented, assigned and/or assumed from time to time (as amended herewith and as it may be further amended, restated, modified, supplemented, assigned and/or assumed from time to time, the "**Pre-Opening Services Agreement**").

3. Subsequent License Agreement:  License Agreement dated as of April 13, 2011, among Trump Marks Panama LLC, the Owners Meeting and Owner, as it may be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

4. Hotel Management Agreement: Amended and Restated Hotel Management Agreement, dated as of April 13, 2011, among Operator, Promoter/Developer, Owner and Owners Meeting (as amended herewith and as it may be further amended, restated, modified or supplemented time to time, the "**Hotel Management Agreement**");

5. Hotel Amenities Units Lease:  Hotel Amenities Units Lease recorded April 13, 2011, between Promoter/Developer and Owner, as it may be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

6. P.H. TOC Management Agreement:  P.H. TOC Management Agreement, dated April 13, 2011, by and between Owners Meeting and P.H. TOC  Manager (as amended herewith and as it may be further amended, restated, modified or supplemented, from time to time, the "**P.H. TOC Management Agreement**"),

7. Hotel Unit Maintenance Agreement: Hotel Unit Maintenance Agreement dated as of closing of each purchase of a Hotel Unit, among Operator, Owner and each Hotel Unit owner, as it may be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

8. Hotel Unit Rental Agreement:  Hotel Unit Rental Agreement dated as of date entered into by each participating Hotel Unit Owner, among Operator, Owner and each voluntarily participating Hotel Unit Owner, as it may be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

9. Hotel Amenities Units Maintenance Agreement: Hotel Amenities Units Maintenance Agreement dated as of April 13, 2011, among Operator, Owner (as lessee of Hotel Amenities Units) and Promoter/Developer (as owner and lessor of Hotel Amenities Units), as it may be amended, restated, modified, supplemented, assigned and/or assumed from time to time.

WDC 372804645v5

10.  Hotel Asset Management Agreement: Hotel Asset Management Agreement dated as of April 13 2011, between Ocean Point Development Corp. and Owner (as amended herewith and as it may be further amended, restated, modified, supplemented, assigned and/or assumed from time to time "**Hotel Asset Management Agreement**".

11.  Unsold Hotel Units Participation Agreement:  Unsold Hotel Units Participation Agreement dated as of April 13, 2011, between Operator, Owner and Promoter/Developer, as owner of all unsold Hotel Units, as it may be amended, restated, modified, supplemented, assigned and/or assumed from time to time (the "**Unsold Hotel Units Participation Agreement**").

12.  License Agreement.  License Agreement, originally dated as of March 16, 2006, between Donald J. Trump, as original licensor, and K Group Developers Inc., as original licensee, as assigned to Licensor, as licensor, and to Promoter/Developer, as licensee, as amended (as previously amended, as amended herewith and as it may be further amended, restated, modified, supplemented, assigned and/or assumed from time to time "**License Agreement**").

16

NON-DISTURBANCE AGREEMENT

<u>Exhibit B</u>

**Draft Plan Documents**

*WDC 372804645v5*

NON-DISTURBANCE AGREEMENT

<u>Exhibit C</u>

**Concessionary Amendments**

1. First Amendment to Pre-Opening Services Agreement, among Newland International Properties, Corp., Ocean Point Development Corp. and Trump Panama Hotel Management LLC.

2. First Amendment to Amended and Restated Hotel Management Agreement, among Trump Panama Hotel Management LLC, Newland International Properties, Corp., Ocean Point Development Corp., Hotel TOC Inc. and Owners Meeting of the P.H. TOC

3. First Amendment to P.H. TOC Management Agreement, between Trump Panama Condominium Management LLC and Owners Meeting of the P.H. TOC.

4. Amended and Restated Hotel Asset Management Agreement, between Ocean Point Development Corp. and Hotel TOC Inc.

5. Eighth Amendment to License Agreement, by and between Trumps Marks Panama LLC and Newland International Properties Corp.

**Exhibit R**

## LIST OF DOCUMENTATION TO BE EXECUTED BY THE TRUSTEE

1. Indenture, dated as of [*] 2013, between Newland International Properties Corp. and CSC Trust Company of Delaware

2. Amended and Restated Agreement of Appointment and Acceptance of Co-Trustee, dated as of [*], 2013 among Newland International Properties Corp., CSC Trust Company of Delaware, Global Financial Funds Corp., HSBC Bank USA, N.A. and HSBC Investment Corporation Panama, S.A.

3. CCSA Satisfaction and Release Agreement, dated as of [*], 2013, among Newland International Properties Corp., CSC Trust Company of Delaware, HSBC Bank USA, N.A., Roger Khafif, Eduardo Saravia, Carlos Serna.

4. Representation and Covenant Letter, dated as of [*], 2013, between Roger Khafif and CSC Trust Company of Delaware.

5. Representation and Covenant Letter, dated as of [*], 2013, between Eduardo Saravia and CSC Trust Company of Delaware.

6. Representation and Covenant Letter, dated as of [*], 2013, between Carlos Serna and CSC Trust Company of Delaware.

7. Non-Disturbance Agreement, dated as of [*], 2013, among CSC Trust Company of Delaware, Trump Marks Panama LLC, Trump Panama Condominium Management LLC and Trump Panama Hotel Management LLC.

**Exhibit S**

**FORM OF RELEASE ACCOUNT AND COLLECTION ACCOUNT CERTIFICATION**

I, _____, hereby certify to The Trustee that I am the _____ of Newland International Properties, Corp. (the "Company").

In connection with the Indenture, dated as of [*], 2013, (the "Indenture"), between the Company and CSC Trust Company of Delaware, as trustee, the Company hereby certifies to the Trustee under the Indenture, as follows:

[*If applicable*]

Pursuant to Section 10.03 of the Indenture, the full Monthly Working Capital Amount of $_____ for the month of_____ has been accumulated and shall be transferred from the Release Account on the next business day that is a Wednesday or a Friday to the Company pursuant to the payment instructions below:

| | |
|---|---|
| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |
| | |
| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| | |
| Final Beneficiary: | Newland International Properties, Corp. |
| Account No.: | |
| Tax ID Number | _____ |

The Monthly Working Capital Amounts includes $[  ] payable as bonus payments under the Cervera Contract and $[  ] in Carry-Over Amounts.

All remaining sums on deposit in the Release Account for the month of _____ shall be transferred to the Collection Account.

[*If applicable*][1]

Pursuant to Section 10.03 of the Indenture, as of the last day of the Monthly Collection Period $[     ] of the Monthly Working Capital Amount has been accumulated and shall be transferred from the Release Account on the next business day that is a Wednesday or a Friday to the Company pursuant to the payment instructions below:

| | |
|---|---|
| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |

---

[1] *Use if full amount has not been accumulated.*

| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| . | |
| Final Beneficiary: | Newland International Properties, Corp. |
| Account No.: | |
| Tax ID Number | _____ |

[*If applicable*]

[Pursuant to Section 10.04(g) of the Indenture the Company hereby sets the Monthly Working Capital Reserve Amount for the month of [    ] at $[*insert amount up to full amount of Monthly Working Capital Amount [and add Cervera Contract bonus amounts, if any] for the next two following calendar months*][2]

Pursuant to Section 10.04(a)(2)(y) of the Indenture, the Company hereby requests the [reservation] [reduction of a prior reservation] [disbursement of a prior reservation] of $_____, constituting the Monthly Working Capital Reserve Amount for the month of [    ].

[Disbursements shall be transferred to the Company pursuant to the payment instructions below:]

| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |
| | |
| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| | |
| Final Beneficiary: | Newland International Properties, Corp. |
| Account No.: | |
| Tax ID Number | _____ |

[*If applicable*]

Pursuant to Section 10.04(a)(3) of the Indenture, the Company hereby requests the [reservation] [reduction of a prior reservation] [disbursement of a prior reservation] of $_____, constituting the Contingency Reserve Amount for the [*insert Contingency Event*].   After such reservation, reduction or disbursement the Contingency Reserve Amount shall equal $[    ].

[The undersigned Officer of the Company certifies to the Trustee that (i) this certification and disbursement request has been reviewed by the Noteholder Representative and such Noteholder Representative has no objection to it and (ii) the Contingency Event described in

---

[2] *To be set in the first certificate delivered in each calendar month.*

Annex A has occurred and must be paid.    Disbursements shall be transferred to the Company
pursuant to the payment instructions below:][3]

| | |
|---|---|
| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |
| | |
| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| | |
| Final Beneficiary: | Newland International Properties, Corp. |
| Account No.: | _____ |
| Tax ID Number | _____ |

[*If applicable*]

Pursuant to Section 10.04(a)(4) of the Indenture, the Company hereby requests the
[reservation] [disbursement of a prior reservation] of $_____, constituting the Bulk 2
Repurchase Reserve Amount.. After such reservation, reduction or disbursement the Bulk 2
Repurchase Reserve Amount shall equal $[    ].[4]

[Disbursements shall be transferred to the Company pursuant to the payment instructions
below:]

| | |
|---|---|
| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |
| | |
| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| | |
| Final Beneficiary: | _____ |
| Account No.: | _____ |
| Tax ID Number | _____ |

[*If applicable*]

Pursuant to Section 10.04(a)(5)(x) of the Indenture, the Company hereby requests the
[reservation] of *$[insert all remaining amounts up to the Debt Service Reserve Amount]*, as
constituting Debt Service Reserve Amount.

[*If applicable*]

---

[3]  Insert for disbursements of Contingency Reserve Amounts
[4]  Shall not be applicable following [June 10, 2013 or the agreed expiration date required by the Plan or the parties
thereto to the Bulk 2 Repurchase Option]

Pursuant to Section 10.04(a)(5)(y) of the Indenture, the Company hereby requests the application of all Debt Service Reserve Amounts previously reserved pursuant to Section 10.04(a)(5)(x) to the payment of Debt Service then due and payable for the next following Payment Date occurring on _____.

[*If applicable*]

Pursuant to Section 10.04(a)(5)(z) of the Indenture, the Company hereby requests the [reservation] [reduction of a prior reservation] of $_____, constituting Debt Service Reserve Amount for the second Payment Date following the date of such reservation or reduction. After such reservation or reduction the Debt Service Reserve Amount for such second Payment Date shall equal $[   ].

[*If applicable*]

Pursuant to Section 10.04(a)(6) of the Indenture, the Company hereby requests the [reservation] [reduction of a prior reservation] [disbursement of a prior reservation] of $_____, constituting [BC Senior Loan Reserve Amount] [BC Ferry Payment Reserve Amount][5] [Open Market Purchase amounts to be paid by the Company] [Optional Redemption amounts to be paid by the Company] [Net Proceeds from Prime Unit Sale to be applied to a Mandatory Prepayment]

[*Insert for disbursements of the BC Senior Loan Reserve Amount or BC Ferry Payment Reserve*] [The undersigned Officer of the Company certifies to the Trustee that this certification and disbursement request has been reviewed by the Noteholder Representative and such Noteholder Representative has no objection to it. Disbursements shall be transferred to the Company pursuant to the payment instructions below:

| | |
|---|---|
| Intermediary Bank in the US: | _____ |
| Swift/ABA: | _____ |
| | |
| Beneficiary Bank: | _____ |
| Account No.: | _____ |
| Swift/ABA: | _____ |
| | |
| Final Beneficiary: | _____ |
| | |
| Account No.: | |
| | |
| Tax ID Number | _____ |

[*If applicable*]

---

[5] No reserve to be maintained after [insert date 18 months after Effective Date]

Pursuant to Section 10.04(a)(7) of the Indenture, the Company hereby certifies that as of the [*insert Determination Date*] $_____ constitutes the Supplemental Amortization Amount to be paid on _____, the Payment Date next following such Determination Date

**[*include for each disbursement of Monthly Working Capital*]**

**The Company hereby certifies that (i) all funds draw down as Monthly Working Capital Amounts shall be spent in accordance with the provisions of the Indenture, including without limitation, Section 4.34 thereof and (ii) the aggregate disbursements of Monthly Working Capital Amount requested from the Release Account or the Collection Account for any month do not exceed the Monthly Working Capital for the applicable month.**

[*Signature page follows*]

Terms used but not defined herein are as defined in the Indenture.

Certified this _____ day of _____, 20__.

**NEWLAND INTERNATIONAL PROPERTIES, CORP.**

By: _____

Name:

Title:

**SCHEDULE 1**

**Agreements in Effect as of the date of the Indenture**

1. (x) Indenture, dated as of [*] 2013, between Newland International Properties Corp. and CSC Trust Company of Delaware and (y) Limited Financial Guaranty, dated as of [*] 2013, between Roger Khafif, Eduardo Saravia, Carlos Serna and CSC Trust Company of Delaware

2. Amended and Restated Agreement of Appointment and Acceptance of Co-Trustee, dated as of [*], 2013 among Newland International Properties Corp., CSC Trust Company of Delaware, Global Financial Funds Corp., HSBC Bank USA, N.A. and HSBC Investment Corporation Panama, S.A.

3. CCSA Satisfaction and Release Agreement, dated as of [*], 2013, among Newland International Properties Corp., CSC Trust Company of Delaware, HSBC Bank USA, N.A., Roger Khafif, Eduardo Saravia, Carlos Serna.

4. Representation and Covenant Letter, dated as of [*], 2013, between Roger Khafif and CSC Trust Company of Delaware.

5. Representation and Covenant Letter, dated as of [*], 2013, between Eduardo Saravia and CSC Trust Company of Delaware.

6. Representation and Covenant Letter, dated as of [*], 2013, between Carlos Serna and CSC Trust Company of Delaware.

7. Non-Disturbance Agreement, dated as of [*], 2013, among CSC Trust Company of Delaware, Trump Marks Panama LLC, Trump Panama Condominium Management LLC and Trump Panama Hotel Management LLC.

8. Lump-Sum Construction Agreement (*Contrato de Construcción de Obra por Precio Alzado*), dated as of August 27, 2007, between Newland International Properties, Corp. and Opcorp Arsesa International Inc. (formerly, Opcorp International, Inc.).

9. Consulting Agreement to Render Services in the International Market, dated as of May 23, 2006, between Newland International Properties, Corp. and Komco International Corp.

10. Administrative Services Letter Agreement, dated as of October 4, 2007, between Newland International Properties, Corp. and Arias, Serna and Saravia, S.A.

11. Letter Agreement by and between Marvin Traub LLC and Ocean Point Development Corp. dated as of October 26th, 2005.

12. License Agreement entered between Trump Marks Panama LLC and Newland, dated as of March 16th, 2006.

13. Construction and Reimbursement of Electrical Lines for the Project Trump Ocean Club International Hotel & Tower, between Empresa de Distribucion Electrica Metro Oeste, S.A. and Newland International Properties, Corp., dated as of July 8th, 2010.

14. Amended and Restated Hotel Management Agreement among Newland International Properties, Corp., Ocean Point Development Corp.,  Trump Panama Hotel Management LLC., as Assignee of Trump International Hotels Management LLC., Hotel TOC Inc., and Owners Meeting of P.H. TOC dated as of April 13th, 2011.

15. Hotel Asset Management Agreement entered into and executed by and between Hotel TOC Inc. and Ocean Point Development Corp. on April 13th, 2011.

16. P.H. TOC Management Agreement entered into and executed by and between Trump Panama Condominium Management LLC. and Owners Meeting of P.H. TOC on April 13th, 2011.

17. Engagement Letter for Advertising Retainer Agreement among LGD Communications Inc., and Newland International Properties Corp., executed on August 10th, 2012.

18. Consulting Agreement by and between Newland International Properties Corp. and Cervera Real Estate, Inc. dated September 10th, 2012.

19. Framework Agreement for the establishment of a Casino in P.H. TOC entered and executed among Sun International Limited, Newland International Properties Corp. and Trump Panama Hotel Management LLC., dated as of November 26th, 2012.

20. Purchase Option Agreement entered into by and between Global Realty Investments, S.A. and Newland International Properties, Corp. dated as of July 13th, 2011.

21. Escrow Agreement made and entered into between Newland International Properties Corp., Global Realty Investments, S.A. and Assets Trust & Corporate Services, Inc.

22. Trust Management for Operations, Personal Property and Work Capital Funds Agreement between Owens & Watson Trust Corp. and Newland International Properties, Corp.

23. Trust Management for Sales Commissions Agreement between Assets Trust & Corporate Services, Inc., and Newland International Properties Corp., dated as of October 16th, 2012.

24. Concession Agreement between Newland International Properties Corp., and Autoridad Maritima de Panama dated as of January 14th, 2013.

25. Rendering of Services for Dock Management Agreement between Newland International Properties Corp., and Island Scape, S.A. dated as of December 20th, 2012.

26. TOCP Casino Letter Agreement, dated as of October 14, 2010, between Gapstone Group LLC and Newland International Properties, Corp.

27. TOCP Casino Transaction Advisory Amendment Letter Agreement, dated as of July 2, 2013, between Gapstone Group LLC and Newland International Properties, Corp.

**SCHEDULE 2**

**Senior Officer Appointments, Corporate Governance Requirements and Noteholder
Representative**

Terms used in this Schedule 2 and not otherwise defined shall have the meaning assigned
to such term elsewhere in the Indenture.

*Senior Officer Appointments*

As part of the restructuring, Carlos Saravia shall be appointed as Chief Executive Officer
("CEO"), President and Legal Representative of the Company.  Carlos Saravia may be replaced
in such roles anytime after September 30, 2013, but shall be given at least 30 days' notice of any
such intended replacement.  An executive search to replace Carlos Saravia will be initiated
before his anticipated departure; furthermore, the replacement Chief Executive Officer shall be
selected prior to Carlos Saravia's departure. Roger Khafif, Eduardo Saravia Calderón, Carlos
Alberto Serna Londoño shall, directly or indirectly, only hold non-executive roles with no
corporate officer responsibilities or powers, or roles or powers related to the Owners meeting of
the PH (as defined in the "Reglamento" (Co-ownership Rules) Board and Administration).

The appointment of corporate officers of the Company (excluding the position of CEO)
shall not be subject to preapproval of the Noteholders' Board Nominee.

Further, Carlos Saravia, as Chief Executive Officer shall have all requisite power to sign
all legal documentation of the Company on behalf of the Company, including sales
documentation. Such power and authority shall be expressly provided in the governing
documentation of the Company and registered in the applicable Panamanian public registry and
by means of power-of-authority from the remaining officers authorized by the governing
documentation of the Company to sign legal documentation on behalf of the Company.

The Company shall also execute a "professional services contract" under Panama law
with Carlos Saravia, outlining his role as Chief Executive Officer. The Company shall also
implement a succession plan for the Chief Executive Officer role; such succession plan shall
provide for the Chief Financial Officer to become interim CEO in the event the CEO resigns or
otherwise ceases to perform its duties prior to securing a replacement and for the means by
which a full-time replacement CEO shall be selected.  Any CEO of the Company after Carlos
Saravia shall have education and experience commensurate with the position, with the hiring of
the replacement CEO shall approved by the Board.  Furthermore, the replacement can only be
consummated if not objected to by the Noteholders' Board Nominee.  The Noteholders' Board
Nominee shall recite any reasons for any objection on the record at a Board meeting or, at his/her
choice, in a separate writing to the Company.

*Corporate Governance*

Shareholder voting agreements shall have been entered by the Shareholders and [*], as
nominee ("Noteholders' Shareholder Nominee") of the Noteholders to provide that 30% of the

shareholder voting rights (but not economic entitlements) attributable to the Company's capital stock shall be controlled by the Noteholders' Shareholder Nominee for the benefit of the Noteholders (the "Noteholder Swing Vote"), such that shareholder voting by shareholders of the Company shall be effectively allocated as follows:  Upper Deck – 21%, Roger Khafif – 49%, and Noteholders' Shareholder Nominee 30% (together, "Voting Persons").  Notwithstanding the foregoing, the 30% shareholder voting rights of the Noteholders' Shareholder Nominee shall only be exercisable in the event of a shareholder voting dispute between Roger Khafif and Upper Deck; provided, that, the Noteholders' Shareholder Nominee shall receive the same information provided to, at the same time as received by, the other shareholders in respect of any voting to be undertaken by the shareholders, and shall be invited, sufficiently in advance, to attend all shareholder meetings at which voting will take place, whether in-person or telephonic, and shall timely receive (at the same time as the other shareholders) copies of all minutes, resolutions, and presentations prepared for or to reflect the outcome of such shareholder voting meeting.

Further, in connection with the shareholder voting arrangements described immediately above, the Company's Board of Directors (the "Board") shall be reconstituted to reflect that the Noteholders shall have appointed [*] as delegate to the Board (the "Noteholders' Board Nominee"), which nominee (a natural person or an entity (in turn, represented by a natural person)) shall not have any voting rights, except as provided below. The Company's governing documents and any existing shareholder and/or voting agreements shall be modified to provide that all decisions by the Shareholders shall be taken unanimously and that, in the case of a non-unanimous vote, the Noteholders' Board Nominee shall have in such instance (and only in such instance) the ability to cast the deciding vote. The Noteholders' Board Nominee shall have unfettered access to all Board meetings and communications, shall receive same at the same time as members of the Board, and shall be invited, sufficiently in advance, to attend all meetings, whether in-person or telephonic, shall timely receive (at the same time as members of the Board) copies of all minutes, resolutions, and presentations, and shall be permitted to participate in such meetings as if s/he were a full-voting member of the Board.

At any time, the Noteholders' Board Nominee and/or the Noteholders' Shareholder Nominee may be removed by Holders of a majority in principal amount of the then outstanding Notes (the "Majority Holders").  The Noteholders' Board Nominee and/or the Noteholders' Shareholder Nominee may resign at any time by providing sixty (60) days prior written notice to the Trustee and the Company.  Promptly upon receipt of a resignation notice, the Trustee shall deliver such resignation notice to the Holders.  If the Noteholders' Board Nominee or the Noteholders' Shareholder Nominee resigns or is removed, the Majority Holders shall promptly appoint a successor Noteholders' Board Nominee or the Noteholders' Shareholder Nominee, as applicable.  The successor Noteholders' Board Nominee or the Noteholders' Shareholder Nominee, as applicable, shall deliver a written acceptance of its appointment to the retiring Noteholders' Board Nominee or the Noteholders' Shareholder Nominee, as applicable, which shall be acknowledged by the Trustee.  Thereupon the resignation or removal of the retiring Noteholders' Board Nominee or the Noteholders' Shareholder Nominee, as applicable, shall become effective, and the successor Noteholders' Board Nominee or the Noteholders' Shareholder Nominee, as applicable,  shall have all the rights, powers and duties of the Noteholders' Board Nominee or the Noteholders' Shareholder Nominee, as applicable, under this Indenture, the corporate governance documents listed below under "—Corporate Governance Documents" and the other Transaction Documents.  Promptly following any

succession, the Trustee shall distribute notice of such succession to the Holders and the Company.

Upon payment in full of the Notes, the Noteholders' Board Nominee shall resign from the Board.

The Company's governing documents shall also have been amended to provide indemnification for the Noteholders' Board Nominee as well as for all other members of the Board of Directors of the Company and for designated Officers of the Company.

The Noteholders' Board Nominee and the Noteholders' Shareholder Nominee can be the same person/entity, but need not be.

### *Noteholder Representative*

[*] shall have been appointed as representative (including any duly authorized representative or designee of such representative, the "Noteholder Representative") to discharge the functions described below. The appointment of the Noteholder Representative shall be duly recorded in the Panamanian Public Registry and the Company's by-laws and, to the extent necessary, other organizing documents would be amended or supplemented to recognize the Noteholder Representative and his/her rights and provide that his/her appointment and service would be governed by the Noteholders.

At any time, the Noteholder Representative may be removed by Holders of a majority in principal amount of the then outstanding Notes (the "Majority Holders"). The Noteholder Representative may resign at any time by providing sixty (60) days prior written notice to the Trustee and the Company. Promptly upon receipt of a resignation notice, the Trustee shall deliver such resignation notice to the Holders. If the Noteholder Representative resigns or is removed, the Majority Holders shall promptly appoint a successor Noteholder Representative. The successor Noteholder Representative shall deliver a written acceptance of its appointment to the retiring Noteholder Representative, which shall be acknowledged by the Trustee. Thereupon the resignation or removal of the retiring Noteholder Representative shall become effective, and the successor Noteholder Representative shall have all the rights, powers and duties of the Noteholder Representative under this Indenture and the other Transaction Documents. Promptly following any succession, the Trustee shall distribute notice of such succession to the Holders and the Company.

The function of the Noteholder Representative shall be to (i) communicate in writing to the Trustee defaults under the Indenture and to review certifications identified herein and (ii) perform such other obligations as are expressly contemplated by the Indenture. In this regard, the Company shall covenant for all periods on or after the date of the Indenture that:

(i)     Noteholder Representative shall have full access to, subject in all cases to confidentiality provisions, the Company's offices and all property, books, accounting and other records, invoices, contracts, and to attend internal and business meetings (but not meetings unrelated to the operation of the Company) and to observe sales and marketing meetings; this clause (i) shall not include internal electronic mail (email) communications; provided that from the date of

the Indenture, a copy of any email communication used by the Chief Executive Officer of the Company as written approval of a unit sale must be delivered to the Noteholder Representative;

(ii)     Noteholder Representative shall have full access to all information concerning the Project, performance data relating to any policies and budgets preapproved pursuant to the Pre-Packaged Plan, and to attend construction, sales, marketing and management meetings. This includes access to weekly reports on sales and expenses, with supporting data; and

(iii)    Noteholder Representative shall have full access to any contracts or other relevant documentation or details that pertain to the legal relationship between the Company and its Affiliates and the Affiliates of the Shareholders or the Parties.

Each Noteholder Representative shall execute a confidentiality agreement with the Company prior to appointment.

The Noteholder Representative function shall cease to exist following the date which is the later of eighteen (18) months following [*] or three (3) months after the existence of an Event of Default, unless such Default has been earlier cured or waived.

The Noteholder Representative will not be required to communicate directly with, and shall not take direct instruction from, holders of the Notes.

*Indemnification*

The Company will indemnify each of the Noteholders' Shareholder Nominee, the Noteholders' Board Nominee, the Noteholder Representative and each of their respective officers, directors, employees, agents and representatives (each, an "Indemnified Nominee") against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, any applicable shareholder voting agreement, any confidentiality agreement or any related document, agreement or instrument, including the costs and expenses of enforcing this Indenture any applicable shareholder voting agreement, any confidentiality agreement or any related document, agreement or instrument against the Company and defending itself against any claim (whether asserted by the Company, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense as shall be determined to have been caused by such Indemnified Nominee's own negligent action, negligent failure to act, willful misconduct or bad faith. The Indemnified Nominee will notify the Company promptly of any claim for which it may seek indemnity. Failure by the Indemnified Nominee to so notify the Company will not relieve the Company of its obligations hereunder. The Company will defend the claim and such Indemnified Nominee will cooperate in the defense. The Indemnified Nominee may have separate counsel and the Company will pay the reasonable fees and expenses of such counsel. The Company need not pay for any settlement made without its consent, which consent will not be unreasonably withheld.

***Corporate Governance Documents***

1.  Amendment to the Articles of Incorporation of "Newland International Properties, Corp.," dated as of [*] 2013.

2.  Amendment to the Articles of Incorporation of "OCEAN POINT DEVELOPMENT CORP.", dated as of [*] 2013.

3.  Shareholders Agreement of the Panamanian company named "OCEAN POINT DEVELOPMENT CORP.", dated as of [*] 2013.