Hearing Date and Time: May 28, 2013
at 2:00 p.m.

SEWARD & KISSEL LLP
John R. Ashmead
Laurie R. Binder
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) Chapter 11 |
| NEWLAND INTERNATIONAL PROPERTIES, CORP., | ) Case No. 13-11396 (MG) |
| Debtor. | ) |

## STEERING GROUP STATEMENT IN SUPPORT OF ORDER APPROVING DEBTOR'S DISCLOSURE STATEMENT AND CONFIRMATION OF THE DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION AND JOINDER IN THE DEBTOR'S MEMORANDUM OF LAW IN SUPPORT THEREOF AND THE DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION

The Steering Group of Prepetition Noteholders (the "Steering Group") hereby (i) submits this statement ("Statement") in support of the entry of an order confirming the *Prepackaged Plan of Reorganization for the Debtor Under Chapter 11 of the Bankruptcy Code*, dated March 29, 2013 [Docket No. 11] (as amended here to date and including all exhibits and supplements thereto, the "Plan"), and approving the *Disclosure Statement for the Prepackaged Plan of Reorganization for the Debtor Under Chapter 11 of the*

SK 27585 0001 1385179

*Bankruptcy Code*, dated March 29, 2013 [Docket No. 12] (as amended here to date and including all exhibits and supplements thereto, the "Disclosure Statement"),[1] and (ii) joins in, adopts and incorporates the *Debtor's (1) Memorandum of Law in Support of Entry of an Order (I) Approving (A) the Disclosure Statement Pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures, and (C) Forms of Ballot; and (II) Confirming the Prepackaged Plan of Reorganization for the Debtor Under Chapter 11 of the Bankruptcy Code, and (2) Omnibus Reply to Objections to Confirmation*, dated May 23, 2013 [Docket No. __] that is anticipated to be filed shortly (the "Confirmation Memorandum").[2] This Statement will focus on the Debtor's restructuring from the Steering Group's perspective, rather than repeat back the contents of the Confirmation Memorandum.

**Background**

1.  The Steering Group is comprised of certain holders (the "Prepetition Noteholders") of Newland International Properties Corp.'s (the "Debtor's") 9.5% Senior Secured Notes due 2014 (the "Prepetition Notes") that hold or control approximately 52% of the outstanding principal amount of the Prepetition Notes.[3] The Prepetition Notes

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan and Disclosure Statement.

[2] The Steering Group members are: Polo Fund, Polo Edge Fund, Polo International Fund, Moneda SA AFI on behalf of Moneda Deuda a Latino Americana Fondo de Inversión, Moneda SA AFI on behalf of Moneda Deuda a Latino Americana Fondo de Inversión, Moneda International Inc. on behalf of Moneda Latin America Corporate Debt, Greylock Global Opportunity Master Fund, Ltd and Associated Entities, Trinidad & Tobago Unit Trust Corporation, and Trinidad & Tobago Unit Trust Corporation. The Steering Group speaks for its members only and does not, and does not purport to, speak for all holders of Prepetition Notes.

[3] Note, at the time the Plan solicitation materials were circulated, the Steering Group held or controlled approximately 42% of the outstanding principal amount of the Prepetition Notes (as disclosed in such materials). After the solicitation materials were circulated, certain members of the Steering Group acquired additional Prepetition Notes.

were issued pursuant the Indenture dated November 7, 2007 (as amended, the "Indenture") in the principal amount of $220,000,000. The proceeds from the issuance of the Prepetition Notes were used to finance the Debtor's construction of the Trump Ocean Club in Panama City, Panama.

2.  The Steering Group formed immediately before, and in anticipation of, the Debtor's November 15, 2011 payment default under the Indenture. The Steering Group was constituted after discussions amongst holders of upwards of 80% of the Prepetition Notes.[4] Once formed, the Steering Group was immediately faced with what actions to recommend to the broader group of Prepetition Noteholders in relation to the default.[5]

3.  After certain initial interim remedial steps by the Trustee initiated by the Steering Group, but accomplished only with participation of Prepetition Noteholders outside the Group, and based on the advice of U.S. and Panama legal and financial advisors, the Steering Group began to (i) consider potential options for the Prepetition Noteholders to recover the amounts owing under the Prepetition Notes, and (ii) engage the Debtor in discussions concerning completion of the building (material construction remained to be completed).

4.  In addition to business and financial due diligence to enable the Steering Group to get its arms around the project and its myriad issues, the Steering Group needed to gain

---

[4] Many holders did not want to join the Steering Group in order to avoid becoming "restricted". Note, the Steering Group initially had another member; however, that member resigned from the Steering Group several months after its formation.

[5] With less than a majority of the principal amount of the Prepetition Notes held by the Steering Group members, the Steering Group could not direct the trustee under the Indenture (the "Trustee") or take remedial actions on its own; it needed the participation of other Prepetition Noteholders to do such things. To that end, the Steering Group maintained regular contact with a substantial majority of the non-Steering Group Prepetition Noteholders, which contact manifested itself several times over 16 months in the form of

an understanding of the Prepetition Noteholders' rights and remedies under Panama law, as well as the availability of consensual solutions.

5. One of the first things explored with Panama legal advisors was the viability of exercising secured creditor rights in Panama against the collateral (the unsold complete and incomplete units and spaces comprising the building), covered by a Panama mortgage held by a local Panama trustee. In the Steering Group's assessment, foreclosure was not a viable alternative, as the consistent advice they received was that a Panamanian foreclosure proceeding *if uncontested* would take from 1 to 2 years and if contested 2 to 3 *or more* years.[6] This was particularly concerning in that the Steering Group also learned that units in the building could not be sold while the building was subject to such foreclosure proceeding, even if the Debtor and Trustee (via directing Prepetition Noteholders) agreed. In short, there would be no constant and sufficient source of funding to maintain the building, let alone complete the construction, and the building would deteriorate.[7]

6. With this as a background, over the ensuing year-plus, the Steering Group worked with the Debtor to come up with a viable restructuring solution, while facilitating completion of construction and dealing with numerous issues attendant to construction completion, sales and marketing, the ancillary beach club, the shareholders and Trump. As a result of those efforts, the building was completed and the Plan and the numerous actions and transactions to take place to implement the Plan were negotiated.

---

multiple Trustee directions (requiring a majority in principal amount of the Notes) and consents for interim amendments to the Indenture.
[6] They also learned that expedited "consensual" or "strict" foreclosure does not exist in Panama, and thus was not available as a "consensual" solution.

**The Restructuring**

7.      The restructuring to be effected through the Plan and the various implementation documents has the following key elements:

> (a) new secured notes with terms that (i) set a longer maturity, (ii) establish minimal scheduled amortizations to keep the Debtor's "feet to the fire", while providing for a significant portion of the amortization through excess cash sweeps, (iii) provide that working capital is set aside each month before funds are accumulated for scheduled payments on the New Notes, and (iv) allow the Debtor to establish various reserves that would reduce excess cash sweep requirements (for subsequent minimum amortization, working capital, tax, and litigation needs), so that it has a cushion in the event of decreases in anticipated sales prices or volume of sales in a period);
>
> (b) an enhanced collateral package that includes a stock pledge and requires all bank accounts to be subject to the Trustee's lien;
>
> (c) stricter corporate governance, including various noteholder participation and information rights;
>
> (d) a limited financial guarantee from the shareholders;
>
> (e) various Trump-related concessions, reducing the amounts payable to Trump from the project; and
>
> (f) mechanisms to assist the completion of the associated beach club.

**The Disclosure Statement Should be Approved and the Plan Confirmed**

8.      Approximately 73% of the outstanding principal amount of the Prepetition Notes voted on the Plan, and 100% of the votes received were in favor of the Plan. In addition, one Prepetition Holder holding Prepetition Notes Claims in aggregate principal amount of $1,250,000.00, who was not a Record Holder but nevertheless submitted a Ballot, voted to accept the Plan.[8]  This is a high turnout by any measure.

---

[7]     In fact, a month or so after the Steering Group's formation, construction laborers shut down the project because of payment issues.

[8]     Moreover, as a result of the additional purchases by members of the Steering Group after the Record Date, members of the Steering Group could have, but for the Record Date (and would have been

9.  No substantive objections have been filed to the Plan or Disclosure Statement. All information needed to reasonably assess the Plan was set forth in the Plan and Disclosure Statement. The New Notes are fully described in the Disclosure Statement and the financial projections, along with the descriptions in the Disclosure Statement of the business as it is being operated today and intended to be operated, provide adequate information to Prepetition Noteholders as to the restructuring and the ability of the Debtor to meet its obligations under the New Notes.

10. After considered analysis by the Debtor and the Steering Group, in consultation with their advisors, filing a chapter 11 petition and the pursuing the reorganization set forth in the Plan was considered to be, and is, the best solution for the Prepetition Noteholders and the Debtor. Moreover, there is no other viable better solution. Under an out-of-court consent solicitation, even with 80 or 90% participation, too much debt would be left on the existing amortization schedule, leaving the project without sufficient funding or certainty of funding to satisfy non-consenting holders of Prepetition Notes and other obligations (while leaving the Debtor open to suit by non-consenting bondholders for overdue principal and interest).

11. Panama has no reorganization law, so the only Panama solution is foreclosure. As discussed above, that is not a viable better solution. Sales in the building as a legal matter, let alone a practical one, would immediately cease. The building could not be maintained without cash infusions. Not only would the Noteholders, Debtor, shareholders, employees and Trump suffer, but the current unit owners and commercial

---

required to pursuant to the terms of the Plan Support Agreement), voted another 10% of the Prepetition Notes in favor of the Plan, bringing total participation to 83% with 100% in favor.

tenants would suffer as the building deteriorated and values plummeted, and the proposed casino transaction would fall away.

**The Release of the Steering Group is Appropriate**

12. The release of the Steering Group provided in the Plan is appropriate. The "touchstone of bankruptcy jurisdiction on third party releases is whether the outcome of the claims asserted may have any conceivable effect on the bankruptcy estate." *In re Trinsum Group, Inc.*, 2013 Bankr. LEXIS 1753, *16 (Bankr. S.D.N.Y. April 30, 2013) (quoting *Quigley Co., Inc. v. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45, 53 (2d Cir. 2102). The Second Circuit has held that "third-party non-debtor releases are "proper only in rare cases,'" (*Trinsum at *17 (quoting Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc)*, 416 F.3d 136, 141 (2d Cir. 2005)) and "should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan." *Id.* at *18 (*quoting Metromedia*, 416 F.3d at 143).

13. Here, the Steering Group members, if sued in connection with their efforts in respect of the Prepetition Notes and the Plan, likely would assert contribution-type claims against the Reorganized Debtor. The assertion of such claims would reduce the assets of the Reorganized Debtor available to meet the obligations under the New Notes, as well as general business obligations. The release would release claims against the Steering Group and, therefore, eliminate any such contribution claims by the Steering Group.

14. Moreover, the Steering Group was a driving force behind the Debtor's reorganization. If not for the substantial efforts of the Steering Group (including

substantial time commitments), there would not be a Plan in this case. If not for the efforts of the Steering Group, construction of the building would not have been completed. The Steering Group directly participated in and drove the preservation and creation of value here. All parties, including the Prepetition Noteholders, other creditors (who will be unaffected by the Plan), unit owners, employees, shareholders and Trump, benefitted or will benefit from those efforts. In other words, the Steering Group has provided substantial consideration for the release contained in the Plan. Furthermore, the Plan Support Agreement also specifically required the Debtor to seek such release and exculpation, so it is bargained-for consideration.

15. Finally, the Plan has been overwhelmingly supported and no objections to the release (or related exculpation and injunction provisions) have been filed.

WHEREFORE, the Steering Group respectfully requests that this Court enter an order approving the Disclosure Statement, confirming the Plan, and grant such other and further relief to the Steering Group as the Court deems appropriate.

Dated: New York, New York
May 23, 2013

          SEWARD & KISSEL LLP

          By: /s/ John R. Ashmead
             John R. Ashmead
             Laurie R. Binder
             One Battery Park Plaza
             New York, NY 10004
             Telephone: (212) 574-1200
             Facsimile: (212) 480-8421

*Attorneys for the Steering Group*

SK 27585 0001 1385179