**GIBSON, DUNN & CRUTCHER LLP**
J. Eric Wise
Shira D. Weiner
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for the Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
IN RE:                                                      :  Chapter 11
                                                            :
NEWLAND INTERNATIONAL                                       :  Case No. 13-11396 (MG)
PROPERTIES, CORP.,                                          :
                                                            :
    Debtor.                                                 :
                                                            :
------------------------------------------------------------x

**DECLARATION OF ALFREDO DE ANGELIS IN SUPPORT OF**
**CONFIRMATION OF PREPACKAGED PLAN OF REORGANIZATION**
**OF THE DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Alfredo de Angelis, make this declaration (the "***Declaration***") and state:

1. I am a managing principal of Gapstone LLC (including its partners and affiliates, "***Gapstone***"),[1] the financial advisor to the Debtor in the above-captioned Chapter 11 Case. Based upon my employment with Gapstone and in connection with my service as financial advisor to the Debtor, I am intimately familiar with the business of the Debtor and its current operations. If I am called upon to testify, I can and will testify competently to the facts and opinions set forth herein.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan (as defined below).

2. Gapstone was engaged by the Debtor in August 2011 to act as its financial advisor in connection with the restructuring of the Prepetition Senior Secured Notes. Gapstone's retention as the Debtor's financial advisor in this Chapter 11 Case was approved by the Court on May 17, 2013 [Docket No. 65]. During its engagement, Gapstone's services included advising and assisting the Debtor with financial and operational restructuring for its corporate turnaround, formulation of its business plan, negotiation among various stakeholders in the Debtor's operations, cash flow modeling and analysis of revenue and expense segments, preparation of a liquidation analysis and feasibility analysis, and other financial analyses as required by the Debtor.

3. I have over twenty (20) years of experience in the capital markets, originating, structuring, underwriting and executing debt and hybrid capital financings. I have significant advisory and investment experience in the financing of distressed entities in connection with corporate turnarounds, including financial restructuring, company valuations, analysis of business plans and operations, corporate governance, and bankruptcy plan development, including for Latin American and Caribbean Debtors.

4. I submit this Declaration in support of the Debtor's Memorandum of Law in Support of Confirmation of Prepackaged Plan of Reorganization for the Debtor under Chapter 11 of the Bankruptcy Code, filed contemporaneously herewith, and in support of confirmation of the Prepackaged Plan of Reorganization for the Debtor under Chapter 11 of the Bankruptcy Code [Docket No. 11] (as may be amended, modified, or supplemented from time to time, the "**Plan**"). Specifically, I make this Declaration to provide certain background facts and opinion relevant to the Plan's compliance with the best interests test contained in section 1129(a)(7) of title 11 of the United States Code (the "**Bankruptcy Code**") and to the Plan's compliance with the feasibility

requirement contained in section 1129(a)(11) of the Bankruptcy Code.  The statements in this Declaration are, except where specifically noted, based on the following: (a) my personal knowledge or information relayed to me by the Debtor's personnel; (b) my review of relevant documents; (c) my view, based upon my experience and knowledge of the Debtor's business and financial condition; or (d) as to matters involving United States bankruptcy law or rules or other applicable laws, my reliance on the advice of counsel to the Debtor.

5. The analysis conducted by Gapstone is based on information made available to it by the Debtor and on a number of reasonable assumptions, including, among others, that the Debtor will be reorganized in accordance with the Plan. Gapstone also assumed, based upon communications with the Debtor and its own reasonable understanding of the circumstances, that the Financial Projections continue to reflect the best, currently available estimates and judgments of the Debtor's management as to the future financial and operating performance of the Debtor.  The future results of the Debtor are dependent upon various factors, many of which are beyond the control or knowledge of the Debtor, and consequently are inherently difficult to forecast.  The Debtor's actual future results may differ materially (positively or negatively) from the Forecast and, as a result, the analysis of recoveries for creditors of the Debtor may be significantly higher or lower than the estimated range herein.  In connection with its analysis, Gapstone relied on information provided by the Debtor as being complete and accurate in all material respects.

A. **Personal Background**

6. I received my Bachelor and Master of Science in engineering (with minor in Economics) from the Massachusetts Institute of Technology ("*MIT*") and completed my requirements at MIT for a Ph.D. as a research fellow.  I have been a managing principal with Gapstone since 2008.  Prior to Gapstone, I was employed by Merrill Lynch (approx. 10 years),

AIG (approx. 5 years), and Fidelity Investments (approx. 3 years) in the global markets and investment banking area. I am a Certified Insolvency and Restructuring Advisor ("**CIRA**") and have FINRA Series 63 (uniform securities agent), 7 (general securities), 79 (investment banking), and 24 (general securities principal) designations.

7. At Gapstone, I specialize in financial restructuring and in the valuation and restructuring of complex structured finance and derivative transactions. My responsibilities have primarily involved advising companies that are financially troubled and creditors to troubled companies. My duties typically include customer negotiations, negotiating and structuring settlements of debt and derivatives liabilities, business plan and cash flow development and assessment, liquidation analysis, financial projections, and other financial analyses.

B.  **The Plan is in the Best Interests of Creditors
    Complying with Section 1129(a)(7) of the Bankruptcy Code**

8. One of Gapstone's roles in conjunction with its engagement by the Debtor was to prepare, in conjunction with the Debtor, a liquidation analysis to determine whether, under the "best interests test" contained in Bankruptcy Code section 1129(a)(7), the Holders of Claims who are impaired under the Plan (i.e. Holders of Claims in Class 3) will receive or retain value under the Plan that is at least equal to the amount that such Holders would receive if the Debtor liquidated under chapter 7 of the Bankruptcy Code. Under the Liquidation Analysis, the values that may be realized by Holders of Claims in Class 3 in a hypothetical chapter 7 liquidation are less than or equal to the value of the expected recoveries to these Holders pursuant to the Plan. This Liquidation Analysis is attached to the Disclosure Statement as Exhibit D.

9. The Liquidation Analysis supports that the Plan complies with the "best interest of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code. Gapstone's preparation of the Liquidation Analysis was completed with my direct involvement. I am familiar with the methods used, and the conclusions reached, in the preparation of the Liquidation Analysis.

10. The Liquidation Analysis was based on a variety of assumptions, which are detailed in the notes to the Liquidation Analysis, and that I believe are reasonable under the circumstances. Chief among these is the assumption that the assets of the Debtor would be liquidated in a foreclosure proceeding at the direction of a Panamanian court on a unit-by-unit basis over a period of at least three (3) years, a likely scenario given the constraints of the local courts in Panama in conducting sales of units in bulk volumes.

11. The Liquidation Analysis provides estimated recoveries for each Plan class under a hypothetical chapter 7 scenario. The chart below sets forth the estimated recovery rate for each group of creditors and reflects that recoveries for creditors under the Plan are equal to or greater than recoveries under a hypothetical chapter 7 scenario:

| Class | Type of Claim or Interest | Estimated Range of % of Recovery Under Plan | Estimated Range of % of Recovery Under Chapter 7 |
|---|---|---|---|
| 1 | Other Priority Claims | 100% | 100% |
| 2 | Other Secured Claims | 100% | 100% |
| 3 | Prepetition Senior Secured Notes Claims | 95%-100% | 22-35% |
| 4 | General Unsecured Claims | 100% | 0% |
| 5 | Interests in Newland International Properties, Corp. | 100% | 0% |

12. I believe that a chapter 7 liquidation of the Debtor would result in substantial diminution in the value to be realized by Holders of Claims against and Interests in the Debtor under the Plan on account of such Claims and Interests. All Classes will do

significantly better under the Plan than they would under a chapter 7 liquidation, and none will do worse.  A liquidation of the Debtor would result in reduced recoveries, because of, among other factors:  (a) the failure to realize the maximum going concern value of the Debtor's assets or enterprise; (b) the additional costs and expenses involved in the appointment of trustees, attorneys, accountants and other professionals to assist such trustees in the liquidation; (c) additional expenses and Claims arising from the liquidation; and (d) the substantial time that would elapse before Holders would receive any distribution in respect of their Claims.  The estimated proceeds available for distribution to creditors in a hypothetical liquidation (net of required costs and expenses) would total between approximately $120.8 million and $149.7 million, with a mid-point of $135.2 million.

13. Based upon all of the relevant facts and circumstances, I believe that the Plan satisfies the "best interest of creditors" test under section 1129(a)(7) of the Bankruptcy Code because, among other things, the Plan provides each non-accepting Holder of a Claim in an Impaired Class a recovery on account of such Claim that has a value of at least equal to the value of the distribution that each such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

C. **Compliance with Section 1129(a)(11) of the Bankruptcy Code**

14. I have been informed that section 1129(a)(11) of the Bankruptcy Code requires that the Plan must be feasible as a condition precedent to confirmation of the Plan, *i.e.*, that confirmation is not likely to be followed by the liquidation or further financial reorganization of the Debtor.

15. Pursuant to the Plan, holders of the Debtor's 9.50% Senior Secured Notes due 2014 will receive 9.50% Senior Secured Notes due 2017 (the "*New Notes*") while holders of other Claims and Interests pass through unimpaired.  All Executory Contracts of the Debtor are

being assumed. As such, the Debtor will cure approximately $125 million of currently defaulted principal on the Notes, extend the final maturity of its Notes by approximately 2.5 years, and will capitalize approximately $32.9 million of past due interest. Furthermore, the Debtor will be provided with a flexible maturity structure for the New Notes, designed to respond to the Debtor's sales volumes and to the sales of certain significant assets such as the casino, spa, and penthouse units, the timing of which is inherently uncertain. As a result of the debt rescheduling of the New Notes, the average semiannual amortizations over the next three (3) years will be reduced by approximately $11.5 million, allowing the Debtor to maintain sufficient future cash flow to meet its ongoing operations.

16. Pursuant to the terms and conditions of the New Notes, the Debtor will also be provided with monthly working capital funding embedded in the Notes account structure, to provide the Debtor with access to working capital on a monthly basis. The monthly working capital funding will be sized based on conservative assumptions for the Debtor's operating budget, sales volumes and prices, and its sales product mix. The monthly working capital funding will also provide for carry-forwards, reserves and $5 million in contingency funds for certain contingencies such as tax, litigation, and post-unit closing expenses to allow the Debtor the flexibility to manage its working capital needs.

17. The Debtor's financial profile is critically important to the marketability and the premium pricing for its real estate products and to the availability of mortgage financing for purchasers of such products. Further, the Debtor's financial flexibility is critically important to implementing key revenue segments of its business plan. These revenue segments include unit sales, hotel unit and amenity operations, Isla Viveros Beach Club membership sales,

residential and commercial leasing, ocean deck concession revenues, casino revenue participation, and storage unit sales.

18. In connection with the implementation of the Debtor's business plan and to best position the Debtor's business for success following the chapter 11 reorganization, the Debtor restructured certain agreements with key stakeholders and contract counterparties to obtain concessionary terms and/or assumed such contracts at a discounted cure amount. These concessions are expected to have a significant positive impact, both direct and indirect, on the Debtor's revenue generation, operating expenses and on its liquidity profile. The Debtor obtained concessions from the Licensor, Hotel Manager, and PH Administrator (as described in the amended summary of the Plan Critical Agreements (<u>Exhibit T</u> to the Plan Supplement)) providing approximately $20 million in savings, a deferred payment plan on past due License Fee amounts, and a restructuring of the hotel units management fee structure to enhance profitability and hence marketability of the hotel units.

19. In addition, the Debtor obtained certain key contributions from equity-interest holders, including their personal undertaking to develop the Isla Viveros Beach Club, allowing the Debtor to generate approximately $13 million in membership sales revenues from Unit buyers, and their provision of a $5 million financial guaranty for the secured creditors. The Isla Viveros Beach Club is an amenity that further differentiates the luxury standards of the Trump Ocean Club and enhancing the marketability and pricing of the Debtor's real estate products. The Isla Viveros Beach Club also enhances the marketability and revenue generating capability of the Debtor's hotel unit inventory, an important objective of the Debtor's business plan.

20. In connection with the implementation of the Plan and to best position the Debtor's business for success following the chapter 11 reorganization, the Debtor intends to refinance the Bulk Sale No. 2 repurchase option (the "**Repurchase Option**"), as described in the Disclosure Statement and the Description of Notes annexed thereto as <u>Exhibit A</u>. The Bulk Sale No. 2 refinancing (the "**Bulk Refinancing**") will extend the Debtor's Repurchase Option for up to approximately two (2) years, substantially reduce its effective interest rate from approximately 20% per annum to approximately 10% per annum, and include substitution rights for the underlying portfolio of units (from time to time, the "**Bulk No. 3 Units**") required for the Bulk Refinancing so that the Debtor can continue to market the Bulk No. 3 Units. The Bulk Refinancing is permitted under the terms of the New Notes and is in the best interest of the Debtor, its estate and all parties in interest because it will preserve the Debtor's right to repurchase the Bulk No. 2 Units at substantially lower prices than current market levels. Such a repurchase of the Bulk No. 2 Units increases the Debtor's inventory of available commercial, bayloft, and other residential units, as well as the spa, and therefore enhances feasibility of the Plan.

21. Upon emergence from bankruptcy, the Debtor will have improved revenue generation capabilities, a lower expense structure, and an extended debt maturity structure, all of which should more closely align the Debtor's debt service schedule with expected cash flow generation. It is my opinion that the Debtor will be better positioned to market and sell its real estate products and services at prices that allow it to generate sufficient cash flow to meet its ongoing operations and debt service obligations upon emergence from chapter 11. The Debtor and I have analyzed its ability to meet its obligations under the Plan and I submit, based on the restructured terms of the New Notes, the Bulk Refinancing, the Debtor's Financial Projections,

and on my and the Debtor's assessment of the Debtor's business operations, that confirmation and consummation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Accordingly, I submit that the Plan is feasible and complies with what I understand are the standards of section 1129(a)(11) of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May 23, 2013

_____
Alfredo de Angelis
Managing Principal
Gapstone LLC